# Isaiah Andrews,

vs.

# City of Cleveland, et al.,

In the United States District Court
for the Northern District of Ohio
Eastern Division
Case No. 1:22-cv-00250

**Ronald Adrine**
Tuesday, December 6, 2022

Reporter Denise Cardona

Tackla & Associates
Court Reporting & Videotaping
www.tacklacourtreporting.com
216-241-3918 fax: 216-241-3935
1020 Ohio Savings Plaza
1801 East 9th Street
Cleveland, OH 44114

TABLE 8 LITIGATION SOLUTIONS
a member of:
www.table8litigationsolutions.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

ISAIAH ANDREWS, )
)
Plaintiff, )
) JUDGE JAMES S. GWIN
-vs- ) CASE NO. 1:22-CV-00250
)
CITY OF CLEVELAND, et al., )
)
Defendants. )
)

- - - -

Deposition of Ronald Adrine, taken as if upon examination before Denise Cardona, a Notary Public within and for the State of Ohio, at the offices of Roetzel & Andress, One Cleveland Center, 10th Floor, 1375 East 9th Street, Cleveland, Ohio, at 12:57 p.m. on Tuesday, December 6, 2022, pursuant to notice and/or stipulations of counsel.

- - - -

APPEARANCES:

On behalf of the Plaintiff:

Friedman, Gilbert + Gerhardstein
SARAH GELSOMINO, ESQ.
MARCUS SIDOTI, ESQ.
TERRY GILBERT, ESQ. (Via Zoom)
ELIZABETH BONHAM, ESQ. (Via Zoom)
50 Public Square, Suite 1900
Cleveland Ohio 44113
216-241-1430
Sarah@fggfirm.com
Marcus@fggfirm.com
Terry@fggfirm.com
Elizabeth@fggfirm.com

APPEARANCE CONT'D:

On behalf of the Defendant City of Cleveland:

J.R. RUSSELL, ESQ.
WILLIAM M. MENZALORA, ESQ.
MICHAEL ARNOLD, ESQ.
ELENA N. BOOP, ESQ (Via Zoom)
City of Cleveland, Department of Law
601 Lakeside Avenue, Room 106
Cleveland, Ohio 44114
216-664-2800
Jrussell2@clevelandohio.gov
Wmenzalora@city.cleveland.oh.us
Eboop@city.cleveland.oh.us

On behalf of Defendants:

STEPHEN FUNK, ESQ.
LAURYN ROBINSON, ESQ.
Roetzel & Andress
222 South Main Street
Suite 400
Akron, Ohio 44308
330-849-6602
Sfunk@ralaw.com

\- - -

INDEX

- - -


| EXAMINATION OF RONALD ADRINE: | PAGE/LINE |
|---|---|
| BY MR. FUNK: | 6/6, 132/11 |
| BY MS. GELSOMINO: | 105/24 |


- - -

EXHIBIT INDEX

- - -


| PLAINTIFF'S EXHIBIT | PAGE/LINE | DESCRIPTION |
|---|---|---|
| 1 | 6/24 | Subpoena |
| 2 | 9/2 | Affidavit |
| 3 | 14/11 | Indictment |
| 4 | 15/3 | Grand jury |
| 5 | 15/23 | Supplementary report |
| 6 | 16/25 | Supplementary report |
| 7 | 18/8 | Police report |
| 8 | 21/12 | Excerpt of transcript |
| 9 | 24/8 | Excerpt of transcript |
| 10 | 24/16 | Excerpt of transcript |
| 11 | 24/21 | Excerpt of transcript |
| 12 | 25/1 | Excerpt of transcript |
| 13 | 34/24 | Motion for Bill of Particulars |
| 14 | 34/24 | Bill of Particulars |

INDEX CONT'D:


| | | |
|---|---|---|
| 15 | 34/24 | Demand for Discovery |
| 16 | 36/17 | Excerpt of transcript |
| 17 | 45/8 | Declaration of Anthony T. Miranda |
| 18 | 46/18 | Case docket |


- - -

P-R-O-C-E-E-D-I-N-G-S

- - -

Ronald Adrine, of lawful age, being first duly sworn, testified upon his oath as follows:

EXAMINATION OF RONALD ADRINE

BY MR. FUNK:

**Q. Okay. Could you please give us your full name for the record.**

A. It's Ronald Bruce Adrine, last name is spelled, A-D-R-I-N-E.

**Q. Okay. Judge Adrine, I appreciate you being here today. My name is Stephen Funk. I'm an attorney at Roetzel & Andress. I've been retained by the City of Cleveland to represent the individual police officers who were named in a lawsuit filed by Isaiah Andrews that's pending in federal court.**

**And you and I have spoken by phone. I think I'd coordinated with you for the scheduling of this deposition.**

**And just to start off, I'm just going to mark for the record, this is a copy of the subpoena that I sent to you.**

**- - - -**

(Thereupon, Defendant's Exhibit 1 was marked for purposes of identification.)

\- - - -

**Q. You know, I know I sent you a subpoena, but basically, you are here voluntarily. We appreciate you being here today. I know you've sat through a lot of trials and hearings and things, but probably haven't had your deposition taken before, I would imagine?**

A. I'm trying to remember what I had. Maybe once.

**Q. Yeah.**

A. Maybe once.

**Q. I've been practicing law for 30 years. I don't think I have ever had my deposition taken. I've always taken them.**

**But in any event, we do have with us today -- we should probably just introduce us, for the record.**

MR. FUNK: Why don't we go around the table and everybody...

MR. RUSSEL: Morning, Judge. I'm J.R. Russel. I'm an attorney for the City of Cleveland.

MR. MENZALORA: Morning, Judge. I'm Bill Menzalora, Chief Assistant Director of Law.

MR. ARNOLD: Michael Arnold, attorney for the City of Cleveland.

MS. ROBINSON: Good morning, your Honor, Lauryn Robinson. I work at Roetzel & Andress.

MR. SIDOTI: Marcus Sidoti, on behalf of

Mr. Andrews.

MS. GELSOMINO: I'm Sarah Gelsomino, also on behalf of Mr. Andrews.

And by Zoom, two other members of the Plaintiff's team are here, Terry Gilbert and Elizabeth Bonham.

MR. FUNK: Also by Zoom is Elena Boop, who is with the City of Cleveland Law Department.

BY MR. FUNK:

**Q. Okay. So, yeah. So basically, I think I'm going to try to move through this as quickly as possible. I think the main thing is just you may know where I'm going with the question, just wait for me to get it out --**

A. Yeah. I'll try to be a good witness.

**Q. And I'll try not to cut you off when you are in the middle of your answer.**

A. Okay.

**Q. If you need to take a break, let us know. I have sort of introduced where the restrooms are. We have water here if you need it. And hopefully we can get through this as quickly as possibly.**

**So the primary reason we want to take your deposition is you submitted an affidavit. And I'm going to mark that as Exhibit 2.**

\- - - -

(Thereupon, Defendant's Exhibit 2 was marked for purposes of identification.)

\- - - -

**Q. It's a two page affidavit. If you could just verify that that's your signature on the second page?**

A. It is.

**Q. And it was signed on July 7, 2021?**

A. That's right.

**Q. Okay. And I kind of just want to walk through the affidavit. So first off, you give a little bit of your background. You've been a licensed attorney since November 3, 1973. So you would have taken the bar exam in 1973?**

A. Right. In July of 1973.

**Q. And that's when you would've graduated from law school?**

A. Yes.

**Q. Where did you go to law school?**

A. Cleveland State University.

**Q. Okay. And then what did you do after graduating from law school, is that when you started at the Prosecutor's Office or did you have a job before that?**

A. I was working for Ohio Bell Telephone Company and going to law school at night. And stayed with the

telephone company until 1974, when I started working as an assistant county prosecuting attorney for Cuyahoga County in the criminal division.

**Q. So was that like -- you know, do you remember when in 1974?**

A. It would have been in the middle of the year. I want to say June or July.

**Q. Okay. And at that time, how many, would you say, attorneys were in the criminal division of the prosecutor's office, Cuyahoga County Prosecutor's Office?**

A. Probably fewer than 100.

**Q. Okay.**

A. I'm just not sure.

**Q. That's still a lot.**

A. Yeah. It was probably the second or the third largest legal organization in the city at the time, something like that.

**Q. Okay. So and then I think you indicated that, as an assistant county prosecutor's attorney, you were co-trial counsel with the Assistant Prosecuting Attorney Charles Laurie, with the State of Ohio, versus Isaiah Andrews, CR17902, before Judge Francis Sweeney.**

**Do you recall that?**

A. Yes.

**Q. Okay.**

A. Vaguely.

**Q. Yeah. That would be about -- we're here in 2022. So almost 50 years ago.**

A. Darn near.

**Q. Yeah. So March 1975, would that have been your first criminal trial?**

A. No.

**Q. I mean, yeah. You would have done other criminal trials. How many trials would you say you would have done before March 1975 with the prosecutor's office?**

A. It's hard for me to know. I imagine -- we were trying cases pretty much back to back from the time I got there. I started in the juvenile division -- actually, I started in Preliminary Hearing Room, over on East 21st Street, originally. And then a week after I started there, I went over to the juvenile division and started trying lawsuits immediately over there. And I moved from there into the regular rotation. This is before really they had major trial section in the Prosecuting Attorney's Office.

So basically, we rotated by room. So there would be, like, three prosecutors who were assigned to two rooms. So at any given point in time, there would be somebody in trial, somebody in trial in the other room,

and somebody preparing for trial. And that's the way we did our rotation.

**Q. Yeah. So how did you become involved with the Isaiah Andrews case? How did that assignment come to you?**

A. You know, I really don't remember.

**Q. Yeah.**

A. I don't think it was anything particular, except for the fact that, given the fact that it was a significant case that -- and me being a younger lawyer, that I think that that's how Charlie got assigned to it and I was assigned second chair. Because I was still pretty much learning the trade at that time.

**Q. So yeah. So Charlie -- Charles Laurie would have been a senior prosecutor at that time?**

A. Yes.

**Q. How many -- do you have a sense for how old he would have been around that time, in 1975?**

A. I would think that he would've been either in his late 50s or maybe early 60s. He'd been with the office for a while.

**Q. Right. And so when it came to a murder trial, the prosecutor would pick -- it wouldn't necessarily be the person that was in that particular courtroom?**

A. Rotation, yeah.

**Q. It wouldn't be that, it would somebody specifically assigned to that trial?**

A. Yeah. And kind of depended again to who was in the rotation.

**Q. Yeah. Who was available.**

A. If there was a more senior person in the rotation, that person would get the assignment to handle a case.

**Q. At that time, were you assigned to the rotation for Judge Sweeney?**

A. My recollection is yes.

**Q. Okay. And so would it have been Charles Laurie who asked to you to be his second chair or did you --**

A. I don't even remember how it came to pass.

**Q. Yeah. Do you have a sense for how much time before March 3rd -- it says here, in paragraph 4, that the trial started on March 3, 1975.**

**Do you have a sense for how much prior to that you would have been first involved with the case?**

A. I wish I could help you out with this.

**Q. Yeah.**

A. But so much time has passed. My recollection is that this was one of the first cases that I handled that had to do with a homicide.

**Q. Okay.**

A. That's my recollection. I can't remember whether I had handled one or two or whether there was the absolute first one. I just know it was one of the first.

**Q. And had you ever worked with Charles Laurie before this trial?**

A. I don't remember, again.

**Q. Yeah. Okay. I've got a couple of documents from the case file I just wanted to get on the record.**

\- - - -

(Thereupon, Defendant's Exhibit 3 was marked for purposes of identification.)

\- - - -

**Q. Handing you what's been marked as Exhibit 3, this is a copy of the indictment, and it's dated January 21, 1975.**

**Would you have had any involvement in the grand jury proceedings?**

A. No.

**Q. Do you know who would have done the grand jury proceedings?**

A. No. There were some prosecutors in the office whose primary responsibility in the office was grand jury presentations. So they would crank them out and we would deal with them.

Q. Right. Okay.

\- - - -

(Thereupon, Defendant's Exhibit 4 was marked for purposes of identification.)

\- - - -

Q. Handing you what's been marked as Exhibit 4. Would you recognize the format of this document or the form?

A. No.

Q. Okay. On this, it talked about that this case had been presented to the grand jury on -- it's actually got two dates there on the bottom.

You see the box, where it says, "Date presented to the grand jury"?

A. Yes.

Q. 10/29/74 and then 1/15/75?

A. Right.

Q. Do you recall that a case went to the grand jury originally in October of '74?

A. Truthfully, I don't know.

Q. You don't remember, okay.

\- - - -

(Thereupon, Defendant's Exhibit 5 was marked for purposes of identification.)

\- - - -

**Q. I'm showing you a police report dated December 17, 1974. It talks about, in here, the case was nolled at this time, due to the fact the witnesses for the prosecution failed to show up for the hearing. And that the prosecutor at that time was Joe Gibson.**

**Do you know Joe Gibson?**

A. Yes.

**Q. Okay. Would he be, at that time, would he have been somebody that was handling grand jury proceeding?**

A. Again, you know, it's just the passage of time. I had occasion to deal with Joe as a room prosecutor at some point.

**Q. Later?**

A. Yeah. But I don't know whether or not his assignment at this particular point in time would've taken him to the grand jury.

**Q. Okay. Do you recall that there -- that there were two grand jury proceedings for this?**

A. I don't really recall --

**Q. One way or the other?**

A. Yeah. From my recollection, all I remember was dealing with the case when it came to us.

**Q. Okay. Let me ask you about this one.**

\- - - -

(Thereupon, Defendant's Exhibit 6 was marked

for purposes of identification.)

- - - -

Q. I'm going to hand you another document marked as Exhibit 6. It indicates -- this is a report and the date of the report is December 31, 1974.

And if you see here, it talks about, at this time -- if you look at the second paragraph, I'm not going to read the whole thing. But you can feel free to read it all just to give you context.

It looks like after the indictment was nolled in October of 1974, that it was then assigned to a Mr. Miller.

A. Um-hmm.

Q. Would you know who Mr. Miller would be in the prosecutor's office?

A. I don't remember.

Q. Yeah. And they also requested -- "We also request that the addresses and phone numbers not be given to anyone of these witnesses, due to the fact that they may be contacted and scared off again before the trial."

Do you recall there being a concern about potential threats against Betty Worthy and Linda Cloud about testifying at the criminal trial?

A. I don't remember any threats. And I'm not -- not

really clear that -- what our concern was at the time. I'm not necessarily saying that there weren't --

**Q. You just don't recall one way or the other?**

A. I don't recall.

**Q. Okay. All right. Okay. I'm going to go ahead and mark this, too.**

\- - - -

(Thereupon, Defendant's Exhibit 7 was marked for purposes of identification.)

\- - - -

**Q. Handing you another report marked as Exhibit 7. This is from December 28, 1974. And it talks about --**

MS. GELSOMINO: Steve, for the record, because these aren't Bates stamped, can you describe what these exhibits are, please?

Because otherwise we are going to be recreating this as to what they are.

MR. FUNK: It's a police report dated December 28, 1974. I think I did state that.

I'm mainly using it to see if it recalls his recollection about -- it talks about that they learned a witness, Betty, in the second paragraph, that she was concerned about -- that she was not -- "she had been hiding from us because of her fear, but now she's willing to testify, and this case will be brought back

in front of a grand jury."

**Q. Does that refresh your recollection at all about whether there were any concern about threats of Betty Worthy as a witness?**

A. I think not say definitely.

**Q. Okay.**

A. You know.

**Q. All right.**

A. Yeah. 50 years is a long time.

**Q. Yeah. That's okay. If you don't remember, that's fine. I just wanted to see if you knew anything about it.**

**Okay. So in general, the -- I guess, presumably, when a matter is -- did you ever present cases to the grand jury, yourself? Were you involved in the rotation?**

A. The only cases I ever presented to the grand jury was right at the end of my tenure, just before I was getting ready to leave, there was a case that involved a young lady who had been snatched off the street and raped by three gentlemen. And I presented it because I knew the most about it, and actually, prosecutor brought me back to try it. But that's the only one I presented to a grand jury.

**Q. So in general, when you were -- back in 1975, '74**

**timeframe we are talking about here. When you were assigned to a case to try --**

A. Um-hmm.

**Q. -- there would already have been a file formed from the grand jury proceedings --**

A. Um-hmm.

**Q. -- right? Is that right?**

A. Yes.

**Q. So there would already be something you would be given when you were starting to handle it, that would essentially would have been compiled during the grand jury?**

A. Yeah. Compiled -- again, it's hard to remember exactly how these things came together. But when you came into the room that you were assigned to, there was a drawer in the prosecutor's office that had all of the upcoming cases. And those cases would have the materials that were germane to each one of the defendants that you had to deal with. So the materials that you had to work with were contained in those files.

**Q. Right. So there would basically be a file for that case?**

A. Right.

**Q. That was already in existence that you would pick up from. And that would be your source to get going or**

your start?

A. Yeah. That would be your jump off point.

Q. Right. Okay. So we do have the transcript from the trial, not expecting you to remember everything that happened in 1975. But there's a couple things I just want to confirm with you.

A. Okay.

Q. All right. So this is just the cover pages, 1 through 4 of the trial, kind of got the index of witnesses.

- - - -

(Thereupon, Defendant's Exhibit 8 was marked for purposes of identification.)

- - - -

Q. We marked that as Exhibit 8. This is the first four cover pages of the trial transcript.

On the front page it's got Charles Laurie and yourself listed as the prosecuting attorneys.

Do you recall any other prosecuting attorneys being involved with the case, besides the two of you?

A. No.

Q. Okay. And then on behalf of the defendant, Williams Summers and John Hyland.

Do you know those two gentlemen?

A. Yes.

**Q. And they're both passed away; is that correct?**
A. That's my understanding.
**Q. Yeah. And were they both public defenders at that time?**
A. No.
**Q. They were not? Okay. And then on page 2 --**
A. I think they were both, you know, assigned by the Court. They weren't public defenders, but they were assigned counsel.
**Q. Okay. Assigned counsel because the defendant would not be able to afford his own counsel?**
A. Right.
**Q. Okay. And the second page is the list of the people who testified at the trial?**
A. (Indicating.)
**Q. Is that refreshing your recollection?**
A. I'm going to take your word for it.
**Q. You would rely on the transcript? You don't have any independent memory --**
A. I don't have any independent --
**Q. All right. And then the next page is the exhibits that were marked and received during the trial.**
**Do you have any independent recollection of that?**
A. None, whatsoever.
**Q. Okay. All right.**

A. I take that back. The only thing that I have any recollection about really is the bedding.

**Q. Um-hmm.**

A. And the pillow case.

**Q. Which were physical exhibits?**

A. Physical exhibits. And I think the peignoir and the nightgown. And that's only because the of the fact that I saw those things at the coroner's office. And it was really the first time that I had come into contact with materials that still had the stench of death on it. And that smell has remained with me. That, I remember strongly, after 48 years.

**Q. Yeah. I can imagine. You are saying you remember it, when you came in contact with it, it was around the time of the trial?**

A. Right.

**Q. Or shortly before?**

A. Shortly before the trial.

**Q. Right. Okay. So I think you indicated that Charles Laurie was the lead counsel, based upon -- I'm not going to go through the entire transcript. But I believe he would have handled opening statements and he also handled the direct examination of Betty Worthy and Detective William Hubbard.**

**Does that recollect with your memory?**

A. That sounds right.

**Q. And I think you handled the direct examination of Linda Cloud; do you remember that?**

A. No. But I'll take your word for it.

**Q. Okay. I do have -- let me just mark these for the record. These are just portions of the transcript.**

\- - - -

(Thereupon, Defendant's Exhibit 9 was marked for purposes of identification.)

\- - - -

**Q. This is portions of the transcript that show the direct examination of Betty Worthy.**

MR. FUNK: Let's go ahead and mark this, too.

\- - - -

(Thereupon, Defendant's Exhibit 10 was marked for purposes of identification.)

\- - - -

MR. FUNK: And 11.

\- - - -

(Thereupon, Defendant's Exhibit 11 was marked for purposes of identification.)

\- - - -

MR. FUNK: And then this is 12.

\- - - -

(Thereupon, Defendant's Exhibit 12 was marked for purposes of identification.)

- - - -

Q. So just for the record, we'll go through them.
A. Okay.
Q. So Exhibit 9 is the excerpt of the -- I'm just going to look with you -- the direct examination of Betty Worthy, conducted by Mr. Laurie.
A. Okay.
Q. Okay? And number 10 --
A. Right.
Q. -- is the direct examination of Linda Cloud. And that indicates it was done by you.
A. Okay.
Q. Do you see that?
A. Yes.
Q. Okay. And you don't remember it, of course?
A. (Indicating.)
Q. Okay. All you would have is the transcript?
A. Right.
Q. Yeah. And then Exhibit 11 is a cross examination of Linda Cloud.
And then Exhibit 12 is the cross examination of Betty Worthy.
A. Okay.

Q. So what's interesting about that is, it looked like they both did their directs back to back, and then the cross examination occurred after that. Was that a typical --
A. No.
Q. Yeah. Do you recall -- and now, one thing I was going to ask you is, if you look at the cross examinations, Exhibits 11 and 12.
So if you see there, Exhibit -- right before the cross examination of Linda Cloud, it's marked as Exhibit --
A. C?
Q. C, right. And if you look at the index, which I previously had marked, Exhibit C is the written statement of Linda Cloud.
A. Okay.
Q. And then if you look at the cross examination of Betty Worthy -- let me see if I can find it.
A. Okay.
Q. It's on the second page. Exhibit D is the written statement of Betty Worthy.
A. Okay.
Q. So do you recall the way it worked back in 1974, in terms of when that written statement would be produced to the defense?

MR. SIDOTI: Can you say that question again? I'm sorry.

**Q. The written statements of Linda Cloud and Betty Worthy were introduced as exhibits at the trial.**

A. Um-hmm.

**Q. And do you recall that the practice in 1975 was that those statements would be reviewed by the judge in camera and then if it seemed to be in conflict with their testimony in any matter, it would be produced to the defendant?**

A. Oh, gees.

**Q. If you don't remember, that's fine.**

A. I'm unclear as to whether or not that was the way we handled it or not. Seems to me that if there was some question about it, we would have had an in-camera inspection. But I can't tell you for sure that's what we did.

**Q. Okay. Would you have been involved in handling the discovery, criminal discovery part of the case with opposing counsel?**

MS. GELSOMINO: Objection. You mean specifically in this case?

MR. FUNK: Yeah.

MS. GELSOMINO: Objection to form.

A. I'm sure that it's in some way or some manner

that I would have. I don't remember specifically as it relates to this case.

**Q. Okay.**

A. Because I don't remember a whole lot about this case.

**Q. Right. I understand. So you don't recall, sitting here today, when the statements of Betty Worthy and Linda Cloud would have been provided to defense counsel?**

MS. GELSOMINO: Objection to form.

They were never provided.

MR. FUNK: They were introduced at the trial.

And I would object to you answering the questions that I ask.

A. My recollection is unclear. Just on general -- generally, the way that things were done, I'm fairly certain that -- no. I can't even say that.

I started to say that they probably would have made it available ahead of time, but I'm not sure.

**Q. Okay. Do you recall that witness statements would generally be handled by the Criminal Statement Unit of the City of Cleveland Police Department?**

A. Yes.

**Q. So essentially, a witness would come to the**

**Statement Unit, and independent detective, who's not involved in the homicide investigation, would actually type up the person's statement?**

A. Now that, I'm unclear of, too. Because, you know, seems to me, my recollection is that somebody would come to the Witness Unit. But whether or not it was an independent detective who took the statement or whether the detective who was involved in the case, you know, was involved in the examination of the witness, is unclear to me.

**Q. Okay. And so there would be -- a witness statement would be essentially a typed up statement --**

A. Right.

**Q. -- that would have question, answer --**

A. Right.

**Q. -- question, answer, and then the witness would sign at the bottom, generally?**

A. Right.

**Q. And --**

A. And that's really why I'm unclear. It seems to me that there would be somebody who was, you know, memorializing the statement. But the person who was asking the questions didn't necessarily have to be the person memorializing the statement.

**Q. Right. And when you -- and then when you would**

**get a file to handle for the prosecution, that witness statement would essentially be your information you would use to understand what that witness was going to say?**

A. That's exactly right.

**Q. And then you would generally almost kind of repeat the questions and answer in the statement to try to make sure it was consistent; would that be fair to say?**

A. You would review the witness statement with the witness to make sure you fully understood what they were trying to say. And depending how the questions were asked and how effective you thought that those questions have been posed, you know, you could repose the questions in a way that might be more effective from your point of view.

**Q. Right. And it was also possible that you might expand on it, to ask additional questions that aren't in the statement?**

A. Right. Or you might subtract some things that you thought were irrelevant from the statement, you know, as far as what you were going to do when you actually did the examination in open court.

**Q. So with respect to this trial, would it have been the situation where you would have prepared the**

**witnesses that you handled for direct examination?**

A. Yes.

**Q. And same thing with -- Laurie would handle the one that he did for direct examination?**

A. Exactly.

**Q. And would there be instances where you wouldn't prepare the witness at all, the witness would come in and you would do it cold?**

A. That would be legal malpractice. No. I can't imagine -- I can't imagine any situation where I wouldn't want to know exactly what that person was going to say before I put them on a witness stand.

**Q. Okay. Would it always be the case that -- so for example, with Linda Cloud and Betty Worthy, there are written statements that were introduced as exhibits at the trial. You would have that.**

**Would there have been instances where you had a witness that you had to prepare to testify where there wasn't a witness statement?**

A. (Indicating.) But not usually in a homicide case.

**Q. Right.**

A. If you are talking about something lesser, where the stakes were not as high, then there's a possibility that you might have a situation where there was no

witness statement, per se.

**Q. Okay. So I asked you whether or not you were involved in doing criminal discovery for this case and you did not recall. Just in general, back in 1975, in that timeframe, how was written discovery or how was criminal discovery generally handled?**

A. You know, it varied from prosecutor to prosecutor. You know, there was some who were a lot more open with discovery than others. I tended to be one of those that was more open with discovery. Because I figured, we either had you or we didn't. And if there was something that you needed to see, as a defense attorney, that was going to be beneficial, I would make it available.

**Q. I was not practicing law back then, so I don't have any understanding. But what I've heard, and I don't know, but I'm just saying -- just asking for you to see whether it was true or not, that the way that it would generally work was the prosecutor would convey things orally. So there would be sort of a face-to-face meeting with the criminal defense attorney. And they would just go through and say, "Well, we have evidence of this," and, "This witness is going to say this."**

**And it would all be done orally. But they wouldn't actually give them physical copies of reports**

**or things like that?**

MS. GELSOMINO: Objection.

A. They wouldn't give them copies, but --

**Q. I'm sorry. Say that again?**

A. They would not give the defense copies, that is, for them to keep.

**Q. Right.**

A. But there were lots of occasions when we gave them copies of what we had for them to look at.

**Q. You would physically show them?**

A. Physically show them.

**Q. Okay.**

A. It was not the office policy to give copies of things.

And there were a number of prosecutors who would not move past an oral recitation of what was in the file.

**Q. Do you know how Charles Laurie handled it?**

MS. GELSOMINO: Objection.

A. I can't recall.

**Q. Okay. You don't know whether -- so in this particular case, if Charles Laurie had done an oral criminal discovery reveal with the opposing counsel, it's possible that that could have been done independent of you?**

MS. GELSOMINO: Objection.

A. I can only speculate. I can't really say.

**Q. Right.**

A. Because I don't remember, you know, how we handled it and how the defense interacted with me and with, you know, Charles.

**Q. Right. Right. So you really can't say one way or the other. It could have been any one of these possibilities, he did it independent of you, you guys did it together, or you did it independent of him?**

MS. GELSOMINO: Objection.

A. I doubt seriously that I did it independent of him, because I was junior.

**Q. Okay. So it was likely that he did it on his own or you were there watching him do it?**

MS. GELSOMINO: Objection.

A. It's possible.

**Q. But you would have to speculate because you don't know one way or the other?**

A. Right.

MS. GELSOMINO: Objection.

**Q. Okay.**

\- - - -

(Thereupon, Defendant's Exhibits 13, 14, and 15 were marked for purposes of

identification.)

\- - - -

**Q. Handing you Exhibit 13. This is a Motion for Bill of Particulars in the Andrews case.**

**And then Exhibit 14 is the response to that, the Bill of Particulars itself.**

**And then Exhibit 15 is the Demand For Discovery.**

MR. RUSSEL: I had 14 was Demand For Discovery.

MS. GELSOMINO: So did I.

MR. FUNK: No. 14 is the Bill of Particulars.

MS. GELSOMINO: Start from the top then and explain what 13 on is.

MR. FUNK: So 13 is the Motion For Bill of Particulars.

14 is Bill of Particulars.

And 15 is Demand for Discovery.

MS. GELSOMINO: I have the Bill of Particulars, Exhibit 14, yeah.

MR. RUSSEL: And 13 is the Motion.

MS. GELSOMINO: Yeah. Thank you.

**Q. So do you recall these documents at all?**

A. No.

**Q. Okay. And if you look at the Bill of**

Particulars, it's signed by Charles Laurie.
You know, is this somebody that he would have prepared?
A. Yes.
Q. And the Demand For Discovery, he also prepared that?
A. I don't remember.
Q. Was this a standard form that was in the prosecutor's office?
A. Yes. Standard form.
Q. And that's something that would be served on the defense?
A. Yeah. It's got his signature at the bottom, so I would take it for granted that he issued that.
Q. Okay.

- - - -

(Thereupon, Defendant's Exhibit 16 was marked for purposes of identification.)

- - - -

Q. I'm going to hand you Exhibit 16. This is a copy of the transcript at the beginning of the trial, prior to any testimony. It starts on page 1 and goes to page 23. And there's a couple things here I wanted to ask you about.
MS. GELSOMINO: Wait. Goes through --

MR. FUNK: Starts on page one and goes through page 23.

MS. GELSOMINO: Which page numbers, the top ones.

MR. FUNK: Top, right-hand corner, yeah.

MS. GELSOMINO: Okay.

**Q. Okay. If you look on page 13, I'm not going to go through the whole discussion, but page 13 shows the Court's ruling.**

**There had been a motion production of names and addresses of the witnesses. The prosecutor had identified witnesses, but withheld two of the names because of concerns about threats to their -- to them.**

**Does that refresh your recollection at all?**

MS. GELSOMINO: Objection.

A. I have a vague recollection of this hearing.

**Q. Okay.**

A. Just that it took place.

**Q. And the Court basically grant the motions of the prosecuting attorney, that the address of the witness not be publicized when they are called to testify, but their names, of course, will be given.**

**Do you see that?**

A. Right.

**Q. Okay. And do you recall that those witnesses**

were Betty Worthy and Linda Cloud?
A. Yes.
Q. Okay. All right. And then go to page 15.
A. Uh-huh.
Q. I'm sorry, 16.
A. Okay.
Q. At top of page 16, there's a statement made by Mr. Laurie. And this is on the fourth line of his statement, where he says, "Now in addition to that -- when he's talking about that, he's referring to the Bill of Particulars.
He said, "I did give you, orally, this morning, before we went on the record, all the witnesses, everything that I recall, the oral statements and a written statement of the defendant."
Do you see that?
A. Yes.
Q. Okay. Do you recall that, being present when that --
A. No. Sorry.
MS. GELSOMINO: Objection.
Q. First of all, do you recall that occurring?
A. No.
Q. Do you recall whether or not you were present when that was --

A. I'm taking it for granted that I was present.

Q. Okay. But you don't recall it?

A. I don't recall it.

Q. Okay. And then, down at the bottom, the Court confirms, "Let the record also show that there was lengthy discussions between counsel for the state and counsel for the defense prior to going on the record about many other facets of the evidence they have in their file and intend to produce at the time of trial concerning not only oral and written statements, but other evidentiary facts presented to the defense."

And you don't recall what was actually said to opposing counsel?

A. No.

Q. Okay. Let's go back to your affidavit there. I'm glad you set that aside. All right. So if you look at the next paragraph, where we left off. It's paragraph 6.

A. Um-hmm.

Q. It indicates that, "During the last 12 months, I was contacted by Attorney Marcus Sidoti, that brought to my attention the existence of evidence that suggested the possibility of an alternate suspect in the case, one Willie Watts, along with additional information linked to the observation of several of the witnesses and their

**statements regarding the investigation."**
**Do you see that?**
A. Um-hmm.
**Q. So you said during the last 12 months. So that would have started -- this is signed July 2021. So that would have been -- this conversation started July of 2020?**
A. That sound about right.
**Q. Okay. And was it only with Mr. Sidoti or were there other attorneys for Isaiah Andrews that you also would have talked to?**
A. No. Mr. Sidoti is the only person I had conversation with.
**Q. Do you have a sense of how many times you would have spoken?**
A. Couple.
**Q. All by phone or in person?**
A. By phone.
**Q. Did you speak with Brian Howe, with the Ohio Innocence Project?**
A. I did.
**Q. Do you recall when you would have spoken with him?**
A. After I talked to Mr. Sidoti, so -- but as far as exactly what time, I'm not sure.

**Q. Any other attorneys at Friedman & Gilbert?**
A. I can't recall.
**Q. Okay. Would you -- have at this time during the post conviction proceedings in the criminal case, the county was represented by Anthony Miranda, as one of the attorneys.**
**Would have had any conversations with Anthony Miranda?**
A. I think I did.
**Q. Okay. Do you recall what you guys discussed?**
A. I think I was telling him, basically, what I was telling you when we first talked, that my -- the totality of my recollection about any of these circumstances is minimal. And all I can do is just talk about what would have been, you know, my usually way of proceeding with things.
**Q. Okay.**
A. So I could give you generalities, but I can't give you specifics as it relates to this case.
**Q. Right. Okay. Do you recall telling him that Charles Laurie handled the discovery in that case?**
A. I might have, depending on how he posed the question. Because, like I said, looking at the documentation, it appears that majority of that might have been handled by Charlie.

Q. Okay. And then in paragraph 7, you indicated that you have now reviewed, and you list four things. I'm not going to read it all. But do you see it there?
A. Yes.
Q. Okay. The first thing is, the police investigation file, including information regarding Willie Watts.
Do you see that?
A. Right.
Q. Additional statements of Linda Cloud and Betty Worthy?
A. Right.
Q. The coroner's file, which included supplemental information related to the Willie Watts investigation?
A. Right.
Q. And the last one is the Willie Watts Cleveland Police Arrest File?
A. Right.
Q. Okay. Of those -- were those four items shown to you by Mr. Sidoti?
A. Yes.
Q. Do you have the ability to actually be able to identify what those items were?
MS. GELSOMINO: Objection.
Q. Like, did you keep a copy of it or --

A. No.
Q. Okay. So when you said you looked at the homicide file, it's what Mr. Sidoti told you was the Homicide file -- not the homicide file, the investigation file.
A. Yes.
Q. And so you don't know whether or not it was the complete investigation file or not?
A. Right. I have no idea.
Q. Okay. And when we talk about additional statements of Linda Cloud and Betty Worthy, were those statements that were recorded in police reports?
A. That's my recollection.
Q. Okay.
A. Um-hmm.
Q. And of these four things. What was not listed was the prosecutor's file. Would you have had occasion to review the prosecutor's file since your trial in 1975?
A. No.
MS. GELSOMINO: Objection.
Q. Okay. So since 1975, did you ever -- did you ask Mr. Miranda if you could review what was in the prosecutor file?
A. No.

**Q. And in general, the prosecutor -- back in the 70s, there would be a physical file that existed, right?**

A. Yes.

**Q. And sometimes it would be more than one file folder?**

A. Depending on the volume of the information, yes.

**Q. Was there, like, a particular jacket that was used?**

A. There was a jacket that had the case number on it and the name of the defendant on the front of the jacket. And also told you when the case was indicted, as I recall. Who it was assigned to currently, as far as -- I should say when it was indicted, when it was arraigned, who the judge it was currently assigned to was. And then prosecutor's notes would be on the outside.

**Q. Okay. Hold on a second.**

**So we have obtained from the prosecutor's office -- and I actually have this on a jump drive. It's the same document that we have produced previously. But I've got hard copies here. But I was going to give the jump drive to the court reporter so she doesn't have to scan it all because it's already been scanned.**

MS. GELSOMINO: What do you purport this to be?

MR. FUNK: I'm not purporting this to be anything. This was the prosecution file that was produced to us by Anthony Miranda.

MS. GELSOMINO: When?

MR. FUNK: It's marked on the affidavit, which I had also given to you.

\- - - -

(Thereupon, Plaintiff's Exhibit 17 was marked for purposes of identification.)

\- - - -

MS. GELSOMINO: I want to be clear for the record, this is the prosecutor's file that was produced recently and is not the prosecutor's file that was produced in 1973[sic]. This does not necessarily -- this document is not the prosecutor's file from 1974. It is what they are now claiming, currently.

MR. FUNK: No. I'm not claiming that. I'm claiming what the declaration says the document is. So I'm about ready to show the witness that.

**Q. So before we get into this, do you mind if we take a quick break?**

A. Oh, that's okay with me.

\- - - -

(Off the record.)

\- - - -

BY MR. FUNK:

Q. This is Exhibit 17, is a Declaration of Anthony T. Miranda, and it sets forth what this document is.

It's essentially what he's identifying as being the prosecutor's archive file that he uploaded -- located and uploaded in April -- on April 11, 2018.

So in other words, it says in there, the file that had been kept and maintained by the prosecutor's office had been previously scanned and electronically stored some time prior to 2018. And then he located that and uploaded it in the Justice Matter Database on April 11, 2018.

So essentially, this is the what the Prosecutor's Office had as being the historic file as it existed prior to 2018. And the reason 2018 was chosen as the date was -- and I'll mark this as Exhibit 18.

\- - - -

(Thereupon, Plaintiff's Exhibit 18 was marked for purposes of identification.)

\- - - -

Q. This is Exhibit 18, it's a copy of the case docket for the criminal matter. And if you look back, you have -- if you go back to the last page, you have -- the docket shows the original proceeding of 1975. And then there were post-conviction proceedings in 1978 and

then there were additional post-conviction proceedings in 1994 and 1997, showed on page 9 of 10. And then the last thing here is between 1999. There was nothing until 2018, when Brian Howe entered an appearance and filed a motion for DNA testing application for DNA testing. That's why that's the relevant date. We were just trying to identify, when did the file exist before these additional post-conviction proceedings occurred.

So if you could take the rubber band off and just -- there's a couple items in there I want to ask you about.

So start with page 4. And if you just want to do a reverse pile, that will make it easier.

Okay. So page 4, do you recognize what this being sort of a copy of sort of the outside jacket?

A. Case file, yeah.

Q. And this is how you recall it looked?

A. Yep.

Q. And so the this would be a prosecutor file jacket?

A. Yes.

Q. Okay. And do you recognize any of your own handwriting on this document at all?

A. Yeah. There was a notation that I returned evidence to the property room on March the 12th, 1975.

**Q. Yeah. I see. That's got your initials there?**

A. Got my initials on it.

**Q. And what about any -- do you recognize Charles Laurie's handwriting on any of this?**

A. I would be guessing, you know.

**Q. Okay. All right. And yours has your initials behind it?**

A. Right. Um-hmm.

**Q. And then if you look on the right-hand side, there's a list of typed up list. This is the typed up list of the names of witnesses?**

A. Yeah. That's right.

**Q. There's a note there on the right-hand side, dated 12/31/74, "Witnesses' addresses not to be given under any circumstances, JTC."**

A. Right.

**Q. That's John T. Corrigan?**

A. Right.

**Q. Okay. And then the handwritten note on the right-hand side is Sweeney, that's the judge?**

A. Right.

**Q. Okay. Okay. Turning then to the next page, 5 -- they're all Bates stamped on the top right-hand corner, that's the page number I'm going to refer to.**

**Top pages 5 through 9 is a report from the United**

**States Penitentiary, Marion, Illinois?**
**Do you see that?**
A. Right.
**Q. And --**
MS. GELSOMINO: What --
MR. FUNK: I'm referring to pages 5 through 9.
**Q. You recall that Isaiah Andrews has been previously incarcerated in a U.S. Penitentiary in Marion, Illinois?**
**You don't recall?**
A. I don't recall.
**Q. Yeah. That's fine.**
A. It seems to me that I recall he had a record. What it was a record for, where he had been previously incarcerated, all that escapes me.
**Q. Do you recall he had been diagnosed with schizo-personality pattern?**
A. No. I don't recall that.
**Q. All right. Based upon Mr. Miranda's declaration, these documents were scanned in. So these were all originals. These were the scanned copies. Sometimes they didn't scan as well.**
**Do you recall that there was a hearing on whether or not, prior to trial, as to whether or not Isaiah**

**Andrews could stand trial on competency grounds?**

A. I don't recall.

**Q. Mental health grounds?**

A. No. I don't recall.

**Q. All right. Turn to page 22. There's a couple of pages here that are too difficult to read because the way they were scanned. Precipe Criminal Case.**

**Would this be -- do you recall what this kind of document would be?**

A. It was witnesses.

**Q. So the clerk that issues subpoenas for them?**

A. Right.

**Q. And this would be a form that was used back in the 1970s?**

A. Yes.

**Q. All right. I'm going to skip ahead. Pages 30 through 37 are all supplemental reports. Do you recognize this as being the form of police reports used by the City of Cleveland?**

**I'm looking at 30 through 37, sorry.**

A. I mean, this looks like a supplemental report. Obviously, this one was one of those that didn't scan really well.

**Q. Right. But do you recognize the form?**

A. But the form, that's the form.

**Q. Now when generally you would see a form like this in the file, would there be -- would you be looking at carbon copies sometimes? In other words, when these forms were used in the 1970s, there would be typed on a form in which there would be multiple copies, like a pink sheet, a blue sheet. Do you recall any of that?**

A. I don't remember what the format was. All I know is the things that we got were legible. So it wasn't like this, you know.

**Q. Okay. So then pages 38 to 107, I'm going to skip over because these are all relating to the post-conviction proceedings in 1970s.**

**And then jump ahead to 108. Would you recognize what page 108 is?**

A. No.

**Q. Okay.**

A. Has my name and Charlie's name at the top. But I don't know what that is.

**Q. Okay. All right. Let's look at...**

A. This was March of '93.

**Q. If you don't recognize it, that's fine. It's not really clear what it says the date is. It says March, but I can't see the rest of it. I just wonder if you recognize the form?**

A. No.

**Q. If you look at page 111, 112, 113, and 114, there was some handwritten notes. Do you recognize any of this handwriting?**

A. No. So 110 is a summary of a referral to a psychiatric clinic. And I really can't make out very well what these handwritten notes are.

**Q. Okay. What about page 112?**

A. "Betty Worthy called good witness. Saw defendant. Talks with victim at about 11 to 12 on the day of the murder. Defendant denies this. Worthy has no reason to lie."

**Q. Do you recognize that handwriting?**

A. Looks like Charlie Laurie's.

**Q. Okay. I'm going to skip 113, unless you recognize it.**

A. Huh-uh.

**Q. Okay. 114, is that Charles Laurie's handwriting as well?**

A. Looks like it.

**Q. Okay. 115 is the demand for discovery that we've previously identified.**

A. Okay.

**Q. Looking at Exhibit -- on page 116, this is another Precipe for Criminal Case?**

A. Yes.

**Q. Is that for purposes of subpoenaing these witnesses?**

A. Yes.

**Q. Okay. It be typical for somebody to -- there's another one at 116.**

A. 116, 117, both? Or is it two 117s?

**Q. 116 and then 117 are both Precipes.**

A. Right.

**Q. Do you recall the process by which that would be done? Is that something you would give somebody to type up?**

A. Yes.

**Q. The one is a handwritten one and then one is typed up?**

A. Yes.

**Q. Okay. And then what about 118, Response to Request For Discovery?**

A. It's basically a form that we used.

**Q. To keep a record of what was actually given in discovery?**

A. It's actually the form that would be given to the defendant.

**Q. Right. So, like, for example, in this one, it indicates that the statement of the defendant was given.**

A. Um-hmm. So it indicated that the defendant made

a statement. And that it was a written statement. That he also had made oral statements. And that there was no grand jury testimony.

**Q. When it says no grand jury testimony, that means that --**

A. By the defendant.

**Q. By the defendant?**

A. Right.

**Q. And so paragraph A is really dealing with prior statements of the defendant?**

A. That's right.

**Q. And then B is a prior criminal record?**

A. Right.

**Q. You would get a copy of that. And it was handwritten down here, "Murder conviction while in U.S. Marines."**

A. Right.

**Q. And that's Charles Laurie's handwriting?**

A. I can't -- you know, it looks like Charlie's handwriting down here at the bottom. I can't say that this other is.

**Q. All witness -- it's not your handwriting?**

A. No, it is not.

**Q. All witness -- and then you see here, C and D is dealing with Rule 16C and Rule 16D.**

A. Um-hmm.

**Q. And then paragraph E is all witnesses the prosecuting attorney intends to call a trial.**

**And there's a handwritten note here that --**

A. There are other witnesses which may not -- are not subject to disclosure, because under the trial --

**Q. Total?**

A. -- facts in the case will subject them to physical harm for coercion.

**Q. Okay. All right. And then page 119 is the Defendant's Response to the State's Demand of Discovery by William Summers?**

A. Um-hmm.

**Q. Okay. Pages 122 and 123 is an Application of Writ of Habeas Corpus and a Grant of the Writ of Habeas Corpus.**

**Is this way something would be done if you were trying to bring -- looks like what this is doing is asking for the habeas corpus to be issued so the U.S. Marshall would bring Isaiah Andrews to court?**

A. Right.

**Q. Okay. And then 124 is another Writ of Habeas Corpus.**

**125, this is actually the typed up version of the handwritten --**

A. Right.

**Q. -- version of -- that we just previously identified, Response to Request For Discovery Under Rule 16?**

A. Correct.

**Q. Okay. And it shows the date. This is dated February 27th, '75. That's the date it would have been sent to the defendant's attorney?**

A. Yes. Or at least the date it was prepared. I don't know if it was sent that day or not.

It says it's dated that day. I think it was date it was prepared. And at the bottom, it says a copy went. So I imagine it was sent the same day.

**Q. Okay. More handwritten notes on 126 and 127.**

A. Yep. These all look like Charlie's.

**Q. Okay. Do you see here on 126, there's a handwritten note that's circled? Says, "Palmprint too smeared to be compared per SIU."**

A. Right.

**Q. Do you recall that?**

A. No.

**Q. No memory of it? All right.**

**128 is handwritten notes. Looks like it's a list of witnesses?**

A. Um-hmm.

**Q. You've got to say yes. I'm sorry.**

A. Oh, I'm sorry. Excuse me. It's bad juju.

**Q. It's okay.**

**All right. 129 is just a document signed by Isaiah Andrews for Motion for Leave to Proceed Appeal Affidavit?**

MR. FUNK: Go ahead. Do you need to take that?

THE WITNESS: No. I just need to turn the phone off, is what I need to do.

**Q. Pages 130 through 133, these are handwritten notes. Based upon your earlier comments, looks like these are handwritten notes of Charles Laurie?**

A. Kind of looks like his handwriting.

**Q. And these are notes on each of the witnesses?**

A. Right. And attempts to contact them.

**Q. Okay. So 135 through 180 are appeal documents from the 1970s. So I'm going to skip over that.**

**So I'm jumping ahead to --**

A. Well, I was right. We didn't produce all these documents.

**Q. They include post-conviction --**

A. That's what I'm saying.

**Q. -- records.**

**So autopsy report is on 181, if you could jump**

**ahead to that.**

A. Okay.

**Q. So when you talk about, "We didn't produce these documents," so technically, after the conviction, you weren't involved in handling any of the appeals or posted-conviction --**

A. No.

**Q. Okay. So 181 is an Autopsy Report?**

A. Um-hmm. Yes.

**Q. And 182 would also be part of that report?**

A. Yes.

**Q. 184, is this a document that would have been generated by the Cleveland Police Department to document the arrest?**

A. I believe so.

**Q. Okay. You recognize this form?**

A. I don't really recognize the form, but I've seen forms like this before.

**Q. Okay. And then 185, 187 and 188 and 189 are reports.**

**Do you recognize this form?**

A. Yeah. That's the standard Cleveland Police Department form.

**Q. Okay. 190, do you recognize the handwriting there?**

A. No.

Q. Okay. All right. 191, Scientific Investigative Unit Report. Did you have an understanding that there was a separate Scientific Investigative Unit from the Homicide Bureau?

A. I believe it was -- there was, but...

Q. Okay. On page 192, do you recognize the handwriting at all on that, where it says, "Broadcast requested and all points, bulletin sent."

A. No.

Q. Okay. But that's the City of Cleveland Police Report form?

A. Yeah. That's a standard police report form.

Q. Okay. And then 193, looks like this was addressed to you?

A. Yeah.

Q. Would recall, you were going to attend the oral argument in the Court of Appeals?

A. That certainly s what it says.

Q. But you don't remember?

A. I don't remember.

Q. Okay. Look at 194 and 195. Would you -- this looks like this relates to a form used by the Scientific Investigative Unit?

A. Right.

**Q. Do you recognize the handwriting there?**
A. No.
**Q. Okay. Do you recognize the form, though?**
A. No.
**Q. Okay. All right. 196 through 203, these are handwritten notes.**
A. These are not actually notes. These are -- I had a habit of drafting out the questions that I wanted to ask witnesses. And that's what this looks like to me.
**Q. Would this be your handwriting?**
A. This is my handwriting.
**Q. Okay. So if you look --**
A. Actually, I'm looking at --
**Q. I think this is out of order, it was scanned out of order. But look at page 198.**
A. So 198 goes before 196.
**Q. Right. Because it goes 1, 2, 3. So this looks like --**
A. So this is actually closing argument.
**Q. This is your writing up of the closing argument that you gave at the trial?**
A. Yes.
**Q. So we have the trial transcript. It shows that you gave the --**
A. Opening and --

**Q. -- and closing argument.**

A. Yeah.

**Q. And then the Defense gave their argument. And then Charlie --**

A. And then Charlie closed.

**Q. Did the rebuttal?**

A. Right.

**Q. So this was sort of your outline what you were going to argue to the jury for closing arguments?**

A. Right.

**Q. What about at 201 through 203?**

A. I might have had the -- no.

I started saying that I might have had the opening argument also. Because --

**Q. But this is your handwriting?**

A. This is all my handwriting.

**Q. Okay.**

A. I'm not really sure what this is, to tell you the truth. Because it does -- it looks like a summary of the evidence. But it's not closing argument. And looks like more like an opening.

**Q. But it's your handwriting?**

A. It's all my handwriting.

**Q. Yeah. Okay. If you're done with it, I'm going to move ahead.**

A. Okay.
Q. I'm going to skip ahead. That's the indictment. Go to page 205, which is the next document.
So these two precipes, 205 and 206, these are calling for subpoenaing witnesses to attend the grand jury. One being on 11/21/74, and that's page 206. And the other being on December 11, 1974, which is 205.
A. Looks right.
Q. And lists here, the Assistant County Prosecutors were -- included Joe Gibson, who was listed before?
A. Right.
Q. And like we talked about before, there would be -- you would essentially inherit the file of the grand jury --
A. Produce.
Q. -- that started?
A. Yeah.
Q. Okay. 207 through 212 are more police reports for the City of Cleveland?
A. Okay.
Q. 213. This is a list of exhibits from the trial?
A. Right.
Q. And 214 is a list of witnesses for the trial?
A. Right.
Q. 216 through --

A. You were asking before about a Mr. Miller. Here's a Robert Miller, here.

Remember, way back you were talking about --

**Q. Okay. Did you know Robert Miller?**

A. I remember him. But I don't want to say I remember him as associating with this case.

**Q. So I believe 215 through 226 relates to the appeal in the 1970s.**

**All right. I'm going to skip ahead to 228. Do you recognize this handwriting as Charles Laurie's?**

A. Looks like it.

**Q. Okay.**

A. At least at the top. There's a notation as it relates to Carmen Marino. "Pat set the murder case for trial, March 3rd. If witnesses show, try the case. If not, take plea to" -- whatever that is.

"This guy is guilty, but I don't know if we can prove it. Carmen."

**Q. And Carmen would be Carmen Marino?**

A. Carmen Marino.

**Q. And was he an assistant prosecutor attorney at that time?**

A. Yes. He was one with supervisory responsibilities.

**Q. And this was to Pat Lazzaro?**

A. Yes.

**Q. And was this somebody that was involved in the case before you?**

A. I imagine so, because she wasn't at the time that we were actively trying to try it.

**Q. So you don't know when these notes would have been written?**

A. I don't know if there's anything that indicate when the note was written. If you turn it the other way around, it says something about Mary Ostendorf, September 18, 1974, but I don't know what that's got to do with anything.

**Q. Okay.**

A. Couple more Writs of Habeas Corpus.

**Q. Yeah. 229 -- not 229, but Writ of Habeas Corpus starting at 232 through 252, goes all the way up to the 1970s, appeal and post-conviction proceedings.**

**And then I want to skip ahead to 253. So 253 through 261 are copies of police reports?**

A. Yes.

**Q. Okay. Now there's some handwritten notes on here. I just want to see if you recognize any of them. Starting on page 254, there's a handwritten note that says Adam Wolf on the left-hand portion?**

A. Looks like Charlie's handwriting. I can't say

that for sure.

**Q. Would it be typical or would you often look at these reports and mark or underline things that you were wanting to emphasize or remember?**

A. Yes.

**Q. If you'd look at page 258, there's a note on the left-hand margin. Says, "opinion," with a star?**

A. Um-hmm. Yes.

**Q. Do you recognize that handwriting?**

A. No.

**Q. Okay.**

A. That might be Charlie's also, but I can't say for sure just with the word.

**Q. Okay. If you go to page 261. There's a handwritten note in the margin, where it says, "Why would defendant benefit."**

**Do you see that, on 261?**

A. Right.

**Q. Are you there?**

A. Yes.

**Q. You see in the bottom left-hand side, it says -- there's a note that says, why would defendant benefit?**

A. Yes.

**Q. Do you recognize that as being Charlie's handwriting?**

A. Again, looks like Charlie's handwriting. I can't say that for sure.

**Q. All right. 262, looks like a copy of the page --**

A. Witness statement.

**Q. One page of the witness statement?**

A. Um-hmm. Yes.

**Q. Signed by Isaiah Andrews at the bottom?**

A. Right.

**Q. Right?**

A. Yes.

**Q. And 263 through 268 are more police reports.**

A. Right. So these markings off to the side and in the margins, like starred and bracketed, in all likelihood, that's Charlie, too.

**Q. Okay. Let me draw your attention to 267. There's a reference to the palmprint. If you remember, that was a note --**

A. Right.

**Q. -- that Charlie made earlier. In which it says here -- it's actually crossed out. The part that's crossed out, there's a handwritten note that says, "per SIU."**

**Are you able to are read that?**

A. Print.

**Q. Unable?**

A. Is it "unable"?
**Q. No. What does it say? I'm sorry.**
A. It says, "print compared, not defendant's."
**Q. Not defendant's print?**
A. Print, yeah.
**Q. Do you know who actually wrote that and marked it out?**
A. (Indicating.)
**Q. You don't know, right?**
A. No.
**Q. What about, it says, "print not clear enough to compare."**
A. I'm not sure who wrote that either.
**Q. And then what about the note on the side, "victim's blood type O. Type O on newspapers."**
A. That looks like Charlie's handwriting to me.
**Q. Okay. All right. 268, at the bottom says, "no valuables taken from body or defendant's room."**
**Is that Charlie's handwriting, too?**
A. I think so.
**Q. 269 is another copy of the SIU report dated 9/18/74.**
**Page 270?**
A. Beginning of the duplicate file.
**Q. So duplicate file means there's going to be now**

**additional file started so that you can you can have more than one file because the file is getting too big?**

A. Either the file is getting too big or the file jacket itself is, you know, deteriorating. Something to that nature.

**Q. But this is a form that was used back in the 1970s?**

A. Yeah. The file folders were like envelopes, that you could put things into.

**Q. I see.**

A. Okay.

**Q. And had this sheet taped on the front?**

A. No. It was actually printed on the front.

**Q. I see.**

A. And so after time, especially if the file was somewhat large, you know, and if it was handled quite a bit, the integrity of the paper would deteriorate. And you might have to put together another file folder. Because this one doesn't have any of the markings that we had on the first one.

So whether they took a copy of the first file folder and then stuck it inside the duplicate, or why it doesn't have any notations in here, that's what I would suggest.

**Q. At the top, it says, "duplicate file, dash,**

original file inside."

A. Yeah. There you go.

Q. Okay. Now 271 to 393, are all documents --

A. You said to 393?

Q. 393. Are all documents from -- do you remember from the document -- I'm sorry. It actually goes further than that. Yeah, 393.

Are all documents from post-conviction proceedings that occurred in the 1990s.

A. Wow.

Q. So I'm going to skip over that.

And if you could go to 393. So it's actually 271 to 392 were the 1990s proceedings.

So skipping ahead to 393. Actually, these are notes that go into the 90s as well. So I'm going to skip over those.

Do you recognize the handwriting?

A. No.

Q. When did you last work for the prosecutor's office?

A. I think I left mid year in '76.

Q. Okay. So you -- your experience there was really mid '74 to mid '76?

A. Right. About two years.

Q. And then would you have occasion to know

**prosecuting attorneys in your role as a judge?**

A. Sure. I mean, I left there in '76, went into private practice with my dad in '76. And in, what, '78 I guess it was, I went to work for Congress for 10 months. And came back and went to private practice with my dad.

So in the mean time, a lot of guys I worked with at the prosecutor's office had left and gone on to other things or went to private practice. So I knew a lot of them before I took the bench.

**Q. When did you take the bench?**

A. I took the bench in 1982.

**Q. Okay. And then you served as a judge until?**

A. Until January of 2018.

**Q. Congratulations. That's a long time.**

A. Yeah. I tell people, I managed to get through that whole time without getting my name on the front page of the Plain Dealer. I consider that a major accomplishment.

**Q. That's true.**

**I'm going to start at 395. So if you could turn to that.**

**So this looks like it's a, when they scanned it, it looks like it was scanned in three parts, maybe four parts, 395 to 398. I'm really just asking if you**

**recognize the form. Looks like they're trying to keep track of the docket.**

A. And this looks like -- yeah. Says "Appearance and execution docket."

**Q. What does that mean?**

A. Some places, they call it "courts and minutes." And it's just a notation of what was on the docket on that particular date and what was done. So you get your court -- your court orders appear here.

**Q. Okay. So this is all -- looks like this is all --**

A. This is administrative stuff.

**Q. Yes. So this is all things from -- if you look at 400 to 614 are actually all additional items from the 1990s appeals and post-conviction proceedings.**

A. 400 to what?

**Q. 400 to 614 -- I'm sorry, no. 612. These are all from the 1990s.**

**So then the last few pages here, looks like these are photographs, 613, 614, 615.**

A. Um-hmm.

**Q. 616. Do you recognize any of these?**

A. This kind of looks like the area where they found her body.

**Q. Okay. And then the last rest of the documents**

**are some documents from 2009, relating to parol hearings, which is 618 to 622.**

A. Um-hmm.

**Q. And that's the end of it. So would you -- other than having seen this here today, when would have been the last time you would have seen the prosecutor's file, if anything?**

A. If Marc hadn't contacted me to tell me this was a live ball, I never gave this another thought after we completed what we did and moved on to the next case.

**Q. And that would have been March of 1975?**

A. That would have been in March of 1975.

As I said --

**Q. So --**

A. -- there's a lot of it that I don't remember.

**Q. Right. So you would not be able to -- we have this as the archive file, produced by the prosecutor's office. But you would not be able to say what was in or out of the file as of March of 1975?**

A. No. It's not like I could look at the documents that we've just gone through and say, "Boy, that's new, that wasn't there at the time."

**Q. Uh-huh.**

A. I wouldn't know that. Or if here's something that's missing, I wouldn't be able to tell you that.

**Q. Right. Based upon the documents that we'd just gone through though, you don't recall anything as being something that would fall in that category?**

A. There's nothing that stand out to me. There are a couple of things that caused me to think that maybe I might -- I don't know how to put this.

There are a couple of things in here where I'm saying, "Huh, I wonder if that's something I should remember."

You know, but there's nothing that leaps out to me and says, "Oh, smack, I forgot that," or "Oh, yeah, now I remember this."

**Q. Okay. Based upon the handwritten notes that you were able to recognize, you were able to confirm that at least the documents that from the timeframe of the 1970s would have been documents that would have been, you know, in the file in the 1970s?**

MS. GELSOMINO: Objection. That's not his testimony. And form.

A. Looking --

MR. FUNK: I don't know if I could say it any differently.

A. Looking at what's here, this looks like the things that were in the file folder that we handled. I didn't see anything in this that contradicted what my

recollection was. I didn't see anything that added to it or subtracted from it.

So I cannot say definitively that this is the totality of that, but I cannot say definitively that it is not.

**Q. Right. Okay. And you don't recall whether there are documents missing from the file or not?**

A. I'm not seeing anything that causes me to believe that anything was removed. And there's nothing here that causes me to feel that somebody's been added.

**Q. You are not saying one way or the other?**

A. One way or the other. After all this kind of passage of time, I'm not in the position to say.

**Q. I understand.**

A. When I look at this, I remember when we caught this case and the first instance, thinking how tragic it was. But as it related to anything definitive about it at this point, I can't --

**Q. Okay.**

A. I cannot assist you.

**Q. No problem. So I wanted to -- so if you could go back to page 256.**

A. Um-hmm.

**Q. Okay. This is a -- page 256 is a police report that's dated 9/23/74. Do you see that at the top?**

A. Yes.

Q. Okay. And at the bottom, it says, "Consulted Chief Police Prosecutor Everett Chandler, who read the files and statements in this case and issued papers for aggravated murder, Revised Code 2903.01, for Isaiah Andrews."

Do you see that?

A. Yes.

Q. Now do you know who Everett Chandler was?

A. Yes.

Q. He would have been the police chief prosecutor for the City of Cleveland?

A. Yes.

Q. Is that typically how it would work, in terms of the city prosecutor would authorize the arrest, and then it would then go to the grand jury?

A. Yes.

Q. Okay. And so then it says here, "Isaiah Andrews arraigned, charged and will appear in police court September 24, 1974."

Is police court essentially what is viewed now as municipal court or is it something different?

A. No. It's the same thing. Police -- what it calls police court here is what we would now refer to as initial appearance.

**Q. Okay.**

A. So if someone is arrested in the City of Cleveland, then after they've been arrested, their first appearance before a judge would be at initial appearance.

**Q. Okay. And you don't know -- this says here in this report that Chandler read the files and statements in this case.**

**You don't have any information one way or the other whether he would have reviewed the entire homicide file and all of the written statements?**

A. Given that it was a homicide, I would expect that he would have -- that the homicide detectives would have brought him everything that they had up to that point for him to make a charging decision.

**Q. Right.**

A. And based upon the information that they presented to him, he would then make that charging decision.

And we would like to think that, you know, they gave him all the good stuff and the bad stuff. We just don't know.

**Q. So you don't have any reason to, one way or the other, to say that that's true or not?**

A. All I know is that at the end of his review, he

concluded there was enough there for him to be arrested and charged -- charged and arrested and brought into the system.

**Q. And then at that point then, the investigation then or the proceedings are handed over to the prosecutor's office, where they would go to the grand jury proceedings, right?**

A. You have initial appearance. If the judge in the municipal court finds that there is probable cause to believe that the crime took place and that the defendant before the Court committed the crime, case would then be bound to the grand jury in Cuyahoga County for further proceedings.

**Q. Do you know what the procedure was? Would the city prosecutor's office take the file and give it to the county prosecutor's office to handle?**

A. Are you talking about the police file?

**Q. I'm talking about, yeah, the files and statements of the case that he relied upon issuing the papers?**

A. The city prosecutor's office would consult with the county prosecutor's office and give them whatever they had.

**Q. Right.**

A. The file that was developed, you know, in the municipal court to put the person in front of the Court

for initial appearance, would be transferred from the municipal clerk's office to the county clerk's office.

But as far as the conversations back and forth between the city police department and the county prosecutor's office, they had their own methodology of, you know, how they brought about those transfers.

**Q. Right. So let me use your affidavit as a point of reference.**

**Go to paragraph 9. You indicated that, in paragraph 9 -- I'm not going to read it verbatim, but you can read it to yourself. Kind of a long paragraph.**

**You said in general it was your -- that it was your standard practice that you would have requested the entire investigative file; is that correct?**

A. Um-hmm. Yes.

**Q. And I guess I was trying to understand the process. We talked about before that, essentially, you would inherit a file from the grand jury proceedings.**

**Is it -- would it typically be the case where the investigative file, the file that you received would already have in it the investigatory materials or would you have to go and request them again?**

A. I'm trying to recall exactly how this worked. Because the way that we handled -- obviously, the police department was our investigative arm, whether we are

talking about at the city's prosecutor's office or the county's prosecutor's office. So they would provide you with all of the materials that they had developed up to a certain point in time. I would like to believe that they gave us everything that they had.

**Q. Right.**

A. You know? And that would go into the file that was worked up for the grand jury. And then once the grand jury had made its recitation, then that would constitute the prosecutor's file for purposes of trial. Because it comes out of grand jury and goes to the arraignment process. And after it's arraigned, then it goes to the trial courtroom. And whoever the prosecutors were who were handling that particular courtroom would have those files.

And then of course, we rotated. You know, so we had, like, a three-month rotation. So you could have a file. It was entirely possible that this file could have started with one set of prosecutors, but then, depending on the timeframe, might have rotated to a second set of prosecutors and possibly even a third set of prosecutors before it was actually tried. It depended on how it went.

We tried to try everything within 90 days if the individual was in jail, 270 days if they were at

liberty. And of course, any kind of thing could happen that could extent that period of time longer.

**Q. So I guess the real question I have is, essentially, you are getting this file that have gone through these various proceedings. At the point you are getting it, do you have to make a request to the City of Cleveland Police Department to provide you with the investigative file or do you already presume you have the investigative file?**

A. I presumed that I had the investigative file when it came to me.

**Q. Do you recall for this particular case, the Andrews case, whether you actually would have made the request?**

A. I cannot tell you that specifically, one way or the other.

**Q. Okay. And so this is not a situation where -- now you would, on occasion, meet with the homicide detectives who investigated the case, right?**

A. Yes.

**Q. Would there be a situation where the homicide detectives themselves would be the ones who would actually bring you file materials?**

A. If we requested it.

**Q. If you had requested it?**

A. Sure.

**Q. But the presumption is that you had already received it?**

A. Yes. If I'm going through the file and I see something and it raises a question with me with, "What happened to, you know, the blood evidence, blah, blah, blah," then I might pick up the phone and call the detective and say, "I'm looking at this and I don't see where the blood evidence is." And then they would then try to fill in the blanks for us.

**Q. But you don't recall that happening in this case one way or the other?**

A. I do not.

**Q. Okay. And do you know who at the City of Cleveland would be responsible for having the homicide investigative file I think we talked about normally it would be given to the city prosecutor and then the city prosecutor --**

A. Transfer it to the county, yeah.

**Q. Is that the way you understood it or was there independent direct communication?**

A. You know, I'm not sure if there was one person, you know, in the city who was responsible for the transfer of all files that were bound over, or whether the detective on the case went directly to the grand

jury to give them their information, I'm not sure how that worked.

**Q. Right. And you don't recall in this particular case?**

A. I certainly don't recall as it relates to this particular case.

**Q. And are you, in your two years working at the prosecutor's office, are you aware of any instance in which a city -- when you, in your opinion, in the two years that you worked there, in which you made a request and the city police department didn't honor your request?**

A. No.

**Q. Do you recall any specific conversations with Detective William Hubbard about this investigation?**

A. Not about this particular case, no.

**Q. What about Detective Ernest Rowell, any specific conversation with him?**

A. I don't remember any specific conversation with Ernie Rowell, either.

**Q. Okay. And William Hubbard testified --**

A. Are either one of them still alive?

**Q. No. They both passed.**

A. Okay. That's sad.

**Q. You knew them both?**

A. I knew them both.

**Q. And that's because they were police detectives?**

A. Yes. Police detectives.

**Q. And William Hubbard, did you have any negative experiences with William Hubbard as a police detective?**

A. With either of them, I didn't have any negative experiences with them.

**Q. In your experience with them, they were honest, hardworking police detectives?**

MS. GELSOMINO: Objection.

**Q. In your experience?**

A. I had no reason to think that they were not.

**Q. Do you have any personal knowledge as to whether or not William Hubbard or Ernest Rowell withheld or emitted any police reports?**

A. From this case?

**Q. Yeah.**

A. No.

**Q. All right. If you look at paragraph 8 of your affidavit.**

A. Okay.

**Q. And at the very -- it's in the middle of paragraph 8. I need to get it here for a second. Hold on.**

A. Okay.

Q. You're talking about your present recollection in paragraph 8, that you do not recall ever being made aware that anyone, other than the defendant, was investigated, arrested, or seriously considered as a potential suspect in this homicide.

Do you see that?

A. Yes.

Q. And that's William -- you are referring to Willie Watts?

A. Yes.

Q. Okay. And then you actually go on to say, "This includes Willie Watts."

And then you said, "Nor do I recall ever being given the opportunity by law enforcement to review the information, which I now reference as it relates to the investigation and arrest of Willie Watts."

And that's based upon, what you are saying is you don't remember them ever saying anything to you about it.

A. Yes.

Q. You don't remember that one way or the other?

A. I don't remember that one way or the other. I don't have -- that's something that I think I would have remembered, but I don't remember it, so...

Q. Okay. But you did not have any direct

**communication with Ernest Rowell or William Hubbard about this case?**

MS. GELSOMINO: Objection.

A. No. I think I would have had conversations. Because, I mean, it would've been the four of us, me, Charlie, Ernie, and Detective Hubbard. Because we would have sat down to talk about what this was, you know, what do we have here.

**Q. Do you remember any specific instance of that happening?**

A. I don't remember the specifics of it. But there's no way in the world that we would've gone to trial on a murder case without us sitting down to have that conversation with both of them.

**Q. Okay.**

A. Because at some point in time it was an absolute certainty that both of them were going to have to take a witness stand.

**Q. But you don't recall any specific meetings with them?**

A. No.

**Q. All right. And would there be -- it's possible that there would be instances in which either Hubbard or Rowell spoke independently to Charles Laurie?**

MS. GELSOMINO: Objection.

A. It's a possibility.

**Q. Okay. Well, for example, in this case Ernest Rowell did not testify at the trial?**

A. Right.

**Q. William Hubbard testified at the trial. Charles Laurie handled his direct examination.**

A. Right.

**Q. In that instance, Charles Laurie would have met with William Hubbard to prepare him for his direct examination, right?**

A. Right.

**Q. Would you have been part of that?**

**You don't recall one way or the other?**

A. I don't recall one way or the other. I know that -- but I'm fairly certain that we would've had some conversation with both of them initially, well before the time we were going to have them take a witness stand, in order to determine how we were going to proceed with regard to the presentation of that case.

And at the junction, the decision obviously was made that we didn't need to do both of them. We just needed to do one of them. And that's how you end up with just one taking the stand.

**Q. You don't recall any actual discussion, you just said you would've, more than likely, would've done that**

because it would've been the normal practice?

A. The normal practice.

Q. Okay. I want to ask you about Willie Watts. If you could turn to page 254 of the file. So I think you are actually there in your affidavit. 256, so two pages away from that.

This is a 9/19/74 police report. Pages 1 of 3 and then you see there's three pages there.

And if I remember correctly, the incident, the murder happened on September 18th. And then he was arrested on September 24th. So this was a fairly quick investigation?

Does that jive with your memory?

A. Yes.

Q. Okay. So this is from 9/19/74. And in this three page report, there's an identification of the body on page 1. See that?

Okay. And turning to the next page, says, "Returned to the homicide office. While typing this report, received a call from the suspect, Willie Watts."

And there's a discussion about Willie Watts. Do you see that?

A. Yes.

Q. Okay. And I think you previously indicated that that handwriting down below, Adam Wolf, would have been

**Charles Laurie's handwriting?**

MS. GELSOMINO: Objection. Mischaracterizes the testimony.

A. Yeah. I think that that looks like Charlie's handwriting.

**Q. Okay. So this would have been the report that at least Charles Laurie had reviewed in at least around this time?**

MS. GELSOMINO: Objection.

A. (Indicating.)

**Q. And if you look at the next page, it indicates that Willie Watts was arrested on page 3 of the report?**

A. Right.

**Q. Okay. So I guess what you are saying is, is that you don't have any -- when you signed your affidavit, you didn't have any present recollection of this, but do you dispute that this report does identify Willie Watts as an alternative suspect?**

A. There's no doubt.

**Q. Okay. And that this would have been something, when you say whether or not this report was provided to the prosecutor's office in 1974, '75?**

A. You know, it's here. So I've got to think that it was.

**Q. Okay. Let's look at -- go to page 259. Do you**

see the second paragraph here? This is report, page 1 of 3 dated 9/19/74.

And there's a paragraph there where it discusses the interview of Willie Watts.

A. Yes.

Q. Do you see that?

A. Yes.

Q. And then at the bottom, there's a statement that says -- that's underlined, where it says, "We now feel that this male is not involved."

A. Right.

Q. And do you know who made that underlining?

A. I'm taking it for granted that it would have been Charlie.

Q. Okay.

A. I know I didn't.

Q. And then go jump ahead to 268. I want to draw your attention down to the bottom, where there's -- in the bottom of this report, there's a line that's got the -- the last sentence that's got a little notation on the left side. And underneath it, it says, "No valuables taken from body or defense room."

Do you see where I'm referring to?

A. Yes.

Q. And in that sentence it says, "It is our opinion

that this crime was committed by Willie H. Watts, who is apparently attempting to sell his mother's coat and other valuables to get money to get away from the city."

A. Yes.

Q. Do you see that?

A. Yes.

Q. And that's Charles Laurie's handwriting right below that?

MS. GELSOMINO: Objection.

A. I think so.

Q. All right. Okay. Now in your affidavit, you had talked about that you were presented with additional statements of Linda Cloud and Betty Worthy?

A. Yes.

Q. And I think we talked about that earlier, that these were statements that were made in police reports?

A. That's my recollection.

Q. Okay. And let's go back to page 259, so we're kind of in the same area here.

We had already -- this is -- page 259 is the first page of a three page report, dated 9/19/74.

And at the bottom paragraph, there's a handwritten notes to the side, with a star. It talks about the interview of Betty Worthy?

A. Yes.

**Q. And Betty Worthy was a witness that was ultimately handled by Charles Laurie at the trial, right?**

A. Right.

**Q. And is this one of the interviews that you reviewed when you prepared your affidavit?**

A. Yes.

**Q. Okay. You don't recall it, but do you have any reason to believe that Charles Laurie would have seen this?**

MS. GELSOMINO: Objection.

A. I have no reason to believe that he did not.

**Q. Okay. And then if you look at 260, next to where there's a star.**

A. Yes.

**Q. Says, "Also Linda Cloud."**

**And reports on interviews that -- or statements that Mrs. Cloud made to the detectives?**

A. Yes.

**Q. All right. And then if you look at -- move ahead to page 266.**

MS. GELSOMINO: What page was the Cloud statement on that you were talking about?

MR. FUNK: 260. Right next to where the star is.

Q. So if you go to 266, this is a report dated September 21, 1974. And it's signed by William Hubbard, and indicates that on that date, September 21, 1974, I went to 3301 Euclid Avenue. And there, I interviewed Betty Worthy, that lives at that address. And then he describes what she said.

A. (Indicating.)

Q. And then there's another star there, where, the note down below.

Do you see that?

A. Yes.

Q. And then also further, that this female was conveyed to the county morgue, where she viewed the bedding that was found with the body of Regina Andrews. And she identified the bedspread as belonging to the hotel.

Do you see that part?

A. Yes.

Q. And it says, "This female was then conveyed to our Statement Unit, where a statement was obtained."

Do you see that?

A. Yes.

Q. Then just below that, with all caps, says, "Linda Cloud said she could not give a statement until Monday."

Do you see that?

A. Yes.

Q. Okay. Again there's a star, handwritten star on this. Do you have any reason to believe that this report would not have been reviewed by Charles Laurie?

MS. GELSOMINO: Objection.

A. I have no reason to believe it would not. That was his process.

Q. And then if you go back to 257.

A. 257?

Q. Yeah. So on 9/20/74, this is a report, pages 1 and 2. It's typed at the bottom, Rowell and Hubbard, at the middle of the page, toward the bottom.

Says, "Contacted Betty Worthy of the Colonial Motel and re-questioned her."

Do you see that?

A. Yes.

Q. Okay. So with respect to Betty Worthy, we have that she was interviewed on 9/19, and then again on 9/20, and then again on 9/21, when she ultimately then was brought down to the Statement Unit to give a statement.

Is it possible that -- I know you don't have a present recollection, but is it possible that you, yourself, would have reviewed these reports back in 1974/1975 and just don't recall?

A. That's highly possible.
**Q. Okay. Okay. So I think we already talked about your conversations with William Hubbard and Ernest Rowell. If William Hubbard -- and you don't recall what William Hubbard would have said to you?**
A. No.
**Q. So it's possible in those conversations that you would have spoken with William Hubbard about Willie Watts?**
MS. GELSOMINO: Objection.
**Q. And you don't recall one way or the other?**
A. It's possible.
**Q. And Linda Cloud and Betty Worthy, you would have discussed them?**
MS. GELSOMINO: Objection.
A. It's possible.
**Q. Okay. Do you have any evidence or knowledge that William Hubbard or Ernest Rowell would have falsified any of their police reports?**
MS. GELSOMINO: Objection.
A. I have nothing that would suggest to me that they would.
**Q. Okay. Or that they ever would have made any false statements?**
MS. GELSOMINO: Objection.

A. Again, I have no way of knowing. But I have nothing to suggest that.

**Q. Okay. And you wouldn't know whether William Hubbard or Ernest Rowell would have ever made any false statements to the city prosecutor in obtaining the charges?**

A. No.

MS. GELSOMINO: Objection.

**Q. And you don't know whether or not they made any false statements to the grand jury?**

MS. GELSOMINO: Objection.

A. No.

**Q. Do you know Leo Allen?**

A. Yes.

**Q. How do you know Leo Allen?**

A. He was a detective with the Cleveland Police Department when I was working at the prosecutor's office.

**Q. And Leo Allen testified at the trial.**

**Do you recall what he testified about?**

A. No.

**Q. And the transcript showed that Charles Laurie handle that direct examination.**

A. Okay.

**Q. Do you recall you personally having any**

**conversations with Leo Allen about the Andrews investigation?**

A. I don't recall. But my recollection is that Charlie and I talked to all of the witnesses. And after the conversations, after we talked to the witnesses, then at some point in time, we decided on division of work as to who was going to present what during the course of the trial.

**Q. And then you would separately meet with your witnesses to prepare them for trial. And then he would meet with his witnesses to prepare them for trial?**

A. That's my recollection.

**Q. So you wouldn't know one way or the other what was said between Leo Allen and Charles Laurie in their witness preparation sessions?**

A. I wouldn't know.

**Q. And you wouldn't have any evidence that Leo Allen ever withheld any information from the prosecutors with the city?**

A. I don't have any information on that.

**Q. And I want to make it clear, withholding information from the city prosecutor or the grand jury or Charles Laurie?**

A. Right.

**Q. Or yourself?**

A. Right.
MS. GELSOMINO: Objection to those questions.
**Q. You don't have any information or knowledge one way or the other that Leo Allen falsified any police reports or any evidence?**
MS. GELSOMINO: Objection.
A. I don't have any such information.
**Q. And you don't have any information one way or the other that Leo Allen ever made any false statements to the city prosecutor?**
A. No.
**Q. You don't have any information or evidence that Leo Allen made any false statements to the grand jury?**
A. No.
MS. GELSOMINO: Objection.
**Q. Do you know David Hicks?**
A. Yes.
**Q. How do you know David Hicks?**
A. He was with the Cleveland Police Department.
**Q. And by the way, do you know whether Leo Allen testified before the grand jury?**
A. I'm not sure.
**Q. You wouldn't know one way or the other?**
A. No. All that would have been before, you know,

we even got involved in the case.

**Q. Right. Do you know what role, if any, David Hicks had in the investigation?**

A. No. I don't recall.

**Q. He was not a witness at the trial?**

A. No.

**Q. Would you have ever spoken with David Hicks about the Andrews investigation?**

A. If I did, I wouldn't recall it now.

**Q. Okay. And you don't know whether or not Charles Laurie would have spoken with David Hicks about the Andrews investigation?**

A. I do not.

MS. GELSOMINO: Objection.

**Q. So you don't have any evidence, one way or the other, as to whether David Hicks made any false statements to any city prosecutors, grand jury proceedings, or to the trial prosecutors?**

MS. GELSOMINO: Objection.

A. I do not.

**Q. And you don't have any evidence or knowledge that David Hicks ever withheld any information from the city prosecutor or the grand jury?**

A. No.

MS. GELSOMINO: Objection.

**Q. Or the trial prosecutors?**

MS. GELSOMINO: Objection.

A. No.

**Q. And you don't have any evidence or information that David Hicks falsified any of his police reports?**

MS. GELSOMINO: Objection.

A. No.

**Q. And you have no information that David Hicks made any false statements to the city prosecutor or to the grand jury or to any of the other prosecutors in the case?**

MS. GELSOMINO: Objection.

A. No.

**Q. You don't know whether or not David Hicks even testified before the grand jury?**

A. No.

**Q. Okay. Peter Comodeca, do you know him?**

A. That name doesn't ring a bell.

**Q. Have you ever spoken with Peter Comodeca?**

A. Not that I can recall.

**Q. Do you know what role, if any, Peter Comodeca had in the Andrews investigation?**

A. I don't know.

**Q. And you wouldn't know if Charles Laurie ever spoke with Peter Comodeca?**

A. I wouldn't know.

**Q. So same series of questions then, you don't have any evidence that Peter Comodeca ever withheld any information about the Andrews investigation from any of the prosecutors, correct?**

MS. GELSOMINO: Objection.

A. No.

**Q. Okay. And you have no information that he ever made any false statements about the Andrews investigation to any of the prosecutors?**

A. No.

MS. GELSOMINO: Objection.

**Q. And that he never -- you don't have any information or evidence that Peter Comodeca was ever really even involved in the investigation?**

MS. GELSOMINO: Objection.

A. No.

**Q. Okay. You wouldn't know what Peter Comodeca's knowledge of the investigation would be?**

A. I have no idea.

**Q. Yeah. Next person is Walter Dugan. Do you know who he is?**

A. That name doesn't ring any bells, either.

**Q. So you don't know -- same series of questions, the answer would be the same?**

A. The answer would be no to all the questions that you asked.

**Q. For Walter Dugan?**

A. Yes.

**Q. And I'm saying, the same questions I asked for Peter Comodeca, the answers would be the same?**

MS. GELSOMINO: Objection.

A. Right.

**Q. Do you know John Kaminski?**

A. That name sounds familiar. But it's in passing. Someone who works for the police department, I think.

**Q. Same set of questions for John Kaminski --**

A. Answers would all be no.

MS. GELSOMINO: Object to all them. Objection.

**Q. What about J. Francis McCaffery, do you know him?**

A. Again, it sounds like somebody that works for the police department. But I don't recall him at all. And my answers to all of the questions you asked for the others would be no for him also.

**Q. Okay. And you don't know what role, if any --**

A. I have no idea what role he may have played in the Andrews investigation.

**Q. Yeah. He certainly wasn't --**

A. He wasn't essential.

**Q. He wasn't essential to the investigation or somebody that you would have ever spoken with?**
A. Not that I can think of.
**Q. What about Kevin Walsh, do you know him?**
A. Again, that name sounds familiar but not as it relates to this investigation.
**Q. Do you know if Kevin Walsh even worked in the Homicide Detective Bureau?**
A. I am not familiar. He may have been one of the patrol officers.
**Q. You don't know?**
A. But I don't know.
**Q. Okay. Do you recall a Kevin Walsh that worked with the Scientific Investigation Unit?**
A. That might be.
**Q. But do you know one way or the other?**
A. I do not.
**Q. Okay. You don't know what role, if any, Kevin Walsh would have played in the Andrews homicide investigation?**
A. No.
**Q. And you don't remember speaking to Kevin Walsh about the Andrews homicide investigation?**
A. No.
**Q. Same set of questions for Kevin Walsh. You**

**wouldn't have any information or knowledge --**

A. Answer would be no, across the boards.

**Q. Okay. And Nick Stanick. Do you know Nick Stanick?**

A. Nick Stanick worked for the police department. I don't know what his role was with regard to the Andrews investigation. Answers would be no across the board as it relates to him and any knowledge that I have about anything he may have done as it relates to this.

**Q. Okay. So we kind of went through some of these police reports from the 1970s. Based upon your role as a prosecutor, it was your understanding that City of Cleveland police officers prepared written police reports in order to document their investigation?**

A. Yes.

**Q. Right? And that those police reports would be kept and maintained in an investigative file so that you would ultimately, as a prosecutor, be able to see the written results of the investigation and understand what had been investigated?**

MS. GELSOMINO: Objection.

A. Yes.

**Q. Is that fair to say?**

A. That would be fair representation, what my understanding was.

**Q. Right. So if a police detective types up a report and puts a typewritten report into the investigative file, in your opinion, would it be reasonable for that police officer to believe that that report would be delivered to the prosecutor's office as part of the rest of the investigative file?**

MS. GELSOMINO: Objection for 18 reasons.

A. My answer would be yes. I think it would be reasonable to think that that would be transmitted to the prosecuting attorney's office.

**Q. Right. So we talked about in this case, for example, William Hubbard and Ernest Rowell were the lead detectives.**

A. Right.

**Q. If there was a report that was typed up by Leo Allen. Leo Allen puts that report into the file, Leo Allen has no reason to believe that it would not be provided to the prosecutor. That's why he types up the report.**

MS. GELSOMINO: Objection.

**Q. Is that fair to say?**

A. That's rational.

**Q. Okay. And if the sergeant in the Detective Bureau signs the police report, is it reasonable for that sergeant to believe that the report will be kept in**

**the file and ultimately delivered to the prosecutor as is normally done?**

MS. GELSOMINO: Objection.

A. I would expect, if I was the sergeant, that that is what would happen.

**Q. Okay.**

MR. FUNK: All right. I think I'm done. Let me just talk with Lauryn.

MR. RUSSEL: Yeah. Let's take five.

\- - - -

(Off the record.)

\- - - -

MR. FUNK: I have no further questions. I appreciate you going through it with me.

THE WITNESS: No problem. I'm sorry that my memory deteriorated to the point I can't be more helpful.

MR. FUNK: Okay. The attorney for the city, do you have any additional questions?

MR. RUSSEL: No. No. That's fine.

MS. GELSOMINO: I do have some questions.

THE WITNESS: Understood.

EXAMINATION OF RONALD ADRINE

MS. GELSOMINO:

**Q. Thanks for being here today. So first of all,**

just to start with Mr. Funk ended, he asked you a series of questions about procedures within the Homicide Unit.

A. Um-hmm.

Q. You never worked as a police officer, have you?

A. Never have.

Q. So you've never worked in the Homicide Unit?

A. No.

Q. Do you know where the Homicide Unit kept files or how they created files?

A. No.

Q. Do you know anything about how they created reports?

A. No.

Q. Are you aware that they had multiple places where they kept files, including something called a work file?

A. No.

MR. FUNK: Objection.

Q. Are there -- so you can't testify as to how files were, like police files were --

A. Assembled.

Q. -- assembled or taken to the prosecutor's office, right?

A. No. No.

Q. And it's possible that in that assembly of the file that was delivered to the prosecutor's office, that

**some records were withheld from that prosecutor's file, right?**

MR. FUNK: Objection.

A. I have no way of knowing.

**Q. Either way?**

A. Either way.

**Q. Fair enough. Because when you get that file, as a prosecutor, you can't say, "this includes every single police report," right? Because you don't know what police reports were created?**

A. You just assume that it did.

**Q. Now given your experience as a member of this legal community for decades, are you aware that there have been instances where police officers failed to include all exculpatory evidence and files that were produced to the prosecutor's office?**

MR. FUNK: Objection.

MR. RUSSEL: Objection.

A. I'm aware.

**Q. In this case, the issue is exactly that, right, whether or not certain exculpatory reports were withheld from the defense, right?**

MR. FUNK: Objection.

**Q. And it is the theory of the city and the city itself and the city detectives that it's the**

prosecutor's office who suppressed that evidence and not the police department. So this feels silly for me to ask that you --

MR. FUNK: Objection.

Q. -- but I have to ask you anyhow.

Did you, in this case, withhold any exculpatory evidence from the defense team of Mr. Andrews?

A. No.

Q. Do you have any reason to believe that your trial partner, Mr. Laurie, withheld exculpatory evidence from Mr. Andrews' defense team?

A. No.

Q. I understand you were second chair in this case. But you tried this case as a partner of Laurie, correct?

A. Yes.

Q. And did you review the entire homicide file before you -- or did you review all of the file available to you before you tried this case?

A. Yes.

Q. Not just for your witnesses, right?

A. Right.

Q. In my experience, sometimes second chairs know a lot more about the case than first chairs, so I imagine that would be correct.

In your review of the materials available to you,

**did you ever learn of a different suspect, Willie Watts?**

MR. FUNK: Objection.

A. You know, this is -- I've been trying to run this around in my head for a while. And I'm not certain that I didn't ever hear of Willie Watts's name, but I'm not certain that I ever did.

**Q. Right.**

A. When I heard that Willie Watts existed, you know, when I was going through this stuff with Marc, originally, I was thinking to myself, I don't remember Willie Watts.

**Q. Um-hmm.**

A. But that does not mean to say that I never saw his name.

**Q. Okay. But you don't remember him as significant this case, do you?**

MR. FUNK: Objection.

A. I have no recollection, no firm recollection about him, period.

**Q. Perfect. Had you learned about him as an alternate suspect, would you have told the defense team?**

MR. FUNK: Objection.

A. If it was brought to my attention, I would have brought it to the attention of the defense. I would have felt obligated to do that.

**Q. Why?**
A. Because that's what the law required.
**Q. For you to disclose exculpatory evidence, like an alternate suspect?**
A. Right.
**Q. Would you or Laurie have stated on the record that exculpatory evidence was produced to the defense team?**
MR. FUNK: Objection.
**Q. Or disclosed to the defense team?**
A. I'm sure we would've.
**Q. You're sure you would have?**
A. Yeah.
**Q. That makes sense. I've seen that in transcripts before --**
A. I mean, if you are going to tell him anything, you want everybody to know you told him.
**Q. Okay. And so you agree with me that -- or do you agree that evidence of the existence of an alternate suspect would be exculpatory evidence?**
A. Yes.
**Q. The issue has come up in this case also of statements of Betty Worthy and Linda Cloud given before trial that are not consistent with their trial testimony.**

**You are aware of that now, right?**

A. Yes.

**Q. In your review of this file back in the 70s, if you can recall, do you remember seeing statements of Betty Worthy or Linda Cloud that were different than their trial testimony?**

MR. FUNK: Objection.

A. I cannot tell you that I do.

**Q. Okay. If you did read those -- well, let me ask you: If there were statements of Betty Worthy and Linda Cloud that were inconsistent with their trial testimony, do you agree that those would be exculpatory?**

MR. FUNK: Objection.

A. Yes.

**Q. And if you had seen those prior inconsistent statements of those two witnesses, would you have told the defense team?**

MR. FUNK: Objection.

A. I imagine it would depend on how it came out, you know? I would think that would be something that we would share. But, you know, it depends on when it came out, you know?

**Q. What do you mean?**

A. If there was testimony that was given that was contradictory at trial from what we anticipated, based

upon what they had said initially, I don't know how we would have handled that exactly. But I would like to think that we would have just turned it over.

**Q. Out of an abundance of caution?**

A. Out of an abundance of caution, yes.

**Q. And if any kind of exculpatory evidence regarding these two witnesses, Betty Worthy and Linda Cloud, had been disclosed to the defense team, would you have also had made sure that that was put on the record for the court?**

A. (Indicating.) For the exact same reason.

**Q. Okay. And you nodded your head. Was that answer yes?**

A. Yes.

**Q. Thank you. When you were putting up Linda Cloud as a witness, did she testify inconsistently with any statements that you had read?**

MR. FUNK: Objection.

**Q. Or seen of hers?**

A. My current recollection is that she testified consistently with what we already had.

**Q. Okay.**

A. I mean, I clearly wouldn't have allowed her to deviate.

**Q. Right.**

A. You know, that wouldn't have -- I can't imagine.

**Q. Right. That's what I thought.**

**So if she had gotten up and testified to something that was inconsistent with any of her prior statements, even unexpectedly, at that moment, you would have taken a pause and made sure to disclose those prior statements to the defense attorney, right?**

A. Yeah, that -- no.

I'm trying to figure out exactly how I would have handled that in realtime. I would like to think that I would say, "you can't do that."

I would have explored it, you know, with her.

**Q. I see.**

A. If she said something very different from what she said before, and it came at me kind of unexpectedly, I would have had to explore it with her in realtime.

**Q. So either way, if you explored it with her directly, yourself, or if you told the defense attorney, one way or another, you wouldn't have let that testimony lie without addressing it?**

MR. FUNK: Objection.

A. Yeah. You know, after I started with the Prosecutor's Office, I went to see John T. Corrigan. And after telling me that -- you know, welcoming me onboard, he said, "Your job is to do justice." And I

took that very seriously.

**Q. I wanted to ask you about that, actually. Because you wrote that in your affidavit, I believe, in paragraph 10.**

A. Um-hmm.

**Q. And it struck me when I read this after you wrote it.**

**At the time that you were in the prosecutor's office, was it the practice for anyone in the prosecutor's office to withhold exculpatory evidence from defense?**

MR. FUNK: Objection.

A. No. But let me qualify. You know, everybody's idea of how justice is done is different, right?

So from my perspective, there were people who held information more closely than others. But we were instructed from the beginning, you know, that the goal ultimately was a just result.

And, you know, I can't speak for everybody in the office. And there have been some things that had come out, you know, over time that had caused me to question whether everybody had the same mindset that I had.

But, you know, the general mindset of the office when I was there was that, it wasn't about racking up notches on your belt, it was about making sure that you

got a just result.

**Q. Okay. This large document, which is Exhibit 17. Mr. Funk referred to as the prosecutor's file. And we went through some of this, but not all of this today, right?**

MR. FUNK: We went through all of it. It took us a long time. Go ahead.

**Q. You didn't read every page in this document, did you, in this exhibit?**

A. No.

**Q. I certainly didn't as we were sitting here today.**

**And you didn't review closely ever police report that's in Exhibit 17, right?**

A. That's correct.

**Q. We know for certain that at least some of the pages in Exhibit 17 were not part of the file that you had available to you in the early 70s, right?**

A. I think that's safe to say.

**Q. I mean, it includes stuff that was created after, in the post-conviction proceedings, right? At the very least.**

A. Right.

**Q. It is also possible that there are police reports in this Exhibit 17 that you did not have available to you in the early 70s when you were prosecuting**

**Mr. Andrews, right?**

MR. FUNK: Objection.

A. I can't say one way or the other. I mean, it's possible.

**Q. Okay. You were asked a number of questions about different handwriting that's in this Exhibit 17. And I don't want to belabor the point and go through the whole thing again. There were some pages you were certain were your handwriting, right?**

A. Right. As I tell people all the time, nobody has ever told me my handwriting was pretty, but nobody ever told me that they couldn't read it, so...

**Q. Actually, I was impressed by that. I thought it was very legible. My closing statement notes are not nearly as legible. They're my secret.**

**So your handwriting aside, obviously, you know your handwriting. But as to who made other underlines or stars or wrote other things in this, you can't be sure, right?**

A. I can't be sure. But I worked with Charlie Laurie on a couple -- several cases. I know that that was his process.

**Q. What do you mean?**

A. That he would underline and he would star things that he thought were important.

**Q. Okay.**

A. And then his handwriting is somewhat distinctive, although not completely distinctive. So I feel like I could recognize the things that were his. And then the other convections that he engaged in when he was doing, you know, document reviews caused me to come to the conclusion that those things that were starred and underlined and starred and circled and underlined were part of his process.

**Q. Okay. Do you know who else has reviewed this -- those police reports, or written on those police reports over the --**

A. I have no idea.

**Q. Do you know if anyone else who looked at the police reports also underlines or stars things or makes notes?**

A. I have no idea.

**Q. If you had seen police reports regarding an alternate suspect, would you have asked the officers about that other suspect?**

MR. FUNK: Objection.

A. I would like to think that I would have, you know? All things being equal certainly would have been something to raise the curiosity of, "who is this guy?" But I'm making a conjecture.

Q. Okay. And you don't recall ever doing that?
A. No.
Q. In terms of the way that you dealt with discovery in your practice, I believe you testified that it wasn't the practice to make copies of police reports, but you would actually show the police reports to the defendant's lawyers?
A. Right.
Q. Would you allow them to write anything down from those police reports?
A. Yes.
Q. Okay. And that's what you would have done in this case also?
MR. FUNK: Objection.
A. I believe that I would have, yes.
Q. Okay. I know that you spoke with my partner Marcus and Brian Howe you said, during the pendency of the criminal case, the second prosecution of Mr. Andrews. I also get the sense that you talked to Mr. Funk before today?
A. Yes.
Q. How many times have you talked to Mr. Funk?
A. Twice.
Q. Okay. And what was the nature of those phone calls -- or I assume they were phone calls.

A. Basically, logistical.

**Q. About today?**

A. Yes.

**Q. And did you talk about the substance of your affidavit or any of your knowledge?**

A. No.

**Q. Okay. You were asked questions about the police court and Chandler making the determination that there was enough evidence for a prosecution of Mr. Andrews, right?**

A. Right.

**Q. Who did Chandler work for?**

A. He was chief police prosecutor. So that he means that he worked for the Law Department of the City of Cleveland.

**Q. Okay. But was assigned to make -- or work with these police officers to make the decisions?**

A. Right.

**Q. Okay. And I believe your testimony about that was that the homicide detectives would bring to Chandler or his team everything that they had. And you would hope that they brought all the good stuff and the bad stuff, right?**

A. Right.

**Q. But you don't know whether the police officers**

**actually did bring all the good stuff and all the bad stuff to Chandler, right?**

A. Yes. I have no idea.

**Q. It's possible they withheld exculpatory information from Chandler at that point, that the determination of probable cause was made?**

MR. FUNK: Objection.

MR. RUSSEL: Objection.

A. I have no way of knowing what they brought.

**Q. Okay. I asked you some questions about your direct examination of Linda Cloud and what you would have done with inconsistent statements that she made from the stand, right?**

A. Um-hmm.

**Q. I know you didn't put on the testimony of Betty Worthy, but you had reviewed the file before Betty Worthy took the stand, right?**

A. Right.

**Q. And if she testified on the stand inconsistently with any prior statement that you have seen, what would you have done?**

MR. FUNK: Objection.

A. I can only conjecture. I think that, especially sitting second chair, that I would have brought it to Charlie's attention. I would have expected that we

brought it to the attention of the Court.

**Q. Okay. Because you wouldn't have just let that lie, right, without taking some action about it?**

MR. FUNK: Objection.

A. Right.

**Q. So because we know from the transcript that you did not bring anything to the attention of the Court or the defense on the record during the testimony or around the time of the testimony of Linda Cloud and Betty Worthy, do you believe that it's a safe assumption to believe that you did not have any knowledge of any prior inconsistent statements?**

MR. FUNK: Objection.

A. At this point in time, I would say yes.

**Q. Now Exhibit 2 is your affidavit which you drafted, right?**

A. Yes.

**Q. Have you reviewed it recently in its entirety?**

A. Just briefly today.

**Q. Okay. Are all of the statements in this affidavit true and accurate?**

A. They were at the time that I executed it.

**Q. Right. And there's no reason that anything had changed there, correct?**

A. No.

Q. Okay. So going back to Linda Cloud. I don't know if you recall this, but her testimony at trial was that she heard Isaiah Andrews say the exact words, "Bitch, you know I'm going to kill you, don't you?"

And then he walked in and walked out.

Do you recall that?

MR. FUNK: Objection.

A. I don't recall.

Q. Do you recall Linda Cloud giving pretty direct and inculpatory testimony about Mr. Andrews' actions?

A. I really don't recall.

Q. Okay. That's fair enough.

If you could look at Exhibit 10 -- actually, you're in Exhibit 17 right now, so what I want you to look at is page 260 in there. And I'll ask you to compare it.

MR. MENZALORA: Page 260, you said.

MR. SIDOTI: Of 17.

Q. So this is a police report regarding Linda Cloud. It's right there next to that star.

A. Right.

Q. I would like you to compare this to her trial testimony, which is in the testimony exhibit, which I think is -- which is Exhibit 10.

A. What are we looking for?

Q. So in Exhibit 10, I was looking at the top of page 260 -- I'm sorry, 206.
And so I understand you haven't read this testimony in a long time, right? And I don't expect you to remember all of it. But just on that page, you can see that you are asking her about what she observed with Mr. Andrews and his wife?
A. Um-hmm.
Q. During an interaction where she claims she saw them standing outside the apartment by the car?
A. Okay.
Q. And then he told her something. He, being Andrews, opened the car door and he told her. And we need the exact words.
And the exact words she said are, "Bitch, you know --
MR. FUNK: Which page are you reading from?
MS. GELSOMINO: 206.
Q. -- you know I'm going to kill you, don't you?"
And he walked back in the car and got in, right?
A. Right.
Q. That's pretty --
A. That's pretty graphic.
Q. Right? That's pretty inculpatory, right?
A. Right.

Q. Okay. And then if you compare that then to this page, 260, in Exhibit 17, which is a police report.

A. Right.

Q. And here Linda Cloud, in her statement, states she did not hear any noise in the victim's apartment. She was home. She said that she saw the victim get into the car and nothing else.

She doesn't say anything about Mr. Andrews saying anything like a direct threat to kill her, right?

A. Right.

Q. Do you recall receiving, and I understand it's been a long time, any kind of a police report or any information from any police officer that Linda Cloud made a statement that she observed Regina Andrews, the victim, and Isaiah Andrews, and that there were no concerning conversations and no threats of death?

MR. FUNK: Objection.

MR. RUSSEL: Objection.

A. I really don't remember.

Q. Okay.

A. It would have to come from someplace. But I don't know -- I don't remember that at all.

Q. Okay. Was it a policy of the prosecutor's office to conceal exculpatory evidence at the time you were in there?

A. No.

MR. FUNK: Objection.

**Q. Would that have been tolerated?**

MR. FUNK: Objection.

A. I would say no.

**Q. I understand you said there was -- you know, some prosecutor's played things a little closer to the chest than others.**

**But were you aware of any prosecutors while you were there who did not disclose exculpatory evidence?**

MR. FUNK: Objection.

A. No.

**Q. Do you believe that your trial partner, Laurie, would have removed any type of exculpatory evidence or hid it from you even?**

A. No.

**Q. That would have been unethical for him to do that, right?**

A. Yes.

**Q. Did you know him to be an unethical prosecutor in any way?**

A. No. He was a hard-nose, tough prosecutor. But I didn't no him to be unethical in any way.

**Q. Okay. Did you ever know him to withhold any exculpatory evidence that he received from police**

**officers?**

A. No.

MR. FUNK: Objection.

**Q. During the course of your time in the prosecutor's office, did you ever request records from the officers at some point and receive additional reports that you did not have in your first file?**

A. Yes.

**Q. Was that common?**

MR. FUNK: Objection.

A. "Common" is a relative term. Occasionally.

**Q. It happened sometimes?**

A. Um-hmm.

**Q. Did you have the habit of writing on police reports while you were reviewing the file?**

A. That was not my process. You know, I usually kept notes on a separate pad.

**Q. Okay.**

A. So I didn't usually -- probably comes from the fact that my mother was a librarian, and writing on books and other documents -- you know, I had a hard time highlighting in college.

**Q. That makes sense. In this file that we just looked at, I didn't see any notes from you other than your closing notes and maybe some opening notes.**

A. Um-hmm.

**Q. Did you make other notes?**

A. I don't remember.

**Q. Would you typically make additional notes as you were reviewing the file or preparing witnesses?**

A. Generally speaking.

**Q. Would those notes have been saved with the prosecutor's file, along with everything else?**

MR. FUNK: Objection.

A. Not necessarily.

**Q. Why not?**

A. Depends on whether or not I gave it to somebody, you know? So I didn't really give it a lot of thought. It was my notes.

**Q. Okay. Did you ever make notes while you were preparing a witness, lay witness or --**

A. Yes.

**Q. -- a cop?**

A. Yes.

**Q. Would you keep those notes?**

A. Yes.

**Q. And I imagine you did that in this case, right, while you were preparing this case to trial?**

A. Yes.

**Q. Did you make notes with your meetings with the**

**detectives?**

A. I don't know. I don't remember.

**Q. Fair enough. Would you expect to see those in the prosecutor's file, though?**

MR. FUNK: Objection.

A. Not necessarily. Because, like I said, those were my notes, and I wouldn't necessarily put them into the prosecutor's file.

**Q. Would you include them in the prosecutor's file if your notes included some kind of exculpatory information that you had not seen before?**

A. If it was exculpatory, yeah.

**Q. And if at any witness told you at any point -- or any witness told you any point of -- let me start question again.**

**If at any point any witness that you were talking to before the time of trial or during trial gave you any kind of evidence that you believe to be exculpatory, would you have made a note of that?**

A. It would have made its way to the prosecutor's office.

**Q. Okay. That would have been something that you would make sure you didn't throw out or put somewhere else, it would've been in the file, right?**

A. Yes.

**Q. And I just want to be clear, this Exhibit 17 is not the prosecutor's file that you had in 1973, right?**

MR. FUNK: Objection.

MR. RUSSEL: Objection.

**Q. I keep saying 1973.**

**This is not the prosecutor's file that you had when you prosecuted this case in 1974, right?**

A. I don't think so.

MR. FUNK: Objection.

MR. RUSSEL: Objection.

A. Based on everything that we've got here, this seems like voluminously more than what we had.

**Q. Right.**

A. You know, I remember this being a fairly thick file, as files go. But I would've thought it maybe would have been an inch, inch and a half thick, at a maximum. You know, it clearly was not everything that we got in front of us now. And of course, as we were going through it, on behalf of the defense, it is clear to see why, you know, there's so much additional material that was generated by post-conviction type of things and that have puffed this up quite a bit.

But as far as the basics are concerned, as I recall, maybe an inch, inch and a half would have been the maximum number of documents.

**Q. Okay. You met with Hubbard and Rowell over the course of this investigation prosecution, right?**
A. Yes.
MR. FUNK: Objection.
**Q. Would you have expected those detectives to tell you about an alternate suspect or prior inconsistent statements of witnesses?**
MR. FUNK: Objection.
A. I would have expected them to tell me everything that was relevant to that case.
**Q. Okay.**
A. You know? As I said, the good, the bad, and the ugly. I would have expected them to give me a complete overview because, you know, as lawyers, the worse thing in the world is for you to get in a trial situation and find out that you are going to get surprised.
**Q. That's true.**
A. And so as a result, in preparation, it was always my goal to make sure that I knew as much as was humanly possible about the case that I was going to have to prosecute.
So I would have anticipated and expected and required that the detectives give me as much as they could.
**Q. Fair. And then you already told me you would**

**have made sure to give that to the defense and say something about that on the record, right?**

A. Yes.

**Q. In this case, because there is no discussion on the record of the disclosure of exculpatory information, is it fair to conclude that you did not know, as the prosecutor in this case, you did not know the existence of an alternate suspect?**

MR. FUNK: Objection.

A. All I can tell you is that I don't recall the information about an alternate suspect.

**Q. Okay.**

A. And the record kind of speaks for itself.

**Q. You may not know the answer to this because I don't believe you ever worked in post-convictions or appeals as a prosecutor, but I'll ask you anyhow.**

**Do you know whether a prosecutor who was working on the case after a conviction, appeal, post conviction, motion for a new trial, anything, can contact detectives or contact the police department to get the full file --**

MR. FUNK: Objection.

MR. RUSSEL: Objection.

A. I have no way of knowing that.

MS. GELSOMINO: I would like to take a quick minute to consult with my team and finish up.

MR. FUNK: Okay.

- - - -

(Off the record.)

- - - -

MS. GELSOMINO: I don't have any other questions. Thank you, Judge.

THE WITNESS: You're welcome.

MR. FUNK: I have one follow-up question.

THE WITNESS: Sure.

RE-EXAMINATION OF RONALD ADRINE

BY MR. FUNK:

**Q. You were asked about the direct examination of Linda Cloud. And I think it's page 206, where -- if you don't have it handy, I can show it to you and make it easier.**

A. Oh, okay. Good.

**Q. You see where there's a question and you were asking, "We need the exact words."**

A. Right.

**Q. And then she answers it?**

A. Yes.

**Q. So you would have, prior to putting Linda Cloud on the stand, would have met with her and prepared her?**

A. Right.

**Q. Is it possible that Linda Cloud would have told**

**you that during your interview?**

A. It's certainly possible.

**Q. So even if that statement wasn't in any of her prior statements, is it possible that she told you that, and a that is why you elicited that testimony?**

A. It is possible.

**Q. And you would not have elicited that testimony if you thought it was not true?**

A. That's true.

**Q. And you were the one that specifically prompted her to give that testimony?**

A. Yes.

**Q. Okay. And then she was subject to cross examination after that?**

A. Right.

MR. FUNK: All right. Thank you.

MS. GELSOMINO: I don't have anything else. Do you have anything on that?

MR. RUSSEL: No.

MS. GELSOMINO: Nor do I.

MR. FUNK: You know, you have the right to review the transcript once it is prepared and we can e-mail it to you or you can just waive signature, that's fine, too.

THE WITNESS: Let me just waive signature.

- - - -

(Deposition concluded at 4:27 p.m.)

- - - -

C E R T I F I C A T E

I, Denise Cardona, a Notary Public within and for the State of Ohio, do hereby certify that I attended the foregoing hearing in its entirety, that I wrote the same in stenotypy, and that this is a true and correct transcript of my stenotype notes.

IN WITNESS WHEREOF, I have hereunto set my hand and seal of office, at Cleveland, Ohio, this 29th day of December A.D. 2022.

Denise Cardona

Denise Cardona, Notary Public, State of Ohio
1020 Ohio Savings Plaza, 1801 East 9th Street,
Cleveland, Ohio 44114
My commission expires November 29, 2026.

**WORD INDEX**

< 1 >
**1** 4:11 6:24 21:8 36:22 60:17 87:7, 17 89:1 93:10
**1/15/75** 15:16
**1:22-CV-00250** 1:10
**10** 4:20 24:16 25:10 47:2 70:4 114:4 122:13, 24 123:1
**10/29/74** 15:16
**100** 10:12
**1020** 135:19
**105/24** 4:5
**106** 3:9
**107** 51:10
**108** 51:13, 14
**10th** 1:20
**11** 4:21 24:19, 21 25:21 26:8 46:6, 12 52:9 62:7
**11/21/74** 62:6
**110** 52:4
**111** 52:1
**112** 52:1, 7
**113** 52:1, 14
**114** 52:1, 17
**115** 52:20
**116** 52:23 53:5, 6, 7
**117** 53:6, 7
**117s** 53:6
**118** 53:16
**119** 55:10
**12** 4:22 24:24 25:1, 23 26:8 39:20 40:4 52:9
**12/31/74** 48:14
**12:57** 1:21
**122** 55:14
**123** 55:14
**124** 55:22
**125** 55:24
**126** 56:14, 16
**127** 56:14
**128** 56:23
**129** 57:4
**12th** 47:25
**13** 4:23 34:24 35:3, 14, 15, 21 37:7, 8
**130** 57:11
**132/11** 4:4
**133** 57:11
**135** 57:17
**1375** 1:21
**14** 4:25 34:24 35:5, 8, 11, 17, 20
**14/11** 4:13
**15** 5:3 34:25 35:7, 18 38:3
**15/23** 4:15
**15/3** 4:14
**16** 5:4 36:17, 20 38:5, 7 56:4
**16/25** 4:16
**16C** 54:25
**16D** 54:25
**17** 5:5 16:2 45:8 46:2 115:2, 13, 16, 24 116:6 122:14, 18 124:2 129:1
**18** 5:7 46:16, 18, 21 64:11 104:7
**18/8** 4:17
**180** 57:17
**1801** 135:19
**181** 57:25 58:8
**182** 58:10
**184** 58:12
**185** 58:19
**187** 58:19
**188** 58:19
**189** 58:19
**18th** 87:10
**190** 58:24
**1900** 2:9
**191** 59:2
**192** 59:7
**193** 59:14
**194** 59:22
**195** 59:22
**196** 60:5, 16
**1970s** 50:14 51:4, 12 57:18 63:8 64:17 68:7 73:15, 17 103:11
**1973** 9:13, 14, 15 129:2, 5
**1973[sic** 45:14
**1974** 10:1, 5 16:2 17:5, 11 18:12, 19 26:23 45:15 62:7 64:11 75:20 88:22 92:2, 3 129:7
**1974/1975** 93:25
**1975** 11:6, 11 12:18 13:17 14:16 19:25 21:5 27:6 32:4 43:19, 22 46:24 47:25 72:11, 12, 19
**1978** 46:25
**198** 60:15, 16
**1982** 70:12
**1990s** 69:9, 13 71:15, 18
**1994** 47:2
**1997** 47:2
**1999** 47:3

< 2 >
**2** 4:12 8:25 9:2 22:6 60:17 93:11 121:15
**20** 135:12
**2009** 72:1
**201** 61:11
**2018** 46:6, 10, 12, 15 47:4 70:14
**2020** 40:7
**2021** 9:8 40:5
**2022** 1:22 11:3
**2026** 135:21
**203** 60:5 61:11
**205** 62:3, 4, 7
**206** 62:4, 6 123:2, 18 132:13
**207** 62:18
**21** 14:16 92:2, 3
**21/12** 4:18
**212** 62:18
**213** 62:21
**214** 62:23
**215** 63:7
**216** 62:25
**216-241-1430** 2:11
**216-664-2800** 3:11
**21st** 11:16
**22** 50:5
**222** 3:20
**226** 63:7
**228** 63:9
**229** 64:15
**23** 36:23 37:2
**232** 64:16
**24** 75:20
**24/16** 4:20
**24/21** 4:21
**24/8** 4:19
**24th** 87:11
**25/1** 4:22
**252** 64:16
**253** 64:18
**254** 64:23 87:4
**256** 74:22, 24 87:5
**257** 93:8, 9
**258** 65:6
**259** 88:25 90:18, 20
**260** 91:13, 24 122:15, 17 123:2 124:2
**261** 64:19 65:14, 17
**262** 66:3
**263** 66:11
**266** 91:21 92:1
**267** 66:15
**268** 66:11 67:17 89:17
**269** 67:21
**270** 67:23 79:25
**271** 69:3, 12
**27th** 56:7
**28** 18:12, 19
**29** 135:21
**2903.01** 75:5

< 3 >
**3** 4:13 9:13 13:17 14:11, 14 60:17 87:7 88:12 89:2
**30** 7:10 50:16, 20
**31** 17:5
**3301** 92:4
**330-849-6602** 3:23
**34/24** 4:23, 25 5:3
**36/17** 5:4
**37** 50:17, 20
**38** 51:10
**392** 69:13
**393** 69:3, 4, 5, 7, 12, 14
**395** 70:21, 25
**398** 70:25
**3rd** 13:16 63:15

< 4 >
**4** 4:14 13:16 15:3, 6 21:9 47:12, 14
**4:27** 134:2
**400** 3:21 71:14, 16, 17
**44113** 2:10
**44114** 3:10 135:20
**44308** 3:22
**45/8** 5:5
**46/18** 5:7
**48** 23:12

< 5 >
**5** 4:15 15:23 48:22, 25 49:6
**50** 2:9 11:4 19:9
**50s** 12:20

< 6 >
**6** 1:22 4:16 16:25 17:4 39:18
**6/24** 4:11
**6/6** 4:4
**601** 3:9
**60s** 12:20
**612** 71:17
**613** 71:20
**614** 71:14, 17, 20
**615** 71:20
**616** 71:22
**618** 72:2
**622** 72:2

< 7 >
**7** 4:17 9:8 18:8, 11 42:1
**70s** 44:2 111:3 115:17, 25
**74** 15:19 19:25 69:23
**75** 56:7 88:22
**76** 69:21, 23 70:2, 3
**78** 70:3

< 8 >
**8** 4:18 21:12, 15 83:19, 23 84:2

< 9 >
**9** 4:19 24:8 25:6 47:2 48:25 49:7 78:9, 10
**9/18/74** 67:22
**9/19** 93:18
**9/19/74** 87:7, 15 89:2 90:21
**9/2** 4:12
**9/20** 93:19
**9/20/74** 93:10
**9/21** 93:19
**9/23/74** 74:25
**90** 79:24
**90s** 69:15
**93** 51:20
**9th** 1:21 135:19

< A >
**A.D** 135:12
**ability** 42:22
**able** 22:11 42:22 66:23 72:16, 18, 25 73:14 103:18
**absolute** 14:3 85:16
**abundance** 112:4, 5
**accomplishment** 70:19
**accurate** 121:21
**action** 121:3
**actions** 122:10
**actively** 64:5
**actual** 86:24
**Adam** 64:24 87:25
**added** 74:1, 10
**addition** 38:9
**additional** 30:18 39:24 42:10 43:10 47:1, 8 68:1 71:14 90:12 105:19 126:6 127:4 129:20
**address** 37:20 92:5
**addressed** 59:15
**addresses** 17:18 37:11 48:14
**addressing** 113:20
**administrative** 71:12
**Adrine** 1:17 4:3 6:3, 5, 9, 11 105:23 132:10
**A-D-R-I-N-E** 6:10
**Affidavit** 4:12 8:24 9:5, 11 39:15 45:5 57:6 78:7 83:20 87:5 88:15 90:11 91:6 114:3 119:5 121:15, 21
**afford** 22:11
**age** 6:3
**aggravated** 75:5
**ago** 11:4
**agree** 110:18, 19 111:12
**ahead** 18:5 24:13 28:20 50:16 51:13 57:7, 19 58:1 61:25 62:2 63:9 64:18 69:14 89:17 91:20 115:7
**Akron** 3:22
**al** 1:12
**alive** 82:22
**Allen** 95:13, 15, 19 96:1, 14, 17 97:5, 10, 14, 21 104:16, 17
**allow** 118:9
**allowed** 112:23
**alternate** 39:23 109:21 110:4, 19 117:19 130:6 131:8, 11
**alternative** 88:18
**and/or** 1:22
**Andress** 1:20 3:19 6:13 7:24
**ANDREWS** 1:6 6:15 8:1, 3 10:23 12:4 35:4 40:10 49:8 50:1 55:20 57:5 66:7 75:6, 18 80:13 92:14 96:1 98:8, 12 99:22 100:4, 9 101:23 102:19, 23 103:6 108:7, 11 116:1 118:19 119:9 122:3, 10 123:7, 13 124:8, 14, 15
**answer** 8:17 29:14, 16 30:7 100:25 101:1 103:2 104:8 112:12 131:14
**answering** 28:14
**answers** 101:6, 13, 19 103:7 132:20
**Anthony** 5:5 41:5, 7 45:3 46:2
**anticipated** 111:25 130:22
**apartment** 123:10 124:5
**apparently** 90:2
**Appeal** 57:5, 17 63:8 64:17 131:18
**appeals** 58:5 59:18 71:15 131:16
**appear** 71:9 75:19
**APPEARANCE** 3:1 47:4 71:3 75:25 76:4, 5 77:8 78:1
**APPEARANCES** 2:1
**appears** 41:24
**application** 47:5 55:14
**appreciate** 6:11 7:3 105:14
**April** 46:6, 12
**archive** 46:5 72:17
**area** 71:23 90:19
**argue** 61:9
**argument** 59:18 60:19, 20 61:1, 3, 14, 20
**arguments** 61:9
**arm** 78:25
**ARNOLD** 3:6 7:21
**arraigned** 44:14 75:19 79:12
**arraignment** 79:12
**Arrest** 42:17 58:14 75:15 84:16
**arrested** 76:2, 3 77:1, 2 84:4 87:11 88:12
**aside** 39:16 116:16
**asked** 13:13 30:13 32:2 101:2, 5, 19 106:1 116:5 117:19 119:7 120:10 132:12
**asking** 29:23 32:17 55:19 63:1 70:25 123:6 132:18
**Assembled** 106:20, 21
**assembly** 106:24
**assigned** 11:23 12:11, 12 13:2, 9 17:11 20:2, 15 22:7, 9, 10 44:12, 14 119:16
**assignment** 12:4 13:7 16:15
**assist** 74:20
**Assistant** 7:20 10:2, 20, 21 62:9 63:21
**associating** 63:6
**assume** 107:11 118:25
**assumption** 121:10
**attempting** 90:2
**attempts** 57:16
**attend** 59:17 62:5
**attended** 135:6
**attention** 39:22 66:15 89:18 109:23, 24 120:25 121:1, 7
**attorney** 6:12 7:18, 21 9:12 10:2, 20, 21 32:13, 21 37:20 39:21 55:3 56:8 63:21 105:18 113:7, 18
**attorneys** 10:9 21:18, 19 40:10 41:1, 6 70:1
**Attorney's** 11:21 104:10
**authorize** 75:15
**autopsy** 57:25 58:8
**available** 13:5 28:20 32:14 108:18, 25 115:17, 24
**Avenue** 3:9 92:4
**aware** 82:8 84:3 106:14 107:13, 19 111:1 125:9

< B >
**back** 11:13 18:25 19:23, 25 23:1 26:2, 23 32:4, 15 39:15 44:1 46:22, 23 50:13 63:3 68:6 70:5 74:22 78:3 90:18 93:8, 24 111:3 122:1 123:20
**background** 9:12
**bad** 57:2 76:21 119:22 120:1 130:12
**ball** 72:9
**band** 47:9
**bar** 9:13
**based** 23:20 49:20 57:12 73:1, 13 76:17 84:17 103:11 111:25 129:11
**basically** 7:3 8:10 11:22 20:21 37:19 41:11 53:18 119:1
**basics** 129:23
**Bates** 18:14 48:23
**bedding** 23:2 92:14
**bedspread** 92:15
**beginning** 36:21 67:24 114:17
**behalf** 2:3 3:2, 16 7:25 8:3 21:22 129:19
**belabor** 116:7
**believe** 23:22 58:15 59:6 63:7 74:8 77:10 79:4 91:9, 12 93:3, 6 104:4, 17, 25 108:9 114:3 118:4, 15 119:19 121:10, 11 125:13 128:18 131:15
**Bell** 9:24 99:18
**bells** 100:23
**belonging** 92:15
**belt** 114:25
**bench** 70:10, 11, 12
**beneficial** 32:13
**benefit** 65:16, 22
**Betty** 17:23 18:22 19:3 23:23 24:12 25:8, 24 26:18, 21 27:3 28:7 31:14 38:1 42:10 43:11 52:8 90:13, 24 91:1 92:5 93:13, 17 94:13 110:23 111:5, 10 112:7 120:15, 16 121:9
**big** 68:2, 3
**Bill** 4:23, 25 7:19 35:4, 6, 11, 15, 17, 19, 25 38:10
**bit** 9:11 68:17 129:22
**Bitch** 122:4 123:15
**blah** 81:6, 7
**blanks** 81:10
**blood** 67:15 81:6, 9
**blue** 51:6
**board** 103:7
**boards** 103:2
**body** 67:18 71:24 87:16 89:22 92:14
**BONHAM** 2:8 8:6
**books** 126:21
**BOOP** 3:7 8:7

**bottom** 15:12 29:17 36:13 39:4 54:20 56:12 65:21 66:7 67:17 75:2 89:8, 18, 19 90:22 93:11, 12
**bound** 77:12 81:24
**box** 15:13
**Boy** 72:21
**bracketed** 66:13
**break** 8:19 45:21
**Brian** 40:19 47:4 118:17
**briefly** 121:19
**bring** 55:18, 20 80:23 119:20 120:1 121:7
**Broadcast** 59:8
**brought** 18:25 19:22 39:21 76:14 77:2 78:6 93:20 109:23, 24 119:22 120:9, 24 121:1
**Bruce** 6:9
**bulletin** 59:9
**Bureau** 59:5 102:8 104:24

< C >
**call** 55:3 71:6 81:7 87:20
**called** 37:21 52:8 106:15
**calling** 62:5
**calls** 75:24 118:25
**camera** 27:8
**caps** 92:23
**car** 123:10, 13, 20 124:7
**carbon** 51:3
**Cardona** 1:18 135:5, 18
**Carmen** 63:14, 18, 19, 20
**CASE** 1:10 5:7 12:4, 10 13:8, 19 14:9 15:10, 18 16:2, 22 18:25 19:19 20:2, 22 21:20 23:4 27:19, 22 28:2, 5 29:8 31:13, 21 32:3 33:22 35:4 39:23 41:4, 19, 21 44:9, 11 46:21 47:16 50:7 52:24 55:8 63:6, 14, 15 64:3 72:10 74:16 75:4 76:8 77:11, 19 78:19 80:12, 13, 19 81:11, 25 82:4, 6, 16 83:16 85:2, 13 86:2, 19 98:1 99:11 104:11 107:20 108:6, 13, 14, 18, 23 109:16 110:22 118:13, 18 127:22, 23 129:7 130:10, 20 131:4, 7, 18
**cases** 11:13 13:23 19:14, 17 20:17 116:21
**category** 73:3
**caught** 74:15
**cause** 77:9 120:6
**caused** 73:5 114:21 117:6
**causes** 74:8, 10
**caution** 112:4, 5
**Center** 1:20
**certain** 28:18 79:4 86:15 107:21 109:4, 6 115:15 116:8
**certainly** 59:19 82:5 101:24 115:11 117:23 133:2
**certainty** 85:17
**certify** 135:6
**chair** 12:12 13:13 108:13 120:24
**chairs** 108:22, 23
**Chandler** 75:3, 9 76:7 119:8, 12, 20 120:2, 5
**changed** 121:24
**charged** 75:19 77:2
**charges** 95:6
**charging** 76:15, 18
**Charles** 10:22 12:14 13:12 14:5 21:17 23:20 33:18, 22 34:6 36:1 41:21 48:3 52:17 54:18 57:13 63:10 85:24 86:5, 8 88:1, 7 90:7 91:2, 9 93:4 95:22 96:14, 23 98:10 99:24
**Charlie** 12:11, 14 41:25 52:13 61:4, 5 66:14, 19 85:6 89:14 96:4 116:20
**Charlie's** 51:17 54:19 56:15 64:25 65:12, 24 66:1 67:16, 19 88:4 120:25
**chest** 125:7
**Chief** 7:20 75:3, 11 119:13
**chosen** 46:15
**circled** 56:17 117:8
**circumstances** 41:14 48:15
**CITY** 1:12 3:2, 8 6:13 7:18, 22 8:8 10:17 28:23 50:19 59:11 62:19 75:12, 15 76:2 77:15, 20 78:4 80:6 81:14, 17, 23 82:9, 11 90:3 95:5 96:19, 22 97:11 98:17, 22 99:9 103:12 105:18 107:24, 25 119:14
**city's** 79:1
**claiming** 45:16, 17, 18
**claims** 123:9
**clear** 18:1 45:11 51:22 67:11 96:21 129:1, 19
**clearly** 112:23 129:17
**clerk** 50:11
**clerk's** 78:2
**CLEVELAND** 1:12, 20, 21 2:10 3:3, 8, 10 6:14 7:18, 22 8:8 9:20 28:23 42:16 50:19 58:13, 22 59:11 62:19 75:12 76:3 80:7 81:15 95:16 97:20 103:13 119:15 135:11, 20
**clinic** 52:5
**closed** 61:5
**closely** 114:16 115:12
**closer** 125:7
**closing** 60:19, 20 61:1, 9, 20 116:14 126:25
**Cloud** 17:23 24:3 25:12, 22 26:10, 15 27:3 28:8 31:14 38:1 42:10 43:11 90:13 91:16, 18, 22 92:24 94:13 110:23 111:5, 11 112:7, 15 120:11 121:9 122:1, 9, 19 124:4, 13 132:13, 22, 25
**coat** 90:2
**Code** 75:5
**coercion** 55:9
**cold** 31:8
**college** 126:22
**Colonial** 93:13
**come** 12:4 23:9 28:25 29:6 31:7 110:22 114:20 117:6 124:21
**comes** 79:11 126:19
**comments** 57:12
**commission** 135:21
**committed** 77:11 90:1
**common** 126:9, 11
**communication** 81:21 85:1
**community** 107:13
**Comodeca** 99:17, 19, 21, 25 100:3, 14 101:6
**Comodeca's** 100:18
**Company** 9:24 10:1
**compare** 67:12 122:16, 22 124:1
**compared** 56:18 67:3
**competency** 50:1
**compiled** 20:11, 13
**complete** 43:8 130:13
**completed** 72:10
**completely** 117:3
**conceal** 124:24
**concern** 17:22 18:1 19:3
**concerned** 18:23 129:23
**concerning** 39:10 124:16
**concerns** 37:13
**conclude** 131:6
**concluded** 77:1 134:2
**conclusion** 117:7
**conducted** 25:8
**confirm** 21:6 73:14
**confirms** 39:5
**conflict** 27:8
**Congratulations** 70:15
**Congress** 70:4
**conjecture** 117:25 120:23
**consider** 70:18
**considered** 84:4
**consistent** 30:8 110:24
**consistently** 112:21
**constitute** 79:10
**consult** 77:20 131:25
**Consulted** 75:2
**contact** 23:9, 14 57:16 131:19, 20
**contacted** 17:20 39:21 72:8 93:13
**contained** 20:20
**CONT'D** 3:1 5:1
**context** 17:9
**contradicted** 73:25
**contradictory** 111:25
**convections** 117:5
**conversation** 40:6, 13 82:18, 19 85:14 86:16
**conversations** 41:7 78:3 82:14 85:4 94:3, 7 96:1, 5 124:16
**convey** 32:19
**conveyed** 92:13, 19
**conviction** 41:4 54:15 58:4 131:18
**coordinated** 6:18
**cop** 127:18
**copies** 32:25 33:3, 5, 9, 13 44:21 49:22 51:3, 5 64:19 118:5
**copy** 6:21 14:15 36:20 42:25 46:21 47:15 54:14 56:12 66:3 67:21 68:21
**corner** 37:5 48:23
**coroner's** 23:8 42:13
**Corpus** 55:15, 16, 19, 23 64:14, 15
**correct** 22:1 56:5 78:14 100:5 108:14, 24 115:14 121:24 135:8
**correctly** 87:9
**Corrigan** 48:17 113:23
**co-trial** 10:21
**counsel** 1:23 10:21 22:9, 10, 11 23:20 27:20 28:9 33:23 39:6, 7, 13
**county** 10:2, 3, 10, 20 41:5 62:9 77:12, 16, 21 78:2, 4 81:19 92:13
**county's** 79:2

**couple** 14:8 21:5 36:23 40:16 47:10 50:5 64:14 73:5, 7 116:21
**course** 25:17 37:22 79:16 80:1 96:8 126:4 129:18 130:2
**COURT** 1:2 6:16 22:8 30:23 37:19 39:4 44:22 55:20 59:18 71:9 75:19, 21, 22, 24 77:9, 11, 25 112:10 119:8 121:1, 7
**courtroom** 12:24 79:13, 15
**courts** 71:6
**Court's** 37:9
**cover** 21:8, 16
**CR17902** 10:23
**crank** 14:24
**created** 106:9, 11 107:10 115:19
**crime** 77:10, 11 90:1
**criminal** 10:3, 9 11:7, 9 17:24 27:19 28:22 32:3, 6, 21 33:23 41:4 46:22 50:7 52:24 54:12 118:18
**cross** 25:21, 23 26:3, 7, 10, 17 133:13
**crossed** 66:20, 21
**curiosity** 117:24
**current** 112:20
**currently** 44:12, 14 45:16
**cut** 8:16
**Cuyahoga** 10:2, 10 77:12

< D >
**dad** 70:3, 6
**Darn** 11:5
**dash** 68:25
**Database** 46:11
**Date** 15:13 17:5 46:16 47:6 51:22 56:6, 7, 9, 11 71:8 92:3
**dated** 14:15 16:1 18:18 48:14 56:6, 11 67:21 74:25 89:2 90:21 92:1
**dates** 15:12
**David** 97:17, 19 98:2, 7, 11, 16, 22 99:5, 8, 14
**day** 52:10 56:10, 11, 13 135:11
**days** 79:24, 25
**deal** 14:25 16:11 20:19
**Dealer** 70:18
**dealing** 16:22 54:9, 25
**dealt** 118:3
**death** 23:10 124:16
**decades** 107:13
**December** 1:22 16:2 17:5 18:12, 19 62:7
**decided** 96:6
**decision** 76:15, 19 86:20
**decisions** 119:17
**Declaration** 5:5 45:18 46:2 49:20
**Defendant** 3:2 21:22 22:10 27:10 38:15 44:10 52:9, 10 53:22, 24, 25 54:6, 7, 10 65:16, 22 77:10 84:3
**Defendants** 1:14 3:16 20:19
**Defendant's** 6:24 9:2 14:11 15:3, 23 16:25 18:8 21:12 24:8, 16, 21 25:1 34:24 36:17 55:11 56:8 67:3, 4, 18 118:7
**defenders** 22:3, 8
**defense** 26:25 28:8 32:12, 21 33:5 34:5 36:12 39:7, 11 61:3 89:22 107:22 108:7, 11 109:21, 24 110:7, 10 111:17 112:8 113:7, 18 114:11 121:8 129:19 131:1
**definitely** 19:5
**definitive** 74:17
**definitively** 74:3, 4
**delivered** 104:5 105:1 106:25
**Demand** 5:3 35:7, 8, 18 36:5 52:20 55:11
**denies** 52:10
**Denise** 1:18 135:5, 18
**Department** 3:8 8:8 28:23 58:13, 23 78:4, 25 80:7 82:11 95:17 97:20 101:11, 18 103:5 108:2 119:14 131:20
**depend** 111:19
**depended** 13:3 79:23
**depending** 30:12 41:22 44:6 79:20
**depends** 111:21 127:12
**Deposition** 1:17 6:19 7:6, 11 8:24 134:2
**describe** 18:14
**describes** 92:6
**DESCRIPTION** 4:10
**Detective** 23:24 29:1, 7, 8 81:8, 25 82:15, 17 83:5 85:6 95:16 102:8 104:1, 23
**detectives** 76:13 80:19, 22 83:2, 3, 9 91:18 104:13 107:25 119:20 128:1 130:5, 23 131:19
**deteriorate** 68:17
**deteriorated** 105:16
**deteriorating** 68:4
**determination** 119:8 120:6
**determine** 86:18
**developed** 77:24 79:3
**deviate** 112:24
**diagnosed** 49:17
**different** 75:22 109:1 111:5 113:14 114:14 116:6
**differently** 73:22
**difficult** 50:6
**direct** 23:23 24:2, 12 25:7, 12 31:1, 4 81:21 84:25 86:6, 9 95:23 120:11 122:9 124:9 132:12
**directly** 81:25 113:18
**Director** 7:20
**directs** 26:2
**disclose** 110:3 113:6 125:10
**disclosed** 110:10 112:8
**disclosure** 55:6 131:5
**Discovery** 5:3 27:19 32:3, 5, 6, 9, 10 33:23 35:7, 9, 18 36:5 41:21 52:20 53:17, 20 55:11 56:3 118:3
**discussed** 41:10 94:14
**discusses** 89:3
**discussion** 37:8 86:24 87:21 131:4
**discussions** 39:6
**dispute** 88:17
**distinctive** 117:2, 3
**DISTRICT** 1:2, 3
**DIVISION** 1:4 10:3, 9 11:14, 17 96:6
**DNA** 47:5
**docket** 5:7 46:22, 24 71:2, 4, 7
**document** 15:7 17:3 44:20 45:15, 18 46:3 47:23 50:9 57:4 58:12, 13 62:3 69:6 103:14 115:2, 8 117:6
**documentation** 41:24
**documents** 14:8 35:23 49:21 57:17, 21 58:4 69:3, 5, 8 71:25 72:1, 20 73:1, 15, 16 74:7 126:21 129:25
**doing** 32:3 55:18 117:5 118:1
**door** 123:13
**doubt** 34:12 88:19
**drafted** 121:16
**drafting** 60:8
**draw** 66:15 89:17
**drawer** 20:16
**drive** 44:19, 22
**due** 16:3 17:19
**Dugan** 100:21 101:3
**duly** 6:3
**duplicate** 67:24, 25 68:22, 25

< E >
**earlier** 57:12 66:19 90:15
**early** 12:20 115:17, 25
**easier** 47:13 132:15
**East** 1:21 11:16 135:19
**EASTERN** 1:4
**Eboop@city.cleveland.oh.us** 3:14
**effective** 30:13, 15
**either** 12:19 32:11 67:13 68:3 82:20, 22 83:6 85:23 100:23 107:5, 6 113:17
**electronically** 46:9
**ELENA** 3:7 8:7
**elicited** 133:5, 7
**ELIZABETH** 2:8 8:5
**Elizabeth@fggfirm.com** 2:15
**e-mail** 133:23
**emitted** 83:15
**emphasize** 65:4
**ended** 106:1
**enforcement** 84:14
**engaged** 117:5
**entered** 47:4
**entire** 23:21 76:10 78:14 108:16
**entirely** 79:18
**entirety** 121:18 135:7
**envelopes** 68:8
**equal** 117:23
**Ernest** 82:17 83:14 85:1 86:2 94:3, 18 95:4 104:12
**Ernie** 82:20 85:6
**escapes** 49:16
**especially** 68:15 120:23
**ESQ** 2:5, 6, 7, 8 3:4, 5, 6, 7, 17, 18
**essential** 101:25 102:1
**essentially** 20:11 28:25 29:12 30:2 46:4, 13 62:13 75:21 78:17 80:4
**et** 1:12
**Euclid** 92:4
**event** 7:13
**Everett** 75:3, 9

**everybody** 7:16 110:17 114:19, 22
**everybody's** 114:13
**evidence** 32:22 39:8, 22 47:25 61:20 81:6, 9 94:17 96:17 97:6, 13 98:15, 21 99:4 100:3, 14 107:15 108:1, 7, 10 110:3, 7, 19, 20 112:6 114:10 119:9 124:24 125:10, 14, 25 128:18
**evidentiary** 39:11
**exact** 112:11 122:3 123:14, 15 132:18
**exactly** 20:14 30:5 31:5, 11 40:25 78:23 107:20 112:2 113:9
**exam** 9:13
**examination** 1:18 4:3 6:5 23:23 24:2, 12 25:7, 12, 21, 23 26:3, 10, 17 29:9 30:23 31:1, 4 86:6, 10 95:23 105:23 120:11 132:12 133:14
**examinations** 26:8
**example** 31:14 53:23 86:2 104:12
**Excerpt** 4:18, 19, 20, 21, 22 5:4 25:6
**exculpatory** 107:15, 21 108:6, 10 110:3, 7, 20 111:12 112:6 114:10 120:4 124:24 125:10, 14, 25 128:10, 12, 18 131:5
**Excuse** 57:2
**executed** 121:22
**execution** 71:4
**EXHIBIT** 4:8, 10 6:24 8:25 9:2 14:11, 14 15:3, 6, 23 16:25 17:4 18:8, 11 21:12, 15 24:8, 16, 21 25:1, 6, 21, 23 26:9, 11, 14, 20 35:3, 5, 7, 20 36:17, 20 45:8 46:2, 16, 18, 21 52:23 115:2, 9, 13, 16, 24 116:6 121:15 122:13, 14, 23, 24 123:1 124:2 129:1
**exhibits** 18:15 22:22 23:5, 6 26:8 27:4 31:15 34:24 62:21
**exist** 47:7
**existed** 44:2 46:14 109:8
**existence** 20:24 39:22 110:19 131:7
**expand** 30:18
**expect** 76:12 105:4 123:4 128:3
**expected** 120:25 130:5, 9, 13, 22
**expecting** 21:4
**experience** 69:22 83:8, 11 107:12 108:22
**experiences** 83:5, 7
**expires** 135:21
**explain** 35:14
**explore** 113:16
**explored** 113:12, 17
**extent** 80:2

< F >
**face-to-face** 32:20
**facets** 39:8
**fact** 12:9 16:3 17:19 23:7 126:20
**facts** 39:11 55:8
**failed** 16:4 107:14
**fair** 30:8 103:23, 24 104:21 107:7 122:12 128:3 130:25 131:6
**fairly** 28:17 86:15 87:11 129:14
**fall** 73:3
**false** 94:24 95:4, 10 97:10, 14 98:16 99:9 100:9
**falsified** 94:18 97:5 99:5
**familiar** 101:10 102:5, 9
**far** 30:22 40:24 44:12 78:3 129:23
**fear** 18:24
**February** 56:7
**federal** 6:16
**feel** 17:8 74:10 89:9 117:3
**feels** 108:2
**felt** 109:25
**female** 92:12, 19
**fewer** 10:12
**figure** 113:9
**figured** 32:11
**file** 14:9 20:4, 21 30:1 33:17 39:9 42:6, 13, 17 43:3, 4, 5, 8, 17, 18, 24 44:2, 4 45:2, 12, 13, 15 46:5, 7, 14 47:7, 16, 19 51:2 62:13 67:24, 25 68:1, 2, 3, 8, 15, 18, 21, 25 69:1 72:6, 17, 19 73:17, 24 74:7 76:11 77:15, 17, 24 78:14, 18, 20 79:7, 10, 18 80:4, 8, 9, 10, 23 81:4, 16 87:4 103:17 104:3, 6, 16 105:1 106:15, 25 107:1, 7 108:16, 17 111:3 115:3, 16 120:16 126:7, 15, 23 127:5, 8 128:4, 8, 9, 24 129:2, 6, 15 131:20
**filed** 6:15 47:5
**files** 20:20 75:4 76:7 77:18 79:15 81:24 106:8, 9, 15, 18, 19 107:15 129:15
**fill** 81:10
**find** 26:18 130:16
**finds** 77:9
**fine** 19:11 27:12 49:13 51:21 105:20 133:24
**finish** 131:25
**firm** 109:18
**first** 6:3 9:11 11:7 13:19, 23 14:3, 4 21:15 23:9 38:22 41:12 42:5 68:20, 21 74:16 76:3 90:21 105:25 108:23 126:7
**five** 105:9
**Floor** 1:20
**folder** 44:5 68:18, 22 73:24
**folders** 68:8
**follows** 6:4
**follow-up** 132:8
**foregoing** 135:7
**forgot** 73:11
**form** 15:8 27:24 28:10 36:8, 10 50:13, 18, 24, 25 51:1, 5, 24 53:18, 21 58:16, 17, 21, 23 59:12, 13, 23 60:3 68:6 71:1 73:19
**format** 15:7 51:7
**formed** 20:4
**forms** 51:4 58:18
**forth** 46:3 78:3
**found** 71:23 92:14
**four** 21:16 42:2, 19 43:16 70:24 85:5
**fourth** 38:8
**Francis** 10:23 101:16
**free** 17:8
**Friedman** 2:4 41:1
**front** 19:1 21:17 44:10 68:12, 13 70:17 77:25 129:18
**full** 6:7 131:20
**fully** 30:11
**FUNK** 3:17 4:4 6:6, 12 7:15 8:7, 9 18:18 24:13, 19, 24 27:23 28:12 35:11, 15 37:1, 5 45:1, 5, 17 46:1 49:6 57:7 73:21 91:24 105:7, 13, 18 106:1, 17 107:3, 17, 23 108:4 109:2, 17, 22 110:9 111:7, 13, 18 112:18 113:21 114:12 115:3, 6 116:2 117:21 118:14, 20, 22 120:7, 22 121:4, 13 122:7 123:17 124:17 125:2, 4, 11 126:3, 10 127:9 128:5 129:3, 9 130:4, 8 131:9, 21 132:1, 8, 11 133:16, 21
**further** 69:7 77:12 92:12 105:13

< G >
**gees** 27:11
**GELSOMINO** 2:5 4:5 8:2 18:13 27:21, 24 28:10 33:2, 19 34:1, 11, 16, 21 35:10, 13, 19, 22 36:25 37:3, 6, 15 38:21 42:24 43:21 44:24 45:4, 11 49:5 73:18 83:10 85:3, 25 88:2, 9 90:9 91:11, 22 93:5 94:10, 15, 20, 25 95:8, 11 97:2, 7, 16 98:14, 19, 25 99:2, 6, 12 100:6, 12, 16 101:7, 14 103:21 104:7, 20 105:3, 21, 24 123:18 131:24 132:5 133:17, 20
**general** 19:13, 25 28:16 32:4 44:1 78:12 114:23
**generalities** 41:18
**generally** 28:17, 22 29:17 30:6 32:6, 19 51:1 127:6
**generated** 58:13 129:21
**gentlemen** 19:21 21:24
**Gerhardstein** 2:4
**germane** 20:18
**getting** 19:19 68:2, 3 70:17 80:4, 6
**Gibson** 16:5, 6 62:10
**Gilbert** 2:4, 7 8:5 41:1
**give** 6:7 9:11 17:9 32:25 33:3, 5, 13 38:12 41:18, 19 44:21 53:10 77:15, 21 82:1 92:24 93:20 127:13 130:13, 23 131:1 133:11
**given** 11:24 12:9 17:19 20:10 37:22 45:6 48:14 53:19, 21, 24 76:12 81:17 84:14 107:12 110:23 111:24
**giving** 122:9
**glad** 39:16
**go** 7:15 9:19 18:5 23:21 24:13 25:4 32:22 37:8 38:3 39:15 46:23 57:7 62:3 65:14 69:2, 12, 15 74:21 75:16 77:6 78:9, 22 79:7 84:11 88:25 89:17 90:18 92:1 93:8 115:7 116:7 129:15
**goal** 114:17 130:19
**goes** 36:22, 25 37:1 60:16, 17 64:16 69:6 79:11, 13

**going** 6:20 8:10, 13, 24 9:25 17:3, 7 18:5, 16 20:25 22:17 23:21 25:7 26:7 30:3, 22 31:11 32:13, 23 36:20 37:7 39:7 42:3 44:21 48:24 50:16 51:10 52:14 57:18 59:17 61:9, 24 62:2 63:9 67:25 69:11, 15 70:21 78:10 81:4 85:17 86:17, 18 96:7 105:14 109:9 110:16 122:1, 4 123:19 129:19 130:16, 20
**Good** 7:23 8:15 52:8 76:21 119:22 120:1 130:12 132:16
**gotten** 113:3
**graduated** 9:16
**graduating** 9:21
**Grand** 4:14 14:17, 20, 23 15:11, 14, 18 16:9, 16, 18 19:1, 15, 17, 24 20:5, 11 54:3, 4 62:5, 13 75:16 77:6, 12 78:18 79:8, 9, 11 81:25 95:10 96:22 97:14, 22 98:17, 23 99:10, 15
**grant** 37:19 55:15
**granted** 36:14 39:1 89:13
**graphic** 123:23
**grounds** 50:1, 3
**guess** 19:13 70:4 78:16 80:3 88:14
**guessing** 48:5
**guilty** 63:17
**guy** 63:17 117:24
**guys** 34:9 41:10 70:7
**GWIN** 1:9

< H >
**Habeas** 55:15, 19, 22 64:14, 15
**habit** 60:8 126:14
**half** 129:16, 24
**hand** 17:3 36:20 135:10
**handed** 77:5
**Handing** 14:14 15:6 18:11 35:3
**handle** 13:7 20:10 30:1 31:3 77:16 95:23
**handled** 13:23 14:2 23:22, 23 24:2 27:14 28:22 31:1 32:6 33:18 34:5 41:21, 25 68:16 73:24 78:24 86:6 91:2 112:2 113:10
**handling** 16:9 27:18 58:5 79:14
**handwriting** 47:23 48:4 52:3, 12, 17 54:18, 20, 22 57:14 58:24 59:8 60:1, 10, 11 61:15, 16, 22, 23 63:10 64:25 65:9, 25 66:1 67:16, 19 69:17 87:25 88:1, 5 90:7 116:6, 9, 11, 16, 17 117:2
**handwritten** 48:19 52:2, 6 53:13 54:15 55:4, 25 56:14, 17, 23 57:11, 13 60:6 64:21, 23 65:15 66:21 73:13 90:23 93:2
**handy** 132:14
**happen** 80:1 105:5
**happened** 21:5 81:6 87:10 126:12
**happening** 81:11 85:10
**hard** 11:12 20:13 44:21 126:21
**hard-nose** 125:22
**hardworking** 83:9
**harm** 55:9
**head** 109:4 112:12
**health** 50:3
**hear** 109:5 124:5
**heard** 32:16 109:8 122:3
**Hearing** 11:15 16:4 37:16 49:24 135:7
**hearings** 7:5 72:2
**He'd** 12:20
**held** 114:16
**help** 13:20
**helpful** 105:17
**hereunto** 135:10
**Hicks** 97:17, 19 98:3, 7, 11, 16, 22 99:5, 8, 14
**hid** 125:15
**hiding** 18:24
**high** 31:24
**highlighting** 126:22
**highly** 94:1
**historic** 46:14
**Hold** 44:17 83:23
**home** 124:6
**homicide** 13:24 29:2 31:20 43:3, 4 59:5 76:10, 12, 13 80:18, 21 81:15 84:5 87:19 102:8, 19, 23 106:2, 6, 8 108:16 119:20
**honest** 83:8
**Honor** 7:23 82:11
**hope** 119:22
**hopefully** 8:21
**hotel** 92:16
**Howe** 40:19 47:4 118:17
**Hubbard** 23:24 82:15, 21 83:4, 5, 14 85:1, 6, 23 86:5, 9 92:2 93:11 94:3, 4, 5, 8, 18 95:4 104:12 130:1
**Huh** 73:8
**Huh-uh** 52:16
**humanly** 130:19
**Hyland** 21:23

< I >
**idea** 43:9 100:20 101:22 114:14 117:13, 17 120:3
**identification** 6:25 9:3 14:12 15:4, 24 17:1 18:9 21:13 24:9, 17, 22 25:2 35:1 36:18 45:9 46:19 87:16
**identified** 37:12 52:21 56:3 92:15
**identify** 42:23 47:7 88:17
**identifying** 46:4
**Illinois** 49:1, 10
**imagine** 7:6 11:12 23:13 31:10 56:13 64:4 108:23 111:19 113:1 127:22
**immediately** 11:18
**important** 116:25
**impressed** 116:13
**in-camera** 27:15
**incarcerated** 49:9, 16
**inch** 129:16, 24
**incident** 87:9
**include** 57:22 107:15 128:9
**included** 42:13 62:10 128:10
**includes** 84:12 107:8 115:19
**including** 42:6 106:15
**inconsistent** 111:11, 15 113:4 120:12 121:12 130:6
**inconsistently** 112:16 120:19
**inculpatory** 122:10 123:24
**independent** 22:19, 20, 23 29:1, 7 33:24 34:9, 10, 12 81:21
**independently** 85:24
**INDEX** 4:1, 8 5:1 21:9 26:13
**indicate** 64:8
**indicated** 10:19 23:19 42:1 53:25 78:9 87:24
**indicates** 17:4 25:13 39:20 53:24 88:11 92:3
**Indicating** 22:15 25:18 31:20 67:8 88:10 92:7 112:11
**indicted** 44:11, 13
**Indictment** 4:13 14:15 17:10 62:2
**individual** 6:14 79:25
**information** 30:2 39:24 42:6, 14 44:6 76:9, 17 82:1 84:15 96:18, 20, 22 97:4, 8, 9, 13 98:22 99:4, 8 100:4, 8, 14 103:1 114:16 120:5 124:13 128:11 131:5, 11
**inherit** 62:13 78:18
**initial** 75:25 76:4 77:8 78:1
**initially** 86:16 112:1
**initials** 48:1, 2, 6
**Innocence** 40:20
**inside** 68:22 69:1
**inspection** 27:16
**instance** 74:16 82:8 85:9 86:8
**instances** 31:6, 17 85:23 107:14
**instructed** 114:17
**integrity** 68:17
**intend** 39:9
**intends** 55:3
**interacted** 34:5
**interaction** 123:9
**interesting** 26:1
**interview** 89:4 90:24 133:1
**interviewed** 92:4 93:18
**interviews** 91:5, 17
**introduce** 7:14
**introduced** 8:20 27:4 28:12 31:15
**investigated** 80:19 84:4 103:20
**investigation** 29:2 40:1 42:6, 14 43:5, 8 77:4 82:15 84:16 87:12 96:2 98:3, 8, 12 99:22 100:4, 10, 15, 19 101:23 102:1, 6, 14, 20, 23 103:7, 14, 19 130:2
**Investigative** 59:2, 4, 24 78:14, 20, 25 80:8, 9, 10 81:16 103:17 104:3, 6
**investigatory** 78:21
**involved** 12:3 13:19 19:15, 19 21:20 27:18 29:2, 8, 9 32:3 58:5 64:2 89:10 98:1 100:15
**involvement** 14:17
**irrelevant** 30:21
**ISAIAH** 1:6 6:15 10:22 12:4 40:10 49:8, 25 55:20 57:5 66:7 75:5, 18 122:3 124:15
**issue** 107:20 110:22
**issued** 36:14 55:19 75:4
**issues** 50:11
**issuing** 77:19

**items** 42:19, 23 47:10 71:14
**its** 79:9 121:18 128:20 135:7

< J >
**J.R** 3:4 7:17
**jacket** 44:7, 9, 11 47:15, 20 68:4
**jail** 79:25
**JAMES** 1:9
**January** 14:16 70:14
**jive** 87:13
**job** 9:23 113:25
**Joe** 16:5, 6, 11 62:10
**John** 21:23 48:17 101:9, 12 113:23
**Jrussell2@clevelandohio.gov** 3:12
**JTC** 48:15
**JUDGE** 1:9 6:11 7:17, 19 10:23 13:10 27:7 44:14 48:20 70:1, 13 76:4 77:8 132:6
**juju** 57:2
**July** 9:8, 15 10:7 40:5, 6
**jump** 21:2 44:19, 22 51:13 57:25 89:17
**jumping** 57:19
**junction** 86:20
**June** 10:7
**junior** 34:13
**jury** 4:14 14:18, 20, 24 15:11, 14, 18 16:9, 16, 18 19:1, 15, 17, 24 20:5, 12 54:3, 4 61:9 62:6, 14 75:16 77:7, 12 78:18 79:8, 9, 11 82:1 95:10 96:22 97:14, 22 98:17, 23 99:10, 15
**Justice** 46:11 113:25 114:14
**juvenile** 11:14, 17

< K >
**Kaminski** 101:9, 12
**keep** 33:6 42:25 53:19 71:1 127:20 129:5
**kept** 46:8 103:17 104:25 106:8, 15 126:17
**Kevin** 102:4, 7, 13, 18, 22, 25
**kill** 122:4 123:19 124:9
**kind** 9:10 13:3 21:9 30:6 50:8 57:14 71:23 74:12 78:11 80:1 90:19 103:10 112:6 113:15 124:12 128:10, 18 131:13
**knew** 19:11, 22 70:9 82:25 83:1 130:19
**know** 7:2, 4 8:12, 19 10:4 11:12 12:6 14:3, 20 15:20 16:6, 10, 14 17:14 19:7 21:24 22:7 29:5, 9, 21 30:14, 22 31:11 32:7, 8, 17 33:18, 21 34:4, 6, 19 36:2 41:15 43:7 48:5 51:7, 9, 18 54:19 56:10 63:4, 17 64:6, 8, 11 67:6, 9 68:4, 16 69:25 72:24 73:6, 10, 17, 21 75:9 76:6, 20, 22, 25 77:14, 24 78:6 79:7, 16 81:6, 14, 22, 23 85:7 86:14 88:23 89:12, 16 93:22 95:3, 9, 13, 15 96:13, 16 97:17, 19, 21, 24, 25 98:2, 10 99:14, 17, 21, 23, 24 100:1, 18, 21, 24 101:9, 16, 21 102:4, 7, 11, 12, 16, 18 103:3, 6 106:8, 11 107:9 108:22 109:3, 8 110:17 111:20, 21, 22 112:1 113:1, 12, 22, 24 114:13, 17, 19, 21, 23 115:15 116:16, 21 117:6, 10, 14, 23 118:16 119:25 120:15 121:6 122:2, 4 123:16, 19 124:22 125:6, 20, 24 126:16, 21 127:13 128:2 129:14, 17, 20 130:12, 14 131:6, 7, 14, 17 133:21
**knowing** 95:1 107:4 120:9 131:23
**knowledge** 83:13 94:17 97:4 98:21 100:19 103:1, 8 119:5 121:11

< L >
**lady** 19:20
**Lakeside** 3:9
**large** 68:16 115:2
**largest** 10:17
**late** 12:20
**Laurie** 10:22 12:14 13:12 14:5 21:17 23:20 25:8 31:3 33:18, 22 36:1 38:8 41:21 57:13 85:24 86:6, 8 88:7 91:2, 9 93:4 95:22 96:14, 23 98:11 99:24 108:10, 14 110:6 116:21 125:13
**Laurie's** 48:4 52:13, 17 54:18 63:10 88:1 90:7
**LAURYN** 3:18 7:24 105:8
**Law** 3:8 7:10, 20 8:8 9:16, 19, 22, 25 32:15 84:14 110:2 119:14
**lawful** 6:3
**lawsuit** 6:15
**lawsuits** 11:18
**lawyer** 12:10
**lawyers** 118:7 130:14
**lay** 127:16
**Lazzaro** 63:25
**lead** 23:20 104:12
**leaps** 73:10
**learn** 109:1
**learned** 18:21 109:20
**learning** 12:13
**leave** 19:19 57:5
**left** 39:17 69:21 70:2, 8 89:21
**left-hand** 64:24 65:7, 21
**legal** 10:17 31:9 107:13
**legible** 51:8 116:14, 15
**lengthy** 39:6
**Leo** 95:13, 15, 19 96:1, 14, 17 97:5, 10, 14, 21 104:15, 16
**lesser** 31:23
**liberty** 80:1
**librarian** 126:20
**licensed** 9:12
**lie** 52:11 113:20 121:3
**likelihood** 66:14
**Linda** 17:23 24:3 25:12, 22 26:10, 15 27:3 28:8 31:14 38:1 42:10 43:11 90:13 91:16 92:23 94:13 110:23 111:5, 10 112:7, 15 120:11 121:9 122:1, 9, 19 124:4, 13 132:13, 22, 25
**line** 38:8 89:19
**linked** 39:24
**list** 22:13 42:2 48:10, 11 56:23 62:21, 23
**listed** 21:18 43:16 62:10
**lists** 62:9
**little** 9:11 89:20 125:7
**live** 72:9
**lives** 92:5
**located** 46:6, 10
**logistical** 119:1
**long** 19:9 70:15 78:11 115:7 123:4 124:12
**longer** 80:2
**look** 17:7 25:7 26:7, 13, 17 33:9 35:25 37:7 39:16 46:22 48:9 51:19 52:1 56:15 59:22 60:12, 15 65:2, 6 71:13 72:20 74:15 83:19 88:11, 25 91:13, 20 122:13, 15
**looked** 26:1 43:2 47:17 117:14 126:24
**looking** 41:23 50:20 51:2 52:23 60:13 73:20, 23 81:8 122:25 123:1
**looks** 17:10 50:21 52:13, 19 54:19 55:18 56:23 57:12, 14 59:14, 23 60:9, 17 61:19, 20 62:8 63:11 64:25 66:1, 3 67:16 70:23, 24 71:1, 3, 10, 19, 23 73:23 88:4
**lot** 7:4 10:15 28:4 32:8 70:7, 9 72:15 108:23 127:13
**lots** 33:8

< M >
**Main** 3:20 8:12
**maintained** 46:8 103:17
**major** 11:20 70:18
**majority** 41:24
**making** 114:25 117:25 119:8
**male** 89:10
**malpractice** 31:9
**managed** 70:16
**manner** 27:25
**Marc** 72:8 109:9
**March** 11:6, 11 13:16, 17 47:25 51:20, 22 63:15 72:11, 12, 19
**MARCUS** 2:6 7:25 39:21 118:17
**Marcus@fggfirm.com** 2:13
**margin** 65:7, 15
**margins** 66:13
**Marines** 54:16
**Marino** 63:14, 19, 20
**Marion** 49:1, 10
**mark** 6:20 8:25 18:6 24:5, 13 46:16 65:3
**marked** 6:24 9:2 14:11, 14 15:3, 6, 23 16:25 17:3 18:8, 11 21:12, 15 22:22 24:8, 17, 22 25:1 26:10, 14 34:25 36:18 45:5, 9 46:19 67:6
**markings** 66:12 68:19
**Marshall** 55:20
**Mary** 64:10
**material** 129:21
**materials** 20:18, 19 23:10 78:21 79:3 80:23 108:25
**matter** 19:14 27:9 46:11, 22
**maximum** 129:17, 25
**McCaffery** 101:16
**mean** 11:9 27:21 50:21 70:2, 7 71:5 85:5 109:13

110:16 111:23 112:23 115:19 116:3, 23
**means** 54:4 67:25 119:13
**meet** 80:18 96:9, 11
**meeting** 32:21
**meetings** 85:19 127:25
**member** 107:12
**members** 8:4
**memorializing** 29:22, 24
**memory** 22:19 23:25 56:22 87:13 105:16
**Mental** 50:3
**MENZALORA** 3:5 7:19, 20 122:17
**met** 86:8 130:1 132:23
**methodology** 78:5
**MICHAEL** 3:6 7:21
**mid** 69:21, 23
**middle** 8:17 10:6 83:22 93:12
**Miller** 17:12, 14 63:1, 2, 4
**mind** 45:20
**mindset** 114:22, 23
**minimal** 41:14
**minute** 131:25
**minutes** 71:6
**Miranda** 5:6 41:5, 8 43:23 45:3 46:3
**Miranda's** 49:20
**Mischaracterizes** 88:2
**missing** 72:25 74:7
**moment** 113:5
**Monday** 92:24
**money** 90:3
**months** 39:20 40:4 70:5
**morgue** 92:13
**Morning** 7:17, 19, 23 38:12
**Motel** 93:14
**mother** 126:20
**mother's** 90:2
**Motion** 4:23 35:3, 15, 21 37:10 47:5 57:5 131:19
**motions** 37:19
**move** 8:11 33:16 61:25 91:20
**moved** 11:19 72:10
**multiple** 51:5 106:14
**municipal** 75:22 77:9, 25 78:2
**murder** 12:22 52:10 54:15 63:14 75:5 85:13 87:10

**< N >**
**name** 6:7, 9, 12 44:10 51:17 70:17 99:18 100:23 101:10 102:5 109:5, 14
**named** 6:15
**names** 37:10, 12, 22 48:11
**nature** 68:5 118:24
**near** 11:5
**nearly** 116:15
**necessarily** 12:23 18:2 29:23 45:14 127:10 128:6, 7
**need** 8:19, 21 57:7, 9, 10 83:23 86:21 123:14 132:18
**needed** 32:12 86:22
**negative** 83:4, 6
**never** 28:11 72:9 100:13 106:4, 5, 6 109:13
**new** 72:21 131:19
**newspapers** 67:15
**Nick** 103:3, 5
**night** 9:25
**nightgown** 23:7
**nodded** 112:12
**noise** 124:5
**nolled** 16:3 17:10
**normal** 87:1, 2
**normally** 81:16 105:2
**NORTHERN** 1:3
**Notary** 1:18 135:5, 18
**notation** 47:24 63:13 71:7 89:20
**notations** 68:23
**notches** 114:25
**note** 48:13, 19 55:4 56:17 64:9, 23 65:6, 15, 22 66:17, 21 67:14 92:9 128:19
**notes** 44:15 52:2, 6 56:14, 23 57:12, 13, 15 60:6, 7 64:6, 21 69:15 73:13 90:23 116:14 117:16 126:17, 24, 25 127:2, 4, 7, 14, 15, 20, 25 128:7, 10 135:9
**notice** 1:22
**November** 9:13 135:21
**number** 25:10 33:15 44:9 48:24 116:5 129:25
**numbers** 17:18 37:3

**< O >**
**oath** 6:4
**object** 28:14 101:14
**Objection** 27:21, 24 28:10 33:2, 19 34:1, 11, 16, 21 37:15 38:21 42:24 43:21 73:18 83:10 85:3, 25 88:2, 9 90:9 91:11 93:5 94:10, 15, 20, 25 95:8, 11 97:2, 7, 16 98:14, 19, 25 99:2, 6, 12 100:6, 12, 16 101:7, 15 103:21 104:7, 20 105:3 106:17 107:3, 17, 18, 23 108:4 109:2, 17, 22 110:9 111:7, 13, 18 112:18 113:21 114:12 116:2 117:21 118:14 120:7, 8, 22 121:4, 13 122:7 124:17, 18 125:2, 4, 11 126:3, 10 127:9 128:5 129:3, 4, 9, 10 130:4, 8 131:9, 21, 22
**obligated** 109:25
**observation** 39:25
**observed** 123:6 124:14
**obtained** 44:18 92:20
**obtaining** 95:5
**Obviously** 50:22 78:24 86:20 116:16
**occasion** 16:11 43:17 69:25 80:18
**Occasionally** 126:11
**occasions** 33:8
**occurred** 26:3 47:8 69:9
**occurring** 38:22
**October** 15:19 17:11
**Office** 9:23 10:10, 11 11:11, 21 12:20 14:22, 23 17:15 20:16 23:8 33:13 36:9 44:18 46:9, 14 69:20 70:8 72:18 77:6, 15, 16, 20, 21 78:2, 5 79:1, 2 82:8 87:19 88:22 95:18 104:5, 10 106:21, 25 107:16 108:1 113:23 114:9, 10, 20, 23 124:23 126:5 128:21 135:11
**officer** 104:4 106:4 124:13
**officers** 6:14 102:10 103:13 107:14 117:19 119:17, 25 126:1, 6
**offices** 1:19
**Oh** 27:11 45:22 57:2 73:11 132:16
**OHIO** 1:3, 19, 21 2:10 3:10, 22 9:24 10:22 40:19 135:6, 11, 18, 19, 20
**Okay** 6:7, 11 8:10, 18 9:10, 21 10:8, 13, 19 11:1 13:12, 25 14:8 15:1, 10, 21 16:8, 17, 23 18:5 19:6, 10, 13 21:3, 7, 22 22:6, 10, 13, 25 23:19 24:5 25:5, 9, 10, 14, 17, 19, 25 26:16, 19, 22 27:18 28:3, 21 29:11 31:13 32:2 33:12, 21 34:14, 22 35:25 36:15 37:6, 7, 17, 25 38:3, 6, 18 39:2, 4, 15 40:9 41:3, 10, 17, 20 42:1, 5, 19 43:2, 10, 14, 22 44:17 45:22 47:14, 22 48:6, 19, 22 51:10, 16, 19 52:7, 14, 17, 20, 22 53:4, 16 55:10, 14, 22 56:6, 14, 16 57:3, 17 58:2, 8, 16, 19, 24 59:2, 7, 11, 14, 22 60:3, 5, 12 61:17, 24 62:1, 18, 20 63:4, 12 64:13, 21 65:11, 14 66:15 67:17 68:11 69:3, 22 70:13 71:10, 25 73:13 74:6, 19, 24 75:2, 18 76:1, 6 80:17 81:14 82:21, 24 83:21, 25 84:11, 25 85:15 86:2 87:3, 15, 18, 24 88:6, 14, 20, 25 89:15 90:11, 18 91:8, 13 93:2, 17 94:2, 17, 23 95:3, 24 98:10 99:17 100:8, 18 101:21 102:13, 18 103:3, 10 104:23 105:6, 18 109:15 110:18 111:9 112:12, 22 115:2 116:5 117:1, 10 118:1, 12, 16, 24 119:7, 16, 19 120:10 121:2, 20 122:1, 12 123:11 124:1, 20, 23 125:24 126:18 127:15 128:22 130:1, 11 131:12 132:1, 16 133:13
**old** 12:17
**onboard** 113:25
**once** 7:7, 9 79:8 133:22
**ones** 37:4 80:22
**open** 30:23 32:9, 10
**opened** 123:13
**opening** 23:22 60:25 61:14, 21 126:25
**opinion** 65:7 82:9 89:25 104:3
**opportunity** 84:14
**opposing** 27:20 33:23 39:13
**oral** 33:16, 22 38:14 39:10 54:2 59:17
**orally** 32:20, 24 38:12
**order** 60:14, 15 86:18 103:14
**orders** 71:9
**organization** 10:17
**original** 46:24 69:1
**originally** 11:16 15:19 109:10
**originals** 49:22
**Ostendorf** 64:10
**outline** 61:8
**outside** 44:16 47:15 123:10
**overview** 130:14

**< P >**

**p.m** 1:21 134:2
**pad** 126:17
**page** 9:5, 6 21:17 22:6, 13, 21 26:20 36:22 37:1, 2, 3, 7, 8 38:3, 7 46:23 47:2, 12, 14 48:22, 24 50:5 51:14 52:1, 7, 23 55:10 59:7 60:15 62:3, 6 64:23 65:6, 14 66:3, 5 67:23 70:18 74:22, 24 87:4, 16, 17, 18 88:11, 12, 25 89:1 90:18, 20, 21 91:21, 22 93:12 115:8 122:15, 17 123:2, 5, 17 124:2 132:13
**PAGE/LINE** 4:3, 10
**pages** 21:8, 16 48:25 49:6 50:6, 16 51:10 55:14 57:11 71:19 87:5, 7, 8 93:10 115:16 116:8
**Palmprint** 56:17 66:16
**paper** 68:17
**papers** 75:4 77:19
**paragraph** 13:16 17:7 18:22 39:17, 18 42:1 54:9 55:2 78:9, 10, 11 83:19, 23 84:2 89:1, 3 90:22 114:4
**parol** 72:1
**part** 27:19 58:10 66:20 86:12 92:17 104:6 115:16 117:9
**particular** 12:8, 24 16:15 33:22 44:7 71:8 79:14 80:12 82:3, 6, 16
**Particulars** 4:24, 25 35:4, 6, 12, 16, 17, 20 36:1 38:11
**partner** 108:10, 14 118:16 125:13
**parts** 70:24, 25
**pass** 13:14
**passage** 16:10 74:13
**passed** 13:22 22:1 82:23
**passing** 101:10
**Pat** 63:14, 25
**patrol** 102:10
**pattern** 49:18
**pause** 113:6
**peignoir** 23:6
**pendency** 118:17
**pending** 6:16
**Penitentiary** 49:1, 9
**people** 22:14 70:16 114:15 116:10
**Perfect** 109:20
**period** 80:2 109:19
**person** 12:24 13:6, 7 29:22, 24 31:11 40:12, 17 77:25 81:22 100:21
**personal** 83:13
**personally** 95:25
**person's** 29:3
**perspective** 114:15
**Peter** 99:17, 19, 21, 25 100:3, 14, 18 101:6
**phone** 6:17 17:18 40:17, 18 57:10 81:7 118:24, 25
**photographs** 71:20
**physical** 23:5, 6 32:25 44:2 55:9
**physically** 33:10, 11
**pick** 12:23 20:24 81:7
**pile** 47:13
**pillow** 23:4
**pink** 51:6
**place** 37:18 77:10
**places** 71:6 106:14
**Plain** 70:18
**Plaintiff** 1:8 2:3
**PLAINTIFF'S** 4:10 8:5 45:8 46:18
**played** 101:22 102:19 125:7
**Plaza** 135:19
**plea** 63:16
**please** 6:7 18:15
**point** 11:24 16:12, 15 21:2 30:16 74:18 76:14 77:4 78:7 79:4 80:5 85:16 96:6 105:16 116:7 120:5 121:14 126:6 128:13, 14, 16
**points** 59:9
**Police** 4:17 6:14 16:1 18:18 28:23 42:5, 17 43:12 50:18 58:13, 22 59:11, 13 62:18 64:19 66:11 74:24 75:3, 11, 19, 21, 23, 24 77:17 78:4, 24 80:7 82:11 83:2, 3, 5, 9, 15 87:7 90:16 94:19 95:16 97:5, 20 99:5 101:11, 18 103:5, 11, 13, 16 104:1, 4, 24 106:4, 19 107:9, 10, 14 108:2 115:12, 23 117:11, 15, 18 118:5, 6, 10 119:7, 13, 17, 25 122:19 124:2, 12, 13 125:25 126:14 131:20
**policy** 33:13 124:23
**portion** 64:24
**portions** 24:6, 11
**posed** 30:14 41:22
**position** 74:13
**possibilities** 34:9
**possibility** 31:24 39:23 86:1
**possible** 8:11 30:17 33:24 34:17 79:18 85:22 93:22, 23 94:1, 7, 12, 16 106:24 115:23 116:4 120:4 130:20 132:25 133:2, 4, 6
**possibly** 8:22 79:21
**post** 41:4 131:18
**post-conviction** 46:25 47:1, 8 51:12 57:22 64:17 69:8 71:15 115:20 129:21
**post-convictions** 131:15
**posted-conviction** 58:6
**potential** 17:23 84:5
**practice** 27:6 70:3, 5, 9 78:13 87:1, 2 114:9 118:4, 5
**practicing** 7:10 32:15
**Precipe** 50:7 52:24
**Precipes** 53:7 62:4
**Preliminary** 11:15
**preparation** 96:15 130:18
**prepare** 31:7, 18 86:9 96:10, 11
**prepared** 30:25 36:3, 5 56:9, 12 91:6 103:13 132:23 133:22
**preparing** 12:1 127:5, 16, 23
**present** 19:14 38:18, 24 39:1 84:1 88:16 93:23 96:7
**presentation** 86:19
**presentations** 14:24
**presented** 15:11, 13 19:17, 21, 23 39:11 76:18 90:12
**presumably** 19:13
**presume** 80:8
**presumed** 80:10
**presumption** 81:2
**pretty** 11:13 12:13 116:11 122:9 123:22, 23, 24
**previously** 26:14 44:20 46:9 49:9, 15 52:21 56:2 87:24
**primary** 8:23 14:23
**Print** 66:24 67:3, 4, 5, 11
**printed** 68:13
**prior** 13:18 36:21 39:7 46:10, 15 49:25 54:9, 12 111:15 113:4, 6 120:20 121:11 130:6 132:22 133:4
**private** 70:3, 5, 9
**probable** 77:9 120:6
**probably** 7:5, 14 10:12, 16 28:19 126:19
**problem** 74:21 105:15
**procedure** 77:14
**procedures** 106:2
**Proceed** 57:5 86:19
**proceeding** 16:9 41:16 46:24
**proceedings** 14:18, 21 16:18 20:5 41:4 46:25 47:1, 8 51:12 64:17 69:9, 13 71:15 77:5, 7, 13 78:18 80:5 98:18 115:20
**P-R-O-C-E-E-D-I-N-G-S** 6:1
**process** 53:9 78:17 79:12 93:7 116:22 117:9 126:16
**produce** 39:9 57:20 58:3 62:15
**produced** 26:25 27:9 44:20 45:3, 12, 14 72:17 107:16 110:7
**production** 37:10
**Project** 40:20
**prompted** 133:10
**property** 47:25
**prosecute** 130:21
**prosecuted** 129:7
**prosecuting** 10:2, 21 11:21 21:18, 19 37:20 55:3 70:1 104:10 115:25
**prosecution** 16:4 30:1 45:2 118:18 119:9 130:2
**prosecutor** 12:15, 23 16:5, 11 19:22 32:7, 8, 19 37:11 43:24 44:1 47:19 63:21 75:3, 11, 15 81:17, 18 95:5 96:22 97:11 98:23 99:9 103:12, 18 104:18 105:1 107:8 119:13 125:20, 22 131:7, 16, 17
**prosecutors** 11:23 14:22 33:15 62:9 79:14, 19, 21, 22 96:18 98:17, 18 99:1, 10 100:5, 10 125:9
**Prosecutor's** 9:23 10:10, 20 11:11 17:15 20:16 36:9 43:17, 18 44:15, 18 45:12, 13, 15 46:5, 8, 13 69:19 70:8 72:6, 17 77:6, 15, 16, 20, 21 78:5 79:1, 2, 10 82:8 88:22 95:17 104:5 106:21, 25 107:1, 16 108:1 113:23 114:8, 10 115:3 124:23 125:7 126:5 127:8 128:4, 8, 9, 20 129:2, 6
**prove** 63:18
**provide** 79:2 80:7

Case: 1:22-cv-00250-JG Doc #: 98 Filed: 02/28/23 146 of 149. PageID #: 1732




**provided** 28:8, 11 88:21 104:18
**psychiatric** 52:5
**Public** 1:18 2:9 22:3, 8 135:5, 18
**publicized** 37:21
**puffed** 129:22
**purport** 44:24
**purporting** 45:1
**purposes** 6:25 9:3 14:12 15:4, 24 17:1 18:9 21:13 24:9, 17, 22 25:2 34:25 36:18 45:9 46:19 53:1 79:10
**pursuant** 1:22
**put** 31:12 68:9, 18 73:6 77:25 112:9 120:15 128:7, 23
**puts** 104:2, 16
**putting** 112:15 132:22

< Q >
**qualify** 114:13
**question** 8:13 27:1, 15 29:14, 16 41:23 80:3 81:5 114:21 128:15 132:8, 17
**questions** 28:15 29:23 30:7, 12, 13, 15, 18 60:8 97:3 100:2, 24 101:1, 5, 12, 19 102:25 105:13, 19, 21 106:2 116:5 119:7 120:10 132:6
**quick** 45:21 87:11 131:24
**quickly** 8:11, 22
**quite** 68:16 129:22

< R >
**racking** 114:24
**raise** 117:24
**raises** 81:5
**raped** 19:21
**rational** 104:22
**read** 17:8 42:3 50:6 66:23 75:3 76:7 78:10, 11 111:9 112:17 114:6 115:8 116:12 123:3
**reading** 123:17
**ready** 19:19 45:19
**real** 80:3
**really** 11:20 12:6 16:19 18:1 23:2, 9 29:20 34:2, 7 50:23 51:22 52:5 54:9 58:17 61:18 69:22 70:25 100:15 122:11 124:19 127:13
**realtime** 113:10, 16
**reason** 8:23 46:15 52:11 76:23 83:12 91:9, 12 93:3, 6 104:17 108:9 112:11 121:23
**reasonable** 104:4, 9, 24
**reasons** 104:7
**rebuttal** 61:6
**recall** 10:24 15:18 16:17, 19 17:22 18:3, 4 21:19 26:6, 23 27:6 28:6, 21 32:4 33:20 35:23 37:25 38:14, 18, 22, 24 39:2, 3, 12 40:22 41:2, 10, 20 44:12 47:17 49:8, 11, 12, 14, 17, 19, 24 50:2, 4, 8 51:6 53:9 56:20 59:17 73:2 74:6 78:23 80:12 81:11 82:3, 5, 14 84:2, 13 85:19 86:13, 14, 24 91:8 93:25 94:4, 11 95:20, 25 96:3 98:4, 9 99:20 101:18 102:13 111:4 118:1 122:2, 6, 8, 9, 11 124:11 129:24 131:10
**recalls** 18:20
**receive** 126:6
**received** 22:22 78:20 81:3 87:20 125:25
**receiving** 124:11
**recitation** 33:16 79:9
**recognize** 15:7 47:14, 22 48:3 50:18, 24 51:13, 21, 24 52:2, 12, 15 58:16, 17, 21, 24 59:7 60:1, 3 63:10 64:22 65:9, 24 69:17 71:1, 22 73:14 117:4
**recollect** 23:25
**recollection** 13:11, 22 14:1 16:21 18:21 19:2 22:16, 23 23:2 28:16 29:5 37:14, 16 41:13 43:13 74:1 84:1 88:16 90:17 93:23 96:3, 12 109:18 112:20
**record** 6:8, 21 7:14 14:9 18:13 24:6 25:4 38:13 39:5, 7 45:12, 24 49:14, 15 53:19 54:12 105:11 110:6 112:9 121:8 131:2, 5, 13 132:3
**recorded** 43:12
**records** 57:24 107:1 126:5
**recreating** 18:17
**RE-EXAMINATION** 132:10
**refer** 48:24 75:24
**reference** 66:16 78:8 84:15
**referral** 52:4
**referred** 115:3
**referring** 38:10 49:6 84:8 89:23
**refresh** 19:2 37:14
**refreshing** 22:16
**regard** 86:19 103:6
**regarding** 40:1 42:6 112:6 117:18 122:19
**Regina** 92:14 124:14
**regular** 11:19
**related** 42:14 74:17
**relates** 28:2 41:19 59:23 63:7, 14 82:5 84:15 102:6 103:8, 9
**relating** 51:11 72:1
**relative** 126:11
**relevant** 47:6 130:10
**relied** 77:19
**rely** 22:18
**remained** 23:11
**remember** 7:7 10:4 12:6 13:14 14:1, 7 15:21 16:21 17:16, 25 19:10 20:13 21:4 23:11, 14 24:3 25:17 27:12 28:1, 4 34:4 36:7 51:7 59:20, 21 63:3, 5, 6 65:4 66:16 69:5 72:15 73:9, 12 74:15 82:19 84:18, 21, 22, 24 85:9, 11 87:9 102:22 109:10, 15 111:4 123:5 124:19, 22 127:3 128:2 129:14
**remembered** 84:24
**removed** 74:9 125:14
**repeat** 30:7
**report** 4:15, 16, 17 16:1 17:4, 5 18:11, 18 48:25 50:21 57:25 58:8, 10 59:3, 12, 13 67:21 74:24 76:7 87:7, 16, 20 88:6, 12, 17, 21 89:1, 19 90:21 92:1 93:4, 10 104:2, 5, 15, 16, 19, 24, 25 107:9 115:12 122:19 124:2, 12
**reporter** 44:22
**reports** 32:25 43:12 50:17, 18 58:20 62:18 64:19 65:3 66:11 83:15 90:16 91:17 93:24 94:19 97:6 99:5 103:11, 14, 16 106:12 107:10, 21 115:23 117:11, 15, 18 118:5, 6, 10 126:7, 15
**repose** 30:14
**represent** 6:14
**representation** 103:24
**represented** 41:5
**request** 17:18 53:17 56:3 78:22 80:6, 14 82:10, 12 126:5
**requested** 17:17 59:9 78:13 80:24, 25
**re-questioned** 93:14
**required** 110:2 130:23
**respect** 30:24 93:17
**response** 35:5 53:16 55:11 56:3
**responsibilities** 63:24
**responsibility** 14:23
**responsible** 81:15, 23
**rest** 51:23 71:25 104:6
**restrooms** 8:20
**result** 114:18 115:1 130:18
**results** 103:19
**retained** 6:13
**returned** 47:24 87:19
**reveal** 33:23
**reverse** 47:13
**review** 30:10 43:18, 23 76:25 84:14 108:16, 17, 25 111:3 115:12 133:22
**reviewed** 27:7 42:2 76:10 88:7 91:6 93:4, 24 117:10 120:16 121:18
**reviewing** 126:15 127:5
**reviews** 117:6
**Revised** 75:5
**right** 9:9, 15 12:22 15:1, 17 18:5 19:8, 18 20:7, 21, 23 21:3, 8 22:12, 21, 25 23:16, 19 24:1 25:11, 20 26:9, 13 28:6 29:13, 15, 18, 25 30:5, 17, 20 31:22 33:7 34:3, 7, 20 37:24 38:3 39:16 40:8 41:20 42:9, 12, 15, 18 43:9 44:2 48:6, 8, 12, 16, 18, 21 49:3, 20 50:5, 12, 16, 24 51:19 53:8, 23 54:8, 11, 13, 17 55:10, 21 56:1, 19, 22 57:4, 16, 20 59:2, 25 60:5, 17 61:7, 10 62:8, 11, 22, 24 63:9 65:18 66:3, 8, 9, 12, 18 67:9, 17 69:24 72:16 73:1 74:6 76:16 77:7, 23 78:7 79:6 80:19 82:3 83:19 85:22 86:4, 7, 10, 11 88:13 89:11 90:7, 11 91:3, 4, 20, 24 96:24 97:1 98:2 101:8 103:16 104:1, 11, 14 105:7 106:22 107:2, 9, 20, 22 108:20, 21 109:7 110:5 111:1 112:25 113:2, 7 114:14 115:5, 13, 17, 20, 22 116:1, 9, 10, 19 118:8 119:10, 11, 18, 23, 24 120:2, 13, 17, 18 121:3, 5, 16, 23 122:14, 20, 21

123:4, 20, 21, 24, 25 124:3, 9, 10 125:18 127:22 128:24 129:2, 7, 13 130:2 131:2 132:19, 24 133:15, 16, 21
**right-hand** 37:5 48:9, 13, 20, 23
**ring** 99:18 100:23
**Robert** 63:2, 4
**ROBINSON** 3:18 7:23, 24
**Roetzel** 1:20 3:19 6:13 7:24
**role** 70:1 98:2 99:21 101:21, 22 102:18 103:6, 11
**Ronald** 1:17 4:3 6:3, 5, 9 105:23 132:10
**Room** 3:9 11:15, 22, 25 16:11 20:15 47:25 67:18 89:22
**rooms** 11:24
**rotated** 11:22 79:16, 20
**rotation** 11:19 12:2, 25 13:4, 7, 9 19:16 79:17
**Rowell** 82:17, 20 83:14 85:1, 24 86:3 93:11 94:4, 18 95:4 104:12 130:1
**rubber** 47:9
**Rule** 54:25 56:3
**ruling** 37:9
**run** 109:3
**RUSSEL** 7:17, 18 35:8, 21 105:9, 20 107:18 120:8 124:18 129:4, 10 131:22 133:19
**RUSSELL** 3:4

< S >
**sad** 82:24
**safe** 115:18 121:10
**SARAH** 2:5 8:2
**Sarah@fggfirm.com** 2:12
**sat** 7:4 85:7
**saved** 127:7
**Savings** 135:19
**saw** 23:8 52:8 109:13 123:9 124:6
**saying** 18:2 23:13 32:17 57:23 61:13 73:8 74:11 84:17, 18 88:14 101:5 124:8 129:5
**says** 13:16 15:13 38:9 45:18 46:7 51:22 54:4 56:11, 12, 17 59:8, 19 64:10, 24 65:7, 15, 21, 22 66:19, 21 67:3, 11, 17 68:25 71:3 73:11 75:2, 18 76:6 87:18 89:9, 21, 25 91:16 92:19, 23 93:13
**scan** 44:23 49:23 50:22
**scanned** 44:23 46:9 49:21, 22 50:7 60:14 70:23, 24
**scared** 17:20
**scheduling** 6:18
**schizo-personality** 49:18
**school** 9:17, 19, 22, 25
**Scientific** 59:2, 4, 23 102:14
**se** 32:1
**seal** 135:11
**second** 9:6 10:16 12:12 13:13 17:7 18:22 22:13 26:20 44:17 79:21 83:23 89:1 108:13, 22 118:18 120:24
**secret** 116:15
**section** 11:20
**see** 15:13 17:6 18:20 19:11 25:15 26:9, 18 32:12, 18 37:23 38:16 40:2 42:3, 8 48:1 49:2 51:1, 23 54:24 56:16 64:22 65:17, 21 68:10, 14 73:25 74:1, 25 75:7 81:4, 8 84:6 87:8, 17, 22 89:1, 6, 23 90:5 92:10, 17, 21, 25 93:15 103:18 113:13, 23 123:6 126:24 128:3 129:20 132:17
**seeing** 74:8 111:4
**seen** 58:17 72:5, 6 91:9 110:14 111:15 112:19 117:18 120:20 128:11
**sell** 90:2
**senior** 12:15 13:6
**sense** 12:17 13:15, 18 40:14 110:14 118:19 126:23
**sent** 6:21 7:2 56:8, 10, 13 59:9
**sentence** 89:20, 25
**separate** 59:4 126:17
**separately** 96:9
**September** 64:11 75:20 87:10, 11 92:2, 3
**sergeant** 104:23, 25 105:4
**series** 100:2, 24 106:1
**seriously** 34:12 84:4 114:1
**served** 36:11 70:13
**sessions** 96:15
**set** 39:16 63:14 79:19, 21 101:12 102:25 135:10
**sets** 46:3
**Sfunk@ralaw.com** 3:24
**share** 111:21
**sheet** 51:6 68:12
**shortly** 23:17, 18
**show** 16:4 24:11 33:10, 11 39:5 45:19 63:15 118:6 132:14
**showed** 47:2 95:22
**showing** 16:1
**shown** 42:19
**shows** 37:8 46:24 56:6 60:23
**side** 48:9, 13, 20 65:21 66:12 67:14 89:21 90:23
**SIDOTI** 2:6 7:25 27:1 39:21 40:9, 12, 24 42:20 43:3 122:18
**sign** 29:17
**signature** 9:6 36:13 133:23, 25
**signed** 9:8 36:1 40:5 57:4 66:7 88:15 92:2
**significant** 12:10 109:15
**signs** 104:24
**silly** 108:2
**single** 107:8
**sitting** 28:7 85:13 115:11 120:24
**situation** 30:25 31:10, 25 80:17, 21 130:15
**SIU** 56:18 66:22 67:21
**skip** 50:16 51:10 52:14 57:18 62:2 63:9 64:18 69:11, 16
**skipping** 69:14
**smack** 73:11
**smeared** 56:18
**smell** 23:11
**snatched** 19:20
**somebody** 11:25 12:1 13:1 16:9 29:5, 21 36:2 53:4, 10 64:2 101:17 102:2 127:12
**somebody's** 74:10
**someplace** 124:21
**somewhat** 68:16 117:2
**sorry** 27:2 33:4 38:5, 20 50:20 57:1, 2 67:2 69:6 71:17 105:15 123:2
**sort** 8:20 32:20 47:15 61:8
**sound** 40:8
**sounds** 24:1 101:10, 17 102:5
**source** 20:25
**South** 3:20
**speak** 40:19 114:19
**speaking** 102:22 127:6
**speaks** 131:13
**specific** 82:14, 17, 19 85:9, 19
**specifically** 13:2 27:22 28:1 80:15 133:10
**specifics** 41:19 85:11
**speculate** 34:2, 18
**spelled** 6:9
**spoke** 85:24 99:25 118:16
**spoken** 6:17 40:15, 22 94:8 98:7, 11 99:19 102:2
**Square** 2:9
**stakes** 31:24
**stamped** 18:14 48:23
**stand** 31:12 50:1 73:4 85:18 86:18, 23 120:13, 17, 19 132:23
**standard** 36:8, 10 58:22 59:13 78:13
**standing** 123:10
**Stanick** 103:3, 4, 5
**star** 65:7 90:23 91:14, 25 92:8 93:2 116:24 122:20
**starred** 66:13 117:7, 8
**stars** 116:18 117:15
**start** 6:20 21:1 35:13 47:12 70:21 106:1 128:14
**started** 9:22 10:1 11:14, 15, 17, 18 13:17 28:19 40:5, 6 61:13 62:16 68:1 79:19 113:22
**starting** 20:10 64:16, 23
**starts** 36:22 37:1
**State** 1:19 9:20 10:22 18:19 39:6 135:6, 18
**stated** 110:6
**statement** 26:15, 21, 24 28:22 29:1, 3, 7, 12, 22, 24 30:2, 7, 10, 19, 21 31:19 32:1 38:7, 9, 15 53:24 54:1 66:4, 5 89:8 91:23 92:20, 24 93:20, 21 116:14 120:20 124:4, 14 133:3
**statements** 23:22 27:3, 7 28:7, 21 31:15 38:14 39:10 40:1 42:10 43:11, 12 54:2, 10 75:4 76:7, 11 77:18 90:13, 16 91:17 94:24 95:5, 10 97:10, 14 98:17 99:9 100:9 110:23 111:4, 10, 16 112:17 113:5, 7 120:12 121:12, 20 130:7 133:4
**STATES** 1:2 49:1 124:4
**State's** 55:11
**stayed** 9:25
**stench** 23:10
**stenotype** 135:9
**stenotypy** 135:8

**STEPHEN** 3:17 6:12
**Steve** 18:13
**stipulations** 1:23
**stored** 46:10
**Street** 1:21 3:20 11:16 19:20 135:19
**strongly** 23:12
**struck** 114:6
**stuck** 68:22
**stuff** 71:12 76:21 109:9 115:19 119:22, 23 120:1, 2
**subject** 55:6, 8 133:13
**submitted** 8:24
**Subpoena** 4:11 6:21 7:2
**subpoenaing** 53:1 62:5
**subpoenas** 50:11
**substance** 119:4
**subtract** 30:20
**subtracted** 74:2
**suggest** 68:24 94:21 95:2
**suggested** 39:22
**Suite** 2:9 3:21
**summary** 52:4 61:19
**Summers** 21:23 55:12
**supervisory** 63:23
**supplemental** 42:13 50:17, 21
**Supplementary** 4:15, 16
**suppressed** 108:1
**sure** 10:14 27:16, 25 28:20 30:8, 11 40:25 61:18 65:1, 13 66:2 67:13 70:2 81:1, 22 82:1 97:23 110:11, 12 112:9 113:6 114:25 116:19, 20 128:23 130:19 131:1 132:9
**surprised** 130:16
**suspect** 39:23 84:5 87:20 88:18 109:1, 21 110:4, 20 117:19, 20 130:6 131:8, 11
**Sweeney** 10:23 13:10 48:20
**sworn** 6:4
**system** 77:3

< T >
**table** 7:15
**take** 8:19, 23 22:17 23:1 24:4 36:14 45:21 47:9 57:7 63:16 70:11 77:15 85:17 86:17 105:9 131:24
**taken** 1:17 7:6, 11, 12 9:13 16:16 67:18 89:22 106:21 113:6
**talk** 41:14 43:10 58:3 85:7 105:8 119:4
**talked** 15:10 40:11, 24 41:12 62:12 78:17 81:16 90:12, 15 94:2 96:4, 5 104:11 118:19, 22
**talking** 20:1 31:23 38:10 63:3 77:17, 18 79:1 84:1 91:23 128:16
**talks** 16:2 17:6 18:12, 21 52:9 90:23
**taped** 68:12
**team** 8:5 108:7, 11 109:21 110:8, 10 111:17 112:8 119:21 131:25
**technically** 58:4
**Telephone** 9:24 10:1
**tell** 27:16 61:18 70:16 72:8, 25 80:15 110:16 111:8 116:10 130:5, 9 131:10
**telling** 41:11, 12, 20 113:24
**tended** 32:9
**tenure** 19:18
**term** 126:11
**terms** 26:24 75:14 118:3
**TERRY** 2:7 8:5
**Terry@fggfirm.com** 2:14
**testified** 6:4 22:14 82:21 86:5 95:19, 20 97:22 99:15 112:20 113:3 118:4 120:19
**testify** 18:25 31:18 37:21 86:3 106:18 112:16
**testifying** 17:24
**testimony** 27:9 36:22 54:3, 4 73:19 88:3 110:25 111:6, 11, 24 113:19 119:19 120:15 121:8, 9 122:2, 10, 23 123:4 133:5, 7, 11
**testing** 47:5, 6
**Thank** 35:22 112:15 132:6 133:16
**Thanks** 105:25
**theory** 107:24
**thick** 129:14, 16
**thing** 8:12 17:8 23:1 26:6 31:3 42:5 47:3 75:23 80:1 116:8 130:14
**things** 7:5 20:14 21:5 23:8 28:17 30:20 32:20 33:1, 14 36:23 41:16 42:2 43:16 51:8 65:3 68:9 70:9 71:13 73:5, 7, 24 114:20 116:18, 24 117:4, 7, 15, 23 125:7 129:22
**think** 6:17 7:11 8:10, 12 10:19 12:8, 11, 19 18:19 19:5 22:7 23:6, 19 24:2 41:9, 11 56:11 60:14 67:20 69:21 73:5 76:20 81:16 83:12 84:23 85:4 87:4, 24 88:4, 23 90:10, 15 94:2 101:11 102:3 104:8, 9 105:7 111:20 112:3 113:10 115:18 117:22 120:23 122:24 129:8 132:13
**thinking** 74:16 109:10
**third** 10:16 79:21
**thought** 30:13, 21 72:9 113:2 116:13, 25 127:13 129:15 133:8
**threat** 124:9
**threats** 17:23, 25 19:3 37:13 124:16
**three** 11:23 19:21 70:24 87:8, 16 90:21
**three-month** 79:17
**throw** 128:23
**time** 10:8, 17 11:13, 24 12:13, 15, 18 13:9, 15, 22 16:3, 5, 8, 10, 15 17:6 18:1 19:9 22:4 23:9, 15 28:20 39:9 40:25 41:3 46:10 63:22 64:4 68:15 70:7, 15, 17 72:6, 22 74:13 79:4 80:2 85:16 86:17 88:8 96:6 114:8, 21 115:7 116:10 121:9, 14, 22 123:4 124:12, 24 126:4, 21 128:17
**timeframe** 20:1 32:5 73:15 79:20
**times** 40:14 118:22
**today** 6:12 7:4, 13 28:7 72:5 105:25 115:4, 11 118:20 119:2 121:19
**told** 43:3 44:11 109:21 110:17 111:16 113:18 116:11, 12 123:12, 13 128:13, 14 130:25 132:25 133:4
**tolerated** 125:3
**top** 35:13 37:3, 5 38:7 48:23, 25 51:17 63:13 68:25 74:25 123:1
**Total** 55:7
**totality** 41:13 74:4
**tough** 125:22
**track** 71:2
**trade** 12:13
**tragic** 74:16
**transcript** 4:18, 19, 20, 21, 22 5:4 21:3, 16 22:18 23:21 24:6, 11 25:19 36:21 60:23 95:22 121:6 133:22 135:9
**transcripts** 110:14
**Transfer** 81:19, 24
**transferred** 78:1
**transfers** 78:6
**transmitted** 104:9
**trial** 11:7, 20, 25 12:1, 22 13:2, 17 14:6 17:21, 24 21:4, 9, 16 22:14, 22 23:15, 18 27:4 28:13 30:24 31:16 36:21 39:9 43:18 49:25 50:1 55:3, 6 60:21, 23 62:21, 23 63:15 79:10, 13 85:13 86:3, 5 91:2 95:19 96:8, 10, 11 98:5, 18 99:1 108:9 110:24 111:6, 11, 25 122:2, 22 125:13 127:23 128:17 130:15 131:19
**trials** 7:5 11:10
**tried** 79:22, 24 108:14, 18
**true** 32:18 70:20 76:24 121:21 130:17 133:8, 9 135:8
**truth** 61:19
**Truthfully** 15:20
**try** 8:11, 15, 16 19:23 20:2 30:7 63:15 64:5 79:24 81:10
**trying** 7:7 11:13, 18 30:12 47:7 55:18 64:5 71:1 78:16, 23 109:3 113:9
**Tuesday** 1:22
**Turn** 50:5 57:9 64:9 70:21 87:4
**turned** 112:3
**Turning** 48:22 87:18
**Twice** 118:23
**two** 8:4 9:5 11:23 14:2 15:12 16:18 21:20, 24 37:12 53:6 62:4 69:24 82:7, 9 87:5 111:16 112:7
**type** 29:3 53:10 67:15 125:14 129:21
**typed** 29:12 48:10 51:4 53:14 55:24 93:11 104:15
**types** 104:1, 18
**typewritten** 104:2
**typical** 26:4 53:4 65:2
**typically** 75:14 78:19 127:4
**typing** 87:19

< U >
**U.S** 49:9 54:15 55:19
**ugly** 130:13
**Uh-huh** 38:4 72:23

**ultimately** 91:*2* 93:*19* 103:*18* 105:*1* 114:*18*
**Um-hmm** 17:*13* 20:*3, 6* 23:*3* 27:*5* 39:*19* 40:*3* 43:*15* 48:*8* 53:*25* 55:*1, 13* 56:*25* 58:*9* 65:*8* 66:*6* 71:*21* 72:*3* 74:*23* 78:*15* 106:*3* 109:*12* 114:*5* 120:*14* 123:*8* 126:*13* 127:*1*
**Unable** 66:*25* 67:*1*
**unclear** 27:*13* 28:*16* 29:*4, 10, 20*
**underline** 65:*3* 116:*24*
**underlined** 89:*9* 117:*8*
**underlines** 116:*17* 117:*15*
**underlining** 89:*12*
**underneath** 89:*21*
**understand** 28:*6* 30:*3* 74:*14* 78:*16* 103:*19* 108:*13* 123:*3* 124:*11* 125:*6*
**understanding** 22:*2* 32:*16* 59:*3* 103:*12, 25*
**understood** 30:*11* 81:*20* 105:*22*
**unethical** 125:*17, 20, 23*
**unexpectedly** 113:*5, 15*
**Unit** 28:*23* 29:*1, 6* 59:*3, 4, 24* 92:*20* 93:*20* 102:*14* 106:*2, 6, 8*
**UNITED** 1:*2* 48:*25*
**University** 9:*20*
**upcoming** 20:*17*
**uploaded** 46:*5, 6, 11*
**use** 30:*3* 78:*7*
**usually** 31:*20* 41:*15* 126:*16, 19*

< V >
**vague** 37:*16*
**Vaguely** 11:*2*
**valuables** 67:*18* 89:*21* 90:*3*
**varied** 32:*7*
**various** 80:*5*
**verbatim** 78:*10*
**verify** 9:*6*
**version** 55:*24* 56:*2*
**versus** 10:*22*
**victim** 52:*9* 124:*6, 15*
**victim's** 67:*15* 124:*5*
**view** 30:*16*
**viewed** 75:*21* 92:*13*
**volume** 44:*6*
**voluminously** 129:*12*
**voluntarily** 7:*3*
**vs** 1:*10*

< W >
**wait** 8:*13* 36:*25*
**waive** 133:*23, 25*
**walk** 9:*10*
**walked** 122:*5* 123:*20*
**Walsh** 102:*4, 7, 13, 19, 22, 25*
**Walter** 100:*21* 101:*3*
**want** 8:*23* 9:*10* 10:*7* 21:*6* 31:*11* 45:*11* 47:*10, 12* 63:*5* 64:*18, 22* 87:*3* 89:*17* 96:*21* 110:*17* 116:*7* 122:*14* 129:*1*
**wanted** 14:*9* 19:*11* 36:*23* 60:*8* 74:*21* 114:*2*
**wanting** 65:*4*
**watching** 34:*15*
**water** 8:*21*
**Watts** 39:*24* 42:*7, 14, 16* 84:*9, 12, 16* 87:*3, 20, 21* 88:*12, 17* 89:*4* 90:*1* 94:*9* 109:*1, 8, 11*
**Watts's** 109:*5*
**way** 12:*1* 16:*20* 18:*3* 26:*23* 27:*13, 25* 28:*17* 30:*15* 32:*18* 34:*7, 19* 41:*15* 50:*7* 55:*17* 63:*3* 64:*9, 16* 74:*11, 12* 76:*9, 23* 78:*24* 80:*15* 81:*12, 20* 84:*21, 22* 85:*12* 86:*13, 14* 94:*11* 95:*1* 96:*13* 97:*5, 9, 21, 24* 98:*15* 102:*16* 107:*4, 5, 6* 113:*17, 19* 116:*3* 118:*3* 120:*9* 125:*21, 23* 128:*20* 131:*23*
**week** 11:*16*
**welcome** 132:*7*
**welcoming** 113:*24*
**Well** 32:*22* 49:*23* 50:*23* 52:*6, 18* 57:*20* 69:*15* 86:*2, 16* 111:*9*
**went** 11:*17* 15:*18* 38:*13* 56:*13* 70:*2, 4, 5, 9* 79:*23* 81:*25* 92:*4* 103:*10* 113:*23* 115:*4, 6*
**we're** 11:*3* 90:*18*
**we've** 52:*20* 72:*21* 129:*11*
**whatsoever** 22:*24*
**WHEREOF** 135:*10*
**wife** 123:*7*
**WILLIAM** 3:*5* 23:*24* 55:*12* 82:*15, 21* 83:*4, 5, 14* 84:*8* 85:*1* 86:*5, 9* 92:*2* 94:*3, 4, 5, 8, 18* 95:*3* 104:*12*
**Williams** 21:*23*
**Willie** 39:*24* 42:*7, 14, 16* 84:*8, 12, 16* 87:*3, 20, 21* 88:*12, 17* 89:*4* 90:*1* 94:*8* 109:*1, 5, 8, 11*
**willing** 18:*25*
**wish** 13:*20*
**withheld** 37:*12* 83:*14* 96:*18* 98:*22* 100:*3* 107:*1, 21* 108:*10* 120:*4*
**withhold** 108:*6* 114:*10* 125:*24*
**withholding** 96:*21*
**witness** 8:*15* 18:*22* 19:*4* 28:*21, 25* 29:*6, 9, 11, 16* 30:*1, 3, 10, 11* 31:*7, 12, 18, 19* 32:*1, 23* 37:*20* 45:*19* 52:*8* 54:*22, 24* 57:*9* 66:*4, 5* 85:*18* 86:*17* 91:*1* 96:*15* 98:*5* 105:*15, 22* 112:*16* 127:*16* 128:*13, 14, 16* 132:*7, 9* 133:*25* 135:*10*
**witnesses** 16:*3* 17:*19* 21:*10* 31:*1* 37:*11, 12, 25* 38:*13* 39:*25* 48:*11, 14* 50:*10* 53:*2* 55:*2, 5* 56:*24* 57:*15* 60:*9* 62:*5, 23* 63:*15* 96:*4, 5, 10, 11* 108:*20* 111:*16* 112:*7* 127:*5* 130:*7*
**Wmenzalora@city.cleveland.oh.us** 3:*13*
**Wolf** 64:*24* 87:*25*
**wonder** 51:*23* 73:*8*
**word** 22:*17* 24:*4* 65:*13*
**words** 46:*7* 51:*3* 122:*3* 123:*14, 15* 132:*18*
**work** 7:*24* 20:*20* 32:*19* 69:*19* 70:*4* 75:*14* 96:*7* 106:*15* 119:*12, 16*
**worked** 14:*5* 26:*23* 70:*7* 78:*23* 79:*8* 82:*2, 10* 102:*7, 13* 103:*5* 106:*4, 6* 116:*20* 119:*14* 131:*15*
**working** 9:*24* 10:*1* 82:*7* 95:*17* 131:*17*
**works** 101:*11, 17*
**world** 85:*12* 130:*15*
**worse** 130:*14*
**Worthy** 17:*23* 19:*4* 23:*23* 24:*12* 25:*8, 24* 26:*18, 21* 27:*4* 28:*7* 31:*14* 38:*1* 42:*11* 43:*11* 52:*8, 10* 90:*13, 24* 91:*1* 92:*5* 93:*13, 17* 94:*13* 110:*23* 111:*5, 10* 112:*7* 120:*16, 17* 121:*10*
**would've** 9:*16* 12:*19* 16:*15* 85:*5, 12* 86:*15, 25* 87:*1* 110:*11* 128:*24* 129:*15*
**Wow** 69:*10*
**Writ** 55:*15, 22* 64:*15*
**write** 118:*9*
**writing** 60:*20* 126:*14, 20*
**Writs** 64:*14*
**written** 26:*14, 21, 24* 27:*3* 31:*15* 32:*5* 38:*15* 39:*10* 54:*1* 64:*7, 9* 76:*11* 103:*13, 19* 117:*11*
**wrote** 67:*6, 13* 114:*3, 6* 116:*18* 135:*7*

< Y >
**Yeah** 7:*8* 8:*10, 15* 10:*16* 11:*3, 6, 9* 12:*3, 7, 14, 25* 13:*3, 5, 15, 21* 14:*8* 16:*14, 21* 17:*17* 19:*9, 10* 20:*13* 21:*2* 22:*3* 23:*13* 25:*21* 26:*6* 27:*23* 35:*20, 22* 36:*13* 37:*5* 47:*16, 24* 48:*1, 12* 49:*13* 58:*22* 59:*13, 16* 61:*2, 24* 62:*17* 64:*15* 67:*5* 68:*8* 69:*2, 7* 70:*16* 71:*3* 73:*11* 77:*18* 81:*19* 83:*17* 88:*4* 93:*10* 100:*21* 101:*24* 105:*9* 110:*13* 113:*8, 22* 128:*12*
**year** 10:*6* 69:*21*
**years** 7:*10* 11:*4* 19:*9* 23:*12* 69:*24* 82:*7, 10*
**Yep** 47:*18* 56:*15*
**young** 19:*20*
**younger** 12:*10*

< Z >
**Zoom** 2:*7, 8* 3:*7* 8:*4, 7*