```
1            IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3                       - - -

4    Isaiah Andrews,            )
                               )
5               Plaintiff,     )
                               )
6         vs.                  )   Case No: 1:22-CV-00250
                               )   Judge Gwin
7    City of Cleveland, et al., )
                               )
8               Defendants.  )

9                       - - -

10

11        Continued videotaped deposition of Carmen

12   Marino, a witness herein, called by the Defendants

13   for direct examination pursuant to the Federal Rules

14   of Civil Procedure, taken before Constance Versagi,

15   Notary Public in and for the State of Ohio, at

16   3340 Rocky River Drive, Cleveland, Ohio, on Tuesday,

17   February 28, 2023, commencing at 10:45 a.m.

18                       - - -

19                    VOLUME II

20                       - - -

21

22

23

24

25
```

1    APPEARANCES:

2    On behalf of the Plaintiff:

3            Sarah Gelsomino, Esq.
             Marcus Sidoti, Esq.
4            Jacqueline Greene, Esq (Remote)
             Friedman, Gilbert & Gerhardstein
5            50 Public Square, Suite 1900
             Cleveland, Ohio  44113
6            216-241-1430
             Sarah@fggfirm.com
7            Jacqueline@fggfirm.com
             Marcus@fggfirm.com

8

9

10   On behalf of the Defendant City of Cleveland:

11           William Menzalora, Esq.
             Timothy Puin, Esq. (Remote)
12           Chief Assistant Director of Law
             City of Cleveland
13           601 Lakeside Avenue, Room 106
             Cleveland, Ohio  44114
14           216-664-4285
             Wmenzalora@city.cleveland.oh.us

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES: Cont'd

2    On behalf of the Defendants Detective Leo Allen,
     Detective David Lee Hicks, Detective J. Francis
3    McCaffery, Sergeant John Kaminski, Estate of Ernest
     Rowell, Estate of Nick Stanick, Estate of Kevin
4    Walsh, Estate of William Hubbard, Estate of Pete
     Comodeca and Debra Dugan Guardian Ad Litem for
5    Walter Dugan (now Deceased):

6            Kenneth A. Calderone, Esq.
             Hanna, Campbell & Powell, LLP
7            3737 Embassy Parkway, Suite 100
             Akron, Ohio  44333
8            330-670-7324
             Kcalderone@hcplaw.net

9

10

11   On behalf of Carmen Marino:

12           David Lambert, Esq.
             Assistant Cuyahoga County Prosecutor
13           Cuyahoga County Prosecutor's Office
             1200 Ontario Street, 9th Floor
14           Cleveland, Ohio  44113
             216-443-7800

15

16

17   Also Present:

18   Steve Mengelkamp, Videographer

19                         - - -

20

21

22

23

24

25

```
 1                      INDEX

 2    WITNESS:                CROSS        REDIRECT

 3    Carmen Marino

 4
            By Ms. Gelsomino     166
 5
            By Mr. Calderone                  361
 6
                          -  -  -
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       PROCEEDINGS

2              THE VIDEOGRAPHER: We're on the record

3          at 10:45.

4                      CARMEN MARINO

5     of lawful age, being first duly sworn, as

6     hereinafter certified, was examined and testified

7     as follows:

8                    CROSS-EXAMINATION

9     BY MS. GELSOMINO:

10    Q     All right.  Carmen, here we are again.  So I

11          would like to start today with asking you some

12          questions about how you kept your file.

13    A     My personal file?

14    Q     Yes.  So you previously testified that when

15          you signed -- when you were assigned a case,

16          you would request the file from the records

17          room, right?

18    A     Right.

19    Q     When that file came to you, what did it look

20          like?

21    A     Brand new, containing all the records that the

22          police put into it.

23    Q     Okay.

24    A     It would have just the basics on it.  A form

25          of about 4 by 6 inches with the typed-in

1          detectives' names on it, City of Cleveland or
2          City of Rocky River or whatever, the heading.
3          The number would be in the upper left-hand
4          corner.  It got to the point where the -- it
5          was a six digit number.  But it wasn't always
6          that.  It was a five digit number.  And there
7          were cases when I started with four digit
8          numbers.
9    Q     That's the file number?
10   A     That's the file number, yes.
11   Q     Was that a County Prosecutor file number?
12   A     Yes.
13   Q     Okay.
14   A     State versus whatever the defendant or
15         defendants' names were.  The judge in the -- I
16         can't remember, upper right-hand corner, lower
17         left-hand, one of the two.
18              Then we would fill out the rest.  You
19         know, if it was us, we would sign our names on
20         it as handling the pretrial.  The case would
21         be completed by the person who tried the case
22         or disposed of it.  He would write in the
23         disposition, the date, his name would go on
24         the file.  If he tried the case, same thing,
25         he would wait for the verdict to come in, and

1          then it would be -- after the trial, it would

2          be refiled back at the records room.

3  Q    Okay.  And you're describing like one piece of

4          paper where you would write down the pretrials

5          and the disposition and everything?

6  A    No, right on the front of the cover.

7  Q    On the file jacket?

8  A    So when you picked it up, you knew who handled

9          the case, which judge it was, what the verdict

10         was, and what the plea.

11  Q    And so -- that makes sense actually.  So

12         everything that was -- any prosecutor who was

13         working the case did, would be written on the

14         front of the file jacket?

15  A    Right.  And if it went from one prosecutor to

16         another, the prosecutor's name that would

17         handle the first pretrial would be on there on

18         the side.  And then notes would be down on the

19         second hearing or something like that.

20             But they got rid of the cases pretty

21         quick because they instituted a speedy trial

22         law.

23  Q    Right.  Were you around when that law was

24         instituted?

25  A    Um-hum.

1    Q      Were you around before that was instituted?

2    A      Yeah.

3    Q      Oh, that's interesting.  Okay.  And there was

4           one file jacket per indictment?

5    A      Yes.

6    Q      So even if -- what if one defendant had

7           multiple cases in different indictments, they

8           would each have their own file jacket?

9    A      Each crime with the defendant's name on it

10          would be a separate file.  Now if there were

11          multiple defendants on a particular crime,

12          there would be multiple defendants on that

13          file.

14   Q      Got it.

15   A      So you might have a defendant who has a count

16          of burglary or robbery, something like that,

17          with another defendant.  Another one by

18          himself.  Another one with a third defendant.

19          Another one with three or four defendants.  So

20          it goes by the crime that was accused.

21   Q      Okay.  That makes sense.

22          And then inside that file jacket, was it one

23          of those like big folders that opened up and

24          you just keep your file right in and --

25   A      Right.  It was an envelope really.  It didn't

```
1            expand.  So some cases that were really long,
2            you would have to get an expansion file to add
3            to it, and that would have a sticker on it
4            identifying it or written on front of it that
5            it is part of the other case.
6    Q       Okay.
7    A       So they would go together.  They would be
8            bound together.
9    Q       Okay.  That makes sense.
10           So in this envelope -- I appreciate you using
11           that word, that helps me -- there would be the
12           police reports, right?  Like right when you
13           got it out of the records room?
14   A       Right.
15   Q       And then what else would be in there at that
16           time?
17   A       It would start with a yellow sheet that was
18           the worksheet for the indictment for the Grand
19           Jury.  Then there would be the indictment and
20           all the police reports would be in there.
21               Usually if it was a homicide, there
22           would be the coroner's report.  And like I
23           say, it was complete.  Rarely did any
24           prosecutor in any case, including the
25           homicides, have to do any special
```

**FINCUN-MANCINI -- THE COURT REPORTERS**
**(216) 696-2272 -- email@fincunmancini.com**

1              investigation.

2    Q        Okay.  What's the Grand Jury worksheet?

3    A        The what?

4    Q        Grand Jury worksheet?

5    A        Before they have anything formally typed out,

6             they sit down with the detectives or they will

7             go through the case themselves and start

8             writing out what type of crime it is.  You

9             know, they have to know, especially when the

10            death penalty came back, okay, there is -- and

11            they changed it from first degree murder,

12            second degree murder, manslaughter.  It went

13            from aggravated murder with specifications,

14            aggravated murder, down to manslaughter.  They

15            would have to know what type of crime it is so

16            what statute they would refer to when they

17            presented it to the Grand Jury.

18   Q        Okay.  And that was something filled out by

19            the Grand Jury prosecutors?

20   A        Right, the Grand Jury prosecutors did that.

21            We had, I think, at one time the cases were

22            coming in, we had three or four Grand Juries

23            going.  One in the morning, one the afternoon

24            for two or three days.

25   Q        When you looked through Exhibit L, these two

```
 1            big binders of the whole file, did you see the
 2            Grand Jury worksheet?
 3   A        I don't recall seeing it in there.
 4   Q        Okay.  But you would expect to see that in
 5            your file when you take the records --
 6   A        That's the first thing we did, start going
 7            through the -- write down what statutes are
 8            applicable.
 9   Q        Okay.  So there would be one -- you said that
10            you were working with two other prosecutors at
11            a time, right?
12   A        Right.
13   Q        Were all -- so if you were working a file, and
14            there were other prosecutors that were also
15            assigned to the same room, how would you share
16            this file?
17   A        The head prosecutors would distribute it.
18   Q        Okay.
19   A        Here, take this pretrial.  The other guy take
20            another pretrial.  We divide them up.
21   Q        Would you make -- would you have your own
22            working file?  Like whenever I work a case, I
23            have my own little working file where I keep
24            my notes and my own copies of reports and
25            stuff like that.
```

1    A      No.  Anything we do -- our notes or whatever
2           would be on the outside.  I can remember
3           writing a lot of notes on the outside of the
4           back of a file, or just write it on a piece of
5           paper and stick it in the file.
6    Q      Why would you do that?
7    A      It is the easiest way of doing it without
8           keeping a separate file for myself.
9    Q      Okay.
10   A      I don't know that anybody did it.  What they
11          did in Major -- I don't how many divisions
12          they have now.  If you start getting assigned
13          cases to you, like we did in the Major Trial
14          Division, then you would have to keep the list
15          of cases that you had and what category they
16          were in so that you can keep -- you know, know
17          how many cases you are responsible for.  Find
18          out which ones are nearing termination on time
19          and so.
20   Q      Okay.  So you -- so that would be like just
21          your own organizational chart?
22   A      Right.
23   Q      You would keep a list of your own cases,
24          right?
25   A      Right.

1    Q      Okay. That makes sense.

2           Did you do that?

3    A      I did. It would list the case number, the

4           date of indictment, the name of it, when the

5           pretrials were, and if there was a

6           disposition, I would write in a disposition

7           and check off that that case was disposed of.

8    Q      Okay. Did you save any of those lists?

9    A      I saved some of them. They might be in a box

10          in my office. It was difficult for me for the

11          past few days to -- if I bend down too far, my

12          hip could pop out, okay? So I don't want to

13          go back to the hospital. So I tried to bend

14          down and look at some of the boxes. I just

15          couldn't get them out of there.

16             But it is a folder, page after page of

17          the cases that were assigned to me.

18    Q      Okay. I don't want you to do anything that is

19          going to require you to go back to the

20          hospital.

21    A      Well, this was not one of them. This was

22          before I was in the Major Trial Division or

23          the COP program so I wouldn't have had a

24          private docket.

25    Q      Okay. Do you have any notes, do you think,

| | | |
|---|---|---|
| 1 | | any personal records related to the Andrews' |
| 2 | | case? |
| 3 | A | No. |
| 4 | Q | Do you have any personal records or notes |
| 5 | | related to any of your prosecutorial -- or any |
| 6 | | of your work as a prosecutor from '74 to '75? |
| 7 | A | No. |
| 8 | Q | So I'm not sure that I got a clear answer to |
| 9 | | this, so I just want to be sure. When you -- |
| 10 | | would you ever keep notes related to your work |
| 11 | | on a case that were not inside the main file? |
| 12 | A | No. |
| 13 | Q | Once you were -- you were working with three |
| 14 | | attorneys per two judges, right? |
| 15 | A | Right. |
| 16 | Q | Did you always move together with those |
| 17 | | attorneys? |
| 18 | A | No. They would break up teams from time to |
| 19 | | time. But there were some stretches, like the |
| 20 | | name of Ruggeri, Bob Ruggeri -- |
| 21 | Q | Right. |
| 22 | A | -- he and I were together for like two years. |
| 23 | Q | Okay. |
| 24 | A | And sometimes when we got stretched thin, we |
| 25 | | would have two prosecutors for two judges. |

1    But they would have to -- without sounding too

2    egotistical, they would have to be like

3    Ruggeri and me.  Any one of us could handle

4    any trial.  We didn't need anyone to sit with

5    us.  We could handle the judge's docket by

6    ourselves.  But that was difficult because

7    when you get in trial, who is going to handle

8    the pretrials.  That was what the third person

9    was for.

10   Q    That makes sense.

11   A    Yes.

12   Q    Do you recall the approximate two years that

13        you and Ruggeri worked together?

14   A    No, other than we did.  There was a stretch

15        where another guy, Tom Wagner and I probably

16        were together longer than that.  But I don't

17        remember which years we were.

18   Q    Okay.  Ruggeri, did you ever work with him

19        around '74 or '75.

20   A    His name is down there.  I might have.

21   Q    You don't remember?

22   A    I do not.

23   Q    It seems like his name was down there as a

24        note but not as if he was a colleague of yours

25        on this case.  That's how I read it.  But --

1  A    I don't think he was.

2  Q    Okay.

3  A    Usually the supervisors who make up the teams

4       would try to distribute the ones who were most

5       experienced with others who were less.

6  Q    That makes sense.

7  A    So you wouldn't get three top experienced

8       attorneys in one room or in two rooms.  So

9       they divided them up so that the younger

10      people got guidance.

11 Q    That makes perfect sense.  It's how you train

12      people, right?

13           But where were you in terms of

14      experience level in '74-'75 in relation to

15      Ruggeri?

16 A    I found out pretty fast that I could handle

17      cases.  I was not afraid of the jury.  We had

18      some guys that would get stage struck.  I

19      mean, they would literally stand up in front

20      of the jury and just couldn't say anything.

21      And the assistant would get up there and sit

22      them down.

23           So I was not -- I didn't have any

24      problem with any of the cases.  In fact, I

25      think it was 1975 that September, October,

1          November, I tried a case, in Judge Nahra's

2          room that lasted three months.  I think that

3          was one of my first really extraordinary cases

4          that was long.

5     Q    Okay.  And how about Ruggeri?

6     A    Ruggeri had to be with me in like '71, '72,

7          '73, something like that.

8     Q    Okay.

9     A    Or after that, because like I say, we weren't

10         in special units at that time.  Everybody

11         handled everything.

12    Q    But you don't remember ever talking to Ruggeri

13         about the Andrews case?

14    A    No.

15    Q    Okay.  So my question, my original question,

16         was these three prosecutors.  When you were

17         reassigned from -- oh, you said occasionally

18         you were broken up in teams, right?

19    A    Yeah, and regularly.  You might do two tours

20         of duty, whether it was three months or so.  I

21         think they found that -- I can't remember what

22         they thought was better.  Three months was

23         pretty short.  Six months was better.

24              So on a longer tour of duty like that,

25         you would probably get broken up after six

1          months and you would go with other people.

2  Q    Do you remember how long you were assigned to

3          Sweeney?

4  A    To Sweeney?

5  Q    In the '74-'75 time.

6  A    I don't.  I can just extrapolate from the time

7          that I came in in September of '74 to when I

8          left at the end of February of '75.  That's

9          six weeks -- six months.

10  Q    Okay.

11  A    So I'm guessing that was probably the tour of

12          duty, that is why I got switched.

13  Q    Okay.  So you believe that you were assigned

14          to this case September of '74 through February

15          of '75?

16  A    Right.

17               MR. CALDERONE:    Objection,

18          foundation.  Go ahead.

19  Q    What is the basis of that -- of your

20          estimation here, the time that you are --

21  A    Because that's six months; September, October,

22          November, December, January, February.  I left

23          the end of February.  Because it looks like

24          the way I was writing notes and making

25          observations on those police reports, that I

1          was preparing for trial in March.  That's why
2          it surprised me -- it surprised me I think
3          back at that time.  We just switched.  It was
4          Charlie Laurie's case, but I thought I was
5          going to be working on it.  When you do that
6          much on a case, pretty much they keep you
7          together.
8   Q      Yeah.
9   A      But they didn't.  So I did not end up trying
10         the case.  He did with Ron Adrine.
11  Q      Did you ever ask to try the case?
12  A      No.
13  Q      Was there ever a discussion about you
14         remaining on and trying the case since you
15         were days away from trial and you had done all
16         the prep work?
17  A      No, I wasn't one that went looking for cases
18         or anything like.  You know, some easy case to
19         make a name on or something like that.  I just
20         went where they told me.
21  Q      Okay.  I don't mean anything like that.  Just
22         like, for the sake of efficiency.  It just
23         seems it would have sense for you to try this
24         case.
25  A      Now I think back, I would thought they would

1      have kept Charlie and me on that case.

2  Q   Who made the decision to move you?

3  A   It would have been the prosecutor who has

4      since passed named Robert Feighan.

5  Q   Okay.

6  A   He was the administrator for all the

7      prosecutors.

8  Q   Okay.

9  A   He did it all by himself.  He didn't have any

10     assistants.  Where later on we had three

11     prosecutors who would handle assignments in

12     rooms and stuff like that because there was

13     just too many prosecutors.

14         But even at that time we probably had

15     50, 60 prosecutors that had to be assigned.

16 Q   Yeah.  And I'm sorry, I don't remember if you

17     told me this the other day.  Do you remember

18     the third person who was assigned to Sweeney's

19     room with you and Laurie?

20 A   I don't.

21 Q   But you never worked with Adrine on this case

22     at all?

23 A   Not on this case or any case.

24 Q   Did you ever work with Joe Gibson?

25 A   No.  I know the name.  I never worked on any

1    case with him.

2  Q  You never worked on the Andrews' case with

3    him?

4  A  No.

5  Q  When you were generally -- let's talk about

6    this generally first and specifically about

7    the Andrews' case.

8  A  Sure.

9  Q  Generally when you were rotated off a case,

10    was there any kind of procedure or policy

11    about how a case was handed from one

12    prosecutor to the next?

13  A  No written procedure or procedure that was

14    established in the office.  It was just a

15    matter of common sense.  If I was passing off

16    a case to somebody else, if there was any

17    complications in it, I would go over it with

18    them and say, you know, handle it this way or

19    this is my suggestion, or take a look at the

20    case from this standpoint, or you might want

21    to take a harder look on how you are going to

22    handle the case.

23      If it was just a normal case that I had

24    pretried and it was set for trial, I just let

25    the next prosecutor pick it up.  They could

| | | |
|---|---|---|
| 1 | | figure it out. |
| 2 | Q | Sure.  But if you had done significant work on |
| 3 | | a case, then you would make sure that you |
| 4 | | passed off that information that you gathered |
| 5 | | to the next prosecutor? |
| 6 | A | Yeah.  And if I missed it, they would see how |
| 7 | | many notes I would have on it.  They would |
| 8 | | contact me and ask me questions if they had |
| 9 | | any.  That would generally be the procedure if |
| 10 | | they had any questions about it, since I had |
| 11 | | done so much work on it. |
| 12 | Q | I understand there was no written policy on |
| 13 | | that.  But was that the practice of the office |
| 14 | | to pass cases between prosecutors in a way |
| 15 | | that you just described? |
| 16 | A | Right.  If you are handing them off from one |
| 17 | | person to another, sure. |
| 18 | Q | Was there ever any training on that? |
| 19 | A | No.  Mainly the training is, trial work |
| 20 | | training is sitting in a courtroom and |
| 21 | | learning. |
| 22 | Q | Okay.  When you would pass this information |
| 23 | | off to the next prosecutor, would you make any |
| 24 | | documentation of that? |
| 25 | A | Well, my notes would be in the file.  Would be |

1      on the front of the file.

2          There was no set procedure.  There was

3      no set form that you had to fill out.

4  Q   Right.

5  A   Just how I handled it.  They could figure it

6      out.

7  Q   Sure.  But would you like, you know, write up

8      a memo of what you learned or --

9  A   No, I never did.

10 Q   -- note bullet points of something for them to

11     look at in the file?

12 A   No, no bullet points.

13 Q   And that wouldn't be something that you would

14     -- that pass off of information would not be

15     indicated anywhere in your notes in the file

16     jacket?

17 A   It would be written on the file jacket.  They

18     would see my notes in the margin of the

19     documents like you see them though now.

20 Q   Right.

21 A   But, you know, the vast majority of cases are

22     not complicated.

23 Q   Sure.

24 A   Just change the name, change the dates, and

25     the law is the same.

1  Q    Is that true?

2  A    It is.

3  Q    I've come to that conclusion too, and I have

4       far less established compared to you.

5           But I guess what I am trying to ask you

6       is, like would there be a note somewhere in a

7       file jacket that said on, you know, 2-22 sit

8       down with so-and-so, new prosecutor, review

9       case, like when you were passing it off?

10 A    I can't remember ever doing it.  If I had any

11      notes, it would be written on the documents on

12      the face of the file or back of the file or

13      something like that.

14 Q    Okay.

15 A    I just didn't put special memos in there or

16      anything.

17 Q    So specifically when you were taken off the

18      Andrews' case, six days before trial, at that

19      point you had done a significant amount of

20      work to gather information and investigate

21      this case, right?

22 A    Yes.

23          MR. LAMBERT:    Objection,

24      foundation.

25          MR. CALDERONE:    Objection.

1  Q    So did you take any steps in this case to pass
2       that information that you learned in your
3       investigation off to the new prosecutor?
4  A    No.  I don't remember any of that.  I just
5       went to the next thing.  Because Charlie was
6       the lead prosecutor, he was going to handle
7       it.  I was sitting second chair.  So if he
8       wanted Ron Adrine to know something, he would
9       sit down with him and go over with him.
10 Q    Did you ever have any conversation with
11      Charlie Laurie about what you learned in the
12      investigation?
13 A    I don't recall it, but I'm sure we discussed
14      the case a lot.
15 Q    So everything that you have told us about this
16      case thus far, all the notes you made and all
17      the investigation that you did and information
18      that you gathered, did you give all of that
19      information to Charlie Laurie before he tried
20      the case?
21 A    It was in the file.  So he took the file.  If
22      there were any questions, he could come back
23      to me.  I didn't make any -- I don't recall
24      making any specific effort to say, here, here
25      is what I've done on it.  He knew what I was

```
 1        doing.
 2   Q    Well, that's what I'm trying to get at.  Like
 3        he knew what you were doing along the way,
 4        right?
 5   A    Yes.
 6   Q    Did you guys talk about that investigation and
 7        preparation along the way?
 8   A    I don't specifically remember it, but we would
 9        have had to.
10   Q    Right.
11   A    On a case like that, you start looking at all
12        aspects of the case and you talk to each
13        other.  Because we both thought the two of us
14        were going to try the case.
15   Q    Okay.  That makes sense.
16             As to this file, I don't -- I have this
17        recollection of you saying something on
18        Saturday about when reports came in to the
19        Prosecutor's Office they were time stamped as
20        received or something like that; do you recall
21        that?
22             MR. LAMBERT:     Objection.
23             MR. CALDERONE:    Objection to form.
24   A    I do.
25   Q    Okay.  Tell me more about that, please.
```

1  A    Well, if there was something to be added to

2         the file, detectives or whoever was delivering

3         it would go to our front desk.  You couldn't

4         get by the front desk.  You couldn't just walk

5         in the office and go back without the approval

6         of the --

7  Q    Sure?

8  A    -- secretary who was handling it.  And she was

9         pretty firm.  You know, it was -- well, at

10       this time I don't know who it was.  Since we

11       were in four different buildings, there would

12       have been four different secretaries.

13              But they would time stamp it so the

14       prosecutor knew when it came in.  Now I don't

15       know what other prosecutors did, but if it

16       were sent to me, I would initial it if it was

17       on the date I got it, I would write the date

18       that I got it on, if it was not the same date

19       that it came in as it was time stamped.  We

20       had a time stamp at the County Prosecutor's

21       Office, date and the time that it was.

22  Q    Okay.  Would the documents that came -- that

23       were in that original file that you would

24       request from the records room, would those

25       also be time stamped for when they were

1            received by --
2   A      No.
3   Q      -- the office?
4   A      They were original.  They would be brought
5          over by the detectives.  They would make, I
6          don't know, two, three, four copies.  And the
7          one that was given to us would be just put in
8          the file.
9   Q      Do you know how that process worked?  How the
10         officers would bring information or records to
11         the Prosecutor's Office at the beginning of a
12         case?
13  A      I known generally.  I never worked with them
14         though.  I mean, I couldn't say specifically
15         because I never worked -- I worked one day in
16         Grand Jury, I think it was, and that was
17         enough.
18  Q      Well, tell me what you know, please.
19  A      Well, the standard would be there would be
20         nothing in the file until the police brought
21         over the reports.  And then the prosecutor
22         would sit down with -- one of the Grand Jury
23         prosecutors would sit down with those reports,
24         read them to figure which crimes by statute
25         had been committed and what degree of homicide

1    was involved, or robbery, or aggravated or

2    not.  And then they would start making up the

3    indictment.

4         They would make up a sketch with the

5    yellow form first, and then that would be

6    typed in to a formal indictment when they went

7    to the Grand Jury.

8  Q  So the records would come straight from the

9    detectives to the Grand Jury prosecutor?

10 A  Right.

11 Q  Where did the City prosecutor come into this

12   process, if you know?

13        MR. CALDERONE:    Objection.  Go ahead.

14 A  They don't.  Once -- we used to handle what

15   they called bind overs in the Cleveland muni

16   court.  Not in the suburbs.  Because we got so

17   much business from Cleveland.  We would have a

18   county prosecutor in the Cleveland Municipal

19   Court when they would binding over felonies to

20   us, follow me?

21 Q  Okay.

22 A  Because they don't have jurisdiction over

23   felonies.  So we would be in there.  The

24   person would come before the municipal judge.

25   The charges against them would be read.  The

1    charges on county crimes, not on city crimes.

2        And they would then be told it's going

3    to be bound over to the County Grand Jury.

4    Then they would start over again, through our

5    process.  They bring those cases over to the

6    County Grand Jury.  Then you would go, Grand

7    Jury.  If there is an indictment, go for an

8    arraignment.  And then to the judge who the

9    case was assigned to.

10 Q    The Bates stamped documents that you told --

11   or the time stamped.  I'm sorry, I keep saying

12   Bates stamped.  When they came into the

13   office, do you know if those would be just,

14   you know, it was just the front of the packet

15   of papers time stamped?  Was each page time

16   stamped?

17 A    No, just the front.  Well, if it was one page,

18   just one page would be stapled.  If it was 10

19   pages, the front page would be stamped.

20 Q    And then so would police ever, other than what

21   you described that sometimes police officers

22   would bring additional information to the desk

23   at your office, right, they would also come to

24   pretrials and meet with you, right?

25       MR. CALDERONE:    Objection to form.

```
 1              Go ahead.
 2    A         Yes.  Usually they would.  Sometimes they
 3              would not.  But on homicide cases, pretty much
 4              the homicide detective showed up.
 5    Q         Would they bring any files with them to the
 6              pretrials?
 7    A         They would bring the same files we had.  The
 8              copy is what we have.
 9    Q         Did ever look at their files?
10    A         No, not unless they were bringing something to
11              my attention like, did you see in this in our
12              file, and then I would go to our file and make
13              sure it's in there.
14    Q         Similarly, I've had police officers, homicide
15              detectives in particular, testify to me that
16              they would bring their own file to trial --
17                   MR. LAMBERT:     Objection.
18    Q         -- to have with them.
19                   MR. MENZALORA:    Objection.
20                   MR. CALDERONE:    Objection; form,
21              foundation.
22                   Sorry, I thought you were done.  Go
23              ahead
24    Q         Did you ever have that experience?
25                   MR. CALDERONE:    Objection, form,
```

```
 1            foundation.  You can answer.
 2   A    They are talking about their copy of the file
 3        they gave us.
 4              Now, sometimes there might be, you
 5        know, their own notebooks that they have
 6        because they are not typing out the forms when
 7        they are talking to someone, they are just
 8        making notes.  This witness come in and they
 9        would make a formal statement, and they know
10        what questions to ask because they previously
11        interviewed them.
12   Q    Right.
13   A    So if there was anything they were referring
14        to, it would be their copy of the documents
15        that they already gave us.  So we would both
16        be looking at the same thing at the same time
17        when we were talking about something.
18   Q    Would officers ever bring their own notes to
19        trial?
20              MR. CALDERONE:    Objection.
21   A    I don't know.  I never asked them or anything
22        like that --
23   Q    Well, I have had officers just -- in my
24        experience, homicide detectives tell me that
25        they would like make trial preparation notes,
```

1          outlines, kind of condense information and

2          bring those with them to the prosecutor's

3          table at trial.

4                    Did you ever have that experience?

5                    MR. LAMBERT:       Objection to the form

6          of the question.

7                    MR. MENZALORA:    Objection.

8                    MR. CALDERONE:    Objection, form,

9          foundation.

10    A    I can't, you know, I can't remember all of

11         them.  I can remember one extraordinary one

12         when we were trying -- let's see.  We were

13         trying the two Kilbane brothers and Judge

14         Robert Steele for the murder of his wife.

15         There was a detective named Lou Coolis who was

16         the head of the detectives in the Sheriff's

17         Office.

18    Q    Okay.

19    A    I told him take the stand with everything.  So

20         he got on the stand with about, I would say,

21         four inches, it might have been six inches of

22         notes and everything.  And I said, handle any

23         question you want.

24                    And so, of course, defense was probably

25         overwhelmed.  He had a stack in front of him.

 1       There was the jury.  There was the judge.
 2       But, yeah, he had a ton of his notes in there.
 3       Like I said, go ahead answer any question.
 4       Let them see whatever they want.
 5   Q   Okay.  And --
 6   A   That was in trial in front of a jury and a
 7       judge.
 8   Q   Right.
 9           Would you ever review the notes that
10       officers made regarding their investigation
11       and their preparation?
12   A   Not really unless they called it to my
13       attention.  Because what they wrote up in the
14       report was their notes in a more formal form.
15   Q   Okay.  In this case did officers ever bring
16       any notes to any pretrials?
17           MR. MENZALORA:    Objection.
18           MR. CALDERONE:    In this case you
19       mean?
20   Q   In Andrews.
21   A   Andrews' case.
22   Q   Thank you.
23   A   No, I don't remember them ever doing it.  I
24       don't even remember the pretrials in this
25       case.  We had them, but -- we had to have

1          them, because you always pretry any case,

2          especially homicide cases.  But I don't

3          remember any special deliveries of any notes

4          that they came to at pretrial.

5     Q    Okay.  Now you testified that there were times

6          where you ask the officers to gather

7          information for you?

8               MR. LAMBERT:      Objection.

9     Q    It that right?

10    A    Just that one time.

11    Q    What do you mean?  Which time?

12    A    Where the guy was burned with kerosene.

13    Q    Oh, right.  We talked about that.  Thank you.

14         I forgot about that. Right, that was the one

15         specific time that you did tell me about that

16         you had them go look for the kerosene.

17              MR. LAMBERT:      Objection.

18    Q    In addition to that, though, I understood your

19         testimony to be that sometimes as you were

20         working a case, you would talk to the

21         detectives --

22    A    You mean in trial?  In trial if something were

23         to pop up.  The only thing I could do is give

24         an example.

25    Q    Okay.

1   A    We were trying the organized crime case and an

2          incident came up we where we had an alibi that

3          we were going to break.  Instead of saying he

4          was with the defendant, he called -- he said

5          he called the defendant from a phone booth.

6          And so I told the detectives -- in fact, I

7          remember Detective Rocco Pollutro, who became

8          Chief of Police of Cleveland, this was on a

9          Saturday, so -- to go out and check and see if

10         the telephone booth was there, where they say

11         they made the call.

12   Q    Was it?

13   A    No, it wasn't.  It was put there three days

14         after they killed Danny.  So this guy couldn't

15         possibly have done it.

16              So when that happened, it was his

17         suggestion we do that.  And of course mine

18         was, bluntly, are you out of your mind.  But

19         he said, let's check it out.  So he checked it

20         out.  And Monday morning there was the Ohio

21         Bell telephone guy talking about how it was

22         not working until three days after Danny

23         Greene was killed.  So there was no worry

24         about an alibi until after that.

25              So that is one where they had to go out

1      and check out something.

2  Q   That worked out, huh?

3  A   Yeah, sure did.  The jury was impressed.

4  Q   When officers would come to pretrials, did you

5      make any note of that or report of that, or

6      have to like fill out one of the duty cards or

7      anything?

8  A   The only thing I would have to do would be if

9      they wanted me to, is to sign their time

10     cards.  Because if they were on duty, it was

11     part of their duty.  But if they were not on

12     duty and they wanted to -- there were a lot of

13     them, they were really conscientious.  They

14     wanted to show up and see what was going on.

15     Then I would sign their time card saying they

16     were here the hours that they claim.

17  Q   Other than that, you wouldn't make a note of

18     it anywhere --

19  A   No.

20  Q   -- on your records or on the jacket?

21  A   No.

22  Q   Did you ever meet with officers at the

23     station?

24  A   Rarely, but, yes.

25  Q   Would you ever meet with witnesses at the

1          station or any station?

2   A     Generally, no. I mean, I'm trying to think of

3          -- I watched some polygraphs through a two-way

4          mirror. But I can't remember whether they

5          were my case or whether it was a

6          demonstration. I wanted to see how effective

7          they were.

8   Q     In relation to your approximately six months

9          that you were working on the Andrews' case,

10         did you ever meet with any officer at the

11         station?

12   A     I can't remember. No, probably not. But I

13         don't remember meeting with any officer.

14   Q     Okay.

15   A     They would always come to our office.

16   Q     How about any witness?

17            MR. CALDERONE: Objection, met any

18         witnesses at the station?

19   Q     Yeah, so in the approximately --

20   A     No, I wouldn't --

21   Q     -- six months or so.

22   A     -- have gone to the station for any of these

23         witnesses. They would come to us.

24   Q     Would you have met with any of these witnesses

25         some other location?

1   A      No.

2   Q      Did you observe any of the polygraphs that

3          were conducted in relation to the Isaiah

4          Andrews' investigation?

5   A      No.

6   Q      What do you think of polygraphs?

7   A      What do I think of them?

8   Q      Um-hum.

9   A      They are pretty good.

10  Q      Yeah?  All right.

11                This Exhibit L clearly has a bunch of

12         documents that had nothing to do with the case

13         -- that weren't in existence at the time you

14         were working this case, right?

15                MR. CALDERONE:    Objection to form.

16                MR. LAMBERT:     Objection.

17  A      You mean the pleadings?  I mean, the one

18         volume that has all the appeals in them?

19  Q      Yeah.  I mean, I haven't looked at what is in

20         Volume 1 versus Volume 2.  But in general --

21  A      Volume 1 is the records of the case and the

22         documents.

23                Volume 2 is I have -- I had nothing to

24         do with because that was all after the trial.

25  Q      Volume 1 includes some appellate -- I think

1           there is appellate proceedings sporadically

2           through here.

3    A      Yeah.

4    Q      But anyhow, we can agree this includes

5           documents that weren't in existence in '74 and

6           '75, right?

7                   MR. MENZALORA:     Objection.

8                   MR. LAMBERT:      Objection.

9                   MR. CALDERONE:     Objection to form.

10   A      I don't remember everything --

11                  MR. LAMBERT:      What includes

12          documents that were in '74 and '75, what

13          document?

14                  MS. GELSOMINO:     Exhibit L.

15   A      The larger of the two files?

16   Q      So, here, I am just going to hand these two

17          for you -- to you.

18                  My understanding, based on what Ken has

19          represented, and I think he's not lying about

20          this, is that these two are Exhibit L, right?

21   A      Okay.  The smaller of the two Exhibit L is --

22          the bottom one that you are holding there, to

23          my recollection is all appellate material, and

24          I had nothing to do with that.

25   Q      Perfect.

1          The first binder I will represent to
2     you does have some appellate.
3          MR. LAMBERT:     Take a look at this
4     before you testify.
5          THE WITNESS:     What?  This whole
6     document here?
7          MR. LAMBERT:     Just take a look at
8     it.
9  Q   I'm not trying to trick you or anything.  I
10     just want to know -- I mean, ultimately this
11     Exhibit L includes stuff, as you just said,
12     that wasn't around when you were on this case,
13     right?
14          MR. CALDERONE:     Objection.
15          MR. LAMBERT:     Objection.
16  A   Flipping through here is the brief of
17     appellee, that is -- I had nothing to do with
18     that.  Anything that you see that's in the
19     form of an appeal, motion to transfer record
20     from whatever, that's -- you know, I had
21     nothing to do with anything.
22          What I had to do with was the basic
23     trial.  All the documents that indicate
24     witnesses and evidence and investigation.
25  Q   Sure.

1           MR. LAMBERT:      The problem is, look

2      at that, that's in there.

3  Q   My understanding is that's what you are

4      saying, right, Carmen, that the police

5      report --

6  A   Right.  Not these, brief of appellees.

7  Q   Okay.  Got it.

8  A   Anything that is formally typed out like that

9      would come from our office.

10 Q   Okay.  So you have no idea where Exhibit L

11     came from, right?

12 A   Where what?

13 Q   This exhibit, these two binders, where this

14     came from, do you?

15 A   Ken Calderone gave it to me.

16 Q   Right.  But in terms of where he got it or

17     where it was originated, you're not sure,

18     right?

19 A   I don't know how he put it together.

20 Q   You don't know when it was scanned or what

21     kind of documents were included in it?

22 A   Right.

23 Q   Okay.  And you don't even know if it's

24     complete as to everything that is in the

25     Prosecutor's possession, right?

```
 1   A      I do not.
 2   Q      Was Charlie Laurie on this case before you
 3          were assigned to it?
 4   A      I do not believe so.  I believe we both were
 5          together in Judge Sweeney's room at the same
 6          time when it came in.
 7   Q      Okay.  In September of '74?
 8   A      Yes.
 9   Q      In terms of Exhibit L, you don't know if there
10          are any items in police possession that are
11          not included in this Exhibit L, do you?
12              MR. CALDERONE:    Objection.
13              I'm sorry, I didn't -- did you say
14          police possession?
15              MS. GELSOMINO:    Yes.
16              MR. CALDERONE:    Okay.  Go ahead.
17   A      I wouldn't know because I didn't compare this
18          with anything else.
19   Q      You have never looked at any police files in
20          this case recently, like anything that came
21          from the City?
22   A      Not for 50 years.
23   Q      Right.  Okay.  Well, in fact, ever, right?  I
24          mean, have you ever looked at files in the
25          police possession in relation to this case or
```

1      did you just look at what was in the

2      Prosecutor's file?

3  A   I look at all the files they gave us.

4  Q   Okay.  That's what I thought.  I just wanted

5      to be clear for the record.

6          While you are working this case with

7      Charlie Laurie, do you know whether he did

8      anything that is not reflected in the notes in

9      this Prosecutor's file?

10  A   I do not.

11  Q   Did he ever tell you anything else that he was

12      working on in relation to this case?

13  A   I don't remember talking to him about it.  He

14      may have, but I don't remember.

15  Q   But you know that you were keeping him

16      apprised of what you were working on, right?

17  A   Yes.  We would discuss the case regularly

18      together.  That would be the procedure.

19  Q   I would assume that you would make sure that

20      he knew everything before you left six days

21      before trial, right?

22          MR. LAMBERT:     Objection.

23          MR. CALDERONE:    Objection, form,

24      foundation.

25  A   I don't remember sitting down talking to him

1    about it.  I mean, we both knew the same

2    thing.  We both had the -- we worked from the

3    same file.  So he saw my markings on it.  I

4    can't remember what his writing looks like, so

5    I don't know what notes he made.

6          But I -- I don't remember saying, you

7    know, I'm being transferred, you know,

8    remember to do this.  Because he was far more

9    experienced.  He was the lead Prosecutor on

10   the case so I just apparently just picked up

11   and left and went to my next duty station.

12   Q   Okay.  Are you aware of this case ever being

13       dismissed?

14   A   I don't remember that.  Do not.

15   Q   Was it ever dismissed or reindicted while you

16       were working on it?

17          MR. CALDERONE:   Objection to form of

18       that question.  Go ahead.

19   A   Not that I can recall.

20   Q   If the case had been dismissed -- if any case

21       was dismissed and reindicted, would those two

22       different cases have different files based on

23       the indictment?

24   A   They should, but I don't know how the

25       recordkeeping was done at that time.  I don't

1        know if it was resubmitted under the same

2        number. I mean, I have had that done.

3 Q    Have you also had it -- seen it over your

4        career where there was one indictment. The

5        first indictment would have its own file and

6        then a different indictment would have a

7        different file, right? That's what you told

8        me earlier.

9        MR. LAMBERT: Objection.

10 A    There were only, I think -- I can't think of

11        more than two cases I had where I took back to

12        the Grand Jury under the same number. So I

13        didn't ask for a different case number. That

14        the case would have been dismissed, and then I

15        would have taken the same case back into the

16        Grand Jury and under the same number

17        reindicted.

18 Q    Oh.

19 A    At the different date, yeah. I would not

20        create another file. I wouldn't.

21 Q    Generally.

22 A    I don't know what the procedure was.

23 Q    Generally you wouldn't create another file?

24 A    Right.

25 Q    Okay. Were all of your actions in this case

1        consistent with the policies and practices of

2        the Prosecutor's Office?

3  A    Yes.

4  Q    Were all of your actions in this case

5        consistent with how you learned -- what you

6        learned of the policies and practices through

7        Chuck Laurie?

8  A    Yes.

9  Q    All right.

10        How are you doing?  Do you want to take

11        a break?

12  A    No, I'm fine.

13        MS. GELSOMINO:    Anybody need a break?

14  Q    I can take back that binder.  I can move it

15        out of your way.

16        I am going to hand you this other

17        binder that has the exhibits that you went

18        over with Ken.

19        MR. LAMBERT:    Can you identify that

20        document?

21        THE WITNESS:    K1, L-1 dash 15.  K-1

22        and then L-1 through I guess, L-15.

23        MR. CALDERONE:    Can I see it for one

24        second?

25        Just for the record, the front page of

1      the binder says Deposition Exhibits Carmen

2      Marino K-1, L-1 to 15, but the binder only

3      contains Exhibits L-1 to L-15.

4              K-1 was marked in a previous depo.

5              MS. GELSOMINO:   Oh, thank you for

6      clarifying that, Ken.  I didn't catch it.

7  Q   So, I just want to go through -- you went

8      through all of these exhibits with Ken on

9      Saturday.  But I have a couple of other

10     follow-up questions for you or clarifications

11     just to make sure that I remember things

12     accurately.

13             So let's look at L-1.  The first page

14     is 111.  Do you see that?

15 A   Yes.

16 Q   I have a hard time reading most of the words

17     on this page.

18 A   You can't read this very well.

19             MS. GELSOMINO:   Actually, Counsel,

20     does anyone have a more legible copy of this

21     page?

22             MR. CALDERONE:   I do not.

23             MR. MENZALORA:   I have what I got

24     from Ken.

25             MS. GELSOMINO:   Tim Puin, let me know

| | | |
|---|---|---|
| 1 | | if you have a more legible copy of this page. |
| 2 | Q | My understanding, based on your testimony on |
| 3 | | Saturday, was that these are not your notes, |
| 4 | | right? |
| 5 | A | That's correct. |
| 6 | Q | Is anything on this page your note? |
| 7 | A | No. |
| 8 | Q | Do you know whose handwriting this is? |
| 9 | A | I do not. |
| 10 | Q | Do you recall ever seeing this in the file? |
| 11 | A | I don't recall specifically seeing any of |
| 12 | | these records in the file. |
| 13 | Q | Just looking at the next page, these are your |
| 14 | | notes, right? |
| 15 | A | They are. |
| 16 | | MR. CALDERONE:   For the record, |
| 17 | | you're referring to Bates stamped page 112? |
| 18 | | MS. GELSOMINO:   Yes, exactly. |
| 19 | Q | So on page 112 -- well, on a lot of pages |
| 20 | | throughout this exhibit binder, there is |
| 21 | | yellow highlighting. |
| 22 | A | That's not mine. |
| 23 | Q | Okay.  I just wanted to be sure. |
| 24 | A | That is not mine, right. |
| 25 | Q | So any yellow that -- the yellow was on there |

1      when you reviewed this document, right?

2  A   Right.

3  Q   But you didn't make it.

4  A   Wait a minute.  The only thing that was on

5      there was my writing.  At the time I did this

6      writing there was no yellow.

7  Q   Right.

8  A   So on the document I'm looking at right now,

9      112, somebody else put a yellow mark on that

10     after this was put in here.

11 Q   Okay.

12         MR. CALDERONE:   For the record, the

13     yellow highlight marks in Exhibits L-1 through

14     L-14, or whatever they are here are from me.

15     When I was looking at that the documents, I

16     made the highlighted mark.

17         The documents in L-1 through L-14 came

18     from Exhibit L.  The original documents

19     produced by the Prosecutor's Office, those

20     documents do not have yellow highlight marks

21     on them.

22 Q   Were the yellow highlight marks on these pages

23     when you first reviewed them, if you recall?

24 A   Same as it is right here before me.

25 Q   All right.

1          This isn't dated, right?

2   A     No.

3   Q     Page 112 doesn't have a date on it?

4   A     No.

5   Q     When we look at all your notes that we went

6          over on Saturday, they are all here,

7          Exhibit L-1 through L-4, I think.  Yeah, L-1

8          through L-4 it looks like.

9              Do you have any sense of

10         chronologically when you made these notes --

11  A     No.

12  Q     -- in relation to each other?

13  A     No.

14  Q     Just take a look at them and so if there is

15         anything about them now, you know, looking at

16         them as a group that there is any way to say

17         that you made one before the other?

18             I doubt you can tell me what date you

19         made anything.  But if there is any order, or

20         rhyme, or reason that you can come up with.

21             MR. CALDERONE:  Objection, foundation.

22             MR. LAMBERT:    Objection to compound

23         question.

24  A     The only thing I can suggest that they were

25         probably, without any degree of certainty,

```
 1          probably the trial preparation notes.
 2               In other words, I was getting ready for
 3          trial, and this is what I wanted to bring out
 4          at trial with the approval or consultation
 5          with Mr. Laurie.
 6               MR. CALDERONE:   Just note for the
 7          record, as the witness was looking at the
 8          exhibits, that he did not look at every page
 9          in Exhibit L-1 through L-14, 13.
10    Q     Okay.  And looking at these, you can't be sure
11          if you made them in the September or if you
12          made them in February, right?
13               MR. LAMBERT:   Objection.  Looking at
14          what?  Looking at these --
15    Q     The same exhibits in this document that we're
16          still looking at.  So your notes in front of
17          you.
18    A     Right.
19    Q     Is there any way for you to tell whether you
20          made any of them toward the beginning of the
21          time that you were working on this file, or
22          towards the end of the time, September to
23          February?
24    A     No.  Since they are not dated, no.
25               MR. CALDERONE:    Note for the record
```

1          the witness is looking at page 112, Bates

2          stamp page 112.

3    A     I'm flipping through 127, 128.  They look like

4          trial prep notes rather than anything I would

5          have made at pretrial.

6                This is extensive.  I wouldn't make

7          these notes at pretrial.

8    Q     Okay.

9    A     I would just get an idea of whether or not the

10         defendant has any prospects of pleading

11         guilty.  Almost nothing happens at the first

12         pretrial in a homicide case anyhow.

13               So when they start getting extensive

14         notes like that, then the prosecutor is honing

15         in on the trial date and getting ready for the

16         trial.

17               MR. CALDERONE:    Note for the record

18         that the witness has not looked at all the

19         notes, on all the pages.

20               THE WITNESS:    Right now I have not,

21         right.  I just started -- I just looked at

22         some of them.

23   Q     And it seems to me, correct me if I am wrong,

24         Carmen, you have been looking at these like

25         L-1 through L-4, which is the exhibits that

1          are just your notes, not the notes you took on
2          the reports?
3     A    Right.  Right.  And that one page that shows
4          the witness subpoena.
5     Q    Sure.  That is definitely you preparing for
6          trial, the witness subpoena which is in L-4,
7          right?
8     A    Right.
9     Q    So your notes are in that.  I was misspeaking.
10         I guess your notes are in L-1 to L-3.
11    A    Some of these notes have a date on here I just
12         noticed.
13    Q    Okay.  So, yeah, there are couple of dates on
14         there, which I'm going to go over with you.
15              But let's go back to 112.  Do you
16         recall how many times you spoke to Betty
17         Worthy?
18    A    I do not.
19    Q    When you spoke, do you remember why you wrote
20         down that she is a good witness?
21    A    I can only interpret it, that I read what she
22         said, compared to what the report said the
23         defendant said, and she didn't have a reason
24         to lie.  There was no relationship between the
25         two of them.  There was no animosity.  There

1     was no reason for her to say something other

2     than the truth.  But that's just a common

3     sense look at what I wrote down here.  That's

4     why I would write it that way.

5  Q  You testified the other day when you were

6     talking to Ken about this page 112, that you

7     had a question about Betty Worthy's testimony

8     from the time you read the file and that's why

9     you made these notes?

10 A  A question?

11 Q  Yes.

12        MR. LAMBERT:    Objection, form of

13     the question.

14        MR. CALDERONE:    Objection,

15     misrepresents testimony.

16 A  Do you want me to answer or what?

17        MR. CALDERONE:    Yeah.  Go ahead.

18 Q  Yeah.  Go ahead.  When you read --

19 A  The question in a sense that I focused on her

20     as a witness that we were probably going to

21     call.  I wasn't questioning her veracity or

22     anything.

23 Q  I see.  So you wanted to follow-up on it?

24 A  Sure.  She would be one of the witnesses that

25     we would call in for consultation before

```
 1            trial.
 2   Q    Did you learn anything from your conversations
 3        with her in addition to -- that was different
 4        than what you read in her statement?
 5   A    I don't remember that at all.
 6   Q    Did you -- at the time that you spoke to her,
 7        were you aware that she made multiple -- more
 8        than one statement to the officers?
 9            MR. CALDERONE:    Objection to the form
10        of that question.
11            MR. MENZALORA:    Objection.
12   A    Not to my memory.  I just note what I have
13        written down here.
14            MS. GELSOMINO:    Ken, what is your an
15        objection to form on this?
16            MR. CALDERONE:  Can you read the
17        question back?
18            Oh, statements.  You said she made a
19        statement, and I think your question is
20        confusing notations that officers made in
21        police reports, as compared to a statement
22        that Betty Worthy wrote herself.
23            MS. GELSOMINO:    Fair enough.
24   Q    When you spoke to Betty Worthy on the phone,
25        were you aware that she had spoken to officers
```

1      on more than one occasion?

2    A    I don't recall talking to her on the phone.

3         I'm just going by my notes here.

4    Q    Okay.  Well, at any point did you question her

5         about the changes -- the differences between

6         the first time she talked to the police

7         officers and the second time?

8              MR. LAMBERT:      Objection to the form

9         of the question.

10             MR. MENZALORA:    Objection.

11             MR. CALDERONE:    Presumes facts not in

12        evidence.

13   A    At this time I don't -- I don't recall talking

14        to her in person at all, or any of the

15        witnesses.  I am just going on what my notes

16        have here.

17   Q    When you say in person, does that also include

18        on the phone?

19   A    Yes, it would, right.  It would include

20        talking to her on the phone or talking to her

21        in person.  I don't recall talking to her on

22        the phone.  I don't recall her sitting in my

23        office and talking to her.

24   Q    Let's go to L-2.

25             Well, actually, first of all, I'm

1        sorry, before I move on, I meant to ask you a

2        question about 113, which is the last page in

3        L-1, or second to the last page, I guess.

4               I don't recall your testimony about

5        this from Saturday.  This is not your writing

6        on this page, right?

7  A    It is not.  Either a letter or whatever that

8        is, a letter that John T. Corrigan wrote.

9        Whoever wrote on the bottom, advise Detective

10       Hubbard to contact this woman.

11  Q    Do you recognize those initials?

12  A    I can't make them out.  I don't know if it is

13       J.D. or J.T. or John T. Corrigan.  It could be

14       J.T.C.  But I can't remember what

15       Mr. Corrigan's initials look like.

16  Q    So this was in November of '74 when you were

17       working on this case.  Would this have come to

18       your attention and you just don't remember it?

19  A    I don't.  It would have been put in the file.

20             Let's see, for a trial that's coming up

21       in March, we wouldn't have been working on it

22       -- we would not have been working on the case.

23       I would not have been working on the case in

24       November.  That's, you know, just way too far

25       in advance.  Too many other cases coming up.

1  Q    So other than just doing like pretrials or
2       something?
3  A    No, trials.  Pretrials are nothing.  You just
4       read the case and try to bargain it to a
5       conclusion.
6            But for trials, unless it's an extended
7       case that you're doing an investigation on,
8       and which I was not on this case, we would not
9       have been working, prepping for trial on
10      November 14th.
11 Q    Okay.  But the file would have been in your
12      possession, right?
13 A    The file would have been in the file room.
14 Q    Oh.
15 A    Once it comes to us, we only use it for that
16      purpose, the pretrial.  Then it goes right
17      back to the record room.
18 Q    Oh, thank you for clarifying that.  I thought
19      it remained in your possession.
20 A    No.  Even if you are going to do the trial,
21      you sent it back until you gauge how much time
22      you need for trial.  Usually you know what you
23      are going to bring in, you know, which
24      witnesses you are going to call.
25           So when you get closer to that trial

1      date then you start working on it.  Like you

2      see the notes start increasing.  So you start

3      working on it more and more.  But I wouldn't

4      work on a trial in March three or four months

5      ahead of time.

6  Q   When would you start to work on the trial

7      prep?

8  A   When I would -- these trial dates that the

9      judges give are more prospective than they are

10     definite.  So there are so many trials that

11     they set.  Like some judges would set two and

12     three trials a day, and you'd have to send out

13     two or three trials a day and be ready or he

14     would go to his next one.  I mean, they were

15     really on us at that time.

16            So, this one, maybe two weeks in

17     advance at most.  That would be enough time

18     for me.  I would have talked to the person,

19     all the witnesses by phone.  The detectives

20     would be aware that we're going to trial for

21     sure.  And then we would start gearing up for

22     trial.

23  Q   And then when you did start to work on a case,

24     knowing that the trial date was coming up,

25     would you keep the file from the record room

1          in your office during that period of time?
2    A     I would at that time, yes, that would stay
3          with me.
4    Q     Okay.  Do you know whether there was ever any
5          follow-up with anyone who wrote a letter to
6          the file?
7    A     I do not.
8    Q     Did you ever talk to Hubbard about this?
9    A     I don't recall talking to him at all.
10   Q     Do you recall ever seeing this letter before
11         Ken presented you with Exhibit L and these
12         documents?
13              MR. CALDERONE:    To be clear on the
14         record, you're speaking about the document on
15         Bates stamped page 113?
16              MS. GELSOMINO:    Right.
17              THE WITNESS:    Yes.
18   A     No.
19   Q     Then 114, is that your writing?
20   A     No.
21   Q     Do you know whose that is?
22   A     I do not.
23   Q     Let's go to L-2.  If you look on page 128 of
24         L-2, in the middle of the page next to -- this
25         is all your handwriting, right?

1    A      It is.

2    Q      Next to Linda Cloud it says, C.K. will relief

3             office, Cloud and Worthy, I think that's what

4             it says; is that accurate? Do you see that?

5    A      It says check with relief office.

6    Q      Check. That is what I was going to ask you

7             what does that mean.

8                What is the relief office?

9    A      We used to have a file of poor relief fraud.

10            In other words, if you were on relief of some

11            type, public money, what would happen, someone

12            would get a job and forget to tell that they

13            did -- usually this is what would happen. Or

14            they would deliberately keep the relief money

15            and do the job. You can't have both at the

16            same time.

17               So automatically they would run through

18            if there was a conflict between a person

19            taking relief money and working the same job,

20            another job privately, that was fraud.

21    Q      Okay.

22    A      Those used to come in 40, 50, 100 a month.

23    Q      Right.

24    A      And they were routinely just sloughed off

25            misdemeanors. And eventually we got rid of

1 prosecuting them. If a person is poor enough

2 to be on relief, then we're going to take a

3 case to court that nothing is going to happen

4 on. So that was that.

5 So sometimes you can get information

6 about the whereabouts of somebody or someone

7 who has that person's file as the public

8 official in charge of that person's relief

9 file, and you might find information. So I

10 said check with the relief office, Cloud and

11 Worthy.

12 Q Did you do that?

13 A I'm just going on what I have here. Not to

14 me. I'm not going to check on them. This

15 goes to the detective. That's their work.

16 Q Oh, I see. Well, did you tell the detectives

17 to go check with the relief office about

18 Worthy?

19 A I don't recall that. You know, it is not that

20 I couldn't pick up the phone and do it. You

21 know, I might have done that.

22 I'm just saying, if I said something

23 like that, it depends on how jammed up I was.

24 If I had the time, I would make the telephone

25 call myself. If not, I would call the

1      detective and tell him to do it.

2  Q   Okay.

3  A   But I don't recall what I did there.  But

4      that's -- that's the essence of what that

5      means.  Per relief office.  You go to the

6      relief office and find out what their

7      background is, or is there anything on those

8      witnesses.

9  Q   Well, do you know whether any information was

10     received from the relief office in this case

11     regarding Cloud and Worthy?

12 A   I do not.

13 Q   Would you expect to see some kind of a report,

14     a follow-up report, about Cloud and Worthy if

15     anything came from the relief office?

16 A   I would not expect it.  It would be rare.

17     Unless they had some information, so -- and

18     then it might.  Even then, they might not

19     write up the report.  They would just say,

20     yeah, call them, and they will tell you what

21     they know.  Things were very informal.  The

22     idea was to get the information, not to

23     document it.

24 Q   Wouldn't documenting information from the

25     fraud office about key witnesses in this case

1          be important?

2    A     Sure, it would be important.

3    Q     Do you agree with me that Cloud and Worthy

4          were the key witnesses in this case?

5                MR. CALDERONE:    Objection, form,

6          foundation.

7    A     I don't remember what significance they were.

8          I mean, just by my notes here why I have them

9          subpoenaed.

10   Q     Okay.  Do you recall anything about what they

11         said?

12   A     Only what I remember without -- without

13         remembering which witness said it.  But I'm

14         guessing it was one of these two about

15         observing the defendant coming out of the

16         motel room with the laundry bag and put it in

17         the trunk and whatever else.  That was the

18         essence of what I remember what their

19         testimony would have been.

20   Q     And that is pretty significant evidence

21         against Mr. Andrews?

22   A     It would be from my standpoint, yeah.

23   Q     Yeah, I would think so.

24               Do you know whether Betty Worthy was

25         facing any charges of fraud or anything

1      related to fraud at the time that she was
2      presented as a witness?
3  A   I do not.
4  Q   Did you ever talk to her about any of the
5      fraud charges against her?
6  A   I don't recall --
7           MR. LAMBERT:    Objection to the form
8      of the question.  The fraud charges against
9      her?  You mean the ones that don't exist,
10     those fraud charges?
11 A   I don't recall talking to her at all.  I don't
12     recall talking to any of the witnesses.  But I
13     must have.
14 Q   Sure.
15 A   Because I know it would have been my
16     procedure.
17 Q   All right.  So then just for the record, as to
18     Betty Worthy, do you recall any -- ever
19     getting any information about any charges
20     pending against her, or being investigated
21     against her?
22 A   I do not.
23 Q   Do you recall either of them having anything
24     about either of them engaging in prostitution
25     or sex work?

```
 1                    MR. MENZALORA:    Objection.
 2                    MR. CALDERONE:    Objection.  Who are
 3          "they"?
 4   Q      Betty Worthy or Linda Cloud.
 5   A      I do not.
 6   Q      Do you know whether any of the officers
 7          involved in investigating this case made any
 8          promises to Cloud or Worthy?
 9                    MR. CALDERONE:    Objection,
10          foundation.
11   A      I never heard of any promises being made to
12          anybody in the whole case.
13   Q      Do you know whether -- some of this is just
14          for the record.
15                    Do you know whether any officers
16          involved in the investigation of this case was
17          aware of criminal charges being investigated
18          or pending against either Betty Worthy or
19          Linda Cloud?
20                    MR. CALDERONE:    Objection to
21          foundation.
22   A      I don't recall it.
23   Q      Okay.  So I have some questions about this FBI
24          Agent Kirk.
25   A      Tom Kirk, yes.
```

| | | |
|---|---|---|
| 1 | Q | Yeah.  Did you work with Kirk, Tom Kirk, |
| 2 | | before your worked on the Isaiah Andrews' |
| 3 | | investigation? |
| 4 | A | I worked with him on the organized crime cases |
| 5 | | related to Nardi and Danny Greene. |
| 6 | Q | So what was his involvement in this |
| 7 | | investigation, in the Andrews investigation? |
| 8 | | MR. CALDERONE:    Objection, |
| 9 | | foundation.  Go ahead. |
| 10 | | I just want to make it clear -- just go |
| 11 | | ahead.  Objection to foundation. |
| 12 | Q | He objects for the record. |
| 13 | A | Now? |
| 14 | Q | You still answer the questions after he -- we |
| 15 | | just have to give him time to make the |
| 16 | | objections for the record. |
| 17 | | MR. CALDERONE:    Yeah.  Sarah, my |
| 18 | | issue is this.  The FBI agents had their |
| 19 | | issues.  The Cleveland Police Department had |
| 20 | | their investigation.  Your question makes it |
| 21 | | seem like the FBI agent was involved in the |
| 22 | | City of Cleveland's investigation, which I |
| 23 | | don't believe is accurate. |
| 24 | | MS. GELSOMINO:    Well, that's why I am |
| 25 | | asking him that. |

1    Q    My question is, did Kirk have any involvement

2        in this investigation?

3             MR. CALDERONE:    That's a good

4        question.

5    A    If his name is down here, there was something

6        that called my attention to him.

7    Q    That's what I thought.

8    A    As I -- I think I may have mentioned the last

9        time, the organization of Blacks Back to

10        Africa would have been the type of

11        organization that the FBI would have focused

12        on as subversive.

13    Q    Right.

14    A    Whether or not it was, because it was arcane,

15        and they were trying to figure out what they

16        were doing.

17             So I'm guessing, with a pretty good

18        guess, that Tom Kirk was probably involved in

19        that type of surveillance and was letting us

20        know that background because we would --

21        Rowell and Hubbard, the chief agent, detective

22        on the case, would not have had access to that

23        type of information.   Unless they sat down

24        with a witness and said, I'm with Blacks Back

25        to Africa.   And there is nothing in the file

1    that says that.

2         So that information must have come to

3    us from the FBI, and that's why his name is

4    down there.  Is he still alive?  Is he still

5    around?  Anybody?

6    Q    I don't know.

7    A    You ought to look that up.

8    Q    I will.

9         In the current -- or the recent

10   reprosecution of Isaiah Andrews there was an

11   FBI agent involved in the investigation

12   working with the Cleveland Police Department.

13        MR. LAMBERT:     Objection --

14   Q    So was there anything like that back at the

15   time that you were working on the Isaiah

16   Andrews' investigation?  Was there any FBI

17   agent or federal involvement in any way with

18   this investigation?

19        MR. CALDERONE:    Objection to form.

20   A    No.  To my recollection we had no intention of

21   calling any FBI agent.

22   Q    Other than giving you information about this

23   Blacks Back to Africa thing, did he give you

24   any -- did he or any other FBI agent give you

25   any other information about Isaiah Andrews or

1        this investigation?

2    A   No.  And I'm presuming that's why his name is

3        down there.  I could be wrong.  But I think

4        I'm 95 percent sure that is why his name is

5        there.

6    Q   So the Blacks Back to Africa thing was new to

7        me on Saturday.  I have never heard of that in

8        relation to this case.

9            Do you know why there are no reports

10       that say anything about that?

11   A   I don't.  The --

12           MR. LAMBERT:    You don't.

13   A   Yeah.

14   Q   You can keep going.  Finish your answer.

15   A   I don't.  I'm not sure this is the type of

16       case where the FBI would have written a report

17       and given it to us, even if they had reports

18       on this.

19   Q   Why?

20   A   There is nothing in the file probably because

21       they didn't give us anything.  There was a

22       phone call or something.  That's why the

23       telephone number is down here.

24   Q   Now you had a relationship with Tom Kirk from

25       other investigations.  Do you recall in this

```
1              case if you called him up and said do you have
2              anything on this, or something like that?
3    A         No, I wouldn't have done that.  At that time
4              there was a real distance between us and the
5              FBI.  We handled our cases.  They handled
6              theirs.
7                      When I started in the organized crime
8              cases, then we were in each other's bailiwick.
9              We did the trial work, and they did the
10             investigation.
11   Q         Okay.
12   A         So that's when we -- that's when we became
13             colleagues, when he started working regularly
14             with us.
15                      This is just a phone call to let us
16             know something.
17   Q         Okay.  So you think he reached out to you?
18   A         Yeah, I don't know who this guy is.  At that
19             time I didn't know who Kirk was.
20   Q         When was the Danny Greene stuff, or the other
21             mob work that you worked on?
22   A         Danny Greene was killed in October of '77 and
23             we tried the cases in '78.
24   Q         Was that your first organized crime case?
25   A         No.  He had been bombed the first time and
```

```
 1          lived.  Another prosecutor and I, John
 2          Jackson, since deceased, worked on it.  And I
 3          think we got split up again somehow.  John
 4          tried.  One defendant got convicted.  Tried
 5          the second defendant, got acquitted.  But that
 6          was when Danny Greene lived.
 7               This was -- when I had them, that was
 8          the second bombing that killed him.
 9   Q      Okay.
10   A      Okay.  Then we got into the organized crime
11          aspects of it.
12   Q      When was the a first bombing?
13   A      Let's see.  The second one was October of '77.
14          It might have been I don't think more than two
15          years prior.  It might have been '75, late
16          '75, Fall of '75 or something like that.  He
17          got bombed at his house on Waterloo.
18   Q      So I imagine -- I mean, just tell -- at the
19          time that Kirk or an FBI agent called you, did
20          he give you this piece of information about a
21          potentially subversive group, did you make any
22          notes about it?
23               MR. LAMBERT:     Objection to the form
24          of the question.
25               MR. CALDERONE:    Objection, form.
```

1   A     I must have remembered -- it's fairly accurate

2          getting it from them.  I don't remember the

3          telephone call.

4                But I'm just saying, I'm hypothesizing

5          here that that's the only way I could have

6          gotten it because Cleveland didn't have that

7          information.  They weren't involved in that

8          kind of investigation.

9                So when I saw an FBI agent's name here

10         -- I don't remember Tom Kirk.  I mean, I

11         remember him when we worked together on the --

12         a few years later on the organized crime

13         cases.  But I don't remember this.

14              This was my note here, and I am --

15         let's see, it says, FBI Agent Kirk, defendant

16         girlfriend in Painesville.  I don't know what

17         that means.  Unless this guy had another

18         girlfriend in Painesville.

19              But I don't know who this guy Kirk is

20         at that time.  I never met him before.  And I

21         don't remember any specific conversation with

22         him.

23   Q     And don't remember making any notes of any

24          information that he gave to you?

25   A     I do not.  That stuck in my mind.

1  Q    Right.

2          Did you yourself or did you do any

3    further investigation into that potential

4    connection, or have any officers do any

5    investigation into that potential connection?

6  A    Not that I can recall.

7  Q    Why not?

8  A    Because we were concentrating on the case

9    itself, proving the crime, and proving the

10    defendant committed the crime.

11  Q    So my understanding, based on how you were

12    talking about this before, was that this was a

13    potential motive to kill her, right?

14  A    Yes.

15  Q    Did you investigate any potential motives of

16    Isaiah Andrews?

17  A    Specifically, I don't remember.  But that was

18    the motive.  And this was probably the

19    information that made the motive more

20    apparent.

21  Q    Okay.

22  A    Because I never heard of Blacks Back to

23    Africa.

24  Q    Right.  Okay.

25          Other than this conversation with Kirk

1              giving you a potential connection to Blacks

2              Back to Africa and a motive, did you get any

3              other information about this from anyone?

4     A       No.  Not that I recall.

5                   MS. GELSOMINO:    Let's take a quick

6              break.

7                   THE VIDEOGRAPHER:  We're off the record

8              at 11:58.

9                        (Recess taken.)

10                  THE VIDEOGRAPHER: We're back on the

11             record at 12:25.

12    BY MS. GELSOMINO:

13    Q       Thank you.  I just turned binder 2 of

14             Exhibit 1 to page 393.

15    A       393, right.

16    Q       Are any of the -- is any of the writing on

17             this page yours?

18    A       No.

19                  MR. CALDERONE:    For the record,

20             binder 2 of Exhibit L?

21                  MS. GELSOMINO:    Thank you.  What did

22             I say?

23                  MR. CALDERONE:    Exhibit 1.

24                  THE WITNESS:    That's 2 of 2.

25    Q       Thank you for -- exhibit -- is any of the

| | | |
|---|---|---|
| 1 | | writing on this page yours? |
| 2 | A | No. |
| 3 | Q | Do you recognize any of it? |
| 4 | A | I do not. |
| 5 | Q | You don't know who did that? |
| 6 | A | No. |
| 7 | Q | Have you ever seen this before? |
| 8 | A | No. |
| 9 | Q | Okay.  Can you go to the page 395, please. |
| 10 | | Actually 395, 396, 397, and 398 to me look |
| 11 | | like they are related. |
| 12 | A | They are what? |
| 13 | Q | Somehow related.  I'm wondering if you can |
| 14 | | tell me what these are. |
| 15 | A | This is the court's form for the prosecution |
| 16 | | of a criminal docket.  This is what -- how did |
| 17 | | you get this?  It must have come out of the |
| 18 | | judge's file I'm guessing. |
| 19 | | Because if you look down there, you see |
| 20 | | Sweeney's name, the verdict, the page numbers, |
| 21 | | and stuff like that.  This comes out of |
| 22 | | probably a combination of the court and the |
| 23 | | Sheriff's Office. |
| 24 | Q | Okay.  So this is not your file jacket? |
| 25 | A | No. |

1  Q     Or not the Prosecutor's file jacket?

2  A     We would never have this in our file.

3  Q     Okay.  Is any of this -- I probably know the

4        answer to this now, but is any of this writing

5        yours?

6  A     No, none of it is.

7  Q     Do you put a name anywhere, or initials, or

8        anything that would indicate when you worked

9        on this case?  Take your time to look at it.

10            Also, if it is helpful to you to take

11       these pages out of the binder, feel free to do

12       that.

13 A     That's all right.

14            You know, I'm scanning this.  Because

15       there is absolutely no reason my name or

16       initials would be on this.  I would never see

17       this.

18 Q     Okay.

19 A     This is how they record the verdict guilty --

20       the jury is sworn in, the fees that go out.

21       These are judge's notations either made by him

22       or his bailiff.

23            Unless I'm missing something, I don't

24       see my name anywhere.

25 Q     Yeah, that's what I'm seeing too.  I don't

1           even see any notations of pretrials on here,

2           at least I can tell would be a pretrial.

3                   Do you see anything that you think

4           would be a pretrial?

5                   MR. CALDERONE:    Objection.

6   A       No.   The pages are incomplete.

7   Q       Yeah, they are difficult to read, for sure.

8   A       Yes, it is extensive when it goes into '92 and

9           everything.

10                  But going back to the first page -- you

11          know, I don't recall that they would ever put

12          the prosecutor's name on this.

13  Q       Okay.   So you think this is a document from

14          the Court, not necessarily from the

15          Prosecutor.   Not a document created by the

16          Prosecutor?

17  A       No, it would not.   We wouldn't -- I mean, I

18          have seen pages like this before.   They are

19          sort of on a, not yellow, but a vanilla type

20          background.   And these are court entries as

21          they make their decisions as the verdict comes

22          in and then the appeals start or whatever else

23          they follow-up in noting what's happening with

24          the case.

25  Q       Can you turn to page 270.   I'm not sure if

```
 1              that's correct.
 2                   No, you know, what.  Page 270.  So I'm
 3              going to hand you binder 1.
 4                   Page 270 in Exhibit L, do you know what
 5              this is?
 6    A    Yeah, that's our file.  That's the front page
 7         of page our -- that's the front of our folding
 8         file, our letter-type file.
 9    Q    And on the top of this one -- I'm sorry, where
10         it says Court Number 17902.
11    A    Right.
12    Q    What is that number?
13    A    That's the case number.  That's our case
14         number.
15    Q    And then this says duplicate file, original
16         file on site.  It looks like it says that.
17    A    I think it says inside.  Sometimes they get
18         handled so much, they literally fall apart.
19         They are dog-eared.  The file itself -- the
20         paper swells and it gets -- starts to get
21         shredded.  So what they will do is they just
22         take that file, fold it in half and put it in
23         this file, a new fresh piece of cardboard or
24         whatever it made out of, heavy paper.
25    Q    Okay.  That makes sense.  Thank you.
```

1          Can you turn to page 4.  Flip all the
2      way to the beginning of that binder, please.
3  A    Page 4 of this, like way back here?
4  Q    Back at the beginning.
5  A    That's what our file generally looked like.
6  Q    Okay.  So, is this, on page 4 of Exhibit L,
7      this would be the file jacket --
8  A    Yes.
9  Q    -- that you told me about?
10  A    This would be the original file jacket.  This
11      is the way they looked regularly.
12  Q    Is your handwriting anywhere on here?
13  A    Okay.  I'll go through so you will know what
14      my handwriting.
15          On the left side where you see Isaiah
16      Andrews, all of that, none of that is my
17      writing.  It is sort of like half of the page
18      to your left.
19  Q    Okay.
20  A    On the right side where it ended up John T.
21      Corrigan, Prosecuting Attorney, you start down
22      from there.  When you see a circle with a
23      star, someone had written witness something
24      not to be given something under any
25      circumstances.

1          Now I boxed that in and put a star

2     there calling it to the attention to me for

3     some reason, and to anybody else that would

4     have the trial, have the case.

5          Below that is Trial 3-3-75.  That is my

6     handwriting.  To the left of where I

7     originally started it says, FBI 522-1400,

8     extension 271.  I don't know for sure, but I'm

9     guessing that's this guy Hayes who must be an

10    FBI agent.  Follow me?  I wrote the name down

11    there and something.  I can't read it now

12    because it's not that clear.  Something ends

13    in H -- it looks like something O'Brien and

14    something H. Hayes, H-A-Y-E-S.

15 Q  Mike O'Brien maybe?

16 A  Could be.

17         FBI 522-1400 extension 271, J.C.

18    Williams 696-1268, then the week or work,

19    whatever, VA.  Then there is an address.

20    That's all mine.

21         I probably circled Hubbard, wrote in

22    John Scott and Eddie Wolf.  And I don't know

23    for sure if I wrote 1669 Caroline Avenue, East

24    Cleveland 681-1950.  I might have.  But I

25    definitely wrote in John Scott and Eddie Wolf.

1  Q    Do you know who John Scott is?

2  A    No.

3  Q    Do you know who Eddie Wolf is?

4  A    No.

5  Q    Do you know who J.C. Williams is?

6  A    No.

7  Q    Do you know anything about this Mike O'Brien

8       maybe or what we believe to say Hayes?

9  A    I don't know.  I don't recall their names.

10 Q    Now you think that you starred this piece of

11      writing here on the right?

12 A    I'm the only one that did stuff like that.  I

13      mean, messy stars and circles.

14 Q    Well, do you know what Chuck Laurie's manner

15      of marking up files was?

16 A    No, I don't.

17 Q    Do you know what Ron Adrine's manner of

18      marking up files was?

19 A    No.

20 Q    Do you know what Joe Gibson's manner of

21      marking up files was?

22 A    No.

23 Q    How about John T. Corrigan, do you know how he

24      wrote up files -- marked up files?

25 A    I do not.

1  Q     This seems to be a note that you think that

2        you boxed in which had the abbreviation J.T.C.

3        under it.  I'm assuming that's John T.

4        Corrigan?

5  A     Yes, that's what I would say.

6  Q     Can you read that?

7  A     We're trying to probably protect a witness.

8        Witness address not to be given under -- given

9        something under any circumstances.  So -- so

10       you know their procedure, someone must have

11       gone to him and rather than us go to the Court

12       to certify that this person needs protection

13       and we're not going to give that name to the

14       defense counsel, well, you can do that,

15       certify for that person's protection.

16             Once in a great, great while you would

17       see a note that someone went to Mr. Corrigan

18       and said, this witness is afraid.  I'm giving

19       you an example here.  This witness is afraid.

20       We don't want the address of this witness

21       given out.  So he would write something like

22       this.  That is what he did there.  And I

23       highlighted it so that no one would ever miss

24       that and not give -- accidentally give their

25       name out in discovery with the address on it.

1          He's telling don't give out the address.  Some

2          -- the easier way to do it, don't give out

3          witness's name and certify to the Court that

4          the witness needs protection.  But this is his

5          writing.  I'm presuming that's his writing.

6          He's the only one that would order us to do

7          something like that.

8   Q   Do you recall in this case, like actually have

9          a memory of anything related to an issue with

10         a witness --

11  A   No.

12  Q   -- being threatened or anything?

13  A   No.

14  Q   Okay.  When you reviewed the exhibit, did that

15         refresh your recollection at all in terms of

16         any potential witness intimidation?

17  A   No.  I don't recall us having a problem with

18         that at all.

19            You can see when it is dated.  It is

20         dated in December.

21  Q   Right.  Which is when you were on the case,

22         right?

23  A   I was still in that room, yes.

24  Q   Okay.  Do you recall any issues at any point

25         with witnesses not showing up for trial?

```
 1   A      I do not.
 2   Q      Okay.  So you've indicated previously today
 3          that this file jacket is where you would mark
 4          pretrials, right?
 5   A      Right.
 6   Q      I don't see anything on here about a pretrial,
 7          do you?
 8   A      No.
 9   Q      Do you think there is another file jacket,
10          since this one is clearly worn, or somewhere
11          else --
12   A      I doubt it.
13   Q      -- or maybe the back of it or something,
14          somewhere else you would have actually noted
15          the pretrials as you testified?
16   A      No.  The pretrials, they could be noted almost
17          anywhere.  You see where I have a trial date,
18          where it says 3-3-75?
19   Q      Sure.
20   A      Well, I would write that stuff.  But there is
21          a formal area.  You can look on the left side
22          that says trial date and assistant prosecutor,
23          that would probably be filled out when you
24          went to trial.
25   Q      Okay.
```

1  A     I would write a trial date in there, because

2           it's tenuous when you are going to trial.

3                 In fact, you don't start working on

4           these cases until you're certain the case is

5           going to go to trial and that you are going to

6           be trying it, so I can't remember what I would

7           have written -- I'll tell you what, if you can

8           cross-reference this case with the Court's

9           document, then you would find out on what day

10         Judge Sweeney set this case for trial in

11         March.  And I have no idea when he did that.

12  Q     Okay.  So I understand, you can write notes

13         anywhere you want.  But you don't see anything

14         on here that indicates any date of any

15         pretrial?

16  A     Nope.

17  Q     Okay.

18  A     No.

19  Q     Do you think that -- this looks like it's cut

20         off to me, you know, like at the top.

21  A     Well, you don't see the words.  You don't see

22         the word charge.  I mean, it would have to --

23         you would have to go a little bit that way.

24  Q     Right.

25  A     And you don't see the finished "court."  All

1       you see is U-R-T.

2    Q  Right.  Is there anything else as you look at

3       this, based on your recollection of what these

4       file jackets looked like, that you think is

5       missing from this page, any other sections?

6    A  No, all my stuff -- all my notes would have

7       been written like they are now.  There is not

8       room to the left of these of what is cut off

9       here for us to make any marks.

10   Q  So like is this, like where the word court --

11      let's guess, assume that the word court is

12      complete and the word charge is complete, is

13      that the end of the jacket on the left?

14   A  It is.

15   Q  Can you turn to page -- I'm going to try to do

16      this in order for you.  Go to page 118,

17      please.

18          Let's do to 117 -- well, 118 is in the

19      top right.  117, I think, is -- let me know if

20      I can help you.

21   A  I got it.

22          What did you say, 118?

23   Q  Go to 117.  That one actually.  It's upside

24      down.

25   A  Right.

1   Q      My only question for you on this is, did you

2            prepare this?

3                MR. CALDERONE:    Objection.  Asked and

4            answered.  It's part of Exhibit L-4.

5                MS. GELSOMINO:    Is it the same copy?

6            Because there is multiple copies of this.

7                MR. CALDERONE:    Yeah, it's L -- yes,

8            it is.  It is page -- the second page of

9            Exhibit L-4 is basically on page 117.

10   Q      Well, remind me, is this your handwriting on

11            here?

12   A      Which one are we looking at?

13   Q      On 117.

14   A      117, no, it's not.  But let me think here.

15   Q      Do you know whose handwriting that is?

16   A      No.

17   Q      Have you ever seen it before?

18   A      I don't remember seeing -- I don't remember

19            seeing this one.  This is my writing, Exhibit

20            116.  That is a request for a subpoena being

21            drawn up for these witnesses.  This is what we

22            would get back from the secretary who drew

23            them up.  You follow me?

24   Q      Yes.

25   A      She would take our handwritten and then type

1          out a precipe for subpoenas to be sent out.

2          And then this goes over to the Sheriff's

3          Office.  So I -- none of the handwriting on

4          Exhibit 117 is mine.

5                   All of the handwriting on Exhibit 116

6          is mine.

7     Q    Okay.

8     A    And I don't know what date I did this.

9     Q    No problem.  Thank you for reminding me about

10         that.

11                  Go to 118, please.

12    A    118?

13    Q    What is this?

14    A    This is response for discovery.  That's what I

15         was talking about before.  How you would check

16         off things and then add to that all the

17         documents that the defense attorney is

18         entitled to.

19    Q    Okay.  That's what I thought.  Is this one

20         that you prepared?

21    A    No.

22    Q    Do you know who did this?

23    A    I do not.  Let me see if there is a name on

24         here.

25                  No, I don't know who did this.

1  Q    Down at the bottom left it says -- some

2         marking.  I can't understand it.  It says

3         11:00 a.m. to 2:00 p.m.  Can you understand

4         that?

5  A    I don't know what that means.

6  Q    In this case did you prepare a response for

7         discovery under Rule 16?

8  A    I don't recall.

9  Q    Now you previously said that you would -- as

10       soon as you started working a case, the first

11       thing you would do is start to respond to

12       discovery, right?

13  A   Right.  I would prepare for it.

14  Q   What does that mean?

15  A   As I read each statement, I would write down

16       the name of the witnesses in that statement.

17       I would note on a form like this.  This is a

18       -- this would have been the Prosecutor's

19       handwriting, all right.  They would not take

20       something like this and add to it or anything

21       other than what the defense attorney is

22       entitled to.

23          So I would write down as each page came

24       up, I would write down all the names for

25       witnesses.  I would note whether or not there

1     is an oral statement, a written statement.

2     Then check off -- let me see here.  There

3     should be some note about -- I would make a

4     list anyhow of what the evidence is as I would

5     read each police report, whether there was

6     clothing, jewelry.

7          I would make sure that the coroner's

8     report is attached, any scientific evidence

9     reports would be attached, if they were in our

10    file.  Or we would go get them and make sure

11    that defense counsel got them.

12         But I don't know who prepared this.

13  Q  So my understanding --

14         MR. CALDERONE:    Just for the record,

15    you're still referring to Bates stamped 118?

16         THE WITNESS:  188.  Yeah, 118.

17  Q  Thank you.

18         Can you turn to 125, please.  Keep this

19    open 118 if you want.

20  A  125?  Okay.

21  Q  This appears to be a response to discovery

22    also.  Is that what it looks like to you?

23  A  It is.  Let me see if -- I can't compare it,

24    but -- looks like the working copy is by the

25    Prosecutor.  Then it is typed up by our

```
 1        secretaries and sent out.
 2   Q    So, where it says on here that there are
 3        additional witnesses which are not subject to
 4        disclosure, at some point they have to be
 5        disclosed to the defense, right?
 6             MR. LAMBERT:     Objection.
 7             MR. MENZALORA:    Objection.
 8             MR. CALDERONE:    Objection, form,
 9        foundation.
10   A    Yes.
11   Q    At what point is that?
12             MR. LAMBERT:     Objection.
13   A    I don't know how it would actually, but I just
14        did it originally.
15             I see on this case there is a list of
16        coroner, three officers.  Barbara Campbell
17        worked out of the coroner's office.  She was a
18        technical expert.
19             Some guys put down there the witnesses
20        which are subject to disclosure.  I just
21        listed them all.  I did not do this.
22   Q    So, my understanding, based on your testimony
23        on Saturday, was that when you started to work
24        a file, you would write down all of the names
25        that were mentioned in the police report and
```

1          give those to the defense?

2      A   Right.

3      Q   Is that accurate?

4      A   If it was my file.  Right, if I was the chief

5          prosecutor on it.

6      Q   Did you do that in the Andrews' case?

7              MR. LAMBERT:     Objection.

8      A   I don't know see that I did.  Someone else

9          must have handled discovery.

10     Q   If you had done it in this case, would you

11         expect to see a list of all -- all the names

12         of everyone in all those police reports?

13             MR. LAMBERT:     Objection,

14         speculation.

15     Q   Let me actually ask a different question.  How

16         is it, based on your review of these documents

17         now, that you can say that you were not the

18         one to handle discovery in this case?

19     A   Because I would write -- I've never written

20         down that there were other witnesses were not

21         subject to disclosure.  Now maybe that is a

22         standard form that I just never noticed.

23             But the form we saw before, working

24         form, I would just start listing on a separate

25         piece of paper if there were a lot of

1   witnesses.  If it's a small case with, you

2   know, four, five, six witnesses, I would just

3   write it in there.  But with my sloppy

4   handwriting, there is probably not enough

5   room.  So I would just use a legal size pad

6   and they would type it up and then attach it

7   to here.  Staple it to this.

8   Q   All right.  So you would include all the names

9       of everyone in the police report and attach it

10      to your response to discovery?

11  A   Yeah, if I were responsible for the case, I

12      would do it.

13  Q   Okay.  And in this case did you give any

14      information about any witness to the defense?

15  A   I don't recall.  I don't recall that at all.

16  Q   Can you turn to 214, please?

17  A   214?

18  Q   Actually pause at what I think is 171.  Go to

19      171 first.

20  A   Okay.  It's a form.

21  Q   Yeah.  So my question on 171 is just do you

22      know what this is?

23  A   I have seen this form before, but I don't know

24      the name of it.  It's sort of like a cover

25      sheet form.  I have no idea who writes it up.

| | | |
|---|---|---|
| 1 | Q | Is any of this writing yours? |
| 2 | A | No. |
| 3 | Q | Do you know if this is a document that is |
| 4 | | created by police, or the prosecutors, or |
| 5 | | someone else? |
| 6 | A | I don't know who creates it. |
| 7 | Q | Now go to 214, please. |
| 8 | A | Okay. |
| 9 | Q | Do you recognize this document? |
| 10 | A | I do.  It's a witness list. |
| 11 | Q | Did you create this? |
| 12 | A | No. |
| 13 | Q | Did you create any draft of this? |
| 14 | A | I don't recall other than the one you saw of |
| 15 | | the precipe request.  That was my handwriting. |
| 16 | | I would have to compare it with this to see if |
| 17 | | this is the typed-up version of what I wrote |
| 18 | | up.  But I don't recognize this. |
| 19 | Q | And you don't recognize the handwriting? |
| 20 | A | No, it's not my handwriting. |
| 21 | Q | Do you know who Mary Smith is? |
| 22 | A | I do not. |
| 23 | Q | Do you recall if you ever spoke to Mary Smith? |
| 24 | A | I do not. |
| 25 | Q | Do you know whether Mary Smith ever gave any |

1         statement to the police officers?

2 A    I don't recall.

3 Q    On page 228, please.

4         MR. LAMBERT:     What is the last page

5         we were on?

6         MR. CALDERONE:    214.

7         MR. MENZALORA:    214.

8 A    Some of the handwriting is upside down.

9 Q    Yes, thank you.

10         MR. CALDERONE:    Which page is that?

11         THE WITNESS:     228.

12 Q    So I don't think this was included.  I don't

13         think we've looked at this yet.  Correct me if

14         I'm wrong, but on page 228, is any of this

15         handwriting yours?

16 A    Look at it normally where 228 is upright.

17 Q    Okay.

18 A    None of that handwriting that is right side up

19         is mine.

20         Now turn it upside down.  When it

21         starts, return these files to P. Lazzaro,

22         Lakeside, C. Marino, all of that is mine.  Pat

23         set the -- this is in reference to some other

24         case.  It says set the murder case for

25         March 3rd.  If witnesses show, try this case.

1    If not, take the plea to robbery.  This guy is

2    guilty, but I don't know if we can prove it,

3    Carmen.

4         There are times when Courts will set

5    multiple cases for trial.  This is not the

6    Isaiah trial.  There is no robbery in Isaiah

7    Andrews' case.

8  Q  Okay.

9  A  So just to give you the benefit of how this

10    probably was written.  I'm sending this back

11    to another prosecutor much older than I, more

12    experienced, Pat Lazzaro.  He's at Lakeside

13    Courthouse, okay?

14  Q  Okay.

15  A  All right.  And I don't know from where I'm

16    sending this.  I don't know if I am at the

17    Watson Building, the Welfare Building, or 21st

18    Street.  I'm telling him to set the murder

19    case for trial.  If witnesses show, try the

20    case.  If not, take the plea to robbery.

21         So it must have been another case that

22    counted as not related to Isaiah Andrews.

23  Q  Okay.

24  A  And that had to be attached to a file.  There

25    is a file number on this.

—

1  Q    Who is Lazzaro?  You said he is an older
2       prosecutor.
3  A    Yes.  He eventually became a magistrate in the
4       federal court.
5  Q    Did he have anything to do with the Isaiah
6       Andrews' investigation as far as you know?
7            MR. CALDERONE:    Objection.
8  A    Not as far as I know.
9  Q    Can you think of any reason why you would
10      return the Isaiah Andrews files to him or tell
11      him anything about the Isaiah Andrews' case?
12 A    No.  The only people involved in the Isaiah
13      Andrews' case would be the people assigned to
14      Judge Sweeney's courtroom.  So that would be
15      Charles Laurie, I don't -- I can't remember if
16      we had a third or who the third was, and me.
17      So we would be the only ones that would handle
18      that.  And we either kept the case for
19      pretrial and then sent it back to the record
20      room.  Or when we got near the trial date,
21      that case would be pulled out permanently
22      until we finished the trial and stay with us
23      until the case was over with.  And then the
24      verdict would be written in and sent down to
25      the records room to be recorded.

1  Q    Do you recall whether you actually completed
2       the Bill of Particulars in this case?
3  A    I do not.
4  Q    Can you go to -- well, any Bill of Particulars
5       that actually was submitted should be signed,
6       right, by a prosecutor?
7  A    Probably John T. Corrigan's name.  It goes on
8       under his name, I think.  A stamp.
9  Q    I did see that.  So did the individual
10      prosecutor who was assigned to the case didn't
11      actually sign the pleadings at that time?
12 A    No, that was another one.  You saw that work
13      form.  When they asked for discovery, we give
14      them witnesses and what other documentation
15      and the opportunity to come and see the hard
16      evidence.
17          On the Bill of Particulars usually what
18      was given back was the indictment.
19 Q    Oh, really?
20 A    Yeah.  They would ask for a Bill of
21      Particulars, we would give them the
22      indictment.  Then we get together and work out
23      whatever differences we have.  But I don't
24      ever remember going through a long series of
25      explanations as to what the basis for a Bill

1           of Particulars is.
2    Q      And you really saw a lot of changes to the
3           criminal legal system.
4    A      Yeah, sure did.
5    Q      Go to 205, please.
6    A      205?
7    Q      205.  Going backwards now.
8    A      All right.  The precipe.  The witness list,
9           subpoenas.
10   Q      So this one is from December of '74.  Do you
11          recall whether you had anything to do with
12          preparing this one?
13   A      I do not.  I've never seen this before.  I
14          don't know -- it says the case number and
15          Judge Jaffe.  And then the Prosecutors on it
16          are Joe Gibson, Tim Taylor, and Dave Borland.
17                 I know all those guys.  I don't know
18          what they had to do with the case.
19   Q      Do you whether Tim Taylor ever worked on this
20          case?
21   A      I do not.
22   Q      Did you ever talk to Tim Taylor about this
23          case?
24   A      I don't remember ever talking to anybody other
25          than Charlie Laurie about it.

1   Q     All right.  So then you don't remember talking
2          to David Borland about it?
3   A     Nor Joe Gibson.
4   Q     Okay.  On the top of that page is a date
5          12-1-74.
6   A     12-11.
7   Q     12-11-74.  Do you know what that means?
8   A     These would have gone out from our secretary
9          who typed this up to the Sheriff's Office.  On
10         12-11-74 the Sheriffs probably received it
11         because it was just a matter of walking it
12         over to them, and then they would start to
13         serve the subpoenas.
14   Q     Can you think of any reason why people would
15         have -- these three people would have been
16         subpoenaed in December of '24 -- December of
17         '74?  Excuse me.
18   A     No.  Other than there would be a dismissal of
19         the original case, or reindictment, and
20         somehow they were reassigned because there is
21         a different room.  They would have been in
22         Judge Jaffe's room, and I don't remember Judge
23         Jaffe having any interest in that case at all.
24   Q     Okay.  You don't remember it ever being
25         reindicted either?

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Did you ever review any notes or learn |
| 3 | | anything about any other prosecutor's |
| 4 | | interviews of any witnesses in this case? |
| 5 | A | No. |
| 6 | Q | When you spoke to witnesses in the course of |
| 7 | | your investigation of this case, did any of |
| 8 | | them tell you that they had been in touch with |
| 9 | | anyone else from the County? |
| 10 | A | I don't remember anyone ever saying anything |
| 11 | | like that to me. |
| 12 | Q | Did you ever talk to J.C. Williams? |
| 13 | A | A J.C. Williams? |
| 14 | Q | Yes. |
| 15 | A | I don't know who he is. |
| 16 | Q | Did you ever speak with an investigator for |
| 17 | | the defense? |
| 18 | A | I don't recall talking to the defense at all, |
| 19 | | much less an investigator.  I know we had |
| 20 | | pretrials with Bill Summers, but I don't know |
| 21 | | that their -- I don't know that an |
| 22 | | investigator would ever come and talk to us. |
| 23 | Q | Last page in this document -- from this |
| 24 | | exhibit is 184.  Can you look at that, please? |
| 25 | A | 184? |

```
 1   Q     Yes.
 2   A     Okay.
 3   Q     Do you know what this is?
 4   A     Yes.  It is the arrest form for the Cleveland
 5         Police Department.
 6   Q     Would you see this?
 7   A     Pardon me?
 8   Q     Would you see this when you were assigned to
 9         the case?
10   A     Yes, this would be in our file.
11              MR. CALDERONE:   I can't see what
12         you're looking at.  It is an arrest warrant
13         for who?
14              THE WITNESS:    It is the Cleveland
15         Police Department arrest form.  184.
16   Q     Was anyone in the Prosecutor's Office ever
17         involved in approving charges of a suspect in
18         this period of time from '74 to '75?
19   A     At what stage?
20   Q     At the time that -- like approving charges to
21         the police officers?
22   A     When they write this out, we don't even know
23         what's going on.  We don't even know about
24         this case when they are writing this out.
25         They are making an arrest of an individual and
```

1    putting down basic information.

2         This -- once they complete their

3    investigation, this would be attached to that

4    and we would get all the files that they have.

5    Then we would present it -- prepare it for

6    Grand Jury presentation and then put it in the

7    record room until some judge tells us to

8    prepare for pretrial.

9  Q  You can put that big binder away for now if

10    you would like.

11  A  Sure.

12  Q  Thank you.

13         Then let's look at this one.  So going

14    back to L-3.  You're in the right binder.

15  A  Oh, okay.

16  Q  Just go to tab 3.

17  A  130?

18  Q  Yes, page 130.

19         Actually move on to 130 -- well, I

20    guess I'll ask 130, this is your handwriting,

21    right?

22  A  It is, yes.

23  Q  Do you recall where you got the information on

24    this page?

25  A  Specifically, no, but it had to come from the

1          police reports.
2    Q    Well, I guess can you say with certainty that
3          you got this information from the police
4          reports or did you gather this information on
5          your own through talking to witnesses?
6    A    It would definitely come from the police
7          report.  I didn't go out and do any
8          investigation on my own.  All the information
9          I got was from police reports.
10   Q    Let's just work through this.  So Adam Wolf,
11         it says he is a desk clerk at Colonial Motel.
12         No longer works there.  It looks like there is
13         some contact.  You made some documentation
14         here about efforts to contact the witness.
15         Could not contact this witness who was the
16         clerk on the day this event occurred, right?
17   A    Yes.
18   Q    Were you talking about your own efforts to
19         contact this witness or someone else's?
20   A    I'm not sure.  This is -- let me see.
21              Okay.  Pages 130 through 133, that is a
22         trial preparatory work for me.  And it appears
23         from here I'm getting ready for trial.  And
24         this is the status of witnesses that would be
25         prospective.  And I'm making notes on each one

1       as to whether or not we could find them, are

2       they available.  So that's what this is.

3             This is not pretrial in the sense of

4       bargaining stage.  This is pre-trial.  I'm

5       getting ready for trial now.  I am.  This is

6       all my writing.

7  Q    So you used those words to distinguish kind of

8       just if you are still trying to -- well,

9       strike that.

10            When you say in these notes could not

11       contact or called the witness, are you talking

12       about your own efforts?

13  A    Yes.

14  Q    You're not documenting someone else's efforts?

15  A    I mean, I can't find this person.  And I may

16       -- if we decided -- if Charlie decided that

17       was the witness we were going to call, then we

18       would have a detective go out there and find

19       them.

20  Q    Page 131.  I think there is a highlight here

21       so I'm sure Ken asked you about this, and I

22       apologize I can't remember the answer.  Is

23       this your handwriting?

24  A    Yes, it is.

25  Q    And where it says, "Steve please check these

1         two people out," that is your handwriting,

2         where there is a little highlighted X?

3 A    Where do you see that, on 131?

4 Q    The last paragraph.

5 A    Oh, yeah, "See if police can check these two

6         people out to see if the defendant told them

7         anything about the crime or his wife."  Okay.

8         That's all my handwriting.

9 Q    Did you contact the police to see if they

10        could check those people out?

11 A   I don't know if I did or not.  Probably did.

12        I don't recall it though.  But, you know, I

13        don't recall making these notes, but this is

14        my handwriting.

15 Q   Fair enough.  So, when you would tell the

16        police to go out and do some follow-up

17        investigation, would you make a report of that

18        or would you -- well, would you make a report

19        of that?

20 A   I would not, no.

21 Q   Would you expect the police officers to make a

22        report of that?

23           MR. MENZALORA:    Objection.

24           MR. CALDERONE:    Objection.

25 A   There is no procedure for them to make a

1        report or not.

2  Q    What do you mean?

3           MR. MENZALORA:  Objection.

4  A    If I said, go out and find a witness, they

5        might give me a call and say, here's the

6        number and here's the address, subpoena them.

7        They wouldn't give me a formal report or

8        anything like that.

9  Q    Okay.  Well --

10  A    Or they may.  Like I say, there is no

11       procedure that was hard line that they had to

12       follow a certain procedure.

13  Q   Okay.  Well, officers have testified to me

14       that in the Homicide Unit they were required

15       to document everything that they did.

16          MR. LAMBERT:   Objection.

17          MR. MENZALORA:  Objection.

18  A    Right.

19  Q   So if an officer went out -- or I guess ever

20       in your experience, have you ever had an

21       officer go out and do some follow-up

22       investigation that you asked for, and then you

23       received a police report that came through,

24       you know, that they dropped off at some point

25       down the line to document that?

```
 1                    MR. CALDERONE:    Objection.
 2   A    I don't specifically recall.  But odds are
 3        that probably happened.  I'm not sure though.
 4        I don't recall any incident like that.
 5   Q    Okay.
 6   A    But it's not farfetched.
 7   Q    Would you ever before trial do any kind of
 8        like final records requests from the police
 9        officers to make sure you had all of the
10        relevant -- or all of the police reports that
11        existed?
12   A    The final records request was not -- they
13        wouldn't hold back evidence from us with
14        documents.  And we saw no need to make a
15        specific request for them, so no.
16   Q    So you would expect that as the officers
17        continue the investigation, they would
18        document that and you would get that
19        information?
20                    MR. MENZALORA:    Objection.
21   A    Right.  They would follow everything that they
22        had to follow in the way of procedure, and we
23        would get the results of it one way or
24        another, by oral or by written statement.
25   Q    And if it came to you by oral statement, would
```

1    you write it down somewhere?

2  A  Oh, sure, yes, I would.

3  Q  Where?

4  A  On something like this.  If I asked a

5    question, for example, I might even say this

6    page and if I'm looking for an answer to a

7    question on this page and they got it to me, I

8    would probably write the date and what it is.

9  Q  Okay.  Did you present this case to the Grand

10    Jury?

11  A  No.

12  Q  Do you know who did?

13  A  I do not.

14  Q  Do you know who testified at the Grand Jury?

15  A  I do not.

16  Q  Did you ever review Grand Jury transcripts?

17  A  No.

18  Q  Do you know what evidence was presented to the

19    Grand Jury?

20  A  I do not.

21  Q  Did you ever speak to the coroner in this

22    case?

23  A  I believe I did because there is some notes

24    indicating that the information I got could

25    only come from the coroner or the coroner's

1     report.

2           But in this case I would imagine I

3     called the coroner on some things, especially

4     on the handprint or something like that, just

5     to confirm that what they were saying was

6     accurate.

7  Q    Are you aware that in this case there were

8     varying times of death reported?

9           MR. CALDERONE:   Objection,

10    foundation, misrepresents facts.  Go ahead.

11  A    I never compared any of the documents.  I

12     don't recall indicating that there were.

13  Q    Let's see if I can find this note.  Oh, it's

14     the beginning.  Back in L-1 I think.

15  A    L-1?

16  Q    Hold on.  Let me find it before I tell you

17     where to go.

18           No, L-2, page 176.

19  A    Okay.

20  Q    Here these are your notes regarding time of

21     death, right?

22  A    Yes.

23  Q    Do you know where you got this information for

24     time of death?

25  A    I either called the morgue or that was in the

1    pathology report.

2  Q  Now this report, or this page here has one

3    date on it and it's "Palm print too smeared to

4    be compared, per SIU 2-20-75," right?  That's

5    the last thing on this page?

6  A  Yes.

7  Q  Do you believe that all of these notes were

8    made on 2-20 of '75?

9  A  I'm not sure when they were made.  Makes sense

10    though.  I mean, if I made them on different

11    dates, they would probably be different pieces

12    of paper.  But it's reasonable.  It's also

13    reasonable that I just added to another paper.

14  Q  Right.  That is what I would do.

15         Do you believe that this, "Palm print

16    too smeared to be compared, per SIU, 2-20-75,"

17    did you write on 2-20-75 or were you

18    documenting information that was received by

19    SIU on 2-20 of '75?

20  A  I got this information on February 20, '75.

21  Q  Are you aware that the Bill of Particulars in

22    this case includes a different time of death?

23    It's not 9:00 to 12:00.

24  A  I don't know where the Bill of Particulars is.

25    I don't remember reading that.

1  Q    Did you ever learn that the time of death was

2       actually between 11:00 and 2:00 p.m.?

3       11:00 a.m. and 2:00 p.m.

4  A    I don't recall that.  I don't recall if I knew

5       it or not.  I'm just looking at my notes here.

6  Q    Would that have been a significant piece of

7       information to you?

8  A    Yes.

9  Q    Why?

10 A    Time of death?

11 Q    Yes.

12 A    Try to get as close to time of death as

13      possible for accuracy.

14 Q    That would be important when determining

15      alibis, right?

16 A    It would be if there is an alibi involved with

17      something like that.  But just to get the

18      facts accurate, that's -- I mean, that's one

19      thing that Mr. Laurie always pushed.  He said,

20      forget the strength or weakness of the case,

21      just get the facts accurate and then work from

22      there.  So the emphasis of getting the case

23      factually correct so that you are presenting

24      it properly to the jury.

25 Q    Did you ever request documents from the

```
 1        coroner in this case?
 2   A    I don't recall it.  But we would regularly get
 3        all the documents we could because that's part
 4        of discovery.
 5   Q    If you made a records request to the Coroner's
 6        Office, there would be a documentation of that
 7        somewhere, right?
 8             MR. MENZALORA:    Objection.
 9             MR. CALDERONE:    Objection.
10   A    Yes.  But records request at that time were a
11        lot different from now.  All we wanted, we
12        would say send it to us.  But they would have
13        already probably given it to the Police
14        Department, in preparation for presentation to
15        the Grand Jury.
16   Q    Sure.  Sure.  But if you -- I guess I'm trying
17        to figure out though if you actually went to
18        the coroner's -- you know, if you requested
19        other -- start again.
20             If you made a request to the Coroner's
21        Office for their file?
22   A    I don't recall doing something like that.  But
23        their file was always complete with us.
24   Q    Okay.  Was there any kind of inter-office mail
25        or any kind of request, like some kind of a
```

1     form that you could fill out to request their

2     file?

3  A  I would give them a telephone call and say

4     send it down, and they would do it.  No

5     reports were made.

6  Q  Well, there would have to be some kind a

7     tracking of that report as it was moving from

8     one office to another, right?

9         MR. MENZALORA:     Objection.

10        MR. LAMBERT:      Objection.

11 A  No.  At most it would arrive at our office,

12    they would date stamp and then give it to us.

13 Q  In this case, did Isaiah Andrews offer any

14    kind of alibi evidence?

15 A  I don't recall whether he did or not.

16 Q  Was the timing of his movements throughout the

17    day of the murder significant?

18        MR. CALDERONE:     Objection,

19    foundation.

20 A  Yes.

21 Q  Why?

22 A  You want to know where he is and what he's

23    doing.

24 Q  Did you ever evaluate Isaiah Andrews'

25    movements that day against the varying times

```
 1          of death?
 2   A      I don't recall ever doing that.
 3   Q      Were you aware while you were investigating
 4          the Isaiah Andrews case that there was an
 5          alternate suspect?
 6                  MR. LAMBERT:      Objection.
 7                  MR. CALDERONE:     Objection, asked and
 8          answered.
 9                  MR. LAMBERT:      Assumes facts not in
10          evidence.
11   A      I don't remember whether there was or not.
12          There could have been, but I don't remember
13          whether or not there was.
14   Q      Okay.  Well, upon your review of these police
15          reports in front of you, does that refresh
16          your recollection as to whether there was an
17          alternate suspect here?
18                  MR. LAMBERT:      Objection.
19   A      After -- there was a reference to -- I forgot
20          the name now -- Watts.  I don't recall
21          specifically that he was an alternate suspect.
22   Q      Based on --
23   A      The police took a look at him and apparently
24          eliminated him as a suspect.
25   Q      Are you aware of any forensic or physical
```

1         evidence connecting any alternate suspect to

2         this murder?

3                MR. MENZALORA:    Objection.

4  A    I am not.

5  Q    Were you ever?

6  A    Not that I can recall.

7  Q    Do you agree that the existence of an

8         alternate suspect is exculpatory information?

9                MR. MENZALORA:    Objection.

10               MR. LAMBERT:     Objection.

11               MR. CALDERONE:    Objection,

12         speculation.

13  A    Depends on how you are looking at it.  I would

14         probably say yes, and the defense attorney

15         would say yes.  But there are many situations

16         where police officers look at suspects and

17         clear them and I don't consider that

18         exculpatory.

19             In any one investigation you could get

20         a number of different situations where before

21         the police find out what really happened, they

22         talk to a number of witnesses and they may

23         focus on one or two of them as suspects, and

24         it turns out that they are not related to the

25         case at all.

1   Q      Okay.

2   A      So that is not exculpatory, the fact that they

3          clear somebody.

4   Q      Do you, in your estimation, if the police

5          officers investigate a suspect and actually

6          make an arrest of that suspect and then

7          release that suspect and pursue charges

8          against another person, should that

9          information about the other suspect and that

10         person's arrest be disclosed to the defense as

11         exculpatory information?

12                MR. MENZALORA:    Objection.

13                MR. CALDERONE:    Objection,

14         foundation.  Calls for speculation.

15                MR. LAMBERT:     Calls for a legal

16         conclusion.  Calls for speculation.

17  A      I wouldn't characterize it as exculpatory.  If

18         it was a situation like that, I would, like I

19         say, list the name of the witness, put it in

20         the file, let the defense attorney figure it

21         out for themselves.

22                We don't sit down, except for when it's

23         really obvious exculpatory information, we

24         don't say, here is a witness that has

25         exculpatory information.  We just give them

1    the witness.  He has to decide what he's going

2    to do.  We're not obliged to try and figure

3    out what the tactics of the defense is as to

4    what's exculpatory or not.  I just give the

5    witness, and let them decide is that

6    exculpatory.

7  Q  Okay.

8  A  Because they have the same right to talk to

9    witnesses as we do.

10 Q  Okay.  So, in this case, did you ever produce

11   the name Willie Watts to the defense?

12 A  I don't recall producing it or not producing

13   it.

14 Q  Do you know if anyone else in the Prosecutor's

15   Office produced the name of Willie Watts to

16   anyone in the defense?

17 A  I do not.

18 Q  Did you ever talk to Willie Watts?

19 A  I don't recall talking to him at all.

20 Q  Do you recall while you were working on this

21   case back in the '70s knowing about Willie

22   Watts?

23 A  No, I do not.

24 Q  Okay.

25 A  As any other witness.  I don't recall Cloud,

1      or Scott, or any of those folks.
2  Q   Well, you don't remember their names, but you
3      do remember parts of the --
4  A   I remember what they said and the character of
5      the case.  How the crime was committed.  I
6      remember the background of Isaiah Andrews.  I
7      remember her background.  That all had to come
8      from the file.
9  Q   Yeah.  You remembered a lot in my -- I thought
10     at least.
11 A   It surprised me too.
12 Q   Yeah.  I don't know that I could have pulled
13     all that out.
14         But so did you have any independent
15     recollection of there being an arrest of some
16     other person in this case?
17 A   No.
18 Q   I want to look at L-6.
19 A   264.  Is that what it is?
20 Q   Let's go to 268.  Yeah, but you're in the
21     right place.
22 A   Wait a minute.
23 Q   It's in L-6.  It's the last page of L-6.
24 A   It jumps, 64, 65, 68.
25         MR. CALDERONE:   There is one page

| | | |
|---|---|---|
| 1 | | missing from the report, page 3. |
| 2 | A | Two at least. |
| 3 | Q | It was produced to me out of order so you're |
| 4 | | correct in that it's 264, 265, 268. |
| 5 | A | The page that is missing is 3 of 4. |
| 6 | Q | Right. Have you ever seen page 3 of 4? |
| 7 | A | I don't recall any of the documents here. |
| 8 | Q | In your review of L -- of Exhibit L, did you |
| 9 | | ever see Exhibit 3 -- I'm sorry -- page 3 of |
| 10 | | this report? |
| 11 | A | I don't recall that, but I would have had to. |
| 12 | | They don't send us reports that are half-baked |
| 13 | | like this. They would have included |
| 14 | | everything. I don't know why the page is |
| 15 | | missing. Obviously on 268 that's my bracket |
| 16 | | and my writing, my printing. |
| 17 | Q | So, at some point you had 268 in your |
| 18 | | possession, right? |
| 19 | A | Yes. |
| 20 | Q | The last paragraph of 268 it reads, "It's our |
| 21 | | opinion that this crime was committed by |
| 22 | | Willie Watts." |
| 23 | A | Right. |
| 24 | Q | And then it goes on to state, "who is |
| 25 | | apparently attempting to sell his mother's |

1         coat and other valuables to get money to get

2         away from the city," right?

3 A     Right. I don't remember that at all.

4 Q     Do you agree though that this conclusion by

5         the police officers that Willie Watts

6         committed this murder would be a significant

7         piece of information to communicate to the

8         defense?

9            MR. LAMBERT:    Objection.

10           MR. MENZALORA:   Objection.

11 A     Yeah, that's why I highlighted it.

12 Q     Did you ever communicate this information to

13         the defense?

14 A     I don't recall whether I did or not.

15 Q     Do you agree that that would be exculpatory

16         information?

17           MR. MENZALORA:   Objection.

18           MR. CALDERONE:   Objection.

19 A     At that stage of the investigation, I don't

20         know what would be exculpatory or not, but

21         it's significant.

22           Because if you look at the report,

23         September 18, that is early on in the

24         investigation. I don't even think at this

25         stage they have zeroed in on Isaiah Andrews.

1         I think they are in a situation where they

2         don't know who committed the crime.

3   Q    You're right because -- well, at this point

4         they had decided --

5   A    They didn't even know who the victim was.

6   Q    -- that Willie Watts hadn't committed the

7         crime, right?

8   A    Unidentified Black female.  So this is really

9         early on in the investigation.

10   Q    Well, even early on -- I mean, this

11        investigation didn't last that long, right?

12         MR. LAMBERT:    Objection.

13   A    I don't know how long it lasted.  Probably

14        lasted until the -- probably the end of

15        September.  Any other investigation they did,

16        I don't know how long it lasted.

17         But the reports seemed to be bunched

18        around the latest of the 25th or something

19        like that.  There may have been a few after

20        that, but they had the information at that

21        time.

22         This was speculation here.  And I can

23        understand why it is speculation.  They don't

24        have all the evidence at hand.

25   Q    On what do you base your statement that this

```
 1            is speculation by the police officers, by the
 2            investigators that Willie Watts committed this
 3            crime?
 4    A       Really don't have enough information to even
 5            make a statement like that.  They don't know
 6            who the victim is.  They never heard of Isaiah
 7            Andrews.  They don't know her background or
 8            his.  They haven't been able to focus on
 9            anyone as a suspect, so this appeared to them
10            at that time to be relevant, and that is the
11            way they wrote it up.
12    Q       Well, they focused on Willie Watts as a
13            suspect, right?
14    A       Right.  That's what -- yeah, they did.
15    Q       They actually then went ahead and arrested
16            Willie Watts, right?
17    A       I would say they probably did arrest him.  I
18            don't know what the rest of the report would
19            say, but I'm guessing that they probably did
20            arrest him and talk to him.
21    Q       Police officers are able to solve murders even
22            if they don't know the identity of the victim,
23            right?
24            MR. MENZALORA:    Objection.
25            MR. CALDERONE:    Objection,
```

1         foundation, speculation.

2   A     Yes. Technically, yes. I have had one case

3         in my own career, and the only I have heard of

4         -- I have only -- and that's the only case I

5         have ever heard of where we disposed of the

6         case not knowing who the victim is.

7            I have never heard of anybody else in

8         the office have a case like where they didn't

9         know who the victim was. We tried cases

10        without the body, but we knew who the body

11        was. I mean, who was missing.

12   Q     Did you ever speak to any police officer about

13        Willie Watts?

14   A     I don't recall if I did or not.

15   Q     Did you ever speak to Laurie about Willie

16        Watts?

17   A     I don't recall specifically, but I probably

18        did. We probably went over everything

19        together.

20   Q     Are you aware of any forensic evidence

21        connecting Willie Watts to the crime?

22   A     I am not.

23   Q     Let's move to L-7.

24            MR. LAMBERT: What page is that?

25            THE WITNESS: 267.

1  A    Is that right, 267?

2  Q    Yes.

3            You were asked about this 267 also by

4       Ken.  The bottom left has a signature.  Do you

5       know whose signature that is?

6  A    No, I do not.

7  Q    Okay.  And then Kevin Walsh signed it also.

8       Kevin Walsh's signature also appears in the

9       middle of the page; do you know why?

10 A    In the middle of the page?

11 Q    Yeah, right above your --

12 A    Scribbling?

13 Q    Your writing.  I see what appears to me to be

14      Kevin Walsh's --

15 A    In my writing, yes, it does.

16 Q    Did that signature exist before you wrote on

17      this?

18           Let me ask you this.  Do you know why

19      his signature is there?

20 A    I do not know why his signature is there.  But

21      that's his signature, not mine.  The printing

22      below it is mine.

23 Q    Do you know who Kevin Walsh was?

24 A    No, I do not.

25 Q    He was a sergeant, right?

1    A      Oh, yeah, I mean, other than the way he is

2            described here, yes, he is a sergeant. But I

3            don't remember him specifically. I don't know

4            if I have ever had any contact with him.

5    Q      Was he assigned to the SIU?

6    A      If you look at the bottom there, do you see

7            where it says approved? When police officers

8            write a report like this, their names go on

9            it. So Kane and Proffert were involved in

10           making this report. He would submitted to

11           their sergeant, and the sergeant would approve

12           it. He would review it to see if it's

13           properly written according to their guidelines

14           and standards, and then he would approve it

15           and then it would go out.

16               There should be some type of a -- the

17           standard is there's some type of sergeant

18           approving all these reports before they are

19           sent to us or they go out as official police

20           officer reports. Because he may look at it

21           and see something deficient and then tell them

22           to go back and do it again.

23    Q      Right.

24    A      So that's his job here. He has no part in the

25           case other than to review documents of the

1          people who work for him.
2    Q     Well, that's what you think, right?  I mean,
3          in fairness you don't actually know what his
4          role in reviewing this was, right?
5    A     Like my temperature 99.6.  You want to bet on
6          it?
7    Q     Do you know if Kevin Walsh was assigned to
8          SIU?
9    A     I do not.  I don't recall that at all.
10   Q     Do you know whether these other two, Hick and
11         Kane -- or I'm sorry -- well, I think that's
12         Hick, Kane, or Crawford were assigned to SIU?
13   A     I do not.
14               MR. CALDERONE:     Just note objection
15         to the interpretation of the name.  I don't
16         think that's Hicks.
17               MS. GELSOMINO:     What do you think it
18         is?
19               MR. CALDERONE:     Pedich.
20               MS. GELSOMINO:     I'm looking at -- who
21         do you think is 22 -- oh, yeah, you're right.
22               MR. LAMBERT:     Patrick.  James
23         Patrick.
24   Q     Well, any of these guy on the bottom left, do
25         you know if any of them are in SIU?

```
 1   A      No, I do not.  But Patrick, Pedich, that's a
 2          flip of a coin there.
 3   Q      Yeah.
 4   A      Well, look him up.  2227 or 2207, they will
 5          tell you who he is.
 6   Q      All right.  That's okay.
 7              Okay.  So we already talked about the
 8          fact that your handwriting is on the middle of
 9          this, right?
10   A      Yes.
11   Q      And part of this is crossed out.  The crossed
12          out part, is that also your handwriting?
13              MR. CALDERONE:    Objection, asked and
14          answered.
15   A      Yes, it is.
16   Q      When did you -- it says per SIU, so I'm
17          assuming you spoke to someone in SIU?
18   A      Yes.
19   Q      Do you mind if I stand up and ask these
20          questions?
21   A      No, go right ahead.  I don't care.
22   Q      It's so uncomfortable.
23   A      That's okay.
24   Q      Did you -- when -- do you know who you spoke
25          to in SIU?
```

1   A     I do not.

2   Q     Do you know when you spoke to SIU and you were

3          told that the print is not defendant's?

4               MR. CALDERONE:   Objection, asked and

5          answered.

6               MR. MENZALORA:   Objection.

7   A     No.

8   Q     Why did you cross that out?

9   A     Because I looked at it.  It looked pretty

10          sloppy.  I could barely read it myself.  So I

11          tried to print it more clear to define the

12          significance of it.

13   Q     Read to me what it says behind where it is

14          crossed out.

15   A     As best I can?

16   Q     Yes.

17   A     "Per SIU" something "print comparable, not

18          defendant."  My answer to that was "print not

19          clear enough to compare."

20               So apparently I was questioning whether

21          or not it was the defendant's and it turned

22          out that there was not sufficient evidence or

23          clarity to compare that with anybody.

24   Q     So, you agree that the words that have been

25          crossed out here are not the same words as the

1          noncrossed out notes that you made, right?

2 A     Right.

3 Q     In fact they mean the opposite, right?

4           MR. CALDERONE:    Objection.

5 Q     Well, that's not true actually. Let me

6         rephrase that.

7 A     I'm questioning it.

8 Q     Well, what you write down is that it is not

9         the defendant's print, right?

10 A     I wrote down compared, not the defendant. And

11         then I started something else. I don't know

12         what that is. It looks like it -- I don't

13         know what that is.

14 Q     Okay. So where it says, not defendant's

15         print, you crossed that out.

16 A     Yeah.

17 Q     And then instead you wrote, print not clear

18         enough to compare.

19 A     Yes.

20 Q     You agree that those two statements are not

21         the same. They don't mean the same thing,

22         right?

23 A     You're right. Literally they do not mean the

24         same thing. Practically from a prosecution

25         stance, they mean it is not the defendant's.

1          In other words, we have no evidence to compare

2          that his print is on that newspaper.

3   Q     Well, per SUI print compared, not defendant's

4          print.

5   A     Right.

6   Q     What does that mean to you?

7                MR. CALDERONE:    Objection to that

8          interpretation of a writing because I don't

9          know that it is his.

10  A     That their opinion it's not his print.  But

11         the more significant conclusion is the print

12         is not clear enough to compare to anybody.

13  Q     Why is that a more significant conclusion than

14         the print doesn't match the defendant's?

15  A     Because if it is not clear enough to compare

16         with anybody, you can't exclude anyone.  It

17         could be the defendant's print.  That's their

18         problem in wording, not mine.

19             I mean, if you have a fingerprint that

20         is not comparable, that doesn't mean the

21         defendant didn't leave it there, that just

22         means you can't say he did because it is not

23         clear enough to say anybody's print is there.

24  Q     Well, let me ask you, do you remember having a

25         conversation with SIU in which they told you

```
 1        that the print was compared and it was not
 2        defendant's print?
 3   A    No, not specifically.  I don't remember any
 4        conversations in this case.
 5   Q    And don't remember then also whether or not
 6        anyone from SIU ever told you the print was
 7        not clear enough to compare, right?
 8             MR. CALDERONE:    Objection.  Asked and
 9        answered three times.
10   A    Well, but they would have had to because it's
11        down there because that's what I believe that
12        they don't have enough -- there is not enough
13        definiteness and clarity on that -- I think it
14        is a palm print, if I'm not mistaken.  On the
15        newspaper, bloody palm print on the newspaper,
16        that is what they are talking about.  It
17        wasn't clear enough to compare with anybody.
18        So it's not the defendant's from a factual
19        standpoint we can't make -- cannot make that
20        claim.
21   Q    Did you ever tell Laurie that you spoke to SIU
22        and you were told that the print was compared
23        and it was not defendant's print?
24   A    I don't remember any conversation with him.
25        But I would have had to told him, my -- I
```

1    would give him my opinions.  I would give him

2    my attitude towards the case.  I would tell

3    him any information that is in there.

4         He would have know about it too.  He

5    would have the same thing.  We would make

6    copies of this.  This is not just my workings.

7    I mean, he would be making his own notes and

8    everything.

9 Q  Okay.  Did you give a copy of this with your

10   written notes on it to Laurie?

11 A  I don't recall doing that.  But I would say

12   this is all geared toward trial preparation,

13   what you are including, what you are

14   excluding.  And that would have to be talked

15   over by the attorneys on the case if there

16   were two or more.

17 Q  Okay.  So you believe that Laurie would have

18   known about these conversations with SIU?

19 A  Oh, absolutely.

20 Q  Did you ever tell anyone on the defense about

21   these conversations with SIU?

22 A  I don't recall talking to the defense.  I may

23   have, I may not have.

24 Q  Oh, you previously testified that you --

25   excuse me if I am wrong -- I thought you

1          previously testified that you recall pretrials
2          with Bill Summers?
3      A   Yes.
4      Q   Okay.
5      A   Not when and where and what we discussed.  But
6          I recall sitting down.  I don't know who the
7          third person was in our group, but it was
8          Mr. Laurie and me and Bill Summers.  And
9          whenever we talked about it, we talked about
10         the case.
11     Q   Do you believe that this information regarding
12         SIU telling you that the print was not
13         defendant's is significant?
14     A   Sure.  It excludes everybody.  You can't use
15         that piece of evidence.  We would put it in,
16         but we would also put it in with idea that
17         this is the evidence.  It's not clear enough
18         to identify anybody.
19     Q   Okay.  But it would be important --
20     A   I -- let me say this, I would put it in.  But
21         I don't know how they handled it at trial.
22     Q   What do you mean you would put it in?
23     A   I would put it in evidence.  I would put in
24         evidence the piece of paper and put the SIU
25         expert on the stand, did you check this out.

1      What was your determination. It was not clear
2      enough to identify the print as being
3      anybody's.
4  Q  I'm sorry, I lost part of that I think. You
5      said that you would put in --
6  A  I would enter this into -- I would, if I were
7      trying the case, I would enter it into
8      evidence.
9  Q  What part of it would you enter into evidence?
10  A  The whole thing. I would bring in the SIU. I
11      would bring in the document that is being
12      questioned, the newspaper with the bloody palm
13      print on it. And I would have them describe
14      what they did with the -- with that newspaper
15      and when it was submitted to them and were
16      they able to identify anybody's palm print.
17      And they would say exactly what's on there.
18      And, no, the palm print was too smeared to
19      identify as being anybody's.
20  Q  Okay. So this is my hang up here. If it was
21      compared to the defendant and it didn't match
22      the defendant, that seems very different than
23      the palm print is too smeared to compare.
24      MR. LAMBERT: Objection.
25      MR. CALDERONE: So what's the

| | | |
|---|---|---|
| 1 | | question? |
| 2 | A | To be blunt, they cannot make that statement. |
| 3 | | If the conclusion is the palm print is too |
| 4 | | smeared to compare with anybody, they cannot |
| 5 | | say it's not the defendant. |
| 6 | Q | When did -- do you -- did you make these notes |
| 7 | | on the same day? The note that you crossed |
| 8 | | out and the other note? |
| 9 | A | I don't know. I don't recall whether I did or |
| 10 | | not. One might have been a question and one |
| 11 | | of them might have been a conclusion. And I |
| 12 | | could have made that on the same day by just |
| 13 | | calling up SIU and talking to them, having |
| 14 | | written down my question and having written |
| 15 | | down their answer might have been done on the |
| 16 | | same day, it might have been done on different |
| 17 | | days. |
| 18 | Q | Wait. Are you now saying that the part that |
| 19 | | you crossed out is your question to SIU? |
| 20 | A | It's a question in my mind. It says per SIU, |
| 21 | | comparable -- not the defendant. Now either |
| 22 | | they told me that or I concluded that from a |
| 23 | | previous knowledge that the palm print was |
| 24 | | smeared and not comparable. And then I wrote |
| 25 | | in specific, print not clear enough to |

| | | |
|---|---|---|
| 1 | | compare. |
| 2 | Q | Did SIU ever provide to you a report stating |
| 3 | | that the print was compared to the defendant |
| 4 | | and it was not defendant's print? |
| 5 | A | I don't recall the report.  But if they made |
| 6 | | that conclusion, they would have documented |
| 7 | | it.  My thinking is they would have documented |
| 8 | | that somewhere. |
| 9 | Q | Right.  Because that's what SIU did, right, |
| 10 | | they documented the results? |
| 11 | A | Yes, they should -- they would normally do |
| 12 | | that.  That was their procedure.  They should |
| 13 | | do it anyhow. |
| 14 | Q | And have you ever seen any report that says |
| 15 | | the print was not clear enough to compare? |
| 16 | A | I don't recall if I saw a report or not. |
| 17 | Q | But you would expect that if was the |
| 18 | | conclusion of SIU, that there would be a |
| 19 | | report on that, right? |
| 20 | A | I would think they are involved in summary, or |
| 21 | | not -- maybe not a separate one for that, but |
| 22 | | in their conclusion of all the evidence we |
| 23 | | would give them, they would go item by item. |
| 24 | Q | Where did you get the information that the |
| 25 | | victim's blood type was C and the newspaper's |

1      blood type was O?  Is that what that says

2      actually?

3               MR. CALDERONE:   No.  I was going to

4      say objection.  That's not what the testimony

5      was.  I don't think that is what it says.

6               I think it says they are both Type O.

7  Q   Well, then -- what does this say?  It's your

8      handwriting, Carmen.

9  A   But it's a sloppy O is what it is.  The blood

10     type is A, B, O, and there is no blood Type C.

11     Unless they come across something new since I

12     have been around.

13 Q   Okay.  So do you know where they got that

14     information?

15 A   It would have to be from some scientific

16     organization, whether it is the coroner's

17     office or the Scientific Identification Unit.

18     I wouldn't know that and they would have to

19     give me that information.

20 Q   Did you ever add any SIU witnesses to any

21     witness list?

22 A   I don't recall if I did or not.  That witness

23     list is prospective because if I left the

24     case, then it was up to Charlie Laurie to

25     figure out who he was going to call.  And me

1     making up a witness list like that, like when

2     you saw my handwriting, that would have been

3     my first impression, but it would be his

4     conclusion as to who we call.  The lead

5     prosecutor on the case always decides how the

6     case is managed through the courts, especially

7     at trial.

8  Q  Sure.

9  A  So who we call as witnesses.

10 Q  Okay.

11 A  We may differ, but probably not very much in a

12    case like this.

13 Q  So, I'm pretty sure, and I can double check,

14    but I'm pretty sure that there is in fact a

15    SIU witness on the list.

16         MR. CALDERONE:    I'm sorry, what was

17    the question?

18 A  In my handwriting?

19 Q  That's what I was going to ask.  This is cut

20    off.

21 A  There should be a coroner.  There should be

22    SIU.  Anybody that did any type of technical

23    or scientific evidence on the case was

24    presented.

25         MR. CALDERONE:    Do you want the

1      answer or do you want --
2              MS. GELSOMINO:    Is Patrick on there?
3              MR. CALDERONE:    Patrick, yes.  It is
4      on the bottom of -- Exhibit L-4 at the bottom
5      should have James Patrick.
6              MS. GELSOMINO:    It's cut off on mine.
7              MR. CALDERONE:    And then right next
8      to it there are some scratched out stuff here.
9    Q  I'm going to hand you page 116.  I think yours
10     is cut off like mine.
11   A  Okay.
12   Q  So is that your handwriting at the bottom that
13     includes Patrick?
14   A  Yes.
15   Q  Did you talk to him?
16   A  I don't recall whether I talked to him at all.
17   Q  Do you know what this crossed out writing is
18     here on this page?
19   A  It says Type O, victim O.
20   Q  So why would that be there?  Why would you
21     have written that here in this exhibit list?
22   A  I don't know.  Probably just making notes.
23     Thoughts crossing my mind.
24   Q  Okay.  I will take that back when you are
25     ready.

1  A    Oh, okay.

2  Q    Thank you.

3           MR. CALDERONE:    For the record, what

4       Bates stamped page were you reading from

5       Exhibit L, Sarah?

6           MS. GELSOMINO:    116.

7           THE WITNESS:    116.

8  A    Oh, I'm sorry, patrolmen at the end, that is

9       not my writing.  That one I said -- I wasn't

10      following you.  That is not my writing.  I

11      don't print like that.

12  Q   Okay.  Hold on.  Let me show you 116 again.

13          MR. CALDERONE:    Yeah, look at the --

14  Q   Does yours have it on there?

15  A   Yeah, those two.  James Patrick again and

16      Sobiensky, that is not my writing.

17  Q   Do you know -- is this victim O, the part that

18      is crossed out, is that your handwriting?

19  A   That is, yes.

20  Q   Okay.  So, there is no report in here from SIU

21      about the conclusions about the palm print.

22          So, did you tell them to look into it

23      to make a comparison?

24  A   I would not have.  I would have -- that is

25      investigative.  Now if they missed it, I would

1    have said, you know, whose palm print is -- do

2    we have a report on this.  They would get it

3    done.  Then you would see a letter, dated

4    report.  But that would have been handled by

5    the police.

6 Q  Well, that's my question is I don't see a

7    report at all on this.  I only see your notes.

8 A  Yeah.

9 Q  So --

10 A  I don't recall if there was a report or not.

11    I'm relatively sure they would make a report

12    on it.  That was their procedure.  They were

13    methodical.

14 Q  I would have expected to see one, but I don't.

15    So, do you --

16 A  Do you know if all this is complete after 50

17    years?

18 Q  Does it appear complete to you?

19 A  No, because there is no SIU report.  I don't

20    see a coroner's report in there either.  Those

21    are standard.

22       In fact, those would have gone out to

23    the defense as discovery.  If I were handling

24    the case, they would have gone out as

25    discovery.

1 Q I remember you saying that, and so is kind of
2 the reason I'm asking this question actually
3 because it appears, because of what you --
4 yeah, if there is an SIU report, you told me
5 you would actually give those actual reports
6 to the defense, right?
7 A Right. It used to be some guys would say, you
8 know, go get it yourself. But they don't have
9 to go get it. It is our obligation to give
10 them all the documentation we have. Telling
11 them, yeah, go down to the coroner's office
12 and pick it up for yourself, that didn't go,
13 and all the trial attorneys knew that.
14 You wouldn't say that to a defense
15 counsel unless you are being, you know,
16 obstreperous or something like that. You knew
17 you had to give them, and that's what you
18 would do. You would get those documents
19 together and give it to them. Plus you were
20 going to use them at trial so they had to have
21 them before trial.
22 Q Right. So in this case, since we don't have
23 an SIU file or SIU report, I should say, is it
24 possible that you saw this report and wanted
25 to know --

1  A    Which one are you referring to?

2  Q    I'm sorry, I'm looking at page 267.  It is --

3  A    Okay.  I got it, yeah.

4  Q    That one.

5       So is it possible that you saw this SIU

6       report that indicates that there was a partial

7       palm print developed, photographed, and

8       entered into evidence, right, known as LP

9       29187?

10 A    Right.

11 Q    And then --

12 A    That means latent print.

13 Q    Right.  So that is a -- there is a print in

14      evidence, right?

15 A    Right.

16      MR. CALDERONE:    What are you looking

17      at?

18      THE WITNESS:    Right here.

19      MR. CALDERONE:    Got it.

20      MS. GELSOMINO:    The second -- your

21      second highlighted paragraph.

22 Q    Is it possible that you then called SIU and

23      said, does this print match?  Find out if this

24      print matches the defendant?

25 A    That seems more probable than having the

1      report, only because I wrote it down.  If I

2      had the report, I would be writing on the

3      report.  I would have put a star, an X with a

4      zero around it, that it's salient, that it's

5      important to the case.

6  Q    That makes sense to me.

7            So, you wanted to -- and I imagine

8      because this would be -- if this print matched

9      the defendant, that would be important

10     information for you to have at trial, right?

11           MR. LAMBERT:    Objection.

12  A    Both ways.

13  Q    And it would also be important information for

14     the defendant?

15  A    Whether it's the defendant's or whether it's

16     not the defendant's, you would present it at

17     trial.

18  Q    Oh, I understand.  Okay.

19           All right.  So, it's most likely then,

20     if I understand what you are saying, that you

21     saw this police report on page 267, you called

22     SIU and you told them that you wanted to know

23     more information about the print, right?

24  A    Yeah.  It might have been -- that sounds the

25     more probable of the two ways.  Because if I

1          had the report in front of me, I wouldn't be
2          questioning it so thoroughly.  I would just
3          look at it and see that the results of the
4          test were that it was not definable enough to
5          compare it with anyone.
6      Q   Then it appears that at some point SIU told
7          you that this print was not the defendant's,
8          right?
9                   MR. LAMBERT:      Objection.
10     A   Right.
11     Q   And then --
12     A   That's my -- I'm writing down what my memory
13         of what they told me.
14     Q   Okay.
15     A   They might have told me it's not comparable
16         with anyone, so in my mind I would have said,
17         well, then it is not -- you know, we can't
18         present it as the defendant, because that's
19         speculation.  The Court would never let that
20         in anyhow.
21     Q   What do you mean by that?
22     A   The Court wouldn't let in speculation.  If I
23         were to say, well, it could be the
24         defendant's.  If it is not comparable, that's
25         the only thing that most of the judges I know

1  would let in.  They wouldn't let you further

2  than that and say it could be.

3  Q  Okay.  Fair enough.

4       But the judges would allow a defense

5  attorney to question based on a statement by

6  SIU that said the print doesn't match, right?

7  A  Well, I'm sure almost every defense attorney I

8  know would draw it out that way.  Then you

9  cannot say that this is the defendant's.  And

10  then an argument is going to be then it is not

11  the defendant's.

12  Q  Right.

13  A  That would be the progression of it.

14  Q  Right.  So that is for the noncrossed-out

15  portion, right?

16  A  Yes.

17  Q  I want to focus on the crossed-out portion for

18  a moment.

19       It would be a significant piece of

20  evidence for a defendant at trial to be able

21  to present to the jury that SIU compared the

22  print and found that it did not match the

23  defendant, right?

24       MR. LAMBERT:     Objection.

25       MR. MENZALORA:    Objection.

```
 1              MR. CALDERONE:    Objection.
 2    A    If he can do that.  He couldn't do that in
 3         this case because they could not compare it
 4         with anything.  Their conclusion was it is not
 5         comparable.  It's smeared, so they can't
 6         compare.
 7              It is like a fingerprint.  If there is
 8         a smeared fingerprint, they can't compare it
 9         with anybody.
10    Q    Okay.
11    A    They can't exclude or include anybody by it.
12    Q    Okay.  And your basing that statement right
13         now just on the fact that you wrote
14         something --
15    A    That's my conclusion --
16    Q    -- different and then crossed it out on this
17         page, right?
18    A    Right.  That's my thinking at that time.
19    Q    Was that your thinking at the time or your
20         thinking now as you look at this?
21    A    Well, it had to be at the time because I wrote
22         it down.
23    Q    As you sit here today, can you tell me that
24         SIU never told you that the print was compared
25         to the defendant's palm print, did not match
```

1          the print?

2    A     No, I can't say they told me that.

3    Q     Okay.  Because that's actually -- because you

4          wrote it down, right?  You said -- your words

5          are per SIU, the match -- the print doesn't

6          match the defendant, right?

7                    MR. CALDERONE:    Objection.

8    A     That's what I wrote down.

9    Q     Okay.  And you didn't make that up, I'm sure.

10         That's actually per SIU.

11   A     It could have been my conclusion after they

12         talked to me.  They may not have said it in

13         those words.  That's why you put the witness

14         on the stand, so it is their words that

15         matter.  And you look at their report.

16                   Surprisingly the SIU report is not in

17         here.  But like I say, I don't know what stage

18         of trial preparation this was.  Maybe these

19         reports were still being made or coming in.

20         That's why we don't have the documentation.

21   Q     And Laurie knew all this, right?

22   A     Pardon?

23   Q     And Laurie knew all of this, right?

24                   MR. MENZALORA:    Objection.

25                   MR. CALDERONE:    Objection.

1  A    (Laughing)

2  Q    Was that a yes?  I'm sorry, I missed the

3  answer.

4  A    Oh, I'm sorry, I got lost.  What did you say

5  again?  I'm sorry, Sarah.

6          MR. CALDERONE:   She is asking you

7  what Laurie knew.

8  A    What he -- I don't know what he knew.

9  Q    Did you tell him about -- I may have asked you

10 this, and I apologize.  Did you tell him about

11 your conversation with SIU?

12 A    I can only hypothesize that he knew the same

13 thing that I knew.

14 Q    Give me one second.

15         So you reached out to SIU because you

16 wanted to gather more information regarding

17 whether this palm -- about this palm print,

18 right?

19 A    I did.  I wanted clarification on it.  Can I

20 do anything with it or not.

21 Q    I presume then that they did the testing and

22 then they got back to you, right?

23         MR. MENZALORA:   Objection.

24         MR. CALDERONE:   Objection,

25 foundation.

1   Q     With the information?

2   A     I'm not sure what the procedure would have

3          been. Either they got back to me or they

4          waited for me to call them or they sent me the

5          report. Could have been any one of them. It

6          was just a question I had, and they were going

7          to answer it one way or the other.

8   Q     Got it. But you called them because you

9          wanted them to get you information about this

10         palm print. Some period of time passed and

11         they got you the information, right?

12   A     I had contact with them. They would have done

13         that anyhow.

14              MR. MENZALORA: Objection.

15   A     They would have done that pursuant to the

16         investigation of the police. The police would

17         have brought them all this information, and

18         they would have known to go over the papers to

19         find out if the palm prints or if any

20         fingerprints were definable enough that they

21         could compare it with anyone. That's

22         standard. They didn't -- they wouldn't have

23         waited for us. This is all part of the

24         initial investigation. They wouldn't wait for

25         a prosecutor to tell them what to do. They

1      knew what to do.

2  Q   And you are saying that not based on any

3      reports in this case, but just based on what

4      you are assuming?

5  A   Right.  It is the same with the pathology

6      reports.  You know, we don't tell -- we don't

7      call those doctors down there and tell them

8      what to do and how to do an autopsy.  They

9      know what to do.  They just give us the

10      results of it.  They are way ahead of us on

11      this stuff.

12 Q   Sure.  In this case did you ask SIU to do

13      anything else for you?

14 A   I don't recall whether I did or not.  As I

15      read these reports now, I don't see why I

16      would ask them to do something.  It looks like

17      they covered everything that I would have

18      questions about.

19 Q   Other than the comparison of the print.

20 A   Right.  Fingerprints, comparison of blood

21      types.  That's all their business and they

22      know what they have to do.

23 Q   Was the print ever tested against Willie

24      Watts?

25 A   I don't know if it was or not.

1    Q     Did you ask SIU to do that?

2          MR. LAMBERT:     Objection.

3    A     I don't recall asking them to do anything.

4    Q     When you called SIU to talk about the print,

5        to get more information about whether it

6        matched the defendant -- we agree that you did

7        call SIU to get more information about the

8        whether the print matched the defendant,

9        right?

10   A     Yeah.

11   Q     When you called SIU to get that information

12       about the print, did you ask them whether the

13       print was compared to anyone else?

14         MR. MENZALORA:    Objection.

15   A     No, I didn't.

16   Q     Did you ask them to compare the print to

17       anyone else, other than the defendant?

18         MR. LAMBERT:     The actual print to

19       compare to anyone else, that print?

20   A     You know, here is one of the problems. You're

21       still looking at an investigation of

22       September 18th. They had a dead body. They

23       don't know who it is. And Isaiah Andrews is

24       not even mentioned in there. So this

25       information that we're writing down now came

1      much later, once they -- they arrested, I

2      assume, somewhere in here I saw they arrested

3      Willie Watts.

4              In the normal course of things, they

5      would have tried to identify that against

6      anybody, if it were identifiable.  But there

7      is no use trying to compare palm prints or

8      fingerprints, if the evidence itself is not

9      comparable, it's too smeared to say whose it

10     is no matter who you are comparing it with.

11             So if this is a situation where they

12     have not concentrated or even come across

13     Isaiah Andrews, they don't know who the body

14     is, and they are just making -- these are

15     preliminary reports.  And I am writing in

16     information undated that would have come days,

17     if not weeks, later finding out what

18     information was done.

19             You know, although the -- what was the

20     date of death, the 14th or something like

21     that?  The body was found on the 18th.  So by

22     the time it gets to our office, these

23     questions might have been asked in October,

24     November, December, whenever the defense

25     attorney -- whenever the judge sets the trial

1      for pretrial.  That's what you should find out

2      because that's the first time we get the case.

3              So if the judge sets this for pretrial,

4      say, on October 10th, we're reading it for the

5      first time on October 10th, and we are looking

6      backwards to find out what the answer to all

7      our questions have been.  Looking at reports

8      dated the 18th, 19th, through the 25th, and

9      we're two or three weeks or a month past that.

10     So you have to find out when Judge Sweeney set

11     this for pretrial.

12             So they are not on top of this as the

13     very day.  This is dated the 18th.  Well, they

14     don't know who the body is.  They don't know

15     who Isaiah Andrews.  And it's not even in the

16     Sweeney's -- Judge Sweeney's jurisdiction.

17             So it's got to go through indictment to

18     him, and he has got to set it for pretrial.

19     And that pretrial date, whatever it is, that's

20     when we start looking at the file.  We don't

21     even know what this is until we get the

22     pretrial date.

23  Q  Okay.  When you called SIU to get more

24     information about the prints, did you ask them

25     to compare the print to anyone else other than

1                  Isaiah Andrews?

2      A     I don't recall whether I did or not.

3      Q     When you call SIU to get more information

4            about the print, did you learn whether the

5            print had been compared to anyone else other

6            than Isaiah Andrews?

7      A     Let me stop you there.  It's presumptious to

8            say what I called them.  I don't recall

9            calling them.  Maybe I call that.  Maybe they

10           sent me a report.

11                 I think I called them.  That is why I

12           wrote it down this way, otherwise I would have

13           a report in front of me.

14                 I don't recall dialing SIU, asking them

15           a specific question.  That's an important

16           questions for us to ask.  So we would either

17           get it by report, and if I had any questions

18           based on that report I would clarify it by

19           calling them rather than calling them down.  I

20           don't recall specifically dialing them or

21           talking to them about this.  Although I

22           probably did.

23     Q     Okay.

24                 MS. GELSOMINO:    Let's take a break.

25                 THE VIDEOGRAPHER:  We're off the record

1          at two o'clock.

2                    (Recess taken.)

3                    THE VIDEOGRAPHER: We're back on the

4          record at 2:19.

5   BY MS. GELSOMINO:

6   Q      Do you know who Rocco Pullotro is?

7   A      Yes.

8   Q      Who is that?

9   A      The Cleveland detective, when I met him, he

10         worked Cleveland intelligence, Cleveland

11         homicide, and eventually became the highest

12         paid Chief of Police ever in the history of

13         the City.  That was his deal with Mike White.

14                    He's quite a guy.  You ever talk to

15         him?

16  Q      No.

17  A      Quite a -- I kid him, he's got every penny he

18         ever made, but --

19  Q      Oh, wow.

20  A      He made himself wealthy.  He was really a good

21         detective, outstanding.

22  Q      Do you know if he had anything to do with the

23         Isaiah Andrews case at any point?

24  A      I don't recall his name coming up in

25         connection with this.

1    Q    In terms of this Exhibit L, I may have asked
2        you this already, but you have no idea when
3        any of these documents were added to this
4        file, right?
5    A    I do not know what dates they came in at all.
6    Q    Okay.  Are you aware of any witness in this
7        case being intimidated or threatened at any
8        time?
9    A    No.
10    Q    Are you aware of any investigations of any
11        nature into Betty Worthy?
12    A    Her specifically, no, other than she is a
13        prospective witness in a case.  That's all I
14        know.
15    Q    Are you aware of any investigation of any kind
16        into Linda Cloud?
17    A    The same, again I'm not.
18    Q    Okay.  Now do you remember where you got the
19        information that Regina was a chemical
20        engineer?
21    A    This is speculation that I gave.  It had to
22        come from the Feds.  It had -- I would tell
23        you the procedure.  It would be nothing
24        formal.  It would be a call, this is the
25        background of that individual, they would not

1       make a document of it.

2    Q  Did you ask any of the family members of

3       Regina that you spoke to about whether she was

4       a chemical engineer?

5    A  I don't know where that came from.  And I

6       don't recall talking to her -- her mother was

7       Mason, I think.  And I don't recall talking to

8       her mother or how I found out that she was

9       involved in Blacks Back to Africa.

10   Q  Were all of your actions in relation to the

11      Isaiah Andrews case consistent with the

12      policies and practices of the Prosecutor's

13      Office?

14           MR. LAMBERT:     Objection.

15   A  They were.

16   Q  Were all of your actions in every case

17      throughout the course of your career

18      consistent with the policies and practices of

19      the Prosecutor's Office?

20   A  Yes.

21           MR. LAMBERT:     Objection.

22           MR. CALDERONE:     Objection,

23      foundation.

24           MR. MENZALORA:     Objection.

25   Q  And your supervisors were aware of all of the

```
 1            actions you took in this case, right?
 2   A        Yes.
 3                 MR. CALDERONE:    Objection.
 4   Q        And your supervisors were aware of all the
 5            actions that you took in every case?
 6   A        No.
 7                 MR. MENZALORA:    Objection.
 8   Q        No?
 9   A        My supervisors?  No, once they assigned me to
10            a room, they didn't follow-up on what cases I
11            tried.  They didn't know what was going on.
12                 The only people that knew what was
13            going on was, specifically with the case, the
14            attorney that tried it, and secondarily the
15            head of the three-man unit, as he would
16            distribute the cases among the three of them.
17   Q        Okay.
18   A        So he know you're trying that case, but he
19            would not get involved.  Or she.
20   Q        Okay.  So that leads me to a question
21            actually.  In terms of the hierarchy of the
22            office or the organization of the office in
23            '74-'75, John T. Corrigan was the head of the
24            office, right?
25   A        He was the elected prosecutor, right.
```

1  Q     And how did it go from there?

2  A     It didn't spread out too much.  We had chiefs

3        of Appeals, Juvenile Court.  We didn't have

4        many divisions.  Appeals, Juvenile Court.  And

5        then there was one Chief Prosecutor -- I'm

6        sorry, he was the First Assistant, okay.  And

7        at one time, the First Assistant approved all

8        the pleas.  So you had anywhere from -- when I

9        went there, 30 or 40 prosecutors going back to

10       the First Assistant for pleas.

11            I was the First Assistant under

12       Stephanie Tubb-Jones.  The duty of the First

13       Assistant is to manage the office, all right.

14       All the complaints from the judges, the

15       prosecutors, anything going wrong in the

16       office, any organization that has to go on.  I

17       mean, it's like literally 40 telephone calls a

18       day.  For me it was like that.

19            Then they decided that was too much.

20       And a guy named -- who was -- what it would be

21       the head of a three-man team between two

22       judges, the name of Bob Feighan.  So they gave

23       him the job of being the prosecutor who

24       approved all pleas.  So at that time he

25       probably had 70 or 80 prosecutors waiting to

1      talk to him about cases to do pleas.

2  Q     When was that?

3  A     That was probably mid '70s through the '80s.

4  Q     Oh, okay.

5  A     Then I don't know -- then they added -- let's

6      see.  They added two others.  Besides him

7      there were two others who were approving

8      pleas.

9             Under Mrs. Jones the saying was, I

10     could approve pleas.  But we had three others

11     who were Chief Prosecutors that had certain

12     judges' rooms, and those prosecutors in those

13     rooms would go to them.

14             So it started out with the First

15     Assistant handling all the pleas.  Then Bob

16     Feighan had that position.  And then, I don't

17     know, like Chief Plea Prosecutor, for want of

18     a better term.

19             And then they added two people to

20     assist him.  And the standard was at least

21     three, along with the First Assistant.

22             And for those of us who knew what

23     leeway we had in the office, you could even go

24     to the Chief Prosecutor -- you could go to the

25     Prosecutor, John T. Corrigan, and Stephanie

1        Tubb-Jones if you didn't like the ruling on a

2        case. It was rare. I mean, you were a little

3        out over your skis going to Mr. Corrigan to

4        complain that someone who has, you know, 20

5        years experience on you is reading the case

6        wrong.

7  Q     But it happened?

8  A     It happened with me, and he let me know it.

9  Q     Okay. So did line -- the courtroom

10       prosecutors, line prosecutors, did they have

11       discretion on how to investigate cases, on how

12       to work cases?

13  A    No. They were taught like everyone else by

14       experience. You had to -- they give you the

15       book. Read the law. Read the procedures.

16       Understand what's required for presenting

17       evidence of a search and seizure or something

18       like that in a courtroom. What are you -- you

19       know, that was taught to you. The rest you

20       learned.

21           And for discretion, for a long time

22       they didn't have any. If you want -- I don't

23       care if it was fourth degree felony and you

24       wanted to knock it down to a misdemeanor, you

25       got approval for it.

1  Q    That's still how it is it seems to me.

2        So you would need approvals for pleas?

3  A    Every single plea.

4  Q    And marks?

5  A    Yes.  And it would be marked on the file.

6  Q    Okay.  But then in terms of working the case,

7       in trying the case, did prosecutors have

8       discretion in those arenas?

9  A    The only discretion they had was they didn't

10      have to try a capital case if they didn't want

11      to, if they objected to it morally.  No

12      pressure was placed -- and no pressure and no

13      criticism was put on them because of it.

14            Other than that, it was sort of on an

15      individual basis.  If the couldn't handle a

16      case, or they thought they weren't suited for

17      it, or if they thought they weren't ready for

18      a case that would last two, three, four weeks,

19      that's heavy stuff.  I mean, you better pretty

20      much know everything before you handle one of

21      those cases.  Trials that were two, three days

22      long, that was pretty standard, and no one had

23      a problem with that.

24  Q   You mentioned training, and a lot of this was

25      just on the experiential training, right?

```
 1   A      Yes.
 2   Q      But was there any formalized training in the
 3          Prosecutor's Office in '74-'75?
 4   A      There was not.
 5   Q      Okay.
 6   A      They didn't have continuing legal education.
 7          And especially we didn't have time or money to
 8          send anyone for seminars.
 9   Q      Were there any written the policy manuals?
10   A      You know, there was.  When you came into the
11          office, they gave it to you.  I don't have
12          mine.  I didn't refer to it that often.  I
13          never looked through, should I do this.  I
14          mean, you know, the standard was you use a
15          standard of morality first.
16   Q      Okay.
17   A      If it's good or bad by morality standards,
18          then I mean then it is right or wrong by legal
19          terms.  So, do what's moral first and pretty
20          much you're on the right track.
21              If you have a question, go see a senior
22          prosecutor as to how you should handle it.
23   Q      Was that in the written policy manuals?
24   A      No, that was just common sense.
25   Q      Did you -- so did you rely on your common
```

```
 1          sense rather than the policy manuals?
 2   A      Yeah, pretty much though because John T. gave
 3          the office its moral compass.  You knew not to
 4          screw up, to make a bad decision.  If you
 5          needed help, you went and got help.  If you
 6          needed his guidance, you got his guidance from
 7          him.
 8   Q      So it was really based on the individual
 9          prosecutor's moral compass?
10   A      Yeah.
11   Q      What was included in the policy manual?
12   A      I don't even remember the first word of it.
13          Do good and avoid evil, or something like
14          that.
15              No, it was a procedure set out.  It was
16          a pamphlet that you got.  And they updated it
17          every so often.  But I have no idea where mine
18          was or -- I read it, I know that.  You know,
19          when you are new in the office, if they tell
20          you to read something, you read it.
21   Q      Sure.  Is it something that you referred to
22          over the course of your career?
23   A      No.  What I referred to was the -- mainly the
24          rules of discovery and then the rules of
25          evidence and the difference between presenting
```

1              something at trial and presenting something in

2              an evidentiary basis, and a motion to

3              suppress.  So, that you had to learn.

4    Q    Okay.

5    A    And you had to pay attention to -- in other

6              words, you had to read the whole code.

7    Q    Sure.

8    A    You had to read the anodized sections too.

9              Annotated rather.

10   Q    Was there any testing or evaluation done to

11             make sure prosecutors were reading and

12             understood the policies of the office?

13                   MR. LAMBERT:     Objection.

14   A    No.

15   Q    What were your duties as a prosecutor?

16   A    Mine was just to try cases.

17   Q    Okay.

18   A    Usually the procedure was, Grand Jury, which I

19             spent one day in.  Juvenile Court for a number

20             of weeks or months.  I went right from one day

21             in a Grand Jury to trying cases.

22   Q    Okay.  Were you taught that you had any kind

23             of duties to the defendant?

24                   MR. CALDERONE:     Objection,

25             foundation.

```
 1   A      The law took care of that.
 2   Q      Okay.  Well, what was your understanding about
 3          your duties as a prosecutor to the defendant?
 4   A      I didn't have any duties to him.  The law
 5          covered that.
 6   Q      What do you mean by that?  I just want to
 7          understand.
 8   A      Well, what's discoverable, what's
 9          exclusionary, what's exculpatory.  The judge
10          is responsible for a fair trial.  We were
11          responsible for following the law as it guides
12          the prosecutors on how they present a case.
13   Q      Did you understand that you had a duty
14          todisclose exculpatory information?
15   A      Oh, absolutely.
16   Q      I'm going to show what you what has been
17          marked, I think, as Exhibit 33 in this case
18          previously.  Here you go.
19              MS. GELSOMINO:    Dave, you want one?
20   Q      You don't have to look at page 1.  Look at 2
21          and 3.
22   A      Page 2?
23   Q      Yeah, this is actually 32, Exhibit 32,
24          previously marked Exhibit 32.
25              So this is a letter from John T.
```

| | | |
|---|---|---|
| 1 | | Corrigan.  Can you take a look at this? |
| 2 | A | The one in the front where it says General |
| 3 | | Police Order? |
| 4 | Q | Yes.  This is actually something I got from |
| 5 | | the Police Department.  But I'm wondering if |
| 6 | | the letter that came from the Prosecutor, it's |
| 7 | | to the Chief of Police, but have you ever seen |
| 8 | | this letter? |
| 9 | A | No, we would never have seen this. |
| 10 | Q | Can you read this?  And my question to you is, |
| 11 | | were the prosecutors required to follow the |
| 12 | | same rules set forth in this letter to the |
| 13 | | police? |
| 14 | | MR. LAMBERT:    Objection.  No |
| 15 | | foundation. |
| 16 | | MR. CALDERONE:    Same objection. |
| 17 | A | I would have to read the whole thing.  This |
| 18 | | has to do with, I believe, a change in rules |
| 19 | | of discovery. |
| 20 | Q | Yes. |
| 21 | A | Is that correct? |
| 22 | Q | Yes. |
| 23 | A | Well, he sends this out to all the police |
| 24 | | departments to let them know what is required. |
| 25 | | We would have gotten this. |

1    Q    Okay.

2    A    And in -- as a rule there were no seminars or

3         anything.  But when these came out, everyone

4         read them.

5    Q    Okay.

6    A    I can only -- I remember the time -- I

7         remember one time we would get together

8         informally in a large part of -- happened more

9         often in the Justice Center, because the other

10        places -- we were at four different locations.

11        And we would discuss some of this.  And it

12        would be told to us, these are the new rules.

13        Read them.  If you have any questions, ask one

14        of the senior prosecutors.  And we would read

15        them.  I mean, this was not something you just

16        threw away, I haven't got the for it.  You did

17        it.

18              This was I guess a change in the rules

19        by the Ohio legislature that John T. Corrigan

20        was an apprising all the cities in Cuyahoga

21        County.  I never saw this though.

22              This is -- when was this?  1973.  So --

23        well, you can see what our was office like.

24        They listed all the prosecutors in it.

25   Q    I know.  It's interesting.

1              Okay.  So you also though were apprised
2       of the change of the rules and were required
3       to abide by those, right?
4   A   Absolutely.
5   Q   As explained by Corrigan?
6   A   Yes, John T.
7   Q   In terms of the file, was there a standard on
8       how to organize and maintain the files in the
9       Prosecutor's Office?  Or could every
10      prosecutor just kind of organize the file as
11      they wished?
12  A   Well, it came to you complete with an
13      investigation.  How you put the papers back in
14      and out was your business.  I mean, I would
15      divide it with the indictment.  Everything
16      that was important in front of the indictment
17      goes there.  Everything that was no value or
18      copies goes behind it.
19              But a lot of guys just left it the way
20      it was, and it was sloppy at times.  You know,
21      in other words, they were all mixed up.
22  Q   Okay.
23  A   But that's the way they read it, and that's
24      the way they handled it.
25  Q   Right.  Okay.  Because there was just no

```
 1        policy or formalized training about how to do
 2        it?
 3  A     No.
 4  Q     Okay.  Was there any kind of inventory of the
 5        file made at any point to ensure that a report
 6        wasn't accidentally -- didn't go missing or
 7        something?
 8             MR. CALDERONE:    Objection to form,
 9        foundation.
10  A     They didn't.  I don't recall us ever having a
11        problem with that.
12  Q     Great.  You don't know anything about how the
13        files were preserved after trial, do you?
14  A     It was sent back to the record room and
15        recorded.  Then when the Notice of Appeals
16        came in, as I recall, they were put in the
17        file, and that file was then pulled with a
18        card to take its place to know where they were
19        sending it.  And we did our own appeals.
20  Q     Right.
21  A     We had an Appellate Division for special
22        appeals, for special situations.  But every
23        prosecutor did his own appeal.  So you tried
24        10 cases a year, you probably had 10 appeals
25        you were going to do.
```

1                    And they came to you that way from the
2          record room.  You didn't go down to get it
3          because you didn't know about it.  There is an
4          appeal filed.  It goes to the records.  It's
5          recorded.  And then it goes to the
6          prosecutor's name on the file.
7     Q    Okay.  You were never in record management in
8          the department, right?
9     A    No.  I was telling these guys.  At 21st Street
10         there was an old lady there, an Irish lady,
11         named Mrs. Willett.  You couldn't get by her
12         with a sledgehammer.
13                   You dare not go into there.  And that
14         followed into the record room when we went to
15         the Justice Center.  You could see a lineup of
16         people waiting to get their files to go up to
17         the courtroom for pretrial.  And there would
18         be may be, you know, 15, 20 people in line
19         waiting the records.  And you weren't allowed
20         back there.  I never went back there.  I never
21         went back there when I was the First
22         Assistant.
23    Q    You knew your domain.
24    A    Yeah.  They really ruled back there.
25    Q    Since there was this rotation between

```
 1              prosecutors and it wasn't uncommon to pass the
 2              file off to another prosecutor, were there any
 3              policies about ensuring that all of the
 4              important information was written down in a
 5              memo of some kind?
 6    A         No.
 7                   MR. CALDERONE:    Objection, form and
 8              foundation.
 9    A         Every prosecutor made whatever notes he wanted
10              to at the time of pretrial.  If they settled
11              it, fine.  Then it was the next prosecutor's
12              job to pick up the file and start right from
13              the beginning again.
14    Q         Okay.
15    A         Read the file himself and decide what they
16              were going to offer.
17    Q         Okay.  So you weren't required to document any
18              kind of steps that you took in the
19              investigation in any way before you passed it
20              off?
21    A         No.  No one wrote memos then or memorandum.
22              Memoranda.
23    Q         Were you required to document any changing
24              witness' stories or any kind of witness
25              accounts before you passed off the file?
```

1   A       Oh, no.  But any prosecutor would make notes

2           like that.  I don't know of anyone who would

3           let that pass if there was a discrepancy

4           between a person's either two written

5           statements, two oral statements, or a written

6           and oral statement, or what they were told

7           when they interviewed the witness as opposed

8           to what the statement made.  That would be in

9           the file.  You would see notes directing

10          anyone's attention to it.

11  Q       And that would be if a witness testified at

12          trial and previously made a different kind of

13          statement or different representations to the

14          police, then that would be considered

15          exculpatory, right?

16                  MR. CALDERONE:      Objection, form.

17                  MR. LAMBERT:        Objection.

18  Q       Or impeachment?

19  A       It would be considered discoverable.

20  Q       Okay.

21  A       After the witness testified, the judge would

22          call a side bar conference.  We would go side

23          bar.  We would turn over -- there were two or

24          three different ways.

25                  We would turn it over to the judge, and

1       he would either read it and see if there was

2       any discrepancy, or he would give the document

3       to the defense counsel, let them read it, have

4       them point out to the judge what they think

5       was exculpatory and subject to cross-

6       examination.

7               Most -- I would say in my experience,

8       most of the judges would say basically do what

9       you want with it.  You know, I'm not going

10      through every objection you have to it.  If it

11      is the prosecutor, I'm not going to go through

12      everything he has.  He now knows what's in

13      there.  Let him use it in cross-examination.

14      That's my experience.

15              But the judge could limit it.  He could

16      go through and say, no, that's not

17      exculpatory, that is just your opinion, and

18      you say that in argument, in closing argument.

19   Q  Okay.

20   A  So it depends what judge you have as to how

21      that was handled.  But that's -- technically

22      that's the first time the defense attorney is

23      allowed to see it.  If the witness takes the

24      stand, and then only afterwards.

25   Q  Okay.  And you call it discoverable?

1   A       Yes, absolutely.

2   Q       Thank you.

3           Whose job was it to investigate --

4           well, to make sure that all leads or potential

5           leads in a case are followed up on?

6               MR. MENZALORA:    Objection.

7               MR. CALDERONE:    Objection.

8   A       The detectives in charge.

9   Q       Okay.  Is there anything that you remember

10          from the investigation into the murder of

11          Regina Andrews that you haven't told me about?

12  A       None that I can think of.

13  Q       Do you know whether there were any statements

14          in the case from the Statement Unit?

15  A       I didn't see any statements in there.

16  Q       So --

17  A       Have you seen statements?

18  Q       I was just going to ask you, can you describe

19          to me what you would consider a statement?

20  A       Yeah, there would be heading, case heading

21          file, very formal.  And it would be typed up,

22          but it would be made pursuant to -- I don't

23          think they did recordings.  It would be made

24          pursuant to the notes taken by the detectives.

25          So, they would interview a witness.

1      And they would take, as a regular course,

2      copious notes.  Then they would write up the

3      statement.  Have it typed up.  Even question

4      and answer and is this your statement.  Do you

5      understand everything.  And then they sign it.

6      And the detectives would witness it.  And it

7      would be formal.

8  Q    You didn't see any of those in this case?

9  A    I didn't see anything in here.

10  Q    Was that pretty common that that would happen?

11      MR. CALDERONE:   Objection.

12  A    Oh, yeah, if there were witness statements or

13      defendant's statement where they took written

14      statements of them -- written meaning typed

15      out.  Or sometime they would have the witness

16      write out the statement.  But then you are

17      dealing with legibility.  But that was

18      standard if there were witness statement.

19  Q    Okay.  I'm going to show you what's been

20      previously marked as Exhibit 40.  I just have

21      a couple of cases.  Would you expect to see

22      formal statements for witnesses who are being

23      called at trial?

24      MR. CALDERONE:   I'm sorry --

25  Q    Strike that.  I withdraw that.

1          All right.  So let's look at Exhibit 40
2     that I just handed you.  And you know what I
3     just realized --
4  A  40?  Is that what I'm looking at now, 40, this
5     one?
6  Q  Yes, that's exactly right.  So I'm going to
7     refer you to these numbers that are really --
8          MR. LAMBERT:    Can I stop you?  This
9     is marked as 203.  Is it Exhibit 40?  Where's
10     the mark?
11          MS. GELSOMINO:    I'm just representing
12     to you that in this case it has been
13     previously marked as evidence as Exhibit 40.
14     It says 203.  But that is the original
15     marking.  I don't know what that is.
16          MR. LAMBERT:    Okay.  So --
17  A  So I should not be looking at 40.  I mean,
18     there is no something that says 40.
19  Q  Nothing says 40.
20  A  Okay.
21  Q  Just for the record I'm representing to you
22     that I have pulled this.
23          MS. GELSOMINO:    It was previously
24     marked as Exhibit 40 in Marty Flask's
25     deposition, Ken.

1   Q      But what I am going to be pointing out are

2           these little Bates stamps numbers at the

3           bottom right corner.  Do you see that?  It

4           says SUPP production, a bunch of zeros and

5           then a number at the very end, it is very

6           small.

7   A      Yes.

8   Q      When I am pointing you to page numbers, that's

9           what I am looking at, okay?

10  A      Oh, okay.

11  Q      I understand that you haven't reviewed Exhibit

12          40 before, but I'm going to ask you about

13          handwriting on some of these pages, okay?

14  A      Sure.

15  Q      So if you go to page 23, Bates stamped page

16          23, just look at the little corner, the little

17          pages at the bottom.

18                Do you see where it says check on?

19  A      Yeah.

20  Q      That's not your handwriting, is it?

21  A      No, it isn't.

22  Q      Do you know whose handwriting that is?

23  A      I don't.

24  Q      I think that is probably going to be your

25          answer for a lot of these, but I am just going

1             to ask you anyhow.

2     A     Sure.

3     Q     Go the page 27.

4     A     That is not mine either.

5     Q     If we go on to page 32.

6     A     32?

7     Q     It just says something there about Judge

8             Sweeney.

9     A     That's not my writing.

10    Q     That's not your handwriting?

11    A     No, it's not.

12    Q     Do you know whose handwriting this is?

13    A     Any of these?

14    Q     Do you recognize it in anyway?

15    A     No, not at all.

16    Q     Go to page 87.  Towards the end.

17    A     Okay.

18    Q     Do you know what this page is?

19    A     It says case procedure, but I don't know who

20            this writing is.  I'm not familiar with this

21            form.

22    Q     Have you ever seen it?

23    A     Not to my recollection.

24    Q     We can put that aside for the moment.

25    A     The whole thing?  The whole --

| | | |
|---|---|---|
| 1 | Q | Yeah. |
| 2 | A | Okay. |
| 3 | Q | Actually go to page 2, please. |
| 4 | A | Of this report that I -- |
| 5 | | MR. CALDERONE: Exhibit 40. |
| 6 | Q | I'm sorry, Exhibit 40. Page 2 of that one. |
| 7 | A | Okay. |
| 8 | Q | The handwriting, is any of that yours? |
| 9 | A | No. None of it. |
| 10 | Q | Do you recognize any of it? |
| 11 | A | No. You see the references though. |
| 12 | Q | I see references to Regina's mother living in |
| 13 | | Ghana. |
| 14 | A | Ghana. You know, I thought it was Liberia, |
| 15 | | but I guess it's Ghana. |
| 16 | Q | If we go back to that last page we were just |
| 17 | | looking at, page 87. That's the court |
| 18 | | procedure page. |
| 19 | A | Right. |
| 20 | Q | Zoom in on the bottom part of this. It says |
| 21 | | Judge Matia and then Prosecutor Cables; do you |
| 22 | | see that? |
| 23 | A | Yes. |
| 24 | Q | Do you know who that is? |
| 25 | A | Tom Cables. |

1          Matia is the -- he's the adopting

2     parent of Judge Matia that -- is there still a

3     Judge Matia on the bench now?

4          MR. MENZALORA:        Yes.

5    A    There is?

6          This Matia I think adopted that Matia.

7     I know this Matia.  I've talked to him many

8     times.  Tried cases in his room and

9     everything.

10          I don't know what this is, the case

11     procedure.  This is probably out of the court

12     administration.  This is not a County

13     Prosecutor's form.

14    Q    Do you know who Prosecutor Cables is?

15    A    I think his name was Tom Cables.  I vaguely

16     remember him.  He didn't stay long with the

17     office.

18    Q    Was he a Grand Jury prosecutor in this case?

19    A    He what?

20    Q    Can you tell if he was the Grand Jury

21     prosecutor in this case?

22    A    I don't know.

23          I know at one time, and for a long time

24     it was -- no, the one I had was Gertrude Mann.

25     She's -- are you familiar with Mapp versus

1  Ohio?

2  Q   Sure am.

3  A   That's Gertrude Mann.  The woman had that

4      case, and she did a -- she was tough.

5          Then it was handed over to Jim O'Meara.

6      Jim O'Meara was the head of Grand Jury with a

7      number of prosecutors working for him to

8      present all the cases for a long time.  Like a

9      couple of decades.

10 Q   Looking at this, is the date presented to

11     Grand Jury and then officers, Hubbard.  Does

12     this lead you to believe that Officer Hubbard

13     testified to the Grand Jury?

14         MR. CALDERONE:   Objection, foundation

15     and speculation.

16 A   That's speculative.  That's pretty standard

17     though.  Rarely do they call witnesses in.

18     The only time they are definitely calling

19     witnesses in would be in a rape case.

20 Q   Oh, okay.

21 A   But --

22 Q   So they would call officers?

23 A   Right.  They are running 30, 45, 50 cases a

24     morning and then an afternoon.  They are not

25     putting on grand presentations.  It's pretty

1      much one person takes the stand and does

2      everything.

3  Q     So you explained to me the difference between

4      -- or what a statement means.  Is that how it

5      was understood in the Police Department to

6      your knowledge, that a statement meant this

7      formalized statement that you explained to me

8      as opposed to just --

9  A     A statement is by a witness.

10          MR. MENZALORA:    Objection.

11          MR. CALDERONE:    Objection,

12      foundation, speculation.  Go ahead.

13  A     Statement is by a witness, whether it's

14      written or oral.  Whether it is by a defendant

15      or a witness.

16          Police officers make reports.  They

17      don't make statements.  Unless they were the

18      witness to the events.

19  Q     Okay.  So if there is a report which documents

20      something that a witness said to a police

21      officer, that would not be considered a

22      statement?

23  A     It could be an oral statement.  The witness

24      could tell him an oral statement and not make

25      a written statement.  It's tedious to make a

1    statement like that.  You have to sit down,

2    take notes, have someone type it up.  They

3    probably had to type it out themselves.  But

4    they are thorough.  They would do it if they

5    had to.

6         But if it was just, I saw him do this,

7    they would make an oral statement out of it

8    and just leave it in their report, which would

9    be discoverable when that witness took the

10   stand.

11 Q   You told us last time that you knew Leo Allen

12   from the neighborhood.  Were you guys pretty

13   close?

14 A   Who, Leo and I?

15 Q   Uh-huh.

16 A   I can remember playing basketball.  He was big

17   into basketball.  But his brother was better.

18   Leo was very good in softball.

19        We remember each other.  I'm sure I'm

20   about three or four years older.  I think we

21   went to -- he went to St. Pat's with me.

22 Q   Right.  I can't remember what you told me

23   about your relationship to Hubbard.  Did

24   you have a relationship with Hubbard?

25 A   No, not Rowell or Hubbard.  I worked with them

 1          before.  I mean, I remember their names, so I
 2          must have worked with him.  Their names are
 3          familiar to me, but I didn't grow up with
 4          them, I didn't know them.
 5    Q     Did you ever go to social events with them?
 6    A     No.  There's a difference between black and
 7          white.  I grew up on the east side, I grew up
 8          on the west side.
 9    Q     That's real true.
10              Okay.  How about Francis McCaffrey?
11    A     I knew Frannie.  He was a homicide detective.
12          And I am more certain that I've had cases with
13          him.
14    Q     Did you have any personal relationship with
15          him?
16    A     No.  We knew each other.  We maybe see each
17          other at maybe retirement parties, but that
18          would be it.
19    Q     What was your relationship with Walter Dugan?
20              MR. CALDERONE:    Objection.
21    A     I just recognize the name.
22    Q     How about Pete Comodeca?
23    A     Pete Comodeca, head of the Homicide Unit.  I
24          had talked to him many times.
25              Just as an aside, he had three sons,

```
 1        all went to West Point.  He had an
 2        extraordinary family.  I'm sure he's passed
 3        since.  But he was quite a guy.  He was a good
 4        manager.  Cleveland Intelligence Unit and
 5        Cleveland Homicide Unit were outstanding
 6        units.  They had people in there that you
 7        didn't have to tell them to do anything, they
 8        knew what to do.
 9    Q   Did you ever hang out?
10    A   No.  No, he was older than I and had a family
11        to raise.
12    Q   How about John Kaminski?
13    A   I know him.  I know the name.  I probably
14        worked with him at times.
15    Q   Any kind of friendship or relationship outside
16        of work?
17    A   No, other than professional.
18    Q   Did you ever go to like FOP events or anything
19        like that?
20    A   No, I didn't.
21    Q   Kevin Walsh, did you have any relationship
22        with him?
23    A   No, I don't remember that name.
24    Q   I know like four from this side of town.  I
25        just wanted to -- how about Nick Stanick?
```

| | | |
|---|---|---|
| 1 | A | Stanick I remember.  Tall guy, lean. |
| 2 | Q | Did you have -- what was your relationship |
| 3 | | like with him? |
| 4 | A | Same as the rest, professional relationship as |
| 5 | | homicide detective and prosecutor. |
| 6 | Q | How about Officer Hicks? |
| 7 | A | Dave Hicks, yeah.  I knew him.  We knew him a |
| 8 | | little better.  He was Leo Allen's partner for |
| 9 | | a long time.  He was big into sports.  I think |
| 10 | | he was a -- wrestling was his off time. |
| 11 | Q | All of these officers that I just asked you |
| 12 | | about, did you ever know of any of them |
| 13 | | failing to include any reports or anything in |
| 14 | | the file? |
| 15 | A | No. |
| 16 | | MR. MENZALORA:    Objection. |
| 17 | Q | Did you ever know of any of them to not tell |
| 18 | | every piece of information to a prosecutor? |
| 19 | | MR. CALDERONE:    Objection. |
| 20 | | MR. MENZALORA:    Objection. |
| 21 | | MR. LAMBERT:     Objection. |
| 22 | A | Absolutely not. |
| 23 | Q | Okay.  Did you ever know any of these officers |
| 24 | | to encourage witnesses to change a statement? |
| 25 | | MR. MENZALORA:    Objection. |

```
1   A      No.
2   Q      Did you ever know any of these officers to
3          threaten people?
4                 MR. MENZALORA:    Objection.
5   A      No.
6   Q      Did you ever know any of these officers to
7          destroy evidence?
8                 MR. MENZALORA:    Objection.
9   A      No.
10  Q      Did you ever know any of these officers to
11         fabricate evidence?
12                MR. MENZALORA:    Objection.
13  A      No.
14  Q      Did you ever know any of these officers to
15         fail to ask when a witness testified
16         inconsistently with prior statements?
17                MR. CALDERONE:    Objection,
18         foundation.
19                MR. MENZALORA:    Objection.
20  A      I'm not sure I follow.  I mean a witness
21         testified and it was inconsistent with their
22         statement?  Well, we would know that because
23         we would have the statement.  We would go to
24         side bar and the defense would know that.
25                If they didn't participate in -- all
```

1          they -- the only reason they were at trial was

2          to give us guidance and to help us get

3          witnesses there and tip us off to something

4          they thought was important that they observed.

5                But when it came to inconsistencies,

6          that was us, our job to present the written,

7          oral statement that was inconsistent with the

8          testimony to the judge, and it was the judge's

9          decision as how we would handle it with

10         defense attorney.

11  Q     All right.  How about -- did you know any of

12         these officers to fail to take action if they

13         became aware that a prosecutor did not know

14         about exculpatory evidence that arose during

15         the investigation?

16               MR. MENZALORA:   Objection.

17               MR. CALDERONE:   Objection, presumes

18         facts and duties not in evidence.

19  A     I'm not sure what the nature of that question

20         is.  I mean, how would they know what we don't

21         know?

22  Q     Yeah, I mean, like if it ever became obvious

23         at any point that a prosecutor didn't --

24  A     That we missed something?

25  Q     Yeah.  Or didn't know about potentially all

1          exculpatory information.

2                    MR. MENZALORA:    Objection.

3     A    I don't imagine that ever happening.  They

4          would keep us up to date on everything.  Our

5          files were current.

6     Q    Okay.

7     A    So if we missed something, it was our fault,

8          not theirs.

9     Q    Okay.  Did you ever know any of these officers

10         to fail to report their fellow officers for

11         misconduct or policy violations?

12    A    We were never up on that.  We didn't know what

13         was going on.  That was police stuff.

14    Q    Did you know any of these officers to

15         fabricate evidence?

16    A    No.

17                   MR. MENZALORA:    Objection.

18    Q    You talked with Ken about formal discipline

19         and I know you didn't have any.  I'm wondering

20         if you were ever investigated by the

21         Prosecutor's Office for anything?

22                   MR. CALDERONE:    Objection.

23    A    Me?

24    Q    Yes.

25    A    Not that I can recall.

```
 1   Q      Have you ever been investigated by any agency
 2          for potential wrongdoing?
 3                 MR. MENZALORA:    Objection.
 4                 MR. CALDERONE:    Objection.
 5   A      No.  Not to my recollection or anything.  If
 6          they did, they didn't tell me about it.
 7   Q      Have you ever had any kind of informal
 8          discipline in the Prosecutor's Office, or any
 9          other -- by any other organization?
10   A      Me?
11   Q      Yeah.
12   A      No, none.
13   Q      Do you know of any prosecutor ever being
14          disciplined or investigated for a Brady
15          violation?
16                 MR. CALDERONE:    Objection.
17   A      For what kind of violation?
18   Q      A Brady violation?  Excuse me.
19   A      No.
20   Q      Are you aware of any wrongful convictions
21          arising out of the Cuyahoga County
22          Prosecutor's Office?
23                 MR. MENZALORA:    Objection.
24                 MR. CALDERONE:    Objection.
25                 MR. LAMBERT:     Objection.
```

| | | |
|---|---|---|
| 1 | A | I mean, other than the ones I've had reversed |
| 2 | | or something like that, no one kept track of |
| 3 | | that.  It was on you to make sure you followed |
| 4 | | through with everything.  And whatever |
| 5 | | happened, the office knew about it.  I would |
| 6 | | go right through John T. Corrigan and |
| 7 | | everything, or Mrs. Jones. |
| 8 | Q | Was anyone ever disciplined for any conduct |
| 9 | | leading to a wrongful conviction? |
| 10 | | MR. LAMBERT:    Objection. |
| 11 | Q | That you know of. |
| 12 | A | No, not that I know of. |
| 13 | Q | Were you -- do you know if any of these |
| 14 | | officers that I just listed -- I can repeat |
| 15 | | them if you need. |
| 16 | A | That's all right.  I remember. |
| 17 | Q | Were any of them ever included on a Brady or |
| 18 | | Giglio list that you know of? |
| 19 | | MR. MENZALORA:    Objection. |
| 20 | | MR. CALDERONE:    Objection. |
| 21 | | MR. LAMBERT:    Objection. |
| 22 | A | I don't recall any of them being on that.  I |
| 23 | | don't recall it.  You know, they may have, but |
| 24 | | I don't recall it.  Nothing stuck out or |
| 25 | | anything like that. |

1   Q     So the only other question that I don't think

2          I totally understand yet is when the --

3          somehow the city prosecutor was involved in

4          the course of the case, right?

5             MR. LAMBERT:    Objection.

6   Q     The police have it.  The police do the

7          investigation.  They want to bring charges

8          against someone.  Somewhere the city

9          prosecutor is involved.  Somehow the county

10         prosecutors becomes involved.

11            What's the role of the city prosecutor?

12             MR. CALDERONE:    Objection.

13             MR. LAMBERT:    Objection.

14   A     I don't think they were involved.  There were

15          two ways that we would get a case.

16            One would be direct from the police

17          officer.  Like the suburbs, there was no

18          bindover.  What they investigated on a felony

19          basis came straight to our office --

20   Q     Sure.

21   A     -- right from the police department.

22            When it came to the Cleveland Police,

23          they had a choice.  Maybe not consistent with

24          their rules, but they had a choice.  They

25          could bring the case directly to us, which

1          they probably did most of the time.  I

2          couldn't give -- but they probably did.  So

3          they would investigate the case and come

4          straight to us.  They would bypass the city

5          prosecutor.

6                    If it was going to be a bindover, then

7          the city prosecutor was there, along with --

8          we always had a person in the bindover room in

9          Cleveland Municipal Court.  So the judge would

10         hear whatever evidence was being presented at

11         that time to bind over that felony case to the

12         county.

13    Q    Right.

14    A    Follow me?  It didn't matter what the judge

15         did.  If he said there is not evidence, I am

16         not binding it over, they could still bring it

17         directly to us.  So his decision -- well, it

18         wasn't a frivolous one, but it was meaningless

19         because they could always bring it over to us.

20                   And finally we cut that out because it

21         was a waste of time, us going over there and

22         sending one or two prosecutors over there

23         every day of the week to wait for bindovers.

24         Just bring us the case, and that is what they

25         would do.

1              So at one time the city prosecutor was

2        involved because one of his assistants was in

3        the bindover room to present enough evidence

4        to the court to bind over the case to the

5        county.

6    Q   That's not the preliminary hearing though, is

7        it?

8    A   A preliminary hearing?

9    Q   Yeah.

10   A   Yeah, you could call that a preliminary

11       hearing, a bindover.

12   Q   Okay.  So then if --

13   A   We didn't have one.  When it came to us, it

14       went right to the Grand Jury.  There was no

15       hearing.

16   Q   Right.  Okay.

17             So if in this case where the city

18       prosecutor would just bring a case or somehow

19       the county prosecutors got it from the city

20       prosecutor, do you know how the file was

21       transferred to the county prosecutor?

22   A   You know, I'm guessing.  Other than a

23       notation, I don't think the city prosecutor

24       had a file.  It was the -- for example, a

25       homicide case, they would present just barely

1    enough evidence to say, yes, there was a

2    murder here, or a homicide, and this is the

3    person who did it.  And the judge not having

4    jurisdiction over felony, would bind it over

5    and say, all right, take it over to county.

6    But they didn't walk in there with a file,

7    they just walked in there with a police

8    officer.

9            And like I say, it got to the point

10   where we no longer needed it because it didn't

11   matter what he municipal court did.

12   Q    Right.  You could do whatever, prosecutor got

13        it.

14   A    Right.

15           MS. GELSOMINO:    All right.  I don't

16        think I have any further questions for you

17        right now.  Thank you, Carmen.

18           THE WITNESS:    Okay.

19           REDIRECT EXAMINATION

20   BY MR. CALDERONE:

21   Q    I have some things to follow up with you on,

22        Carmen.

23   A    Oh, good.

24   Q    A few moments ago you explained that if you

25        were at trial and there was some inconsistent

1        -- some testimony from a witness that was

2        inconsistent with a prior statement, that that

3        was a matter that would be brought up to the

4        trial judge by the prosecutor?

5  A     It didn't have to be inconsistent.  Once the

6        witness testified, we had to submit the

7        statement.  It wasn't us to determine whether

8        there is an inconsistency.

9           As soon as the witness finished

10       testifying on direct, we went to side bar and

11       that document was presented to the judge.  It

12       was up to the judge to either review it or

13       just give it to defense counsel and say what

14       inconsistencies do you see between the

15       testimony you just heard and this statement.

16          So it wasn't a matter of us determining

17       if there is an inconsistency.  As soon as they

18       testified, the defense attorney was entitled

19       to the statement.

20  Q    You were asked questions earlier about being

21       aware of whether witnesses who testified in

22       the criminal trial of Andrews were

23       intimidated.  And you said that you did not

24       know of any.

25          My understanding from the answer is you

1     don't have any recollection one way or the

2     other whether any of the witnesses who

3     testified in the Andrews' case were or were

4     not ever intimidated?

5  A   Yeah, at minimum that would be that way.

6  Q   You were asked questions about Exhibit L-7.

7     About the notes in the middle of the page

8     regarding the palm print.

9         But when you were being asked those

10    questions, you were not given the opportunity

11    to look at all of your notes about SIU

12    communications.  So I'm going to put in front

13    of you, along with Exhibit L-7, Exhibit L-2.

14        You've testified before that Exhibit

15    L-2 is your handwriting, correct?

16  A   Yes, L-2.

17  Q   You testified at the bottom of the page that

18    there is a notation that you made from

19    speaking to the SIU Unit, correct?

20  A   Right.  "Palm print too smeared to be compared

21    for SIU 2-20-75."

22  Q   Now when you were asked questions about L-7,

23    you were asked what date you may have made the

24    notes in the middle of the page on L-7.

25  A   Yeah, they are comparable.

1    Q      Looking at Exhibit --

2    A      Yeah, I have got no definite.  But, I mean, if

3           that's the date I made that observation.

4    Q      Would it be a fair and logical assumption that

5           the handwritten notes you made on Exhibit L-7

6           were made either on or after the -- what is

7           the date, February 20, 1975?

8           MS. GELSOMINO:    Objection.

9    Q      Is that the date here?

10    A      Yes, it is.

11           It's a fair one.  I mean, I can't say

12           definitely, but it's a fair one.

13    Q      And in your notation from speaking to the SIU

14           Unit, your notation says palm print too

15           smeared to be compared.

16           Does your notation on L-2 say anything

17           about the palm print being compared to any --

18           strike that.

19           Does the notation on L-2 indicate that

20           the palm print was too smeared to be compared?

21    A      That's correct.

22    Q      In cases that you typically handled, when you

23           learned from an SIU Unit that a palm print was

24           too smeared to be compared, was there any

25           reason in your experience to ask additional

1            questions on whether that same palm print

2            could be compared to particular witnesses?

3                 MS. GELSOMINO:   Objection.

4  A     No.  Once they tell us they can't compare it,

5            they are not going to listen to us anyhow.  I

6            mean, if they say we can't compare it and we

7            say, well, we want you compare it with

8            something else, they are not going to do that.

9            I mean, they already said it's too smeared or

10           opaque to be compared.  They are just not

11           going to do it.

12  Q    From your notation that you made on Exhibit

13           L-2, is it a fair interpretation of your note

14           that the SIU Unit was indicating to you that

15           the palm print was too smeared to be compared

16           to anyone's print?

17                 MS. GELSOMINO:   Objection.

18  A    That's the inference.  If they say it can't be

19           compared, that's for everybody.  There is no

20           exception.

21  Q    You have reviewed several times Exhibit L-7,

22           which references Willie Watts.  You reviewed

23           Exhibit L-8, which again references Willie

24           Watts being arrested.  And you were looking at

25           Exhibit L-9, which has references of Willie

```
 1              Watts being released by the police.
 2                   All of these supplemental reports, L-7,
 3              L-8, L-9, these are supplemental reports that
 4              have markings on it from you, correct?
 5   A          Yes.
 6   Q          And all of these exhibits, L-7, L-8, L-9, are
 7              all exhibits that were in the prosecutor's
 8              file when you worked on the file back in 1974
 9              or 1975?
10   A          Yes.
11                   MS. GELSOMINO:    Objection.
12   Q          Turning your attention to Exhibit L-3.  Now,
13              in your questioning by Sarah here, at some
14              point you were asked the question do you know
15              who Mary Smith was.  But when you were asked
16              that question, you were not given the
17              opportunity to have your notes in front of
18              you.
19                   I'm now showing you your notes that you
20              previously talked about in Exhibit L-3,
21              correct?
22   A          Right.
23   Q          On the bottom of the page of L-3, there are
24              some handwritten notes that you made about
25              Mary Smith, correct?
```

| | | |
|---|---|---|
| 1 | A | Right. |
| 2 | Q | Why don't you go ahead and read those notes |
| 3 | | for me. |
| 4 | A | "Called witness 2-19-75. Witness recalls |
| 5 | | seeing defendant and victim alive presumably |
| 6 | | on the date of murder, and doesn't remember |
| 7 | | dates too well, but is positive that she and |
| 8 | | Worthy see defendant" -- "saw defendant |
| 9 | | talking to wife -- victim around 8:11 a.m. on |
| 10 | | date in question." I can't read the rest of |
| 11 | | it. |
| 12 | Q | The rest of it on the bottom of that page? |
| 13 | A | Yeah, "Seems like a good witness." |
| 14 | Q | And then the notations on the side here. |
| 15 | A | Yeah. "Defendant must be lying. This witness |
| 16 | | too honest. No reason to lie." |
| 17 | Q | After reviewing your notes that we see on |
| 18 | | Exhibit L-3, I now ask you, do you know who |
| 19 | | Mary Smith is or was in this matter? |
| 20 | A | Yeah. Sure I do. She is a witness. But what |
| 21 | | was asking me, in all fairness, what she was |
| 22 | | asking me, I don't know who Mary Smith is. I |
| 23 | | mean, I don't remember sitting down and |
| 24 | | talking to her and meeting with her. But I |
| 25 | | know from this I had to talk to her |

```
 1            extensively to get this much information down.
 2   Q        You were also asked questions several times
 3            about whether you remember when you made
 4            certain notations that we see on Exhibits L-1
 5            through L-13.  And it's true, is it not, that
 6            in some of these notes you mention specific
 7            dates?
 8                    For example, if we look at Exhibit L-2
 9            again --
10   A        Right.
11   Q        -- your reference on Exhibit L-2 of speaking
12            with the SIU Unit has a date on it, correct?
13   A        Right.
14   Q        If we look at Exhibit L-3, that we just noted
15            on the bottom of the page, you made a notation
16            of the date you spoke to Mary Smith, correct?
17   A        Right.
18   Q        So it's true, is it not, that in Exhibits L-1
19            through L-13 that there are some specific
20            references of dates when you made the
21            notations?
22   A        There are.
23   Q        For all of those other notations that we see
24            in Exhibits L-1 through L-13, even though you
25            may not recall the specific date, it's true,
```

1          it is not, that all of your notations were

2          made before Isaiah Andrews went to trial for

3          the murder of his wife?

4     A    Yes.

5               MR. CALDERONE:     Give me one second.

6          Let's take a quick break.  I may be done.

7               THE VIDEOGRAPHER:  We're off the record

8          at 3:12.

9                    (Recess taken.)

10              THE VIDEOGRAPHER: We're back on the

11         record 3:13.

12              MR. CALDERONE:     Those are all

13         questions I have.

14              MR. MENZALORA:     Nothing from the

15         City.

16              MS. GELSOMINO:     You have nothing,

17         right?

18              MR. LAMBERT:     No.

19              MS. GELSOMINO:     I don't have any

20         further questions for you, Carmen.

21              I just want to be clear, you -- this

22         was not noticed as a trial deposition.  So to

23         the extent that you believe it to be so, I

24         object.

25              MR. CALDERONE:     Okay.  I don't know

1          that the Federal Rules designate a trial

2          deposition.

3                    MS. GELSOMINO:    Okay.  Just for the

4          record.  There it is.

5                    Thanks very much.

6                    THE WITNESS:    Okay.

7                    MR. CALDERONE:    Mr. Marino, would you

8          like the opportunity to review this

9          transcript?

10                    THE WITNESS:    No.

11                    MR. CALDERONE:    You want to waive

12          that right?

13                    THE WITNESS:    Right.

14                    MR. LAMBERT:    You have the right to

15          review it and make corrections.  But to do

16          that, you have got to order the transcript.

17                    THE WITNESS:    Then who is going to

18          pay for it?

19                    How big is this transcript going to be?

20          It's going to be this big, isn't it?  You can

21          answer the question.  You can say anything you

22          want.

23                    MR. CALDERONE:    We will order the

24          transcript.  And if you'd like you can reserve

25          the right to review it and waive it later.

1              THE WITNESS:      That's fine, that's
2      what I'll do.
3              MR. LAMBERT:      Most people waive.
4              THE WITNESS:      That's fine.
5              THE VIDEOGRAPHER: We are off the record
6      at 3:15.
7              (Deposition concluded at 3:15 p.m.)
8              (Signature not waived.)
9                          - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  SIGNATURE PAGE

2  In Re:      Isaiah Andrews vs. City of Cleveland

3  Case Number:  1:22-CV-00250

4  Deponent:    Carmen Marino

5  Date:        3/3/23

6

7  To the Reporter:

8      I have read the entire transcript of my

9  Deposition taken in the captioned matter or the same

10  has been read to me.  I request that the following

11  changes be entered upon the record for the reasons

12  indicated.

13      I have signed my name to the Errata Sheet and

14  the appropriate Certificate and authorize you to

15  attach both to the original transcript.

16

17

18

19                          _____

20                          Carmen Marino

21      Subscribed and sworn to before me this

22  _____day of _____, 2023.

23

24                          _____

25  My commission expires:_____.

1 I have read the foregoing transcript from page 1

2 through page 375 and note the following corrections:

3 PAGE-LINE      REQUESTED CHANGE      REASON FOR CHANGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

_____      _____
25 Carmen Marino                          Date

```
 1  State of Ohio,          )
                            ) SS:   CERTIFICATE
 2  County of Cuyahoga,     )
```

 3       I, Constance Versagi, Court Reporter and

 4  Notary Public in and for the State of Ohio, duly

 5  commissioned and qualified, do hereby certify that

 6  the within named witness, Carmen Marino, was by me

 7  first duly sworn to testify the truth, the whole

 8  truth, and nothing but the truth in the cause

 9  aforesaid; that the testimony then given by him was

10  by me reduced to stenotypy/computer in the presence

11  of said witness, afterward transcribed, and that the

12  foregoing is a true and correct transcript of the

13  testimony so given by him as aforesaid.

14       I do further certify that the testimony given

15  by the witness was video/audio recorded and that the

16  video recording hereto attached is a true and

17  correct visual and audio reproduction of the

18  testimony given by him.

19       I do further certify that this deposition was

20  taken at 3340 Rocky River Drive, Cleveland, Ohio on

21  February 28, 2023, and was completed.

22       I do further certify that I am not a relative,

23  counsel, or attorney of either party, or otherwise

24  interested in the event of this action.

25

1          IN WITNESS WHEREOF, I have hereunto set my

2   hand and affixed my seal of office at Cleveland,

3   Ohio, on this 3rd day of March, 2023.

4

5

6   Constance Versagi, Court Reporter and
    Notary Public in and for the State of Ohio.
7   My Commission expires January 14, 2028.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# A

abbreviation (1)
245:2
abide (1)
334:3
able (4)
286:8,21;298:16;
310:20
above (1)
288:11
absolutely (6)
239:15;296:19;
331:15;334:4;340:1;
352:22
access (1)
230:22
accidentally (2)
245:24;335:6
according (1)
289:13
accounts (1)
337:25
accuracy (1)
275:13
accurate (7)
223:4;229:23;
235:1;255:3;273:6;
275:18,21
accurately (1)
209:12
accused (1)
169:20
acquitted (1)
234:5
across (2)
301:11;317:12
action (1)
354:12
actions (6)
207:25;208:4;
322:10,16;323:1,5
actual (2)
306:5;316:18
actually (29)
168:11;209:19;
218:25;238:10;
246:8;247:14;
249:23;254:13;
255:15;256:18;
261:1,5,11;266:19;
275:2;276:17;280:5;
286:15;290:3;293:5;
301:2;306:2,5;312:3,
10;323:21;331:23;
332:4;345:3
Adam (1)
267:10
add (4)
170:2;251:16;
252:20;301:20
added (6)

188:1;274:13;
321:3;325:5,6,19
addition (2)
196:18;217:3
additional (3)
191:22;254:3;
364:25
address (6)
243:19;245:8,20,
25;246:1;270:6
administration (1)
346:12
administrator (1)
181:6
adopted (1)
346:6
adopting (1)
346:1
Adrine (3)
180:10;181:21;
186:8
Adrine's (1)
244:17
advance (2)
219:25;221:17
advise (1)
219:9
afraid (3)
177:17;245:18,19
Africa (7)
230:10,25;231:23;
232:6;236:23;237:2;
322:9
afternoon (2)
171:23;347:24
afterwards (1)
339:24
again (12)
166:10;191:4;
234:3;276:19;
289:22;304:12,15;
313:5;321:17;
337:13;365:23;368:9
against (12)
190:25;226:21;
227:5,8,20,21;
228:18;277:25;
280:8;315:23;317:5;
358:8
age (1)
166:5
agency (1)
356:1
Agent (10)
228:24;229:21;
230:21;231:11,17,21,
24;234:19;235:15;
243:10
agents (1)
229:18
agent's (1)
235:9
aggravated (3)

171:13,14;190:1
ago (1)
361:24
agree (8)
201:4;226:3;279:7;
284:4,15;292:24;
293:20;316:6
ahead (18)
179:18;190:13;
192:1,23;195:3;
204:16;206:18;
216:17,18;221:5;
229:9,11;273:10;
286:15;291:21;
315:10;348:12;367:2
alibi (4)
197:2,24;275:16;
277:14
alibis (1)
275:15
alive (2)
231:4;367:5
Allen (1)
349:11
Allen's (1)
352:8
allow (1)
310:4
allowed (2)
336:19;339:23
Almost (3)
214:11;247:16;
310:7
along (5)
187:3,7;325:21;
359:7;363:13
alternate (5)
278:5,17,21;279:1,
8
although (2)
317:19;319:21
always (9)
167:5;175:16;
196:1;199:15;
275:19;276:23;
302:5;359:8,19
among (1)
323:16
amount (1)
185:19
Andrews (25)
178:13;195:20;
226:21;229:7;
231:10,25;236:16;
242:16;259:22;
260:10;277:13;
278:4;282:6;284:25;
286:7;316:23;
317:13;318:15;
319:1,6;320:23;
322:11;340:11;
362:22;369:2
Andrews' (16)

175:1;182:2,7;
185:18;195:21;
199:9;200:4;229:2;
231:16;255:6;259:7;
260:6,11,13;277:24;
363:3
animosity (1)
215:25
Annotated (1)
330:9
anodized (1)
330:8
answered (5)
250:4;278:8;
291:14;292:5;295:9
apart (1)
241:18
apologize (2)
268:22;313:10
apparent (1)
236:20
apparently (4)
206:10;278:23;
283:25;292:20
appeal (3)
202:19;335:23;
336:4
appeals (8)
200:18;240:22;
324:3,4;335:15,19,
22,24
appear (1)
305:18
appeared (1)
286:9
appears (6)
253:21;267:22;
288:8,13;306:3;
309:6
appellate (5)
200:25;201:1,23;
202:2;335:21
appellee (1)
202:17
appellees (1)
203:6
applicable (1)
172:8
appreciate (1)
170:10
apprised (2)
205:16;334:1
apprising (1)
333:20
approval (3)
188:5;213:4;
326:25
approvals (1)
327:2
approve (3)
289:11,14;325:10
approved (3)
289:7;324:7,24

approving (4)
265:17,20;289:18;
325:7
approximate (1)
176:12
approximately (2)
199:8,19
arcane (1)
230:14
area (1)
247:21
arenas (1)
327:8
argument (3)
310:10;339:18,18
arising (1)
356:21
arose (1)
354:14
around (9)
168:23;169:1;
176:19;202:12;
231:5;285:18;
301:12;308:4;367:9
arraignment (1)
191:8
arrest (9)
265:4,12,15,25;
280:6,10;282:15;
286:17,20
arrested (4)
286:15;317:1,2;
365:24
arrive (1)
277:11
aside (2)
344:24;350:25
aspects (2)
187:12;234:11
assigned (17)
166:15;172:15;
173:12;174:17;
179:2,13;181:15,18;
191:9;204:3;260:13;
261:10;265:8;289:5;
290:7,12;323:9
assignments (1)
181:11
assist (1)
325:20
assistant (10)
177:21;247:22;
324:6,7,10,11,13;
325:15,21;336:22
assistants (2)
181:10;360:2
assume (3)
205:19;249:11;
317:2
Assumes (1)
278:9
assuming (3)
245:3;291:17;

315:4
**assumption (1)**
364:4
**attach (2)**
256:6,9
**attached (4)**
253:8,9;259:24;
266:3
**attempting (1)**
283:25
**attention (8)**
192:11;195:13;
219:18;230:6;243:2;
330:5;338:10;366:12
**attitude (1)**
296:2
**Attorney (12)**
242:21;251:17;
252:21;279:14;
280:20;310:5,7;
317:25;323:14;
339:22;354:10;
362:18
**attorneys (5)**
175:14,17;177:8;
296:15;306:13
**automatically (1)**
223:17
**autopsy (1)**
315:8
**available (1)**
268:2
**Avenue (1)**
243:23
**avoid (1)**
329:13
**aware (18)**
206:12;217:7,25;
221:20;228:17;
273:7;274:21;278:3,
25;287:20;321:6,10,
15;322:25;323:4;
354:13;356:20;
362:21
**away (4)**
180:15;266:9;
284:2;333:16

**B**

**back (53)**
168:2;171:10;
173:4;174:13,19;
180:3,25;185:12;
186:22;188:5;
207:11,15;208:14;
215:15;217:17;
220:17,21;230:9,24;
231:14,23;232:6;
236:22;237:2,10;
240:10;242:3,4;
247:13;250:22;
259:10;260:19;

261:18;266:14;
271:13;273:14;
281:21;289:22;
303:24;313:22;
314:3;320:3;322:9;
324:9;334:13;
335:14;336:20,20,21,
24;345:16;366:8;
369:10
**background (7)**
225:7;230:20;
240:20;282:6,7;
286:7;321:25
**backwards (1)**
262:7;318:6
**bad (1)**
328:17;329:4
**bag (1)**
226:16
**bailiff (1)**
239:22
**bailiwick (1)**
233:8
**bar (4)**
338:22,23;353:24;
362:10
**Barbara (1)**
254:16
**barely (1)**
292:10;360:25
**bargain (1)**
220:4
**bargaining (1)**
268:4
**base (1)**
285:25
**based (13)**
201:18;206:22;
210:2;236:11;249:3;
254:22;255:16;
278:22;310:5;315:2,
3;319:18;329:8
**basic (2)**
202:22;266:1
**basically (2)**
250:9;339:8
**basics (1)**
166:24
**basing (1)**
311:12
**basis (5)**
179:19;261:25;
327:15;330:2;358:19
**basketball (2)**
349:16,17
**Bates (9)**
191:10,12;210:17;
214:1;222:15;
253:15;304:4;343:2,
15
**became (6)**
197:7;233:12;
260:3;320:11;

354:13,22
**becomes (1)**
358:10
**beginning (6)**
189:11;213:20;
242:2,4;273:14;
337:13
**behind (2)**
292:13;334:18
**Bell (1)**
197:21
**Below (2)**
243:5;288:22
**bench (1)**
346:3
**bend (2)**
174:11,13
**benefit (1)**
259:9
**Besides (1)**
325:6
**best (1)**
292:15
**bet (1)**
290:5
**better (6)**
178:22,23;325:18;
327:19;349:17;352:8
**Betty (9)**
215:16;216:7;
217:22,24;226:24;
227:18;228:4,18;
321:11
**big (7)**
169:23;172:1;
266:9;349:16;352:9;
370:19,20
**Bill (10)**
261:2,4,17,20,25;
264:20;274:21,24;
297:2,8
**bind (4)**
190:15;359:11;
360:4;361:4
**binder (13)**
202:1;208:14,17;
209:1,2;210:20;
237:13,20;239:11;
241:3;242:2;266:9,
14
**binders (2)**
172:1;203:13
**binding (2)**
190:19;359:16
**bindover (5)**
358:18;359:6,8;
360:3,11
**bindovers (1)**
359:23
**bit (1)**
248:23
**Black (2)**
285:8;350:6

**Blacks (7)**
230:9,24;231:23;
232:6;236:22;237:1;
322:9
**blood (5)**
300:25;301:1,9,10;
315:20
**bloody (2)**
295:15;298:12
**blunt (1)**
299:2
**bluntly (1)**
197:18
**Bob (3)**
175:20;324:22;
325:15
**body (6)**
287:10,10;316:22;
317:13,21;318:14
**bombed (2)**
233:25;234:17
**bombing (2)**
234:8,12
**book (1)**
326:15
**booth (2)**
197:5,10
**Borland (2)**
262:16;263:2
**both (8)**
187:13;193:15;
204:4;206:1,2;
223:15;301:6;308:12
**bottom (16)**
201:22;219:9;
252:1;288:4;289:6;
290:24;303:4,4,12;
343:3,17;345:20;
363:17;366:23;
367:12;368:15
**bound (2)**
170:8;191:3
**box (1)**
174:9
**boxed (2)**
243:1;245:2
**boxes (1)**
174:14
**bracket (1)**
283:15
**Brady (3)**
356:14,18;357:17
**Brand (1)**
166:21
**break (7)**
175:18;197:3;
208:11,13;237:6;
319:24;369:6
**brief (2)**
202:16;203:6
**bring (19)**
189:10;191:5,22;
192:5,7,16;193:18;

194:2;195:15;213:3;
220:23;298:10,11;
358:7,25;359:16,19,
24;360:18
**bringing (1)**
192:10
**broken (2)**
178:18,25
**brother (1)**
349:17
**brothers (1)**
194:13
**brought (4)**
189:4,20;314:17;
362:3
**Building (2)**
259:17,17
**buildings (1)**
188:11
**bullet (2)**
184:10,12
**bunch (2)**
200:11;343:4
**bunched (1)**
285:17
**burglary (1)**
169:16
**burned (1)**
196:12
**business (3)**
190:17;315:21;
334:14
**bypass (1)**
359:4

**C**

**Cables (4)**
345:21,25;346:14,
15
**CALDERONE (116)**
179:17;185:25;
187:23;190:13;
191:25;192:20,25;
193:20;194:8;
195:18;199:17;
200:15;201:9;
202:14;203:15;
204:12,16;205:23;
206:17;208:23;
209:22;210:16;
211:12;212:21;
213:6,25;214:17;
216:14,17,17:9,16;
218:11;222:13;
226:5;228:2,9,20;
229:8,17;230:3;
231:19;234:25;
237:19,23;240:5;
250:3,7;253:14;
254:8;258:6,10;
260:7;265:11;
269:24;271:1;273:9;

276:9;277:18;278:7;
279:11;280:13;
282:25;284:18;
286:25;290:14,19;
291:13;292:4;293:4;
294:7;295:8;298:25;
301:3;302:16,25;
303:3,7;304:3,13;
307:16,19;311:1;
312:7,25;313:6,24;
322:22;323:3;
330:24;332:16;
335:8;337:7;338:16;
340:7;341:11,24;
345:5;347:14;
348:11;350:20;
352:19;353:17;
354:17;355:22;
356:4,16,24;357:20;
358:12;361:20;
369:5,12,25;370:7,
11,23
**call (27)**
197:11;216:21,25;
220:24;224:25,25;
225:20;232:22;
233:15;235:3;
268:17;270:5;277:3;
301:25;302:4,9;
314:4;315:7;316:7;
319:3,9;321:24;
338:22;339:25;
347:17,22;360:10
**called (20)**
190:15;195:12;
197:4,5;230:6;233:1;
234:19;268:11;
273:3,25;307:22;
308:21;314:8;316:4,
11;318:23;319:8,11;
341:23;367:4
**calling (7)**
231:21;243:2;
299:13;319:9,19,19;
347:18
**Calls (4)**
280:14,15,16;
324:17
**came (32)**
166:19;171:10;
179:7;187:18;
188:14,19,22;191:12;
196:4;197:2;203:11,
14;204:6,20;211:17;
225:15;252:23;
270:23;271:25;
316:25;321:5;322:5;
328:10;332:6;333:3;
334:12;335:16;
336:1;354:5;358:19,
22;360:13
**Campbell (1)**
254:16

**can (68)**
173:2,16;179:6;
193:1;194:11;201:4;
206:19;208:14,14,19,
23;212:18,20,24;
215:21;217:16;
224:5;232:14;236:6;
238:9,13;240:2,25;
242:1;245:6,14;
246:19;247:21;
248:7,12;249:15,20;
252:3;253:18;
255:17;256:16;
259:2;260:9;261:4;
263:14;264:24;
266:9;267:2;269:5;
273:13;279:6;
285:22;292:15;
302:13;311:2,23;
313:12,19;332:1,10;
333:6,23;340:12,18;
342:8;344:24;
346:20;349:16;
355:25;357:14;
370:20,21,24
**capital (1)**
327:10
**card (2)**
198:15;335:18
**cardboard (1)**
241:23
**cards (2)**
198:6,10
**care (3)**
291:21;326:23;
331:1
**career (4)**
207:4;287:3;
322:17;329:22
**CARMEN (10)**
166:4,10;203:4;
209:1;214:24;259:3;
301:8;361:17,22;
369:20
**Caroline (1)**
243:23
**case (220)**
166:15;167:20,21,
24;168:9,13;170:5,
24;171:7;172:22;
174:3,7;175:2,11;
176:25;178:1,13;
179:14;180:4,6,10,
11,14,18,24;181:1,
21,23,23;182:1,2,7,9,
11,16,20,22,23;
183:3;185:9,18,21;
186:1,14,16,20;
187:11,12,14;189:12;
191:9;195:15,18,21,
25;196:1,20;197:1;
199:5,9;200:12,14,
21;202:12;204:2,20,

25;205:6,12,17;
206:10,12,20,20;
207:13,14,15,25;
208:4;214:12;
219:17,22,23;220:4,
7,8;221:23;224:3;
225:10,25;226:4;
228:7,12,16;230:22;
232:8,16;233:1,24;
236:8;239:9;240:24;
241:13,13;243:4;
246:8,21;248:4,8,10;
252:6,10;254:15;
255:6,10,18;256:1,
11,13;258:24,24,25;
259:7,19,20,21;
260:11,13,18,21,23;
261:2,10;262:14,18,
20,23;263:19,23;
264:4,7;265:9,24;
272:9,22;273:2,7;
274:22;275:20,22;
276:1;277:13;278:4;
279:25;281:10,21;
282:5,16;287:2,4,6,8;
289:25;295:4;296:2,
15;297:10;298:7;
301:24;302:5,6,12,
23;305:24;306:22;
308:5;311:3;315:3,
12;318:2;320:23;
321:7,13;322:11,16;
323:1,5,13,18;326:2,
5;327:6,7,10,16,18;
331:12,17;340:5,14,
20;341:8;342:12;
344:19;346:10,18,21;
347:4,19;358:4,4,15,
25;359:3,11,24;
360:4,17,18,25;363:3
**cases (45)**
167:7;168:20;
169:7;170:1;171:21;
173:13,15,17,23;
174:17;177:17,24;
178:3;180:17;
183:14;184:21;
191:5;192:3;196:2;
206:22;207:11;
219:25;229:4;233:5,
8,23;235:13;248:4;
259:5;287:9;323:10,
16;325:1;326:11,12;
327:21;330:16,21;
335:24;341:21;
346:8;347:8,23;
350:12;364:22
**catch (1)**
209:6
**category (1)**
173:15
**Center (2)**
333:9;336:15

25;205:6,12,17;
**certain (5)**
248:4;270:12;
325:11;350:12;368:4
**certainty (2)**
212:25;267:2
**certified (1)**
166:6
**certify (3)**
245:12,15;246:3
**chair (1)**
186:7
**change (6)**
184:24,24;332:18;
333:18;334:2;352:24
**changed (1)**
171:11
**changes (2)**
218:5;262:2
**changing (1)**
337:23
**character (1)**
282:4
**characterize (1)**
280:17
**charge (4)**
224:8;248:22;
249:12;340:8
**charges (12)**
190:25;191:1;
226:25;227:5,8,10,
19;228:17;265:17,
20;280:7;358:7
**Charles (1)**
260:15
**Charlie (10)**
180:4;181:1;186:5,
11,19;204:2;205:7;
262:25;268:16;
301:24
**chart (1)**
173:21
**check (17)**
174:7;197:9,19;
198:1;223:5,6;
224:10,14,17;251:15;
253:2;268:25;269:5,
10;297:25;302:13;
343:18
**checked (1)**
197:19
**chemical (2)**
321:19;322:4
**Chief (9)**
197:8;230:21;
255:4;320:12;324:5;
325:11,17,24;332:7
**chiefs (1)**
324:2
**choice (1)**
358:23,24
**chronologically (1)**
212:10
**Chuck (2)**

208:7;244:14
**circle (1)**
242:22
**circled (1)**
243:21
**circles (1)**
244:13
**circumstances (2)**
242:25;245:9
**cities (1)**
333:20
**City (18)**
167:1,2;190:11;
191:1;204:21;
229:22;284:2;
320:13;358:3,8,11;
359:4,7;360:1,17,19,
23;369:15
**CK (1)**
223:2
**claim (2)**
198:16;295:20
**clarification (1)**
313:19
**clarifications (1)**
209:10
**clarify (1)**
319:18
**clarifying (2)**
209:6;220:18
**clarity (2)**
292:23;295:13
**clear (20)**
175:8;205:5;
222:13;229:10;
243:12;279:17;
280:3;292:11,19;
293:17;294:12,15,23;
295:7,17;297:17;
298:1;299:25;
300:15;369:21
**clearly (2)**
200:11;247:10
**clerk (2)**
267:11,16
**Cleveland (18)**
167:1;190:15,17,
18;197:8;229:19;
231:12;235:6;
243:24;265:4,14;
320:9,10,10;351:4,5;
358:22;359:9
**Cleveland's (1)**
229:22
**close (2)**
275:12;349:13
**closer (1)**
220:25
**closing (1)**
339:18
**clothing (1)**
253:6
**Cloud (11)**

223:2,3;224:10;
225:11,14;226:3;
228:4,8,19;281:25;
321:16
**coat (1)**
284:1
**code (1)**
330:6
**coin (1)**
291:2
**colleague (1)**
176:24
**colleagues (1)**
233:13
**Colonial (1)**
267:11
**combination (1)**
238:22
**coming (7)**
171:22;219:20,25;
221:24;226:15;
312:19;320:24
**committed (8)**
189:25;236:10;
282:5;283:21;284:6;
285:2,6;286:2
**common (5)**
182:15;216:2;
328:24,25;341:10
**communicate (2)**
284:7,12
**communications (1)**
363:12
**Comodeca (2)**
350:22,23
**comparable (9)**
292:17;294:20;
299:21,24;309:15,24;
311:5;317:9;363:25
**compare (27)**
204:17;253:23;
257:16;292:19,23;
293:18;294:1,12,15;
295:7,17;298:23;
299:4;300:1,15;
309:5;311:3,6,8;
314:21;316:16,19;
317:7;318:25;365:4,
6,7
**compared (25)**
185:4;215:22;
217:21;273:11;
274:4,16;293:10;
294:3;295:1,22;
298:21;300:3;
310:21;311:24;
316:13;319:5;
363:20;364:15,17,20,
24;365:2,10,15,19
**comparing (1)**
317:10
**comparison (3)**
304:23;315:19,20

**compass (2)**
329:3,9
**complain (1)**
326:4
**complaints (1)**
324:14
**complete (9)**
170:23;203:24;
249:12,12;266:2;
276:23;305:16,18;
334:12
**completed (2)**
167:21;261:1
**complicated (1)**
184:22
**complications (1)**
182:17
**compound (1)**
212:22
**concentrated (1)**
317:12
**concentrating (1)**
236:8
**concluded (2)**
299:22;371:7
**conclusion (15)**
185:3;220:5;
280:16;284:4;
294:11,13;299:3,11;
300:6,18,22;302:4;
311:4,15;312:11
**conclusions (1)**
304:21
**condense (1)**
194:1
**conduct (1)**
357:8
**conducted (1)**
200:3
**conference (1)**
338:22
**confirm (1)**
273:5
**conflict (1)**
223:18
**confusing (1)**
217:20
**connecting (2)**
279:1;287:21
**connection (4)**
236:4,5;237:1;
320:25
**conscientious (1)**
198:13
**consider (2)**
279:17;340:19
**considered (3)**
338:14,19;348:21
**consistent (5)**
208:1,5;322:11,18;
358:23
**consultation (2)**
213:4;216:25

**contact (10)**
183:8;219:10;
267:13,14,15,19;
268:11;269:9;289:4;
314:12
**containing (1)**
166:21
**contains (1)**
209:3
**continue (1)**
271:17
**continuing (1)**
328:6
**conversation (6)**
186:10;235:21;
236:25;294:25;
295:24;313:11
**conversations (4)**
217:2;295:4;
296:18,21
**convicted (1)**
234:4
**conviction (1)**
357:9
**convictions (1)**
356:20
**Coolis (1)**
194:15
**COP (1)**
174:23
**copies (5)**
172:24;189:6;
250:6;296:6;334:18
**copious (1)**
341:2
**copy (8)**
192:8;193:2,14;
209:20;210:1;250:5;
253:24;296:9
**corner (4)**
167:4,16;343:3,16
**coroner (6)**
254:16;272:21,25;
273:3;276:1;302:21
**coroner's (10)**
170:22;253:7;
254:17;272:25;
276:5,18,20;301:16;
305:20;306:11
**corrections (1)**
370:15
**Corrigan (13)**
219:8,13;242:21;
244:23;245:4,17;
323:23;325:25;
326:3;332:1;333:19;
334:5;357:6
**Corrigan's (2)**
219:15;261:7
**Counsel (6)**
209:19;245:14;
253:11;306:15;
339:3;362:13

**count (1)**
169:15
**counted (1)**
259:22
**County (16)**
167:11;188:20;
190:18;191:1,3,6;
264:9;333:21;
346:12;356:21;
358:9;359:12;360:5,
19,21;361:5
**couple (4)**
209:9;215:13;
341:21;347:9
**course (8)**
194:24;197:17;
264:6;317:4;322:17;
329:22;341:1;358:4
**court (23)**
190:16,19;224:3;
238:22;240:14,20;
241:10;245:11;
246:3;248:25;
249:10,11;260:4;
309:19,22;324:3,4;
330:19;345:17;
346:11;359:9;360:4;
361:11
**Courthouse (1)**
259:13
**courtroom (5)**
183:20;260:14;
326:9;18;336:17
**Courts (2)**
259:4;302:6
**court's (2)**
238:15;248:8
**cover (2)**
168:6;256:24
**covered (2)**
315:17;331:5
**Crawford (1)**
290:12
**create (4)**
207:20,23;257:11,
13
**created (2)**
240:15;257:4
**creates (1)**
257:6
**crime (20)**
169:9,11,20;171:8,
15;197:1;229:4;
233:7,24;234:10;
235:12;236:9,10;
269:7;282:5;283:21;
285:2,7;286:3;
287:21
**crimes (3)**
189:24;191:1,1
**criminal (3)**
228:17;238:16;
262:3;362:22

**criticism (1)**
327:13
**cross (1)**
292:8
**cross- (1)**
339:5
**crossed (10)**
291:11,11;292:14,
25;293:15;299:7,19;
303:17;304:18;
311:16
**crossed-out (1)**
310:17
**CROSS-EXAMINATION (2)**
166:8;339:13
**crossing (1)**
303:23
**cross-reference (1)**
248:8
**current (2)**
231:9;355:5
**cut (6)**
248:19;249:8;
302:19;303:6,10;
359:20
**Cuyahoga (2)**
333:20;356:21

## D

**Danny (6)**
197:14,22;229:5;
233:20,22;234:6
**dare (1)**
336:13
**dash (1)**
208:21
**date (37)**
167:23;174:4;
188:17,17,18,21;
207:19;212:3,18;
214:15;215:11;
221:1,24;247:17,22;
248:1,14;251:8;
260:20;263:4;272:8;
274:3;277:12;
317:20;318:19,22;
347:10;355:4;
363:23;364:3,7,9;
367:6,10;368:12,16,
25
**dated (7)**
212:1;213:24;
246:19,20;305:3;
318:8,13
**dates (8)**
184:24;215:13;
221:8;274:11;321:5;
367:7;368:7,20
**Dave (3)**
262:16;331:19;
352:7
**David (1)**

263:2
**day (17)**
181:17;189:15;
216:5;221:12,13;
248:9;267:16;
277:17,25;299:7,12,
16;318:13;324:18;
330:19,20;359:23
**days (10)**
171:24;174:11;
180:15;185:18;
197:13,22;205:20;
299:17;317:16;
327:21
**dead (1)**
316:22
**deal (1)**
320:13
**dealing (1)**
341:17
**death (10)**
171:10;273:8,21,
24;274:22;275:1,10,
12;278:1;317:20
**decades (1)**
347:9
**deceased (1)**
234:2
**December (6)**
179:22;246:20;
262:10;263:16,16;
317:24
**decide (3)**
281:1,5;337:15
**decided (4)**
268:16,16;285:4;
324:19
**decides (1)**
302:5
**decision (4)**
181:2;329:4;354:9;
359:17
**decisions (1)**
240:21
**defendant (40)**
167:14;169:6,15,
17,18;197:4,5;
214:10;215:23;
226:15;234:4,5;
235:15;236:10;
269:6;292:18;
293:10;294:21;
298:21,22;299:5,21;
300:3;307:24;308:9,
14;309:18;310:20,
23;312:6;316:6,8,17;
330:23;331:3;
348:14;367:5,8,8,15
**defendants (3)**
169:11,12,19
**defendants' (1)**
167:15
**defendant's (22)**

169:9;292:3,21;
293:9,14,25;294:3,
14,17;295:2,18,23;
297:13;300:4;
308:15,16;309:7,24;
310:9,11;311:25;
341:13
**defense (32)**
194:24;245:14;
251:17;252:21;
253:11;254:5;255:1;
256:14;264:17,18;
279:14;280:10,20;
281:3,11,16;284:8,
13;296:20,22;
305:23;306:6,14;
310:4,7;317:24;
339:3,22;353:24;
354:10;362:13,18
**deficient (1)**
289:21
**definable (2)**
309:4;314:20
**define (1)**
292:11
**definite (2)**
221:10;364:2
**definitely (5)**
215:5;243:25;
267:6;347:18;364:12
**definiteness (1)**
295:13
**degree (5)**
171:11,12;189:25;
212:25;326:23
**deliberately (1)**
223:14
**deliveries (1)**
196:3
**delivering (1)**
188:2
**demonstration (1)**
199:6
**Department (9)**
229:19;231:12;
265:5,15;276:14;
332:5;336:8;348:5;
358:21
**departments (1)**
332:24
**depends (3)**
224:23;279:13;
339:20
**depo (1)**
209:4
**Deposition (5)**
209:1;342:25;
369:22;370:2;371:7
**describe (2)**
298:13;340:18
**described (2)**
183:15;191:21;
289:2

**describing (1)**
168:3
**designate (1)**
370:1
**desk (4)**
188:3,4;191:22;
267:11
**destroy (1)**
353:7
**detective (12)**
192:4;194:15;
197:7;219:9;224:15;
225:1;230:21;
268:18;320:9,21;
350:11;352:5
**detectives (14)**
171:6;188:2;189:5;
190:9;192:15;
193:24;194:16;
196:21;197:6;
221:19;224:16;
340:8,24;341:6
**detectives' (1)**
167:1
**determination (1)**
298:1
**determine (1)**
362:7
**determining (2)**
275:14;362:16
**developed (1)**
307:7
**dialing (2)**
319:14,20
**differ (1)**
302:11
**difference (3)**
329:25;348:3;
350:6
**differences (2)**
218:5;261:23
**different (24)**
169:7;188:11,12;
206:22,22;207:6,7,
13,19;217:3;255:15;
263:21;274:10,11,22;
276:11;279:20;
298:22;299:16;
311:16;333:10;
338:12,13,24
**difficult (3)**
174:10;176:6;
240:7
**digit (3)**
167:5,6,7
**direct (2)**
358:16;362:10
**directing (1)**
338:9
**directly (2)**
358:25;359:17
**discipline (2)**
355:18;356:8

**disciplined (2)**
356:14;357:8
**disclosed (2)**
254:5;280:10
**disclosure (3)**
254:4,20;255:21
**discoverable (4)**
331:8;338:19;
339:25;349:9
**discovery (14)**
245:25;251:14;
252:7,12;253:21;
255:9,18;256:10;
261:13;276:4;
305:23,25;329:24;
332:19
**discrepancy (2)**
338:3;339:2
**discretion (4)**
326:11,21;327:8,9
**discuss (2)**
205:17;333:11
**discussed (2)**
186:13;297:5
**discussion (1)**
180:13
**dismissal (1)**
263:18
**dismissed (5)**
206:13,15,20,21;
207:14
**disposed (3)**
167:22;174:7;
287:5
**disposition (4)**
167:23;168:5;
174:6,6
**distance (1)**
233:4
**distinguish (1)**
268:7
**distribute (3)**
172:17;177:4;
323:16
**divide (2)**
172:20;334:15
**divided (1)**
177:9
**Division (3)**
173:14;174:22;
335:21
**divisions (2)**
173:11;324:4
**docket (3)**
174:24;176:5;
238:16
**doctors (1)**
315:7
**document (23)**
201:13;202:6;
208:20;211:1,8;
213:15;222:14;
225:23;240:13,15;

248:9;257:3,9;
264:23;270:15,25;
271:18;298:11;
322:1;337:17,23;
339:2;362:11
**documentation (6)**
183:24;261:14;
267:13;276:6;
306:10;312:20
**documented (3)**
300:6,7,10
**documenting (3)**
225:24;268:14;
274:18
**documents (27)**
184:19;185:11;
188:22;191:10;
193:14;200:12,22;
201:5,12;202:23;
203:21;211:15,17,18,
20;222:12;251:17;
255:16;271:14;
273:11;275:25;
276:3;283:7;289:25;
306:18;321:3;348:19
**dog-eared (1)**
241:19
**domain (1)**
336:23
**done (20)**
180:15;183:2,11;
185:19;186:25;
192:22;197:15;
206:25;207:2;
224:21;233:3;
255:10;299:15,16;
305:3;314:12,15;
317:18;330:10;369:6
**double (1)**
302:13
**doubt (2)**
212:18;247:12
**down (64)**
168:4,18;171:6,14;
172:7;174:11,14;
176:20,23;177:22;
185:8;186:9;189:22,
23;205:25;215:20;
216:3;217:13;230:5,
23;231:4;232:3,23;
238:19;242:21;
243:10;249:24;
252:1,15,23,24;
254:19,24;255:20;
258:8,20;260:24;
266:1;270:25;272:1;
277:4;280:22;293:8,
10;295:11;297:6;
299:14,15;306:11;
308:1;309:12;
311:22;312:4,8;
315:7;316:25;
319:12,19;326:24;

336:2;337:4;349:1;
367:23;368:1
**draft (1)**
257:13
**draw (1)**
310:8
**drawn (1)**
250:21
**drew (1)**
250:22
**dropped (1)**
270:24
**Dugan (1)**
350:19
**duly (1)**
166:5
**duplicate (1)**
241:15
**during (2)**
222:1;354:14
**duties (5)**
330:15,23;331:3,4;
354:18
**duty (10)**
178:20,24;179:12;
198:6,10,11,12;
206:11;324:12;
331:13

## E

**earlier (2)**
207:8;362:20
**early (3)**
284:23;285:9,10
**easier (1)**
246:2
**easiest (1)**
173:7
**East (2)**
243:23;350:7
**easy (1)**
180:18
**Eddie (3)**
243:22,25;244:3
**education (1)**
328:6
**effective (1)**
199:6
**efficiency (1)**
180:22
**effort (1)**
186:24
**efforts (4)**
267:14,18;268:12,
14
**egotistical (1)**
176:2
**Either (17)**
219:7;227:23,24;
228:18;239:21;
260:18;263:25;
273:25;299:21;

305:20;314:3;
319:16;338:4;339:1;
344:4;362:12;364:6
**elected (1)**
323:25
**eliminated (1)**
278:24
**else (25)**
170:15;182:16;
204:18;205:11;
211:9;226:17;
240:22;243:3;
247:11,14;249:2;
255:8;257:5;264:9;
281:14;287:7;
293:11;315:13;
316:13,17,19;318:25;
319:5;326:13;365:8
**else's (2)**
267:19;268:14
**emphasis (1)**
275:22
**encourage (1)**
352:24
**end (9)**
179:8,23;180:9;
213:22;249:13;
285:14;304:8;343:5;
344:16
**ended (1)**
242:20
**ends (1)**
243:12
**engaging (1)**
227:24
**engineer (2)**
321:20;322:4
**enough (25)**
189:17;217:23;
221:17;224:1;256:4;
269:15;286:4;
292:19;293:18;
294:12,15,23;295:7,
12,12,17;297:17;
298:2;299:25;
300:15;309:4;310:3;
314:20;360:3;361:1
**ensure (1)**
335:5
**ensuring (1)**
337:3
**enter (3)**
298:6,7,9
**entered (1)**
307:8
**entitled (3)**
251:18;252:22;
362:18
**entries (1)**
240:20
**envelope (2)**
169:25;170:10
**especially (5)**

171:9;196:2;273:3;
302:6;328:7
**essence (1)**
225:4;226:18
**established (2)**
182:14;185:4
**estimation (2)**
179:20;280:4
**evaluate (1)**
277:24
**evaluation (1)**
330:10
**even (24)**
169:6;181:14;
195:24;203:23;
220:20;225:18;
232:17;240:1;
265:22,23;272:5;
284:24;285:5,10;
286:4,21;316:24;
317:12;318:15,21;
325:23;329:12;
341:3;368:24
**event (1)**
267:16
**events (3)**
348:18;350:5;
351:18
**eventually (3)**
223:25;260:3;
320:11
**Everybody (3)**
178:10;297:14;
365:19
**everyone (4)**
255:12;256:9;
326:13;333:3
**evidence (39)**
202:24;218:12;
226:20;253:4,8;
261:16;271:13;
272:18;277:14;
278:10;279:1;
285:24;287:20;
292:22;294:1;
297:15,17,23,24;
298:8,9;300:22;
302:23;307:8,14;
310:20;317:8;
326:17;329:25;
342:13;353:7,11;
354:14,18;355:15;
359:10,15;360:3;
361:1
**evidentiary (1)**
330:2
**evil (1)**
329:13
**exactly (3)**
210:18;298:17;
342:6
**examination (2)**
339:6;361:19

examined (1)
166:6
**example (5)**
196:24;245:19;
272:5;360:24;368:8
**except (1)**
280:22
**exception (1)**
365:20
**exclude (2)**
294:16;311:11
**excludes (1)**
297:14
**excluding (1)**
296:14
**exclusionary (1)**
331:9
**exculpatory (18)**
279:8,18;280:2,11,
17,23,25;281:4,6;
284:15,20;331:9,14;
338:15;339:5,17;
354:14;355:1
**Excuse (3)**
263:17;296:25;
356:18
**Exhibit (61)**
171:25;200:11;
201:14,20,21;202:11;
203:10,13;204:9,11;
210:20;211:18;
212:7;213:9;222:11;
237:14,20,23,25;
241:4;242:6;246:14;
250:4,9,19;251:4,5;
264:24;283:8,9;
303:4,21;304:5;
321:1;331:17,23,24;
341:20;342:1,9,13,
24;343:11;345:5,6;
363:6,13,13,14;
364:1,5;365:12,21,
23,25;366:12,20;
367:18;368:8,11,14
**exhibits (13)**
208:17;209:1,3,8;
211:13;213:8,15;
214:25;366:6,7;
368:4,18,24
**exist (2)**
227:9;288:16
**existed (1)**
271:11
**existence (3)**
200:13;201:5;
279:7
**expand (1)**
170:1
**expansion (1)**
170:2
**expect (8)**
172:4;225:13,16;
255:11;269:21;

271:16;300:17;
341:21
**expected (1)**
305:14
**experience (10)**
177:14;192:24;
193:24;194:4;
270:20;326:5,14;
339:7,14;364:25
**experienced (4)**
177:5,7;206:9;
259:12
**experiential (1)**
327:25
**expert (2)**
254:18;297:25
**explained (4)**
334:5;348:3,7;
361:24
**explanations (1)**
261:25
**extended (1)**
220:6
**extension (2)**
243:8,17
**extensive (3)**
214:6,13;240:8
**extensively (1)**
368:1
**extent (1)**
369:23
**extraordinary (3)**
178:3;194:11;
351:2
**extrapolate (1)**
179:6

## F

**fabricate (2)**
353:11;355:15
**face (1)**
185:12
**facing (1)**
226:25
**fact (10)**
177:24;197:6;
204:23;248:3;280:2;
291:8;293:3;302:14;
305:22;311:13
**facts (6)**
218:11;273:10;
275:18,21;278:9;
354:18
**factual (1)**
295:18
**factually (1)**
275:23
**fail (3)**
353:15;354:12;
355:10
**failing (1)**
352:13

**Fair (8)**
217:23;269:15;
310:3;331:10;364:4,
11,12;365:13
**fairly (1)**
235:1
**fairness (2)**
290:3;367:21
**Fall (2)**
234:16;241:18
**familiar (3)**
344:20;346:25;
350:3
**family (3)**
322:2;351:2,10
**far (7)**
174:11;185:4;
186:16;206:8;
219:24;260:6,8
**farfetched (1)**
271:6
**fast (1)**
177:16
**fault (1)**
355:7
**FBI (17)**
228:23;229:18,21;
230:11;231:3,11,16,
21,24;232:16;233:5;
234:19;235:9,15;
243:7,10,17
**February (8)**
179:8,14,22,23;
213:12,23;274:20;
364:7
**federal (3)**
231:17;260:4;
370:1
**Feds (1)**
321:22
**feel (1)**
239:11
**fees (1)**
239:20
**Feighan (3)**
181:4;324:22;
325:16
**fellow (1)**
355:10
**felonies (2)**
190:19,23
**felony (4)**
326:23;358:18;
359:11;361:4
**female (1)**
285:8
**few (4)**
174:11;235:12;
285:19;361:24
**figure (8)**
183:1;184:5;
189:24;230:15;
276:17;280:20;

281:2;301:25
**file (119)**
166:12,13,16,19;
167:9,10,11,24;
168:7,14;169:4,8,10,
13,22,24;170:2;
172:1,5,13,16,22,23;
173:4,5,8;175:11;
183:25;184:1,11,15,
17;185:7,12,12;
186:21,21;187:16;
188:2,23;189:8,20;
192:12,16;193:2;
205:2,9;206:3;207:5,
7,20,23;210:10,12;
213:21;216:8;
219:19;220:11,13,13;
221:25;222:6;223:9;
224:7,9;230:25;
232:20;238:18,24;
239:1,2;241:6,8,8,15,
16,19,22,23;242:5,7,
10;247:3,9;249:4;
253:10;254:24;
255:4;259:24,25;
265:10;276:21,23;
277:2;280:20;282:8;
306:23;318:20;
321:4;327:5;334:7,
10;335:5,17,17;
336:6;337:2,12,15,
25;338:9;340:21;
352:14;360:20,24;
361:6;366:8,8
**filed (1)**
336:4
**files (20)**
192:5,7,9;201:15;
204:19,24;205:3;
206:22;244:15,18,21,
24,24;258:21;
260:10;266:4;334:8;
335:13;336:16;355:5
**fill (4)**
167:18;184:3;
198:6;277:1
**filled (2)**
171:18;247:23
**final (2)**
271:8,12
**finally (1)**
359:20
**Find (16)**
173:17;224:9;
225:6;248:9;268:1,
15,18;270:4;273:13,
16;279:21;307:23;
314:19;318:1,6,10
**finding (1)**
317:17
**fine (4)**
208:12;337:11;
371:1,4

**fingerprint (3)**
294:19;311:7,8
**fingerprints (3)**
314:20;315:20;
317:8
**Finish (1)**
232:14
**finished (3)**
248:25;260:22;
362:9
**firm (1)**
188:9
**first (35)**
166:5;168:17;
171:11;172:6;178:3;
182:6;190:5;202:1;
207:5;209:13;
211:23;214:11;
218:6,25;233:24,25;
234:12;240:10;
252:10;256:19;
302:3;318:2,5;324:6,
7,10,11,12;325:14,
21;328:15,19;
329:12;336:21;
339:22
**five (2)**
167:6;256:2
**Flask's (1)**
342:24
**Flip (2)**
242:1;291:2
**Flipping (2)**
202:16;214:3
**focus (3)**
279:23;286:8;
310:17
**focused (3)**
216:19;230:11;
286:12
**fold (1)**
241:22
**folder (1)**
174:16
**folders (1)**
169:23
**folding (1)**
241:7
**folks (1)**
282:1
**follow (10)**
190:20;243:10;
250:23;270:12;
271:21,22;332:11;
353:20;359:14;
361:21
**followed (3)**
336:14;340:5;
357:3
**following (2)**
304:10;331:11
**follows (1)**
166:7

**follow-up (8)**
209:10;216:23;
222:5;225:14;
240:23;269:16;
270:21;323:10
**FOP (1)**
351:18
**forensic (2)**
278:25;287:20
**forget (2)**
223:12;275:20
**forgot (2)**
196:14;278:19
**form (42)**
166:24;184:3;
187:23;190:5;
191:25;192:20,25;
194:5,8;195:14;
200:15;201:9;
202:19;205:23;
206:17;216:12;
217:9,15;218:8;
226:5;227:7;231:19;
234:23,25;238:15;
252:17;254:8;
255:22,23,24;256:20,
23,25;261:13;265:4,
15;277:1;335:8;
337:7;338:16;
344:21;346:13
**formal (10)**
190:6;193:9;
195:14;247:21;
270:7;321:24;
340:21;341:7,22;
355:18
**formalized (3)**
328:2;335:1;348:7
**formally (2)**
171:5;203:8
**forms (1)**
193:6
**forth (1)**
332:12
**found (5)**
177:16;178:21;
310:22;317:21;322:8
**foundation (26)**
179:18;185:24;
192:21;193:1;194:9;
205:24;212:21;
226:6;228:10,21;
229:9,11;254:9;
273:10;277:19;
280:14;287:1;
313:25;322:23;
330:25;332:15;
335:9;337:8;347:14;
348:12;353:18
**four (13)**
167:7;169:19;
171:22;188:11,12;
189:6;194:21;221:4;

256:2;327:18;
333:10;349:20;
351:24
**fourth (1)**
326:23
**Francis (1)**
350:10
**Frannie (1)**
350:11
**fraud (8)**
223:9,20;225:25;
226:25;227:1,5,8,10
**free (1)**
239:11
**fresh (1)**
241:23
**friendship (1)**
351:15
**frivolous (1)**
359:18
**front (23)**
168:6,14;170:4;
177:19;184:1;188:3,
4;191:14,17,19;
194:25;195:6;
208:25;213:16;
241:6,7;278:15;
309:1;319:13;332:2;
334:16;363:12;
366:17
**further (4)**
236:3;310:1;
361:16;369:20

## G

**gather (4)**
185:20;196:6;
267:4;313:16
**gathered (2)**
183:4;186:18
**gauge (1)**
220:21
**gave (10)**
193:3,15;203:15;
205:3;235:24;
257:25;321:21;
324:22;328:11;329:2
**geared (1)**
296:12
**gearing (1)**
221:21
**GELSOMINO (35)**
166:9;201:14;
204:15;208:13;
209:5,19,25;210:18;
217:14,23;222:16;
229:24;237:5,12,21;
250:5;290:17,20;
303:2,6;304:6;
307:20;319:24;
320:5;331:19;
342:11,23;361:15;

364:8;365:3,17;
366:11;369:16,19;
370:3
**general (2)**
200:20;332:2
**generally (9)**
182:5,6,9;183:9;
189:13;199:2;
207:21,23;242:5
**Gertrude (2)**
346:24;347:3
**gets (2)**
241:20;317:22
**Ghana (3)**
345:13,14,15
**Gibson (3)**
181:24;262:16;
263:3
**Gibson's (1)**
244:20
**Giglio (1)**
357:18
**girlfriend (2)**
235:16,18
**given (10)**
189:7;232:17;
242:24;245:8,8,21;
261:18;276:13;
363:10;366:16
**giving (3)**
231:22;237:1;
245:18
**goes (11)**
169:20;220:16;
224:15;240:8;251:2;
261:7;283:24;
334:17,18;336:4,5
**good (11)**
200:9;215:20;
230:3,17;320:20;
328:17;329:13;
349:18;351:3;
361:23;367:13
**Grand (32)**
170:18;171:2,4,17,
19,20,22;172:2;
189:16,22;190:7,9;
191:3,6,6;207:12,16;
266:6;272:9,14,16,
19;276:15;330:18,
21;346:18,20;347:6,
11,13,25;360:14
**great (3)**
245:16,16;335:12
**Greene (5)**
197:23;229:5;
233:20,22;234:6
**grew (2)**
350:7,7
**group (3)**
212:16;234:21;
297:7
**grow (1)**

350:3
**guess (12)**
185:5;208:22;
215:10;219:3;
230:18;249:11;
266:20;267:2;
270:19;276:16;
333:18;345:15
**guessing (7)**
179:11;226:14;
230:17;238:18;
243:9;286:19;360:22
**guidance (4)**
177:10;329:6,6;
354:2
**guidelines (1)**
289:13
**guides (1)**
331:11
**guilty (3)**
214:11;239:19;
259:2
**guy (15)**
172:19;176:15;
196:12;197:14,21;
233:18;235:17,19;
243:9;259:1;290:24;
320:14;324:20;
351:3;352:1
**guys (8)**
177:18;187:6;
254:19;262:17;
306:7;334:19;336:9;
349:12

## H

**half (2)**
241:22;242:17
**half-baked (1)**
283:12
**hand (5)**
201:16;208:16;
241:3;285:24;303:9
**handed (3)**
182:11;342:2;
347:5
**handing (1)**
183:16
**handle (17)**
168:17;176:3,5,7;
177:16;181:11;
182:18,22;186:6;
190:14;194:22;
255:18;260:17;
327:15,20;328:22;
354:9
**handled (12)**
168:8;178:11;
184:5;233:5,5;
241:18;255:9;
297:21;305:4;
334:24;339:21;

364:22
**handling (4)**
167:20;188:8;
305:23;325:15
**handprint (1)**
273:4
**handwriting (36)**
210:8;222:25;
242:12,14;243:6;
250:10,15;251:3,5;
252:19;256:4;
257:15,19,20;258:8,
15,18;266:20;
268:23;269:1,8,14;
291:8,12;301:8;
302:2,18;303:12;
304:18;343:13,20,22;
344:10,12;345:8;
363:15
**handwritten (3)**
250:25;364:5;
366:24
**hang (2)**
298:20;351:9
**happen (4)**
223:11,13;224:3;
341:10
**happened (7)**
197:16;271:3;
279:21;326:7,8;
333:8;357:5
**happening (2)**
240:23;355:3
**happens (1)**
214:11
**hard (3)**
209:16;261:15;
270:11
**harder (1)**
182:21
**Hayes (3)**
243:9,14;244:8
**H-A-Y-E-S (1)**
243:14
**head (7)**
172:17;194:16;
323:15,23;324:21;
347:6;350:23
**heading (3)**
167:2;340:20,20
**hear (1)**
359:10
**heard (8)**
228:11;232:7;
236:22;286:6;287:3,
5,7;362:15
**hearing (5)**
168:19;360:6,8,11,
15
**heavy (2)**
241:24;327:19
**help (4)**
249:20;329:5,5;

354:2
**helpful (1)**
239:10
**helps (1)**
170:11
**hereinafter (1)**
166:6
**here's (2)**
270:5,6
**herself (1)**
217:22
**Hick (2)**
290:10,12
**Hicks (3)**
290:16;352:6,7
**hierarchy (1)**
323:21
**highest (1)**
320:11
**highlight (4)**
211:13,20,22;
268:20
**highlighted (5)**
211:16;245:23;
269:2;284:11;307:21
**highlighting (1)**
210:21
**himself (4)**
169:18;181:9;
320:20;337:15
**hip (1)**
174:12
**history (1)**
320:12
**hold (3)**
271:13;273:16;
304:12
**holding (1)**
201:22
**homicide (16)**
170:21;189:25;
192:3,4,14;193:24;
196:2;214:12;
270:14;320:11;
350:11,23;351:5;
352:5;360:25;361:2
**homicides (1)**
170:25
**honest (1)**
367:16
**honing (1)**
214:14
**hospital (2)**
174:13,20
**hours (1)**
198:16
**house (1)**
234:17
**Hubbard (9)**
219:10;222:8;
230:21;243:21;
347:11,12;349:23,24,
25

354:2
**helpful (1)**
239:10
**helps (1)**
170:11
**huh (1)**
198:2
**hypothesize (1)**
313:12
**hypothesizing (1)**
235:4

## I

**idea (8)**
203:10;214:9;
225:22;248:11;
256:25;297:16;
321:2;329:17
**identifiable (1)**
317:6
**Identification (1)**
301:17
**identify (6)**
208:19;297:18;
298:2,16,19;317:5
**identifying (1)**
170:4
**identity (1)**
286:22
**imagine (4)**
234:18;273:2;
308:7;355:3
**impeachment (1)**
338:18
**important (11)**
226:1,2;275:14;
297:19;308:5,9,13;
319:15;334:16;
337:4;354:4
**impressed (1)**
198:3
**impression (1)**
302:3
**inches (3)**
166:25;194:21,21
**incident (2)**
197:2;271:4
**include (5)**
218:17,19;256:8;
311:11;352:13
**included (6)**
203:21;204:11;
258:12;283:13;
329:11;357:17
**includes (6)**
200:25;201:4,11;
202:11;274:22;
303:13
**including (2)**
170:24;296:13
**incomplete (1)**
240:6
**inconsistencies (2)**
354:5;362:14
**inconsistency (2)**
362:8,17
**inconsistent (5)**

353:21;354:7;
361:25;362:2,5
**inconsistently (1)**
353:16
**increasing (1)**
221:2
**independent (1)**
282:14
**indicate (3)**
202:23;239:8;
364:19
**indicated (2)**
184:15;247:2
**indicates (2)**
248:14;307:6
**indicating (3)**
272:24;273:12;
365:14
**indictment (16)**
169:4;170:18,19;
174:4;190:3,6;191:7;
206:23;207:4,5,6;
261:18,22;318:17;
334:15,16
**indictments (1)**
169:7
**individual (5)**
261:9;265:25;
321:25;327:15;329:8
**inference (1)**
365:18
**informal (2)**
225:21;356:7
**informally (1)**
333:8
**information (76)**
183:4,22;184:14;
185:20;186:2,17,19;
189:10;191:22;
194:1;196:7;224:5,9;
225:9,17,22,24;
227:19;230:23;
231:2,22,25;234:20;
235:7,24;236:19;
237:3;256:14;266:1,
23;267:3,4,8;271:19;
272:24;273:23;
274:18,20;275:7;
279:8;280:9,11,23,
25;284:7,12,16;
285:20;286:4;296:3;
297:11;300:24;
301:14,19;308:10,13,
23;313:16;314:1,9,
11,17;316:5,7,11,25;
317:16,18;318:24;
319:3;321:19;
331:14;337:4;
352:18;355:1;368:1
**initial (2)**
188:16;314:24
**initials (4)**
219:11,15;239:7,

16
**inside (3)**
169:22;175:11;
241:17
**Instead (2)**
197:3;293:17
**instituted (3)**
168:21,24;169:1
**intelligence (2)**
320:10;351:4
**intention (1)**
231:20
**interest (1)**
263:23
**interesting (2)**
169:3;333:25
**inter-office (1)**
276:24
**interpret (1)**
215:21
**interpretation (3)**
290:15;294:8;
365:13
**interview (1)**
340:25
**interviewed (2)**
193:11;338:7
**interviews (1)**
264:4
**intimidated (3)**
321:7;362:23;
363:4
**intimidation (1)**
246:16
**into (21)**
166:22;190:11;
191:12;207:15;
234:10;236:3,5;
240:8;298:6,7,9;
304:22;307:8;
321:11,16;328:10;
336:13,14;340:10;
349:17;352:9
**inventory (1)**
335:4
**investigate (5)**
185:20;236:15;
280:5;326:11;340:3;
359:3
**investigated (6)**
227:20;228:17;
355:20;356:1,14;
358:18
**investigating (2)**
228:7;278:3
**investigation (46)**
171:1;186:3,12,17;
187:6;195:10;200:4;
202:24;220:7;
228:16;229:3,7,7,20,
22;230:2;231:11,16,
18;232:1;233:10;
235:8;236:3,5;260:6;

264:7;266:3;267:8;
269:17;270:22;
271:17;279:19;
284:19,24;285:9,11,
15;314:16,24;
316:21;321:15;
334:13;337:19;
340:10;354:15;358:7
**investigations (2)**
232:25;321:10
**investigative (1)**
304:25
**investigator (3)**
264:16,19,22
**investigators (1)**
286:2
**involved (19)**
190:1;228:7,16;
229:21;230:18;
231:11;235:7;
260:12;265:17;
275:16;289:9;
300:20;322:9;
323:19;358:3,9,10,
14;360:2
**involvement (3)**
229:6;230:1;
231:17
**Irish (1)**
336:10
**Isaiah (28)**
200:3;229:2;
231:10,15,25;236:16;
242:15;259:6,6,22;
260:5,10,11,12;
277:13,24;278:4;
282:6;284:25;286:6;
316:23;317:13;
318:15;319:16;
320:23;322:11;369:2
**issue (2)**
229:18;246:9
**issues (2)**
229:19;246:24
**item (2)**
300:23,23
**items (1)**
204:10

**J**

**jacket (16)**
168:7,14;169:4,8,
22;184:16,17;185:7;
198:20;238:24;
239:1;242:7,10;
247:3,9;249:13
**jackets (1)**
249:4
**Jackson (1)**
234:2
**Jaffe (2)**
262:15;263:23

**Jaffe's (1)**
263:22
**James (3)**
290:22;303:5;
304:15
**jammed (1)**
224:23
**January (1)**
179:22
**JC (4)**
243:17;244:5;
264:12,13
**JD (1)**
219:13
**jewelry (1)**
253:6
**Jim (2)**
347:5,6
**job (9)**
223:12,15,19,20;
289:24;324:23;
337:12;340:3;354:6
**Joe (4)**
181:24;244:20;
262:16;263:3
**John (19)**
219:8,13;234:1,3;
242:20;243:22,25;
244:1,23;245:3;
261:7;323:23;
325:25;329:2;
331:25;333:19;
334:6;351:12;357:6
**Jones (2)**
325:9;357:7
**JT (1)**
219:13
**JTC (2)**
219:14;245:2
**judge (36)**
167:15;168:9;
178:1;190:24;191:8;
194:13;195:1,7;
204:5;248:10;
260:14;262:15;
263:22,22;266:7;
317:25;318:3,10,16;
331:9;338:21,25;
339:4,15,20;344:7;
345:21;346:2,3;
354:8;359:9,14;
361:3;362:4,11,12
**judges (9)**
175:14,25;221:9,
11;309:25;310:4;
324:14,22;339:8
**judges' (1)**
325:12
**judge's (4)**
176:5;238:18;
239:21;354:8
**jumps (1)**
282:24

**Juries (1)**
171:22
**jurisdiction (3)**
190:22;318:16;
361:4
**Jury (38)**
170:19;171:2,4,17,
19,20;172:2;177:17,
20;189:16,22;190:7,
9;191:3,6,7;195:1,6;
198:3;207:12,16;
239:20;266:6;
272:10,14,16,19;
275:24;276:15;
310:21;330:18,21;
346:18,20;347:6,11,
13;360:14
**Justice (2)**
333:9;336:15
**Juvenile (3)**
324:3,4;330:19

**K**

**K1 (1)**
208:21
**K-1 (3)**
208:21;209:2,4
**Kaminski (1)**
351:12
**Kane (3)**
289:9;290:11,12
**keep (13)**
169:24;172:23;
173:14,16,23;175:10;
180:6;191:11;
221:25;223:14;
232:14;253:18;355:4
**keeping (2)**
173:8;205:15
**Ken (13)**
201:18;203:15;
208:18;209:6,8,24;
216:6;217:14;
222:11;268:21;
288:4;342:25;355:18
**kept (4)**
166:12;181:1;
260:18;357:2
**kerosene (2)**
196:12,16
**Kevin (6)**
288:7,8,14,23;
290:7;351:21
**key (2)**
225:25;226:4
**kid (1)**
320:17
**Kilbane (1)**
194:13
**kill (1)**
236:13
**killed (4)**

197:14,23;233:22;
234:8
**kind (24)**
182:10;194:1;
203:21;225:13;
235:8;268:7;271:7;
276:24,25,25;277:6,
14;306:1;321:15;
330:22;334:10;
335:4;337:5,18,24;
338:12;351:15;
356:7,17
**Kirk (13)**
228:24,25;229:1,1;
230:1,18;232:24;
233:19;234:19;
235:10,15,19;236:25
**knew (28)**
168:8;186:25;
187:3;188:14;
205:20;206:1;275:4;
287:10;306:13,16;
312:21,23;313:7,8,
12,13;315:1;323:12;
325:22;329:3;
336:23;349:11;
350:11,16;351:8;
352:7,7;357:5
**knock (1)**
326:24
**knowing (3)**
221:24;281:21;
287:6
**knowledge (2)**
299:23;348:6
**known (4)**
189:13;296:18;
307:8;314:18
**knows (1)**
339:12

# L

**L-1 (18)**
208:21,22;209:2,3,
13;211:13,17;212:7,
7;213:9;214:25;
215:10;219:3;
273:14,15;368:4,18,
24
**L-13 (3)**
368:5,19,24
**L-14 (3)**
211:14,17;213:9
**L-15 (2)**
208:22;209:3
**L-2 (12)**
218:24;222:23,24;
273:18;363:13,15,16;
364:16,19;365:13;
368:8,11
**L-3 (7)**
215:10;266:14;

366:12,20,23;367:18;
368:14
**L-4 (7)**
212:7,8;214:25;
215:6;250:4,9;303:4
**L-6 (3)**
282:18,23,23
**L-7 (9)**
287:23;363:6,13,
22,24;364:5;365:21;
366:2,6
**L-8 (3)**
365:23;366:3,6
**L-9 (3)**
365:25;366:3,6
**lady (2)**
336:10,10
**Lakeside (2)**
258:22;259:12
**LAMBERT (62)**
185:23;187:22;
192:17;194:5;196:8,
17;200:16;201:8,11;
202:3,7,15;203:1;
205:22;207:9;
208:19;212:22;
213:13;216:12;
218:8;227:7;231:13;
232:12;234:23;
254:6,12;255:7,13;
258:4;270:16;
277:10;278:6,9,18;
279:10;280:15;
284:9;285:12;
287:24;290:22;
298:24;308:11;
309:9;310:24;316:2,
18;322:14,21;
330:13;332:14;
338:17;342:8,16;
352:21;356:25;
357:10,21;358:5,13;
369:18;370:14;371:3
**large (1)**
333:8
**larger (1)**
201:15
**last (13)**
219:2,3;230:8;
258:4;264:23;269:4;
274:5;282:23;
283:20;285:11;
327:18;345:16;
349:11
**lasted (4)**
178:2;285:13,14,
16
**late (1)**
234:15
**latent (1)**
307:12
**later (5)**
181:10;235:12;

317:1,17;370:25
**latest (1)**
285:18
**Laughing (1)**
313:1
**laundry (1)**
226:16
**Laurie (19)**
181:19;186:11,19;
204:2;205:7;208:7;
213:5;260:15;
262:25;275:19;
287:15;295:21;
296:10,17;297:8;
301:24;312:21,23;
313:7
**Laurie's (2)**
180:4;244:14
**law (7)**
168:22,23;184:25;
326:15;331:1,4,11
**lawful (1)**
166:5
**Lazzaro (3)**
258:21;259:12;
260:1
**lead (4)**
186:6;206:9;302:4;
347:12
**leading (1)**
357:9
**leads (3)**
323:20;340:4,5
**lean (1)**
352:1
**learn (5)**
217:2;264:2;275:1;
319:4;330:3
**learned (7)**
184:8;186:2,11;
208:5,6;326:20;
364:23
**learning (1)**
183:21
**least (4)**
240:2;282:10;
283:2;325:20
**leave (2)**
294:21;349:8
**leeway (1)**
325:23
**left (15)**
179:8,22;205:20;
206:11;242:15,18;
243:6;247:21;249:8,
13;252:1;288:4;
290:24;301:23;
334:19
**left-hand (2)**
167:3,17
**legal (5)**
256:5;262:3;
280:15;328:6,18

**legibility (1)**
341:17
**legible (2)**
209:20;210:1
**legislature (1)**
333:19
**Leo (4)**
349:11,14,18;
352:8
**less (3)**
177:5;185:4;
264:19
**letter (9)**
219:7,8;222:5,10;
305:3;331:25;332:6,
8,12
**letter-type (1)**
241:8
**letting (1)**
230:19
**level (1)**
177:14
**Liberia (1)**
345:14
**lie (2)**
215:24;367:16
**likely (1)**
308:19
**limit (1)**
339:15
**Linda (4)**
223:2;228:4,19;
321:16
**line (5)**
270:11,25;326:9,
10;336:18
**lineup (1)**
336:15
**list (15)**
173:14,23;174:3;
253:4;254:15;
255:11;257:10;
262:8;280:19;
301:21,23;302:1,15;
303:21;357:18
**listed (3)**
254:21;333:24;
357:14
**listen (1)**
365:5
**listing (1)**
255:24
**lists (1)**
174:8
**literally (4)**
177:19;241:18;
293:23;324:17
**little (8)**
172:23;248:23;
269:2;326:2;343:2,
16,16;352:8
**lived (2)**
234:1,6

**living (1)**
345:12
**location (1)**
199:25
**locations (1)**
333:10
**logical (1)**
364:4
**long (13)**
170:1;178:4;179:2;
261:24;285:11,13,16;
326:21;327:22;
346:16,23;347:8;
352:9
**longer (4)**
176:16;178:24;
267:12;361:10
**look (49)**
166:19;174:14;
182:19,21;184:11;
192:9;196:16;202:3,
7;203:1;205:1,3;
209:13;212:5,14;
213:8;214:3;216:3;
219:15;222:23;
231:7;238:10,19;
239:9;247:21;249:2;
258:16;264:24;
266:13;278:23;
279:16;282:18;
284:22;289:6,20;
291:4;304:13,22;
309:3;311:20;
312:15;331:20,20;
332:1;342:1;343:16;
363:11;368:8,14
**looked (13)**
171:25;200:19;
204:19,24;214:18,21;
242:5,11;249:4;
258:13;292:9,9;
328:13
**looking (33)**
180:17;187:11;
193:16;210:13;
211:8,15;212:15;
213:7,10,13,14,16;
214:1,24;250:12;
265:12;272:6;275:5;
279:13;290:20;
307:2,16;316:21;
318:5,7,20;342:4,17;
343:9;345:17;
347:10;364:1;365:24
**looks (11)**
179:23;206:4;
212:8;241:16;
243:13;248:19;
253:22,24;267:12;
293:12;315:16
**lost (2)**
298:4;313:4
**lot (11)**

173:3;186:14;
198:12;210:19;
255:25;262:2;
276:11;282:9;
327:24;334:19;
343:25
**Lou (1)**
194:15
**lower (1)**
167:16
**LP (1)**
307:8
**lying (2)**
201:19;367:15

## M

**magistrate (1)**
260:3
**mail (1)**
276:24
**main (1)**
175:11
**Mainly (2)**
183:19;329:23
**maintain (1)**
334:8
**Major (3)**
173:11,13;174:22
**majority (1)**
184:21
**makes (12)**
168:11;169:21;
170:9;174:1;176:10;
177:6,11;187:15;
229:20;241:25;
274:9;308:6
**making (13)**
179:24;186:24;
190:2;193:8;235:23;
265:25;267:25;
269:13;289:10;
296:7;302:1;303:22;
317:14
**manage (1)**
324:13
**managed (1)**
302:6
**management (1)**
336:7
**manager (1)**
351:4
**Mann (2)**
346:24;347:3
**manner (3)**
244:14,17,20
**manslaughter (2)**
171:12,14
**manual (1)**
329:11
**manuals (3)**
328:9,23;329:1
**many (11)**

173:11,17;181:13;
183:7;215:16;
219:25;221:10;
279:15;324:4;346:7;
350:24
**Mapp (1)**
346:25
**March (2)**
180:1;219:21;
221:4;248:11;258:25
**margin (1)**
184:18
**MARINO (4)**
166:4;209:2;
258:22;370:7
**mark (4)**
211:9,16;247:3;
342:10
**marked (9)**
209:4;244:24;
327:5;331:17,24;
341:20;342:9,13,24
**marking (5)**
244:15,18,21;
252:2;342:15
**markings (2)**
206:3;366:4
**marks (5)**
211:13,20,22;
249:9;327:4
**Marty (1)**
342:24
**Mary (8)**
257:21,23,25;
366:15,25;367:19,22;
368:16
**Mason (1)**
322:7
**match (8)**
294:14;298:21;
307:23;310:6,22;
311:25;312:5,6
**matched (3)**
308:8;316:6,8
**matches (1)**
307:24
**material (1)**
201:23
**Matia (7)**
345:21;346:1,2,3,6,
6,7
**matter (9)**
182:15;263:11;
312:15;317:10;
359:14;361:11;
362:3,16;367:19
**may (18)**
205:14;230:8;
268:15;270:10;
279:22;285:19;
289:20;296:22,23;
302:11;312:12;
313:9;321:1;336:18;

357:23;363:23;
368:25;369:6
**maybe (12)**
221:16;243:15;
244:8;247:13;
255:21;300:21;
312:18;319:9,9;
350:16,17;358:23
**McCaffrey (1)**
350:10
**mean (61)**
177:19;180:21;
189:14;195:19;
196:11,22;199:2;
200:17,17,19;202:10;
204:24;206:1;207:2;
221:14;223:7;226:8;
227:9;234:18;
235:10;240:17;
244:13;248:22;
252:14;268:15;
270:2;274:10;
275:18;285:10;
287:11;289:1;290:2;
293:3,21,23,25;
294:6,19,20;296:7;
297:22;309:21;
324:17;326:2;
327:19;328:14,18;
331:6;333:15;
334:14;342:17;
350:1;353:20;
354:20,22;357:1;
364:2,11;365:6,9;
367:23
**meaning (1)**
341:14
**meaningless (1)**
359:18
**means (7)**
225:5;235:17;
252:5;263:7;294:22;
307:12;348:4
**meant (2)**
219:1;348:6
**meet (4)**
191:24;198:22,25;
199:10
**meeting (2)**
199:13;367:24
**members (1)**
322:2
**memo (2)**
184:8;337:5
**Memoranda (1)**
337:22
**memorandum (1)**
337:21
**memory (3)**
217:12;246:9;
309:12
**memos (2)**
185:15;337:21

**mention (1)**
368:6
**mentioned (4)**
230:8;254:25;
316:24;327:24
**MENZALORA (47)**
192:19;194:7;
195:17;201:7;
209:23;217:11;
218:10;228:1;254:7;
258:7;269:23;270:3,
17;271:20;276:8;
277:9;279:3,9;
280:12;284:10,17;
286:24;292:6;
310:25;312:24;
313:23;314:14;
316:14;322:24;
323:7;340:6;346:4;
348:10;352:16,20,25;
353:4,8,12,19;
354:16;355:2,17;
356:3,23;357:19;
369:14
**messy (1)**
244:13
**met (4)**
199:17,24;235:20;
320:9
**methodical (1)**
305:13
**mid (1)**
325:3
**middle (6)**
222:24;288:9,10;
291:8;363:7,24
**might (23)**
169:15;174:9;
176:20;178:19;
182:20;193:4;
194:21;224:9,21;
225:18,18;234:14,15;
243:24;270:5;272:5;
299:10,11,15,16;
308:24;309:15;
317:23
**Mike (3)**
243:15;244:7;
320:13
**mind (6)**
197:18;235:25;
291:19;299:20;
303:23;309:16
**mine (17)**
197:17;210:22,24;
243:20;251:4,6;
258:19,22;288:21,22;
294:18;303:6,10;
328:12;329:17;
330:16;344:4
**minimum (1)**
363:5
**minute (2)**

211:4;282:22
**mirror (1)**
199:4
**misconduct (1)**
355:11
**misdemeanor (1)**
326:24
**misdemeanors (1)**
223:25
**misrepresents (2)**
216:15;273:10
**miss (1)**
245:23
**missed (5)**
183:6;304:25;
313:2;354:24;355:7
**missing (7)**
239:23;249:5;
283:1,5,15;287:11;
335:6
**misspeaking (1)**
215:9
**mistaken (1)**
295:14
**mixed (1)**
334:21
**mob (1)**
233:21
**moment (2)**
310:18;344:24
**moments (1)**
361:24
**Monday (1)**
197:20
**money (5)**
223:11,14,19;
284:1;328:7
**month (2)**
223:22;318:9
**months (11)**
178:2,20,22,23;
179:1,9,21;199:8,21;
221:4;330:20
**moral (3)**
328:19;329:3,9
**morality (2)**
328:15,17
**morally (1)**
327:11
**more (28)**
187:25;195:14;
206:8;207:11;
209:20;210:1;217:7;
218:1;221:3,3,9;
234:14;236:19;
259:11;292:11;
294:11,13;296:16;
307:25;308:23,25;
313:16;316:5,7;
318:23;319:3;333:8;
350:12
**morgue (1)**
273:25

**morning (3)**
171:23;197:20;
347:24
**most (10)**
177:4;209:16;
221:17;277:11;
308:19;309:25;
339:7,8;359:1;371:3
**motel (2)**
226:16;267:11
**mother (3)**
322:6,8;345:12
**mother's (1)**
283:25
**motion (2)**
202:19;330:2
**motive (4)**
236:13,18,19;
237:2
**motives (1)**
236:15
**move (6)**
175:16;181:2;
208:14;219:1;
266:19;287:23
**movements (2)**
277:16,25
**moving (1)**
277:7
**Mrs (3)**
325:9;336:11;
357:7
**much (19)**
180:6,6;183:11;
190:17;192:3;
220:21;241:18;
259:11;264:19;
302:11;317:1;324:2,
19;327:20;328:20;
329:2;348:1;368:1;
370:5
**multiple (6)**
169:7,11,12;217:7;
250:6;259:5
**muni (1)**
190:15
**Municipal (4)**
190:18,24;359:9;
361:11
**murder (14)**
171:11,12,13,14;
194:14;258:24;
259:18;277:17;
279:2;284:6;340:10;
361:2;367:6;369:3
**murders (1)**
286:21
**must (10)**
227:13;231:2;
235:1;238:17;243:9;
245:10;255:9;
259:21;350:2;367:15
**myself (3)**

173:8;224:25;
292:10

**N**

**Nahra's (1)**
178:1
**name (41)**
167:23;168:16;
169:9;174:4;175:20;
176:20,23;180:19;
181:25;184:24;
230:5;231:3;232:2,4;
235:9;238:20;239:7,
15,24;240:12;
243:10;245:13,25;
246:3;251:23;
252:16;256:24;
261:7,8;278:20;
280:19;281:11,15;
290:15;320:24;
324:22;336:6;
346:15;350:21;
351:13,23
**named (4)**
181:4;194:15;
324:20;336:11
**names (4)**
167:1,15,19;244:9;
252:24;254:24;
255:11;256:8;282:2;
289:8;350:1,2
**Nardi (1)**
229:5
**nature (2)**
321:11;354:19
**near (1)**
260:20
**nearing (1)**
173:18
**necessarily (1)**
240:14
**need (6)**
176:4;208:13;
220:22;271:14;
327:2;357:15
**needed (3)**
329:5,6;361:10
**needs (2)**
245:12;246:4
**neighborhood (1)**
349:12
**new (8)**
166:21;185:8;
186:3;232:6;241:23;
301:11;329:19;
333:12
**newspaper (5)**
294:2;295:15,15;
298:12,14
**newspaper's (1)**
300:25
**next (12)**

182:12,25;183:5,
23;186:5;206:11;
210:13;221:14;
222:24;223:2;303:7;
337:11
**Nick (1)**
351:25
**noncrossed (1)**
293:1
**noncrossed-out (1)**
310:14
**none (7)**
239:6;242:16;
251:3;258:18;
340:12;345:9;356:12
**Nope (1)**
248:16
**Nor (1)**
263:3
**normal (2)**
182:23;317:4
**normally (2)**
258:16;300:11
**notation (8)**
360:23;363:18;
364:13,14,16,19;
365:12;368:15
**notations (1)**
217:20;239:21;
240:1;367:14;368:4,
21,23;369:1
**note (21)**
176:24;184:10;
185:6;198:5,17;
210:6;213:6,25;
214:17;217:12;
235:14;245:1,17;
252:17,25;253:3;
273:13;290:14;
299:7,8;365:13
**notebooks (1)**
193:5
**noted (3)**
247:14,16;368:14
**notes (79)**
168:18;172:24;
173:1,3;174:25;
175:4,10;179:24;
183:7,25;184:15,18;
185:11;186:16;
193:8,18,25;194:22;
195:2,9,14,16;196:3;
205:8;206:5;210:3,
14;212:5,10;213:1,
16;214:4,7,14,19;
215:1,1,9,10,11;
216:9;218:3,15;
221:2;226:8;234:22;
235:23;248:12;
249:6;264:2;267:25;
268:10;269:13;
272:23;273:20;
274:7;275:5;293:1;

296:7,10;299:6;
303:22;305:7;337:9;
338:1,9;340:24;
341:2;349:2;363:7,
11,24;364:5;366:17,
19,24;367:2,17;368:6
**Notice (1)**
335:15
**noticed (3)**
215:12;255:22;
369:22
**noting (1)**
240:23
**November (6)**
178:1;179:22;
219:16,24;220:10;
317:24
**number (24)**
167:3,5,6,9,10,11;
174:3;207:2,12,13,
16;232:23;241:10,12,
13,14;259:25;
262:14;270:6;
279:20,22;330:19;
343:5;347:7
**numbers (5)**
167:8;238:20;
342:7;343:2,8

**O**

**object (1)**
369:24
**objected (1)**
327:11
**Objection (167)**
179:17;185:23,25;
187:22,23;190:13;
191:25;192:17,19,20,
25;193:20;194:5,7,8;
195:17;196:8,17;
199:17;200:15,16;
201:7,8,9;202:14,15;
204:12;205:22,23;
206:17;207:9;
212:21,22;213:13;
216:12,14;217:9,11,
15;218:8,10;226:5;
227:7;228:1,2,9,20;
229:8,11;231:13,19;
234:23,25;240:5;
250:3;254:6,7,8,12;
255:7,13;260:7;
269:23,24;270:3,16,
17;271:1,20;273:9;
276:8,9;277:9,10,18;
278:6,7,18;279:3,9,
10,11;280:12,13;
284:9,10,17,18;
285:12;286:24,25;
290:14;291:13;
292:4,6;293:4;294:7;
295:8;298:24;301:4;

308:11;309:9;
310:24,25;311:1;
312:7,24,25;313:23,
24;314:14;316:2,14;
322:14,21,22,24;
323:3,7;330:13,24;
332:14,16;335:8;
337:7;338:16,17;
339:10;340:6,7;
341:11;347:14;
348:10,11;350:20;
352:16,19,20,21,25;
353:4,8,12,17,19;
354:16,17;355:2,17,
22;356:3,4,16,23,24,
25;357:10,19,24,25;
358:5,12,13;364:8;
365:3,17;366:11
**objections (1)**
229:16
**objects (1)**
229:12
**obligation (1)**
306:9
**obliged (1)**
281:2
**O'Brien (3)**
243:13,15;244:7
**observation (1)**
364:3
**observations (1)**
179:25
**observe (1)**
200:2
**observed (1)**
354:4
**observing (1)**
226:15
**obstreperous (1)**
306:16
**obvious (2)**
280:23;354:22
**Obviously (1)**
283:15
**occasion (1)**
218:1
**occasionally (1)**
178:17
**occurred (1)**
267:16
**o'clock (1)**
320:1
**October (7)**
177:25;179:21;
233:22;234:13;
317:23;318:4,5
**odds (1)**
271:2
**off (28)**
174:7;182:9,15;
183:4,16,23;184:14;
185:9;17;186:3;
223:24;237:7;

248:20;249:8;
251:16;253:2;
270:24;302:20;
303:6,10;319:25;
337:2,20,25;352:10;
354:3;369:7;371:5
**offer (2)**
277:13;337:16
**office (62)**
174:10;182:14;
183:13;187:19;
188:5,21;189:3,11;
191:13,23;194:17;
199:15;203:9;208:2;
211:19;218:23;
222:1;223:3,5,8;
224:10,17;225:5,6,
10,15,25;238:23;
251:3;254:17;263:9;
265:16;276:6,21;
277:8,11;281:15;
287:8;301:17;
306:11;317:22;
322:13,19;323:22,22,
24;324:13,16;
325:23;328:3,11;
329:3,19;330:12;
333:23;334:9;
346:17;355:21;
356:8,22;357:5;
358:19
**officer (11)**
199:10,13;270:19,
21;287:12;289:20;
347:12;348:21;
352:6;358:17;361:8
**officers (44)**
189:10;191:21;
192:14;193:18,23;
195:10,15;196:6;
198:4,22;217:8,20,
25;218:7;228:6,15;
236:4;254:16;258:1;
265:21;269:21;
270:13;271:9,16;
279:16;280:5;284:5;
286:1,21;289:7;
347:11,22;348:16;
352:11,23;353:2,6,
10,14;354:12;355:9,
10,14;357:14
**official (2)**
224:8;289:19
**often (3)**
328:12;329:17;
333:9
**Ohio (3)**
197:20;333:19;
347:1
**old (1)**
336:10
**older (4)**
259:11;260:1;

349:20;351:10
**O'Meara (2)**
347:5,6
**Once (9)**
175:13;190:14;
220:15;245:16;
266:2;317:1;323:9;
362:5;365:4
**one (107)**
167:17;168:3,15;
169:4,6,17,18,19,22;
171:21,23,23;172:9;
174:21;176:3;177:8;
178:3;180:17;
182:11;183:16;
189:7,15,22;191:17,
18;194:11,11;196:10,
14;197:25;198:6;
200:17;201:22;
207:4;208:23;
212:17;215:3;
216:24;217:8;218:1;
221:14,16;226:14;
234:4,13;241:9;
244:12;245:23;
246:6;247:10;
249:23;250:12,19;
251:19;255:18;
257:14;261:12;
262:10,12;266:13;
267:25;271:23;
274:2;275:18;277:8;
279:19,23;282:25;
287:2;299:10,10;
300:21;304:9;
305:14;307:1,4;
313:14;314:5,7;
316:20;324:5,7;
327:20,22;330:19,20;
331:19;332:2;333:7,
13;337:21;342:5;
345:6;346:23,24;
348:1;357:2;358:16;
359:18,22;360:1,2,
13;363:1;364:11,12;
369:5
**ones (5)**
173:18;177:4;
227:9;260:17;357:1
**only (30)**
196:23;198:8;
207:10;209:2;211:4;
212:24;215:21;
220:15;226:12;
235:5;244:12;246:6;
250:1;260:12,17;
272:25;287:3,4,4;
305:7;308:1;309:25;
313:12;323:12;
327:9;333:6;339:24;
347:18;354:1;358:1
**opaque (1)**
365:10

**open (1)**
253:19
**opened (1)**
169:23
**opinion (3)**
283:21;294:10;
339:17
**opinions (1)**
296:1
**opportunity (4)**
261:15;363:10;
366:17;370:8
**opposed (2)**
338:7;348:8
**opposite (1)**
293:3
**oral (10)**
253:1;271:24,25;
338:5,6;348:14,23,
24;349:7;354:7
**order (7)**
212:19;246:6;
249:16;283:3;332:3;
370:16,23
**organization (6)**
230:9,11;301:16;
323:22;324:16;356:9
**organizational (1)**
173:21
**organize (2)**
334:8,10
**organized (6)**
197:1;229:4;233:7,
24;234:10;235:12
**original (8)**
178:15;188:23;
189:4;211:18;
241:15;242:10;
263:19;342:14
**originally (2)**
243:7;254:14
**originated (1)**
203:17
**others (4)**
177:5;325:6,7,10
**other's (1)**
233:8
**otherwise (1)**
319:12
**ought (1)**
231:7
**ourselves (1)**
176:6
**out (114)**
167:18;170:13;
171:5,8,18;173:18;
174:12,15;177:16;
183:1;184:3,6;193:6;
197:9,18,19,20,25;
198:1,2,6;203:8;
208:15;213:3;
219:12;221:12;
225:6;226:15;

230:15;233:17;
238:17,21;239:11,20;
241:24;245:21,25;
246:1,2;247:23;
248:9;251:1,1;254:1,
17;260:21;261:22;
263:8;265:22,24;
267:7;268:18;269:1,
6,10,16;270:4,19,21;
276:17;277:1;
279:21,24;280:21;
281:3;282:13;283:3;
289:15,19;291:11,12;
292:8,14,22,25;
293:1,15;297:25;
299:8,19;301:25;
303:8,17;304:18;
305:22,24;307:23;
310:8;311:16;
313:15;314:19;
317:17;318:1,6,10;
322:8;324:2;325:14;
326:3;329:15;
332:23;333:3;
334:14;339:4;
341:15,16;343:1;
346:11;349:3,7;
351:9;356:21;
357:24;359:20
**outlines (1)**
194:1
**outside (3)**
173:2,3;351:15
**outstanding (2)**
320:21;351:5
**over (33)**
182:17;186:9;
189:5,21;190:19,22;
191:3,4,5;207:3;
208:18;212:6;
215:14;251:2;
260:23;263:12;
287:18;296:15;
314:18;326:3;
329:22;338:23,25;
347:5;359:11,16,19,
21,22;360:4;361:4,4,
5
**overs (1)**
190:15
**overwhelmed (1)**
194:25
**own (18)**
169:8;172:21,23,
24;173:21,23;
192:16;193:5,18;
207:5;267:5,8,18;
268:12;287:3;296:7;
335:19,23

**P**

**packet (1)**

191:14
**pad (1)**
256:5
**page (99)**
174:16,16;191:15,
17,18,19;208:25;
209:13,17,21;210:1,
6,13,17,19;212:3;
213:8;214:1,2;215:3;
216:6;219:2,3,6;
222:15,23,24;237:14,
17;238:1,9,20;
240:10,25;241:2,4,6,
7;242:1,3,6,17;249:5,
15,16;250:8,8,9;
252:23;258:3,4,10,
14;263:4;264:23;
266:18,24;268:20;
272:6,7;273:18;
274:2,5;282:23,25;
283:1,5,6,9,14;
287:24;288:9,10;
303:9,18;304:4;
307:2;308:21;
311:17;331:20,22;
343:8,15,15;344:3,5,
16,18;345:3,6,16,17,
18;363:7,17,24;
366:23;367:12;
368:15
**pages (10)**
191:19;210:19;
211:22;214:19;
239:11;240:6,18;
267:21;343:13,17
**paid (1)**
320:12
**Painesville (2)**
235:16,18
**Palm (27)**
274:3,15;295:14,
15;298:12,16,18,23;
299:3,23;304:21;
305:1;307:7;311:25;
313:17,17;314:10,19;
317:7;363:8,20;
364:14,17,20,23;
365:1,15
**pamphlet (1)**
329:16
**paper (8)**
168:4;173:5;
241:20,24;255:25;
274:12,13;297:24
**papers (3)**
191:15;314:18;
334:13
**paragraph (3)**
269:4;283:20;
307:21
**Pardon (2)**
265:7;312:22
**parent (1)**

346:2
**part (14)**
170:5;198:11;
250:4;276:3;289:24;
291:11,12;298:4,9;
299:18;304:17;
314:23;333:8;345:20
**partial (1)**
307:6
**participate (1)**
353:25
**particular (3)**
169:11;192:15;
365:2
**Particulars (7)**
261:2,4,17,21;
262:1;274:21,24
**parties (1)**
350:17
**partner (1)**
352:8
**parts (1)**
282:3
**pass (6)**
183:14,22;184:14;
186:1;337:1;338:3
**passed (6)**
181:4;183:4;
314:10;337:19,25;
351:2
**passing (2)**
182:15;185:9
**past (2)**
174:11;318:9
**Pat (2)**
258:22;259:12
**pathology (2)**
274:1;315:5
**Patrick (8)**
290:22,23;291:1;
303:2,3,5,13;304:15
**patrolmen (1)**
304:8
**Pat's (1)**
349:21
**pause (1)**
256:18
**pay (2)**
330:5;370:18
**Pedich (2)**
290:19;291:1
**penalty (1)**
171:10
**pending (2)**
227:20;228:18
**penny (1)**
320:17
**people (18)**
177:10,12;179:1;
260:12,13;263:14,15;
269:1,6,10;290:1;
323:12;325:19;
336:16,18;351:6;

353:3;371:3
**per (11)**
169:4;175:14;
225:5;274:4,16;
291:16;292:17;
294:3;299:20;312:5,
10
**percent (1)**
232:4
**perfect (2)**
177:11;201:25
**period (3)**
222:1;265:18;
314:10
**permanently (1)**
260:21
**person (19)**
167:21;176:8;
181:18;183:17;
190:24;218:14,17,21;
221:18;223:18;
224:1;245:12;
268:15;280:8;
282:16;297:7;348:1;
359:8;361:3
**personal (4)**
166:13;175:1,4;
350:14
**person's (5)**
224:7,8;245:15;
280:10;338:4
**Pete (2)**
350:22,23
**phone (10)**
197:5;217:24;
218:2,18,20,22;
221:19;224:20;
232:22;233:15
**photographed (1)**
307:7
**physical (1)**
278:25
**pick (4)**
182:25;224:20;
306:12;337:12
**picked (2)**
168:8;206:10
**piece (12)**
168:3;173:4;
234:20;241:23;
244:10;255:25;
275:6;284:7;297:15,
24;310:19;352:18
**pieces (1)**
274:11
**place (2)**
282:21;335:18
**placed (1)**
327:12
**places (1)**
333:10
**playing (1)**
349:16

**plea (5)**
168:10;259:1,20;
325:17;327:3
**pleading (1)**
214:10
**pleadings (2)**
200:17;261:11
**pleas (8)**
324:8,10,24;325:1,
8,10,15;327:2
**please (14)**
187:25;189:18;
238:9;242:2;249:17;
251:11;253:18;
256:16;257:7;258:3;
262:5;264:24;
268:25;345:3
**Plus (1)**
306:19
**pm (4)**
252:3;275:2,3;
371:7
**point (17)**
167:4;185:19;
218:4;246:24;254:4,
11;270:24;283:17;
285:3;309:6;320:23;
335:5;339:4;351:1;
354:23;361:9;366:14
**pointing (2)**
343:1,8
**points (2)**
184:10,12
**police (72)**
166:22;170:12,20;
179:25;189:20;
191:20,21;192:14;
197:8;203:4;204:10,
14,19,25;217:21;
218:6;229:19;
231:12;253:5;
254:25;255:12;
256:9;257:4;258:1;
265:5,15,21;267:1,3,
6,9;269:5,9,16,21;
270:23;271:8,10;
276:13;278:14,23;
279:16,21;280:4;
284:5;286:1,21;
287:12;289:7,19;
305:5;308:21;
314:16,16;320:12;
332:3,5,7,13,23;
338:14;348:5,16,20;
355:13;358:6,6,16,
21,22;361:7;366:1
**policies (6)**
208:1,6;322:12,18;
330:12;337:3
**policy (8)**
182:10;183:12;
328:9,23;329:1,11;
335:1;355:11

**Pollutro (1)**
197:7
**polygraphs (3)**
199:3;200:2,6
**poor (2)**
223:9;224:1
**pop (2)**
174:12;196:23
**portion (2)**
310:15,17
**position (1)**
325:16
**positive (1)**
367:7
**possession (7)**
203:25;204:10,14,
25;220:12,19;283:18
**possible (4)**
275:13;306:24;
307:5,22
**possibly (1)**
197:15
**potential (8)**
236:3,5,13,15;
237:1;246:16;340:4;
356:2
**potentially (2)**
234:21;354:25
**Practically (1)**
293:24
**practice (1)**
183:13
**practices (4)**
208:1,6;322:12,18
**precipe (3)**
251:1;257:15;
262:8
**preliminary (4)**
317:15;360:6,8,10
**prep (3)**
180:16;214:4;
221:7
**preparation (7)**
187:7;193:25;
195:11;213:1;
276:14;296:12;
312:18
**preparatory (1)**
267:22
**prepare (5)**
250:2;252:6,13;
266:5,8
**prepared (2)**
251:20;253:12
**preparing (3)**
180:1;215:5;
262:12
**prepping (1)**
220:9
**present (10)**
266:5;272:9;
308:16;309:18;
310:21;331:12;

347:8;354:6;360:3,
25
**presentation (2)**
266:6;276:14
**presentations (1)**
347:25
**presented (8)**
171:17;222:11;
227:2;272:18;
302:24;347:10;
359:10;362:11
**presenting (4)**
275:23;326:16;
329:25;330:1
**preserved (1)**
335:13
**pressure (2)**
327:12,12
**presumably (1)**
367:5
**presume (1)**
313:21
**Presumes (2)**
218:11;354:17
**presuming (2)**
232:2;246:5
**presumptuous (1)**
319:7
**pretrial (24)**
167:20;168:17;
172:19,20;196:4;
214:5,7,12;220:16;
240:2,4;247:6;
248:15;260:19;
266:8;268:3;318:1,3,
11,18,19,22;336:17;
337:10
**pre-trial (1)**
268:4
**pretrials (16)**
168:4;174:5;176:8;
191:24;192:6;
195:16,24;198:4;
220:1,3;240:1;247:4,
15,16;264:20;297:1
**pretried (1)**
182:24
**pretry (1)**
196:1
**pretty (20)**
168:20;177:16;
178:23;180:6;188:9;
192:3;200:9;226:20;
230:17;292:9;
302:13,14;327:19,22;
328:19;329:2;
341:10;347:16,25;
349:12
**previous (2)**
209:4;299:23
**previously (13)**
166:14;193:10;
247:2;252:9;296:24;

print - recent

297:1;331:18,24;
338:12;341:20;
342:13,23;366:20
**print (76)**
274:3,15;292:3,11,
17,18;293:9,15,17;
294:2,3,4,10,11,14,
17,23;295:1,2,6,14,
15,22,23;297:12;
298:2,13,16,18,23;
299:3,23,25;300:3,4,
15;304:11,21;305:1;
307:7,12,13,23,24;
308:8,23;309:7;
310:6,22;311:24,25;
312:1,5;313:17;
314:10;315:19,23;
316:4,8,12,13,16,18,
19;318:25;319:4,5;
363:8,20;364:14,17,
20,23;365:1,15,16
**printing (2)**
283:16;288:21
**prints (3)**
314:19;317:7;
318:24
**prior (3)**
234:15;353:16;
362:2
**private (1)**
174:24
**privately (1)**
223:20
**probable (2)**
307:25;308:25
**probably (45)**
176:15;178:25;
179:11;181:14;
194:24;199:12;
212:25;213:1;
216:20;230:18;
232:20;236:18;
238:22;239:3;
243:21;245:7;
247:23;256:4;
259:10;261:7;
263:10;269:11;
271:3;272:8;274:11;
276:13;279:14;
285:13,14;286:17,19;
287:17,18;302:11;
303:22;319:22;
324:25;325:3;
335:24;343:24;
346:11;349:3;
351:13;359:1,2
**problem (7)**
177:24;203:1;
246:17;251:9;
294:18;327:23;
335:11
**problems (1)**
316:20

**procedure (22)**
182:10,13,13;
183:9;184:2;205:18;
207:22;227:16;
245:10;269:25;
270:11,12;271:22;
300:12;305:12;
314:2;321:23;
329:15;330:18;
344:19;345:18;
346:11
**procedures (1)**
326:15
**PROCEEDINGS (2)**
166:1;201:1
**process (3)**
189:9;190:12;
191:5
**produce (1)**
281:10
**produced (3)**
211:19;281:15;
283:3
**producing (2)**
281:12,12
**production (1)**
343:4
**professional (2)**
351:17;352:4
**Proffert (1)**
289:9
**program (1)**
174:23
**progression (1)**
310:13
**promises (2)**
228:8,11
**properly (2)**
275:24;289:13
**prosecuting (2)**
224:1;242:21
**prosecution (2)**
238:15;293:24
**Prosecutor (69)**
167:11;168:12,15;
170:24;175:6;181:3;
182:12,25;183:5,23;
185:8;186:3,6;
188:14;189:21;
190:9,11,18;206:9;
214:14;234:1;
240:15,16;247:22;
253:25;255:5;
259:11;260:2;261:6,
10;302:5;314:25;
323:25;324:5,23;
325:17,24,25;328:22;
330:15;331:3;332:6;
334:10;335:23;
337:2,9;338:1;
339:11;345:21;
346:14,18,21;352:5,
18;354:13,23;

356:13;358:3,9,11;
359:5,7;360:1,18,20,
21,23;361:12;362:4
**prosecutorial (1)**
175:5
**prosecutors (34)**
171:19,20;172:10,
14,17;175:25;
178:16;181:7,11,13,
15;183:14;188:15;
189:23;257:4;
262:15;324:9,15,25;
325:11,12;326:10,10;
327:7;330:11;
331:12;332:11;
333:14,24;337:1;
347:7;358:10;
359:22;360:19
**prosecutor's (28)**
168:16;187:19;
188:20;189:11;
194:2;203:25;205:2,
9;208:2;211:19;
239:1;240:12;
252:18;264:3;
265:16;281:14;
322:12,19;328:3;
329:9;334:9;336:6;
337:11;346:13;
355:21;356:8,22;
366:7
**prospective (4)**
221:9;267:25;
301:23;321:13
**prospects (1)**
214:10
**prostitution (1)**
227:24
**protect (1)**
245:7
**protection (3)**
245:12,15;246:4
**prove (1)**
259:2
**provide (1)**
300:2
**proving (2)**
236:9,9
**public (2)**
223:11;224:7
**Puin (1)**
209:25
**pulled (4)**
260:21;282:12;
335:17;342:22
**Pullotro (1)**
320:6
**purpose (1)**
220:16
**pursuant (3)**
314:15;340:22,24
**pursue (1)**
280:7

**pushed (1)**
275:19
**put (32)**
166:22;185:15;
189:7;197:13;
203:19;211:9,10;
219:19;226:16;
239:7;240:11;
241:22;243:1;
254:19;266:6,9;
280:19;297:15,16,20,
22,23,23,24;298:5;
308:3;312:13;
327:13;334:13;
335:16;344:24;
363:12
**putting (2)**
266:1;347:25

---

## Q

**quick (3)**
168:21;237:5;
369:6
**quite (3)**
320:14,17;351:3

---

## R

**raise (1)**
351:11
**rape (1)**
347:19
**rare (2)**
225:16;326:2
**Rarely (3)**
170:23;198:24;
347:17
**rather (5)**
214:4;245:11;
319:19;329:1;330:9
**reached (2)**
233:17;313:15
**read (36)**
176:25;189:24;
190:25;209:18;
215:21;216:8,18;
217:4,16;220:4;
240:7;243:11;245:6;
252:15;253:5;
292:10,13;315:15;
326:15,15;329:18,20,
20;330:6,8;332:10,
17;333:4,13,14;
334:23;337:15;
339:1,3;367:2,10
**reading (6)**
209:16;274:25;
304:4;318:4;326:5;
330:11
**reads (1)**
283:20
**ready (7)**

213:2;214:15;
221:13;267:23;
268:5;303:25;327:17
**real (2)**
233:4;350:9
**realized (1)**
342:3
**really (16)**
169:25;170:1;
178:3;195:12;
198:13;221:15;
261:19;262:2;
279:21;280:23;
285:8;286:4;320:20;
329:8;336:24;342:7
**reason (11)**
212:20;215:23;
216:1;239:15;243:3;
260:9;263:14;306:2;
354:1;364:25;367:16
**reasonable (2)**
274:12,13
**reassigned (2)**
178:17;263:20
**recall (93)**
172:3;176:12;
186:13,23;187:20;
206:19;210:10,11;
211:23;215:16;
218:2,13,21,22;
219:4;222:9,10;
224:19;225:3;
226:10;227:6,11,12,
18,23;228:22;
232:25;236:6;237:4;
240:11;244:9;246:8,
17,24;252:8;256:15,
15;257:14,23;258:2;
261:1;262:11;
264:18;266:23;
269:12,13;271:2,4;
273:12;275:4,4;
278:2,20;279:6;
281:12,19,20,25;
283:7,11;284:14;
287:14,17;290:9;
296:11,22;297:1,6;
299:9;300:5,16;
301:22;303:16;
305:10;315:14;
316:3;319:2,8,14,20;
320:24;322:6,7;
335:10,16;355:25;
357:22,23,24;368:25
**recalls (1)**
367:4
**received (6)**
187:20;189:1;
225:10;263:10;
270:23;274:18
**recent (1)**
231:9

**recently (1)**
204:20
**Recess (3)**
237:9;320:2;369:9
**recognize (8)**
219:11;238:3;
257:9,18,19;344:14;
345:10;350:21
**recollection (10)**
187:17;201:23;
231:20;246:15;
249:3;278:16;
282:15;344:23;
356:5;363:1
**record (35)**
166:2;202:19;
205:5;208:25;
210:16;211:12;
213:7,25;214:17;
220:17;221:25;
222:14;227:17;
228:14;229:12,16;
237:7,11,19;239:19;
253:14;260:19;
266:7;304:3;319:25;
320:4;335:14;336:2,
7,14;342:21;369:7,
11;370:4;371:5
**recorded (3)**
260:25;335:15;
336:5
**recordings (1)**
340:23
**recordkeeping (1)**
206:25
**records (20)**
166:16,21;168:2;
170:13;172:5;175:1,
4;188:24;189:10;
190:8;198:20;
200:21;210:12;
260:25;271:8,12;
276:5,10;336:4,19
**REDIRECT (1)**
361:19
**refer (3)**
171:16;328:12;
342:7
**reference (3)**
258:23;278:19;
368:11
**references (6)**
345:11,12;365:22,
23,25;368:20
**referred (2)**
329:21,23
**referring (4)**
193:13;210:17;
253:15;307:1
**refiled (1)**
168:2
**reflected (1)**
205:8

**refresh (2)**
246:15;278:15
**regarding (6)**
195:10;225:11;
273:20;297:11;
313:16;363:8
**Regina (3)**
321:19;322:3;
340:11
**Regina's (1)**
345:12
**regular (1)**
341:1
**regularly (5)**
178:19;205:17;
233:13;242:11;276:2
**reindicted (4)**
206:15,21;207:17;
263:25
**reindictment (1)**
263:19
**related (10)**
175:1,5,10;227:1;
229:5;238:11,13;
246:9;259:22;279:24
**relation (8)**
177:14;199:8;
200:3;204:25;
205:12;212:12;
232:8;322:10
**relationship (10)**
215:24;232:24;
349:23,24;350:14,19;
351:15,21;352:2,4
**relatively (1)**
305:11
**release (1)**
280:7
**released (1)**
366:1
**relevant (2)**
271:10;286:10
**relief (15)**
223:2,5,8,9,10,14,
19;224:2,8,10,17;
225:5,6,10,15
**rely (1)**
328:25
**remained (1)**
220:19
**remaining (1)**
180:14
**remember (86)**
167:16;173:2;
176:17,21;178:12,21;
179:2;181:16,17;
185:10;186:4;187:8;
194:10,11;195:23,24;
196:3;197:7;199:4,
12,13;201:10;205:13,
14,25;206:4,6,8,14;
209:11;215:19;
217:5;219:14,18;

226:7,12,18;235:2,
10,11,13,21,23;
236:17;248:6;
250:18,18;260:15;
261:24;262:24;
263:1,22,24;264:10;
268:22;274:25;
278:11,12;282:2,3,4,
6,7;284:3;289:3;
294:24;295:3,5,24;
306:1;321:18;
329:12;333:6,7;
340:9;346:16;
349:16,19,22;350:1;
351:23;352:1;
357:16;367:6,23;
368:3
**remembered (2)**
235:1;282:9
**remembering (1)**
226:13
**remind (1)**
250:10
**reminding (1)**
251:9
**repeat (1)**
357:14
**rephrase (1)**
293:6
**report (64)**
170:22;195:14;
198:5;203:5;215:22;
225:13,14,19;232:16;
253:5,8;254:25;
256:9;267:7;269:17,
18,22;270:1,7,23;
273:1;274:1,2;277:7;
283:1,10;284:22;
286:18;289:8,10;
300:2,5,14,16,19;
304:20;305:2,4,7,10,
11,19,20;306:4,23,
24;307:6;308:1,2,3,
21;309:1;312:15,16;
314:5;319:10,13,17,
18;335:5;345:4;
348:19;349:8;355:10
**reported (1)**
273:8
**reports (34)**
170:12,20;172:24;
179:25;187:18;
189:21,23;215:2;
217:21;232:9,17;
253:9;255:12;267:1,
4,9;271:10;277:5;
278:15;283:12;
285:17;289:18,20;
306:5;312:19;315:3,
6,15;317:15;318:7;
348:16;352:13;
366:2,3
**represent (1)**

202:1
**representations (1)**
338:13
**represented (1)**
201:19
**representing (2)**
342:11,21
**reprosecution (1)**
231:10
**request (12)**
166:16;188:24;
250:20;257:15;
271:12,15;275:25;
276:5,10,20,25;277:1
**requested (1)**
276:18
**requests (1)**
271:8
**require (1)**
174:19
**required (7)**
270:14;326:16;
332:11,24;334:2;
337:17,23
**reserve (1)**
370:24
**respond (1)**
252:11
**response (4)**
251:14;252:6;
253:21;256:10
**responsible (4)**
173:17;256:11;
331:10,11
**rest (6)**
167:18;286:18;
326:19;352:4;
367:10,12
**resubmitted (1)**
207:1
**results (4)**
271:23;300:10;
309:3;315:10
**retirement (1)**
350:17
**return (2)**
258:21;260:10
**reversed (1)**
357:1
**review (13)**
185:8;195:9;
255:16;264:2;
272:16;278:14;
283:8;289:12,25;
362:12;370:8,15,25
**reviewed (6)**
211:1,23;246:14;
343:11;365:21,22
**reviewing (2)**
290:4;367:17
**rhyme (1)**
212:20
**rid (2)**

168:20;223:25
**right (235)**
166:10,17,18;
168:6,15,23;169:24,
25;170:12,12,14;
171:20;172:11,12;
173:22,24,25;175:14,
15,21;177:12;
178:18;179:16;
183:16;184:4,20;
185:21;187:4,10;
190:10;191:23,24;
193:12;195:8;196:9,
13,14;200:10,14;
201:6,20;202:13;
203:4,6,11,16,18,22,
25;204:23,23;205:16,
21;207:7,24;208:9;
210:4,14,24;211:1,2,
7,8,24,25;212:1;
213:12,18;214:20,21;
215:3,3,7,8;218:19;
219:6;220:12,16;
222:16,25;223:23;
227:17;230:13;
236:1,13,24;237:15;
239:13;241:11;
242:20;244:11;
246:21,22;247:4,5;
248:24;249:2,19,25;
252:12,13,19;254:5;
255:2,4;256:8;
258:18;259:15;
261:6;262:8;263:1;
266:14,21;267:16;
270:18;271:21;
273:21;274:4,14;
275:15;276:7;277:8;
281:8;282:21;283:6,
18,23;284:2,3;285:3,
7,11;286:13,14,16,
23;288:1,11,25;
289:23;290:2,4,21;
291:6,9,21;293:1,2,3,
9,22,23;294:5;295:7;
300:9,9,19;303:7;
306:6,7,22;307:8,10,
13,14,15,18;308:10,
19,23;309:8,10;
310:6,12,14,15,23;
311:12,17,18;312:4,
6,21,23;313:18,22;
314:11;315:5,20;
316:9;321:4;323:1,
24,25;324:13;
327:25;328:18,20;
330:20;334:3,25;
335:20;336:8;
337:12;338:15;
342:1,6;343:3;
345:19;347:23;
349:22;354:11;
357:6,16;358:4,21;

359:13;360:14,16;
  361:5,12,14,15,17;
  363:20;366:22;
  367:1;368:10,13,17;
  369:17;370:12,13,14,
  25
right-hand (1)
  167:16
River (1)
  167:2
robbery (5)
  169:16;190:1;
  259:1,6,20
Robert (2)
  181:4;194:14
Rocco (2)
  197:7;320:6
Rocky (1)
  167:2
role (2)
  290:4;358:11
Ron (3)
  180:10;186:8;
  244:17
room (28)
  166:17;168:2;
  170:13;172:15;
  177:8;178:2;181:19;
  188:24;204:5;
  220:13,17;221:25;
  226:16;246:23;
  249:8;256:5;260:20,
  25;263:21,22;266:7;
  323:10;335:14;
  336:2,14;346:8;
  359:8;360:3
rooms (4)
  177:8;181:12;
  325:12,13
rotated (1)
  182:9
rotation (1)
  336:25
routinely (1)
  223:24
Rowell (2)
  230:21;349:25
Ruggeri (9)
  175:20,20;176:3,
  13,18;177:15;178:5,
  6,12
Rule (2)
  252:7;333:2
ruled (1)
  336:24
rules (9)
  329:24,24;332:12,
  18;333:12,18;334:2;
  358:24;370:1
ruling (1)
  326:1
run (1)
  223:17

running (1)
  347:23

S

sake (1)
  180:22
salient (1)
  308:4
same (35)
  167:24;172:15;
  184:25;188:18;
  192:7;193:16,16;
  204:5;206:1,3;207:1,
  12,15,16,16;211:24;
  213:15;223:16,19;
  250:5;281:8;292:25;
  293:21,21,24;296:5;
  299:7,12,16;313:12;
  315:5;321:17;
  332:12,16;352:4;
  365:1
Sarah (4)
  229:17;304:5;
  313:5;366:13
sat (1)
  230:23
Saturday (8)
  187:18;197:9;
  209:9;210:3;212:6;
  219:5;232:7;254:23
save (1)
  174:8
saved (1)
  174:9
saw (16)
  206:3;235:9;
  255:23;257:14;
  261:12;262:2;
  271:14;300:16;
  302:2;306:24;307:5;
  308:21;317:2;
  333:21;349:6;367:8
saying (15)
  187:17;191:11;
  197:3;198:15;203:4;
  206:6;224:22;235:4;
  264:10;273:5;
  299:18;306:1;
  308:20;315:2;325:9
scanned (1)
  203:20
scanning (1)
  239:14
scientific (4)
  253:8;301:15,17;
  302:23
Scott (4)
  243:22,25;244:1;
  282:1
scratched (1)
  303:8
screw (1)

329:4
Scribbling (1)
  288:12
search (1)
  326:17
second (14)
  168:19;171:12;
  186:7;208:24;218:7;
  219:3;234:5,8,13;
  250:8;307:20,21;
  313:14;369:5
secondarily (1)
  323:14
secretaries (2)
  188:12;254:1
secretary (3)
  188:8;250:22;
  263:8
sections (2)
  249:5;330:8
seeing (8)
  172:3;210:10,11;
  222:10;239:25;
  250:18,19;367:5
seem (1)
  229:21
seemed (1)
  285:17
seems (8)
  176:23;180:23;
  214:23;245:1;
  298:22;307:25;
  327:1;367:13
seizure (1)
  326:17
sell (1)
  283:25
seminars (2)
  328:8;333:2
send (5)
  221:12;276:12;
  277:4;283:12;328:8
sending (4)
  259:10,16;335:19;
  359:22
sends (1)
  332:23
senior (2)
  328:21;333:14
sense (19)
  168:11;169:21;
  170:9;174:1;176:10;
  177:6,11;180:23;
  182:15;187:15;
  212:9;216:3,19;
  241:25;268:3;274:9;
  308:6;328:24;329:1
sent (10)
  188:16;220:21;
  251:1;254:1;260:19,
  24;289:19;314:4;
  319:10;335:14
separate (4)

169:10;173:8;
  255:24;300:21
September (10)
  177:25;179:7,14,
  21;204:7;213:11,22;
  284:23;285:15;
  316:22
sergeant (5)
  288:25;289:2,11,
  11,17
series (1)
  261:24
serve (1)
  263:13
set (14)
  182:24;184:2,3;
  221:11,11;248:10;
  258:23,24;259:4,18;
  318:10,18;329:15;
  332:12
sets (2)
  317:25;318:3
settled (1)
  337:10
several (2)
  365:21;368:2
sex (1)
  227:25
share (1)
  172:15
sheet (2)
  170:17;256:25
Sheriffs (1)
  263:10
Sheriff's (4)
  194:16;238:23;
  251:2;263:9
short (1)
  178:23
show (6)
  198:14;258:25;
  259:19;304:12;
  331:16;341:19
showed (1)
  192:4
showing (2)
  246:25;366:19
shows (1)
  215:3
shredded (1)
  241:21
side (13)
  168:18;242:15,20;
  247:21;258:18;
  338:22,22;350:7,8;
  351:24;353:24;
  362:10;367:14
sign (5)
  167:19;198:9,15;
  261:11;341:5
signature (8)
  288:4,5,8,16,19,20,
  21;371:8

signed (3)
  166:15;261:5;
  288:7
significance (2)
  226:7;292:12
significant (11)
  183:2;185:19;
  226:20;275:6;
  277:17;284:6,21;
  294:11,13;297:13;
  310:19
Similarly (1)
  192:14
single (1)
  327:3
sit (10)
  171:6;176:4;
  177:21;185:7;186:9;
  189:22,23;280:22;
  311:23;349:1
site (1)
  241:16
sitting (6)
  183:20;186:7;
  205:25;218:22;
  297:6;367:23
situation (3)
  280:18;285:1;
  317:11
situations (3)
  279:15,20;335:22
SIU (61)
  274:4,16,19;289:5;
  290:8,12,25;291:16,
  17,25;292:2,17;
  294:25;295:6,21;
  296:18,21;297:12,24;
  298:10;299:13,19,20;
  300:2,9,18;301:20;
  302:15,22;304:20;
  305:19;306:4,23,23;
  307:5,22;308:22;
  309:6;310:6,21;
  311:24;312:5,10,16;
  313:11,15;315:12;
  316:1,4,7,11;318:23;
  319:3,14;363:11,19,
  21;364:13,23;
  365:14;368:12
six (12)
  167:5;178:23,25;
  179:9,9,21;185:18;
  194:21;199:8,21;
  205:20;256:2
size (1)
  256:5
sketch (1)
  190:4
skis (1)
  326:3
sledgehammer (1)
  336:12
sloppy (4)

256:3;292:10;
301:9;334:20
**sloughed (1)**
223:24
**small (2)**
256:1;343:6
**smaller (1)**
201:21
**smeared (15)**
274:3,16;298:18,
23;299:4,24;311:5,8;
317:9;363:20;
364:15,20,24;365:9,
15
**Smith (8)**
257:21,23,25;
366:15,25;367:19,22;
368:16
**so-and-so (1)**
185:8
**Sobiensky (1)**
304:16
**social (1)**
350:5
**softball (1)**
349:18
**solve (1)**
286:21
**somebody (4)**
182:16;211:9;
224:6;280:3
**somehow (6)**
234:3;238:13;
263:20;358:3,9;
360:18
**someone (14)**
193:7;223:11;
224:6;242:23;
245:10,17;255:8;
257:5;267:19;
268:14;291:17;
326:4;349:2;358:8
**sometime (1)**
341:15
**sometimes (7)**
175:24;191:21;
192:2;193:4;196:19;
224:5;241:17
**somewhere (8)**
185:6;247:10,14;
272:1;276:7;300:8;
317:2;358:8
**sons (1)**
350:25
**soon (3)**
252:10;362:9,17
**sorry (18)**
181:16;191:11;
192:22;204:13;
219:1;241:9;283:9;
290:11;298:4;
302:16;304:8;307:2;
313:2,4,5;324:6;

341:24;345:6
**sort (4)**
240:19;242:17;
256:24;327:14
**sounding (1)**
176:1
**sounds (1)**
308:24
**speak (4)**
264:16;272:21;
287:12,15
**speaking (4)**
222:14;363:19;
364:13;368:11
**special (6)**
170:25;178:10;
185:15;196:3;
335:21,22
**specific (9)**
186:24;196:15;
235:21;271:15;
299:25;319:15;
368:6,19,25
**specifically (15)**
182:6;185:17;
187:8;189:14;
210:11;236:17;
266:25;271:2;
278:21;287:17;
289:3;295:3;319:20;
321:12;323:13
**specifications (1)**
171:13
**speculation (13)**
255:14;279:12;
280:14,16;285:22,23;
286:1;287:1;309:19,
22;321:21;347:15;
348:12
**speculative (1)**
347:16
**speedy (1)**
168:21
**spent (1)**
330:19
**split (1)**
234:3
**spoke (12)**
215:16,19;217:6,
24;257:23;264:6;
291:17,24;292:2;
295:21;322:3;368:16
**spoken (1)**
217:25
**sporadically (1)**
201:1
**sports (1)**
352:9
**spread (1)**
324:2
**St (1)**
349:21
**stack (1)**

194:25
**stage (6)**
177:18;265:19;
268:4;284:19,25;
312:17
**stamp (5)**
188:13,20;214:2;
261:8;277:12
**stamped (14)**
187:19;188:19,25;
191:10,11,12,15,16,
19;210:17;222:15;
253:15;304:4;343:15
**stamps (1)**
343:2
**stance (1)**
293:25
**stand (9)**
177:19;194:19,20;
291:19;297:25;
312:14;339:24;
348:1;349:10
**standard (12)**
189:19;255:22;
289:17;305:21;
314:22;325:20;
327:22;328:14,15;
334:7;341:18;347:16
**standards (2)**
289:14;328:17
**standpoint (3)**
182:20;226:22;
295:19
**Stanick (2)**
351:25;352:1
**Staple (1)**
256:7
**stapled (1)**
191:18
**star (3)**
242:23;243:1;
308:3
**starred (1)**
244:10
**stars (1)**
244:13
**start (24)**
166:11;170:17;
171:7;172:6;173:12;
187:11;190:2;191:4;
214:13;221:1,2,2,6,
21,23;240:22;
242:21;248:3;
252:11;255:24;
263:12;276:19;
318:20;337:12
**started (9)**
167:7;214:21;
233:7,13;243:7;
252:10;254:23;
293:11;325:14
**starts (2)**
241:20;258:21

**State (2)**
167:14;283:24
**statement (46)**
193:9;217:4,8,19,
21;252:15,16;253:1,
1;258:1;271:24,25;
285:25;286:5;299:2;
310:5;311:12;338:6,
8,13;340:14,19;
341:3,4,13,16,18;
348:4,6,7,9,13,22,23,
24,25;349:1,7;
352:24;353:22,23;
354:7;362:2,7,15,19
**statements (12)**
217:18;293:20;
338:5,5;340:13,15,
17;341:12,14,22;
348:17;353:16
**stating (1)**
300:2
**station (7)**
198:23;199:1,1,11,
18,22;206:11
**status (1)**
267:24
**statute (2)**
171:16;189:24
**statutes (1)**
172:7
**stay (3)**
222:2;260:22;
346:16
**Steele (1)**
194:14
**Stephanie (2)**
324:12;325:25
**steps (2)**
186:1;337:18
**Steve (1)**
268:25
**stick (1)**
173:5
**sticker (1)**
170:3
**still (12)**
213:16;229:14;
231:4,4;246:23;
253:15;268:8;
312:19;316:21;
327:1;346:2;359:16
**stop (2)**
319:7;342:8
**stories (1)**
337:24
**straight (3)**
190:8;358:19;
359:4
**Street (2)**
259:18;336:9
**strength (1)**
275:20
**stretch (1)**

176:14
**stretched (1)**
175:24
**stretches (1)**
175:19
**strike (3)**
268:9;341:25;
364:18
**struck (1)**
177:18
**stuck (2)**
235:25;357:24
**stuff (12)**
172:25;181:12;
202:11;233:20;
238:21;244:12;
247:20;249:6;303:8;
315:11;327:19;
355:13
**subject (4)**
254:3,20;255:21;
339:5
**submit (1)**
362:6
**submitted (3)**
261:5;289:10;
298:15
**subpoena (4)**
215:4,6;250:20;
270:6
**subpoenaed (2)**
226:9;263:16
**subpoenas (3)**
251:1;262:9;
263:13
**suburbs (2)**
190:16;358:17
**subversive (2)**
230:12;234:21
**sufficient (1)**
292:22
**suggest (1)**
212:24
**suggestion (2)**
182:19;197:17
**SUI (1)**
294:3
**suited (1)**
327:16
**summary (1)**
300:20
**Summers (3)**
264:20;297:2,8
**supervisors (4)**
177:3;322:25;
323:4,9
**SUPP (1)**
343:4
**supplemental (2)**
366:2,3
**suppress (1)**
330:3
**sure (65)**

175:8,9;182:8;
183:2,3,17;184:7,23;
186:13;188:7;
192:13;198:3;
202:25;203:17;
205:19;209:11;
210:23;213:10;
215:5;216:24;
221:21;226:2;
227:14;232:4,15;
240:7,25;243:8,23;
247:19;253:7,10;
262:4;266:11;
267:20;268:21;
271:3,9;272:2;274:9;
276:16,16;297:14;
302:8,13,14;305:11;
310:7;312:9;314:2;
315:12;329:21;
330:7,11;340:4;
343:14;344:2;347:2;
349:19;351:2;
353:20;354:19;
357:3;358:20;367:20
**surprised (3)**
180:2,2;282:11
**Surprisingly (1)**
312:16
**surveillance (1)**
230:19
**suspect (13)**
265:17;278:5,17,
21,24;279:1,8;280:5,
6,7,9;286:9,13
**suspects (2)**
279:16,23
**Sweeney (5)**
179:3,4;248:10;
318:10;344:8
**Sweeney's (6)**
181:18;204:5;
238:20;260:14;
318:16,16
**swells (1)**
241:20
**switched (2)**
179:12;180:3
**sworn (2)**
166:5;239:20
**system (1)**
262:3

**T**

**tab (1)**
266:16
**table (1)**
194:3
**tactics (1)**
281:3
**talk (18)**
182:5;187:6,12;
196:20;222:8;227:4;

262:22;264:12,22;
279:22;281:8,18;
286:20;303:15;
316:4;320:14;325:1;
367:25
**talked (13)**
196:13;218:6;
221:18;291:7;
296:14;297:9,9;
303:16;312:12;
346:7;350:24;
355:18;366:20
**talking (34)**
178:12;193:2,7,17;
197:21;205:13,25;
216:6;218:2,13,20,
20,21,23;222:9;
227:11,12;236:12;
251:15;262:24;
263:1;264:18;267:5,
18;268:11;281:19;
295:16;296:22;
299:13;319:21;
322:6,7;367:9,24
**Tall (1)**
352:1
**taught (3)**
326:13,19;330:22
**Taylor (3)**
262:16,19,22
**team (1)**
324:21
**teams (3)**
175:18;177:3;
178:18
**technical (1)**
254:18;302:22
**Technically (2)**
287:2;339:21
**tedious (1)**
348:25
**telephone (7)**
197:10,21;224:24;
232:23;235:3;277:3;
324:17
**telling (5)**
246:1;259:18;
297:12;306:10;336:9
**tells (1)**
266:7
**temperature (1)**
290:5
**tenuous (1)**
248:2
**term (1)**
325:18
**termination (1)**
173:18
**terms (9)**
177:13;203:16;
204:9;246:15;321:1;
323:21;327:6;
328:19;334:7

**test (1)**
309:4
**tested (1)**
315:23
**testified (20)**
166:6,14;196:5;
216:5;247:15;
270:13;272:14;
296:24;297:1;
338:11,21;347:13;
353:15,21;362:6,18,
21;363:3,14,17
**testify (2)**
192:15;202:4
**testifying (1)**
362:10
**testimony (11)**
196:19;210:2;
216:7,15;219:4;
226:19;254:22;
301:4;354:8;362:1,
15
**testing (2)**
313:21;330:10
**Thanks (1)**
370:5
**theirs (2)**
233:6;355:8
**thin (1)**
175:24
**thinking (4)**
300:7;311:18,19,
20
**third (6)**
169:18;176:8;
181:18;260:16,16;
297:7
**thorough (1)**
349:4
**thoroughly (1)**
309:2
**though (15)**
184:19;189:14;
196:18;269:12;
271:3;274:10;
276:17;284:4;329:2;
333:21;334:1;
345:11;347:17;
360:6;368:24
**thought (15)**
178:22;180:4,25;
187:13;192:22;
205:4;220:18;230:7;
251:19;282:9;
296:25;327:16,17;
345:14;354:4
**Thoughts (1)**
303:23
**threaten (1)**
353:3
**threatened (2)**
246:12;321:7
**three (28)**

169:19;171:22,24;
175:13;177:7;178:2,
16,20,22;181:10;
189:6;197:13,22;
221:4,12,13;254:16;
263:15;295:9;318:9;
323:16;325:10,21;
327:18,21;338:24;
349:20;350:25
**three-man (2)**
323:15;324:21
**threw (1)**
333:16
**throughout (3)**
210:20;277:16;
322:17
**thus (1)**
186:16
**Tim (4)**
209:25;262:16,19,
22
**times (12)**
196:5;215:16;
259:4;273:8;277:25;
295:9;334:20;346:8;
350:24;351:14;
365:21;368:2
**timing (1)**
277:16
**tip (1)**
354:3
**today (3)**
166:11;247:2;
311:23
**todisclose (1)**
331:14
**together (15)**
170:7,8;175:16,22;
176:13,16;180:7;
203:19;204:5;
205:18;235:11;
261:22;287:19;
306:19;333:7
**told (28)**
180:20;181:17;
186:15;191:2,10;
194:19;197:6;207:7;
242:9;269:6;292:3;
294:25;295:6,22,25;
299:22;306:4;
308:22;309:6,13,15;
311:24;312:2;
333:12;338:6;
340:11;349:11,22
**Tom (8)**
176:15;228:25;
229:1;230:18;
232:24;235:10;
345:25;346:15
**ton (1)**
195:2
**took (10)**
186:21;207:11;

215:1;278:23;323:1,
5;331:1;337:18;
341:13;349:9
**top (6)**
177:7;241:9;
248:20;249:19;
263:4;318:12
**totally (1)**
358:2
**touch (1)**
264:8
**tough (1)**
347:4
**tour (2)**
178:24;179:11
**tours (1)**
178:19
**toward (2)**
213:20;296:12
**towards (3)**
213:22;296:2;
344:16
**town (1)**
351:24
**track (2)**
328:20;357:2
**tracking (1)**
277:7
**train (1)**
177:11
**training (7)**
183:18,19,20;
327:24,25;328:2;
335:1
**transcript (4)**
370:9,16,19,24
**transcripts (1)**
272:16
**transfer (1)**
202:19
**transferred (2)**
206:7;360:21
**trial (83)**
168:1,21;173:13;
174:22;176:4,7;
180:1,15;182:24;
183:19;185:18;
192:16;193:19,25;
194:3;195:6;196:22,
22;200:24;202:23;
205:21;213:1,3,4;
214:4,15,16;215:6;
217:1;219:20;220:9,
20,22,25;221:4,6,8,
20,22,24;233:9;
243:4,5;246:25;
247:17,22,24;248:1,
2,5,10;259:5,6,19;
260:20,22;267:22,23;
268:5;271:7;296:12;
297:21;302:7;
306:13,20,21;308:10,
17;310:20;312:18;

317:25;330:1;
331:10;335:13;
338:12;341:23;
354:1;361:25;362:4,
22;369:2,22;370:1
**trials (6)**
220:3,6;221:10,12,
13;327:21
**trick (1)**
202:9
**tried (15)**
167:21,24;174:13;
178:1;186:19;
233:23;234:4,4;
287:9;292:11;317:5;
323:11,14;335:23;
346:8
**true (6)**
185:1;293:5;350:9;
368:5,18,25
**trunk (1)**
226:17
**truth (1)**
216:2
**try (12)**
177:4;180:11,23;
187:14;220:4;
249:15;258:25;
259:19;275:12;
281:2;327:10;330:16
**trying (19)**
180:9,14;185:5;
187:2;194:12,13;
197:1;199:2;202:9;
230:15;245:7;248:6;
268:8;276:16;298:7;
317:7;323:18;327:7;
330:21
**Tubb-Jones (2)**
324:12;326:1
**turn (8)**
240:25;242:1;
249:15;253:18;
256:16;258:20;
338:23,25
**turned (2)**
237:13;292:21
**Turning (1)**
366:12
**turns (1)**
279:24
**two (49)**
167:17;171:24,25;
172:10;175:14,22,25,
25;176:12;177:8;
178:19;187:13;
189:6;194:13;
201:15,16,20,21;
203:13;206:21;
207:11;215:25;
221:11,13,16;226:14;
234:14;269:1,5;
279:23;283:2;

290:10;293:20;
296:16;304:15;
308:25;318:9;320:1;
324:21;325:6,7,19;
327:18,21;338:4,5,
23;358:15;359:22
**two-way (1)**
199:3
**type (21)**
171:8,15;223:11;
230:10,19,23;232:15;
240:19;250:25;
256:6;289:16,17;
300:25;301:1,6,10,
10;302:22;303:19;
349:2,3
**typed (8)**
171:5;190:6;203:8;
253:25;263:9;
340:21;341:3,14
**typed-in (1)**
166:25
**typed-up (1)**
257:17
**types (1)**
315:21
**typically (1)**
364:22
**typing (1)**
193:6

## U

**ultimately (1)**
202:10
**Um-hum (2)**
168:25;200:8
**uncomfortable (1)**
291:22
**uncommon (1)**
337:1
**undated (1)**
317:16
**under (11)**
207:1,12,16;
242:24;245:3,8,9;
252:7;261:8;324:11;
325:9
**understood (3)**
196:18;330:12;
348:5
**Unidentified (1)**
285:8
**Unit (12)**
270:14;301:17;
323:15;340:14;
350:23;351:4,5;
363:19;364:14,23;
365:14;368:12
**units (2)**
178:10;351:6
**unless (10)**
192:10;195:12;

220:6;225:17;
230:23;235:17;
239:23;301:11;
306:15;348:17
**up (75)**
168:8;169:23;
172:20;175:18;
177:3,9,19,21;
178:18,25;180:9;
182:25;184:7;190:2,
4;192:4;195:13;
196:23;197:2;
198:14;206:10;
212:20;219:20,25;
221:21,24;224:20,23;
225:19;231:7;233:1;
234:3;242:20;
244:15,18,21,24,24;
246:25;250:21,23;
252:24;253:25;
256:6,25;257:18;
258:18;263:9;
286:11;291:4,19;
298:20;299:13;
301:24;302:1;
306:12;312:9;
320:24;329:4;
334:21;336:16;
337:12;340:5,21;
341:2,3;349:2;350:3,
7,7;355:4,12;361:21;
362:3,12
**updated (1)**
329:16
**upon (1)**
278:14
**upper (2)**
167:3,16
**upright (1)**
258:16
**upside (3)**
249:23;258:8,20
**U-R-T (1)**
249:1
**use (7)**
220:15;256:5;
297:14;306:20;
317:7;328:14;339:13
**used (5)**
190:14;223:9,22;
268:7;306:7
**using (1)**
170:10
**Usually (7)**
170:21;177:3;
192:2;220:22;
223:13;261:17;
330:18

## V

**VA (1)**
243:19

**vaguely (1)**
346:15
**valuables (1)**
284:1
**value (1)**
334:17
**vanilla (1)**
240:19
**varying (2)**
273:8;277:25
**vast (1)**
184:21
**veracity (1)**
216:21
**verdict (5)**
167:25;168:9;
238:20;239:19;
240:21;260:24
**version (1)**
257:17
**versus (3)**
167:14;200:20;
346:25
**victim (9)**
285:5;286:6,22;
287:6,9;303:19;
304:17;367:5,9
**victim's (1)**
300:25
**VIDEOGRAPHER (8)**
166:2;237:7,10;
319:25;320:3;369:7,
10;371:5
**violation (3)**
356:15,17,18
**violations (1)**
355:11
**volume (6)**
200:18,20,20,21,
23,25

## W

**Wagner (1)**
176:15
**wait (6)**
167:25;211:4;
282:22;299:18;
314:24;359:23
**waited (2)**
314:4,23
**waiting (3)**
324:25;336:16,19
**waive (3)**
370:11,25;371:3
**waived (1)**
371:8
**walk (2)**
188:4;361:6
**walked (1)**
361:7
**walking (1)**
263:11

**Walsh (4)**
288:7,23;290:7;
351:21
**Walsh's (2)**
288:8,14
**Walter (1)**
350:19
**warrant (1)**
265:12
**waste (1)**
359:21
**watched (1)**
199:3
**Waterloo (1)**
234:17
**Watson (1)**
259:17
**Watts (19)**
278:20;281:11,15,
18,22;283:22;284:5;
285:6;286:2,12,16;
287:13,16,21;315:24;
317:3;365:22,24;
366:1
**way (33)**
173:7;179:24;
182:18;183:14;
187:3,7;208:15;
212:16;213:19;
216:4;219:24;
231:17;235:5;242:2,
3,11;246:2;248:23;
271:22,23;286:11;
289:1;310:8;314:7;
315:10;319:12;
334:19,23,24;336:1;
337:19;363:1,5
**ways (4)**
308:12,25;338:24;
358:15
**weakness (1)**
275:20
**wealthy (1)**
320:20
**week (2)**
243:18;359:23
**weeks (6)**
179:9;221:16;
317:17;318:9;
327:18;330:20
**Welfare (1)**
259:17
**weren't (8)**
178:9;200:13;
201:5;235:7;327:16,
17;336:19;337:17
**west (2)**
350:8;351:1
**What's (14)**
171:2;240:23;
265:23;281:4;
298:17,25;326:16;
328:19;331:8,8,9;

339:12;341:19;
358:11
**whenever (4)**
172:22;297:9;
317:24,25
**whereabouts (1)**
224:6
**Where's (1)**
342:9
**White (2)**
320:13;350:7
**whole (8)**
172:1;202:5;
228:12;298:10;
330:6;332:17;
344:25,25
**whose (9)**
210:8;222:21;
250:15;288:5;305:1;
317:9;340:3;343:22;
344:12
**wife (4)**
194:14;269:7;
367:9;369:3
**Willett (1)**
336:11
**Williams (4)**
243:18;244:5;
264:12,13
**Willie (18)**
281:11,15,18,21;
283:22;284:5;285:6;
286:2,12,16;287:13,
15,21;315:23;317:3;
365:22,23,25
**wished (1)**
334:11
**withdraw (1)**
341:25
**without (7)**
173:7;176:1;188:5;
212:25;226:12,12;
287:10
**witness (87)**
193:8;199:16;
202:5;208:21;213:7;
214:1,18,20;215:4,6,
20;216:20;222:17;
226:13;227:2;
230:24;237:24;
242:23;245:7,8,18,
19,20;246:4,10,16;
253:16;256:14;
257:10;258:11;
262:8;265:14;
267:14,15,19;268:11,
17;270:4;280:19,24;
281:1,5,25;287:25;
301:21,22;302:1,15;
304:7;307:18;
312:13;321:6,13;
337:24;338:7,11,21;
339:23;340:25;

341:6,12,15,18;
348:9,13,15,18,20,
23;349:9;353:15,20;
361:18;362:1,6,9;
367:4,4,13,15,20;
370:6,10,13,17;
371:1,4
**witness' (1)**
337:24
**witnesses (41)**
198:25;199:18,23,
24;202:24;216:24;
218:15;220:24;
221:19;225:8,25;
226:4;227:12;
246:25;250:21;
252:16,25;254:3,19;
255:20;256:1,2;
258:25;259:19;
261:14;264:4,6;
267:5,24;279:22;
281:9;301:20;302:9;
341:22;347:17,19;
352:24;354:3;
362:21;363:2;365:2
**witness's (1)**
246:3
**Wolf (3)**
243:22,25;244:3;
267:10
**woman (2)**
219:10;347:3
**wondering (3)**
238:13;332:5;
355:19
**word (6)**
170:11;248:22;
249:10,11,12;329:12
**wording (1)**
294:18
**words (13)**
209:16;213:2;
223:10;248:21;
268:7;292:24,25;
294:1;312:4,13,14;
330:6;334:21
**work (28)**
172:22;175:6,10;
176:18;180:16;
181:24;183:2,11,19;
185:20;221:4,6,23;
224:15;227:25;
229:1;233:9,21;
243:18;254:23;
261:12,22;267:10,22;
275:21;290:1;
326:12;351:16
**worked (23)**
176:13;181:21,25;
182:2;189:9,13,15,
15;198:2;206:2;
229:2,4;233:21;
234:2;235:11;239:8;

254:17;262:19;
320:10;349:25;
350:2;351:14;366:8
**working (34)**
168:13;172:10,13,
22,23;175:13;180:5;
196:20;197:22;
199:9;200:14;205:6,
12,16;206:16;
213:21;219:17,21,22,
23;220:9;221:1,3;
223:19;231:12,15;
233:13;248:3;
252:10;253:24;
255:23;281:20;
327:6;347:7
**workings (1)**
296:6
**works (1)**
267:12
**worksheet (4)**
170:18;171:2,4;
172:2
**worn (1)**
247:10
**worry (1)**
197:23
**Worthy (16)**
215:17;217:22,24;
223:3;224:11,18;
225:11,14;226:3,24;
227:18;228:4,8,18;
321:11;367:8
**Worthy's (1)**
216:7
**wow (1)**
320:19
**wrestling (1)**
352:10
**write (27)**
167:22;168:4;
172:7;173:4;174:6;
184:7;188:17;216:4;
225:19;245:21;
247:20;248:1,12;
252:15,23,24;254:24;
255:19;256:3;
265:22;272:1,8;
274:17;289:8;293:8;
341:2,16
**writes (1)**
256:25
**writing (33)**
171:8;173:3;
179:24;206:4;211:5,
6;219:5;222:19;
237:16;238:1;239:4;
242:17;244:11;
246:5,5;250:19;
257:1;265:24;268:6;
283:16;288:13,15;
294:8;303:17;304:9,
10,16;308:2;309:12;

316:25;317:15;
344:9,20
**written (31)**
168:13;170:4;
182:13;183:12;
184:17;185:11;
217:13;232:16;
242:23;248:7;249:7;
253:1;255:19;
259:10;260:24;
271:24;289:13;
296:10;299:14,14;
303:21;328:9,23;
337:4;338:4,5;
341:13,14;348:14,25;
354:6
**wrong (7)**
214:23;232:3;
258:14;296:25;
324:15;326:6;328:18
**wrongdoing (1)**
356:2
**wrongful (2)**
356:20;357:9
**wrote (25)**
195:13;215:19;
216:3;217:22;219:8,
9;222:5;243:10,21,
23,25;244:24;
257:17;286:11;
288:16;293:10,17;
299:24;308:1;
311:13,21;312:4,8;
319:12;337:21

**Y**

**year (1)**
335:24
**years (9)**
175:22;176:12,17;
204:22;234:15;
235:12;305:17;
326:5;349:20
**yellow (11)**
170:17;190:5;
210:21,25,25;211:6,
9,13,20,22;240:19
**younger (1)**
177:9

**Z**

**zero (1)**
308:4
**zeroed (1)**
284:25
**zeros (1)**
343:4
**Zoom (1)**
345:20

**1**

**1 (7)**
200:20,21,25;
237:14,23;241:3;
331:20
**10 (3)**
191:18;335:24,24
**10:45 (1)**
166:3
**100 (1)**
223:22
**10th (2)**
318:4,5
**11:00 (3)**
252:3;275:2,3
**11:58 (1)**
237:8
**111 (1)**
209:14
**112 (8)**
210:17,19;211:9;
212:3;214:1,2;
215:15;216:6
**113 (2)**
219:2;222:15
**114 (1)**
222:19
**116 (6)**
250:20;251:5;
303:9;304:6,7,12
**117 (7)**
249:18,19,23;
250:9,13,14;251:4
**118 (8)**
249:16,18,22;
251:11,12;253:15,16,
19
**12:00 (1)**
274:23
**12:25 (1)**
237:11
**12-11 (1)**
263:6
**12-11-74 (2)**
263:7,10
**12-1-74 (1)**
263:5
**125 (2)**
253:18,20
**127 (1)**
214:3
**128 (2)**
214:3;222:23
**13 (1)**
213:9
**130 (5)**
266:17,18,19,20;
267:21
**131 (2)**
268:20;269:3
**133 (1)**

267:21
**14th (2)**
  220:10;317:20
**15 (3)**
  208:21;209:2;
  336:18
**16 (1)**
  252:7
**1669 (1)**
  243:23
**171 (3)**
  256:18,19,21
**176 (1)**
  273:18
**17902 (1)**
  241:10
**18 (1)**
  284:23
**184 (3)**
  264:24,25;265:15
**188 (1)**
  253:16
**18th (4)**
  316:22;317:21;
  318:8,13
**1973 (1)**
  333:22
**1974 (1)**
  366:8
**1975 (3)**
  177:25;364:7;
  366:9
**19th (1)**
  318:8

---

**2**

**2 (10)**
  200:20,23;237:13,
  20,24,24;331:20,22;
  345:3,6
**2:00 (3)**
  252:3;275:2,3
**2:19 (1)**
  320:4
**20 (4)**
  274:20;326:4;
  336:18;364:7
**203 (2)**
  342:9,14
**205 (3)**
  262:5,6,7
**214 (5)**
  256:16,17;257:7;
  258:6,7
**2-19-75 (1)**
  367:4
**21st (2)**
  259:17;336:9
**22 (1)**
  290:21
**2-20 (2)**
  274:8,19

---

**2207 (1)**
  291:4
**2-20-75 (4)**
  274:4,16,17;
  363:21
**2-22 (1)**
  185:7
**2227 (1)**
  291:4
**228 (4)**
  258:3,11,14,16
**23 (2)**
  343:15,16
**24 (1)**
  263:16
**25th (2)**
  285:18;318:8
**264 (2)**
  282:19;283:4
**265 (1)**
  283:4
**267 (5)**
  287:25;288:1,3;
  307:2;308:21
**268 (5)**
  282:20;283:4,15,
  17,20
**27 (1)**
  344:3
**270 (3)**
  240:25;241:2,4
**271 (2)**
  243:8,17
**29187 (1)**
  307:9

---

**3**

**3 (7)**
  266:16;283:1,5,6,9,
  9;331:21
**3:12 (1)**
  369:8
**3:13 (1)**
  369:11
**3:15 (2)**
  371:6,7
**30 (2)**
  324:9;347:23
**32 (5)**
  331:23,23,24;
  344:5,6
**33 (1)**
  331:17
**3-3-75 (2)**
  243:5;247:18
**393 (2)**
  237:14,15
**395 (2)**
  238:9,10
**396 (1)**
  238:10
**397 (1)**

---

238:10
**398 (1)**
  238:10
**3rd (1)**
  258:25

---

**4**

**4 (6)**
  166:25;242:1,3,6;
  283:5,6
**40 (16)**
  223:22;324:9,17;
  341:20;342:1,4,4,9,
  13,17,18,19,24;
  343:12;345:5,6
**45 (1)**
  347:23

---

**5**

**50 (5)**
  181:15;204:22;
  223:22;305:16;
  347:23
**522-1400 (2)**
  243:7,17

---

**6**

**6 (1)**
  166:25
**60 (1)**
  181:15
**64 (1)**
  282:24
**65 (1)**
  282:24
**68 (1)**
  282:24
**681-1950 (1)**
  243:24
**696-1268 (1)**
  243:18

---

**7**

**70 (1)**
  324:25
**70s (2)**
  281:21;325:3
**71 (1)**
  178:6
**72 (1)**
  178:6
**73 (1)**
  178:7
**74 (11)**
  175:6;176:19;
  179:7,14;201:5,12;
  204:7;219:16;
  262:10;263:17;
  265:18

---

**74-'75 (4)**
  177:14;179:5;
  323:23;328:3
**75 (13)**
  175:6;176:19;
  179:8,15;201:6,12;
  234:15,16,16;265:18;
  274:8,19,20
**77 (2)**
  233:22;234:13
**78 (1)**
  233:23

---

**8**

**8:11 (1)**
  367:9
**80 (1)**
  324:25
**80s (1)**
  325:3
**87 (2)**
  344:16;345:17

---

**9**

**9:00 (1)**
  274:23
**92 (1)**
  240:8
**95 (1)**
  232:4
**99.6 (1)**
  290:5