**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ISAIAH ANDREWS, | ) | CASE NO. 1:22-cv-00250-JG |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| CITY OF CLEVELAND, et al., | ) | **DEFENDANT CITY OF** |
| | ) | **CLEVELAND'S MOTION FOR** |
| Defendants | ) | **SUMMARY JUDGMENT** |

Defendant City of Cleveland respectfully submits its Memorandum in Support of its

Motion for Summary Judgment.

Respectfully submitted,

MARK D. GRIFFIN (0064141)
Director of Law

By: *s/ Timothy J. Puin*
Elena N. Boop (0072907)
Chief Trial Counsel
William M. Menzalora (0061136)
Chief Assistant Director of Law
J.R. Russell, Jr. (0075499)
Chief Assistant Director of Law
Timothy J. Puin (0065120)
Gilbert E. Blomgren (0065240)
Matthew R. Aumann (0093612)
City of Cleveland, Department of Law
601 Lakeside Avenue E., Room 106
Cleveland, Ohio 44114
(216) 664-2800
eboop@clevelandohio.gov
wmenzalora@clevelandohio.gov
jrussell2@clevelandohio.gov
tpuin@clevelandohio.us
gblomgren@clevelandohio.gov
maumann@clevelandohio.gov
Attorneys for Defendant City of Cleveland

**Exhibit A**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... iii

MEMORANDUM IN SUPPORT    .........................................................................1

I.      STATEMENT OF THE ISSUES.....................................................................1

II.     SUMMARY OF ARGUMENT ........................................................................1

III.    STATEMENT OF UNDISPUTED MATERIAL FACTS ................................2

      A.      Cleveland's Official Policies Required Complete and Unbiased Investigations, as Well as Proper Collection and Preservation of Evidence and its Proper Preparation and Presentation to the Prosecutor, Which Necessarily Included Disclosure of the Entire Contents of Investigative Files .........................................2

      B.      Cleveland's Training and Supervision of Police Officers Demonstrated a Commitment to Constitutional Policing and Proper Preparation, Preservation and Submission of All Evidence to the Prosecuting Attorney .......................................7

      C.      There is No Evidence of Actions Authorized by a Designated Decision Maker...10

      D.      There is No Evidence of Any Custom of Acquiescence in Rights Violations ......10

IV.    LAW AND ANALYSIS ....................................................................................11

      A.      Plaintiff Cannot Establish *Monell* Liability Against the City of Cleveland ..........11

            1.      Standard of Liability Under Monell............................................................11

            2.      Cleveland's Official Policies Prohibited the Alleged Rights Violations .....................................................................................11

                  a.      Cleveland's policies only make sense in context of the *Brady* duty to disclose, under applicable precedent, and therefore cannot be found to have been the driving force behind the alleged constitutional violation.................................................................12

                        i.      The record in *Jackson* did not include pivotal written policies regarding proper preservation of evidence and its disclosure to the Prosecutor ...............................................14

                        ii.     *Jackson*'s unique set of facts is so removed from the facts of this case that the Sixth Circuit's decision does not guide the outcome here ...............................................................17

i

IV.   LAW AND ANALYSIS ............................................................................continued

          3.      There Is No Evidence of Ratification by Final Decision Makers.............19

          4.      Officer Training Reflected the City's Commitment to Constitutional
                  Policing ...........................................................................................20

          5.      There Is No Evidence of a Custom of Tolerance of Rights Violations  ....21

     B.   The City Has Statutory Immunity from Plaintiff's State Law Claims ..................22

     C.   Dismissal is Required by FED. R. CIV. P. 25(a)(1) ................................................23

V.   CONCLUSION.................................................................................................25

CERTIFICATION OF TRACK ASSIGNMENT AND COMPLIANCE WITH PAGE
LIMITATIONS

## **TABLE OF AUTHORITIES**

### **Cases**

*Arizona v. Youngblood*, 488 U.S. 51 (1988) ..........................................................................13, 14

*Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988 (6th Cir. 2017) ..........................22

*Bickerstaff v. Lucarelli*, No. 1:14-cv-831, 2015 WL 1431160 (N.D. Ohio Mar. 27, 2015) .........22

*Board of Comm'rs v. Brown*, 520 U.S. 397 (1997) ......................................................................11

*Brady v. Maryland*, 373 U.S. 83 (1963) .........................................9, 12, 13, 14, 15, 16, 17, 19, 21

*Chang v. U.S.*, No. 02-2010, 2010 WL 11591197 (D.D.C. 2010) .................................................14

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989) .................................................................11

*Colbert v. Cleveland*, 99 Ohio St. 3d 215, 2003-Ohio-3319, 790 N.E.2d 781 .......................22, 23

*Connick v. Thompson*, 563 U.S. 51 (2011) .................................................................................20

*Feliciano v. Cleveland*, 988 F.2d 649 (6th Cir. 1993) .................................................................19

*Francis v. Francis*, No. 1:90-cv-1235, 1992 WL 57953 (N.D. Ohio Jan. 7, 1992) ................24–5

*Gillispie v. City of Miami Twp.*, No. 3:13-cv-416, 2020 WL 5629677 (S.D. Ohio 2020) ...........14

*Harris v. Sutton*, 183 Ohio App.3d 616, 2009-Ohio-4033 (8th Dist.) .........................................23

*Harris v. US Bank Natl. Assn. as Tr. for Structured Asset Inv. Loan Tr. Mortg. Pass-Through Certificates, Series 2004-2*, No. 20-2005, 2021 WL 7542603 (6th Cir. Sept. 10, 2021) .............24

*Hunter v. District of Columbia*, 824 F.Supp.2d 125 (D D.C. 2011) ............................................21

*Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) ...........................2, 10, 14–19, 21, 22

*Jones v. Muskegon Cty.*, 625 F.3d 935 (6th Cir. 2010) ...............................................................21

*Joy v. City of Dayton*, No. C–3–90–132, 1991 WL 1092505 (S.D. Ohio 1991) .........................22

*Kasting v. American Family Mut. Ins. Co.*, 196 F.R.D. 595 (D. Kansas 2000) ...........................24

*Lewis v. City of Cleveland*, No. 1:13-cv-589, 2013 WL 5564146 (N.D. Ohio Oct. 8, 2013) .......22

*McDonald v. Medina City Bd. of Educ.*, No. 1:19-cv-00334, 2020 WL 2085144
(N.D. Ohio April 30, 2020) ....................................................................................................... 24

*Moldowan v. City of Warren*, 578 F.3d 351 (2009) ............................................................... 13, 17

*Monell v. Department of Social Services of the City of New York*,
436 U.S. 658 (1978)....................................................................1, 2, 10, 11, 15, 18, 19, 21, 22

*Novak v. City of Parma*, 33 F.4th 296 (6th Cir. 2022) ...................................................11

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ...................................................11

*Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992) ...........................................20

*Sygula v. Regency Hosp. of Cleveland E.*, 64 N.E.3d 458, 2016-Ohio-2843 (8th Dist.) ..............23

*Teare v. Independence Local School Dist. Bd. of Educ.,* No. 1:10–cv–01711,
2011 WL 4633105 (N.D. Ohio 2011) ..........................................................................22

*The Scrap Yard, LLC v. City of Cleveland*, Case No. 1:10-cv-2465, 2011 WL 3900571
(N.D. Ohio Sept. 6, 2011) ......................................................................................22

*Thomas v. City of Chattanoga*, 398 F.3d 426 (6th Cir. 2006) ...................................... 11

*U.S. v. Patel*, No. 01-cr-7162002, WL 1750948 (N.D. Ill. 2002) ...................................13

*U.S. v. Vega*, 826 F.3d 514 (D.C. Cir. 2016) ...........................................................13

*Zavatson vs. City of Warren, Michigan*, 714 Fed.Appx. 512 (6th Cir. 2017) .............................20

## Statutes

18 U.S.C. § 3500...................................................................................................13, 14

42 U.S.C. § 1983 ...................................................................................................11

Ohio Rev. Code Ch. 2744...................................................................................2, 22

Ohio Rev. Code § 2744.01..................................................................................22–23

Ohio Rev. Code § 2744.02.........................................................................1, 22–23

Ohio Rev. Code § 2744.03..................................................................................23

## Rules

Crim. R. 16 .........................................................................................................13

Fed.R.Civ.P. 25 ...........................................................................................1, 2, 23–25

FED.R.CIV.P. 30(b)(6)................................................................................................................2

FED.R.CIV.P. 56 ....................................................................................................................25

## **Other**

Adam Ferrise, *Attorney: Legal fight for Isaiah Andrews...will continue on after his death*, CLEVELAND.COM (April 13, 2022), https://www.cleveland.com/metro/2922/04/attorney-legal-fight-for-isaiah-andrews-who-struggled-for-47-years-to-clear-his-name-for-a-murder-he-didnt-commit-will-continue-on-after-his-death.html) ........................................................................25

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1955..................................................................................................................................24

## MEMORANDUM IN SUPPORT

### I.    STATEMENT OF THE ISSUES

1.    Whether Plaintiff's *Monell* claims should be dismissed because Cleveland's police officers did not violate the constitutional rights of Isaiah Andrews.

2.    Whether Plaintiff's *Monell* claims should be dismissed because Cleveland's policy and custom, including officer training, required full and complete investigations and collection, documentation, preservation and submission of all evidence to the prosecuting attorney.

3.    Whether statutory immunity for governmental functions under Ohio Revised Code § 2744.02, for which no exception applies, requires dismissal of Plaintiff's state law claims.

4.    Whether the failure to comply with FED. R. CIV. P. 25 mandates dismissal of the lawsuit in its entirety.

### II.    SUMMARY OF ARGUMENT

Plaintiff's Complaint alleges that Cleveland's customs and practices to "falsely implicate criminal suspects" by allegedly suppressing, fabricating and manipulating evidence was the driving force behind the conviction and incarceration of Isaiah Andrews. (Compl., ECF No. 1, PageID.15–33.)  However, Plaintiff's *Monell* claims fail for multiple reasons.

First, Cleveland cannot be held liable because its police officers did not cause Isaiah Andrews to suffer any constitutional injury.  For that point, Cleveland incorporates as if fully rewritten herein the Motions for Summary Judgment filed by the individual officers or their estates.  Second, Cleveland's policies, customs, procedures, as well as its training and supervision of officers, required complete and unbiased investigations and proper collection,

1

preservation and submission of all evidence to the prosecutor.  Further, there is no evidence of a custom of tolerance for constitutional rights violations.

Other than the allegations contained in the Complaint, Plaintiff cites to no specific evidence, documentary or otherwise, to substantiate the *Monell* claims. (Exhibit 1, Plaintiff's discovery responses.)  The only case example cited in the Complaint that is from the same time period during which Andrews was tried and convicted is *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019).[1]  As discussed in more detail below, however, *Jackson* does not serve as a basis for liability here because it was based on a record that did not contain several pivotal sources of policies and procedures, was based on testimony of entirely different witnesses and involved an entirely different set of facts.

Cleveland is entitled to summary judgment on Plaintiff's state law claims under Ohio's Political Subdivision Tort Liability Act, R.C. Chapter 2744; and no applicable exception applies.

Finally, this case should be dismissed because no successor or representative of the estate of Isaiah Andrews has filed a motion to substitute as the party plaintiff in this case and, therefore, dismissal is mandated by FED. R. CIV. P. 25(a)(1).

## III.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Cleveland's Official Policies Required Complete and Unbiased Investigations, as Well as Proper Collection and Preservation of Evidence and its Proper Preparation and Presentation to the Prosecutor, Which Necessarily Included Disclosure of the Entire Contents of Investigative Files

---

[1]    The remaining cases cited by Plaintiff are all from more than a decade later, the nearest in time being the Green case from 1988, involving a photo lineup.  (Compl., *supra*, at PageID.21.) The Complaint also cites the autobiography of Carl Stokes *(id.* at PageID.22-23); a Cleveland Foundation report *(id*. at PageID.24); and a 1966 academic study *(id*. at PageID.26).  The Complaint leans heavily on the testimony of a former police official, William Tell, in the *Jackson* case, although Tell was not identified as a Rule 30(b)(6) witness for the City in either the *Jackson* case or this case.

Rule 13 of the Rules of Conduct and Discipline for the Officers, Members and Employees of The Division of Police in the Department of Public Safety (1950) (hereinafter, "Manual of Rules"), Homocide [*sic*] Unit, provided in pertinent part:

> The officer in charge shall require the proper investigation of all homocides [*sic*]… He shall provide for . . . the proper preparation and presentation of evidence to the prosecutor and to the court.[2]

(ECF No. 99-1, PageID.2750; Flask Dep., ECF No. 6, PageID.3860–3862.)

The importance of "the proper preparation and presentation of evidence to the prosecutor and to the court" is reinforced in Rule 66, requiring that "[o]fficers and members prosecuting persons charged with a crime shall thoroughly familiarize themselves with all of the facts and details concerning such case, so that all of the evidence may be properly presented to the court." (ECF No. 99-1, PageID.2781.)

A manual specific to the Detective Division and all homicide detectives (hereafter "the Detective Manual") defined "proper preparation and presentation of evidence to the prosecutor and to the court" as follows:

> 1.30   BIG CASE-ADMINISTRATIVE DETAIL
> It will be the responsibility of the superior officer in charge to assemble a file on the investigation, which normally involves setting up a folder in which *all* reports, communications and other information, can be assembled and bound permanently. (ECF No. 106-1, PageID.4115–4116) (emphasis in original);

> 2.51   STATEMENTS, USE OF
> In preparing a felony case, written statements are taken from complainants, victims, witnesses and defendants as a permanent record of their testimony.   Such statements enable the prosecutor and the arresting officers to present an orderly case in court.  (*id.* at PageID.4137–4138);

> 3.00   INVESTIGATION, PURPOSE OF

---

[2]     Cited Rules from the Manual of Rules are attached as Exhibit 2.  Cited pages from Flask's deposition are attached as Exhibit 3.

3

A routine is followed to ensure that ALL the physical evidence and ALL the pertinent and relevant testimony of witnesses is obtained. (Emphasis in original) (*id.* at PageID.4140);

4.00    PURPOSE OF [RECORDS]
Official reports not only reveal the activity of the investigators to the reviewing superior officers, but also serve as a permanent file record of the facts and evidence obtained by the Department ... Each file must be complete and up-to-date … Each file shall include ... suspects wanted or cleared. (*id.* at PageID.4158);

4.20    FILES, CUSTODY AND HANDLING
reports are to be removed from the files only with [Officer in Charge's] approval and then only by clerks detailed to that duty (*id.* at PageID.4160–4161).

(ECF No.. 106-1, PageID.4105–4178; Flask Dep., ECF No. 106, PageID.3856, 3860, 3880.) [3]

Thus, according to the Detective Manual, in order to permit "the proper preparation and presentation of evidence to the prosecutor and to the court," officers were required to:

- set up files in "which *all* reports, communications and other information, can be assembled and bound permanently" (1.30) including "suspects wanted or cleared" (4.00), and which cannot be altered without the officer in charge's approval (4.20);

- take statements "from complainants, victims, witnesses and defendants as a permanent record of their testimony" (2.51);

- "ensure that ALL the physical evidence and ALL the pertinent and relevant testimony of witnesses is obtained" in a "permanent file record" (3.00; 4.00).

The purpose of these requirements is stated in 1.04, i.e., "[a]lthough it is not specifically stated in the Book of Rules, it is apparent that if a crime has been committed the '*necessary action*' means a professional effort to apprehend and prosecute the perpetrator of the crime." (ECF No. 106-1, PageID.4110) (emphasis in original.)  Further, "good investigators must have complete command of all the facts and information available in order to conduct a professional investigation" (*id.* at PageID.4159–4160) (4.10 USE IN INVESTIGATION).

---

[3]    Cited Orders and Procedures from the Detective Manual are attached as Exhibit 4.

A professional investigation was defined as investigating *every* lead.  As set forth in 1.31 BIG CASE – MANY LEADS INVOLVED, "[E]ach lead should be set forth on a separate mimeographed 81/2x11 sheet in duplicate, the copy going into the file with a number for page and index, and the original to the investigator assigned to check the lead," (*id.* at PageID.4116–4117); and 3.87 SUSPECT – LEADS, "[E]very investigative lead about a suspect must be followed until nothing further can be done, or the lead has been proved valueless." (*Id.* at PageID.4152–4153).

In order to document every lead, 1.33 BIG CASE – SUMMARY REPORT (*id.* at PageID.4117–4118) required that Daily Summary Reports be made showing the status of the investigation and the leads that had been checked that day.  Reports about suspects were required to be completed on a Form 10 report so that "the Officers in Charge and the Commanding Officer may know what is going on."  The Daily Summary Report was required to be part of the file.  In this regard, Martin Flask, a former Cleveland police chief and safety director, testified Cleveland police detectives:

> [H]ad a duty and responsibility to complete and report all information that came to their in [*sic*] attention, all interviews, statements, witness information, supplemental information, and report that included in the supplemental reports to their supervisory officers before they reported off duty on any given day. So any information that came to the attention of the officer was required to be included within a supplemental report and provided into a case file that was maintained by the Detective Bureau function.

(Flask Dep., ECF No. 106, PageID.3891–3892.)

A professional investigation also meant impartiality in approaching witnesses, as stated in 3.96 WITNESSES, INTERVIEWING (ECF No. 106-1, PageID.4156–4157) ("the investigator must be careful not to suggest what he wants or expects the witness to say").  It was understood at the time of the murder investigation that offering or facilitating false testimony was against the

5

law and could result in the officer being charged with a criminal offense. (Flask Dep., ECF No. 106, PageID.4066.)

Cleveland Division of Police required proper supervision of investigations, as set forth in 1.40 CHAIN OF COMMAND (ECF No. 106-1, PageID.4120): "All superior officers of the Detective Bureau must be aware of the activity of the personnel supervised by them, even though detectives usually work without direct personal supervision.  All members of the Detective Bureau shall keep the Officer-in-Charge informed by both written and verbal reports, in order that he may make the most efficient use of the facilities of the Department."  A Daily Summary Report by the supervising officer was required to provide a "coherent intelligible report of all of the activity of all the personnel involved in the investigation for the previous 24 hours."  (1.33) (*Id.* at PageID.4117–4118; *see also* Flask Dep., ECF No. 106, PageID.3909.)

In addition, the Manual of Rules included the following orders:

- Rule 14, providing that the officer in charge of the Case Preparation and Fraud Unit shall see that statements taken in the course of criminal investigations "are properly filed and preserved" (ECF No. 99-1, PageID.2750–2751);

- Rule 16, providing that personnel of the Scientific Investigation Unit "shall forward to the office of the County Prosecutor all available criminal records of persons held for the Grand Jury or the Court of Common Pleas" (*id.* at PageID 2751–2753);

- Rule 77, providing, "Officers and members shall report on all matters referred to or investigated by them" (*id.* at PageID.2785–2786); and

- Rule 78, providing, "Written and verbal reports, testimony in court and conversation of any kind affecting the Division of Police, its officers, members, employees or persons under its jurisdiction shall be truthful and unbiased" (*id.* at PageID.2786).

Read together, the Manual of Rules and the Detective Manual establish that the "proper preparation and presentation of evidence to the prosecutor and to the court" meant disclosure of *all* evidence to the Prosecutor, including exculpatory evidence.  As stated by Flask, "the officer's

responsibility was pretty clear.  They were mandated to collect all information and present it and make [it] an integral part of the case file which ultimately is to the prosecutor for review." (Flask Dep., ECF No. 106, PageID.3958, PageID.4004–4005) ("Again, detectives are required to include all information within their supplemental reports … Anything that comes to their attention should be included within a supplemental report and included within the case file").

Detectives understood they were expected to "hold nothing back" from the Prosecutor. (Allen Dep., ECF No. 99, PageID.2606) (Exhibit 5). Detectives Hicks and McCaffrey had no recollection of officers "not telling every piece of information they knew about an investigation to the prosecutor."  (Hicks Dep., ECF No. 100, PageID.3056 (Exhibit 6); McCaffrey Dep., ECF No. 102, PageID.3203 (Exhibit 7)).  The reason detectives would call it to a Prosecutor's attention if there was any misunderstanding about the evidence is that "[e]veryone wants justice." (Kaminski Dep., ECF No. 103, PageID.3543) (Exhibit 8).

Moreover, Cleveland's official written policies prohibited detectives from procuring false witness testimony (3.96, ECF No. 106-1, PageID. 4156–4157); required direct supervision of detectives on a daily basis (1.31, *id.* at PageID.4116–4117; 1.40, *id.* at PageID.4120); and generally required officers be "truthful and unbiased" (Rule 78, ECF Do. 99-1, PageID.2786; Flask Dep., ECF No. 106, PageID.3922) ("[a]ll the information prepared in a report submitted by an officer was mandated to be truthful and un-bias [*sic*].")  Officers had a duty to comply these such rules and regulations and those who did not comply with the foregoing responsibilities were subject to disciplinary charges (Flask Dep., ECF No. 106, PageID.3903).

### B. Cleveland's Training and Supervision of Police Officers Demonstrated a Commitment to Constitutional Policing and Proper Preparation, Preservation and Submission of All Evidence to the Prosecuting Attorney

The record contains ample evidence that the ten defendant police officers received superior training and supervision and were held to the highest professional standards by the

Cleveland Division of Police (CDP).  (Flask Dep., ECF No. 109, PageID.6917 ) ("All received training").  First, all Cleveland police officers had to meet minimum qualifications for appointment prior to being selected to attend the Police Academy.  (Flask Dep., ECF No. 106, PageID.4043.)  After appointment, recruits were required to undergo a rigorous training curriculum that was established by Ohio Attorney General through the Ohio Peace Officer Training Commission (OPOTC).  (*Id.* at PageID.4043–4044; ECF No. 109, PageID.6956–6957.)

Among the required topics of instruction were arrests, searches and seizures, criminal law, evidence, court testimony, and proper report writing.  (*Id.*, ECF No. 109, PageID.6957.) The entire course took 305 hours over nine weeks in 1973.  (*Id.* at PageID.6978)  The recruits were expected to be alert and were routinely tested to ensure they were meeting the program goals. (Flask Dep., ECF No. 106, PageID.4043.  If successful in completing the Academy, an officer was formally appointed by the State.  (*Id.* at PageID.4044)

In 1967, the Executive Director of OPOTC wrote a letter to the Chief of Police commending the CDP for its "progressive program and police training."  (Flask Dep., ECF No. 109, PageID.6955)  Indeed, the CDP imposed a higher grading standard for its recruits to pass the Academy than OPOTC required (75% vs. 70%).  (*Id.* at PageID.6959)  In 1970, four recruits were separated from the Academy for failure to meet this higher standard.  (*Id.* at PageID.6966.)

After graduating from the Police Academy, all officers were assigned to specific duties in CDP usually to patrol activities out in Cleveland's neighborhoods.  (Flask Dep., ECF No. 106, PageID.4044.)  They were placed under the direct supervision and control of a field training officer who evaluated their performance.  (*Id.*)  Those supervising officers themselves had been trained to ensure that they could provide the necessary training necessary for the success of the rookies.  (*Id.*)  Rookies were evaluated on a regular basis, as well as the training officers themselves.  (*Id.*)  The purpose of the mentoring program was "to continue the training of

8

graduate probationary patrolmen." (Flask Dep., ECF No. 109, PageID.6985.) The responsibilities of the field training officers were so important that they were codified in a GPO. (*Id.* at PageID.6985.) Report writing continued to be an area of evaluation. (*Id.* at PageID.6990.)

After becoming a veteran officer, a CDP member would undergo regular in-service training. (Flask Dep., ECF No. 106, PageID.4044–4045.) In 1974, there was a 40-hour mandatory in-service training program for all CDP officers, including supervisors, on the Ohio Revised Code; newly enacted Rules of Criminal Procedure (effective 1973); and related constitutional law issues. (*Id.*) The CDP also made opportunities available to officers to attend correspondence courses, including on constitutional law. (Flask Dep., ECF No. 109, PageID.6914.) One of the texts used discussed *Brady*. (*Id.* at PageID.7005–7006.)

The evidence is undisputed that "training is and was a continuous process within the Division of Police." (Flask Dep., ECF No. 106, PageID.4046.) Officers were trained, supervised and evaluated on a daily basis through roll calls, reviews of daily duty reports, discipline and commendations. (*Id.* at PageID.4045.) Formal performance reviews tracked officers' adherence to the GPO's, divisional notices, published rules and regulations, Civil Service rules, the Revised Code, and the Codified Ordinances of the City. (Flask Dep., ECF No. 109, PageID.6989; PageID.6992–6993.) Testimony from the individual Defendant officers confirms that detectives received on-the-job training regarding the need to make full disclosures to the Prosecutor. (Allen Dep., ECF No. 99, PageID.2609.) Supervisors made sure to pair less experienced officers with more experienced officers. (Kaminski Dep., ECF No. 103, PageID.3484.) As one testified, "if you worked with somebody that was a good detective, you got trained every day." (McCaffrey Dep., ECF No. 102, PageID.3158.)

Cleveland put continued emphasis on the importance of accurate and complete report writing.  In particular, officers in the relevant period were trained to prepare full and complete reports based on notes they took in the field.  (Flask Dep., ECF No. 109, PageID.6994–6998.)  Officers were required to document their investigation, including all communications, evidence and information obtained that day, in their supplemental reports and submit those for review and approval of their supervisor.  The supervising officer had an independent duty to review those reports for completeness and make them a part of the investigative file, with the explicit understanding that the file would be turned over to the prosecutor's office for proper case presentation.  (Flask Dep., ECF No. 106, PageID.3958; PageID.3891-3894; PageID.4004–4005.)  Detectives and supervising officers expressly understood that the Prosecutor would rely on the officers' written reports.  (Flask Dep., ECF No. 109, PageID.6999.)

### C.     There is No Evidence of Actions Authorized by a Designated Decision Maker

There is no evidence in the record of unconstitutional actions authorized by any City officials with final policymaking authority.  Plaintiff obtained discovery about the identity of decision makers in the relevant time period but did not connect any alleged constitutional rights violations to these individuals.  Thus, there is no question of fact concerning this avenue of *Monell* liability.

### D.     There is No Evidence of Any Custom of Acquiescence in Rights Violations

Finally, Cleveland did not have a custom of tolerance for civil rights violations prior to Andrews' conviction..  Even if judicial notice is taken of cases cited in the Complaint, the only case from the relevant time period is *Jackson*, and it does not affect the outcome of this case based on the different record before this court.  The remaining cases are all from over ten years after 1975. The 1988 *Green* case, involving a photo lineup (Compl., ECF No. 1, PageId.20), is

10

the closest in time, but it cannot be used to prove the existence of a pre-1975 policy causing Andrews a constitutional injury.

## IV.  LAW AND ANALYSIS

### A.  Plaintiff Cannot Establish *Monell* Liability Against the City of Cleveland.

#### 1.  *Standard of Liability Under Monell*

Under 42 U.S.C. § 1983, a city cannot be held vicariously liable on a theory of *respondeat superior* for a violation of an individual's constitutional rights that its police officers commit. *Thomas v. City of Chattanooga*, 398 F.3d 426, 432–33 (6th Cir. 2005) (citing *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978)). Instead, municipality liability exists for a policy or custom that caused a constitutional injury through the city's own "deliberate conduct." *Board of Comm'rs v. Brown*, 520 U.S. 397, 404–05 (1997). Even then, the policy or custom must have been the "moving force" behind the injury and must have "intentionally" deprived the plaintiff of a constitutional right. *Id.* at 404–05.

There are four avenues to make a claim of municipal liability under *Monell*: (1) official policy or legislation; (2) action authorized by a designated decision maker; (3) failure to train or supervise employees; and (4) a custom of acquiescence in rights violations. *Novak v. City of Parma*, 33 F.4th 296, 309 (6th Cir. 2022) (citations omitted). The first two are based on the illegality of the municipal law, policy, or practice at issue, or the appropriate official's ratification. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). The latter two involve "deliberate indifference" to the rights of those with whom municipal officials deal. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Plaintiff has failed to establish any avenue of liability against the City of Cleveland under *Monell*.

#### 2.  *Cleveland's Official Policies Prohibited the Alleged Rights Violations*

The official written policies and procedures of CDP as well as testimony from Flask and the individual defendants unequivocally establish a policy and custom of the City of Cleveland to conduct investigations in a complete, truthful and unbiased way; to document, gather and preserve all facts and evidence gathered in the investigation; and to properly prepare and present the entire contents of the investigative file to the prosecuting attorney.  These policies, customs and procedures cannot be said to have been the driving force or proximate cause behind the alleged constitutional violations in this case.

Additionally, as argued below, applicable precedent holds that the specific written mandate of proper preservation of information gathered during the investigation is necessarily correlative to CDP's obligation to disclose that information to the prosecuting attorneys.

> a. ***Cleveland's policies only make sense in context of the* Brady *duty to disclose, under applicable precedent, and therefore cannot be found to have been the driving force behind the alleged constitutional violation.***

There is no reasonable dispute that Cleveland's official policies, practices and procedures, including the Manual of Rules and Detective Manual, expressly ordered detectives to conduct a thorough and professional investigation, to run down every lead, to document every piece of evidence, to speak with every witness in a fair and neutral manner, to report every development to their supervisors, and to build and preserve a complete investigative file.  In light of this overwhelming evidence of the City's requirements, there is no need to look for a written directive parroting the language of *Brady v. Maryland*, 373 U.S. 83 (1963).  Cleveland's expectation that *Brady* will be followed is writ large in the record.  There is no other way to understand the official policies.

The fact that Cleveland's official policies only make sense in the context of *Brady* is explained by the judicial rule that an obligation of the police to preserve evidence is a correlative

duty to the obligation to disclose evidence to prosecutors.  In *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), the Supreme Court held that the police's failure to preserve potentially useful evidence may constitute a denial of due process of law.  The disclosure obligations stated in CRIM. R. 16; the Jencks Act, 18 U.S.C. § 3500, and *Brady* include a "correlative duty to preserve that evidence in the first place, since '[o]nly if evidence is carefully preserved during the early stages of investigation will disclosure be possible later."  *U.S. v. Vega*, 826 F.3d 514, 533 (D.C. Cir. 2016) (citations omitted).  The Sixth Circuit in *Moldowan v. City of Warren*, 578 F.3d 351, 380 (2009) held that the *Youngblood* duty to preserve evidence and the *Brady* duty to disclose evidence were analogous and interrelated duties.  The CDP's express policies consistent with the *Youngblood* duty thus can only be understood as contemplating the *Brady* duty.  There could be no other reason to preserve "ALL" evidence other than to disclose it to the prosecutor and the court – *i.e.*, to make "the proper preparation and presentation of evidence to the prosecutor and to the court," as stated in Rule 13 of the Manual of Rules.

Because the evidence in this case demonstrates that an express, written CDP policy to preserve ALL potentially useful evidence applied to the officers involved in the investigation, there must also be a concomitant obligation for officers to disclose that evidence.  The holdings in *Youngblood*, *supra*, and *Moldowan*, *supra,* simply do not allow for any other conclusion.  As held in *Moldowan*, *supra*, at 380, the police's obligation to turn over material and exculpatory evidence "follows inexorably from the Supreme Court's recognition that the police have a constitutional duty to preserve such evidence. … Why else would the police be required to preserve such evidence if they had no attendant obligation to reveal its existence?"  *Id*.

Thus, the clear directives given to officers to include all evidence in the file can only be understood as being issued pursuant to the duty to disclose. *See, e.g.*, *U.S. v. Patel*, No. 01-cr-7162002 WL 1750948, *1 (N.D. Ill. 2002) ("The Government has agreed to preserve this

13

material pursuant to its duty to disclose material under section 3500, *Giglio, Brady,* and Federal Rule of Criminal Procedure 16"); *Chang v. U.S.*, No. 02-2010, 2010 WL 11591197, *1 (D.D.C. 2010) (general police order distributed in 2010 defined officers' general obligation to preserve evidence "[t]o ensure the integrity of any criminal investigation . . . so that the prosecuting authority may disclose such material in a criminal judicial proceeding").  As stated in *Gillispie v. City of Miami Twp.*, No. 3:13-cv-416, 2020 WL 5629677, *24 (S.D. Ohio 2020), "[g]iven that, in this context, destroying exculpatory evidence is a form—the ultimate form—of withholding such evidence, the outcome of the analysis is the same" for a *Youngblood* claim and a *Brady* claim (*Id.*, citations omitted).  Accordingly, CDP policies are consistent with both *Youngblood* and *Brady.*

Cleveland's custom and practices, as discussed by Flask and the individual officers, serve to reinforce the written preservation mandates.  As Flask testified in detail, Cleveland's requirement of documenting the details of investigations in supplementary reports, followed by review and approval of same by the supervisors and assembly of same into a permanent file, which can then be presented to the prosecutor, was expressly stated and understood by CDP officers, including through Rule 13 requiring "the proper preparation and presentation of evidence to the prosecutor and to the court."  (ECF No. 99-1, PageID.2750.)

i. **The record in *Jackson* did not include pivotal written policies regarding proper preservation of evidence and its disclosure to the Prosecutor**

Plaintiff may argue that the Sixth Circuit's opinion in *Jackson* demonstrates that Cleveland's policies were the moving force behind the alleged violation of *Andrews'* constitutional rights in this case.  This court should not rely on *Jackson* because, according to the record developed in <u>that</u> case, the Sixth Circuit concluded there was a triable issue of fact on

14

*Monell* liability.  However, the record developed in *Jackson* differs significantly from what is in the record in this case.

The record in this case contains significant documentary evidence of the written policies and procedures of the CPD that were not before the Sixth Circuit in *Jackson*, including:

- Rule 13, which required the Homicide Unit to provide for "the proper preparation and presentation of evidence to the prosecutor and to the court."  (Exhibit 2) (Flask Dep., ECF No. 106, PageID.3860–3862); and

- The Detective Manual, which contains multiple rules relevant to issues presented in this case, including that "ALL the physical evidence and ALL the pertinent and relevant testimony of witnesses" must be obtained and kept in the file. (1.30, 3.00, 4.00) (Exhibit 4) (Flask Dep., ECF No. 106, PageID.3856).

Flask testified that "the officer's responsibility was pretty clear.  They were mandated to collect all information and make an integral part of the case file which ultimately is to the Prosecutor for review."  (Flask Dep., ECF No. 106, PageID.3958; *see also id.* at PageID.4004–4005) ("Again, detectives are required to include all information within their supplemental reports.  Anything that comes to their attention should be included within a supplemental report and included within the case file").)  Officers who did not comply with the foregoing responsibilities were subject to disciplinary charges.  (*Id*. at PageID.3903.)  Neither this testimony nor the above policies were part of the record in the *Jackson* case.

Thus, the plain meaning of the City's official policies from the relevant time, verified by the uncontroverted testimony of a former Cleveland Police Chief and Director of Public Safety, entitles the City to summary judgment.

The Sixth Circuit's holding in *Jackson* does not require a contrary conclusion.  The Plaintiffs in *Jackson* argued that General Police Order (GPO) 19-73 caused the *Brady* violations in the *Jackson* case.  GPO 19-73 provided that defense counsel was entitled to "evidence favorable to the defendant" and excepted "statements made by witnesses or prospective

witnesses to state agents."  The Sixth Circuit held in *Jackson* that a reasonable interpretation of GPO 19-73 was that it "served as a directive to officers as to what evidence they should, and should not, give to prosecutors."  *Jackson*, *supra*, at 831.  Furthermore, the *Jackson* court held that GPO 19-73 can be read as consistent with a policy of not disclosing exculpatory witness statements because it was "reasonable" to read the language as informing the police that "they did *not* need to disclose exculpatory witness statements to the Prosecutor's Office."  *Id*.

The reading of GPO 19-73 as ambiguous was reached based on an interpretation that considered a very limited number of written rules of the CPD, specifically Rules 14, 66, 77 and 78, as well as Ohio Rule of Criminal Procedure 16 — but did not consider at all Rule 13 or the many relevant sections of the Detective Manual.  *Id*.  The Sixth Circuit found that "none of the rules contained with the [Division of Police] Manual [of Rules], taken individually or collectively, are inconsistent with an interpretation of GPO 19-73 that permits officers to withhold exculpatory information from prosecutors."  *Id.* at 832–33.  With respect to Ohio Rule of Criminal Procedure 16, although its text "made it quite clear that defendants were entitled to exculpatory witness reports" Defendant City of Cleveland "provided no evidence that Cleveland required that its officers follow the official version of the Ohio Rules of Criminal Procedure" or that they were even aware of their existence.  All of the foregoing, according to the Sixth Circuit in *Jackson*, amounted to a genuine issue of material fact as to whether Cleveland had a policy of permitting *Brady* violations; and the Court reversed the District Court's award of summary judgment. *Id* at 834.

No such issue of material fact exists in the case at bar. In this case, the evidence is clear that officers were mandated to be trained on the newly enacted Rules of Criminal Procedure, which included Crim.R. 16.  (Flask Dep., ECF No. 106, PageID.4044–4045.)  The substantial additional documentary and testimonial evidence present in the record removes all doubt with

respect to the requirements of CPD policies and procedures regarding the handling and preservation of evidence, including exculpatory evidence.  The lack of specific *Brady*-derived language in GPO 19-73, when the order was issued decades before the Sixth Circuit expressly extended *Brady* to the police in *Moldowan*, does not mean that GPO 19-73 gives police any latitude to suppress evidence or even frame innocent people for murder.

The CDP rules <u>not</u> reviewed in *Jackson* included express requirements in the Detective Manual for fair and thorough investigations, including paragraph 1.30, requiring that a file be set up "in which *all* reports, communications and other information, can be assembled and bound permanently" (ECF No. 106-1, PageID.4115–4116) (emphasis in original); paragraph 3.00, requiring that "ALL the physical evidence and ALL the pertinent and relevant testimony of witnesses is obtained" (*id.* at PageID.4140) (emphasis in original); and paragraph 4.00, requiring "a permanent file record of the facts and evidence obtained by the Department" that is "complete and up to date" and includes "suspects wanted or cleared" (*id.* at PageID.4158).

The Detective Manual, Rule 13 and the testimony of Flask and all other detectives deposed in this case establish Cleveland's unequivocal expectation and mandate that the *entire contents* of an investigation, including all reports, were required to be part of a permanent file to be used by the Prosecutor and the State.

   **ii.**  <u>***Jackson*'s unique set of facts is so removed from the facts in this case that the Sixth Circuit's decision does not guide the outcome this case.**</u>

The evidence in *Jackson* showed that in 1975 two Cleveland detectives had threatened a twelve-year-old boy, Edward Vernon, with sending his parents to jail for perjury if he failed to identify two suspects, Ricky Jackson and Kwame Ajamu *fka* Ronnie Bridgeman, as individuals that he had witnessed commit a murder.  *Jackson, supra*, at 804.  Ricky Jackson, Kwame Ajamu *fka* Ronnie Bridgman and a third individual, Wiley Edward Bridgman, were convicted of murder

17

in three separate trials as a result of Vernon's false eyewitness testimony.  *Id* at 805. Vernon formally recanted his testimony as to all three of the aforementioned individuals in 2014.  *Id* at 805.  In the subsequent action for wrongful incarceration, Vernon testified that two CPD officers had "led him into a room after he failed to identify the suspects at a line-up and coerced him into signing a false statement about the line-up." *Id* at 814.  Because this coerced witness statement formed the core of the Prosecutor's case, the Sixth Circuit held that if the jury had been aware of the coerced and fabricated nature of the statement and that Vernon had told the police that he had not seen the shooting, there was a "reasonable likelihood" that these suspects would not have been convicted. *Id* at 815.

The relevant question, according to the Sixth Circuit, was not whether the fabricated evidence was shown to the jury but whether it "affected" the decision of the jury.  *Id* at 816. Because the Prosecutor testified that if he had been aware of the falsity of the statement he would have declined to prosecute, a jury hearing the *Monell* claim could find that the juries in the murder case were affected because the jury could not have convicted if it was never empaneled. *Id.* at 816.

It is apparent from this review of the salient facts in *Jackson* that although they date from the 1970s and involved CDP officers, any similarities between the facts in *Jackson* and the operative facts in the case at bar end there.  Unlike *Jackson*, the record in this case is devoid of any hint of police misconduct throughout the entire investigation of the murder of Regina Andrews.  Andrews has presented no evidence that the City's legislative enactments or official policies presented an obvious risk to his constitutional rights or that the City disregarded such a hypothetical known risk. The thrust of the allegations against CDP officers here is that they failed to turn over exculpatory evidence contained in police reports to the prosecutor.  In dramatic contrast to the facts in *Jackson*, there is no evidence that any CPD officer failed to

18

provide exculpatory evidence to the prosecutor or committed any violation of Andrews' constitutional rights.

Because the evidence establishes that there were no violations of Andrews' constitutional rights by any CPD officer, there is no reason for this Court to engage in any analysis under *Monell* and its progeny. Even if this Court were to somehow find that there was a *Brady* violation or some other violation of the constitutional rights of Andrews, there is *no* support in the record for a finding of any illegal CPD policy or procedure. Instead of the contradictory testimonial evidence present in the *Jackson* case*,* the uncontroverted documentary evidence together with the testimony of Flask in this case establishes that the policy, practice and procedure of the CPD at all material times was to properly preserve and provide the contents of the *entire* homicide investigation file to the prosecuting attorney.

### 3. *There Is No Evidence of Ratification by Final Decision Makers*

The only officials who can create *Monell* liability through ratifying unconstitutional acts or policies are those whose "decisions are final and unreviewable and are not constrained by the official policies of superior officials," which in Cleveland would not even apply to the Police Chief, but rather to the Director of Public Safety or Mayor. *Feliciano v. Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993); (Flask Dep., ECF No. 109, PageID.6926). There is no allegation or evidence of such ratification in this case. Even the contemporary studies cited by the Complaint show that the final decision makers of the City initiated and promoted systemic changes in policing with the goal of protecting individual liberties. (*See, e.g.,* City of Cleveland press release from Mayor Perk, Appendix Item A to Preliminary Report of Mayor's Crime Commission Created March 15, 1974, cited in Complaint at ¶¶ 97 ff.; ECF No. 1, PageID.25–27). The Complaint identifies initiatives to reform the CDP as if they were initiatives to reform Defendant City of Cleveland itself, when it is clear from the face of the allegations that it was the

19

City officials with final policymaking authority who were spearheading police reform in the civil rights era and 1970's.

  **4.**   ***Officer Training Reflected the City's Commitment to Constitutional Policing***

  To succeed on a failure to train or supervise claim, the plaintiff must prove (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's "deliberate indifference"; and (3) the inadequacy was closely related to or actually caused the injury. *Zavatson vs. City of Warren*, *Michigan*, 714 Fed.Appx. 512, 526 (6th Cir. 2017). "Deliberate indifference" is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Therefore, a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id*; *see also Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992). Allegations that an individual officer was inadequately trained are insufficient; a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, *supra*, at 62 (citation omitted).

  Police Academy standards prior to Andrews' trial met or exceeded OPOTC standards. (Flask Dep., ECF No. 106, PageID.4043–4044, ECF No. 109, PageID.6955) In 1967, the Executive Director of OPOTC wrote a letter to the Chief of Police, commending the CDP for its "progressive program and police training." (Flask Dep., ECF No. 109, PageID.6955) After graduation, officers were placed under the direct supervision and control of a field training officer who evaluated their performance. (Flask Dep., ECF No. 106, PageID.4044.) The responsibilities of the field training officer were so important that they were codified in a GPO. (Flask Dep., ECF No. 109, PageID.6985.) Proper report writing was a topic of instruction. (*Id.*

at PageID.6986-6987.)  After the probationary period, regular in-service training was required. (Flask Dep., ECF No. 106, PageID.4044–4045.)  In 1974, there was a 40-hour mandatory in-service training program for all CDP officers, including supervisors, on the Ohio Revised Code; newly enacted Rules of Criminal Procedure (effective 1973); and related constitutional law issues.  (*Id.*)  Officers were trained and evaluated on a daily basis, through roll calls, reviews of daily duty reports, discipline and commendations.  (*Id.*)  Formal performance reviews tracked the officer's adherence to the GPO's, divisional notices, published rules and regulations, Civil Service rules, the Revised Code, and the Codified Ordinances of the City.  (Flask Dep., ECF No. 109, PageID.6989, PageID.6992–6993.) There was continued emphasis on the importance of accurate and complete report writing.  (*Id.*)

Thus, the evidence is undisputed that "training is and was a continual process within the division of police." (Flask Dep.,  ECF No. 106, PageID.4046.)  Unlike in *Jackson*, *supra*, there is no testimony in this case from which a jury could find any inadequate training on *Brady*-derived duties.  Therefore, this avenue of *Monell* liability is also a dead end for Plaintiff.

### 5.    *There Is No Evidence of a Custom of Tolerance of Rights Violations*

To show a custom of tolerance or acquiescence of federal rights violations, a plaintiff must identify more than a single incident or a limited number of similar incidents and show that the custom or practice was so widespread, permanent, and well-settled as to have the force of law.  *Jones v. Muskegon Cty.*, 625 F.3d 935, 946 (6th Cir. 2010) (five incidents of improper conduct alone did not make the required showing of a "widespread, permanent, and well-settled custom"); *Hunter v. District of Columbia*, 824 F.Supp.2d 125, 133 (D D.C. 2011) ("The plaintiff must 'present concentrated, fully packed, precisely delineated scenarios'") (citations omitted).

In this case, there is no proof of a persistent pattern of unconstitutional conduct.  Even if judicial notice is taken of reported cases cited in the Complaint, the only case from the time of

21

the murder of Regina Andrews is *Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019), which involved coercion of a juvenile to give false testimony. Other than *Jackson*, the cases cited in the Complaint are all from more than a decade later, the nearest in time being the Green case from 1988, involving a photo lineup. "[W]rongful conduct after an injury cannot be the proximate cause of the same injury." *Teare v. Independence Local School Dist. Bd. of Educ.*, No. 1:10–cv–01711, 2011 WL 4633105, *8 (N.D. Ohio 2011) (citations omitted); *Joy v. City of Dayton*, No. C–3–90–132, 1991 WL 1092505, *10 (S.D. Ohio 1991) (evidence of later events standing alone cannot prove a pre-existing municipal policy or custom).

This Court has not hesitated to dismiss claims against the City for lack of any plausible allegation of an existing policy or custom. *See*, *e.g.*, *Lewis v. City of Cleveland*, No. 1:13-cv-589, 2013 WL 5564146, *2 (N.D. Ohio Oct. 8, 2013); *Bickerstaff v. Lucarelli*, No. 1:14-cv-831, 2015 WL 1431160, *9 (N.D. Ohio Mar. 27, 2015); *The Scrap Yard, LLC v. City of Cleveland*, Case No. 1:10-cv-2465, 2011 WL 3900571, at *4 (N.D. Ohio Sept. 6, 2011).

As with the other avenues to *Monell* liability, the "rigorous requirements of culpability and causation" required to hold a municipality liable for alleged violations of constitutional rights have not been met in this case. *Arrington-Bey v. City of Bedford Hts., Ohio*, 858 F.3d 988, 995 (6th Cir. 2017).

**B.    The City Has Statutory Immunity from Plaintiff's State Law Claims**

The state law claims against the City for negligence, willful, wanton and/or reckless conduct and malicious prosecution must be dismissed under the three-tiered analysis required by the Political Subdivision Tort Liability Act, R.C. Chapter 2744. "The first tier is the general rule that a political subdivision is immune from liability incurred in performing either a governmental function or proprietary function," under R.C. § 2744.02(A)(1). *Colbert v. Cleveland*, 99 Ohio St. 3d 215, 216, 2003-Ohio-3319, 790 N.E.2d 781, ¶ 7. Under R.C. § 2744.01(C)(2),

22

governmental functions include the "provision or nonprovision of police … services or protection;" the "power to preserve the peace;" "prosecutorial … functions;" and "enforcement or nonperformance of any law," which are the basis for the allegations against the City.  "The second tier of the analysis requires a court to determine whether any of the five exceptions to immunity listed in R.C. § 2744.02(B) apply to expose the political subdivision to liability."  *Colbert*, *supra*, at ¶ 8.  The five exceptions in R.C. § 2744.02(B) are negligent operation of a motor vehicle; negligent performance of proprietary functions; negligent failure to keep public roads safe; the negligence causing injury or loss due to physical defects of the grounds of buildings; and the express imposition of liability by another section of the Revised Code.  None of these exceptions apply here.  Thus, the third tier, *i.e.*, whether any of the defenses in R.C. § 2744.03 apply, is irrelevant and the City has blanket immunity under the first tier.  *Harris v. Sutton*, 183 Ohio App.3d 616, 2009-Ohio-4033, ¶¶ 15–16 (8th Dist.).[4]

### C.      Dismissal is Required by FED. R. CIV. P. 25(a)(1)

Independent from the foregoing, Plaintiff's claims are not properly before the Court and must be dismissed.  On April 22, 2022, Plaintiff's counsel filed a Notice of Suggestion of Death of Isaiah Andrews (ECF No. 7).  On July 20, 2022, Sarah Gelsomino, as "Counsel for Plaintiff Isaiah Andrews," moved to substitute the administrator of the Estate of Isaiah Andrews as the party plaintiff (ECF No. 45).  The administrator, Adam Fried, did not file any motion to substitute on his own behalf or through counsel.  On August 8, 2022, the Court granted the

---

[4]      The state law claims also fail on the merits, because Andrews did not suffer any violation of his constitutional rights.  *Sygula v. Regency Hosp. of Cleveland E.*, 64 N.E.3d 458, 2016-Ohio-2843, ¶ 29 (8th Dist.) (malicious prosecution requires proof of malice in instituting or continuing the prosecution; lack of probable cause; and termination of the prosecution in favor of the accused).

motion to substitute.  An amended complaint substituting the administrator of the Estate, in place of Isaiah Andrews, was never filed.

Under FED. R. CIV. P. 25(a)(1), Substitution of Parties, if a motion to substitute the decedent's estate as the party plaintiff is not filed by the successor within 90 days after service of a statement noting the death, the action by the decedent <u>must</u> be dismissed.  More than seven months after this 90-day deadline, a motion to substitute still has not been filed by the Estate. The motion filed on July 20, 2022, by Sarah Gelsomino as "Counsel for Plaintiff Isaiah Andrews" (ECF No. 45) was a nullity because, "once a plaintiff dies, he is no longer a party to the case, and any motions filed on his behalf are tantamount to no motion at all."  *Kasting v. American Family Mut. Ins. Co.*, 196 F.R.D. 595, 598 (D. Kansas 2000), *citing* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 1955.

Even if the Notice of Suggestion of Death (ECF No. 7) did not trigger the 90-day deadline because it did not identify a successor, a proper substitution still has not been made. *McDonald v. Medina City Bd. of Educ.*, No. 1:19-cv-00334, 2020 WL 2085144 (N.D. Ohio April 30, 2020) (even if the mandatory 90-day deadline is somehow avoided in the interest of having a case heard on the merits, a proper motion to substitute is still required to avoid dismissal); *Harris v. US Bank Natl. Assn. as Tr. for Structured Asset Inv. Loan Tr. Mortg. Pass-Through Certificates, Series 2004-2*, No. 20-2005, 2021 WL 7542603, at *3 (6th Cir. Sept. 10, 2021), *cert. denied sub nom. Watkins v. U.S. Bank Natl. Assn.*, 212 L. Ed. 2d 327, 142 S. Ct. 1369 (2022) ("it is 'self-evident' that 'a dead person, *qua* a dead person (as opposed to the dead person's estate) cannot sue, be sued, or be joined to a lawsuit'") (citation omitted); *Francis v.*

24

*Francis*, No. 1:90-cv-1235, 1992 WL 57953, *1 (N.D. Ohio Jan. 7, 1992) ("The language of Rule 25(a)(1) is mandatory").[5]

## V.    CONCLUSION

For all the above reasons, Defendant City of Cleveland moves this Honorable Court for an Order granting it summary judgment under FED. R. CIV. P. 56 on all claims against it and dismissing the case with prejudice and costs taxed to Plaintiff.

Respectfully submitted,

MARK D. GRIFFIN (0064141)
Director of Law

By: *s/ Timothy J. Puin*
Elena N. Boop (0072907)
Chief Trial Counsel
William M. Menzalora (0061136)
J.R. Russell, Jr. (0075499)
Timothy J. Puin (0065120)
Gilbert E. Blomgren (0065240)
Matthew R. Aumann (0093612)
City of Cleveland, Department of Law
601 Lakeside Avenue E., Room 106
Cleveland, Ohio  44114
(216) 664-2800
eboop@clevelandohio.gov
wmenzalora@clevelandohio.gov
jrussell2@clevelandohio.gov
tpuin@clevelandohio.us
gblomgren@clevelandohio.gov
maumann@clevelandohio.gov

---

[5]    The rights of intended heirs and beneficiaries may be at stake here.  Plaintiff's attorney Marcus Sidoti told Cleveland.com that Andrews had a will, despite the probate court documents submitted to the Court (ECF No. 45-1) identifying him as intestate: "Sidoti said Andrews had a will, and Andrews wanted any money he receives in both cases to go to certain people and organizations."  Adam Ferrise, *Attorney: Legal fight for Isaiah Andrews...will continue on after his death*, CLEVELAND.COM (April 13, 2022), https://www.cleveland.com/metro/2922/04/attorney-legal-fight-for-isaiah-andrews-who-struggled-for-47-years-to-clear-his-name-for-a-murder-he-didnt-commit-will-continue-on-after-his-death.html.  The probate court records do not identify any such "certain people and organizations."

## CERTIFICATION OF TRACK ASSIGNMENT AND COMPLIANCE WITH PAGE LIMITATIONS

This case is currently on the standard track (ECF No. 86) and the above Memorandum complies with the page limitations set forth in Loc. R. 7.1(f) as modified by the Court's non-document order of March 2, 2023, i.e., 25 pages, not including Table of Contents, Table of Authorities, and this Certificate.  Pursuant to 28 U.S.C. § 1746 and the Court's Order of October 18, 2022 (ECF No. 86) I certify under penalty of perjury that the foregoing is true and correct.

By: _s/ Timothy J. Puin_
Timothy J. Puin (0065120)