1    A.  Understood.

2    Q.  If at any point and time I ask a bad question or

3  you don't understand what I'm asking, it's inevitable

4  that that's going to happen, please just let me know if

5  you need me to rephrase or clarify, whatever it may be,

6  just let me know, okay?

7    A.  I will.

8    Q.  If you do answer the question, we'll assume that

9  you understood the question, fair enough?

10    A.  That's fair.

11    Q.  Okay.  And if at any stage you want to take a

12  break, that's fine.  There's no problem with that.  Just

13  let us know.  The only exception would be if there's a

14  pending question, I ask that you answer the question

15  before we take a break, okay?

16    A.  Okay.

17    Q.  And of course, as we proceed today, it is

18  possible that some of the lawyers in attendance may

19  object to my question or if others then question you, I

20  may object to theirs.  If that happens, please allow the

21  objection to be spoken, and then go ahead and answer

22  unless someone instructs you not to, okay?

23    A.  Understood.

24    Q.  Okay.  Are you experiencing any circumstances

25  that may affect your memory or your ability to testify

EXHIBIT
3

Deposition of Martin Flask                    Isaiah Andrews, vs. City of Cleveland, et al.,

```
 1   truthfully and accurately today?
 2      A.  No.
 3      Q.  What is your current employment, if any, with the
 4   City of Cleveland?
 5      A.  I am retired from employment with the City of
 6   Cleveland.
 7      Q.  Are you currently employed elsewhere?
 8      A.  I am not.
 9      Q.  When did you retire from the City of Cleveland?
10      A.  I officially retired January 2, 2022.
11      Q.  And what was your title at the time you retired?
12      A.  I was an executive assistant to then Mayor Frank
13   G. Jackson.
14      Q.  And when did you begin working for the City of
15   Cleveland?
16      A.  50 years ago today, January 16, 1973.
17      Q.  Okay.  And can you please walk me through the
18   history of your employment with the City of Cleveland,
19   starting from that time?
20      A.  I can.  I actually began my career even before
21   January 16th of 1973, when I studied for a civil service
22   exam.  I took the background check, psychological check,
23   physical examination, and a polygraph examination for
24   employment with the City of Cleveland.  But my official
25   first day of work actually began through Cleveland
```

1    Police Academy in January 16, 1973.

2         Upon graduation from the police academy, I had a

3    number of jobs in escalating levels of responsibilities

4    through my career.  I served in the Vice Enforcement

5    Unit, the Accident Investigation Unit, basic patrol at

6    the 4th District, 5th Police Districts.  I served as a

7    Sergeant in basic patrol activities, a Sergeant in

8    Detective Bureau, and as a Lieutenant, I was the officer

9    in charge of the Airport Unit, the Harbor Unit, the

10   Narcotics Unit.  I served again as Executive Assistant

11   to then Chief Howard Rudolf.  And when he retired in

12   December of 1989, I stayed in that role and served as a

13   Executive Assistant to incoming Police Chief Edward

14   Kovacic until the fall of 1991.  And in the fall of

15   1991, I was assigned to the Homicide Investigation Unit

16   as the officer in charge.

17        In 1992, I was assigned as Commander of the

18   downtown police district.  1995, Commander of the Bureau

19   of Community Policing.  1996, as the deputy Chief of

20   Field Operations, where I had executive oversight of all

21   of the police districts and the Bureau of Traffic and

22   Communication.  And in 1999, I was appointed Chief of

23   Police until my retirement on August 26, 2001.

24        Following my retirement from the Division of

25   Police, I was employed as, with the City of Cleveland,

Deposition of Martin Flask                                    Isaiah Andrews, vs. City of Cleveland, et al.,

```
 1    as the Security Manager and Airport Security Coordinator
 2    at Cleveland Hopkins International Airport until January
 3    of 2006.
 4            In January of 2006, incoming Mayor Frank G.
 5    Jackson asked me to return to City Hall as Director of
 6    Public Safety.  I stayed in that job until February of
 7    2014.  In February of 2014, I joined the mayor staff as
 8    a executive assistant on his staff.
 9            I retired a second time in 2018, and was rehired
10    by the City as a contract employment to work on some
11    projects that the mayor wanted completed, specifically
12    to transfer a jail operations from the City to Cuyahoga
13    County and the sale of the headquarters building from
14    the City to Cuyahoga County.
15            In September of 2019, I was reemployed by the
16    City on a part-time basis, between September of 2018
17    until I retired in January of 2022.  I was a part-time
18    employed, again, working on the mayor's staff, as a
19    executive assistant to the mayor.
20            And on January 2nd of 2022, I retired for the
21    third and final time.
22       Q.  A long and dedicated career to the City of
23    Cleveland you've got there.
24            You mentioned that you were a sergeant in the
25    Detective Bureau, when was that?
```

```
 1               So, Jasmin, this would be the Detective
 2    Manual 1970, if you want to pull that, and hand it to
 3    Mr. Flask, please.
 4               MS. ALBINO:  Yes.
 5               MS. GREENE:  And I am putting this on the
 6    screen now.  So when you have that on hand, let me know.
 7               MR. CALDERONE:  Is this going to be Exhibit
 8    24?
 9               MS. GREENE:  It will be, once we have it
10    handy to mark, yes.
11                     -   -   -   -
12               (Thereupon, Plaintiff's Exhibit 24 was
13               marked for purposes of identification.)
14                     -   -   -   -
15               MS. BOOP:  I'm sorry.  One moment.  Can I
16    take a look at this real quick?  Okay.
17         Q.  Looks like you have now what we now marked as
18    Exhibit 24 in front of you, Mr. Flask --
19               MS. BOOP:  Hang on, one second.  We're
20    flipping through it.
21               MR. CALDERONE:  Can I examine that exhibit
22    also.
23               MS. GREENE:  Yes.
24               MR. CALDERONE:  This is part of a different
25    exhibit.
```

1    MS. GREENE:  And for the record --

2    MR. CALDERONE:  We're just getting the

3  exhibit prepared for you.

4    MS. GREENE:  That's fine.  I'm just going

5  to --

6    MS. BOOP:  There was extra pages at the end

7  of it that looked like part of a different exhibit.

8    MS. GREENE:  Thank you.  Okay.  So for the

9  record, this is Bates stamped SUPP PROD, as in

10  Supplemental Production, 000218 through 291.

11    **Q.  And, Mr. Flask, do you recognize this document?**

12    A.  Yes, I do.

13    **Q.  Is this one of the manuals that you reviewed?**

14    A.  Yes, it is.

15    **Q.  Okay.  Now is there a second detective's manual**

16  **of some type, that you also reviewed?**

17    A.  Yes, there is.  There's a Manual of Rules.

18  Appeared to have been a hardbound Manual of Rules that

19  was specifically identified and issued to the detectives

20  as the Division of Police.  It was called the Manual of

21  Rules.

22    **Q.  Okay.  Would that have been -- well, let me just**

23  **-- was this the manual --**

24    MS. GREENE:  I guess it's a question to

25  Counsel.  Maybe you can confirm this just for the ease

```
 1   of speeding this along.
 2              MS. BOOP:  Sure.
 3              MS. GREENE:  Is that what has been marked as
 4   Exhibit 1?
 5              MS. BOOP:  Exhibit 1 to what?  I'm sorry.
 6              MS. GREENE:  Plaintiff's Exhibit 1.  I'll
 7   put it on the screen now.
 8                        -  -  -  -
 9              (Thereupon, Plaintiff's Exhibit 1 was
10              introduced for purposes of identification.)
11                        -  -  -  -
12              MS. GREENE:  But it was previously marked as
13   Exhibit 1.  Is that Manual of Rules --
14              MS. BOOP:  I think we are talking about,
15   yeah, that Manual of Rules.  It's a booklet.
16              MR. PUIN:  Jacqueline, they would have Bates
17   numbers MAN, not CLE.  It should have MAN Bates numbers.
18              If you scroll down, the CLE I don't think
19   are correct.  There's a more complete version of that,
20   that we produced on Saturday, February 4th.  I can
21   e-mail it to you again right now if you want.
22              MS. GREENE:  So there's a different version
23   of this document, Exhibit 1, that you think was
24   produced.
25              MR. PUIN:  It's the same document, but it
```

Deposition of Martin Flask                               Isaiah Andrews, vs. City of Cleveland, et al.,

```
 1                    MR. PUIN:  I'll print it right now.

 2                    MS. GREENE:  Yeah.  And I'll make sure I

 3       have the electronic version.

 4                    MR. PUIN:  I'll send it to you, also,

 5       Jacqueline.  I know that Sarah has it, but since it's on

 6       my screen, I'll send it right now.

 7                    MS. GREENE:  Thanks, so much, Tim.

 8                    All right.  Off the record.  Thanks,

 9       everybody.

10                    THE VIDEOGRAPHER:  Off the record at 11:10.

11                         -   -   -   -

12                    (Off the record.)

13                         -   -   -   -

14                    THE VIDEOGRAPHER:  Back on the record at

15       11:14.

16       BY MS. GREENE:

17          Q.  Mr. Flask, I believe that you have been handed

18       another document, which we will mark as Exhibit 25.

19                         -   -   -   -

20                    (Thereupon, Plaintiff's Exhibit 25 was

21                    marked for purposes of identification.)

22                         -   -   -   -

23                    MS. BOOP:  Can we identify it by Bates

24       numbers?

25                    MS. GREENE:  Yes.  As soon as I get it open.
```

1              Okay.  So this document appears to be

2     stamped Manual 001 through Manual 074, and we're going

3     to mark this as Exhibit 25.

4        **Q.  Mr. Flask, do you recognize this document?**

5        A.  Yes, I do.  There's actually two documents within

6     this exhibit.  There's actually a Manual of Rules,

7     specifically for the Division of Police detectives.  But

8     there's also a second document that's included within

9     here.  It's the Rules of the Conduct of Discipline For

10    All Members of the Cleveland Division of Police.  So

11    there's actually two specific -- two separate documents

12    within this exhibit.

13             MS. BOOP:  Do you want me to identify that

14    Bates number for you, Jacquie?

15             MS. GREENE:  Yeah, please.  If I can find

16    it.

17             MR. PUIN:  It's at the top.

18             MS. BOOP:  I can't read it.

19             MR. PUIN:  Manual --

20             MS. BOOP:  Starting on Manual 035 as the

21    second manual.

22             MS. GREENE:  Okay.  My technology is acting

23    up at the moment.  So I'm going to have to come back to

24    this document a little later in deposition.  But for

25    now, we'll mark this as Exhibit 25.

Deposition of Martin Flask                                    Isaiah Andrews, vs. City of Cleveland, et al.,

1       **Q.  Mr. Flask, this is the second manual that you**

2   **referenced, regarding detectives, that you reviewed in**

3   **preparation for this deposition, correct?**

4              MS. BOOP:  Objection.

5              You can answer.

6       A.  Yeah.  Just to be clear, this is -- the Manual of

7   Rules is, in fact, one of the three documents that I

8   reviewed.  The rules of conduct, which are at the back,

9   starting at whatever page this is, is really a third

10  document, a separate and standalone document.

11             MS. GREENE:  All right.  Well, then I would

12  like to mark those separately.  I don't know.

13             Let's say then the sticker is already on the

14  Manual of Rules, which starts at Manual 001 and goes

15  through 0034, correct?

16             MS. BOOP:  Yeah.  I think Tim wants to

17  explain something here.

18             MR. PUIN:  This is Tim Puin, City of

19  Cleveland.  The cover page, as you can see from the

20  Xerox, is -- that's a leather book.  And it is a binder,

21  a six-ring binder.  And the Manual of Rules that's on

22  the title page of this, of the book, on the cover, may

23  refer to the Rules of Conduct and Discipline, which

24  begins on page Bates number Manual 35.  But included

25  within the copy that was found in the City's archive,

1    was also the Detective Procedure Manual, which is Manual

2    2 through 34.

3              And so whoever the -- there's a signature of

4    a police officer on three pages.  That officer put --

5    must have been a detective.  And he put the Detective

6    Manual in with the Manual of Rules.  So those were all

7    produced as one because that's the exact form they were

8    found in the City.  But as the witness said, those are

9    actually two separate documents that the witness put

10   together in a six-ring binder.  Thank you.

11             MS. GREENE:  Okay.  So then we'll leave it

12   as one exhibit, and note that this is the Manual of

13   Rules.  And if you could -- I'm having trouble getting

14   this file open on my side in a way that it's working.

15   It's part of the struggle we are having here.

16             MS. BOOP:  I put it back together.

17             MS. GREENE:  Thanks.

18   **Q.  So the Cleveland Police Department Detective**

19   **Bureau Procedure Manual and the Manual of Rules are in a**

20   **combined Exhibit 25 in this version that was obtained**

21   **from, as Mr. Puin states, the City archives, correct?**

22             MR. PUIN:  Correct.

23   **Q.  Okay.  And you reviewed both the documents**

24   **contained in this Exhibit 25, correct, Mr. Flask?**

25   A.  I did.

1    **Q.  Okay.  Thank you.  So we will come back to this**

2    **later.  In the mean time, I would like to show you --**

3    **well, actually, you know what?  Before we go on to some**

4    **more documents, let me ask you about a couple things**

5    **that you discussed before.**

6         **You mentioned that you directed an investigation**

7    **concerning allegations of racism in the department when**

8    **you were discussing Commander James Muhic, correct?**

9         MS. BOOP:  Let me note an objection to the

10   line of questioning.  If I could have a standing

11   objection, so I don't keep interrupting, to any line of

12   questioning regarding the 1999 allegation, insofar as it

13   doesn't fall within the designated topics.

14        In with that objection, please go ahead and

15   answer.

16        MR. CALDERONE:  Also note an objection to

17   the form of the question.

18        MS. GREENE:  Go ahead, Mr. Flask.

19   A.   I did, in fact, have a conversation with Retired

20   Commissioner James Muhic regarding that 1999

21   investigation.  There was some information that came to

22   light during my tenure as chief of police that alleged

23   there was organized racial groups operating within the

24   Cleveland Division of Police, including Ku Klux Klan

25   members.  And it was very public allegation.

1    Police.  And, of course, there was the training that was
2    provided to the officers that was included within -- was
3    training directly -- required the officers to comply
4    with.
5       Q.   Did you review the deposition of Edward Tomba in
6    preparation for your deposition today?
7       A.   I did.
8       Q.   For the matters of Jackson versus City of
9    Cleveland and Ajamu/Bridgeman, versus City of Cleveland?
10      A.   I did review Retired Deputy Chief's Tomba's
11   deposition.  But I was not familiar with the cases that
12   he was specifically questioned about during the
13   deposition.
14      Q.   Okay.  So getting back to the written sources of
15   policies in 1970s and that decade, '70 to '80.  You
16   mentioned GPOs, you mentioned departmental notices, and
17   the Manual of Rules.  Was there anything else that would
18   have constituted a written policy at the department at
19   that time?
20      A.   Well, certainly, there was information and
21   requirements set forth in the Ohio Revised Code, the
22   ordinances of the City of Cleveland, the Civil Service
23   rules for the City of Cleveland.  There was three
24   additional sources of policies and written guidance or
25   direction given to the officers within the Division of

1   Police.

2        Q.  Okay.  Anything else?

3        A.  Nothing that I can recall right now.  No.

4        Q.  Was there a Homicide Unit manual in the 70s?

5        A.  There was a Detective Bureau manual that provided

6   direction to the Homicide Unit investigators that was

7   issued some time in 1970.  I think summer of 1970.

8        Q.  Okay.  So there wasn't a manual specific to the

9   Homicide Unit though, was there?

10       A.  Not that I'm aware.

11       Q.  Now you mentioned Detective Bureau manual.  That

12  applied to all detectives, including those in the

13  Homicide Unit; is that right?

14       A.  Yes, it did.

15       Q.  And are you referencing, when you talk about that

16  manual that we previously marked as Exhibit 24?

17       A.  24 and 25.

18       Q.  So those are two separate manuals, correct?

19       A.  That's correct.

20       Q.  Okay.  Beyond -- and well, and those two manuals

21  in Exhibit 24 and the portion of Exhibit 25 that

22  pertains to detectives, specifically, those also

23  constitute policies of the department, correct?

24       A.  That's correct.

25       Q.  Are there any other manuals or collections of

1  **rules or orders that constituted policies in the**

2  **department in the 70s?**

3      A.  That which I had referred to previously.  It was

4  rules of conduct for officers and members,

5  specifically --

6      **Q.  Okay.**

7      A.  -- rules of conduct and discipline for the

8  officers, members, and employees of the Cleveland

9  Division of Police Department of Public Safety.

10     **Q.  And that Manual of Rules is contained in Exhibit**

11  **25 and in Exhibit 1, correct?**

12          MS. BOOP:  Objection.  I'm sorry, which --

13  you are referring to Exhibit 1?

14          MS. GREENE:  Yeah.  You know what?  Maybe I

15  -- have I shown that to you guys yet?

16          MS. BOOP:  No.  You haven't marked it as an

17  exhibit.

18          MS. GREENE:  All right.  Well, it is marked

19  in a prior deposition.

20          MS. BOOP:  Okay.

21          MS. GREENE:  I'll share it with you.  I

22  believe this is what we were looking at on the screen

23  earlier, when we determined that another version of this

24  had been produced in this litigation.

25          So what I've placed on the screen for you

Deposition of Martin Flask                    Isaiah Andrews, vs. City of Cleveland, et al.,

```
 1   the manual?
 2      A.   I'm not aware of any specific testing that
 3   occurred.
 4      Q.   Okay.  Okay.  I'd like for you to turn to Rule 1,
 5   which in my electronic copy is on page 43 of this
 6   document.  I cannot read the stamp there.  It's manual
 7   43.
 8              MS. BOOP:  Do you see these little
 9   notations?  That's what page numbers she's referring to
10   by Manual.
11              You're on Manual 43?
12              MS. GREENE:  Yes.
13      A.   I have it in front of me.
14      Q.   Okay.  And so as you look at Rule 1, Obedience to
15   Rules, it states that, "All officers, members, and
16   employees of the Division of Police shall familiarize
17   themselves with the rules and shall obey them," correct?
18      A.   That's correct.
19      Q.   How did the City enforce this?
20              MS. BOOP:  Are you talking about the time
21   period subject to the notice, or are you talking about
22   now?
23              MS. GREENE:  Talking about the time period
24   subject to the notice.
25              MS. BOOP:  Thank you.
```

1    A.  Officers who do not comply with the rules set

2  forth in the manual are subject to disciplinary charges

3  being referred against them.  If found guilty, being

4  disciplined.  Officers had the responsible to

5  familiarize themselves with all of the rules and shall

6  obey them.  And those officers that did not comply, that

7  was brought to their attention through a supervisor

8  oversight, citizens complaints, information from the

9  prosecutor, or another officer that resulted in an

10  investigation, would subject them to potential

11  disciplinary action.

12    **Q.  And so what were the mechanisms in place to**

13  **monitor officers compliance with the rules?**

14    A.  Well, that's the rule of the officers immediate

15  supervisor, officer in charge, commanding officers, at

16  that time the deputy inspectors and inspectors and chief

17  of police.

18      Information did come forward as a result of

19  citizen complaints, observations, or a supervisor

20  identifying a failure.  Those facts would be documented

21  and presented to an organizational chain of command,

22  ultimately to the chief who would initiate disciplinary

23  action to the individual officer who broke one of the

24  rules contained within this manual.

25    **Q.  And so if any one of those individuals from the**

1    direct supervisor on up became aware of a rule violation

2    of an officers, those processes that you just described

3    were supposed to be initiated, correct?

4        A.   That's correct.

5        Q.   Okay.   I would like you to turn to Rule 14, which

6    in this version of the manual -- in this version of the

7    manual is on page 48.

8        A.   Okay.

9        Q.   And I would like you to look at section 2 of that

10   rule, which states that, "The officer in charge shall

11   cause statements to be taken from persons brought to the

12   unit in the course of criminal investigations and shall

13   see that such statements are properly filed and

14   preserved.   These statements shall be available only to

15   the officers and members of the Division of Police who

16   are interested in the presentation of a particular case

17   to the office of the county prosecutor or the Law

18   Department of the City of Cleveland.   Under no

19   circumstances shall they be given or exhibited to any

20   other person without the written consent of the chief of

21   police."

22            Do you see that?

23       A.   Yes, I do.

24       Q.   Manual 48 to 49.   So this aspect of the rule, of

25   Rule 14, applies to persons brought to the Statement

```
 1   officers who worked in an office duty capacity, were
 2   also required to complete a daily duty report that
 3   articulated -- not articulated, but documented where
 4   they were, what they did, report numbers, contact
 5   information.  It outlined from the beginning of their
 6   tour of duty to the end of the day when they went home
 7   what their duties -- the duties that they actually
 8   performed.  That --
 9       Q.  The daily duty report --
10       A.  -- was called the daily duty report.  That was
11   required to be completed by all officers except those
12   that were assigned to office duties.
13       Q.  And a detective who was out on the street
14   investigating the a case would not be considered someone
15   assigned office duties, right?
16       A.  That's correct.
17       Q.  And those daily duty reports were recorded on
18   Form 1s, correct?
19       A.  No.  A specific document.  Form 1 was a report
20   that conveyed information.  There was supplemental
21   reports.  But the daily duty reports was completed by
22   all officers within the Division of Police, whether they
23   were patrol or detective function that outlined their
24   duties and responsibilities and what they did during the
25   course of the day.  And it was submitted at the end of
```

1   their tour of duty to the supervisor.

2       **Q.  Was there a specific form that was used for that**

3   **purpose, the daily duty report?**

4       A.  In the 70s, it was called the daily duty report.

5       **Q.  There was a form, a standard form, that said**

6   **Daily Duty Report that the officers filled out in the**

7   **70s?**

8       A.  That's correct.

9       **Q.  For that daily duty report, were those added to**

10  **case files?**

11      A.  No.

12      **Q.  Where were they -- well, tell me from the point**

13  **in time that the officer wrote the daily duty report,**

14  **can you describe to me in the 1970s what happened next?**

15      A.  They submitted the daily duty report to a

16  supervisory officer who would review it.  If that

17  supervisory officer had any questions about what was

18  done or not done or had any questions regarding it, he

19  would individually ask those officers.  The report would

20  be signed by not only the officer but the supervisor.

21          And it would be retained.  There was a specific

22  retention period for daily duty reports.  I'm

23  familiar --

24      **Q.  What was that retention period?**

25      A.  I'd be speculating.

1  **Q.  You don't know what the retention period was?**

2  A.  I do not specifically know for certain what that

3  retention period was.

4  **Q.  Where were those reports, those daily duty**

5  **reports retained?**

6  A.  I believe they were -- at the district level, the

7  patrol level, they were kept at the neighborhood police

8  district in which the officer was assigned.  And other

9  functions were retained within the Detective Bureau or

10  other units that were being operated within the City of

11  Cleveland.  And again, there was a lot of units in

12  operation.

13  **Q.  So for example, homicide detective wrote a daily**

14  **duty report, would that daily duty report be retained in**

15  **the Homicide Unit or would it be retained in the**

16  **Detective Bureau?**

17  A.  You know, I can't remember where specifically it

18  was retained.  I can't remember for the Homicide Unit.

19  I do not know.

20      I shouldn't say I can't remember, I do not know

21  where it was retained.

22  **Q.  With respect to the retention period, I know you**

23  **said that you don't exactly know.  But do you have a**

24  **rough idea or general idea how long that retention**

25  **period was?**

1    notes from that notebook or memorandum book to a case

2    file, correct?

3        A.   There really was no need to.

4        Q.   But there was no rule or policy that required

5    that, right?

6        A.   No, there was not.

7        Q.   And there was no requirement in any rule or

8    policy to communicate all of the information in the

9    memorandum book or the notebook to fellow detectives,

10   supervisors or other officers, correct?

11               MS. BOOP:  Objection.  Assumes facts not in

12   evidence.  Mischaracterizes prior testimony.

13       A.   The information contained within a notebook or

14   memorandum book was used as the foundation to refresh an

15   officer so that when they completed their official

16   report, prior to reporting off duty, that it was

17   complete and accurate.

18       Q.   Are you reading something right now to answer

19   that question?

20       A.   No.

21       Q.   No?  That's just straight out of your head?

22   Okay --

23               MS. BOOP:  Just for the record, he is

24   holding the manual about which you are asking him

25   questions.  He's holding exhibit --

1      A.  Rule 85.

2      Q.  Okay.  Wonderful.  So then there was no rule or

3  policy though, right, that dictated that officers must

4  report, communicate all the information contained in

5  their notebook or their memorandum book to their fellow

6  officers, detectives, supervisors, or others, correct?

7          MS. BOOP:  Same objection as the previous

8  objection.

9      A.  Detectives were required and mandated to complete

10  and update in a form generally of a supplemental report

11  containing all of the evidence and information that came

12  to their attention and submit that to the supervisory

13  officer before they reported off duty.

14      Q.  It is true that not all notes contained in the

15  notebook or the memoranda were always recorded in

16  supplemental reports, correct?

17          MS. BOOP:  Objection.

18          MR. CALDERONE:  Objection.  Foundation.

19  Calls for speculation.

20      A.  All the information prepared in a report

21  submitted by an officer was mandated to be truthful and

22  un-bias.

23      Q.  That's not my question.  So in your experience as

24  an officer in the Cleveland Police Department, all the

25  way up to the time when you were chief, you are aware of

1    officers who had notebooks and memoranda books, right?

2       A.  Yes, I did.

3       Q.  And of course, you even had one yourself at some

4    points, right?

5       A.  As a young police officer, I did.

6       Q.  And it is true that not every single piece of

7    information that was written into your notebook made it

8    into a report, correct?

9       A.  I believe that there was some information that I

10   would write in my notebook that would not be included

11   within an official report and something along the lines

12   don't forget a memo, personal note to myself as a

13   reminder to do something in my personal life.  And that

14   would not be, of course, included within an official

15   report.

16            MS. GREENE:  Okay.  All right.  I would like

17   to move on from this manual to a different document.

18            And Jasmin, if you could please provide Mr.

19   Flask with what was previously marked as Exhibit 2.

20            MS. BOOP:  I think we have it here.

21            MS. GREENE:  I'll share it on the screen as

22   well.

23            MS. BOOP:  Can we take a quick break?  I'm

24   going to go get clips.

25            MS. GREENE:  Can we -- let's -- first of

1    would be presented to the prosecutor.  The prosecutor

2    would have an opportunity to review all the evidence and

3    make the determination of what may be exculpatory and

4    which may be not, under rules established by the Court.

5           The policemen and detectives were, for the most

6    part, not attorneys.  So that decision clearly rests in

7    the hands of the prosecutor.  Again, the policemen were

8    required and mandated to collect and document all

9    information, communication, statements, and information

10   that came to their attention, include that within that

11   report and included that within the file.

12   **Q.  Was there any policy or other written guidance or**

13   **rule, any other written material that define for**

14   **officers what "evidence favorable to the defendant"**

15   **meant in the 70s?**

16          MR. CALDERONE:  Objection.  Foundation.

17   Form of the question.

18          Go ahead.

19   A.  Certainly was some training that was provided to

20   officers in the Cleveland Division of Police, both

21   supplemental and other communications that was provided

22   to them, external to the general police orders,

23   unconstitutional law, Rules of Evidence, and so forth.

24   So I think most police --

25   **Q.  So Mr. --**

Deposition of Martin Flask                          Isaiah Andrews, vs. City of Cleveland, et al.,

```
 1              MS. GREENE:  Hang on.  Let him finish.
 2     A.  -- officers had an understanding of what
 3   constituted Brady, versus Maryland constitutional
 4   issues.
 5         But, again, the officer's responsibility was
 6   pretty clear.  They were mandated to collect all
 7   information and present it and make an integral part of
 8   the case file, which ultimately is to the prosecutor for
 9   review.
10     Q.  My question to you is, is there any written
11   guidance, policy, rule, that defines for officers what
12   "evidence favorable to the defendant" was?
13              MS. BOOP:  Objection.  I think he answered
14   the question.
15              Go ahead.
16              MR. CALDERONE:  Objection.  Foundation as
17   well.
18     A.  I do not recall any specific policy that
19   identifies specifically what constituted exculpatory
20   evidence.  I do not remember any specific policy or
21   order, other than that which is contained in General
22   Police Order 19.73.
23     Q.  You said 1973?
24              MS. BOOP:  Yes.  That's what he said.
25              MS. GREENE:  Okay.  Thank you.
```

1          All right.  I would like to turn to GPO

2    33-70, which is on the page -- there are two Bates stamp

3    on them.  One is Supplemental Production 1847.  At the

4    bottom right, it also says CLE 3159.

5          MS. BOOP:  Let me find it.

6          THE WITNESS:  Okay.

7          MS. BOOP:  Are you referring to CLE 3159,

8    Supplemental 1847?

9          MS. GREENE:  Yes.  That is what I said.

10          MS. BOOP:  I know.  By the time I find it, I

11    forget it.

12          MS. GREENE:  It's on the screen, too, for

13    reference.

14          MS. BOOP:  Yeah.  But it's, like, really

15    small.

16          MS. GREENE:  Okay.  If you need me to zoom

17    in, let me know.

18    **Q.  It's GPO 33-70 that we are looking at on this**

19    **page.  It addresses the field training program, correct?**

20    A.  That's correct.

21    **Q.  What did the field training program consist of in**

22    **the 70s?**

23    A.  Classroom training, certification, and

24    evaluations.  The field training officer had the

25    responsibility to evaluate the performance of

1    A.  Other than the direction provided within the

2    manual here, I'm not aware of any other instructions

3    being given.

4    **Q.  Okay.  Well, in any case, this section 3.87**

5    **obligates detectives, including those in the Homicide**

6    **Unit, to investigate every lead until it's been proved**

7    **valueless or nothing further can be done, correct?**

8    A.  Yes, it does.

9    **Q.  And in a situation where a suspect has an alibi**

10   **but that alibi is later proven to not cover the full**

11   **time period within which the crime might have been**

12   **committed, then that suspect lead has not reached the**

13   **stage of becoming valueless or nothing further can be**

14   **done, correct?**

15          MS. BOOP:  Objection to the form of the

16   question.

17   A.  You're asking me to speculate on a specific

18   investigative process, and I can't do that.  Detectives

19   are --

20   **Q.  Well --**

21   A.  Detectives are, in fact, mandated to follow

22   through and identify any prospective lead.  And that's

23   clearly identified within the order, itself.

24   **Q.  So in your experience, when you were doing**

25   **detective work, you had a suspect or that suspect had an**

1   alibi.  And you later learned that the window of time in

2   which the crime was committed was not fully covered by

3   that alibi, you would not consider that suspect lead to

4   have reached the stage of valueless, correct?

5          MS. BOOP:  Objection.

6   A.  It would mandate that the investigating officers

7   complete a supplemental report, give it to the

8   supervisor included with the case file, all the way to

9   the prosecutor, who can, as part of the investigatory

10  process after the individual is charged, continue the

11  investigation.

12         As I stated before, it's routine for a prosecutor

13  to meet with an investigating officers to flesh out any

14  information necessary to successfully conduct a case or

15  proceed with a case.

16  Q.  So in that circumstance, though, a report should

17  have been written by the detective when he learned that

18  the alibi didn't cover the full window of time during

19  which the crime might have been committed, correct?

20         MS. BOOP:  Objection.

21  A.  Again, detectives are required to include all

22  information within their supplemental reports.  Anything

23  that --

24  Q.  And --

25  A.  Anything that comes to their attention should be

1  included within a supplemental report and included

2  within the case file.

3      Q.   Okay.   And that circumstance that we've discussed

4  would not constitute the circumstance where nothing

5  further can be done with that suspect lead, right?

6              MS. BOOP:  Objection.

7              MR. CALDERONE:  Objection.  Form.

8      A.   I don't understand the question.

9              MR. CALDERONE:  Good.  Neither do I.

10     Q.   Sure.  Where a suspect in a case presents an

11 alibi and you, as an officer, learns later on that the

12 alibi doesn't cover the whole window of time during

13 which the crime might have been committed, that suspect

14 lead has not reached --  become a lead where nothing

15 further can be done, correct?

16             MS. BOOP:  Objection.  Form of the question.

17 Assumes facts not in evidence.  Calls for speculation.

18             You can answer.

19             MR. CALDERONE:  Objection.  Asked and

20 answered.

21     A.   You know, detectives are mandated to prepare a

22 report that any information that comes to light, any

23 information they learn, every communication, every

24 statement, every bit of evidence that they acquired

25 during the course of the investigation can and should

1   be, and mandated to be -- I shouldn't say "can" or

2   "should be."  It's mandated to be included within the

3   investigative file.

4        That information would be presented to the

5   prosecutor.  The prosecutor, again, as the investigation

6   moves forward toward the potential trial, the prosecutor

7   has, in fact, an opportunity to meet with the officers,

8   and routinely meets with the officers, to further

9   question the officers in what information was available,

10  what -- in the prosecutor's mind, what additional

11  information should be included, additional statements

12  that might be taken, additional inquiries that could and

13  should be made by investigators to ensure that when the

14  case is actually ready for trial, that all of the

15  evidence is available to the prosecutor.

16        MS. GREENE:  Okay.  I'd like to take a brief

17  break off the record.

18        THE VIDEOGRAPHER:  We're off the record at

19  3:22.

20                 -  -  -  -

21        (Off the record.)

22                 -  -  -  -

23        THE VIDEOGRAPHER:  Back on the record at

24  3:33.

25        MS. BOOP:  Okay.

```
 1    But the tabs are very detailed and very impressive.  But

 2    it's just a matter of going through the tabs.

 3              Do you have a clean copy?  Do you have a

 4    Bates number?

 5              MR. CALDERONE:  Yeah, Jacqueline, does your

 6    first page of that document begin with the M-13 at the

 7    top.

 8              MS. GREENE:  Begins with M-24.  It's an

 9    excerpt.  Page 23 of the document.

10              MR. CALDERONE:  I have that page here,

11    begins with page 23.

12              MS. BOOP:  Where does it end?

13              MS. GREENE:  Yeah.

14              MR. CALDERONE:  Where does your exhibit end?

15              MS. GREENE:  On page 24.  It's just those

16    two pages.

17              MS. BOOP:  Do you have a lot of questions

18    about it that will require him to look at it?

19              MS. GREENE:  No.

20              MS. BOOP:  Let's give it a shot.  And if we

21    have to look at it, I'll make a copy.
```

**Q.  I'm showing you what's been marked as Exhibit 35.**
**And my question to you is, you'll see in the middle of**
**page 23 of this exhibit, Memorandum 25, April 13, 1961,**
**Subject Re-issue Memorandum 2660, April 14, 1960, to all**

```
 1   members of the department.

 2           Do you see that memorandum?

 3               MS. BOOP:  Can you read it, or do you want

 4   me to make you a copy?

 5               I'm going to make a copy real quick.

 6               MS. GREENE:  Okay.  Well, okay, let's go off

 7   the record.

 8               THE VIDEOGRAPHER:  Off the record at 4:23.

 9                       -   -   -   -

10               (Off the record.)

11                       -   -   -   -

12               THE VIDEOGRAPHER:  We're back on the record

13   at 4:28.

14               MS. GREENE:  Okay.  Thank you.

15   BY MS. GREENE:

16     Q.  Okay.  So we've just handed to you what's been

17   marked as Exhibit 35.  I would like to direct you,

18   please, to the April 13, 1961 memorandum on page 23 of

19   the exhibit, and ask if you've ever seen this before?

20     A.  I did see this, a copy of this document last

21   week.

22     Q.  Okay.  And do you know -- the effective date of

23   this memorandum was April 13, 1961, correct?

24     A.  It appears to be an M-25, dated April 13, 1961.

25   The subject, specifically, Re-Issue a Memorandum From
```

1  1960 to All Members of the Department.

2     Q.  Okay.  And so this references obligations of

3  officers with respect to subpoenas, correct?

4          MS. BOOP:  Objection.  Mischaracterizes the

5  document.

6     Q.  That's correct, sir?

7     A.  Yes, it is.

8     Q.  Okay.  And do you know whether officers in the

9  department were ever trained with respect to the content

10  of this memorandum?

11    A.  Well, like other orders that are issued by the

12  chief of police to the officers of the Division of

13  Police, failure to comply with this order would, in

14  fact, result in some sanctions to the individual police

15  officer.  But --

16    Q.  But no formal --

17    A.  -- whether or not a specific training was

18  actually provided, this would have been information that

19  would have been shared at rollcalls, a memorandum was

20  given to the individual officers, and may be discussed.

21  But whether or not there was any training on this

22  memorandum, I do not know.

23    Q.  Okay.  Okay.  We're going to talk about topic 2,

24  please in the Notice, of Exhibit 23.

25          Before we get into what the notice states, I

1  would like for you to generally, please describe for me

2  officer and detective training in the 1970s in brief.

3                        -   -   -   -

4                (Court reporter requested clarification.)

5                        -   -   -   -

6      Q.   Please describe for me officer and detective

7  training in the 1970s in brief.

8      A.   All officers of the Cleveland Division of Police,

9  once they were selected and met the minimum

10  qualifications for appointment to the Division of

11  Police, were required to undergo a training curriculum

12  that was established by State Attorney General's office,

13  actually the Ohio Peace Officer Training Commission.

14      The Ohio Peace Officer Training Commission set

15  forth the minimum training requirements, the topical

16  areas that were included in the training, and the number

17  of hours of training that were required of all the

18  individual officers.

19      During the training itself, officers were

20  expected to be alert, learn, and were routinely tested

21  during a program to ensure that they were meeting the

22  goals of being informed.  If they were successful in

23  completing the training program and passed the final

24  examination, the Division of Police would notify the

25  attorney general's office, the Ohio Peace Officer

1    Training Council, under the attorney general, that the

2    officer themselves had met the minimum qualifications

3    for appointment as a police officer in the State of

4    Ohio.

5           That was the minimum training, classroom training

6    that was provided to officers in the police academy.

7    Following the police academy, all officers were assigned

8    to specific duties in the Division of Police.

9    Generally, almost exclusively, they were assigned to

10   patrol activities out in neighborhoods in the City of

11   Cleveland.  They were under the direct supervision or

12   control of a field training officer who evaluated that

13   individual.

14          Those training officers had gone through a

15   training program themselves to ensure that they could

16   provide the necessary training to ensure success of that

17   individual officer.  Those new officers were evaluated

18   on a regular basis.  And, in fact, the training officers

19   themselves were evaluated every six months by their

20   supervisors to ensure they were doing a good job with

21   the new police officer, the new recruit.

22          That was the minimum training that applied to

23   officers.  It was other training that was provided.  And

24   I remember specifically in 1974, there was a 40 hour

25   mandatory in-service training program for all officers

1  in the Division of Police, including supervisors on the

2  Ohio Revised Code Rules of Criminal Procedure and some

3  constitutional law issues.  Those -- that training was

4  mandated by state attorney general and the state.

5        And I say the state attorney general.  Might have

6  been the Ohio Peace Officer Training Commission or the

7  attorney general.  But it was state mandated training.

8        So that notice went out to all the officer in the

9  Division of Police in 1974, that they were all required

10  to undergo an additional 40 hours of classroom training

11  to ensure that they understand the new criminal code,

12  Rules of Evidence, and criminal procedures, and

13  constitutional law.

14        Again, as I articulated earlier, there was lots

15  of other training that was provided to officers during

16  the course of their duties or responsibilities, beyond

17  classroom, beyond the ride-along.  Again, training was

18  provided to officers on a daily basis.  At rollcall,

19  feedback, duty reports, questions, report review, the

20  training was continuous then.  And that hasn't changed,

21  other than the amount of hours that the officers had to

22  undergo through basic training has changed.

23        It was originally established at about 120 hours.

24  It rose to about 240 hours in some time around 1972 or

25  1973.  Currently, as of 2020, it's 737 hours.

1       So there was -- the training -- the volume in the

2  level of training provided to police officers have

3  continued.

4       And again, training had to do with -- discipline

5  is part of training.  Ensuring that people do what they

6  are supposed to do is part of training.  Daily review

7  and reports and documentation that officers provide is

8  part of training.  Feedback is part of training.

9  Accolades and awards and award recognition is part of

10  training.  As is, obviously, disciplinary training, as I

11  had stated before.  So training is and was a continuous

12  process within the Division of Police.

13            MS. GREENE:  Can you please pull the

14  document titled Source Document for Police Training.

15  I'd like to mark that as Exhibit 36.

16            MR. CALDERONE:  Give us one minute to find

17  this here.

18            MS. GREENE:  It will say "Source document of

19  police training" on the tab.

20            MS. BOOP:  We found it.

21            MS. GREENE:  Great.  Thank you.

22            MR. CALDERONE:  You want to give me the

23  Bates stamp range?

24            MS. GREENE:  Just pull the whole thing, Ken,

25  please.

```
 1              MS. BOOP:  The whole tab.

 2              MR. CALDERONE:  Well, it's not really --

 3    okay.  So that's -- let me pull it out of the binder

 4    here.  Clip it.

 5              MS. BOOP:  Do you want to mark it?

 6              MS. GREENE:  So this document that we are

 7    marking as Exhibit 35[sic] --

 8              THE COURT REPORTER:  I believe this is 36.

 9              MS. GREENE:  Thank you.  36.

10              So this document marked as Exhibit 36 should

11    start with the Bates stamp -- there are two sets on this

12    document.  The first page is Supplemental Production

13    4290.  It's also stamped as CLE 2589.  And runs through

14    SUPP PROD 4587 and is also stamped CLE 2886.

15                      -  -  -  -

16              (Thereupon, Plaintiff's Exhibit 36 was

17              marked for purposes of identification.)

18                      -  -  -  -

19    Q.  Have you ever seen this document before,

20    Mr. Flask?

21    A.  Yes, I have.

22    Q.  And this is a curriculum for OPOTA police

23    training, correct?

24    A.  Yes, it is.

25    Q.  Was this document used for training of Cleveland
```

1  broad and compound nature of that question.

2          You can go ahead and answer to the best of

3  your ability.

4     A.   Detectives were, in fact, again, mandated to

5  prepare and complete their reports in a truthful and

6  un-bias manner, submit those reports to a supervisory

7  officer who would review those reports and incorporate

8  those reports within a case file that was under the

9  control of a supervisor in the Homicide Unit.

10         All those case files and all the information

11  contained within those files was transported,

12  transferred to the county prosecutor's office, where if

13  there was any exculpatory information that was contained

14  within that file, would be had the responsibility --

15  would be the responsibility of the county prosecutor to

16  disclose any potential exculpatory information or

17  exculpatory information.

18    **Q.   Are you aware of any specific training provided**

19  **by the CPD to its officers on topic 2-F?**

20    A.   Other than -- sorry.

21         MS. BOOP:  Same objection.

22    A.   Other than that which is mandated in the policies

23  and procedures of the Division of Police, I'm not aware

24  of any specific training.

25    **Q.   Okay.  Are you aware of any specific training**

1  provided by the CPD to its officers concerning topic

2  2-G, offering or facilitating false testimony?

3          MS. BOOP:  Objection.  Assumes facts not in

4  evidence.  Same objection to the previous topic.

5    A.  Officers are mandated to be truthful and un-bias,

6  offer testimony in court to their supervisors and to the

7  community that is truthful.  Violation of that is not

8  only a violation of -- failure to do that is not only a

9  violation of Manual of Rules and Regulations and city

10  policies, but potentially in the manner in which it's

11  given could result of the officer being charged with a

12  criminal offense.

13          Officers are mandated to follow the laws in the

14  State of Ohio, United States, and the ordinances and

15  charter of the City of Cleveland.

16    Q.  Okay.  Are you aware of any specific training by

17  CPD to its officers on that topic 2-G?

18    A.  Other than that which is required and mandated in

19  the Manual Rules and Regulations and Policies, I'm not

20  aware of any specific training that was offered to the

21  officers.

22    Q.  Okay.  And then the same question with respect to

23  topic 2-H.

24          Are you aware of any specific training by CPD to

25  its officers concerning discipline, training and

Deposition of Martin Flask                    Isaiah Andrews, vs. City of Cleveland, et al.,

1   **supervision of its detectives, officers and supervisors?**

2              MS. BOOP:  Objection.  Compound.  Confusing

3   redundant.

4              Go ahead and answer if you understand.

5   A.   There's really three issues here.  And that

6   involves discipline, training, and supervision of the

7   detectives, officers, and supervisors.  Currently,

8   there's an organizational structure that powers

9   individuals within the Division of Police.  Those are

10  the sergeants, lieutenants, captains and so forth, to

11  provide oversights to the officers and detectives within

12  the Division of Police.

13         Training is, again, as I articulated earlier, an

14  ongoing, almost daily occurrence, within the ranks of

15  the Division of Police.

16         In terms of discipline, failure to comply with

17  the Manual of Rules and Regulations and Policies and

18  Procedures of the Division of Police could, and often

19  does, subject an officer to some disciplinary

20  consequences.

21  **Q.  Are you aware of any specific training by the**

22  **Cleveland Division of Police for its officers on topic**

23  **2-H?**

24  A.   Other than that which I've explained, in terms of

25  the consequences to adhere to the policies and

1              MS. BOOP:  Same objection.

2              You can answer.

3      A.  Yes, I do.

4      **Q.  Okay.  I would like to show you another document.**

5  **This is not in the binder because Tim produced it to me**

6  **on Friday, on behalf of the City of Cleveland.  But...**

7              MS. BOOP:  Jacquie, how voluminous is it?

8  Do you think it would be worthwhile printing out it out

9  and putting it in front of the witness?

10             MS. GREENE:  Sure.  Let's go off the record.

11             THE VIDEOGRAPHER:  We're off the record at

12  10:54.

13                     -   -   -   -

14             (Off the record.)

15                     -   -   -   -

16             THE VIDEOGRAPHER:  We are back on the record

17  at 11:10.

18                     -   -   -   -

19             (Thereupon, Plaintiff's Exhibit 43 was

20             marked for purposes of identification.)

21                     -   -   -   -

22  BY MS. GREENE:

23     **Q.  Okay.  Mr. Flask, you've been handed what's been**

24  **marked as Exhibit 43, which includes documents produced**

25  **by the City of Cleveland on Friday[sic] last week.**

1      And have you seen the contents of Exhibit 43

2  before?

3      A.  I have.

4      Q.  This is a correspondence course of constitutional

5  law and related GPOs and reading materials; is that

6  right?

7      A.  Yes.  This is included in some of the documents I

8  had the opportunity to review.

9      Q.  Okay.  And the documents contained in this

10  exhibit refer to an optional constitutional log

11  correspondence course for Cleveland police, correct?

12     A.  The police academy will offer six correspondence

13  courses.  One of which was constitutional law for the

14  police officer.

15     Q.  And it was an optional course, correct?

16     A.  There was not mandatory attendance.

17     Q.  Okay.  Do you know whether the individual

18  defendants named in this litigation took this course?

19     A.  I did have the opportunity to review the

20  personnel files for the defendant officers.  And many of

21  the officers took supplemental courses for this

22  training.  But I don't recall which ones specifically.

23  But there were supplemental training courses that were

24  attended by the individual officers who are defendants

25  in this matter.

1    **Q.  Did any of the individual defendants take this**

2    **course?**

3    A.  I believe there was at least one.

4    **Q.  And you don't know which one that was?**

5    A.  It was either Leo Allen or Hicks, but I don't

6    recall which one specifically.

7    **Q.  Okay.  All training taken by the individual**

8    **officers would be contained in their personnel files,**

9    **correct?**

10   A.  It should be included within their personnel

11   files.

12   **Q.  And the personnel files would include all of the**

13   **titles of the programs that those officers took for the**

14   **training in the Cleveland Police Department, correct?**

15   A.  Personnel files would be pretty inclusive of

16   investigations, requests, documentation, training,

17   training requests, many times vacations, military

18   service, requests for specific items that were more

19   related to their personnel matters rather than to

20   individual investigations.

21   **Q.  Okay.  For Mr. Comodeca, do you know whether at**

22   **any time in his employment he was ever investigated by**

23   **the City of Cleveland?**

24   A.  Yes, I do.

25   **Q.  For what?**

Deposition of Martin Flask, Volume II                    Isaiah Andrews, vs. City of Cleveland, et al.,

1      A.  He was --

2              MR. CALDERONE:  Objection.  Foundation.

3      Relevance.

4      A.  During my review of the personnel files, I did

5      observe that Officer Comodeca, back around 1954 or 1955,

6      was involved in a fight, a disturbance of some type that

7      I categorized as a fight that led to disciplinary action

8      being taken against him.

9      Q.  And what was the discipline for that?

10     A.  The chief of police reviewed -- referred the

11     matter to the Director of Public Safety for review and a

12     decision.  I believe Officer Comodeca pled guilty to the

13     charges or charge that he violated a Manual of Rules of

14     Regulations to the Division of Police and received a

15     reprimand from the director of public safety.

16     Q.  Reprimand is just, like, a letter that goes in

17     your personnel file, right?

18             MS. BOOP:  Objection.

19             You can answer.

20     A.  It's unclear whether it was a verbal or written.

21     But there was evidence in the file that indicated that

22     the matter went before the Director of Public Safety.

23     And that letter from the Director of Public Safety to

24     the chief of police was, in fact, included in the file.

25     Q.  And that event involved off-duty conduct,

1    correct?

2        A.   Yes, it did.

3        Q.   **Was he investigated for anything else?**

4        A.   I'm not aware of any other further investigations

5    involving -- none -- if there were any other

6    investigates that may have been conducted or other

7    documentation within his file, but none that led to any

8    disciplinary action.

9        Q.   **And let me ask briefly, none of the individual**

10   **defendants in this matter attended any detective school**

11   **from the Cleveland Police, correct?**

12              MS. BOOP:  Objection.

13              You can answer.

14              MR. CALDERONE:  Objection to foundation.

15       A.   All received training, but the terminology

16   "detective training," I can't specifically address

17   whether or not it was detective or some other form of

18   instructional training provided by the Division of

19   Police.

20       Q.   **Okay.  For Mr. Dugan, do you know whether he was**

21   **ever investigated by the City of Cleveland?**

22       A.   Yes.  Yes, he was.

23       Q.   **And for what?**

24       A.   He did, in fact, receive disciplinary action

25   around either 1976, 1977, for a sick-leave violation,

1    that at that time, he violated a rule of the Cleveland

2    Division of Police that mandated when an officer

3    reported off sick, he had to stay at his residence

4    during the time in which he had reported off sick.

5    Superior officer went to his home and found no evidence

6    that he was actually at the home.  And he faced

7    disciplinary action for that violation.  And did, in

8    fact, receive a one-day suspension.

9        **Q.  Was Mr. Dugan ever investigated or disciplined by**

10   **the City of Cleveland for anything else?**

11       A.  Dugan was, in fact, investigated for an alleged

12   assault that took place in the 1950s.  And I was able to

13   review the documentation that was prepared by then

14   Lieutenant Edward Lentz, detailing the investigation,

15   itself.  The fact that Dugan, along with all of the

16   other officers on his shift within the 3rd Police

17   District, were put into a lineup, where the victim of

18   the assault and one witness had the opportunity to

19   review all of the officers.  That investigation was

20   concluded without having any disciplinary action taken

21   against Dugan.

22       **Q.  Was it determined that he had, in fact, engaged**

23   **in the assault?**

24       A.  There was no evidence to support the allegation

25   that he was.

 1   responsibility within the Cleveland Police Academy.  I

 2   believe it was Lieutenant Reagan, R-E-A-G-A-N, to the

 3   best of my memory.

 4       **Q.  And you said the chief had the ultimate**

 5   **responsibility for the training in that period?**

 6       A.  It was the chief of police's responsibility for

 7   the conduct and discipline for all officers within the

 8   Division of Police.

 9       **Q.  And that included all training of all officers,**

10   **right?**

11       A.  Organizationally, all officers within the

12   Division of Police, through the chain of command,

13   reports to the chief of police.

14       **Q.  The chief of police was ultimately responsibile**

15   **for all policies of the police department in the 70s,**

16   **right?**

17       A.  With the exception of those policies that were

18   based on funding, legislation, and other matters that

19   required either administrative, Director of Public

20   Safety or City Council approval.

21       **Q.  With respect to Exhibits 24 and 25, and the**

22   **policies contained in those documents, were those**

23   **policies subject to that approval beyond the chief of**

24   **police?**

25               MS. BOOP:  Objection.  It's been asked and

```
 1   answered.

 2               Go ahead.

 3       A.   The chief of police does, in fact, report to the

 4   Director of Public Safety who reports to the Mayor of

 5   the City of Cleveland.  But in terms of the policies

 6   contained within the Detective Bureau manual in 1970,

 7   the Manual of Rules, and the conduct manual, those

 8   generally would have been under the direct supervision

 9   or control and authorized by the chief of police.

10       Q.   Okay.  In the 1970s, did the CPD do anything to

11   ensure that its officers would not withhold exculpatory

12   evidence?

13               MS. BOOP:  Objection.

14       A.   Cleveland police officers had the duty and

15   responsibility to obtain information, complete reports

16   and ensure that those reports, communication, and

17   evidence be included within the investigative files that

18   were under the control, maintenance by a superior

19   officer.  So every officer at the Division of Police

20   that was involved in an investigative process, was

21   mandated and required complete reports that were

22   reviewed and included within a case files that were

23   under the control of the superior officer.

24       Q.   Has the City ever received any complaints about

25   officers holding exculpatory evidence?
```

Deposition of Martin Flask, Volume II                    Isaiah Andrews, vs. City of Cleveland, et al.,

```
 1              MS. BOOP:  Objection.

 2              You can answer.

 3              MR. CALDERONE:  Objection.  Scope.

 4    Foundation.

 5      A.  I'm not personally aware of any specific

 6    complaint where an officer withheld exculpatory

 7    evidence.  Because all evidence, all reports,

 8    communications, documentation and communication is

 9    required to be obtained within the investigatory file

10    presented to a prosecutor.  The prosecutor makes the

11    determination what constitutes exculpatory evidence.

12      Q.  In the 1970s, can you identify any instance when

13    an officer was investigated or disciplined by the City

14    for failing to disclose exculpatory evidence?

15              MS. BOOP:  Objection.

16      A.  I'm not personally aware of any incident like

17    that.

18      Q.  Are you aware of any incident like that over the

19    course of your career with the City of Cleveland?

20              MS. BOOP:  Objection.

21              You can answer.

22      A.  I'm not aware of any incident like that ever

23    occurring during my career between 1973 and 2022.

24      Q.  Can you identify an instance where the City

25    investigated or disciplined an officer for withholding
```

Deposition of Martin Flask, Volume II

Isaiah Andrews, vs. City of Cleveland, et al.,

1    Q.  Please turn to the next page in Exhibit A.  It's

2  Bates stamped 4602.

3        And this appears to be a letter, which was dated

4  April 11, 1967, correct?

5    A.  Yes, sir.

6    Q.  The letter was written by Richard Wagner Chief of

7  Police, correct?

8    A.  That's correct.

9    Q.  Do you remember Mr. Wagner being the chief of

10  police back in '67?

11    A.  I do not.

12    Q.  Looking at the letter of who it was addressed to

13  it, it identifies Mr. Anson Cook, Executive Director of

14  the Ohio Peace Officers Training Council, correct?

15    A.  That's correct.

16    Q.  Would you please read the second paragraph of

17  this letter for me.

18    A.  "Group A, consisting of 40 patrolmen, roster

19  attached, will receive the complete recruit training

20  course immediately at the Cleveland Police Academy with

21  the completion date of June 30, 1967."

22    Q.  And read the next paragraph, please.

23    A.  "Groups B and C, rosters attached, will receive

24  88 hours of intensified training preparatory to street

25  assignment with Group B returning to the police academy

1    on July 1, 1967, and group C on October 1, 1967, for the

2    complete training course."

3        Q.  So this letter, as we see it on the document, is

4    a letter from the chief of police in Cleveland to the

5    Ohio Peace Officers Training Council, discussing

6    Cleveland Police Academy training, correct?

7        A.  And the schedule of training, that is correct.

8        Q.  Turn to the next page of Exhibit A.

9        A.  Yes, sir.

10       Q.  This document, I believe, is Bates stamped

11   Supplemental Production 4603.  This appears to be an

12   April 14, 1967 letter from Mr. Cook, the executive

13   director of the Ohio Peace Officers Training Council,

14   back to Mr. Wagner, the chief of police in Cleveland,

15   correct?

16       A.  That's correct.

17       Q.  Would you please read the second paragraph of

18   this letter into the letter.

19       A.  "The Cleveland Police Department is to be

20   commended for their progressive program and police

21   training.  We wish you continued success."

22          Signed by Anson Cook, Executive Director.

23       Q.  Based upon the contents of this letter, it

24   appears that the Ohio Peace Officers Training Council

25   was very satisfied, if not impressed, by the Cleveland

1    Police Department's academy, correct?

2        A.   That's correct.

3        Q.   I would like you to turn to Exhibit B.

4                    -   -   -   -

5                (Thereupon, Defendant's Exhibit B was marked

6                for purposes of identification.)

7                    -   -   -   -

8        Q.   I'll represent to you that Exhibit B appears to

9    be the Ohio Peace Officers Training Council curriculum

10   for 1968.

11           If you look at the first page, which I don't

12   think you can see it on the Exhibit, but it's actually

13   Supplemental Production 4795.  The first page of this

14   exhibit, again, says that it's property of the Ohio

15   Peace Officers Training Council, correct?

16       A.   That's correct.

17       Q.   It references the Cleveland Police Academy,

18   correct?

19       A.   Correct.

20       Q.   And the years or the dates are March 4, 1968, to

21   April 13, 1968, correct?

22       A.   Correct.

23       Q.   And the commander was Captain Pfaff, P-F-A-F-F,

24   correct?

25       A.   Correct.

```
 1        Q.  Looking at the basic subjects that were part of

 2   the Ohio Peace Officers Training Council, again, if we

 3   look at the first 10 or so subjects, they seem to mimic

 4   the subjects we saw in Exhibit A, correct?

 5             MS. GREENE:  Objection.

 6        A.  Yes, they do.

 7        Q.  Okay.  Looking at those topics though, just to be

 8   clear, one of the topics is Role of Law Enforcement,

 9   correct?

10        A.  Correct.

11        Q.  And another topic is Laws of Arrest and Search

12   and Seizure, correct?

13        A.  Correct.

14        Q.  Another is Criminal Law and PR, correct?

15        A.  Correct.

16        Q.  Skipping down a couple, Laws of Evidence,

17   correct?

18        A.  Correct.

19        Q.  Court Testimony is another topic which was part

20   of the curriculum, correct?

21        A.  Correct.

22        Q.  And, again, Report Writing was a specific topic

23   of the Ohio Peace Officers Training Council curriculum

24   in 1968, correct?

25        A.  Correct.
```

1    Q.  Looking at the bottom of that column, again, this

2  document also references that an examination was given

3  or must be given to all officers going through the

4  academy, correct?

5    A.  Correct.

6    Q.  I'd ask you to turn now to the third page of

7  Exhibit B.  This is a March 15, 1968 letter from Michael

8  Blackwell, Chief of Police in Cleveland, to Mr. Cook,

9  the executive director of the Ohio Peace Officers

10  Training Council, correct?

11    A.  Correct.

12    Q.  The third paragraph of this letter says, "The

13  original certification requests of the above members

14  were held up at the time of their respective graduations

15  from the Cleveland Police Academy for reasons of having

16  an academic average under 75 percent.  However, these

17  members did attain an average above the 70 percent

18  minimum standard, as prescribed by the Ohio Peace

19  Officers Training Council.  Therefore, after careful

20  study of the evaluation reports from the various

21  district commanders attesting to the performance ability

22  of the above-named members, it is recommended that they

23  be certified for permanent appointment to the Cleveland

24  Police Department prior to determination of their

25  probationary period, April 1, 1968."

Deposition of Martin Flask, Volume II                    Isaiah Andrews, vs. City of Cleveland, et al.,

```
 1            Do you see that?
 2       A.  Yes, sir.
 3       Q.  This letter that was sent to the Ohio Peace
 4   Officers Training Council seems to indicate that the
 5   Cleveland Police Academy had a 75 percent standard that
 6   it demanded of its officers in the academy, correct?
 7       A.  That's correct.
 8       Q.  And that 75 percent standard was higher than the
 9   minimum 70 percent standard that was required by the
10   Ohio Peace Officers Training Council.
11       A.  That's correct.  It exceeded the minimum scores
12   mandated by the Peace Officers Training Council.
13       Q.  And I'm going direct your attention to this
14   letter to the second paragraph.  It lists out different
15   officers, correct?
16       A.  That's correct.
17       Q.  And as examples, I want to draw your attention to
18   Detective James Perkins and Patrolman Scott Manley as
19   two officers identified on this sheet.
20            I would like you to turn, I believe, two pages
21   further into Exhibit B.  And there is a document that is
22   titled Basic Training Certification Record.  And it's a
23   certification record of James A. Perkins.
24            Do you see that?
25       A.  Yes, sir.
```

1    Q.  This is a certification that Mr. Perkins has

2    complied with certain topics of the Ohio Peace Officer

3    curriculum, correct?

4    A.  That's correct.

5              MS. GREENE:  Objection.  Foundation.

6    Q.  One of the topics or items that Officer Perkins

7    was certified on was notebooks.

8         Do you see that?

9    A.  Yes, sir.

10   Q.  Could you tell me what that references?

11   A.  During recruit training program, all officers are

12   required to prepare a notebook, take notes in the police

13   academy so they can refer back to, for study purposes,

14   to prepare them for the final examination.

15   Q.  And I would ask you to the turn approximately 10

16   pages past that, to Bates stamped page Supplemental

17   Production 4809.

18        Are you there?

19   A.  Yes, sir.

20   Q.  This document is labeled Basic Training

21   Certification Record.  And it's the certification record

22   of officer Scott Manley, correct?

23   A.  Yes, sir.

24   Q.  And it indicates that, "I hereby satisfy -- I'm

25   sorry -- "certify that Scott P. Manley has

 1      Q.   Court Testimony, correct?

 2      A.   Yes, sir.

 3      Q.   And, again, we see Report Writing, four hours?

 4      A.   That's correct.

 5      Q.   At the bottom of the page, we see, again, that he

 6  the Ohio Peace Officers Training Council required a

 7  two-hour examination be given on these topics, correct?

 8      A.   That's correct.

 9      Q.   I'd ask you to turn approximately three pages

10  into this Exhibit C, to the document that is Bates

11  stamped Supplemental Production 4659?

12      A.   Yes, sir.

13      Q.   And looking at this page, there's two pages.

14  This appears to be a letter from the chief of police in

15  Cleveland, to Mr. Cook, the executive director of the

16  Ohio Peace Officers Training Council, correct?

17      A.   That's correct.

18      Q.   The date of the letter is January 28, 1970,

19  correct?

20      A.   Yes, sir.

21      Q.   I'm going to ask you to go to the third paragraph

22  of this letter.  The letter indicates, "These officers

23  were in session at the academy for a period of 13 weeks

24  of intensive training in a course that conforms with the

25  minimum standard recommendations and requirements of the

1    Peace Officers Training Code."

2        A.   That's correct.

3        Q.   "The total amount of instructional hours exceeded

4    500 hours, and included 30 hours in classes on the human

5    and social sciences, 62 hours of firearms training,

6    under both indoor and outdoor conditions."

7            It says, "District duty orientation was deferred

8    this time in order to expedite training and relieve

9    critical manpower shortages at the district."

10           Below that, it identifies four officers that were

11   separated from the academy for cause and failure to

12   achieve satisfactory academic and firearm proficiency

13   performances.

14           Do you see that?

15       A.   Yes, sir.

16       Q.   I'd ask you to turn six or seven pages past that,

17   to the page Bates stamped 4670.

18           Let me know when you're there.

19       A.   I'm there.

20       Q.   This appears to be a June 18, 1970 letter,

21   written by Mr. Cook, the executive director of the Ohio

22   Peace Officers Training Council, to the chief of police

23   in Cleveland, correct?

24       A.   Yes, sir.

25       Q.   The first paragraph of that letter indicates,

1    "Replying to your letter of June 15th, we wish to advise

2    that the present rules and regulations of the Ohio Peace

3    Officers Training Council provide for minimum of 12

4    hours of firearms training.  We are in the process of

5    upgrading the minimum Peace Officers Training standards

6    from 120 to 240 hours.  And this, in turn, will increase

7    the firearms training of a minimum of 26 hours.  The new

8    240-hour program should be in effect on or after

9    January 1, 1971.  Your office will be notified of the

10   changes and the minimum mandatory training program prior

11   to the effective date."

12       A.  That's correct.

13       Q.  So this letter seems to indicate that in June of

14   1970, the Peace Officers Training Council was increasing

15   the minimum hours of training required of officers,

16   correct?

17       A.  That's correct.

18       Q.  And as we've already noted in these documents,

19   the curriculum required by the Ohio Peace Officers

20   Training Council included a specific topic on report

21   writing?

22       A.  It did.

23       Q.  And required officers to pass a written

24   examination on all those topics designated in the

25   curriculum?

1    A.  Yes, sir.

2    Q.  And that was a letter that was sent March 23rd of

3  1973?

4    A.  That's correct.

5    Q.  The first paragraph of this letter indicates,

6  "This is to advise the Peace Officers Training Council

7  that an additional 35 officers have been appointed to

8  this department and are presently assigned to the police

9  academy.  And date of appointment was March 13, 1973.

10  And the class will be known as the 81st class, Group 3."

11        The next paragraph reads, "The course of training

12  will consist of the recommended and required subject

13  matter, as set forth by the Ohio Peace Officers Training

14  Council.  This information is submitted for the

15  Council's information and records upon successful

16  completion of training.  Certification for these

17  officers will be requested."

18        Did I read that correctly?

19    A.  Yes, sir.

20    Q.  If we turn to the next page, March 24, 1973,

21  letter from the chief of police to the executive

22  director of the Ohio Peace Officers Training Council,

23  correct?

24    A.  That's correct.

25    Q.  The second paragraph of that letter says, "These

 1   officers were assigned to the academy during the above

 2   dates and underwent a course of instruction on police

 3   subjects that consisted of 305 hours and was almost nine

 4   weeks in duration.  This course was modeled after and

 5   complied -- I'm sorry.

 6        "This course was modeled after and complied with

 7   all requirements of the Ohio Peace Officers Training

 8   regulations."

 9        Did I read that correctly?

10   A.  Yes, sir.

11   Q.  So looking at these three documents consisting of

12   the Peace Officers Training curriculum and the letters

13   from the City of Cleveland to the Ohio Peace Officers

14   Training Council, it appears that officers were

15   instructed on several topics, including Report Writing

16   as one, correct?

17   A.  Yes, sir.

18   Q.  Federal Civil Rights as another topic, correct?

19   A.  That's correct.

20   Q.  Police Canons and Ethics, as another topic,

21   correct?

22   A.  That's correct.

23   Q.  And officers who successfully completed the

24   Cleveland Police Academy had to pass a two-hour

25   examination on a curriculum including those topics,

1    correct?

2        A.  Yes, sir.

3        Q.  I would ask you to look at Exhibit F.

4                    -  -  -  -

5                (Thereupon, Defendant's Exhibit F was marked

6                for purposes of identification.)

7                    -  -  -  -

8        Q.  Exhibit F is identified also as Supplemental

9    Production 4647 and is titled, Cleveland Police Academy

10   Recruit Training Schedule Breakdown.

11       Do you see that?

12       A.  Yes, sir.

13       Q.  This document seems to indicate the breakdown of

14   topics that officers were trained on in the Cleveland

15   Police Academy, correct?

16       A.  Correct.

17       Q.  And the date on the bottom of this document is

18   1978, correct?

19       A.  That's correct.

20       Q.  The total hours identified on this page for

21   recruit training included 594 hours, correct?

22       A.  Yes, sir.

23       Q.  If the you turn to the second page of this

24   document, Bates stamped page 4638.  The Cleveland Police

25   Academy Schedule Breakdown includes several topics,

Deposition of Martin Flask, Volume II

Isaiah Andrews, vs. City of Cleveland, et al.,

1    it was the standard of training in the Cleveland Police

2    Academy that required training on proper investigation

3    of crimes?

4        A.  Yes, sir, it did.

5             MS. GREENE:  Objection.  Mischaracterizes

6    evidence.

7        Q.  And we know as early as 1973, that the training

8    in the Cleveland Police Academy included, as a standard,

9    instruction on Federal Civil Rights?

10       A.  It did.

11            MS. GREENE:  Objection.  Mischaracterizes

12   evidence.  Speculation.

13       Q.  I would like you to turn to Exhibit G.

14                  -   -   -   -

15            (Thereupon, Defendant's Exhibit G was marked

16            for purposes of identification.)

17                  -   -   -   -

18       A.  Yes, sir.

19       Q.  Exhibit G, again, seems to be a curriculum of the

20   Ohio Peace Officers Training Council, correct?

21       A.  Yes, sir.

22       Q.  And if you look at the document at the top, it's

23   headed or titled Ohio Peace Officers Training Council.

24   And the academy identified on this document is what?

25       A.  Cleveland Police Academy.

1    Q.  And the years addressed on this document is

2   October 29, 1979, to February 22, of 1980, correct?

3    A.  That's correct.

4    Q.  And if we look at the basic subjects of

5   curriculum required by the Ohio Peace Officers Training

6   Council, on this page, we continue to see one of the

7   subjects being Role of Law Enforcement, correct?

8    A.  That's correct.

9    Q.  Police Canons and Ethics were another required

10  topic of training, correct?

11   A.  Correct.

12   Q.  Laws of Arrest were another topic of training,

13  correct?

14   A.  Correct.

15   Q.  If you go down a couple, Lineups was another

16  required topic of instruction?

17   A.  That's correct.

18   Q.  Below that, Rules of Evidence was a topic of

19  instruction required, correct?

20   A.  Yes, sir.

21   Q.  Searches and Seizures was another topic of

22  instruction?

23   A.  Yes, sir.

24   Q.  If you go down a couple more, Federal of Civil

25  Rights continued to be a mandatory topic of instruction

1  in the academy, correct?

2      A.  Correct.

3      Q.  Below that, Law Enforcement and Civil Liberties

4  was an additional topic of mandatory instruction,

5  correct?

6      A.  Yes.

7      Q.  And if you go down three or four below that, we

8  still have Report Writing as a mandatory topic of

9  instruction in the academy as required by the Ohio

10  Police Officers Training Council, correct?

11      A.  It did.

12      Q.  I'd ask you to turn to Exhibit H.

13                  -  -  -  -

14              (Thereupon, Defendant's Exhibit H was marked

15              for purposes of identification.)

16                  -  -  -  -

17      Q.  You were asked questions or you testified in your

18  deposition about probationary patrolmen going through

19  field training, correct?

20      A.  I did.

21      Q.  If we look at Exhibit H, it's Bates stamped

22  Supplemental Production 4892.

23          Do you see that?

24      A.  I do.

25      Q.  And this appears to be a departmental memorandum

1    numbered 70-21, correct?

2        A.   Yes.

3        Q.   Did and the date is January 26, 1970?

4        A.   That's correct.

5        Q.   And the subject of this department memorandum was

6    Assignment of Probationary Patrolman With Training

7    Coaches, correct?

8        A.   That's correct.

9        Q.   The memo states that, "Each of the six districts

10   has 15 patrolmen who received training and are qualified

11   as coach trainers.  Their purpose is to continue the

12   training of graduate, probationary patrolmen during the

13   first year of their on-street assignment."

14           Did I read that correctly?

15       A.   Yes, sir.

16       Q.   If you turn to the next page of Exhibit H,

17   beginning on Supplemental Production Bates number 4893,

18   this is a general police order that was in effect in

19   September of 1970, correct?

20       A.   Yes, sir.

21       Q.   And the GPO number is 33-70?

22       A.   Yes, sir.

23       Q.   And says, "Responsibilities and operational and

24   assignment procedures of the field training program."

25           Correct?

1    A.  That's correct.

2    Q.  **Under the heading of A, this police order**

3    **identifies the procedures or responsibilities of the**

4    **field training officer, correct?**

5    A.  That's correct.

6    Q.  **And item A-4 indicates that, "The training**

7    **officer shall provide instruction on, A, police vehicle**

8    **operation, B, operational procedures."**

9        **Now let me stop there.**

10       **What are operational procedures?**

11   A.  The general police orders and divisional notices

12   that have been issued by the chief to ensure that they

13   are complying with established policy, completing

14   reports in a proper manner, operating the safe and

15   appropriate manner while they are out there doing their

16   duties and responsibilities.  Which is three of the

17   broad topics for Operational Procedures.

18   Q.  **If we look in this general order, under A-5, it**

19   **indicates that, "Field training officers shall examine**

20   **and initial all reports prepared by the trainee."**

21       **What is that referring to?**

22   A.  Well, generally, that would include the zone car

23   duty report that was completed every day during the

24   first year of training.  The officers generally prepared

25   the reports so they would learn how to prepare reports

1  appropriately.  Any reports that were submitted by the

2  new probationary officer would be initialed by the

3  training officer.

4  **Q.  And would some of those reports include Form 1s?**

5  A.  Form 1s, Form 10s, any other supplemental report

6  that was required to be completed during the performance

7  of their duties.

8  **Q.  Looking at item A-6, under GPO 33-70, indicates**

9  **that, "Field training officers shall submit periodic**

10  **performance-rating reports."**

11  **What are those?**

12  A.  On a regular basis, I believe it was every 90

13  days, the field training officer was mandated and

14  required to submit a progress report on the performance

15  of the new probationary officer to ensure -- to identify

16  any strengths or weaknesses is that may require

17  retraining.

18  **Q.  Finally, if you turn to the next page of this**

19  **GPO, under item A-7, it says, "The field training**

20  **officer's duties, which require extra duty -- open**

21  **paren, OT, closed paren -- such as an examination and**

22  **preparation of reports shall be credited in accord with**

23  **standard overtime procedures."**

24  **What is that referencing?**

25  A.  You know, if a field training officer was

```
 1    required to work beyond his normal work hours to

 2    finalize evaluations or reports that were necessary for

 3    his oversight of the probationary officer, the training

 4    officer would, in fact, be entitled to overtime

 5    compensation.

 6        Q.  I'd like to turn your attention to Exhibit I.

 7    I've marked three different documents here.  The first

 8    page being I-1.

 9                    -  -  -  -

10              (Thereupon, Defendant's Exhibit I-1 was

11              marked for purposes of identification.)

12                    -  -  -  -

13        Q.  This document is titled a the top, New Appointee

14    Progress Report.

15            Do you recognize this report?

16        A.  It's an earlier version of an evaluation report.

17        Q.  And it's --

18        A.  But I do -- I have seen these in the past.

19        Q.  This evaluation report has a date of 1967,

20    correct?

21        A.  That's correct.

22        Q.  And among the topics that officers were evaluated

23    on as designated on this form, was the quality of their

24    work, correct?

25        A.  That's correct.
```

1    Q.  And the form references, under the quality of the

2  work their, their thoroughness, neatness, and accuracy,

3  correct?

4    A.  Yes, sir.

5    Q.  Also, another category that officers were

6  evaluated on at that time is under the heading of

7  Character and Habits, correct?

8    A.  That's correct.

9    Q.  And one of the items that was evaluated under

10  that heading was whether the officer was following

11  policies and instructions?

12    A.  That's correct.

13    Q.  And the reference of policies and instructions

14  refers to what?

15    A.  General police orders, divisional notice, Manual

16  Rules of Regulation, Civil Service, Ohio Revised Code,

17  ordinances of the City of Cleveland.

18    Q.  Looking at Exhibit I-2, we have another Cleveland

19  Police Department performance rating form that

20  references a particular officer.

21                  -   -   -   -

22            (Thereupon, Defendant's Exhibit I-2 was

23            marked for purposes of identification.)

24                  -   -   -   -

25    Q.  Do you see that?

1    A.  Yes, I do.

2    Q.  The date on this document is 1978, correct?

3    A.  That's correct.

4    Q.  Looking at this form, we still see that officers

5    were evaluated on the quality of their work, correct?

6    A.  That's correct.

7    Q.  And under the heading of quality of their work,

8    they were specifically evaluated on knowledge of their

9    duties, correct?

10   A.  Correct.

11   Q.  Thoroughness of their work, correct?

12   A.  Yes, sir.

13   Q.  And the ability to make reports, correct?

14   A.  Correct.

15   Q.  And compliance with departmental policies and

16   directives, correct?

17   A.  Correct.

18   Q.  And preparation of court cases?

19   A.  Correct.

20   Q.  And presentation of court cases?

21   A.  Yes, sir.

22   Q.  If we look at the last page of Exhibit I-2, we

23   see yet another Cleveland Police Department performance

24   rating checklist that was used of officers, correct?

25   A.  That's correct.

```
 1        Q.  The date on this document is January '77 to April
 2   of '77?
 3        A.  That's correct.
 4        Q.  If we look at this form for this officer, we
 5   again see that officers were evaluated on the quality of
 6   their work, correct?
 7        A.  Yes, sir.
 8             MS. BOOP:  Just for the record you are
 9   referring to Exhibit I-3.  I think you said before I-2.
10             MR. CALDERONE:  Oh, I'm sorry.  Yeah.  I'm
11   referring to Exhibit I-3.
12                   -   -   -   -
13             (Thereupon, Defendant's Exhibit I-3 was
14             marked for purposes of identification.)
15                   -   -   -   -
16        Q.  Under the quality of their work, some of the
17   items that were specifically evaluated of officers
18   included accuracy of their work, correct?
19        A.  Yes, sir.
20        Q.  Knowledge of their duties was another topic they
21   were specifically evaluated on, correct?
22        A.  Yes, sir.
23        Q.  Thoroughness of their work, correct?
24        A.  Yes, sir.
25        Q.  And compliance with departmental policies and
```

1    directives, correct?

2      A.   Correct.

3      Q.   Considering the information we see on Exhibit H,

4    which is the Field Training Program, and Exhibit I,

5    which is the sample evaluation reports of police

6    officers, was it the fact back in 1974 and 1975, and

7    before 1974 and 1975, that officers were evaluated on

8    the thoroughness of their work?

9      A.   Yes, they were.

10     Q.   And by thoroughness of their work, we are

11   referring to the officers' ability to make reports?

12     A.   Ability.  Accurately.  And the submission in a

13   proper manner.

14     Q.   And in the quality of their work, officers were

15   evaluated, in 1974 and before, on whether or not they

16   complied with departmental policy and directives?

17     A.   That's correct.

18     Q.   I want to turn back to Exhibit 36 for one moment.

19   And I want to ask you about some of the specific

20   training requirements in Exhibit 36.

21          First, I'd ask you to turn to page 130 of this

22   book paginated page 130.  The topic in the Source

23   Document For Police Training, identified on page 130 in

24   Exhibit 36, is Report Writing, correct?

25     A.   That's correct.

1    Q.  If we look at the second paragraph under

2    Introduction, it says, quite literally, "The success of

3    the police operation depends upon the quality of your

4    reports and your ability to write effectively.  We rely

5    on written reports to relay information to our

6    superiors, coworkers, the courts, and numerous other

7    agencies.  We use them to train personnel to get people

8    to follow procedures and policies."

9    A.  That's correct.

10   Q.  A few moments ago, I asked you questions about

11   the field training program and the evaluation of

12   officers in the City of Cleveland.

13       Was the standard that we see in Exhibit 36, that

14   emphasizes the accuracy and completeness of reports, the

15   same standard that Cleveland police officers were

16   required to follow back in the 1970s?

17   A.  Yes, sir.

18   Q.  Were Cleveland police officers trained in the

19   1970s to write quality, complete reports to the best of

20   their ability?

21   A.  Yes, sir.

22   Q.  I would like to look back on Exhibit 36, on page

23   130, on that same page.  Under Roman numeral 1-A, it

24   says, "Basic definition, a report is an official or

25   formal statement of fact or proceedings, which relays

1  information in a manner so presented as to put the

2  reader in the same position relative to the facts as is

3  the one originating information."

4       Exhibit 36 provides that basic definition of the

5  word "report," correct?

6     A.  Yes, sir.

7     Q.  Was that the same standard that the City of

8  Cleveland Police Department used as the definition of

9  "report"?

10    A.  Yes, it was.

11    Q.  And in the 1970s, were police officers for the

12  City of Cleveland trained on that standard as the

13  definition of the word "report"?

14    A.  Yes, sir.

15    Q.  Going back to page 130 of Exhibit 36, under 1-B,

16  it says, "Investigative report.  And investigative

17  report is a written narrative containing the facts and

18  findings learned during the course of an investigation.

19  It is a means of communications used by an investigator

20  to inform those who are interested in his work of his

21  progress and of his findings."

22       Did I read that accurately?

23    A.  Yes, sir, you did.

24    Q.  That was the standard in Exhibit 36, the Source

25  Document For Police Training in Ohio, as to the

Deposition of Martin Flask, Volume II

Isaiah Andrews, vs. City of Cleveland, et al.,

1    definition of an investigative report, correct?

2        A.  That's correct.

3        Q.  Was that the same standard that the City of

4    Cleveland Police Department complied with as the

5    definition of "investigative report"?

6        A.  Yes, sir.

7        Q.  And were police officers in the City of Cleveland

8    in the 1970s trained on that definition of an

9    investigative report?

10       A.  Yes, sir.

11       Q.  I'd like you to turn to page 131 of Exhibit 36.

12   This is still in the chapter of Report Writing, correct?

13       A.  That's correct.

14       Q.  Roman numeral 3 on page 131, in the chapter of

15   Report Writing identifies Uses of Reports in Police

16   Operations, correct?

17       A.  That's correct.

18       Q.  According to Exhibit 36, one use of the police

19   report is to aid in police administration, correct?

20       A.  Correct.

21       Q.  Another use is to aid in effective police record

22   systems, correct?

23       A.  Correct.

24       Q.  Another use of reports is to aid better police

25   supervision, correct?

1    A.  Yes, sir.

2    Q.  Looking at those three uses of reports in Exhibit

3  36, were these also standards that the City of Cleveland

4  Police Department trained its officers on for the use of

5  reports by the Cleveland Police Department?

6    A.  Yes, sir.

7    Q.  Under letter C on page 131, it identifies one of

8  the uses of the report is to aid in better police

9  supervision.

10      And under that topic it says, "By reviewing the

11  officer's work, the supervisor is able to detect if the

12  case has been mismanaged."

13      And if you look two numbers before that, it says,

14  Errors of omission and commission can be detected."

15      Now that identifies standards for supervisors --

16  I should say police supervisors, in reviewing reports,

17  correct?

18    A.  That's correct.

19    Q.  Was this the same standard of expectation of

20  police supervisors that the City of Cleveland Police

21  Department had in the 1970s, particularly, 1974 and

22  1975?

23    A.  Absolutely.

24    Q.  And did the Cleveland Police Department provide

25  training to officers on these standards of supervision

1   of files, with respect to reports?

2       A.   It did.

3       Q.   I'd ask you to turn to page 132, still under the

4   chapter of Report Writing in Exhibit 36.

5           Another use of police reports identified in

6   Exhibit 36 is that they aid to the over all police

7   operations.

8           Do you see that?

9       A.   Yes, sir.

10      Q.   And one of the items that it specifically lists

11  there is under D-4, "The individual officer is part of a

12  team.  Unless the information he possesses is available

13  to others, it is useless as no one else can take proper

14  action.  Information obtained in the officer's memory or

15  personal notebook is meaningless from a record

16  standpoint."

17          And the next number says, "A progress or

18  follow-up report is one method from which an officer is

19  able to share his information with others and preserve

20  the continuity of an investigation."

21          And the next number says, "If for some reason an

22  officer is unable to complete his assignment, proper

23  documentation of the work already performed will permit

24  another officer to assume the case with little need to

25  backtrack or duplicate the efforts already completed."

1          Did I read those standards correctly, under Aid

2    to Overall Police Operations?

3        A.  You did.

4        Q.  Now those are standards that are set forth in

5    Exhibit 36.  Were those standard also the standards that

6    were put into operation and enforced by the Cleveland

7    Police Department in the 1970s?

8        A.  They were.

9        Q.  And particularly, were they in effect in 1974 and

10   1975?

11       A.  They were.

12       Q.  Were Cleveland police officers trained on those

13   standards on how to make reports and update them as

14   mandated in that standard?

15       A.  They were.

16       Q.  Looking at item E on page 132, one of the other

17   uses of reports is identified as Aid to Outside Police

18   Agencies.

19          Do you see that?

20       A.  I do.

21       Q.  And one of the standards under this section says,

22   "Prosecuting attorneys rely on information of police

23   reports to prepare a case and to determine the charges

24   to be placed against a criminal."

25       A.  That's correct.

1    Q.  Back in the 1970s, and in particular 1974 and

2    1975, was it the standard in the Cleveland Police

3    Department that police officer reports were used and

4    known to be used by prosecutors and preparing cases to

5    determine whether charges should be placed against a

6    criminal defendant?

7    A.  They were.

8    Q.  Were police officers trained back in the 70s and

9    before the 70s that their reports may be utilized by

10   prosecutors to charge and pursue prosecution of

11   suspects?

12   A.  Yes, they were.

13   Q.  If you look at page 132, one of the topics

14   identified inspect Exhibit 36 in the chapter of Report

15   Writing is the importance of note taking in report

16   preparation.

17        Do you see that?

18   A.  I do.

19   Q.  Under that topic, it talks about, "Permanency of

20   notes.  And it indicates that information committed to

21   memory is soon forgotten.  Notes, however, are

22   permanent.  A complete and satisfactory report is based

23   upon the quantity and quality of the notes taken during

24   the course of the investigation.  Many variables,

25   including ability, training, practice, and effort

1    influence the process of recalling the past."

2         Did I read that correctly?

3    A.   You did.

4    Q.   The standard identified in **Exhibit 36**, under this

5    section of note taking is a standard that indicates a

6    complete and satisfactory report is based upon an

7    officer's notes, correct?

8    A.   That's correct.

9    Q.   Was it the standard in the Cleveland Police

10   Department in the 1970s, particularly '74 and '75, that

11   officers would prepare adequate reports based upon notes

12   they took in the field?

13   A.   They did.

14   Q.   And were officers trained back at that time on

15   taking notes in the field and using those notes to

16   prepare adequate reports?

17   A.   They were.

18   Q.   One second here.  I would like you to turn to

19   page 134 of **Exhibit 36**.  This is another topic of

20   training, under Reports.  This topic is titled

21   Fundamentals and Qualities of Good Report Writing.

22        Under B there, I point out that it says, "A

23   written report must be clear, legible, complete,

24   accurate, brief, prompt," correct?

25   A.   Correct.

1    you've looked at today.  This is a departmental memo

2    issued April 7, 1972, correct?

3       A.  That's correct.

4       Q.  And this is the memorandum that offered the

5    constitutional law for police officers, correct?

6       A.  That's correct.

7       Q.  The course book that is identified in this

8    memorandum is Constitutional Law For Police, Second

9    Edition, by John C. Klotter.

10          Do you see that?

11      A.  Yes, sir.

12      Q.  I would ask you to turn two pages past in the

13   Exhibit J, and there is a title page of a book, correct?

14      A.  That's correct.

15      Q.  The next four pages after that seem to be

16   sections taken from the Constitutional For Police

17   coursebook, by John C. Klotter, correct?

18      A.  That's correct.

19      Q.  Now the second page of Exhibit J is another

20   departmental memorandum that was sent out, or

21   departmental notice, in April 18 of 1972, correct?

22      A.  That's correct.

23      Q.  And that notice was just telling officers that

24   the deadline for enrolling in this constitutional law

25   course was approaching, correct?

```
 1        A.   Closing.   That's correct.

 2        Q.   I would like to turn to some of the topics in the

 3   Constitutional Law For Police coursebook.

 4        If you look at the page that is Bates stamped

 5   Supplemental Production 4888, there is a section there

 6   numbered 10.18, correct?

 7        A.   That's correct.

 8        Q.   The title of that section is Misconduct of the

 9   Prosecutor.

10        Do you see that?

11        A.   Yes, I do.

12        Q.   If you look at the first paragraph below that, it

13   says that, "The office of the public prosecutor in the

14   United States carries a two-fold responsibility.  As the

15   state's representative in the adversary proceeding, it

16   is the prosecutor's duty to vindicate wrongs against

17   society and to see that the guilty do not go unpunished.

18   Unlike the defense attorney, however, he is not a wholly

19   partisan figure.  Although his ethical obligation as an

20   officer of the court, means some instances conflict with

21   his role as society's avenger, he is under an equally

22   imperative duty to see that those accused of crime

23   receive a fair trial."

24        Did I read that correctly?

25        A.   You did.
```

 1      Q.  If you turn two pages past that, within section

 2   10.18, there's a paragraph on that page that states, "A

 3   closely-related problem arises when the state's

 4   attorney, instead of attempting to profit from

 5   introduction of false testimony, keeps to himself

 6   relevant evidence which might have helped the defendant

 7   create a reasonable doubt in the mind of the jury.  Here

 8   the defect is one of passive omission, rather than

 9   active commission.  Nevertheless, the net effect is the

10   same.  If the state presents evidence pointing to the

11   defendant's guilt without informing him of evidence in

12   its possession which contradicts this is inference, the

13   danger of unfair conviction is equally present."

14        The next paragraph begins by discussing the case

15   of Brady, versus Maryland.

16        Do you see that?

17      A.  I do.

18      Q.  Instead of reading the whole paragraph, I'm going

19   to go to the middle of that paragraph where this

20   coursebook says, "Consequently, the prosecuting attorney

21   is under a strict disclosure obligation which is not

22   neutralized by showing that he acted in good faith."

23      A.  That's correct.

24      Q.  I want to stop there.

25        Earlier in the deposition, you were shown a GPO

1    issued by the Cleveland Police Department incorporating

2    a letter from Prosecutor John Corrigan.

3         Do you remember that GPO?

4    A.   I do.

5    Q.   And in that GPO, Prosecutor Corrigan instructed

6    police officers that they were not to produce documents

7    or any other evidence to a criminal defendant or

8    criminal defense attorney, correct?

9    A.   Police department are not required, nor shall

10   they.   I think those were the exact words.

11   Q.   And in that police order, which incorporated the

12   instruction from the prosecutor, it also indicated that

13   the prosecutor would be the entity in determining what

14   information would and would not be produced to a

15   criminal defendant, correct?

16   A.   That's correct.

17   Q.   I believe after that GPO was implemented, you

18   also testified about mandatory state training that

19   required all police officers to be familiar with the new

20   criminal rules?

21   A.   That's correct.

22   Q.   And if I recall your testimony correctly, as part

23   of that mandatory state training, police officers in the

24   City of Cleveland were trained that they were disclosed

25   all documents and information to a prosecutor and that