IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

RICKY JACKSON,

Plaintiff,

JUDGE BOYKO

-vs- CASE NO. 1:15-CV-00989

CITY OF CLEVELAND, et al.,

Defendants.

______________________________/

KWAME AJAMU, et al.,

Plaintiffs,

-vs- JUDGE BOYKO

CASE NO 1:15-CV-01320

CITY OF CLEVELAND, et al.,

Defendants.

______________________________/

Deposition of EDWARD TOMBA, taken as if upon examination before Brian A. Kuebler, a Notary Public within and for the State of Ohio, at the offices of Friedman & Gilbert, 55 Public Square, Suite 1055, Cleveland, Ohio, at 9:05 a.m. on Monday, February 22, 2016, pursuant to notice and/or stipulations of counsel, on behalf of the Plaintiffs in this cause.

\- - - -

APPEARANCES:

Elizabeth Wang, Esq.
Loevy & Loevy
2060 Broadway, Suite 460
Boulder, Ohio 80302
(720) 328-5642,

On behalf of the Plaintiff;
Ricky Jackson;

Terry H. Gilbert, Esq.
Jacqueline C. Greene, Esq.
Friedman & Gilbert
55 Public Square, Suite 1022
Cleveland, Ohio 44113
(216) 241-1430,

and

David E. Mills, Esq.
The Mills Law Office, LLC
1300 West Ninth Street, Suite 636
Cleveland, Ohio 44113
(216) 929-4747,

On behalf of the Plaintiffs,
Kwame Ajamu and Wiley Bridgeman;

Stephen W. Funk, Esq.
Roetzel & Andress
222 South Main Street
Suite 400
Akron, Ohio 44308
(330) 376-2700,

On behalf of the Individual
and Estate Defendants;

Shawn Mallamad, Esq.
City of Cleveland Law Department
601 Lakeside Avenue
Room 106 City Hall
Cleveland, Ohio 44114
(216) 664-2569,

On behalf of the Defendant,
City of Cleveland.

I N D E X


| | |
|---|---|
| EXAMINATION<br>EDWARD TOMBA<br>BY MS. WANG | 4 |
| EXAMINATION<br>EDWARD TOMBA<br>BY MR. GILBERT | 184 |
| RE-EXAMINATION<br>EDWARD TOMBA<br>BY MS. WANG | 192 |
| Deposition Exhibit 1 | 11 |
| Deposition Exhibit 2 | 36 |
| Deposition Exhibit 3 | 63 |
| Deposition Exhibit 4 | 67 |
| Deposition Exhibit 5 | 67 |
| Deposition Exhibit 6 | 111 |
| Plaintiff's Exhibit 7 | 132 |
| Plaintiff's Exhibit 8 | 132 |
| Plaintiff's Exhibit 9 | 136 |
| Plaintiff's Exhibit 10 | 144 |
| Plaintiff's Exhibit 11 | 146 |
| Plaintiff's Exhibit 12 | 176 |
| Plaintiff's Exhibit 13 | 192 |
| Plaintiff's Exhibit 14 | 203 |

EDWARD TOMBA, of lawful age, called by the Plaintiffs for the purpose of examination, as provided by the Rules of Civil Procedure, being by me first duly sworn, as hereinafter certified, deposed and said as follows:

EXAMINATION OF EDWARD TOMBA

BY MS. WANG:

Q. Would you please state your name and spell it for the record?

A. Edward Tomba, T-o-m-b-a.

Q. What's your -- do you have a current position in the Cleveland Police Department?

A. Yes. I am the deputy chief of homeland security and special operations.

Q. What, generally, are your duties and responsibilities in that position?

A. My duties and responsibilities are to oversee the operations of three commands within the division of police; the Bureau of Homeland Services, the Bureau of Special Investigations, and the Bureau of Special Services.

And under those commands are three commanders, all the investigative functions within the division of police, our organized crime and intelligence unit, and the staff at

the Cleveland Hopkins Airport.
Q. How long have you had that position?
A. Seven years.
Q. Prior to -- well, let's start from the beginning, actually.
When were you first appointed to the Cleveland Police Department?
A. July 29th, 1985.
Q. Okay. And at that time, what was your -- did you go to the police academy?
A. Yeah. Yes, I did.
Q. Okay. By the way, have you been deposed before?
A. Once before, yes.
Q. How long ago?
A. Probably ten years ago.
Q. Okay. So just -- I'll go over some preliminary rules for a deposition just to refresh your recollection.
So we're here for a deposition that the City of Cleveland has designated you for in the case of Ricky Jackson versus the City of Cleveland and Kwame Ajamu and Wiley Bridgeman versus the City of Cleveland.
I'll be asking you some questions. If you don't understand any of my questions, let me

know, and I'll try to rephrase or make it understandable; is that fair?
A. Okay. Yep.
Q. All right. And so the record is clear, please allow me to finish asking my question before you begin your answer. That way the record will be clear; is that fair?
A. Yes.
Q. Okay. We can take a break at any time that you wish, except for when a question is pending; is that fair?
A. Okay. Yes.
Q. All right. So the police academy. How long were you in the police academy?
A. Four months.
Q. And then where were you assigned?
A. I was assigned to the basic patrol division of the Sixth District, which is on the east side of the city.
Q. How long were you in that position?
A. Six years.
Q. All right. And then after that, what was your next position?
A. I was assigned as a vice detective, vice detective in the Sixth District --

Q. What kind --
A. -- for 18 months.
Q. What kind of crimes did you investigate in vice?
A. Prostitution, illegal gambling, and narcotics.
Q. All right. And then where did you go after that?
A. I was promoted to sergeant in 1993. And I worked the -- I was a road supervisor in the uniform division for a year, and I supervised a group of officers for a year.
And then after that, I was transferred to the internal affairs bureau for four and a half years, where we investigated allegations of police misconduct.
Q. What did you do as a road supervisor?
A. Road supervisor is, I was in a patrol car, a supervisor, and I supervised the men and women in the Sixth District on a specific shift that answered calls for service.
So if there was a serious crime or something that they needed supervisory guidance, I would respond in uniform and talk to the officers on the scene, and we would come to a decision as to exactly what action to take.
Q. Okay. And then when you were transferred to internal affairs, you were there for four and a

half years?
A. Yes.
Q. Okay. So was that '95 to '99?
A. Yes. Exactly.
Q. Did you have a supervisory position in internal affairs?
A. No. I was a sergeant, and all the investigators were supervisors. We answered to a lieutenant, who answered directly to the chief of police.
Q. After your stint in internal affairs, where did you go?
A. I went to the Third District, strike force unit, which covered the downtown business district. And we investigated -- I was a supervisor. We investigated pattern crimes within the downtown business district, street robberies, auto thefts, narcotics, complaints.
I did that for about a year, and then I was promoted to lieutenant.
Q. What year was it that you made lieutenant?
A. That was 2000.
Q. Where did you go next as lieutenant?
A. I was assigned to the Third District detective bureau, and I was responsible for the general duty detectives, who investigated crimes

throughout the Third District and the strike force, who investigated pattern crimes, and also the vice unit.

And I had three sergeants underneath me that were the direct supervisors in those units.

Q. Okay. So you supervised the sergeants?

A. I supervised the sergeants, yes.

Q. And the sergeants supervised the detectives?

A. The detectives. Correct.

Q. Okay. How long were you in that position?

A. I was in that position until 2002. And then I was appointed as the commander of the Bureau of Special Investigations.

Q. And what where your duties and responsibilities there?

A. I oversaw the investigative function of the major investigative bureaus within the city, the homicide unit, sex crimes and child abuse unit, financial crimes unit, domestic violence unit, our bomb squad, our forensic lab. Any specialized investigation was handled by our unit.

Q. How long were you in that position?

A. Until 2005 -- 2006, 2006.

Q. Where did you go in 2006?

A. And I was promoted to deputy chief, my current position.
Q. Where did you go to college?
A. Cleveland State University.
Q. When did you graduate?
A. 2007.
Q. You got a BA or --
A. Bachelor's degree in public safety management.
Q. Did you work before you joined the Cleveland Police Department?
A. I did for three -- before that, I got out of -- I was at Ashley University when I got out of high school. And then from 1981 until I was hired, I worked at the Cleveland Clinic Foundation.
Q. What did you do at the Cleveland Clinic Foundation?
A. I was an orderly.
Q. And you said 1980 to 1981?
A. 1981 until I was appointed in '85.
Q. Oh, okay.
A. About four years.
MS. WANG: All right. I'm going to -- it's just the deposition notice.
MR. MALLAMAD: I can look at the chief's if you guys need an extra copy.

(Thereupon, Deposition Exhibit 1 was marked for purposes of identification.)

BY MS. WANG:

Q. All right. I have handed you what the court reporter has marked as Deposition Exhibit 1. It is the Amended Notice of Rule 30(b)(6) Deposition to Defendant City of Cleveland. And just take a look at that.

Have you seen that document before?

A. Yes.

Q. Okay. Now, I'm just going to go through these topics and confirm that you have, in fact, been designated by the city to testify about these topics here today.

A. Okay.

Q. So are you the person who has been designated by the City of Cleveland to provide binding testimony on the city's behalf on the following topics?

One: The city's written and unwritten policies, practices, and customs in effect from May 19th, 1970, through May 19th, 1980, relating to: A. Documenting or memorializing the developments in an investigation in such a way that they would become part of the official file

during the course of an investigation, including
documentation and preservation of information
learned during a homicide investigation,
including placing witness statements and notes
thereof in the official investigation file.
Have you been so designated?
A. Yes.
MR. MALLAMAD: Liz, if I could
just interrupt, obviously, you're going to
read each and every one of these sentences
and paragraphs. That's fine, but I'm sure
the chief could review this and give you a
global response if you --
MS. WANG: Well, I want it on the
record. So I'm going to read each of the
topics.
MR. MALLAMAD: Okay.
BY MS. WANG:
Q. B. Conducting and documenting photo or in-person
lineup or showup. Have you been designated to
testify about that topic?
A. Yes, I have.
Q. C. Use of informants or witnesses during a
criminal investigation, including disclosure of
such witnesses and payments, gifts, promises,

and threats made to such witnesses.
A. Yes.
Q. D. Disclosure of exculpatory evidence, including, but not limited to, impeachment materials, to criminal defendants, defense attorneys, or prosecutors.
A. Yes.
Q. E. Conducting and documenting interrogations or interviews of suspects and witnesses, including juveniles.
A. Yes.
Q. F. Writing, preserving, and destroying police reports, investigator/detective notes, memos, and exculpatory evidence, including impeachment materials, during the course of an investigation, including use, creation, contents of, storage, location, movement, and preservation of homicidal investigative files kept by the Cleveland Police Department and Cleveland detectives.
A. Yes.
Q. G. Discipline, training, and supervision of detectives.
A. Yes.
Q. Okay. Have you been designated by the city to testify -- to provide binding testimony on the

city's behalf on the topic of: 2. The city's training of its law enforcement officers in effect from May 19th, 1970, through May 19th, 1980, relating to A: Documenting or memorializing the developments in an investigation in such a way that they would become part of the official file during the course of an investigation, including documentation and preservation of information learned during a homicide investigation, including placing witness statements and notes thereof in the official investigation file?
A. Yes.
Q. B. Conducting and documenting photo or in-person lineup or showup.
Have you been designated on topic 2B?
A. Yes.
Q. Have you been --
A. I'm sorry.
Q. Are you following along?
A. Yes, I am.
Q. All right. Have you been designated on topic 2C? Use of informants or witnesses during a criminal investigation, including disclosure of such witnesses and payments, gifts, promises,

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 15 of 248. PageID #: 1333



and threats made to such witnesses.
A. Yes.
Q. Have you been designated on topic 2D? Disclosure of exculpatory evidence, including, but not limited to impeachment materials, to criminal defendants, defense attorneys, or prosecutors?
A. Yes.
Q. 2E. Conducting and documenting interrogations or interviews with suspects and witnesses, including juveniles.
A. Yes.
Q. 2F. Writing, preserving, and destroying police reports, investigator/detective notes, memos, and exculpatory evidence, including impeachment materials, during the course of an investigation, including the use, creation, contents of, storage, location, movement, and preservation of homicidal investigative files kept by the Cleveland Police Department and Cleveland detectives.
A. Yes.
Q. 2G. Discipline, training, and supervision of detectives.
A. Yes.

Q. Have you been designated to provide binding testimony on behalf of the City of Cleveland on the topic of 3?
Any and all training provided to Eugene Terpay, James Farmer, Frank Stoiker, John Staimpel, Peter Comodeca, Michael Cummings, James White, Jerold Englehart.
A. Yes.
Q. Have you been designated by the City of Cleveland to provide binding testimony on topic 4?
The city's efforts to locate and produce files responsive to plaintiff's document request in this case. This request includes, but is not limited to, the persons with knowledge about those search efforts where efforts have been undertaken to locate and produce documents relating to the Franks' homicide investigation or to the police department's policies and procedures from different areas of the Cleveland Police Department and the City of Cleveland, including, but not limited to, location of the documents produced in this case between 1975 and the present day.
A. Yes.
Q. Have you been designated by the City of Cleveland

to provide binding testimony on topic 5?
The Cleveland Police Department and the city's document retention policies from May 1975 to the present.
A. Yes.
Q. Have you been designated by the City of Cleveland to provide binding testimony on topic 6?
Any efforts by the City of Cleveland to identify, investigate, or present any of the following types of misconduct and discipline imposed by the city as a result of such investigations.
A. Improper eyewitness identification procedures, including misconduct related to live in-person lineup and photographic showup or lack of documentation regarding the same.
A. Yes.
Q. 6B. Failure to place Brady evidence and information in the official investigative file or otherwise withholding material, exculpatory information from prosectors, suspects, criminal defendants and their attorneys.
A. Yes.
Q. 6C. Failure to document and preserve information learned during a homicide investigation.

A. Yes.
Q. 6D. Improper interviews, interrogations, or interactions with juvenile witnesses and/or juvenile suspects.
A. Yes.
Q. Have you been designated by the City of Cleveland to provide binding testimony on behalf of topic 7, which is the final policymaking authority for the City of Cleveland for the time period of May 19th, 1970, through May 19th, 1980, on policies, procedures, practices, and training relating to topics 1 through 6 listed above?
A. Yes.
Q. Thank you.
A. Uh-huh.
Q. Now, what did you do to prepare for this deposition?
A. I met with Mr. Mallamad, and I reviewed some documents that he had provided from the City of Cleveland.
Q. Okay. When did you meet with Mr. Mallamad?
A. We met twice last week. I believe it was on Tuesday and Friday.
Q. Is that it? Are those the only times you met with him?

A. Yes.
Q. How long did you meet with Mr. Mallamad?
A. Total? Probably about six hours.
Q. What documents did you review in preparation for your deposition?
A. It was a series of documents that were responsive to the requests that were made. And there was policy, general police orders, some policies from the State of Ohio. There were documents that were related to the Manual of Rules during the years in question.
There was a large, large group of responsive documents. We reviewed all of those. Exactly, every single document, I couldn't tell you exactly what it was, but...
Q. All right. So it's your understanding that you reviewed documents that have been produced in this case?
A. Yes.
Q. Okay. Did you speak with anyone else, besides Mr. Mallamad, in preparation for the deposition today?
A. Yes.
Q. Who else did you speak to?
A. I talked to -- a phone conversation with Steve.

Q. With Mr. Funk?
A. Yes.
Q. When did you speak with him?
A. That was Friday afternoon.
Q. What did you say to him? What did he say to you?
A. Just a general overview of what to expect today, being the fact that I haven't been deposed in quite a long time.
Just that -- really, reiterated a lot of things that Shawn and I spoke about about answering the questions relative to the responsive documents that were provided.
Q. Did Mr. Funk call you, or did you call him?
A. Shawn called him, and we had a conference call.
Q. So who else was present for that conversation --
A. Just the two of us.
Q. Sorry. Just let me finish the question so the record is clear.
Who else was present for that conversation, besides yourself, Mr. Mallamad, and Mr. Funk?
A. It was just myself, Mr. Mallamad, and Mr. Funk was on the phone.
Q. Okay. And I'm sorry if I just asked you this, but how long was that phone call?
A. Ten minutes at best.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 21 of 248. PageID #: 1339



Q. Was there anything else that was said in that conversation, other than what you've already testified to?
A. No.
Q. Did Mr. Funk point out any documents for you to review?
A. No, he didn't.
Q. Did he tell you anything about what the defendant officers were alleged to have done in this case?
A. I was aware of what they were alleged to have done.
Q. Did you review the complaint in this case?
A. Yes.
Q. Besides anything that you might have learned from speaking with your attorney, how else are you aware of what the allegations are in this case?
A. I really don't have any other knowledge, except when I was contacted by the law department to start this process.
Q. Okay. Now, was there anybody who was in the Cleveland Police Department in the 1970s that you spoke with in preparation for your deposition today?
A. No, there isn't.
Q. What is your understanding, generally, of how

written policies for the Cleveland Police Department were established in the 1970s?
A. Well, I can speak as to how things are done today. And after reviewing those documents, it looked like they were about the same. So I can tell you how we do things today.
We have a Manual of Rules. We have general police orders, and we have divisional notices. And reviewing some of those documents, I see that they had the same thing back in the 1970s.
So, you know, the orders and the notices are established by the chief of police, and they are given to the members of the Division of Police to follow.
Q. And so I just want to be clear which time period you're speaking of now. The orders in the 1970s were -- both today and in the 1970s are established by the chief of police?
A. By the chief of police, yes.
Q. And you're talking about the general police orders?
A. Yes, I am.
Q. Okay. And in the 1970s, was there anybody else responsible for establishing or promulgating police orders, general police orders, besides

the chief of police?
A. The ultimate responsibility comes from the chief of police, but he gathers information from a lot of different sources. It could be new case law. It could be new policies within different organizations that we work with.
Anything that would change or guide the men and women of the Division of Police about how they do their jobs.
So he is the sole policy setter for the division, but there are a lot of other outside, I would have to say, people that make recommendations.
And, you know, we do follow the law. So if the law changes, the chief will put that in the policy.
Q. Okay. So in the 1970s, the chief of police was the final policy maker for the department?
A. Yes.
Q. And that's on any of the topics -- any of the issue areas that might confront a police officer?
A. Yes.
Q. What was the role in the 1970s of the director of public safety in relationship to the police chief?

A. Well, the director of public safety answers to the mayor of the City of Cleveland. And the director of public safety is responsible for management and oversight of the Division of Police, the Division of Fire, the Division of EMS, and the dog warden.
Q. And that was true in the 1970s as well?
A. Yes.
Q. Did the director of public safety have any responsibility for creating or promulgating rules or general orders for the department?
A. In the 1970s, no. I believe it was still the office of the chief of police was the final policy maker. And I think -- I believe that is set by the charter of the City of Cleveland.
Q. Okay. You mentioned there was a Manual -- there is a Manual of Rules --
A. Yes.
Q. -- that was in existence in the 1970s?
A. Yes, there is.
Q. Is there still a Manual of Rules today?
A. Yes, there is.
Q. The Manual of Rules, in the 1970s, do you know who created that, the one that was in existence in the 1970s?

A. No. I don't recall.
Q. Today, who is responsible for creating or revising the Manual of Rules?
A. Chief Williams.
Q. Chief Williams?
A. The chief of police.
Q. Oh, the chief of police.
A. Yes.
Q. And does he receive input from people in the same way, in terms of the Manual of Rules and making updates or edits to it, as he did -- as he does with the police orders?
A. Yes, he does.
Q. What's the difference between the kinds of items, you know, rules that were in the Manual of Rules, versus the general police orders?
A. The Manual of Rules is a document that provides responsibility, job descriptions of different ranks within the division. It provides a broad overview of what is expected, as far as conduct for the members of the Division of Police.
    And the general police orders -- I could describe them as more operational, day-to-day responsibilities that a supervisory officer, all the way down to a first line uniformed officer

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 26 of 248. PageID #: 1344



would follow.
So the Manual of Rules is very -- is broad, and it encompasses our conduct and our responsibilities. And then the general police orders encompass the day-to-day things that take place in the field.
Q. Today, in the general police orders, is there an order concerning the officer's obligation to disclose exculpatory evidence?
A. Today?
Q. Yes.
A. Not in a general police order, but, you know, the number one responsibility for a police officer is to follow the law and, you know, be honest and conduct their job with integrity, but is it documented anywhere in a general police order? No. But that is following the law that is expected of them.
Q. Is there any rule, policy, or written document in the Cleveland Police Department today that explains to officers what their duties are to disclose exculpatory evidence?
A. Well, I would have to say that they -- their responsibilities, particularly in the detective function, is that we are the -- it's outlined

that we are the gatherer of information and facts.

And we present everything that we gather to the prosecutor for that decision. We don't make that decision as to what is exculpatory or not. We provide everything that we get during the course of an investigation, and we give it to the prosecutor's office. That is our duty.

And then they decide what is or what isn't through the legal process. That isn't something that is mandated, or that is not a responsibility of a Cleveland police officer.

Q. The duty and obligation that you just described to disclose all evidence to the prosecutor, is that written down?

A. That's in -- those are in different policy manuals within the Division of Police.

Q. Today?

A. Yes.

Q. Which policy manual?

A. It's in the homicide unit policy manual, sex crimes. Any investigative unit within the Division of Police is -- it's pretty much a standard operating procedure when conducting an investigation, that any and all evidence,

information gathered, is turned over to the prosecutor's office so they can make an informed decision.

And all of our cases are reviewed by a prosecutor. We don't make any of those decisions on our own.

Q. Okay. And that is written down in policy manuals --
A. Yes.
Q. -- that exist today?
A. Yes, it is.
Q. And you said in any of the -- that is in -- so there is more than one policy manual?
A. Yes.
Q. There is a policy manual for each investigative division?
A. Each investigative unit.
Q. Oh, unit.
A. Each investigative unit.
Q. And what do you mean by investigative unit?
A. I would say homicide is an investigative unit. Sex crimes and child abuse is an investigative unit. Narcotics is an investigative unit.

There are broad investigative responsibilities and requirements that we

all follow. And then the uniqueness of the investigation to a particular unit, there are policies that guide them also.

Q. Okay. The requirement of officers to disclose evidence to the prosecutors, where else is that written down today, besides in the policy manual?

A. I don't think it's written anywhere else.

Q. In the 1970s, what was the role of -- or sorry. Strike that.

Today, you said you have divisional notices?

A. Yes.

Q. Okay. And what is the purpose of divisional notices today?

A. Divisional notices are temporary notices, such as -- a general police order is an order that is to be followed until the general police order is revised.

A divisional notice is a notice of -- such as December 23rd and 21st, municipal prosecutor's office will not be open for prosecutor consultation. Tomorrow is St. Patrick's Day. The uniform of the day will be such and such.

So they're operational notices that have an expiration, usually, within a week or so. It's just information that the police chief wants to

get out to the division.
Q. Okay. And back in the 1970s, were there divisional notices then, too?
A. During the review of my documents, I did not see any.
Q. I saw a reference to departmental notices that existed back in 1970.
A. Same thing. Departmental notices could be the same thing as a divisional notice.
Q. Do you have things called departmental notices today?
A. No. We have divisional notices.
Q. So you think that the -- if there was a reference to departmental notices in one of these documents from the 1970s, it may be the same thing as the divisional notices today?
A. It may be, yes.
Q. All right. Besides -- today, you mentioned there is Manual of Rules, general police orders, divisional notices. There is policy manuals for each investigative unit.
A. Yes.
Q. Where else are there written policies and procedures for the operation of the department today?

A. That is it.
Q. Okay.
A. I believe that is it.
Q. Okay. Back in the 1970s, were there written policies or procedures for the operation of the department besides what you've already testified to, which were the Manual of Rules, the general police orders?
A. Just what -- from the documents that I reviewed, those were the only documents that had the rules and regulations. And I didn't see any policy manuals.
Q. Okay. With respect -- today, you -- strike that.
You testified that, currently, detectives have an obligation to turn over information that is in their file to the prosecutor?
A. Yes.
Q. Is that correct?
A. I did.
Q. Today, if there were information that was known to the detective that was not contained within the investigative file, would they have an obligation to turn that over to the prosecutor?
A. Yes, they would.
Q. And how would they -- how would they communicate

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 32 of 248. PageID #: 1350



that information?
A. A lot of different ways, but I would imagine face-to-face.
Q. Is there a requirement that that -- a written policy or requirement or rule that requires officers to document the fact that they have communicated such information to prosecutors?
A. Could you rephrase that?
Q. Okay. If there were information that an officer verbally communicated to the prosecutor's office, is there any -- does he have to document that somewhere?
A. Yes.
Q. Where does he have to document that?
A. He would document that in -- today?
Q. Yes.
A. We call that a form 10, and that would be a written -- a written report. And at times, that would be at the request of the prosecutor's office.
There are conversations that take place that are not documented in a form 10, but if it's an investigative -- if it's something that is relevant to the investigation, the prosecutor may even say, "You know, I need you to type

that out and document it in a form 10."
Q. Is there a department -- is there a rule in the department or a policy somewhere that explains to officers that they are to document that information in a form 10?
A. Yes, there is. It's in the policy manuals.
Q. For each of the investigative units?
A. For each of the investigative units. Yes, there is.
Q. When were the policy manuals, the ones that exist currently, the policy manuals for the investigative units, when were those created?
A. I don't know exactly. I don't know. I know when I was appointed in my command of special investigations, those manuals existed, and we update them every year.
So I can tell you from my experience in the last ten years that they have been updated every year for the last ten years.
Q. And is the police chief responsible for updating those, too?
A. He gives us the order, and we push that down to our commanders and our lieutenants, who do the operational work in those bureaus.
We'll tell the lieutenant January 1st, "By

March 1st, please have your manuals updated with any new case law, any new policy, any new procedure that's taken place over the last year."

Q. Okay. Taking a look at the deposition notice, let's talk about topic 1A. Topic 1A relates to the city's written and unwritten policies, practices, and customs in effect from May 19th, 1970, through May 19th, 1980, relating to documenting or memorializing the developments in an investigation in such a way that they would become part of the official file during the course of an investigation.

What written policies or procedures were there in place during that time period, relating to that topic?

A. You know, when I was reviewing this, as far as written policies in the '70s and the 1980s, I can't speak with certainty on that, but I go back to the Manual of Rules and to, you know, what the duty of a law enforcement officer is.

And it's to follow the law. And all this is part of, I believe -- and it is definitely, you know, following the law.

So I would assume -- I don't have any evidence to prove it, but I would assume that the

officers that were conducting that -- those types of investigations during that time frame would document their work and provide everything that they have to the prosecutor, but as far as manuals and any type of guidance, just what is in the general police orders and the departmental notices.

Q. Well, have you seen a departmental notice on -- specifically about officers' obligation to document or memorialize the developments in an investigation in such a way that they would become part of an official file during the course --
A. I saw that.
Q. -- of an investigation?
A. Yes, I did.
Q. A departmental notice?
A. Yeah. I believe I saw that in the documents that we reviewed.
Q. Which one was it?
A. I believe that was the -- I believe that was the document that was created after a letter was received from the Cuyahoga County prosecutor at the time about turning over evidence and making sure all the evidence that was obtained was given

to the prosecutor's office.
Q. Because that was a general police order, right?
A. Right. It was.
Q. That's was number 19-73?
A. Yes.
Q. Okay. We'll talk about that.
A. Okay.
Q. Let's talk about the Manual of Rules.
MS. WANG: Can I have this marked as Exhibit 2?
- - - -
(Thereupon, Deposition Exhibit 2 was marked for purposes of identification.)
- - - -
BY MS. WANG:
Q. All right. So this is -- for the record, it's the version of the Manual of Rules produced by the City of Cleveland. It is Bates stamped CLE 3219 through CLE 3305.
Could you take a look at that and let me know if you've seen it before?
A. I have seen this document before.
Q. Okay. And this is one of the documents that you reviewed in preparation for your deposition?
A. Yes, it was.

Q. Okay. Now, if you turn to the second page right here.
A. Uh-huh.
Q. That is CLE 3220. There is a cover or an inside cover that lays out the title of this manual. It's the Rules of Conduct and Discipline for the Officers, Members, and Employees of the Division of Police and the Department of Public Safety 1950.
Is it your understanding that this manual was published in 1950?
A. Yes.
Q. And this was the -- this was the Manual of Rules that governed, generally, the conduct of officers in the department?
A. Correct. It is.
Q. And it was in effect in 1975?
A. I believe it was.
Q. Okay. Do you know when this manual stopped being in effect?
A. The manual is still in effect today. We still have a Manual of Rules. So I don't believe that there was ever an interruption in the producing of the manual.
Q. The Manual of Rules that you have today, does it

look like this one? Is it the 1950 one?
A. It looks similar.
Q. Is there -- the one that you have today, is that a different publications date?
A. Yes. That is updated also every year.
Q. That is updated every year?
A. Yes.
Q. Do you know when the -- this version of the Manual of Rules, the 1950 one, stopped being in effect and there was like a new one that was in effect?
A. No, I don't. No, I don't.
Q. Do you know what the handwritten markings are on the bottom here?
A. No, I don't.
Q. And by that, I just mean, for the record, there is a handwritten number 609 Clifton John. And then under that, it says 902 of Rocha 3/1/57.
Do you see that?
A. Yes, I do.
Q. Do you know where this Manual of Rules was obtained from to produce it in discovery?
A. Yes. I believe it was discovered in our police museum.
Q. Okay. Do you know if perhaps the names that are

handwritten here were officers who donated their copy to the museum?
A. Yeah. That is a good possibility. We -- number 609, the way that is written, traditionally, I mean, it looks like a badge number to me.
I mean, I would write my badge number like that with that sign and then my badge number and then my last name first and then my first name.
That is just kind of a traditional way that law enforcement officers within the city would write things.
Q. Okay. Do you know how this -- in the 1970s, do you know how the Manual of Rules was distributed to the officers?
A. In the 1970s, I would say it was distributed in a hard copy version given to each officer maybe in a binder, but each officer was required to have a copy of this.
Q. Okay. And so when would officers get their copy of the Manual of Rules? Like, for instance -- and I'm just going to give an example -- if an officer -- you know, this was originally published in 1950, but if an officer didn't come onto the force until 1962 or something, would they just get a copy of the Manual of Rules at

that time?

A. The Manual of Rules was discussed, and the officers were trained on it while they were in the academy. So in your scenario, if an officer was in the police academy in 1962, when he or she left the police academy, they would have a copy of this.

Q. Okay. And then if there were changes made to the Manual of Rules, were there inserts that were given to officers to put into the copies that they had, or were new -- whole new copies issued?

A. In the 1950s, I really can't speak on that, but I can tell you today how we do things is, it would be a divisional notice.

If it was in the middle of the year, the chief would put out a divisional notice and say, "This change will be in effect immediately for the Manual of Rules and Regulations of the Division of Police. The manual will be updated annually."

And whenever that annually is -- it's not every January. It's, you know, on a 12-month cycle. Then the chief would update the manual, and he would push it out again as a whole.

Q. Do you know, in the 1970s, how the manual -- how

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 41 of 248. PageID #: 1359



amendments to the Manual of Rules would be made?
A. No, I don't.
Q. All right. So if you turn to the page that is Bates stamped at the bottom CLE 3229, it says Section 8, Chief of Police.
"The chief of police shall be the executive head of the Division of Police who shall direct all activities of the division and cause to be enforced all laws and ordinances."
Do you see that?
A. Yes, I do.
Q. And just for the record, there is highlighting there that was not in the original copy that was produced to me, but somehow my highlighting got reproduced, but just for the record.
So the manual itself states that the chief of police is responsible for promulgating orders and enforcing all laws and ordinances; is that correct?
A. Yes, it does.
Q. And that's what it says in Section 83 as well?
A. Yes.
Q. If you turn to page 3231, Rule 1, obedience to rules, Section 1.
It says, "All officers, members, and

employees of the Division of Police shall familiarize themselves with these rules and obey them."

A. Yes. That is correct.

Q. How -- so the city expected officers to follow the rules, correct?

A. Oh, yes.

Q. Okay. How did the city enforce this in the 1970s?

A. Well, in reviewing some of the documents that I reviewed, if there was an allegation or if someone didn't follow the rules, either on the recommendation of a superior officer or by a complaint, the chief would cause an investigation into that alleged rule violation, but that is a supervisor's responsibility.

Q. So prior to the violation of a rule, how did the city ensure that officers were following the rules?

A. Prior --

Q. Was it -- go ahead.

A. No. Go ahead.

Q. So you're saying that if a rule was violated, then certain disciplinary action would be taken?

A. Right.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 43 of 248. PageID #: 1361



Q. Okay. So how did -- besides giving officers a copy of the rules and saying, "Here, these are the rules," was there anything else that the department did to ensure that officers would actually read this and follow the rules?
A. Right. I understand. Number one, they were required to read it. And they were required -- it's assumed throughout the division that you read this and you know what the rules are and what the laws are.
There was training within the different units as to the operational procedures. So if you came into the unit and they had -- and there was this list of rules and obligations, your training officer would explain those to you. You would follow those. And the oversight was by the superior officers.
Q. And that was in the 1970s?
A. That was in the 1970s, and it continues today. That is the way it is today also.
Q. Going back to the topic 1A that's in the notice --
A. Okay.
Q. -- do you see any written rule in the Manual of Rules that specifically requires officers to

document or memorialize the developments in an investigation so that they become part of the official file?

A. No, I don't.

Q. Okay. Now, turning to document -- or Bates stamp CLE 3242, that is Rule 14?

A. Yes.

Q. So Rule 14.2 says, "The officer in charge shall cause statements to be taken from persons brought to the unit in the course of criminal investigations and shall see that such statements are properly filed and preserved. These statements shall be available only to the officers and members of the Division of Police who are interested in the preparation of a particular case, to the officers of the county prosecutor, or the law department of the City of Cleveland. Under no circumstances shall they be given or exhibited to any other person without the written consent of the chief of police."

What's your understanding of how that rule worked within the department in the 1970s?

A. How that rule worked in the 1970s, based on what is written here, is there was a separate unit that was called the statement unit. And there

were city officers and employees in that statement unit.
And if a detective was required to obtain a written statement, they would take the person to that unit, and they would type it out on a typewriter and obtain that statement.
And then it was part of the investigative file, which was turned over to the prosecutor's office as part of that file.
Q. And the statements -- where were the statements kept, the typed statements?
A. Well, I can tell you that the statement unit still exists today in our building, which I believe was built in 1976. And there is a statement unit that houses all the statements throughout the division.
Q. Okay. So they keep the statements there?
A. They keep them there, and investigators have them in their -- in their case files also.
Q. And officers were expected not to give the statements to anyone, other than the officers who were involved in the case or the county prosecutor or the law department?
A. Correct. Unless they had written consent from the chief of police.

Q. Where does it say that?
A. It says it in Rule 14 at the end of number 2. "Under no circumstances shall they be given or exhibited to any other person without the written consent of the chief of police."
Q. Do you know what was the purpose of that rule?
A. No, I don't.
Q. Does that rule still exist today?
A. No, it doesn't.
Q. Do you know why not?
A. No, I don't.
Q. Okay. Do you know why the rule was changed?
A. No, I don't.
Q. If you turn to page CLE 3264, Rule 42 states, "Officers and members shall, at the end of their tour of duty, advise the relieving officers and members of all important police business transacted during that tour of duty and of all unfinished police business in their jurisdiction. They shall familiarize themselves at the commencement of their tour of duty with all important police business transacted since their last tour of duty and all unfinished police business within their jurisdiction."
What is your understanding of how that rule

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 47 of 248. PageID #: 1365



worked in the 1970s? What did this rule require officers to do?
A. Well, my understanding, this rule or some iteration of this rule still is in effect today. So I can tell you that before we would leave, as an officer or superior officer, if anything unusual took place in your area of responsibility, your zone, or the area that you were to patrol that you think may affect the officers that are relieving you, that you should talk to them and tell them kind of as a heads-up.
"I want to give you a heads-up. This is what is going on," such as -- you know, we get off at 3 o'clock, but at 5 o'clock tonight, there is going to be a parade downtown in your zone.
So that's the way it's done today, and that's the way I expected that it was done in the 1970s throughout law enforcement, that they would communicate what took place during their day, anything of any significance, be on the lookout for maybe a suspect or a stolen car or something like that.
Q. So let's take, for example, detectives who are assigned to investigate a homicide. And we're talking about in the 1970s.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 48 of 248. PageID #: 1366



There may be more than one team of detectives that were assigned to investigate a case, right?
A. Correct.
Q. And so there may be a team, you know, a partner pair of detectives who were assigned to investigate a case during a day shift and then also another team or pair of detectives assigned to investigate during the night shift.
Is that fair to say?
A. That is.
Q. Okay. And so this rule, Rule 42, would require the pair, you know, who were working on the case throughout the day to, before they left, make sure that the next pair of detectives working on that case would know what it is they had done on that investigation and what there was left to do, for instance?
MR. FUNK: Objection.
Q. Is that fair to say?
MR. MALLAMAD: You can answer.
A. It would be. The way things are done is, usually, one team of detectives is the primary. And that's the way it was in the '70s. They are the primary investigative team.
If there was a request -- and a lot of --

even these requests are documented.

If there was a request, if they work day shift, they could give a request to the second shift, afternoon shift, and say, "We need to speak with Mrs. Jones. She doesn't get home from work until 6 o'clock. You guys working 4 to midnight, could you go talk to Mrs. Jones and ask her the following questions?"

So, historically, there's only one primary set of investigators, one set of detectives that primarily investigates.

Very complicated cases, they do use more than one team, but, historically, it's just been one team.

BY MS. WANG:

Q. Okay. So the primary set of detectives could ask another set of detectives who are coming on the following shift to do certain tasks in the case?

A. Yes.

Q. And if those -- the second set of detectives did complete whatever task it was that the first set of detectives had asked them to do, were they expected to communicate that information to the primary set of detectives when they're done with their shift?

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 50 of 248. PageID #: 1368



A. Yes.
Q. Okay. Rule 66, which is on page 3273 --
A. Okay.
Q. -- says, Section 1, "Officers and members prosecuting persons charged with a crime shall thoroughly familiarize themselves with all the facts and details concerning the case so that all of the evidence may be properly presented to the court."
What is your understanding of what this rule required officers to do in the 1970s?
A. My understanding is that -- really, just what it says. It's not a suggestion. It's a -- it's a shall. It's an order that they be familiarized with all the facts and details and that all the evidence is properly presented to the prosecutor's office for presentation to the court.
Q. Okay. So did this rule require officers to familiarize themselves with the evidence in the case just prior to trial in preparation for trial or like throughout their investigation?
A. No. The way I read it and the way it's done today -- and I can tell you, being a policeman for 31 years, historically, when you're assigned

a case, you know the intricacies of that case as it's going on, not just for -- not just before you go to trial.

Q. And were you -- you were a detective at some point?

A. I was.

Q. And so you considered it your responsibility to know what all the facts were in the case as you were investigating it?

A. Yes.

Q. And you would keep yourself apprised of what facts were learned by -- you know, may have been learned by other detectives or other investigators in a particular case?

A. Yes.

Q. And why did you consider it your -- part of your duty to make sure that you were apprised of all the facts in a particular case that you were investigating?

A. Well, number one, it was our duty. It's the law. It's our duty. And that is what the system is based on is to gather all the facts as we know them and present them to the prosecutor.

You know, in this rule, it says, "Officers and members prosecuting persons." You know, we

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 52 of 248. PageID #: 1370



don't prosecute people. We're the gatherer of facts, and that is the prosecutor's job to decide whether they go forward with the prosecution.
Q. And you gather facts to present to the prosecutor so that they may prosecute; is that correct?
A. Facts, anything, things that aren't based in facts. Your job is to present everything. Any rumor, innuendo, tip that goes nowhere. Your job is to present that and let them make that determination.
Q. When you were a detective, did you consider it your -- or did you make it a practice to apprise yourself of all the facts known about how a particular crime occurred before interviewing witnesses -- potential witnesses to a crime?
MR. FUNK: Objection. You can answer.
THE WITNESS: No, no. That -- I would have to say that was on a case by case basis, and it was kind of up to that particular detective and whatever the case was before you would decide exactly how you wanted to proceed with that case.
I can give you an example. If there was something that happened immediate

and there was witnesses there, it's always a good practice to interview people right away.

Things are a little fresh in their minds, but we've interviewed people months and years after cases have taken place, because facts have come to light.

There really isn't one -- I guess if you're looking for a standard operating procedure, exactly how to go about it, I don't think there -- that one exists.

BY MS. WANG:

Q. In the 1970s, you mentioned that the practice was to have a pair of -- if there were -- there would -- in terms of a homicide, investigation of a homicide in the 1970s, there would have been a primary set of investigative detectives; is that correct?

A. Yes.

Q. Now, was it expected, you know, under the rules or the policies or procedures of the department, that the primary set of investigating detectives would read the reports or form 10's or what have you that were created by any other detectives or officers in the case, you know, once they came

back on shift?
A. Yes. That was expected.
Q. Rule 71 on page 3274 simply states in Section 1, "Officers and members shall familiarize themselves with all general orders issued by the chief of police."
And then number two basically says, if there were orders issued in their absence, they would be expected to know them after they came back?
A. Yes. That is still in place today.
Q. And members of the department were expected to follow that rule, right?
A. Yes, they were.
Q. Now, page 3277, Rule 77, Section 1, states, "Officers and members shall report on all matters referred to and investigated by them. Such reports may be either verbal or written, as the officer in charge may direct."
Were -- so written reports -- were the written reports just form 10's in the '70s, do you know, or was there some other kind of form?
A. Well, there were form 10's. There were form 1's, which is a written documentation of -- form 10's are investigative follow-up reports. Form 1's are informational reports that any officer can

do.

If I was -- we knew there was a crime that was committed and I was working a particular zone and I received information about that crime, I would type a form 1 and give that to the investigator.

So anyone can do a form 1. Follow-up investigations require a form 10.

Q. Okay. In a particular case?

A. Yes.

Q. How would verbal reports on the progress of an investigation be documented?

A. The way they're documented today is, some of them are documented in a daily duty report, an assignment that the supervisors are required to fill out every day.

If you're the sergeant in the homicide unit and I brief you, an overview, "Sarge, today, we did A, B, C, and D," you would just put in your daily duty report, "Conferred with Detective Jones, who stated they conducted follow-up investigations on this case," very broad, very generic.

If it was something specific, they would document it in that report. We're all required

to do a daily duty assignment.
Q. And that includes detectives, too?
A. Pardon me?
Q. That includes detectives?
A. Oh, yes.
Q. And that is today. That is the requirement today?
A. Yes.
Q. Was there a requirement for detectives to do daily duty reports in the 1970s?
A. I don't know if there was, and I didn't -- don't recall seeing them in any of the responsive documents, but that is the -- today and the 30 years plus that I have been on the job, that is the number one police 101 bit of administrative work that you're taught from day one you're in the academy, to document what happens during your shift.
Q. And where are those -- today, where are those daily duty reports kept for --
A. Today, they're -- excuse me. Go ahead.
Q. -- for detectives?
A. They're kept in our inspection unit.
Q. And how long are they retained?
A. I don't know what the -- what the retention

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 57 of 248. PageID #: 1375



schedule is. I couldn't tell you, but whatever the retention schedule is, we follow it.
Q. So the daily duty reports -- they're not kept in specific case files, are they, like there -- because they might cover a lot of things that don't have to do with a particular case?
A. Correct.
Q. So I just want to make sure I understand. The requirement today for what goes into a daily duty report is anything that an officer does during his shift?
A. Yeah. Specifically, today --
Q. Yes.
A. -- I will have my starting time, what I did today, and my completion time, what I did today. If I'm here for 8, 10, 12 hours, however long I'm here --
Q. It won't be 12 hours.
A. -- it's going to be -- it's going to be one line. If I was a uniformed officer and I answered 15 calls for service, parking violation, domestic violence, it'll all be documented in that report.
So they vary. They're not -- it's just what did you do today, and we are taught early on to put any significant items in there.

Q. Okay. And how long are they, usually? Just one page?
A. They're one page.
Q. Okay. Does -- is the supervisor supposed to sign off on them?
A. Yes. Both -- if you're -- yes. The supervisor signs off on them. It is an accounting of your daily duty. You sign it. Your partner signs it. Your supervisor reviews it, and they sign it.
You could go an entire shift without having any face-to-face discussion with your supervisor. So he or she could come in the next morning, look at it, this is what I did yesterday, maybe ask you a question about it or whatever.
If not, it's just -- it's like our -- you know, our time would be -- you know, our timecard. We're tracking exactly what you did.
Q. Okay. Rule 85. It's on page 3281. It states, "Officers and members shall have in their possession a memorandum book, in which they shall record information necessary for the performance of their duty."
Do you know what this memorandum book was in the 1970s?
A. In the 1970s, there was -- throughout law

enforcement, officers had a memo book. And what it was, it was -- if you were walking a beat or you were working, you would jot down things on that book as to what you were doing, kind of like a duty report.

And then the supervisor could come up to you and say, "Let me see your memorandum book," and he or she would initial it, or if something significant happened, the boss would tell you, "Put that in your memorandum book," and then they would initial it.

That is how it was. It was a little more formalized. We do not have memorandum books today. We have what we call run sheets.

And, basically, a run sheet, if you see any officer today working, there is paper like this folded, and they usually have it in their pocket. And they just jot things down.

If the police radio gives you an assignment to respond to 123 Main Street for a parked vehicle, you write that down. You write the disposition down.

And then you transpose that onto your daily duty report, but that is all -- that is all that is. It's -- the daily -- the run sheets, I have

had them. I have done it. I still do it. You know, you get rid of them at the end of the day.
Q. So there is no rule -- today, there is no rule that requires officers to keep their run sheets?
A. No. There is no rule.
Q. And officers are allowed to dispose of their run sheets?
A. Yes.
Q. And in the 1970s, officers were allowed by department policy to dispose of their memorandum books?
A. I don't believe so. I believe the memorandum book was a little more formal, because it was issued by the Division of Police. And it was usually in a leather case.
It would almost look like a reporter's notebook. They would flip it over, and they would jot things down in that -- in that book --
Q. Okay.
A. -- for the officer's supervisor to review.
Q. What written policy required the -- what written policy required officers to turn in their memorandum books?
A. I don't know.

Q. Did you see any written policies or rules or regulations in your review of the documents in preparation for your deposition here today that required officers in the 1970s to keep their memorandum books?
A. No, I did not.
Q. And did you see any memorandum books of any of the defendant officers in this case in your preparation for your deposition here today?
A. No, I did not.
Q. Have you ever seen a memorandum book?
A. Yes.
Q. When did you last see one?
A. I couldn't tell you exactly when, but I saw them when I was a rookie policeman when I came on the job. I came on in 1985, and some of the men and women that broke me in on the job were hired in the '60s.
And, you know, we would have these run sheets, and they would say, "Oh, we used to carry these, you know. Now we carry run sheets."
So yeah. I mean, I remember seeing them. Like I said, the men and women that trained me were hired in the '50s, '60s, and '70s. So, you know, customary to say, "Kid, this is the way we

did things now, and this is the way we do things."
Q. And so when you started, you didn't --
A. No.
Q. You did not have a memorandum book when you started?
A. Run sheets. No memorandum book.
Q. Did you know any of the defendant officers in this case?
A. No, I did not. Let me -- no. Let me -- let me back up. I'm sorry. Jerry Englehart.
I didn't know him when he was on the job, but after he retired, he was -- he worked for the county at the grand jury. And I knew him from there.
I mean, I knew he was a Cleveland policeman, but when he was on the job, I never had the opportunity to work with him, or I'm not exactly sure when he retired, but he was, I guess, the scheduler for the grand jury. And when I would testify, I would see him, and we would say hello.
Q. Did you know him any more specifically than just --
A. No.
Q. -- through your dealings with the grand jury?

A. No.

MR. FUNK: Is this a good time for a break?

MS. WANG: Sure.

- - - -

(Thereupon, a recess was had.)

- - - -

MS. WANG: Let's mark this as Exhibit 3.

(Thereupon, Deposition Exhibit 3 was marked for purposes of identification.)

BY MS. WANG:

Q. So the court reporter has handed you what has been marked as Deposition Exhibit 3. And it is another version of the Manual of Rules. It is Bates stamped Jackson 4682 through 4755.

This one, I believe, was obtained from the Cleveland Public Library, this version.

Did you review this one in preparation for your deposition?

A. Yes.

Q. Did you see any noticeable differences between this version of the Manual of Rules and the other one?

A. No, nothing that I can recall. Noticeable

difference? I don't know what --
Q. Well, would it be fair to say that Deposition Exhibit 2 has a few rules that were updated after 1950, whereas this version, Deposition Exhibit 3, appears to have been published in 1950 without any revisions?
A. Yes. That would be fair to say.
Q. And the couple revisions that were in Deposition Exhibit 2 were from later in the '50s; is that fair?
A. Yes, they were.
Q. Okay. Do you know when this Manual of Rules was published, the one that's Deposition Exhibit 3?
A. No, I don't.
Q. Okay. It says 1950 on the cover?
A. Right.
Q. Is it fair to say that it was published in 1950?
A. I could assume that, yes.
Q. And it would have been in effect in 1975?
A. This or some iteration of this, yes.
Q. Okay.
A. It's still in effect today, the Manual of Rules. So I could make that assumption, yes.
Q. Now, when the police chief promulgated the Manual of Rules, the 1950 Manual of Rules, did he have

to get approval from anybody else, like the mayor or the director of public safety or anyone, prior to promulgating the Manual of Rules?

A. I can tell you today. Everything -- we operate with a paramilitary chain of command. Anything that we do goes up to the next person for review.

So in this case, the chief answers to the safety director. The safety director answers to the mayor.

By looking at this, I would assume, yes. The mayor is the final authority in the division -- in the city, just as he is today.

So everything goes up the next level until it stops. It can either -- it can stop with the chief of police as a divisional notice, but something as important as this, I would assume by looking at this, since his name is on it, it probably did go up to the mayor's office for final approval.

Q. Does the mayor have the power to veto any of the rules?

A. Yes. The mayor can do -- yeah.

Q. Okay. So is the chief of police -- in 1975, was the chief of police the final policy maker for rules in the department?

A. Yes, he was. And everything -- yeah. He is the final policy maker by the charter, but, obviously, the director of public safety and the mayor have final authority.

If they felt something was not appropriate or something was missing, they would recommend to the chief, you know, "Maybe this needs to go in."

And we've changed our uniform, or we've done something like that, but all the final decisions do rest with the chief. The chief is appointed by the mayor in the City of Cleveland.

Technically, the mayor's got final say on everything.

Q. If the director of public safety or the mayor don't have any -- well, you gave an example. You know, the public -- the director of public safety or the mayor might make a recommendation to the police chief as to how a specific rule or order should look.

Was the police chief free to reject those recommendations or suggestions?

A. I can tell you today, Chief Williams has that authority. He can talk to the mayor and say he doesn't believe that this is in the best interest of the Division of Police and the citizens that

we serve.

In the 1950s and the 1970s, I would imagine that the chief did have a lot of input into that, exactly what went into that manual.

The mayors have enough confidence to appoint somebody to be the chief of that division. They expect them to be able to run it.

Q. Okay. And part of running it includes having final say over the rules that would govern the department?

A. Yes, yes.

Q. Now, let's take a look at --

MS. WANG: Let's mark another one.

(Thereupon, Deposition Exhibit 4 was marked for purposes of identification.)

(Thereupon, Deposition Exhibit 5 was marked for purposes of identification.)

BY MS. WANG:

Q. Deposition Exhibit 4, which the court reporter just handed you, is Bates stamped CLE 2983 through 3092. And Deposition Exhibit 5 is 3093 -- CLE 3093 through 4172.

Okay. Deputy Chief, did you review these documents in preparation for your deposition?

A. Yes, I did. Uh-huh.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 68 of 248. PageID #: 1386



THE WITNESS: These are the GPOs that were in that -- yes, I did.

MR. MALLAMAD: Answer her question.

THE WITNESS: Yes, I did.

BY MS. WANG:

Q. Have you had a chance to look at that?

A. Yes, I did.

Q. Now, this Deposition Exhibit 4 says at the top, "Draft Copy, Manual of Duties and Procedures, with Index of GPOs, 1969 to 1974, Cleveland Police Department, October 1974."

And in the note, it says that this manual is the first draft of an updated version of the Cleveland Police -- Cleveland Division of Police duties and procedures complied by Inspector Lloyd Gary in 1969.

And, essentially, it says -- and I won't read the whole thing, but, essentially, it says that it is a draft copy. And so it's not in the complete format that it would exist in the final copy, but they're giving it out to the police officers so that they will have it.

Is that fair to say?

A. Yes, it is.

Q. And then it appears this general police orders that's Deposition Exhibit 5, 1969 to 1974, is what was attached with this draft copy of the Manual of Duties and Procedures?

A. Yes.

Q. Okay. And Deposition Exhibit 5, general police orders dated 1969 to 1974, is this a complete copy of the general police orders that were in existence in 1969 to 1974?

A. This is everything that was located and produced. I could say that if there were any other orders, I didn't have a chance to review them, but this was everything that was located during that time frame.

Q. And, in fact, there is a -- so the Bates numbers that begin with CLE, those were stamped -- those were page numbers that were stamped by the city, but there is a separate set of page numbers. If you turn to the second page, it says G1 at the bottom.

A. Oh, yes.

Q. Okay. And then if you look at all the page numbers, it goes from G1 to G79. The last page is G79.

A. Correct.

Q. And all the pages are there, right? G1 through G79?
A. Yes.
Q. Now, do you know what was the purpose of the manual -- going back to Deposition Exhibit 4 --
A. Okay.
Q. -- what was the purpose of this Manual of Duties and Procedures, with the index of GPOs, do you know?
A. This was a manual that was produced to provide guidance to the men and women of the Division of Police about how to perform their duties and what procedures to follow during the performance of those duties.
Q. There is a reference to the -- sorry. Strike that.
And so it's dated October 1974. Is it your understanding that this document with the GPOs was distributed to officers at that time?
A. Yes.
Q. And it would have been distributed to all officers in the department?
A. Yes, it would have.
Q. And do you know where this copy was found?
A. No, I don't.

Q. What about the general police orders, Deposition Exhibit 5? Do you know where this was found?
A. I believe that was located in our police museum.
Q. Okay. If you'd turn to page 3,000 in this Deposition Exhibit 4.
A. Okay.
Q. All right. So there is a section on writing reports. And the general rule, Section A, governing written reports says, "Anything that requires immediate police action or which will necessitate future action by police or other units of government should be reported in written form by the officer receiving the complaint or learning of the incident or information."
What was your understanding of what this rule required?
A. My understanding of this rule is that any incident either immediate or that will require police action needs to be documented in what I described earlier as either a form 10 or an offense incident report, which back in the -- when this was written, they were called RC1 reports.
And it is an officer's first observation of what took place. It's very generic, date,

time, location, witnesses. And that's how it's documented.

So that is my understanding, that our job requires the documentation of action that is taken immediate and for future investigative purposes.

Q. How were officers -- besides -- I'm sorry. Strike that.

Were officers trained on how -- strike that.

All officers in the department got a copy of this manual in October of 1974; is that correct?

A. I would assume they did, yes.

Q. Was there any instruction given to officers about anything that was in the manual for the general police orders when they received it?

A. I don't know if there was additional instruction given in 1970.

Q. And if there was instruction, it would be reflected in the training documents that we received in this litigation?

A. It may -- it may have been reflected in that. This is a requirement. When you're given a general police order, when you're given -- provided a policy document, it is understood that you will know the document and follow the

document. That is what it's there for.
Q. So you're expected to read it, right?
A. Yes, you are.
Q. Is there any explanation or training given to officers, besides expecting them to read it?
A. No, there is not, but the expectation is, you're expected to read it. If you don't understand something -- and that is the way it is today -- you need to go to your supervisor, and that particular section or policy that you don't understand will be explained further to you.
Q. Is that documented somewhere?
A. Pardon me?
Q. How is it -- how do officers know that that's what they're to do, that they're to ask questions if they don't understand something that's --
A. Well, today, we put it in our general police orders. And in the last 31 years, since I've been a police officer, it says you're to know this, particularly, orders that are -- general police orders that we update every year. You are expected to understand this order.
They read it at roll call for seven days. It says right in the instructions: "Supervisor shall read this order at roll call for seven

days. Anyone that doesn't understand it, you will assume to have understanding of this order. If not, you are to talk to your supervisor."

Q. Was that done in 1970?

A. I don't know if it was.

Q. That is your experience since you joined the department?

A. That is my experience, yes.

Q. All right. Turning to 3010, page 3010, there is a memo here on this page and the next page about the message reporting report system.

Do you know how that process worked?

A. Yes. This was before -- long before we had the technology that we have today. Our reports were called in to a central reporting system by telephone. You would dictate your report almost to like a stenographer type.

And that is what that was. So -- and then if there was a message to be left, if they were overloaded or they were busy, they could call in and leave a message.

"I got this incident. I need to report it. I need to get it documented. I will be on shift tomorrow. Get ahold of me, and I will make that report."

A vehicle was stolen, or a business was broken into, something along those lines.
Q. Was this just for a patrolman, or did detectives use this, too?
A. In my experience, it was just for the patrolmen. When I came on, we actually still had some of this in 1985. And when I first started, we would call in our reports on a telephone and dictate exactly what took place.
Q. Did you also -- you know, at the end of your shift, did you also write up your report, or was a written report generated from the system?
A. A written report was generated from that system, yes.
Q. And so you were expected to dictate your report and do this verbally for any report that you had --
A. Yes.
Q. -- as opposed to writing it down yourself?
A. Yes, we were. Yes.
Q. Okay. Were you ever -- were you ever aware of detectives using this message recording system?
A. In my experience, I was not. And when I became a detective, we didn't use that. We did everything on form 10's and form 1's.

Q. And then if a written report was generated from the message recording report system, did you then have an opportunity to review it to make sure that it was written correctly?
A. In my experience, no. There was a supervisor at the report center. They would review it for accuracy, and they would have the final say-so.
Q. How would they know what it was that you knew -- I mean, the supervisor wouldn't have been there for whatever it was that you were reporting, right?
A. Right.
Q. So how would they know whether it was accurate?
A. Because I dictated it. So they would -- they would just review what I told them.
Q. Oh, the recording, the actual --
A. Yes, yes.
Q. All right. The page that is Bates stamped CLE 3020 --
A. Okay.
Q. -- there is a section on the officer's notebook. It says, "Type of notebook. A regular bound notebook is preferred with entries made in ink; one, it provides a chronological personal record of duties, findings, and occurrences; two,

reduces the possibility of lost pages and contentions by the defense that pages have been removed or newly inserted."

Then it gives three reasons for the purpose of the notebook.

Is this the same thing as the memo book that was mentioned in Rule 85, the Manual of Rules?

A. No. I don't believe it is. This is a different type of notebook that they were required to keep. And it looks like it was a little more formal as to what took place.

Q. And was this notebook issued by the department to officers?

A. I don't know.

Q. Do you know anything about what was required to be -- what officers were required to put into the notebook, besides what it says here?

A. No. I don't know what the -- you know, what the requirements were.

Q. Okay. So it says in the purpose section that the purpose is, one, to record details of all investigations; two, to serve as the basis for official reports; three, to refresh the memory of the officer/investigator.

A. In criminal cases, the notebook should be

turned over to the county prosecutor to prevent its being used as an article of evidence by the defense attorney.

Was this rule followed?

A. Yes. I -- yes. That rule -- if it was in this, you were expected to follow that rule, yes.

Q. Were supervisors required to sign off on what was in the notebook?

A. I don't think so. And I don't -- I don't see it anywhere, unless it's documented somewhere in this document that they were required to do it under supervisory responsibilities.

Q. Have you ever seen a notebook of this description?

A. No, I haven't.

Q. The older officers who trained you when you first started, do you remember them ever having a notebook like this?

A. No, I don't.

Q. Do you remember there ever being any discussion within the department of a regular bound notebook like this?

A. No, I don't. In the reviewing of this, I found this -- I had never heard of that.

Q. And were there any policies, rules, or procedures

that required detectives to place their notebook or make a copy of it and place it into the official investigative file?
A. It's stated right here that they were required to do that. They were required to turn it over to the county prosecutor.
Q. Was there an official investigative file in the 1970s for each investigation?
A. For each investigation?
Q. Right.
A. Yes.
Q. Okay. And there still is today, right?
A. Yes.
Q. And is there any written policy that required officers to turn in their notebooks and place them into the official investigative file?
A. No. I don't see any.
Q. Was there any written policy or procedure that required officers to turn -- to place their -- a copy -- to either place their original memo book or a copy of it into the official investigative file?
A. No. I don't see it.
Q. If you'd turn to page 3064.
A. Okay.

Q. So there is a number of pages here that go to 3069, detailing the law on -- what appears to be the law on searches of a person and of vehicles and so forth.
Do you see that?
A. Yes.
Q. Okay. Was there any instruction given to officers on any of these topics, besides the fact that they just got a copy of this document?
A. In the 1970s?
Q. In the 1970s.
A. In the 1970s, I'm not aware if there was any additional, no.
Q. In this Deposition Exhibit 4, the document here, were there any -- do you see any policies or procedures relating to the requirement of officers to document developments in an investigation so that they would be maintained in an official investigative file?
A. I think that -- I see documentation where it says that they shall have documents and maintain them, but to be exact, where it says putting them in an investigative file, no, I don't see that.
Q. In the document that has been marked as Deposition Exhibit 4, is there any policy that --

is there any policy relating to the conducting or documenting of photo or in-person lineups or show-ups?
A. I have to go through this. No, there is not.
Q. In the document -- go ahead.
A. No. Go ahead.
Q. Are you done?
A. Yeah. I'm done.
Q. In that document, Deposition Exhibit 4, is there any policy or procedure relating to the use of informants or witnesses during a criminal investigation, including disclosure of such witnesses and payments, gifts, promises, and threats made to such witnesses?
A. Not in the documents provided.
Q. In the document before you, Deposition Exhibit 4, is there any policy or procedure or rule or regulation relating to the conducting and documenting of interrogations or interviews of suspects and witnesses, include juveniles?
A. No. I don't believe there is.
Q. In the document marked as Exhibit 4, is there any policy or procedure or rule or regulation relating to the writing, preserving, and destroying of police reports,

investigator/detective notes, memos, and exculpatory evidence, including the course of -- during the course of an investigation?
A. In this document, there is not. That is -- in this document, no.
Q. Okay. And in this document, Deposition Exhibit 4, is there any policy, procedure, rule, or regulation relating to the discipline, training, or supervision of detectives?
A. Yes. In this document, there is.
Q. What page is that on?
A. There is documentation regarding the duties and procedures of members of the Division of Police, but there is no documentation as to exactly what their training is, but there is a guide here as to what they're supposed to do.
Q. Just identify the page for me.
A. Well, there is numerous pages, but I can point to -- on page 3060, it has what you would do -- page 73, Bates number 3060, what you would do in the event that there was a felony arrest. So that is a guide there as to exactly what the detectives would do.
Q. Okay. Going back to Deposition Exhibit 1 -- or not 1 -- 2 -- sorry -- is there anything in that

Manual of Rules that relates to the conducting -- or the conducting and documenting -- strike that.

Is there anything in Deposition Exhibit 2, the Manual of Rules, relating to conducting and documenting photo or in-person line-ups or show-ups?

A. No, there is not.

Q. Is there anything in Deposition Exhibit 2, the Manual of Rules, relating to use of informants or witnesses during a criminal investigation, including disclosure of such witnesses and payments, gifts, promises, and threats made to such witnesses?

A. I would point to Rule 104. "No member of the Division of Police shall directly or indirectly give, offer, solicit, or receive or be in any manner concerned in giving, offering, soliciting, receiving any assessment, subscription, or contribution of money or any other thing of value to or for any ranking officer to include or persuade such officer to resign/retire for the purpose of accelerating a promotion or a promotional list."

Basically, that covers that in our -- in the law and in our rules and regulations, that will

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 84 of 248. PageID #: 1402



not be subject to any type of, I guess, financial gain or gift to do anything that is contrary to the law. So I think Rule 104 would cover that. That rule is still in effect today.
Q. Okay. Any other rule in the Manual of Rules that covers the topic of making payments, gifts, threats, or promises to witnesses?
A. Rule number 99. "Officers, members, and employees shall violate no laws of the United States, the State of Ohio, no ordinances of the City of Cleveland. They shall not willfully disobey any lawful order issued to them by a superior officer."
I think Rule 99, Section 1, would cover that.
Q. Okay. So an officer is supposed to know, based on reading Rule 99, that he is not to make any promises, threats, gifts, payments to witnesses?
A. Well, that is against the law. So I would assume that they would understand that.
Q. Okay. But it's not spelled out in the Manual of Rules, correct?
MR. FUNK: Objection.
MR. MALLAMAD: Objection. You can answer.
BY MS. WANG:

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 85 of 248. PageID #: 1403



Q. It doesn't specifically say anything about threats or promises to witnesses in Rule 99, does it?
A. No, it does not say that. It just says obey the law.
Q. Okay. In the Manual of Rules that has been marked as Deposition Exhibit 2, is there any rule relating to the disclosure of exculpatory evidence, including, but not limited to, impeachment material to criminal defendants, defense attorneys, or prosecutors?
A. There isn't. I would still answer that as a follow-up and say I would still point to that Rule 99, that they should not violate the law of the state, the city.
Q. When -- you're familiar with the case Brady versus Maryland, correct?
A. Yes, I am.
Q. Okay. And what's your understanding of what it obligates officers to do?
MR. FUNK: Objection.
MR. MALLAMAD: Objection.
Go ahead, Chief. You can answer. It's not a 30(b) subject, but if you can answer in a -- to the best of your ability.

Plus it calls for a legal analysis.
A. I'm limited familiar with it, that their officers are required to provide any and all evidence and reports to the prosecution so it can be determined as to the value of what it -- the value of that evidence is in a court proceeding.
BY MS. WANG:
Q. When Brady versus Maryland was decided in 1963, was there any notice or anything given to any of the officers in the department so that they would know that this decision had come down?
MR. FUNK: Objection.
MR. MALLAMAD: Objection. You can answer.
A. Yeah. In 1963, I couldn't answer that.
Q. Okay. At any time between 1963 and 1975, were officers informed of what their obligations were under Brady versus Maryland?
A. I can't answer that to that date. I can tell you that we are notified today. I can tell you how we do it today in any Supreme Court decision that relates to law enforcement or how we do our job. Those are promulgated by Chief Williams through the law department.
Q. In what kind of notice?

A. Usually, a divisional notice.
Q. Okay. Did you see any divisional notices from the 1970s, relating to Brady versus Maryland?
A. No, I did not.
Q. Did you see any written policies whatsoever, whether it was a rule from the Manual of Rules or a general police order or a departmental or divisional notice, relating to officers' obligation to disclose exculpatory evidence?
A. No, I didn't.
Q. And so your belief is that officers in the 1970s would read Rule 99 and think that they were required to disclose exculpatory evidence to prosecutors and criminal defendants?
MR. MALLAMAD: Objection. It really is outside of the scope of the deposition, but, Chief, if you have a response, you can respond.
A. I can tell you that -- I can't tell you what they were thinking or assuming then, but I know the standard that for the last 31 years that we've been held to is that you are required to know this and follow this.
And when we come on this job to be police officers, it's unique, because we do take an oath

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 88 of 248. PageID #: 1406



to uphold that law, the laws of the state and the federal government and the city.

So I think that is all-encompassing, but that particular -- the way you worded it in particular, I would have to say no, but my assumption would be that everybody knew that they had to follow the law. If that was the law, then I assume it would be followed.

BY MS. WANG:

Q. So you did not go to law school, right?

A. No, I didn't.

Q. And police officers, most of them, are not lawyers, correct?

A. Yeah.

Q. So would you agree that officers would need to get training or instruction of some sort to know what the law is?

A. Well, I think -- I would agree, and I would agree that officers do receive -- officers do and continue to receive training. And the basic -- it's very elementary. Very basic police 101 is that you know the law and you follow the law. That is your profession, that you do know that.

Was there anything formal that is documented from the 1970s? I don't know, but I do know

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 89 of 248. PageID #: 1407



that the officers that -- they have supervisors that train them, teach them. They have senior detectives that would reiterate that to those officers.
    And that is how I was trained also. My training was a little more formal, but in the '60s and '70s, I think it was a little more informal, but I still believe that it all goes back to this rule, to follow that, to follow the law.
Q. Okay. And so the only way that officers would know -- in the 1970s would know what the law required of them is if somebody else in the department told them?
        MR. FUNK: Objection.
        MR. MALLAMAD: Objection. That's not his testimony, but you can answer, Chief.
A. I don't -- I don't think it would be if somebody else told them. I think if -- I don't see any divisional notices that address that.
    I know there was a document that we haven't located that was then put into a general police order.
    If I remember correctly, I think it was at

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 90 of 248. PageID #: 1408



the time Prosecutor John Corrigan, who sent a letter to the then chief that said, "Make sure you follow A, B, C, and D, as far as evidence."
    And the chief took that and put that into a divisional notice. I don't believe I've seen the letter, but yeah. That's how they would -- that's how they would be notified of it.
BY MS. WANG:
Q. So officers would be notified by a divisional notice or if it was in a rule?
A. In a rule.
Q. In a general police order; is that right?
A. Yes.
Q. Are there any other written forms that -- in which an officer would be informed of what the law is?
A. No, not that I'm aware of at that time.
Q. And let's go back to the Manual of Rules for a second.
    Deposition Exhibit 2, the Manual of Rules, do you see anything in there that relates to the conducting and documenting of interrogations or interviews of suspects and witnesses, including juveniles?
A. No. That would not be contained in the Manual of

Rules.

Q. Is there anything in the Manual of Rules, Deposition Exhibit 2, that relates to writing, preserving, and destroying police reports, investigator/detective notes, memos, exculpatory evidence during the course of an investigation?

MR. MALLAMAD: I will object, because it's already been asked and answered, but go ahead.

THE WITNESS: As far as -- the answer to the question is no, with this explanation, that if -- it's not our determination nor a law enforcement officer's determination to decide what is exculpatory or not. That decision is made by the prosecutor's office.

So our job and our requirement is to follow the law and turn everything over to the prosecutor's office to make that determination.

BY MS. WANG:

Q. Where does it say that in the Manual of Rules?

A. It says that -- I don't believe it's in the Manual of Rules, but I believe it says in the investigative process that any and all evidence

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 92 of 248. PageID #: 1410



that you obtain is to be turned over to the prosecutor's office.

And I think we did reference it in one of these other documents earlier that you had highlighted.

Q. Okay. And so what you're referring to is what we previously discussed?

A. Yes.

Q. Is there anything else that you're thinking of that is responsive to whether or not there is any rules or regulations or policies on the writing, preserving, and destroying of police reports, investigator/detective notes, memos, and exculpatory evidence?

A. No, there was not.

MR. MALLAMAD: You're referring to this Manual of Rules, Exhibit 2?

MS. WANG: Yes.

MR. MALLAMAD: Then I object. It's been asked and answered as cited previously.

BY MS. WANG:

Q. The deposition Exhibit 5 -- actually, one last question.

Is there anything in the Manual of Rules,

Deposition Exhibit 2, that relates to the discipline, training, and supervision of detectives?
A. The discipline? Could you repeat that?
Q. Discipline, training, and supervision of detectives.
A. No. To detectives specifically, no, there is not.
Q. Okay. The document that has been Bates stamped Deposition Exhibit 5.
Okay. So let's take a look at -- well, actually, first of all, a background question about the general police orders.
This is a book of general police orders from 1969 to 1974; is that right?
A. Yes, it is.
Q. And these police orders were promulgated by the police chief, correct?
A. Yes.
Q. Do you know why this particular set of police orders only covers 1969 to 1974?
A. No, I don't.
Q. Okay. There were police orders that existed prior to 1969, right?
A. Yes, there were.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 94 of 248. PageID #: 1412



Q. And there were police orders that existed after 1974?
A. Yes, there were.
Q. If there had been police orders that -- strike that.
Let's take a look at page 3108.
A. Okay.
Q. So on page 3108, there's a Rule number 2-74. It says, "January 25th, 1974, Subject: Amendment to the Manual of Rules."
And it says, "To the Members of the Department by the Authority of James T. Conny, Director of Public Safety, the Manual of Rules of the Department of Public Safety, Division of Police, shall be revised as follows."
And then it gives what appears to be an amendment to the rules; is that right?
A. Yes. That's correct.
Q. Okay. So it appears that the amendments to the Manual of Rules were issued in police orders?
A. Yes.
Q. Was there any other way in which amendments to the Manual of Rules were issued?
A. No, not that I'm aware of.
Q. And if you'd just take a look at page 3110.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 95 of 248. PageID #: 1413



A. Okay.
Q. Number 22-73 dated August 31st, 1973, says, "Subject: Procedure Before a Custodial Interrogation."
And this rule has to do with the procedure that officers are expected to follow, in terms of giving a suspect their Miranda rights; is that right?
A. Yes. That is right.
Q. So this is the type of rule or policy that would be promulgated per general police order?
A. That's correct.
Q. Okay. Can you think of any other place that a rule relating to, you know, procedures during a custodial interrogation would be given, besides in a general police order?
A. In --
Q. In the 1970s.
A. No.
Q. It's not the kind of thing that would be in the Manual of Rules, right?
A. Right.
Q. And it's not the kind of thing that would be given by a divisional or departmental notice?
A. No. It would be in a general police order.

Q. Okay. And if you'd just look at the number, it says number 22-73. So the 73 refers to the year that the rule is promulgated, right?
A. Yes.
Q. And they're given in order; is that fair to say?
A. Yes.
Q. All right. So starting in January of a given year, you would start numbering the police orders for that year 1 dash year?
A. Yes.
Q. And then at the end of the year, it would be whatever the last one for the year would be?
A. That's correct.
Q. Is that still how it's done today, the numbers?
A. No.
Q. No?
A. No. It's different today.
Q. Okay. And if you'd turn to page 3112.
A. Okay.
Q. Number 19-73, dated July 18th, 1973, the subject is pretrial discovery rights of defense attorneys in court in criminal cases.
Now, this one states, "To Members of the Department, in a letter to this department, County Prosecutor John T. Corrigan has defined

the legal rights of defense attorneys in court to statements, reports, and other items in criminal cases. His letter, as a part of this order, shall be considered an integral part of criminal case preparation procedures, and all members shall comply with this provision. A copy shall be forwarded to all divisions, districts, and units."

And then what follows appears be the text of Attorney Corrigan's letter; is that right?

MR. MALLAMAD: Objection. If you know.

Q. Well, take a minute to review it.

A. Yeah. That appears to be the text of his letter.

Q. Okay. It says at the end, "Respectfully Submitted, signed John T. Corrigan" --

A. Yes.

Q. -- "Prosecuting Attorney," right?

A. Yes.

Q. All right. So --

MR. FUNK: I'm sorry. What's the Bates number on this?

MS. WANG: 3112, CLE 3112.

BY MS. WANG:

Q. Now, in approximately the middle of the page, in

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 98 of 248. PageID #: 1416



the first column, it says, "No police department is required or shall give to the defense counsel any -- and/or any court any record, paper, statement, report, or tangible object of a criminal case."

MR. MALLAMAD: Wait for the question.

BY MS. WANG:

Q. This letter from Attorney Corrigan was adopted by the police department in a general police order, right?

A. Yes, it was.

Q. In this police order?

A. Yes.

Q. And this police order was distributed to all the officers in the department?

A. Yes, it was.

Q. And the officers, including detectives, were expected to follow this order?

A. Yes.

Q. It then says, "Under proper circumstances under this rule, by application to the prosecuting attorney and/or the court, the defense counsel may be entitled to the following."

And then it gives a number of items. Number

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 99 of 248. PageID #: 1417



6 is evidence favorable to the defendant. Do you see that?
A. Yes, I do.
Q. Was there any explanation in any of the general police orders that you have here before you in Deposition Exhibit 5 of what evidence favorable to the defendant was?
A. No, there wasn't.
Q. Okay. Is there any other written document that you're aware of from the 1970s that explained what evidence favorable to the defendant was?
A. No, there is not.
Q. And then it says, "Exception to the foregoing. The foregoing does not authorize the discovery or the inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents" -- police departments or his agents" -- in connection with the investigation or prosecution of a case or of statements made by witnesses or prospective witnesses to state agents."
Do you see that?
A. Yes, I do.
Q. So this rule set out in numbers 1 through 6 items that police officers were expected to give

to defense counsel, but witness statements were excepted from that?

THE COURT: Objection.

MR. MALLAMAD: Objection.

BY MS. WANG:

Q. Is that fair to say?

MR. MALLAMAD: Objection. You can answer it to the best of your ability.

THE WITNESS: The foregoing does not -- yes. That appears to be what it says.

BY MS. WANG:

Q. And officers were expected to follow this rule?

A. Yes. It was a law.

Q. And it was adopted by the police department in a general police order?

A. Yes.

Q. Is that still a rule that the police department follows today?

A. Yes. And I believe it's been expanded upon with the rules of discovery, if I'm not mistaken, but yes. Any and all information is to go to the prosecutor's office.

Q. Actually, that's not what this says, right? So you're saying the rule today is that any and all

information that an investigating officer --
A. Right.
MR. MALLAMAD: Hold on.
BY MS. WANG:
Q. -- obtains today is to be given to a prosecutor, right?
A. Correct.
Q. This rule says items 1 through 6 -- and 6 is evidence favorable to the defense.
A. Right.
Q. -- may be given -- by application to the prosecutor or the court may be given to the defense counsel, except witness statements?
A. Right. So the answer to your question --
MR. FUNK: Objection.
MR. MALLAMAD: Objection. Go ahead and answer.
THE WITNESS: Okay.
BY MS. WANG:
Q. Is that your understanding -- is that your understanding of what it says?
A. That's my understanding of what it says. And the answer to the question is -- is this in effect today? The answer is no.
Q. Okay.

A. This is not in effect today.
Q. Okay. It was in effect in 1975, right?
A. Correct.
Q. It was in effect as of July 18th of 1973?
A. Yes.
Q. Why isn't it in effect today?
A. It is not in effect today because of the -- our procedures, our rules have changed. And the rules of discovery and what the prosecutor requires us to provide them is any and all documentation in a case.
Exactly how that came about, I think it was a legal matter that was decided in court. So...
Q. If you'd turn to 3149, number 2171, do you see that at the top of that page?
A. I do.
Q. Okay. And it's dated May 3rd, 1971. The subject is supplement to GPO 3370, field training program procedures.
So this general -- is it fair to say that this general order establishes some revision or supplement to the field training procedures?
A. Yes, it does.
Q. Okay. And let's go to number 3370, which is on page 3159, all right?

A. Yes.
Q. So number 3370, which was promulgated on September 10th of 1970, the subject is responsibilities and operational and assignment procedures in the field training program.
So this general order lays out the field training program, correct?
A. Yes, it does.
Q. Was there any other training provided to detectives of the Cleveland Police Department in the 1970s, besides the field training program?
A. Yes, there was.
Q. And what training was there?
A. They received training from the police academy before they were sworn in as a law enforcement officer. There was training from supervisors and other officers that were memorialized or formalized in the field training officer program.
And there were some opportunities for what we would call today continuing education training for our officers.
Q. All right. So was there any other training provided to officers in the 1970s?
A. Not that -- not that I'm aware of.
Q. Okay. What was taught to officers in the

academy?
A. Well, in the 1970s, I can tell you what we were taught. In 1984, when I attended the police academy, rules, regulations, laws, Supreme Court decisions, physical fitness, firearms training, how to conduct interviews, diversity training, how to deal with the public, you know, how to write tickets, just, you know, six months of law enforcement training from -- like I said, from rules and regulations all the way down to your responsibilities when you're on and off duty.
Q. And this was when you attended the academy in 1985?
A. Yes.
Q. Did they have diversity training in the 1970s?
A. I don't believe they did, but I couldn't speak on it, but I don't believe they did. I believe that was something that evolved over the years.
Q. Okay. And so how did you -- so you were -- what is your understanding of what training officers in the 1960s, let's say, had at the academy?
A. My understanding is from one of the reports that I reviewed. It was a form 1 report from the training academy supervisor, and it listed -- I think there was six or seven different categories

with the officers' grades, you know, how they scored on it.

Exactly the fact that they -- if there was any lesson plans or anything, I don't have any knowledge of that.

I know there was a peace officer training council that was set up by the State's Attorney General, and they followed some of those guidelines.

It's quite a bit more formalized today than it was in the '70s.

Q. Okay. What else did officers -- or sorry. Strike that.

How else did officers get training in the 1960s and '70s, besides from the police academy --

MR. MALLAMAD: Objection. You can answer.

Q. -- and the field training program?

MR. MALLAMAD: Objection. Asked and answered. You can answer.

THE WITNESS: Okay.

A. I believe in the 1960s and 1970s, a lot of it was from your supervisor and from your senior officers. I think you could define it as

on-the-job training, just as in any profession.
A more experienced officer would assist you until you became comfortable in what you were doing.
BY MS. WANG:
Q. Did you -- when you became a detective, did you have to go to detective school?
A. No, I didn't.
Q. Did you have to receive any kind of specialized training to be a detective?
A. No. The detective function within the Division of Police is not a rank. It is an assignment. And you're a patrol officer, working in a plain clothes investigative assignment.
So your training was -- we do have detective training now, but to your question, when I was a detective, you were detailed to an investigative bureau, and you were trained by the investigators in that bureau.
Q. Like on-the-job training?
A. On-the-job training, reviewing some of these policies in the manuals, but, mostly, it was, you just shadowed somebody for a while, until you became comfortable with the process.
Q. And in the 1960s and '70s, was there any

formalized training for detectives?
A. I believe it was the same thing.
Q. On-the-job training?
A. Yes.
Q. Is there anything in Deposition Exhibit 5, the general police orders from 1969 to 1974, that relates to topic 1A of the deposition notice, which is documenting or memorializing the developments in an investigation in such a way that they would become part of the official file during the course of an investigation?
MR. MALLAMAD: Objection to the extent that the documents speak for themselves, but you can go ahead and review this document, Chief.
A. There is no index here, obviously, right?
MR. FUNK: All the GPOs?
MR. MALLAMAD: No. I'm sorry. The exhibit, Deposition Exhibit 5, what's been identified as general police orders, 1969 to 1974.
MR. FUNK: Okay.
A. Could you repeat that, please?
Q. Sure. Is there anything in the general police orders, 1969 to 1974, Deposition Exhibit 5,

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 108 of 248. PageID #: 1426



that relates to documenting or memorializing the developments in an investigation in such a way that they would become part of the official file during the course of an investigation?

MR. MALLAMAD: Objection. Asked and answer. You can answer, Chief.

A. There are -- in the general police orders, there are guidelines regarding reports and what they should include, but there is nothing that says exactly where those reports shall go. So the first answer is yes. It's on page 3103.

The second answer is no, that there is no place listed in here, where those reports should go.

BY MS. WANG:

Q. All right. Is there anything in Deposition Exhibit 5 that relates to conducting and documenting photo or in-person lineups or showups?

MR. FUNK: Objection. Asked and answered.

THE WITNESS: I don't believe there is, no.

MR. FUNK: You can answer.

MS. WANG: He hasn't answered with

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 109 of 248. PageID #: 1427



respect to this document.
MR. FUNK: His prior answer would have encompassed the answer to that question, but go ahead, Chief.
THE WITNESS: No.
BY MS. WANG:
Q. Did you have something else to say?
A. No, I didn't.
Q. Okay. Is there anything in Deposition Exhibit 5 that relates to topic 1C of the deposition notice, which is use of informants or witnesses during a criminal investigation, including disclosure of such witnesses and payments, gifts, promises, or threats made to such witnesses?
MR. FUNK: Objection. Asked and answered. You can answer, Chief.
THE WITNESS: Yeah. In these documents, no, there is not. I cited the Manual of Rules is where that would be.
BY MS. WANG:
Q. The Deposition Exhibit 5, is there anything in there that relates to D, 1D, disclosure of exculpatory evidence, including, but not limited to, impeachment materials to criminal defendants,

defense attorneys, or prosecutors, other than Rule 19-73, which we already discussed?
A. Other than --
MR. MALLAMAD: Objection. Asked and answered. You can answer.
A. Other than that rule with the letter, no.
BY MS. WANG:
Q. And by that rule with the letter, we're talking about the one with the prosecutor's letter?
A. Yes.
Q. Okay. Is there anything in Deposition Exhibit 5 that relates to topic 1F, writing, preserving, and destroying police reports, investigator/ detective notes, memos, exculpatory evidence during the course of an investigation?
MR. FUNK: Objection. Asked and answered. You can answer, Chief.
THE WITNESS: Just the writing of the police reports.
BY MS. WANG:
Q. And do you recall which general order it is?
A. That would be -- I just read it. That is on page 3103, reports, what shall be included in the reports.
Q. Okay. Is there anything in Deposition Exhibit 5

that relates to discipline, training, and supervision of detectives?

MR. FUNK: Objection. It's been answered. You can answer, Chief.

THE WITNESS: No, there is not.

MS. WANG: Okay. Let's mark that as an exhibit.

(Thereupon, Deposition Exhibit 6 was marked for purposes of identification.)

BY MS. WANG:

Q. Okay. So we -- I have handed you what's been marked as Deposition Exhibit 6. That is -- it's Bates stamped CLE 160 through 976.

A. Yes.

Q. So I know it's a very large document, but is that one of the documents that you reviewed in preparation for your deposition?

A. Some of the documents in this, I reviewed.

Q. Okay. Do you know where this copy was obtained from?

A. I think it was -- I believe it was obtained from our police museum. Now, I know that we had two retired police officers working diligently to find all the responsive documents, and I know they recovered a lot of it from our police

museum.
Q. So the cover here is -- it has handwritten on it Sergeant C.H. Breaery, B-R-E-A-E-R-Y. Is it your understanding that this was that person's copy of the manual?
A. Yes. Yes, it is.
Q. Not manual, but of the police orders?
A. Yes.
Q. And he likely donated it to the museum?
A. It appears that way.
Q. So these documents are in reverse chronological order, it appears from the approximately -- if you go to the last page, the date is from 1961.
A. Okay.
Q. I will just let you get there.
A. 1959.
Q. Or 1959, actually.
A. Yes.
Q. It goes from 1959 to 1976.
A. Correct.
Q. Do you know if this is a complete copy of this person's, Sergeant Breaery, police orders, or this is some subset?
A. No. I do not know if this is a complete copy.
Q. Okay. Now, these -- if you flip through it, you

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 113 of 248. PageID #: 1431



will see that it contains the police orders, essentially, from 1959 to 1976.
A. Yes.
Q. Is this --
MR. FUNK: Wait for the question.
THE WITNESS: Okay.
BY MS. WANG:
Q. Is it your understanding that these are the police orders that existed from 1959 to 1976?
MR. MALLAMAD: Objection. You can answer to the best of your ability.
THE WITNESS: To the best of my ability, I would have to say yes. There may be other documents out there, but these are all the documents that could have been located.
BY MS. WANG:
Q. Okay. So when you say there may have been other documents out there, what are you referring to?
A. I'm talking about -- I would refer to these general police orders. Exactly how many were issued, if there were any addendums or any other orders that could still be -- we could be unable to locate them, but --
Q. So the city has already -- has done a search for

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 114 of 248. PageID #: 1432



all of the documents that constituted general police orders dating from the 1960s and '70s; is that true?
A. Yes, they have. Yes.
Q. And you've produced already the ones that you have obtained, right?
A. Yes.
Q. And you're not -- are you still continuing your search for additional documents?
A. I don't know if the search is ongoing, but the possibility that other documents may exist or could have existed is -- it's possible.
Q. And you don't know what those are?
A. No. I am not -- I'm not in charge of that search process. I'm not in charge of producing these. So --
Q. Right. But whatever documents you haven't seen, if there was some general police order out there from the 1960s or '70s that is not in the documents before you that you've reviewed, you would not know what it said, right?
A. Right, correct. I would not.
Q. Okay. And the general police orders in this set of general police orders are also numbered, you know, 1 through whatever it is at the end of the

year, and then the second set of numbers is the year, correct?
A. Yes.
Q. Okay. To your knowledge, were there any general police orders that were not numbered in that fashion from the 1960s and '70s?
A. I can't answer. I don't know.
Q. If you take a look at -- just one moment.
All right. If you look at CLE 822. So this just has to do with building permits. It's the general police order number 25-53 and the date is April 26, 1963.
It says towards the bottom, "All such inspections" -- and it's talking about building inspections -- "are to be included in the member's daily duty report."
Do you see that?
A. Yes.
Q. Okay. So there is a reference here to the daily duty report that we discussed earlier?
A. Yes, there is.
Q. So at least according to this document, daily duty reports were required of officers at least in 1963?
A. Yes.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 116 of 248. PageID #: 1434



Q. And they still are today?
A. Yes, they are.
Q. And is it your understanding that they were required of officers and detectives in the 1970s as well?
A. Yes.
Q. Now, turning to page 732, this one is general police order number 1070, dated April 14th, 1970. It's an amendment to training bulletin 82.53.
And then there is a discussion of different training bulletins in this general order. Do you still have training bulletins today?
A. No, we don't.
Q. What is your understanding of when training bulletins were issued?
A. When there was -- my understanding today is, we issue training opportunities, which probably back then would be a bulletin, in divisional notices. So that's a divisional notice today.
There is a training opportunity for search and seizure at Tri-C this date. If you'd like to attend, fill out the following form.
That is how we do it today. Maybe they did it a little bit different back then, but I'm not -- but today this would be a divisional notice.

Q. Okay. And did you come across any training bulletins in your search for responsive documents regarding training materials in the 1970s?

A. No, I didn't.

Q. So the best of your understanding is that a training bulletin from the 1960s and '70s were notices that the department would put out about training opportunities. That is kind of how it would be done today, and you would expect it would be the same back then?

MR. FUNK: Objection. You can answer.

THE WITNESS: Right. I would expect it would be the same. Reading this document, all new legislation and the statutes would have been amended and repealed. Same thing today.

A divisional notice would tell you if there was new legislation or a statute or an ordinance in the City of Cleveland has been repealed or is no longer enforceable, yes.

BY MS. WANG:

Q. Let's take a look at CLE 685. So there is -- that is general order 3470, dated September 16th,

1970. There is a reference there to the general record room.
Do you see that?
A. Yes.
Q. Do you still have a general record room today?
A. No, we don't.
Q. What was the general record room?
A. The general record room was just what it said. It kept all general records for the Division of Police internally.
So your employment application, your assignment -- we have a card that tells you where you have been assigned throughout the division.
Those are general records that were -- now they're maintained in all sorts of different units; police academy unit, inspection unit.
It's been decentralized. This was just a general record room where files were kept.
Q. Was it just for personnel type files or investigative files also?
A. It was not investigatory files.
Q. So where were -- in the 1970s, where were the investigatory files kept for the homicide unit?
A. For the homicide unit, where they're kept today, in the homicide unit.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 119 of 248. PageID #: 1437



Q. All right. Turning to CLE 601, this is general police order number 28-71, dated June 1st, 1971. And it's a rescinding of a rule from the Manual of Rules; is that accurate?
MR. FUNK: Objection. If you know.
THE WITNESS: Yeah. It looks like it, yes.
BY MS. WANG:
Q. So changes, amendments, rescinding of rules were done by general police orders, at least as of 1971?
A. Yes. It appears so.
Q. And -- strike that.
MR. FUNK: What's that general order number? I'm sorry.
MS. WANG: That one is 28-71.
MR. FUNK: 28-71.
BY MS. WANG:
Q. All right. Let's take a look at CLE 434 through 435.
A. Okay.
Q. Actually, I think I asked you about this one already. So strike that.
All right. CLE 323 is general police

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 120 of 248. PageID #: 1438



order number 26-75, dated July 18th, 1975. This rule -- or police order -- the subject is unauthorized and prohibited comments, communications, and interviews.

And it says, "To the Members of the Department. All members are expressly directed to give full compliance to Rule 4147 and Rule 97."

So the reference to the rules here is a reference to the Manual of Rules; is that right?
A. Yes.
Q. Okay. And it's the manual that we were discussing earlier?
A. Yes, it was.
Q. Page 172, CLE 172. It's general police order number 35-76, and it's dated May 24th, 1976. The subject line is acknowledgement of receipt of general police orders, departmental notices, and memorandums.

And it says, "To the Members of the Department. Within 48 hours of receipt of a general police order, departmental notice, or memorandum, every commanding officer shall receive a copy of same and return a receipt of copy to the chief's office."

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 121 of 248. PageID #: 1439



What is your understanding of whether or not this rule was in place before 1976?
A. I don't know if it was in place before 1976.
Q. Do you have to do that today? Do officers have to sign acknowledgement that they've received a general order?
A. No.
Q. Did you have to do that when you first started at the department in '85?
A. No. We are required to keep an updated general police order book, which is subject to inspection at any time. And it's done randomly at roll calls. You may be asked to attend roll call tomorrow night at 10:00 o'clock. Bring your general police order book with you and then it will be inspected there. And if it's not in compliance, you'll be told to get it in compliance. You're usually given three days. If it's not in compliance then, then there's formal discipline.
Q. Well, where -- these days where do officers keep their general police office book?
A. Some officers have them in their car when they're driving around. Mine is on my desk. I'm required to keep it. It all depends. Some of

them keep it in their lockers. It's up to you to have that and to be able to refer to that. So there is no specific place.
Q. Okay. Is there anything in Deposition Exhibit 6 that relates to topic 1A of the Notice of Deposition, which is, "Documenting or memorializing the developments in an investigation in such a way that they would become part of the official file during the course of an investigation"?
A. There are -- there is an order on page 170 that is significant and it deals with evidence in sex crimes cases.
Q. Okay.
A. But as far as -- I wish they had an index because I could tell you --
MR. MALLAMAD: Well, objection to the extent that the documents speak for themselves and their completeness is not being attested to.
Beyond that you can review every page of that if you wish to to try and answer the question.
A. There are guidelines for how certain offenses should be handled and documented in these general

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 123 of 248. PageID #: 1441



police orders, but to answer your specific question, I'd have to say that -- I'd imagine that they're in these documents, but exactly where they're at, I cannot point out to you at the moment.

Q. All right. So if there were a written policy relating to topic 1A of the Amended Notice of Deposition, it would be in that document?

A. It would be --

MR. MALLAMAD: Objection.

THE WITNESS: Go ahead.

MR. MALLAMAD: To the extent that these documents may reflect that, the City is not attesting that these are a complete set of general police orders in effect in a period of time. These are what had been able to be located.

MS. WANG: Shawn, you're not testifying --

MR. MALLAMAD: Well, let me get my objection on the record and then the Chief can answer.

MS. WANG: What is the objection? There's no speaking objections. You're giving a speaking objection.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 124 of 248. PageID #: 1442



MR. MALLAMAD: Okay. I think that the court reporter got it all down, so, Chief, you can testify.
BY MS. WANG:
Q. And just so the record is clear, my question is: If there were a general police order that existed from 1971 through 19 -- or I'm sorry, strike that.
If there were a general police order that existed in that book of general police -- sorry, strike that.
If there were a general police order relating to topic 1A in the deposition notice, it would be reflected in that document CLE 160 through 976; is that correct?
MR. MALLAMAD: And I assert the same objection.
MR. FUNK: Objection.
MR. MALLAMAD: You can answer, Chief.
A. Yes.
Q. If there were a general police order relating to topic 1B of the deposition notice, which is conducting and documenting photo or in-person lineups or showups, it would be contained in

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 125 of 248. PageID #: 1443



Deposition Exhibit 6, which is CLE 160 through 976?
MR. MALLAMAD: Same objection.
A. Yes, it would be in the documents provided.
Q. If there were a general police order relating to topic 1C of the deposition notice, which is use of informants or witnesses during a criminal investigation including disclosure of such witnesses and payments, gifts, promises or threats made to such witnesses, it would be contained in Deposition Exhibit 6?
MR. MALLAMAD: Same objection.
A. Yes, it would.
Q. If there were a general police order relating to topic 1D of the deposition notice, which is disclosure of exculpatory evidence including but not limited to impeachment material, to criminal defendants, defense attorneys or prosectors, it would be contained in CLE 160 through 976, which is Deposition Exhibit 6?
MR. MALLAMAD: Same objection.
A. Yes, it would.
Q. If there were a general police order relating to the documenting and conducting of interrogations or interviews of suspects and witnesses,

including juveniles, it would be contained in the general police orders Bates Stamped CLE 160 through 976?

MR. MALLAMAD: Same objection.

A. Yes, it would.

Q. If there were a general police order relating to topic 1F of the deposition notice, which is writing, observing and destroying police reports, investigator/detective notes, memos and exculpatory evidence during the course of an investigation, it would be contained in Deposition Exhibit 6, which is CLE 160 through 976?

MR. MALLAMAD: Same objection.

A. Yes.

Q. If there were a general police order relating to the topic 1G of the deposition notice, which is discipline, training and supervision of detectives, it would be contained in Deposition Exhibit 6, which is Bates Stamped CLE 160 through 976?

MR. MALLAMAD: Same objection.

A. Yes.

Q. Okay. Thank you.

MS. WANG: Let's take a quick

break.

\- - - -

(Thereupon, a recess was had.)

\- - - -

BY MS. WANG:

Q. All right. So now, Deputy Chief Tomba, we've reviewed the Manual of Rules, both versions, that we got in this case as well as two different versions of the general police orders.

So, having reviewed those documents and -- well, strike that.

So, I just want to go through a couple of these topics in the notice and ask you about any unwritten policies or procedures relating to the topics, all right?

A. Okay.

Q. We talked about the written and I just want to talk about if there's any unwritten.

So, for topic 1A for the deposition and that's documenting or memorializing the developments in an investigation in such a way that it would become part of an official file during the course of an investigation.

Was there any unwritten -- were there any unwritten policies or practices in place during

the relevant time period relating to that topic?
A. During that time period, I don't know if there were.
Q. In the relevant time period, were there any unwritten policies, procedures or practices relating to topic 1B?
A. You know, during that time period I don't know. I can speak on how we did things -- how we did things in the 1980s up until now, but during that time frame, no.
Q. Okay. During the relevant time period of 1970 through 1980, were there any unwritten policies, procedures or practices relating to topic 1C?
A. No, not that I'm aware of.
Q. During the time period of 1970 to 1980, were there any unwritten policies, practices or procedures relating to topic 1D?
A. No, not that I'm aware of.
Q. During the relevant time period of 1970 to 1980, were there any unwritten policies, procedures or practices relating to topic 1E?
A. No, not that I'm aware of.
Q. During the time period of 1970 to 1980, were there any unwritten policies, procedures or practices relating to topic 1F?

A. No, not that I'm aware of.
Q. During the time period of 1970 to 1980, were there any unwritten policies, procedures or practices relating to 1G?
A. Not that I'm aware of, no.
Q. Okay. Now, who was responsible for the maintenance and preservation of general police orders in the 1970s?
A. Who was -- I'd have to -- the chief of police.
Q. Okay. And what is your understanding of what the retention policies were for general police orders in the 1970s?
A. The only time a general police order would not be retained is when it was not in effect. So, if the general police order was amended, that old general police order would no longer be in effect.
Now, if your question is how long do we maintain those older ones? I don't have an answer for you. But if it's not in effect, then it's not a relevant document. I don't believe it was retained.
Q. So, it appeared -- you know, from reviewing the general police orders that were produced in this case, there would be general police orders that

would be issued that were amendments to prior orders. Is that fair to say?
A. Yes, it is fair to say.
Q. Is that still how it's done today?
A. Yes.
Q. So, older police orders would still be in effect until it was rescinded or amended in some way?
A. Correct.
Q. And then -- so, when a new officer joins the force, would they just be given a copy of all the current general police orders that are in effect as of that date?
A. Yes.
Q. And then as new ones are added or old ones are rescinded, they would get inserts that they would put into their books?
A. Yes.
Q. Okay. And that's still how it works today?
A. Yes. The filing system is a little different, but general police orders are classified in broad categories. Administration, investigation, traffic, communications. That's the way they're classified today. So, General Police Order 4.011 is always going to be how we investigate use of force. If that's changed, it will just be sent

out, this has now been changed -- the Section G1 is now changed. Review it. But that number stays the same. A little bit different in the '70s.
Q. The numbering system?
A. The numbering system, that's all.
Q. And there was the one general police order we talked about, which is No. 19-73 relating to the obligation to disclose evidence to the prosecutor, correct?
A. Yes.
Q. That's the one that contained the prosecutor's letter?
A. Yes.
Q. So, that topic area, the topic area of disclosure of evidence to prosecutors and defense counsel, is the kind of topic area that would be discussed in a general police order?
A. Yes, it is.
Q. And so if there were other general police orders relating to the topic of disclosure of evidence to criminal defense counsel or to prosecutors, it would be in a general police order?
A. Yes, it would.
MS. WANG: Let's have this marked

as 7.

- - - -

(Thereupon, Plaintiff's Exhibit 7 was marked for purposes of identification.)

- - - -

Q. So, I have handed you what has been marked as Deposition Exhibit 7.

So, Deposition Exhibit 7 is the City of Cleveland's answer to Plaintiff's first amended -- amended first set of interrogatories to Defendant City of Cleveland.

Could you take a look at that and let me know if you've seen that before.

A. I have seen this document before.

MS. WANG: Let's have this marked as Exhibit 8.

- - - -

(Thereupon, Plaintiff's Exhibit 8 was marked for purposes of identification.)

- - - -

Q. All right. So, Deposition Exhibit 8 is a verification. And it is -- is that your signature there?

A. That is, yes.

Q. Okay. And so you have verified on this form that

you have answered the interrogatories and given supplemental answers to the interrogatories under oath?
A. Yes, I have.
Q. Okay. Now, let's take a look at Deposition Exhibit 7, No. 8.
A. Okay.
Q. All right. So, Interrogatory No. 8 states, please state whether any of the individual defendants or any other defendant city employee involved in the Harold Franks' homicide investigation acted inconsistently with any of the policies, customs or practices of the City of Cleveland at any time during the events described in Plaintiff's Complaint.
Now, you read Plaintiff's Complaint, correct?
A. Yes.
Q. So, what is -- what is the city's position with respect to whether any of the individual defendants involved in the homicide investigation acted inconsistently with any of the policies or practices with the City of Cleveland?
MR. FUNK: Objection.
MR. MALLAMAD: Objection. To the extent that Chief Tomba can answer beyond

what's already in the answer to interrogatory, in light of the objection that's also contained in there, you may respond, Chief.

A. My response is there was no inconsistency within the policy and the Manual of Rules. And I cannot make a determination about customs or practices during that time frame.

Q. Okay. The officers, the defendant officers in the case, acted consistently with the policies as reflected in the manual of rules in the general police orders?

MR. MALLAMAD: Objection.

MR. FUNK: Objection.

A. As far as I was concerned, yes, that they followed the Manual of Rules and the general police orders, yes.

Q. With respect to Interrogatory No. 10, which is on page 7, it states for any document requested in Plaintiff's discovery requests that have been lost, discarded or destroyed, please identify each such document as completely as possible and state the approximate date it was lost, discarded or destroyed.

The answer that was given here says documents

may have been destroyed in accordance with the city's record retention policy.
Are you aware specifically of any documents that have been destroyed in this case relating to any policies or procedures of the city?
A. No, I am not.
Q. Okay. Interrogatory No. 12 states, do you contend that the City of Cleveland had in place between 1950 and 1980 a written policy or procedure that -- and then it lists a bunch of topic areas. Just take a moment to read through those subsections and then I'll ask you some questions about it.
A. Okay. I'm done. Go ahead.
Q. All right. So, we've spent a lot of time already today talking about the policies and procedures relating to topics 12A through E, correct?
A. Yes, we have.
Q. Are there any other policies, written policies or procedures, that the City of Cleveland had relating to any of these topics, which you're aware of, other than what we've discussed today?
A. Other than what we've discussed and what's been provided, no.
MS. WANG: Let's mark this as

Exhibit 9.

\- - - -

(Thereupon, Plaintiff's Exhibit 9 was marked for purposes of identification.)

\- - - -

Q. Deposition Exhibit 9 is your -- the City of Cleveland's supplemental answers to Plaintiff's First Set of Interrogatories. Just take a moment to look at that and let me know if you've seen that before?
A. Yes. I have seen this document before.
Q. Okay. And this one is also verified under oath under the verification that you signed, correct?
A. Yes, it is.
Q. Okay. If you turn to page 3, Interrogatory No. 12, Interrogatory No. 12 says -- now, this relates to the one that we were just discussing on the other exhibit --
A. Yes.
Q. -- the policies and procedures that we talked about today.

So, the City of Cleveland has supplemented its answer by saying, upon information and belief Defendant, City of Cleveland, states that there were written policies and procedures between 1950

and 1980 regarding all the subject areas referenced in Interrogatory No. 12.

Upon a diligent search of its records from the relevant time period, the City of Cleveland has located some of the general police orders, written training manuals and other written procedures from the relevant period of time and has produced such documents to the Plaintiff.

Upon information and belief, the documents produced are all not the written policies, procedures and training manuals that were in existence at this time.

Are there any written policies or procedures relating to any of the topics in 12A through E other than what we've discussed today?

MR. MALLAMAD: Objection. You can answer.

MR. FUNK: Objection. Asked and answered.

A. The answer is that I don't know, but I know the efforts that were made to locate all these documents were Herculian efforts by a couple of retired policemen. So, is there a possibility that other information does exist, that possibility is there, but exactly where it's at,

I don't have any knowledge of it. And like I said, I believe that the men that worked on this did everything they could to locate it.
Q. And so on what basis have you said under oath that upon information and belief the documents produced are not all the written policies, procedures and training materials that were in existence at the time?
MR. MALLAMAD: Objection. You can answer.
A. I'm sorry. Upon --
Q. So, you're -- what you're aware of --
A. Right.
Q. -- is the efforts that certain officers with CPD made --
A. Yes.
Q. -- to locate documents, right?
A. Correct.
Q. And you don't know what documents may have existed other than the ones that have been produced, if any?
A. That's correct.
Q. You don't know if there are other general police orders or versions of the Manual of Rules that did exist that you haven't found?

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 139 of 248. PageID #: 1457



A. That's correct.
Q. Okay. You understand that you signed the answers to these interrogatories under oath on behalf of the City of Cleveland?
A. Yes. Yes.
Q. In your supplemental interrogatory answer No. 12, it states that at the end, upon information and belief, the documents produced are not all the written policies, procedures and training manuals that were in existence at this time.
Upon what information or belief did you write that sentence?
A. I would say it's not information. It's being a police officer for 31 years, knowing how police departments operate. Knowing how our police department operates with the volume of records that we produce daily, yearly, that I'm confident that they -- their search was exhaustive. But are there other documents? There is a possibility.
So, I'm not saying it is a definite, I'm not giving you that. In fact, I said, there is a belief that there could be something else out there.
That I have knowledge of? No, absolutely

not. I do not have knowledge that there's something that's out there that's being withheld at all, but I do know how police departments run and how the Cleveland Police Department runs.
Q. Okay. And so you don't know, one way or the other, what any missing policies or procedures might have said?
A. No, I don't. I do not.
Q. Or even if there are any?
A. Correct, I do not know.
Q. And the chief of police would have been responsible for maintaining or preserving any policies and procedures; is that true?
A. Yes.
Q. Okay. No. 13, Interrogatory No. 13 in Deposition Exhibit 7, it states do you contend that the City of Cleveland had in place between 1950 and 1980 any training for its police officers, formal or informal, relating to any of the subject areas identified in Interrogatory No. 12A through E above?
So, we talked a little bit about training that existed in the 1960s and '70s. And talked about the police academy. You mentioned the police officer -- peace officer's training

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 141 of 248. PageID #: 1459



council, and you mentioned on-the-job training from supervisors.

MR. MALLAMAD: Wait for the question.

Q. Okay. Is there any other training that existed for police officers in the 1960s and '70s?

MR. MALLAMAD: Objection. You can answer.

A. In reviewing the documents that were provided, I do recall seeing some training certificates for some officers limited to that. Other than that, I do not know.

Q. Okay. So there would have been training, as reflected in whatever training certificates the officers had, right?

A. It is documented that were the -- some of the documents that were provided.

Q. Okay. Are you aware of there being any training of detectives in the Cleveland Police Department on how to document or memorialize the various developments in an investigation in such a way that it would become part of the official file?

MR. MALLAMAD: Objection. Asked and answered. You can answer.

A. I believe that those policies and that training

was outlined in the document from the Ohio Police Officers Training Academy, and some of it we discussed that were in the Manual of Rules and Regulations.

Q. Is there any training that the Cleveland Police Department provided to detectives that required them to place any witness statements in the official file or otherwise make them available to criminal defendants, defense counsels, and prosecutors?

MR. MALLAMAD: Objection. Asked and answered. You can answer, Chief.

A. As far as training, I would have to say no. But still going back to what I said earlier, being guided by the law and the general police orders.

Q. Was there any training that the City of Cleveland provided between 1950 and 1980 to its detectives regarding documenting or memorializing photo or in-person lineups or otherwise governing the conduct of detectives during photo or in-person lineups?

MR. MALLAMAD: Objection. Asked and answered. You can answer, Chief.

A. Specifically training, once again, my answer would be the same, no. But under the law and

under the general police orders, we were expected to follow those.
Q. Was there any training that the City of Cleveland had in place between 1950 and 1980 for detectives, requiring them to disclose exculpatory evidence?
MR. MALLAMAD: Objection. Asked and answered. You can answer, Chief.
A. No. No specific training. Just once again, following the law and the general police orders.
Q. Was there any training that the City of Cleveland had in place between 1950 and 1980 relating to requiring detectives of the Cleveland Police Department to document or memorialize interrogations or interviews of suspects and witnesses including that police officers retain notes of interviews?
MR. MALLAMAD: Objection. Asked and answered. You can answer, Chief.
A. No. No specific training as to that. Just the rules of the department.
Q. Okay. So the -- let's take a look at Interrogatory No. 14 in Deposition Exhibit 7 -- actually strike that, let's go to something else.
\- - - -

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 144 of 248. PageID #: 1462



(Thereupon, Plaintiff's Exhibit 10 was marked for purposes of identification.)

\- - - -

Q. All right. Take a look at Deposition Exhibit 10 and let me know if you've seen that before.
A. Yes, I've seen this document before.
Q. Okay. Now, that is a document Bates Stamped CLE 2589 through 2886, titled Source Document for Police Training.
Is that one of the documents that you reviewed for your deposition?
A. Yes, it was.
Q. And do you know when this was published?
A. No, I don't unless there's a -- no, I don't.
Q. Do you know if this is distributed to officers or detectives through the department?
A. No, I don't.
Q. Do you know how this document was obtained?
A. It was obtained on the -- through a request from the law department. And I believe it was obtained by the two investigators from the law department.
Q. Okay. So, do you know whether or not this document was given to two detectives or officers in the 1970s as a part of their training?

MR. MALLAMAD: Objection. You can answer.
A. No, I don't. This particular document, no, I do not know if this was provided.
Q. Okay. So, do you know why this document was produced in discovery in this case?
A. I do not know why it was produced. I would imagine it was produced at the request of somebody, whoever.
Q. But you have no information that this was actually given to officers as a part of their training in the 1970s?
MR. MALLAMAD: Objection. You can answer.
A. No, I have no facts that this was provided to officers in the 1970s.
Q. Okay. What does the peace officers training council do?
A. The Ohio Peace Officers Training Council is a group that is -- they set standards for police officers' training throughout the state under the guidance and the direction of the Ohio Attorney General.
Currently our officers have to be OPOTA, Ohio Peace Officers Training, it's an association now.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 146 of 248. PageID #: 1464



They have to be OPOTA certified. They provide certification for law enforcement officers across the state. And they set standards for law enforcement.
Q. Did that exist in the 1970s?
A. Yes, it did.
Q. Okay. And what was the peace officers training council's role with respect to training Cleveland police officers in the 1960s and '70s, if any?
A. I don't know if they had any role in the actual training of Cleveland police officers. I believe they set forth a source document, a best practice, what they felt was the best way to conduct law enforcement at that time throughout the state.

\- - - -

(Thereupon, Plaintiff's Exhibit 11 was marked for purposes of identification.)

\- - - -

Q. I'll give the Bates numbers for the record. Deposition Exhibit 11 is CLE 3640, 3641, 3337, 3342, 3949, 3945 -- sorry --
A. 36.
Q. 3545, 3546, 3416, 3417, 3429, 3957, 3960, 3965 and 3967.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 147 of 248. PageID #: 1465



A. Yes.
Q. So, these are some training certificates that were in the personnel files of the defendant officers in this case that were produced to us in discovery. Could you just take a look through it and let me know if you've seen this before.
A. Yes, I have seen these before.
Q. Okay. Let's start at the beginning. The first page, 3640 is the certificate from the State of Ohio to Peter Comodeca from the Peace Officer Training council. And it's dated 9/13/74. It says this is to certify that Peter Comodeca is an instructor in the criminal code training program.
Do you know what this certificate was for exactly?
A. Just what it says is that Officer Comodeca was certified to be an instructor in criminal code training, which is not unusual. We still do that today. We still have our officers that are certified by OPOTA to train our officers. Today it's called Train the Trainer. You train a group of officers, they become the internal trainers to train their members of the division.
Q. Do you know what was taught in the criminal code training program?

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 148 of 248. PageID #: 1466



A. No, I don't.
Q. Did you see documents that were produced in this case that related to a criminal code training program?
A. I don't -- I don't recall if I did.
Q. Okay. The second page is another certificate relating to Peter Comodeca from the Ohio Peace Officer Training council and it says this is to certify that Peter Comodeca completed the Ohio Peace Officer criminal code training program. Awarded September 1st, 1974.
So, do you know what this certificate was for?
A. This certificate looks like a certificate of completion of a certain amount of hours of a course regarding the criminal code that was given by the Ohio Peace Officer Training council.
Q. And do you know what the substance of the criminal code training program was?
A. No, I don't.
Q. Okay. So it appears that he received his certificate to be an instructor in the program 12 days after he received training in the program itself. Is that accurate?
A. Yes.

Q. The next page is a certificate, the same kind of certificate, but to Frank Stoiker, for completing the Ohio Peace Officer criminal code training program dated September 1st, 1974.
And what's your understanding of what this certificate was for?
A. My understanding is the same, that Officer Stoiker attended a training session and completed it successfully and was provided this certificate as proof.
Q. Okay. So, if there were documents that were produced in this case relating to the criminal code training program, would it be fair to say that your knowledge of what was taught in that training program is reflected in the documents?
A. Yes. My knowledge is -- I really don't have exact knowledge. I can only assume that it was the criminal code at that time that they trained them on.
Q. On what kinds of things were offenses and so on?
A. Correct.
Q. Okay. The next page is CLE 3343. This appears to be a student registration form signed by Frank Stoiker --
A. 3342?

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 150 of 248. PageID #: 1468



Q. I'm sorry -- what did I say? 3342.
A. Okay. Yes, that's correct.
Q. All right. So this was a signup form it looks like for criminal code training. Is that fair to say?
A. Yes, it is. It's a student registration form.
Q. Now, at the bottom it says, there's a signature for the training officer of the police academy, Francis Reagan, Lieutenant. Do you see that?
A. Yes.
Q. Actually I'm not sure it says Francis, but it says F-r-a -- I'm not sure what it says, but the last name is Reagan. Are you familiar with a lieutenant named Reagan?
A. No.
Q. Do you know who were the people who were training officers in the police academy at the time?
A. No, I don't.
Q. Are there records of who the police officer training officers were in the 1970s?
A. I don't know if they -- if those exist.
Q. The next page is CLE 4949 and it is also a criminal code training program certificate. This one is to Eugene Terpay dated September 1st, 1974.

And so what's your understanding of what the certificate was for?
A. My understanding is the same criminal code training Officer Terpay participated in and was given this certificate upon completion.
Q. All right. And then the next page is CLE 3545. It's also the same certificate, but to John Staimpel, dated September 1st, 1974. Is this also for completing the criminal code training program?
A. Yes, it is.
Q. Page 3546 is a student registration form for John Staimpel. We don't need to ask about that.
All right. The next page is CLE 3516. It's also a criminal code training program certificate to James Farmer, dated September 1st, 1974.
And is it your understanding that this certificate was for completing the criminal code training program?
A. Yes, it is.
Q. All right. Turning -- skipping the next page and turning to 3429. It's an international homicide seminar certificate to JT Farmer. This states, this certifies that JT Farmer has satisfactorily completed a course in homicide investigation as

prescribed by the board of trustees of the Hocking Technical College, Nelsonville, Ohio. Total clock hours 40. Dates March 18 through 23, 1979.
    What is your understanding of what this certificate is for?
A. My understanding is that Officer Farmer attended a one-week course, 40 hours, and that he completed that course and was issued that certificate of completion by Hocking Technical College.
Q. And he completed that in 1979?
A. Yes, he did.
Q. Do you know what the substance -- do you know anything about the substance of what was taught during that course?
A. No, I don't.
Q. Page CLE 3957 is a departmental information form that's dated June 30th, 1980. Take a look at this form for a moment and then I will ask you a question about it.
    All right. Ready?
    So this one states at the top, during the week of June 23 through 27, 1980, a training seminar, first one, supervision was held at the

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 153 of 248. PageID #: 1471



police academy, and then it basically states, you know, there were sergeants and certain other people who were in attendance and topics that they were taught on. One of the sergeants in attendance was Jerold Englehart. He had a score on a posttest of 83.
Do you have any knowledge of what was taught during this training seminar?
A. Only what's listed on this. This is a Form 1.
Q. Okay. This is a Form 1.
A. This is a Form 1. You can see it up on top, CFC Form 71-1. So this is an internal document from Sergeant Mengle to her lieutenant. And exactly what was taught, just what she has documented, leadership, interpersonal communications, everything else on this document.
Q. Is it fair to say that generally what was taught involved the subject matter of supervision?
A. Yes.
Q. Do you have any other knowledge of what was taught during this course?
A. No, I do not.
Q. On the next page, CLE 3960, it is also a Form 1. It's dated March 31st, 1977. And the subject is numbers in attendance, juvenile handling seminar

conducted at the police academy on March 30th, 1977.

Then it says in the narrative part: Sir, the following is a list of members in attendance at the police academy for the juvenile handling seminar conducted on Wednesday, March 30th, 1977, between 1230 and 1630 hours. And Detective Englehart -- or I don't know if he was a detective then, but Englehart is listed there. Do you see that?

A. Yes, I do. And he was a detective at the time.

Q. Oh, he was. Okay.

So this -- is it your understanding that this document states that Detective Englehart attended a juvenile handling seminar in 1977?

A. Yes.

Q. Do you know -- and this seminar lasted four hours?

MR. MALLAMAD: Objection.

A. That's what the document states.

Q. Do you have any understanding of what specifically was taught during that seminar?

A. Specific, no, I do not.

Q. Page 3965 is a certificate issued to Jerold Englehart for completion of the criminal code

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 155 of 248. PageID #: 1473



training program on September 1st, 1974. Do you see that?
A. Yes, I do.
Q. So, is it your understanding that this indicates that Detective Englehart finished that training program on that date?
A. Yes, it is.
Q. Okay. Do you have any knowledge of what -- I'm sorry, strike that.
What is your understanding of what any of the defendant officers or detectives in this case were trained on other than what's reflected in these documents that we just discussed, which is Deposition Exhibit 11?
A. I don't have any other documents or knowledge of what they were trained on besides what's reflected in these documents.
Q. If any of the defendant detectives in this case had received any additional training or certificates of any kind from specific programs, would you expect that to have been contained in their personnel files?
A. I would have expected that, yes.
Q. Okay. Let's talk about topic 6 in the deposition notice.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 156 of 248. PageID #: 1474



So, 6A asks for testimony on any efforts by the City of Cleveland to identify, investigate, or present any of the following types of misconduct, and discipline imposed by the city as a result of such investigations.
6A is, improper eyewitness identification procedures including misconduct related to live in-person lineups and photographic showups, or lack of documentation regarding the same.
What is your -- what efforts did the City of Cleveland make to identify or prevent any of these types of misconducts listed in topic 6A?
MR. MALLAMAD: Objection. You can answer.
A. The efforts at the time go back to following the law and the general police orders. If I understand your question correctly. If you're asking for the efforts to locate these types of things, like I said before, the efforts were by the two retired police officers and numerous members of the division of police.
Q. And let me be clear, I'm not asking about documentary evidence --
A. Okay.
Q. -- I'm asking about the topic -- topic in topic

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 157 of 248. PageID #: 1475



six relates to what efforts the City of Cleveland made to identify, investigate or prevent any of those types of misconduct that are listed in A through D?

MR. MALLAMAD: Let me just object. What time period are you asking about?

MS. WANG: 1970 through 1980.

A. Okay.

Q. So, during that time period, what efforts -- let's break this down. What efforts did the City of Cleveland make to identify any misconduct relating to improper eyewitness identification procedures?

A. Okay. I don't think effort was made to identify misconduct, but by those training records and our general police orders I think there was guidance provided to avoid misconduct. And as far as discipline, I don't see any discipline in any of these records where anyone was disciplined for not following any of these orders that were -- orders or laws.

Q. Were there any general police orders relating to eyewitness identification procedures at all in all of the documents that we looked at today?

MR. MALLAMAD: Objection. You can

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 158 of 248. PageID #: 1476



answer.
A. I don't believe there was, no.
Q. Okay. Were there any efforts made by the City of Cleveland to investigate any misconduct relating to improper eyewitness identification procedures?
MR. MALLAMAD: Again, same objection. You're referring to the 1970s?
MS. WANG: Yes, that's what the notice says. May 19 -- in the front page --
MR. MALLAMAD: Just so we're clear. There's other subjects mentioned in those dates, so I wanted to be -- just wanted to have the deputy chief clear that you're asking about between 1970 and 1980 is what she's referring to.
THE WITNESS: Yes, I'm clear and the answer is no.
Q. Okay. Were there any efforts by the City of Cleveland to prevent misconduct relating to eyewitness identification procedures in the time period of 1970 to 1980?
MR. MALLAMAD: Objection. Go ahead.
A. I would to have say, no, not to my knowledge

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 159 of 248. PageID #: 1477



there wasn't.
Q. Were there any efforts by the City of Cleveland to identify, investigate or prevent misconduct relating to conduct of in-person lineups during the 1970s or '80s?
MR. MALLAMAD: Objection. You can answer.
A. No, not that I'm aware.
Q. During the time period of 1970 to 1980, were there any efforts by the City of Cleveland to identify, investigate or prevent misconduct relating to failure to place Brady evidence and information in the official investigative file or otherwise withholding material, exculpatory evidence?
MR. MALLAMAD: Objection. You may answer.
A. I would say that there was in the general police orders as a follow-up to the letter written by John Corrigan.
Q. Are you saying -- are you just referring to the general police order? The one that we talked about before?
A. Yes, that's correct.
Q. I just want to be clear in your answer. Are you

saying there was follow-up to that general police order?
A. No.
Q. Are you aware of any other efforts by the City of Cleveland to identify, investigate or prevent misconduct relating to withholding exculpatory evidence besides what's in the general police order?
MR. MALLAMAD: Objection. You can answer, Chief.
A. No, I am not.
Q. Are you aware of any efforts by the City of Cleveland to identify, investigate or prevent misconduct relating to failure to identify -- or failure to document and preserve information learned during a homicide investigation?
MR. MALLAMAD: Objection. You can answer, Chief.
A. No, not to my knowledge I'm not.
Q. Are you aware of any efforts by the City of Cleveland to identify, investigate or prevent misconduct relating to improper interviews, interrogations or interactions with juvenile witnesses?
MR. MALLAMAD: Objection. You can

answer.
A. No, not to my knowledge.
Q. Are you aware of any audits or other sort of internal reviews conducted of any of the general police orders in the 1970s or '80s to insure that they were, in fact, being followed by officers?
MR. MALLAMAD: Objection. You can answer.
A. No, I'm not aware of any audits.
MR. FUNK: Can we take a break?
MS. WANG: Well, let's go off the record.
\- - - -
(Thereupon, a recess was had.)
\- - - -
BY MS. WANG:
Q. Okay.
A. Can I say something?
Q. Yes.
A. When I was providing my answers regarding efforts, I was under the impression you were looking for documents. So, what I would like to add, if it's okay, is that the efforts that were made were in the form of, you know, supervision. We had complaints that were investigated, and I

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 162 of 248. PageID #: 1480



think some of those are documented in the responsive documents that I reviewed.

So, as far as efforts to identify, investigate or present, any of the following types of misconduct, discipline imposed by the city, I didn't have documentation, but I can tell you the efforts were internally supervision of the supervisors.

And then secondly is, like I said I believe I did see a document in there where a complaint was lodged in writing and that was investigated.

So, if that's a little different from the one-word answer that I gave you, I'd have to say that those were some of the efforts that were made, but as far as having actual documentation of that, we do not.

Q. So, in what way do supervisors make efforts to investigate or prevent improper eyewitness identification procedures?

A. Well, and the way we do it today is still in place is they are responsible for those under their command for review of reports, for review of an oversight of anything that they're doing. If they were conducting an interview, they would view that from a separate room, they would view

that interview. If they were conducting a lineup, a supervisor would have to be there. That's part of our -- that would be part of their internal policy.

So, I think the first-line supervision are the ones that are really charged with the integrity and performance of the officers that they supervise.

Q. So, can you think of anything specifically that any supervisors did in the 1970s -- strike that.

I understand your answer to be directed to what happens today. Is that what you're saying?

A. And from the time I was on the police department, yes.

Q. Okay. So, in the 1970s, what efforts did supervisors make to identify, investigate or prevent improper eyewitness identification?

A. Okay. That is in the specific -- I cannot give you specifics, but it is in the Manual of Rules what their responsibilities are. And their responsibilities are guidance and oversight. To make sure that the rules and regulations and the laws are followed. But specifically I can't tell you what took place in the 1970s.

Q. But specifically did you see any rules or

regulations relating to supervisors investigating, preventing or identifying improper eyewitness identification?
A. Did I see?
Q. Right.
A. In the 1970s?
Q. Did you see any in any of the documents that have been produced?
A. No, I didn't.
Q. Okay. With respect to topic 6B, speaking of, since you brought up supervision, what efforts did supervisors make in the 1970s to identify, investigate or prevent officers from withholding exculpatory evidence?
MR. MALLAMAD: Objection. Asked and answered. To the extent you can expand.
A. Yeah, I would say that their efforts were, as I stated before, the oversight of the officers. And as far as the exculpatory evidence, they would really never have a role in that. All that was done by the prosecutor's office. It was up to those supervisors to insure that everything related to that case was provided to the prosecutor's office.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 165 of 248. PageID #: 1483



Q. The supervisors are not there with investigating detectives during an investigation, correct?
MR. MALLAMAD: Objection. You can answer.
A. No, that's not correct, they are there. For every part of it? No. But they are there for quite a bit of it.
Q. But there are things that an investigating detective would do in an investigation in the absence of a supervisor, right?
A. Yes, there are.
Q. Investigating detectives might interview witnesses, right?
A. Yes.
Q. They might receive tips about information in a case, right?
A. Yes.
Q. A supervisor may or may not be aware of that depending on whether they were there for that, right?
MR. MALLAMAD: Objection. You can answer.
A. Immediately at that time they might not be aware of it, but that's part of the Form 10, Form 1, and the daily debriefing that we talked about

earlier.
Q. So, if the investigating detective decides not to write something down in a Form 1 or a Form 10 or tell their supervisor about something that's going on in a case, how would the supervisor know what was going on?
MR. MALLAMAD: Objection. You can answer.
A. They wouldn't know.
Q. Okay. So a supervisor just depends -- just relies on what the investigating detective decides to tell them --
MR. MALLAMAD: Objection.
Q. -- about an investigation. Is that fair to say?
MR. MALLAMAD: Objection. You can answer.
A. Yes.
Q. And so a supervisor can only insure that an investigating detective turned over everything to the prosecutor if the investigating detective had decided to turn over everything to the supervisor?
MR. MALLAMAD: Objection. You can answer.
A. Correct. And that is the detective's

responsibility to do that.
Q. What efforts do supervisors at the City of Cleveland make to identify, investigate or prevent the failure to document and preserve information learned during a homicide investigation?
MR. MALLAMAD: Objection. Asked and answered. To the extent you can expand, you can answer, Chief.
A. Okay. The efforts would be the same with the supervisors. It's their responsibility to oversee that investigation and insure that things are being done properly and within the law.
Q. And if there was information that was learned by an investigating detective that the supervisor was unaware of, how does the supervisor become apprised of it?
MR. MALLAMAD: Objection.
MR. FUNK: Objection.
MR. MALLAMAD: You can answer.
A. They wouldn't know about it.
Q. What efforts did the supervisors at the City of Cleveland make to identify, investigate, or prevent improper interviews, interrogations, or interactions with juvenile witnesses?

MR. MALLAMAD: Objection. Asked and answered. To the extent you can expand, Chief, you can answer.
A. That would just be the supervisor's responsibility is to provide that oversight and to make sure things are done correctly with the information that they have provided to them.
Q. Today do you have general orders or any other kind of rules or regulations related to juvenile witnesses?
A. Yes.
Q. And what do those rules and orders say generally?
MR. MALLAMAD: Objection. Beyond the scope of the deposition, but go ahead, Chief, you can answer.
A. Generally, that it's a general guidance about how we interact with juveniles when we're either questioning them or just the daily interaction with them, that there has to be an adult with them now. And, you know, we treat them a little bit different than we do adult witnesses and/or suspects.
Q. What is the reason that juvenile witnesses or suspects are treated differently than adults?
MR. MALLAMAD: Objection. You can

answer.
A. The way it is now is that's -- you know, we felt that -- I don't know if there was any one specific incident that led to that, but being that they're underage, you know, we just thought it was best that we had an adult there with them.
Q. Would you ever question a juvenile witness without an adult present?
MR. MALLAMAD: Objection.
A. Yes, we would.
Q. Under what circumstance?
MR. MALLAMAD: Same objection.
A. An interview on the street. If a juvenile came up and engaged us and said, hey, this is what's going on, you know, we would continue that dialog with them. We do it all the time. You know, we interact and interview and speak with juveniles without adults there all the time. If it became part of a, you know, specific investigation, it all depends where that investigation would lead, if we would require a parent.
Q. Now, what if you were going to take a statement from a juvenile regarding something he had witnessed, a crime he had witnessed, is that a situation --

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 170 of 248. PageID #: 1488



MR. FUNK: Objection.
Q. -- where you would have a parent present or an adult present?
MR. MALLAMAD: Same objection in that it exceeds the scope of this deposition. You can answer, Chief.
A. Today we would.
Q. And why?
MR. MALLAMAD: Same objection.
A. It's in our general police orders.
Q. Do you think that's a good idea to do that?
MR. MALLAMAD: Objection.
MR. FUNK: Objection.
MR. MALLAMAD: You can answer, Chief.
A. Do you want my opinion?
Q. Yeah.
A. Yes.
Q. Why?
A. I just think it's a good idea, just like I think Miranda is a good idea and now it's case law. So I think juveniles need to feel comfortable and, you know, be allowed to speak freely.
Q. Was there a requirement that an adult be present for juvenile interviews in the 1970s?

MR. MALLAMAD: Objection. Asked and answered. You can answer.
A. I don't believe there was.
Q. Do you know when the department first adopted a policy that an adult should be present?
A. No, I don't.
Q. Was that the case -- was that rule in place when you first started in 1985?
A. I don't know if it was. I couldn't tell you. I would have to look.
Q. Are you aware of any instance between 1950 and May 19th, 1975 in which the final policy maker for the police department undertook to review or analyze whether there were any problems with any of the policies or procedures in the department?
MR. MALLAMAD: Objection. You can answer, Chief.
A. No, I do not.
Q. Are you aware of any instance between 1950 and May 19th, 1975, in which the final policy maker for the department undertook to review, investigate or determine whether there was misconduct going on with respect to withholding exculpatory evidence?
MR. MALLAMAD: Objection. You can

answer, Chief.

A. No, I do not.

Q. If there had been efforts to systematically review the policies and procedures of the department to insure that they were, in fact, acting effectively to prevent the violation of civilians' constitutional rights, is that something that would be documented by the department?

MR. MALLAMAD: Objection.

MR. FUNK: Objection.

MR. MALLAMAD: It's way beyond the scope of the deposition, but if you know, Chief, you can answer.

A. Yeah. During those times, that time period, I don't know.

Q. Are you aware of any instance between 1950 and May 19th, 1975, in which the final policy maker of the department undertook to review or determine whether there was any misconduct going on with respect to interviews of juvenile witnesses?

MR. MALLAMAD: Objection. Same basis. You can answer.

A. No, I do not know that.

Q. If you turn back to Deposition Exhibit 8.
A. The verification?
Q. Oh, sorry. Seven.
A. That's the other interrogatories.
Q. All right. Interrogatory No. 15 on page 10, it states please identify and describe any and all changes made between 1950 to May 19th, 1975 for the City of Cleveland or Cleveland Police Department's policies, practices and/or training relating to any of the policies, procedures or training identified in Interrogatory numbers 12 through 13 above.
Are there any changes that you're aware of relating to any of the policies, practices or training other than what's reflected in the documents that we discussed today?
MR. MALLAMAD: Objection. Same basis. Asked and answered. You can answer, Chief.
A. No, I'm not aware. No, I do not know.
Q. If you turn to Deposition Exhibit 9, page 4, there's Interrogatory No. 15, which is the supplement to your prior interrogatory answer. And this one states that Defendant, City of Cleveland, states that there were a number of

changes made to its written policies, procedures and training materials from 1950 to 1980. The general police orders that were issued to members of the division of police have been produced.
Is that a true statement?
A. Yes.
Q. And what changes were made to the written policies, procedures and training materials from 1950 to 1980?
MR. MALLAMAD: Objection. That's a pretty broad question and it's been asked and answered throughout this deposition, but if you have additional information, Chief, you can answer.
THE WITNESS: Yeah.
A. No, I don't. I do not know. I don't have any additional information.
Q. So if there's changes that were made to the policies, procedures and training materials from 1950 to 1980 they would be reflected in the documents that have been produced?
MR. FUNK: Objection.
MR. MALLAMAD: Objection.
That's not the testimony, but go ahead, Chief.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 175 of 248. PageID #: 1493



A. Yeah, I'd have to say that, like we said before, there are -- the documents that have been produced are one thing, there may be other documents out there that answer those questions but I don't know where they're located at.
Q. What are those changes? Do you know of any changes to any policies, procedures or training from 1950 to 1980?
MR. MALLAMAD: Objection. Asked and answered. To the extent that you can provide additional information, Chief, go ahead and answer.
A. No, I do not know what those changes were.
Q. So, on the last sentence of Interrogatory No. 15, the supplemental answer, it says upon information and belief, the documents produced are not all the written policies, procedures and training materials that were in existence at this time.
And you said already that there may have existed other things out there, but you don't know what they are. Is that fair to say?
A. Yes, that's fair to say.
Q. Can you identify any of the changes made to any policies, procedures or training between 1950 to 1980?

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 176 of 248. PageID #: 1494



MR. MALLAMAD: Objection. Asked and answered. I'm not sure how many --

MR. GILBERT: Shawn, you're not keeping track of all the questions. That was related to something else. You know, she's asking the same question for policy, supervision, GPOs, this is now training.

MR. MALLAMAD: That was asked and answered, but to the extent you can answer, Chief, go ahead.

A. No, I don't have any information on that. I cannot answer that.

Q. All right. Let's take a look at --

MS. WANG: Mark this as Exhibit 12.

\- - - -

(Thereupon, Plaintiff's Exhibit 12 was marked for purposes of identification.)

\- - - -

Q. All right. Take a look at Deposition Exhibit 12 and let me know if you've seen it before. And I'll say for the record it's CLE 3912 through CLE 3919.

A. Yes, I've seen this before.

Q. Okay. This is a complaint report filed by an

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 177 of 248. PageID #: 1495



attorney named Stanley Tolliver against Detective Terpay, Eugene Terpay; is that fair?
A. Yes, it is.
Q. And on page 2, which is CLE 3913, there is a letter from Stanley Tolliver to Chief of Police Garrity at the time, dated November 25th, 1975. And in it he advises the chief of police that -- and I'll just paraphrase here -- he brought his client to the Police Department. He advised the police that no statements were to be asked of his client unless he was present, and then later that day Detective Terpay called to say that his client had quote, changed his mind, and was willing to give a written statement.
Tolliver then recounts that on consultation with Clayton, the client, I've learned that he had not changed his mind, but was beaten by the police, one of which was Terpay.
Do you see that letter?
A. Yes, I do.
MR. FUNK: Objection.
MS. WANG: What's the objection?
MR. FUNK: It's hearsay. It's multiple hearsays.
Q. The letter states, we are asking that you check

into this matter.
Are you aware of any action that the Police Department took to check into this matter?
MR. MALLAMAD: Objection. You can answer that, Chief.
A. The action that I'm aware of is an investigation by Sergeant Comodeca in response to this complaint.
Q. That's Peter Comodeca?
A. Yes, it is.
Q. And what was the nature of his investigation?
MR. MALLAMAD: Objection. The documents speak for themselves. But if you wish, the chief can review the documents and tell you what they reflect. He can do that. He obviously wasn't part of the investigation.
A. At an overview look at this, this is a standard procedure. Whenever any type of complaint is received, that it's investigated by a supervisory officer. That's still true today. It appears that this letter was provided to the sergeant at the time and he asked him to investigate it. And his results of what he did and exactly how he investigated are in this Form 1 that was

generated by Sergeant Comodeca and signed off on by his captain.
Q. Okay. And the investigation of Sergeant Comodeca was that he interviewed the involved officers; is that correct?
MR. MALLAMAD: Objection. To the extent that you can glean from that 40-year-old document, Chief, go ahead.
A. Yes, correct.
Q. Is there any evidence that Sergeant Comodeca interviewed the complainant, Stanley Tolliver?
MR. MALLAMAD: Objection. Same basis.
A. No, there's not. I do see he interviewed some FBI agents who were speaking to the complainant after the alleged allegation took place, but, no. And I don't see anything where he interviewed Stanley Tolliver.
Q. Is there any evidence that Sergeant Comodeca interviewed George Clayton who was the person that was Stanley Tolliver's client?
MR. MALLAMAD: Objection. Same basis.
A. No.
Q. Is the investigation that Sergeant Comodeca

conducted into this complaint, consistent with the kind of investigation that would be conducted into a complaint like this today?

A. No, it's not consistent.

Q. And how would an investigation into an allegation that police officers had beaten somebody in the police station, how would that be conducted today?

MR. MALLAMAD: Objection. Beyond the scope of the deposition, but you can answer, Chief.

A. Well, it's actually changed dramatically. There are several avenues that one can use to file a complaint of alleged misconduct against an officer. They are assigned police investigators and at different times civilian investigators, which require that statements are obtained. And it's required that photographs are taken. It's required that the interviews are audio taped and transcribed. And every effort is to be made to do a complete impartial investigation. And the complainant is notified of the results of the investigation.

Q. And do you agree with the use of those procedures today in investigating an allegation of

misconduct against a department member?

MR. MALLAMAD: Objection. Beyond the scope. If you have an opinion, you can express it.

A. My opinion is today, yeah, I believe that those are good policies that we have in place.

Q. Would you characterize the investigation that Sergeant Comodeca did into the complaints of Stanley Tolliver concerning his client, George Clayton, a full and complete investigation?

MR. FUNK: Objection.

MR. MALLAMAD: Objection. Beyond the scope. To the extent that this reflects the entirety of the investigation, beyond that, Chief, you can answer if you have an opinion.

A. No. As far as today's standards, it would be a little bit different, but I believe that -- I mean the sergeant did what he thought was appropriate as far as investigating this at the time.

Q. Are you aware of anything that Sergeant Comodeca did in relation to this investigation other than what's reflected in these documents?

MR. MALLAMAD: Objection. Beyond

the scope. If you know, Chief, you can answer.
A. No, I do not know of anything else that he did.
Q. Is there any discipline, that you're aware of, that Detective Terpay -- strike that.
Is there any discipline -- strike that.
Did the Cleveland Police Department issue any discipline to Detective Terpay as a result of this complaint?
MR. MALLAMAD: Objection.
MR. FUNK: Objection.
MR. MALLAMAD: Same basis. Beyond the scope of this deposition. If you know, Chief, you can answer.
A. I do not know if any discipline was given to Officer Terpay.
Q. If there was any discipline that was given to Officer Terpay as a result of this complaint, would you expect that to be reflected in his personnel file?
MR. FUNK: Objection.
MR. MALLAMAD: Objection. Same basis. You can answer, chief.
A. I would, yes.
Q. Who is the final policy maker in the 1970s with

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 183 of 248. PageID #: 1501



respect to discipline of detectives?
A. The chief of police.
Q. Was there any in-service training program in existence in 1975 for the members of the Police Department?
A. I don't know if there was.
Q. Was there anything done by the final policy maker in the 1970s to insure that officers who withheld exculpatory evidence were disciplined?
MR. MALLAMAD: Objection. Asked and answered. Beyond the scope. You can answer if you have a response, Chief.
A. No, I don't have any additional information on that.
Q. Were you able to find any instance of an officer or a detective who was cited or disciplined for engaging in unlawful interrogation tactics in the 1970s?
MR. MALLAMAD: Objection. Same basis. You can answer, Chief.
A. No.
Q. In the 1970s, was there any sort of policy or practice in place for insuring that officers who suppressed evidence and then, you know, subsequently a motion to suppress was granted,

that they were disciplined or retrained in some way?
MR. MALLAMAD: Objection. Asked and answered.
MR. FUNK: Objection.
MR. MALLAMAD: You can answer, Chief.
A. In the 1970s, no, I do not know if there was.
MS. WANG: All right. Okay.
\- - - -
EXAMINATION OF EDWARD TOMBA
BY MR. GILBERT:
Q. Just a few questions and then we'll be done. I won't keep you long. We'll be out of here by 1:30.
A. Okay.
Q. Good afternoon.
A. Good afternoon.
Q. I'll try to be brief.
Deputy Chief, you read the complaint in this case, correct?
A. Yes.
Q. All right. There was a reference, if you recall, to a report that was done, funded by the Cleveland Foundation regarding the Cleveland --

the operation of the Cleveland Police Department. This would have been in 1975. You saw that in the complaint, correct?
A. That reference?
Q. Yes --
A. Yes.
Q. -- that reference.
A. Yes.
Q. Did you through your efforts to review the materials that were requested in this case, come across any reference to that report?
A. No.
Q. Any of the visits to the Cleveland Police Museum or any other repository of a document?
A. No, I did not.
Q. Okay. Do you have any knowledge as to whether any of the criticism or recommendations in that report were followed up by the Cleveland Police Department during the period of 1975 and thereafter?
MR. MALLAMAD: Objection. You can answer, Chief.
A. No, I do not, no.
Q. Have you ever read that report?
A. No, sir, I have not.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 186 of 248. PageID #: 1504



MR. MALLAMAD: I'm sorry, for the record, what's the name of the report?

MR. GILBERT: The name of the report is -- thank you -- for Private Sector Assistance to the Cleveland Police Department, authored by John Maddox and Mark Furstenberg.

MS. WANG: And produced by the city in this case.

BY MR. GILBERT:

Q. So, your answer is that you have not seen it, correct?

A. That's correct. I have not seen that report.

Q. And you have not seen any written indication that any response or follow-up was done by the Cleveland Police Department?

MR. MALLAMAD: Objection. You can answer, Chief.

A. That's correct, I'm not aware of that.

Q. Are you aware of a document called the 1974 report by the mayor's crime commission concerning police corruption and criminal conduct in 1974?

A. No, I'm not aware of that.

Q. Okay. You saw this in the lawsuit complaint, did you not?

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 187 of 248. PageID #: 1505



A. I did, yes.
Q. Well, there was an appendix to that which was a 1966 study by public administrations service on the Cleveland Police Department. Were you aware of that?
A. Just by reading that document.
Q. Are you aware of a study that was actually conducted by the Cleveland Police Department itself called the Cleveland Police Department 1970 to 1980?
MR. MALLAMAD: Objection. Beyond the scope. You can answer, Chief.
A. No, I'm not aware of that document.
MR. GILBERT: Okay. Well, there's references there I believe that relate to training, guidance, supervision and things like that. So, I think it's within the scope, but if he doesn't know about it, he doesn't know about.
A. I don't, I'm not aware of that.
Q. Okay. Earlier in the deposition you mentioned some reference to diversity training that I believe you said it has existed since you came on the department, but you didn't believe it was in existence prior to your getting on the

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 188 of 248. PageID #: 1506



department. Do you remember that?
A. Yes, I did.
Q. Did I state your testimony correctly?
A. Yes, you did.
Q. Okay. Now, in addition to diversity training, were you aware of actual problems between minorities and white officers within the department before you came on the job in the 1980s?
MR. MALLAMAD: Objection. Beyond the scope. You can answer, Chief, to the extent that you have knowledge of that.
A. Yeah, no, I had no knowledge of that.
Q. Were you aware of any kinds of cartoons, lynching pictures, derogatory, racially negative postings in various districts of the Cleveland Police Department?
MR. MALLAMAD: For what period of time?
Q. When you came on the force in the '80s.
MR. MALLAMAD: Objection. Beyond the scope of this deposition. You can answer, Chief.
A. Yeah. No, I never saw anything like that in the Sixth District.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 189 of 248. PageID #: 1507



Q. Okay. But in the department in general?
A. No.
MR. MALLAMAD: Same objection.
A. No.
Q. Have you heard about these kinds of things going on in the Cleveland Police Department?
MR. MALLAMAD: For what period of time, Terry? In his career?
MR. GILBERT: Anytime. Anytime.
MR. MALLAMAD: Objection. Beyond the scope of this deposition. To the extent that you can answer, Chief, go ahead.
A. Yes, I have heard of those things.
Q. And tell me about that.
A. I heard that there were some derogatory things that were posted in different city buildings that were investigated by members of the division of police and other people, but never saw anything, never had any dealing with any of that during my tenure within the police division.
Q. Was this during the term of Mayor White, if you know?
A. I don't know when it was.
Q. Okay. Now, were you aware of a lawsuit regarding

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 190 of 248. PageID #: 1508



discriminatory hiring practices in federal court that was ongoing from 1977 into the period where you were on the department? Were you aware of this?

MR. MALLAMAD: Objection. Beyond the scope of this deposition. If you have knowledge, Chief, go ahead.

A. Yes, I was aware of that.

Q. And what were you aware that that -- generally speaking, what that lawsuit was about?

MR. MALLAMAD: Same objection.

A. In general -- in general terms, it was about the hiring practices of the division of police and the promotional practices of the division of police. I wasn't involved in that as far as being hired or promoted, so I really -- I didn't pay a whole lot of attention to it.

Q. Were you aware that the City of Cleveland was under some kind of court order regarding the practices?

MR. MALLAMAD: Same objection. You can answer to the extent you have knowledge.

A. Right. No, I don't believe -- no, I don't have any knowledge of a court order.

Q. Did you come across, in your search for documents, any kind of documents, any kind of letters or references or memos, regarding reform efforts in the Cleveland Police Department during the period of our case, from 1950 to 1980?

MR. MALLAMAD: Objection.

MR. FUNK: Objection.

MR. MALLAMAD: You can answer, Chief.

A. And just to be clear, I didn't perform any searches. You know, the officers, retired officers did, and the answer to that is, no, I did not.

Q. So, specifically do you know -- did you know if there was any effort on the part of the people that were doing actually the search for documents, did you ask them to look for any kind of internal documents that refer to any kind of reform efforts?

MR. MALLAMAD: Objection.

MR. FUNK: Objection.

MR. MALLAMAD: You can answer to the extent you can.

A. No, I did not.

Q. Are you aware of any kind of document, any

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 192 of 248. PageID #: 1510



documents or memos or letters that refer to reform efforts in the Cleveland Police Department between 1950 and 1980?

MR. MALLAMAD: Objection. You can answer.

A. No, I'm not aware of any.

MR. GILBERT: I have no further questions.

MR. MALLAMAD: The chief would like to read his deposition.

MS. WANG: Oh, I have a couple follow-ups from what Terry asked. Sorry.

MR. MALLAMAD: Go ahead.

MS. WANG: Since he mentioned some documents, I have more.

\- - - -

(Thereupon, Plaintiff's Exhibit 13 was marked for purposes of identification.)

\- - - -

RE-EXAMINATION OF EDWARD TOMBA

BY MS. WANG:

Q. All right. So, the court reporter has handed you what's been marked as Deposition Exhibit 13. And it's titled Private Sector Assistance to the Cleveland Police Department. And that is the

version produced by the city in this case, although unfortunately the little Bates numbers in the bottom got cut off.

So, I'll let you take a look at that and then my question is just -- my first question is just: Have you seen that before?

MR. FUNK: Do you know what the Bates numbers are?

MS. WANG: Yes. CLE 977 through 1026. Also produced in this case is Jackson 4905 to 4957.

A. No, I have not reviewed this document previous 'til today.

Q. Okay. So on page -- there's a little roman numeral --

A. Right.

Q. -- page 7 of the little roman numerals --

A. Okay.

Q. -- so under the training section, No. 2 there, it says a California based consultant group has been engaged by the city to develop a department in-service training program that's separate and as a result to given rise to concern within the department.

Do you know what this -- what this California

based consultant group was?
A. No, I do not.
Q. Do you know if there's any records kept by the city or the Police Department about the consulting group?
A. No, I don't know if there are any records.
Q. Okay. And so is it your understanding that the department did not have any in-service training programs at the time of this report in 1975?
MR. MALLAMAD: Objection. Asked and answered.
A. Yeah, I believe I did answer that before and I was not sure if there was in-service the way we run it today, an annual in-service training.
Q. If this report indicates that there was not an in-service training program and they were as of September 1975 developing one, do you have any information to dispute that?
MR. MALLAMAD: Objection.
A. No, I don't.
MR. MALLAMAD: You can answer.
A. No, I do not.
Q. Does the Cleveland Police Department do anything with the Cleveland Foundation these days?
MR. MALLAMAD: Objection. Beyond

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 195 of 248. PageID #: 1513



the scope. You can answer, Chief.
A. Yes, we do.
Q. Okay. And today what does the Cleveland Foundation do for the Police Department?
MR. MALLAMAD: Same objection.
A. The Cleveland Foundation, they do numerous things. They're a wonderful community partner for us. At times we've gone to them and asked them for funding for certain projects that they've provided us. They sit on some of our boards, including our police foundation. So specifically what they funded -- they are a source of funding for us. So, exactly what they funded specifically, you know, I really couldn't tell you, but I've been involved with numerous representatives from that foundation and they're just a great civic asset to the city and to the division of police.
Q. Okay. And just going back to the foreword at the very beginning of this document, it says in May of 1975 the Cleveland Foundation asked a number of lawyers, businessmen, civic leaders, to serve on a special committee of citizens concerned about criminal justice, which would recommend ways private funds could best be used to help

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 196 of 248. PageID #: 1514



improve local criminal -- the local criminal justice system. This is one of five staff reports made to the committee.

Is that characterization, is that familiar to you in terms of the role that the Cleveland Foundation plays today with respect to the Cleveland Police Department?

MR. MALLAMAD: Objection. Beyond the scope. You can answer, Chief.

A. You know, I really don't know. I mean, I can -- like I said before, my experience with them, but exactly how their organization is set up and what they do, I really can't comment on that, I don't know.

Q. Okay. So going back to inside the document, the page that's roman numeral six, the little ones -- not roman but --

A. Uh-huh.

Q. -- the little numbers.

MR. MALLAMAD: I'm sorry, roman numeral six or the number six?

MS. WANG: Is that roman numerals?

MR. FUNK: They're all roman numerals.

MS. WANG: Oh, those are roman

numerals. The other ones are arabic numerals. Okay.
A. Right, I got it.
Q. The bottom it says "project recommendations"?
A. Correct.
Q. Each of these recommended projects arose from our discussions with one or more Cleveland police officials or officers?
A. Right.
Q. Then it says the police manual project has been formally requested by the chief. And it says one, police manual, the Cleveland Police Manual is out of date in light of new standards. The modern police manual is drafted pursuant to these standard to create departmental uniformity. Provide guidance to officers in complex situations and instill public confidence and protect conforming officers from civil liability. The Cleveland Police Department is currently rewriting its manual.
    Do you know anything about the effort to rewrite the manual during this time period of September 1975?
A. No, I do not.
Q. Okay. And is it your understanding that the

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 198 of 248. PageID #: 1516



manual -- as of the publishing of this document which is September of 1975 -- the manual was in the process of being rewritten, but that had not yet been completed?
MR. MALLAMAD: Objection. Beyond the scope. Assuming you have knowledge, Chief, go ahead.
A. Right. By reading this I would say that is correct.
Q. Okay. And you have no information to contest that?
A. No.
MR. MALLAMAD: Same objection.
A. No, I do not.
Q. Okay. Now -- by the way, are there annual reports of the Cleveland Police Department put out in the 1970s?
MR. MALLAMAD: Objection. Beyond the scope, but you can answer.
A. I don't know if there were annual reports.
Q. Today are there annual reports?
MR. MALLAMAD: Same objection.
A. Yes.
Q. And what do the annual reports cover generally today?

MR. MALLAMAD: Same objection.
A. They cover, obviously, crime statistics. Budgetary expenditures. Programs that we implemented within the division of police. I mean, just -- I would have to say a broad review or overview of what took place during our last 12 months of the division, in the division of police.
Q. On page 11 the arabic numerals.
A. Regular page 11?
Q. Regular page 11.
A. Okay. Got it.
Q. The second full paragraph says the lack of non-salaried funds to be used as the discretion of the department is evidenced by one, the absence of ongoing in-service training for all officers.
Do you see that sentence?
A. Yes, I do.
Q. Do you have any information to dispute that there was no ongoing in-service training for all officers?
MR. MALLAMAD: Objection.
A. No, I --
MR. MALLAMAD: Beyond the scope.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 200 of 248. PageID #: 1518



To the extent you have personal knowledge, Chief, you can answer.
A. No, I do not.
Q. Well, you've been designated by the city to testify about all training that existed in the 1970s; is that right?
A. Yes, I have been.
Q. All right. Your answers are in the capacity as the person who was designated by the city to testify about the training that did or did not exist in 1970 to 1980 --
MR. MALLAMAD: Objection.
Q. -- is that true?
MR. MALLAMAD: Based on the records that were available and have been located. This gentleman is not a member of the Police Department in the 1970s.
A. Yes.
MS. GILBERT: Then we need somebody, right?
MR. MALLAMAD: Good luck.
A. Yes, that's correct and I fully understand that.
Q. All right. And if there were some other training that the City of Cleveland provided, you don't know what that is?

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 201 of 248. PageID #: 1519



MR. MALLAMAD: Objection. Same basis. You can answer.
A. Right. That is correct. I am unaware of that.
Q. All right. Turning to page 25 -- actually go to 24, which is the page before.
A. Okay.
Q. So, on page 24 the Cleveland Foundation here is giving project recommendations. And at the bottom it says "police manual". Now, turn to page 25.
A. Okay.
MR. MALLAMAD: There's not a question yet, Chief, so I'm going to object to the beginning of that statement, but go ahead.
Q. The Cleveland -- on page 25 it says the Cleveland Police Manual rules of conduct was promulgated in 1950 and like the manuals of many departments is out of date in light of these new standards.
Actually, let me read the sentence before. So from the bottom of 24 to 25 it says, 1, police manual, the importance of police policy has been recognized widely during the past few years culminating in recommended national standards for implementing police policy.

And then in a footnote it cites to ABA standards and MAC standards dating to 1973.

Then it says the Cleveland Police Manual rules of conduct and discipline was promulgated in 1950 and like the manuals of many departments is out of date in light of these new standards.

Do you have any information to dispute that there were, in fact, national standards for implementing police policy that existed at the time?

MR. MALLAMAD: Objection --

MR. FUNK: Objection.

MR. MALLAMAD: -- to form, as to the scope of the deposition. To the extent you have personal knowledge, Chief, you can answer.

A. No, I do not have knowledge of that.

Q. Okay. Do you have any information, one way or another, with respect to -- sorry, strike that.

Do you have any information to contest that the Cleveland Police Manual that was promulgated in 1950 was still in existence and in effect in September of 1975?

MR. MALLAMAD: Same objection.

You can answer, Chief.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 203 of 248. PageID #: 1521



A. No, I don't have any information if it was the same manual.
Q. On page 27 on the training, it says presently there is little formal training going on in the department and there's little reason to believe that the department can make a major investment in training; however much importance it may attach to training.
Do you have any information to dispute that there was little formal training going on in the department at the time?
MR. MALLAMAD: Objection. Beyond the scope. Beyond this mans' personal knowledge, but to the extent you know, Chief, you may answer.
A. No, I do not know.
- - - -
(Thereupon, Plaintiff's Exhibit 14 was marked for purposes of identification.)
- - - -
Q. So, the court reporter has handed to you what has been marked as Deposition Exhibit 14. It is Bates Stamped Jackson 4756 through 4904. And for the record it was also produced by the city as CLE 1105 through 1252.

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 204 of 248. PageID #: 1522



Have you ever see that document before?
MR. MALLAMAD: This one appears to be blank.
MS. WANG: Oh, what happened to my --
A. Here we go -- well -- here, these are all blank.
- - - -
(Off the record.)
- - - -
BY MS. WANG:
Q. So, if you would just turn to -- oh, have you seen that document?
A. Yes.
Q. Okay. And did you review it in the context of preparing for your deposition today?
A. I reviewed parts of it, yes.
Q. Okay. If you turn to the first little tab there, that Jackson 4762, there's a highlighted sentence there that states departmental procedures and rules have not been revised in nearly one quarter of a century despite the overwhelming changes in society and the police functions which have taken place in that time.
Are you aware of any information to disagree with that statement?

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 205 of 248. PageID #: 1523



MR. MALLAMAD: Objection. Form. Beyond the scope of the deposition. To the extent you have any personal knowledge, Chief, you can answer.
A. No, I have no knowledge if that's true.
Q. Okay. And this is a preliminary report of the mayor's crime commission created March 16th, 1974 with recommendations, and then there's another date, June 6th, 1974, right?
A. Yes, there is.
Q. So actually this is a document that was commissioned by the mayor itself concerning the Cleveland Police Department and issues concerning police corruption that were taking place in the Police Department at the time. Is that fair to say?
MR. MALLAMAD: Objection. Beyond the scope. To the extent you have personal knowledge of the reason this was created, Chief, you can answer.
A. I don't know the reason why it was created.
Q. Okay. Do you have any information to dispute the fact that the Cleveland Crime Commission was commissioned by the mayor of Cleveland at the time?

MR. MALLAMAD: Objection. Same basis.

A. Yeah, I have no -- nothing to dispute that.

Q. Okay. So, if you turn to the page that is Bates Stamped Jackson 4843, it is labeled appendix item F and it is a memo from Mayor Ralph Perk to James Carney, Director of Safety, and Gerald Rademaker, Chief of Police, it's dated October 5th, 1972. Do you see that?

A. Yes, I do.

Q. Now, on page 6 of the memo, which is Bates Stamped Jackson, 4848, it says at the bottom, immediate steps should also be undertaken for a complete revision of the rules of conduct and discipline written in 1950 for members of the Cleveland Police Department so that it is consistent with the requirements and conditions that exist today in 1972.

Do you see that?

A. Yes, I do.

Q. Are you aware of whether or not the Mayor, Ralph Perk, issued a memo to the chief of police and the director of public safety in 1972 telling the Police Department that they needed to revise their 1950 police manual?

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 207 of 248. PageID #: 1525



MR. MALLAMAD: Objection. Beyond the scope. To the extent you have personal knowledge of that, you can answer, Chief.

A. No, I don't -- no, I do not have any personal knowledge of that.

Q. Okay. Are you aware of whether or not the Cleveland Police Manual was revised at any time between 1972 and 1975?

MR. MALLAMAD: Objection. Same basis. You can answer.

A. No, I did not.

MS. WANG: I have no further questions.

MR. MALLAMAD: The chief would like to read. Thank you.

SIGNATURE OF DEPONENT

I, the undersigned, EDWARD TOMBA, do hereby certify that I have read the foregoing deposition and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

PAGE LINE CHANGE REASON

___________________
EDWARD TOMBA

C E R T I F I C A T E

The State of Ohio, ) SS:
County of Cuyahoga.)

I, Brian A. Kuebler, a Notary Public within and for the State of Ohio, authorized to administer oaths and to take and certify depositions, do hereby certify that the above-named witness was by me, before the giving of their deposition, first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the deposition as above-set forth was reduced to writing by me by means of stenotypy, and was later transcribed by computer-aided technology under my direction; that this is a true record of the testimony given by the witness; that said deposition was taken at the aforementioned time, date and place, pursuant to notice or stipulations of counsel; that I am not a relative or employee or attorney of any of the parties, or a relative or employee of such attorney or financially interested in this action; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I have hereunto set my hand and seal of office, at Cleveland, Ohio, this ____ day of ____________, A.D. 20 ___.

______________________________________________
Brian A. Kuebler, Notary Public, State of Ohio
55 Public Square, Suite 1332
Cleveland, Ohio 44113
My commission expires June 12, 2017

Reference No.: 355660

Case: JACKSON vs CITY OF CLEVELAND

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

_____________________________

Edward Tomba

NOTARIZATION OF CHANGES

(If Required)

Subscribed and sworn to on the ______ day of

____________________________, 20____ before me,

(Notary Sign)__________________________________

(Print Name) Notary Public,

in and for the State of ______________________

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 211 of 248. PageID #: 1529



Reference No.: 355660
Case: JACKSON vs CITY OF CLEVELAND

Page No._____Line No._____Change to:______________
________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:___________
Edward Tomba

Reference No.: 355660
Case: JACKSON vs CITY OF CLEVELAND

Page No._____Line No._____Change to:_______________
___________________________________________________
Reason for change:__________________________________
Page No._____Line No._____Change to:_______________
___________________________________________________
Reason for change:__________________________________
Page No._____Line No._____Change to:_______________
___________________________________________________
Reason for change:__________________________________
Page No._____Line No._____Change to:_______________
___________________________________________________
Reason for change:__________________________________
Page No._____Line No._____Change to:_______________
___________________________________________________
Reason for change:__________________________________
Page No._____Line No._____Change to:_______________
___________________________________________________
Reason for change:__________________________________
Page No._____Line No._____Change to:_______________
___________________________________________________
Reason for change:__________________________________

SIGNATURE:_________________________DATE:____________
Edward Tomba

## A


**aba** 202:1
**ability** 85:25 100:8 113:11,13
**able** 67:7 122:2 123:17 183:15
**abovenamed** 209:9
**aboveset** 209:10
**absence** 54:8 165:10 199:16
**absolutely** 139:25
**abuse** 9:18 28:22
**academy** 5:10 6:13,14 40:4,5,6 56:17 103:14 104:1,4 104:12,21,24 105:16 118:16 140:24 142:2 150:8,17 153:1 154:1,5
**accelerating** 83:22
**accounting** 58:7
**accuracy** 76:7
**accurate** 76:13 119:4 148:24 208:5
**acknowledge...** 120:17 121:5
**acted** 133:12,21 134:10
**acting** 172:6
**action** 7:23 42:24 71:10,11,19 72:4 178:2,6 209:16
**activities** 41:8
**actual** 76:16 146:10 162:15 188:6
**add** 161:23
**added** 130:14
**addendums** 113:22
**addition** 188:5
**additional** 72:16 80:13 114:9 155:19 174:13,17 175:11 183:13
**address** 89:21
**administer** 209:8
**administration** 130:21
**administrations** 187:3
**administrative** 56:15
**adopted** 98:9 100:15 171:4
**adult** 168:19,21 169:6 169:8 170:3,24 171:5
**adults** 168:24 169:18
**advise** 46:16
**advised** 177:9
**advises** 177:7
**affairs** 7:11,25 8:6,10
**affect** 47:9
**affiliated** 209:16
**aforementioned** 209:13
**afternoon** 20:4 49:4 184:17,18
**age** 4:1
**agents** 99:17,18,21 179:15
**ago** 5:14,15
**agree** 88:15,18,18 180:24
**ahead** 42:21,22 56:21 81:5,6 85:23 91:9 101:17 107:14 109:4 123:11 135:14 158:24 168:14 174:25 175:12 176:10 179:8 189:13 190:7 192:13 198:7 201:15
**ahold** 74:24
**airport** 5:1
**ajamu** 1:8 2:14 5:22
**akron** 2:17
**al** 1:6,8,11
**allegation** 42:11 179:16 180:5,25
**allegations** 7:12 21:16
**alleged** 21:9,10 42:15 179:16 180:14
**allencompassi...** 88:3
**allow** 6:5
**allowed** 60:6,9 170:23
**amended** 11:6 117:16 123:7 129:15 130:7 132:9,10
**amendment** 94:9,17 116:9
**amendments** 41:1 94:19,22 119:10 130:1
**amount** 148:15
**analysis** 86:1
**analyze** 171:14
**andress** 2:16
**annual** 194:14 198:15 198:20,21,24
**annually** 40:20,21
**answer** 6:6 48:20 52:17 68:3 84:24 85:12,23,25 86:14,15,19 89:17 91:11 100:8 101:14 101:17,23,24 105:18,21 108:6,6,11,12 108:24 109:2,3 109:16 110:5 110:17 111:4 113:11 115:7 117:12 122:23 123:1,22 124:19 129:20 132:9 133:25 134:1,25 136:23 137:17 137:20 138:10 139:6 141:8,24 142:12,23,24 143:8,19 145:2 145:14 156:14 158:1,18 159:7 159:17,25 160:10,18 161:1,8 162:13 163:11 165:4 165:22 166:8 166:16,24 167:9,20 168:3 168:15 169:1 170:6,14 171:2 171:17 172:1 172:14,24 173:19,23 174:14 175:4 175:12,15 176:9,12 178:5 180:11 181:15 182:2,14,23 183:12,20 184:6 185:22 186:11,18 187:12 188:11 188:23 189:12 190:22 191:8 191:12,22 192:5 194:12 194:21 195:1 196:9 198:19 200:2 201:2 202:16,25 203:15 205:4 205:20 207:3 207:10
**answered** 7:18 8:8,9 57:20 91:9 92:20 105:21 108:21 108:25 109:16 110:5,17 111:4 133:1 137:19 141:24 142:12 142:23 143:8 143:19 164:16 167:8 168:2 171:2 173:18 174:12 175:10 176:2,9 183:11 184:4 194:11

**answering** 20:11
**answers** 24:1 65:7,8 133:2 136:7 139:2 161:20 200:8
**anybody** 21:20 22:23 65:1
**anytime** 189:9,9
**appearances** 2:1
**appeared** 129:23
**appears** 64:5 69:1 80:2 94:16,19 97:9 97:14 100:10 112:10,12 119:13 148:21 149:22 178:21 204:2
**appendix** 187:2 206:5
**application** 98:22 101:11 118:11
**appoint** 67:5
**appointed** 5:6 9:12 10:19 33:14 66:10
**apprise** 52:12
**apprised** 51:11,17 167:17
**appropriate** 66:5 181:20
**approval** 65:1,19
**approximate** 134:23
**approximately** 97:25 112:12
**april** 115:12 116:8
**arabic** 197:1 199:9
**area** 47:7,8 131:15,15 131:17
**areas** 16:19 23:21 135:11 137:1 140:19
**arent** 52:6
**arose** 197:6
**arrest** 82:21
**article** 78:2
**ashley** 10:12
**asked** 20:23 49:22 91:8 92:20 105:20 108:5 108:20 109:15 110:4,16 119:23 121:13 137:18 141:23 142:11,22 143:7,18 164:15 167:7 168:1 171:1 173:18 174:11 175:9 176:1,8 177:10 178:23 183:10 184:3 192:12 194:10 195:8,21
**asking** 5:24 6:5 156:18 156:22,25 157:6 158:15 176:6 177:25
**asks** 156:1
**assert** 124:16
**assessment** 83:18
**asset** 195:17
**assigned** 6:16,17,24 8:23 47:24 48:2,5,7 50:25 118:13 180:15
**assignment** 55:15 56:1 59:19 103:4 106:12,14 118:12
**assist** 106:2
**assistance** 186:5 192:24
**association** 145:25
**assume** 34:24,25 64:18 65:10,16 72:12 74:2 84:18 88:8 149:17
**assumed** 43:8
**assuming** 87:20 198:6
**assumption** 64:23 88:6
**attach** 203:8
**attached** 69:3
**attend** 116:22 121:13
**attendance** 153:3,5,25 154:4
**attended** 104:3,12 149:8 152:7 154:14
**attention** 190:17
**attested** 122:20
**attesting** 123:14
**attorney** 21:15 78:3 97:10,18 98:9 98:23 99:17 105:7 145:22 177:1 209:14 209:15
**attorneys** 13:6 15:6 17:22 85:11 96:21 97:1 110:1 125:18
**audio** 180:19
**audits** 161:3,9
**august** 95:2
**authored** 186:6
**authority** 18:8 65:11 66:4 66:23 94:12
**authorize** 99:14
**authorized** 209:7
**auto** 8:16
**available** 44:13 142:8 200:15
**avenue** 2:21
**avenues** 180:13
**avoid** 157:17
**awarded** 148:11
**aware** 21:10,16 75:21 80:12 90:17 94:24 99:10 103:24 128:14 128:18,22 129:1,5 135:3 135:22 138:12 141:18 159:8 160:4,12,20 161:3,9 165:18 165:23 171:11 171:19 172:17 173:13,20 178:2,6 181:22 182:4 186:19 186:20,23 187:4,7,13,20 188:6,14 189:25 190:3,8 190:9,18 191:25 192:6 204:24 206:21 207:6

**B**

**b** 11:6 12:19 14:14 55:19 85:24 90:3
**ba** 10:7
**bachelors** 10:8
**back** 22:10 30:2,7 31:4 34:18 43:21 54:1,9 62:11 70:5 71:21 82:24 89:9 90:18 116:17,24 117:10 142:14 156:15 173:1 195:19 196:15
**background** 93:12
**badge** 39:5,6,7
**based** 44:23 51:22 52:6 84:15 193:20 194:1 200:14
**basic** 6:17 88:20,21
**basically** 54:7 59:15 83:24 153:1
**basis** 52:20 77:22 138:4 172:24 173:18 179:13 179:23 182:12

182:23 183:20 201:2 206:2 207:10
**bates**
36:18 41:4 44:5 63:16 67:20 69:15 76:18 82:20 93:9 97:22 111:13 126:2,20 144:7 146:20 193:2,8 203:23 206:4 206:11
**beat**
59:2
**beaten**
177:17 180:6
**beginning**
5:4 147:8 195:20 201:14
**behalf**
1:20 2:5,14,19 2:24 11:18 14:1 16:2 18:7 139:3
**belief**
87:11 136:23 137:9 138:5 139:8,11,23 175:16
**believe**
18:22 24:12,14 31:3 34:22 35:18,21,21 37:18,22 38:23 45:14 60:12,12 63:17 66:24 71:3 77:8 81:21 89:8 90:5 91:23,24 100:20 104:16 104:17,17 105:23 107:2 108:22 111:21 129:21 138:2 141:25 144:20 146:11 158:2 162:9 171:3 181:5,18
187:15,23,24 190:24 194:12 203:5
**best**
20:25 66:24 85:25 100:8 113:11,12 117:5 146:12 146:13 169:6 195:25
**beyond**
122:21 133:25 168:13 172:12 180:9 181:2,12 181:15,25 182:12 183:11 187:11 188:10 188:21 189:10 190:5 194:25 196:8 198:5,18 199:25 203:12 203:13 205:2 205:17 207:1
**binder**
39:17
**binding**
11:17 13:25 16:1,10 17:1,7 18:7
**bit**
56:15 105:10 116:24 131:3 140:22 165:7 168:21 181:18
**blank**
204:3,6
**board**
152:1
**boards**
195:11
**bomb**
9:20
**book**
58:20,23 59:1,4 59:7,10 60:13 60:19 61:11 62:5,7 77:6 79:20 93:14 121:11,15,22
124:10
**books**
59:13 60:11,24 61:5,7 130:16
**boss**
59:9
**bottom**
38:14 41:4 69:20 115:13 150:7 193:3 197:4 201:9,21 206:12
**boulder**
2:3
**bound**
76:22 78:21
**boyko**
1:4,10
**brady**
17:18 85:16 86:8,18 87:3 159:12
**breaery**
112:3,3,22
**break**
6:9 63:3 127:1 157:10 161:10
**brian**
1:15 209:7,21
**bridgeman**
2:14 5:22
**brief**
55:18 184:19
**bring**
121:14
**broad**
25:19 26:2 28:24 55:22 130:20 174:11 199:5
**broadway**
2:3
**broke**
61:17
**broken**
75:2
**brought**
44:10 164:11 177:8
**budgetary**
199:3
**building**
45:13 115:10,14
**buildings**
189:17
**built**
45:14
**bulletin**
116:9,18 117:6
**bulletins**
116:11,12,15 117:2
**bunch**
135:10
**bureau**
4:19,20,20 7:11 8:24 9:12 106:18,19
**bureaus**
9:17 33:24
**business**
8:13,16 46:17,19 46:22,24 75:1
**businessmen**
195:22
**busy**
74:20

**C**

**c**
2:7 12:23 55:19 90:3 112:3 209:3,3
**california**
193:20,25
**call**
20:13,13,14,24 32:17 59:14 73:23,25 74:20 75:8 103:20 121:13
**called**
4:1 20:14 30:10 44:25 71:22 74:15 147:21 177:12 186:20 187:9
**calls**
7:18 57:21 86:1
121:13
**cant**
34:18 40:12 86:19 87:19 115:7 163:23 196:13
**capacity**
200:8
**captain**
179:2
**car**
7:15 47:21 121:23
**card**
118:12
**career**
189:8
**carney**
206:7
**carry**
61:20,21
**cartoons**
188:14
**case**
1:5,10 5:20 16:13,22 19:18 21:9,12,16 23:4 34:2 44:16 45:19,22 48:2,6,12,15 49:18 50:7,21 51:1,1,8,14,18 52:19,20,21,23 53:25 55:9,22 57:4,6 60:15 61:8 62:9 65:7 85:16 97:5 98:5 99:19 102:11 127:8 129:25 134:10 135:4 145:6 147:4 148:3 149:12 155:11 155:18 164:24 165:16 166:5 170:21 171:7 184:21 185:10 186:9 191:5 193:1,10

**cases**
28:4 49:12 53:6 77:25 96:22 97:3 122:13
**categories**
104:25 130:21
**cause**
1:21 41:8 42:14 44:9
**center**
76:6
**central**
74:15
**century**
204:21
**certain**
42:24 49:18 122:24 138:14 148:15 153:2 195:9
**certainty**
34:18
**certificate**
147:9,14 148:6 148:12,14,14 148:22 149:1,2 149:6,9 150:23 151:2,5,7,15 151:18,23 152:6,10 154:24
**certificates**
141:10,14 147:2 155:20
**certification**
146:2
**certified**
4:4 146:1 147:17,20
**certifies**
151:24
**certify**
147:12 148:9 208:3 209:8,8
**cfc**
153:11
**chain**
65:5
**chance**
68:7 69:12
**change**
23:7 40:17 208:7
**changed**
46:12 66:8 102:8 130:25 131:1,2 177:13 177:17 180:12
**changes**
23:15 40:8 119:10 173:7 173:13 174:1,7 174:18 175:6,7 175:13,23 204:21
**characterization**
196:4
**characterize**
181:7
**charge**
44:8 54:18 114:14,15
**charged**
50:5 163:6
**charter**
24:15 66:2
**check**
177:25 178:3
**chief**
4:13 8:9 10:1 12:12 22:12,18 22:19 23:1,2 23:15,17,25 24:13 25:4,5,6 25:7 29:25 33:20 40:16,23 41:5,6,16 42:14 44:20 45:25 46:5 54:6 64:24 65:7,15,23,24 66:7,10,10,18 66:20,22 67:3 67:6,23 85:23 86:23 87:17 89:18 90:2,4 93:18 107:15 108:6 109:4,16 110:17 111:4 123:21 124:3 124:20 127:6 129:9 133:25 134:4 140:11 142:12,23 143:8,19 158:14 160:10 160:18 167:9 168:3,15 170:6 170:15 171:17 172:1,14 173:19 174:14 174:25 175:11 176:10 177:5,7 178:5,14 179:8 180:11 181:15 182:1,14,23 183:2,12,20 184:7,20 185:22 186:18 187:12 188:11 188:23 189:12 190:7 191:9 192:9 195:1 196:9 197:11 198:7 200:2 201:13 202:15 202:25 203:15 205:4,20 206:8 206:22 207:3 207:14
**chiefs**
10:25 120:25
**child**
9:18 28:22
**chronological**
76:24 112:11
**circumstance**
169:11
**circumstances**
44:18 46:3 98:21
**cited**
92:20 109:18 183:16
**cites**
202:1
**citizens**
66:25 195:23
**city**
1:6,11 2:21,22 2:24 5:19,21 5:22 6:19 9:17 11:7,13,17 13:24 16:2,9 16:20,25 17:6 17:8,11 18:6,9 18:19 24:2,15 36:18 39:10 42:5,8,18 44:17 45:1 65:12 66:11 69:17 84:11 85:15 88:2 113:25 117:20 123:13 132:8 132:11 133:10 133:13,22 135:5,8,20 136:6,22,24 137:4 139:4 140:16 142:16 143:3,11 156:2 156:4,10 157:1 157:10 158:3 158:19 159:2 159:10 160:4 160:12,20 162:6 167:2,22 173:8,24 186:9 189:17 190:18 193:1,21 194:4 195:17 200:4,9 200:24 203:24
**citys**
11:18,20 14:1,1 16:11 17:3 34:6 133:18 135:2
**civic**
195:17,22
**civil**
4:3 197:18 209:17
**civilian**
180:16
**civilians**
172:7
**classified**
130:20,23
**clayton**
177:16 179:20 181:10
**cle**
36:18,19 37:4 41:4 44:6 46:14 67:20,22 69:16 76:18 97:23 111:13 115:9 117:24 119:1,20,25 120:15 124:14 125:1,19 126:2 126:12,20 144:7 146:21 149:22 150:22 151:6,14 152:18 153:23 176:22,22 177:4 193:9 203:25
**clear**
6:4,7 20:18 22:15 124:5 156:22 158:12 158:14,17 159:25 191:10
**cleveland**
1:6,11,18 2:8,12 2:21,22,24 4:12 5:1,7,20 5:21,23 10:4,9 10:14,15 11:7 11:17 13:18,19 15:20,20 16:2 16:9,19,20,25 17:2,6,8 18:6,9 18:20 21:21 22:1 24:2,15 26:20 27:12 36:18 44:18 62:16 63:18 66:11 68:11,15 68:15 84:11 103:10 117:20 132:11 133:14

133:22 135:8 135:20 136:22 136:24 137:4 139:4 140:4,17 141:19 142:5 142:16 143:3 143:11,13 146:8,11 156:2 156:11 157:1 157:11 158:4 158:20 159:2 159:10 160:5 160:13,21 167:3,23 173:8 173:8,25 182:7 184:25,25 185:1,13,18 186:5,16 187:4 187:8,9 188:16 189:6 190:18 191:4 192:2,25 194:23,24 195:3,6,21 196:5,7 197:7 197:12,19 198:16 200:24 201:7,16,16 202:3,21 205:13,23,24 206:16 207:7 209:18,22
**clevelands** 132:9 136:7
**client** 177:9,11,13,16 179:21 181:9
**clifton** 38:17
**clinic** 10:14,15
**clock** 152:3
**clothes** 106:14
**code** 147:13,17,24 148:3,10,16,19 149:3,13,18 150:4,23 151:3 151:9,15,18 154:25
**college** 10:3 152:2,11
**column** 98:1
**come** 7:22 39:23 53:7 58:12 59:6 86:11 87:24 117:1 185:10 191:1
**comes** 23:2
**comfortable** 106:3,24 170:22
**coming** 49:17
**command** 33:14 65:5 162:22
**commander** 9:12
**commanders** 4:23 33:23
**commanding** 120:23
**commands** 4:18,22
**commencement** 46:21
**comment** 196:13
**comments** 120:3
**commission** 186:21 205:7,23 209:23
**commissioned** 205:12,24
**committed** 55:3
**committee** 195:23 196:3
**communicate** 31:25 47:19 49:23
**communicated** 32:7,10
**communicatio...** 120:4 130:22 153:15
**community** 195:7
**comodeca** 16:6 147:10,12 147:16 148:7,9 178:7,9 179:1 179:3,10,19,25 181:8,22
**complainant** 179:11,15 180:22
**complaint** 21:12 42:14 71:13 133:15 133:16 162:10 176:25 178:8 178:19 180:1,3 180:14 182:9 182:18 184:20 185:3 186:24
**complaints** 8:17 161:25 181:8
**complete** 49:21 68:21 69:7 112:21,24 123:14 180:21 181:10 206:14
**completed** 148:9 149:8 151:25 152:9 152:12 198:4
**completely** 134:22
**completeness** 122:19
**completing** 149:2 151:9,18
**completion** 57:15 148:15 151:5 152:10 154:25
**complex** 197:16
**compliance** 120:7 121:17,18 121:19
**complicated** 49:12
**complied** 68:16
**comply** 97:6
**computeraided** 209:11
**concern** 193:23
**concerned** 83:17 134:15 195:23
**concerning** 26:8 50:7 181:9 186:21 205:12 205:13
**conditions** 206:17
**conduct** 25:20 26:3,15 37:6,14 104:6 142:20 146:14 159:4 186:22 201:17 202:4 206:14
**conducted** 55:21 154:1,6 161:4 180:1,2 180:7 187:8
**conducting** 12:19 13:8 14:14 15:9 27:24 35:1 81:1,18 83:1,2 83:4 90:22 108:17 124:24 125:24 162:24 163:1
**conference** 20:14
**conferred** 55:20
**confidence** 67:5 197:17
**confident** 139:17
**confirm** 11:12
**conforming** 197:18
**confront** 23:21
**connection** 99:18
**conny** 94:12
**consent** 44:20 45:24 46:5
**consider** 51:16 52:11
**considered** 51:7 97:4
**consistent** 180:1,4 206:17
**consistently** 134:10
**constituted** 114:1
**constitutional** 172:7
**consultant** 193:20 194:1
**consultation** 29:21 177:15
**consulting** 194:5
**contacted** 21:18
**contained** 31:21 90:25 124:25 125:11 125:19 126:1 126:11,19 131:12 134:3 155:21
**contains** 113:1
**contend** 135:8 140:16
**contentions** 77:2
**contents** 13:16 15:17
**contest** 198:10 202:20

**context** 204:14
**continue** 88:20 169:15
**continues** 43:19
**continuing** 103:20 114:8
**contract** 209:16
**contrary** 84:2
**contribution** 83:19
**conversation** 19:25 20:15,19 21:2
**conversations** 32:21
**copies** 40:10,11
**copy** 10:25 39:2,16,18 39:19,25 40:6 41:13 43:2 68:10,20,22 69:3,8 70:24 72:10 79:2,20 79:21 80:9 97:6 111:19 112:4,21,24 120:24,25 130:10
**correct** 9:9 31:18 37:16 41:19 42:4,6 45:24 48:3 52:5 53:18 57:7 69:25 72:11 84:21 85:17 88:13 93:18 94:18 95:12 96:13 101:7 102:3 103:7 112:20 114:22 115:2 124:15 130:8 131:10 133:16 135:17 136:13 138:18,22 139:1 140:10 149:21 150:2 159:24 165:2,5 166:25 179:5,9 184:21 185:3 186:12,13,19 197:5 198:9 200:22 201:3
**corrections** 208:6
**correctly** 76:4 89:25 156:17 168:6 188:3
**corrigan** 90:1 96:25 97:16 98:9 159:20
**corrigans** 97:10
**corruption** 186:22 205:14
**couldnt** 19:14 57:1 61:14 86:15 104:16 171:9 195:14
**council** 105:7 141:1 145:18,19 147:11 148:8 148:17
**councils** 146:8
**counsel** 1:20 98:2,23 100:1 101:13 131:16,22 209:14
**counsels** 142:9
**county** 35:23 44:16 45:22 62:14 78:1 79:6 96:25 209:5
**couple** 64:8 127:12 137:22 192:11
**course** 12:1 13:15 14:8 15:16 27:7 34:12 35:13 44:10 82:2,3 91:6 107:11 108:4 110:15 122:10 126:10 127:23 148:16 151:25 152:8,9 152:16 153:21
**court** 1:1 11:4 50:9,18 63:13 67:19 86:6,21 96:22 97:1 98:3,23 100:3 101:12 102:13 104:4 124:2 190:1,19 190:25 192:22 203:21 209:16
**cover** 37:4,5 57:5 64:15 84:3,14 112:2 198:24 199:2
**covered** 8:13
**covers** 83:24 84:6 93:21
**cpd** 138:14
**create** 197:15
**created** 24:24 33:12 35:22 53:24 205:7,19,21
**creating** 24:10 25:2
**creation** 13:16 15:17
**crime** 4:25 7:19 50:5 52:14,15 55:2 55:4 169:24 186:21 199:2 205:7,23
**crimes** 7:3 8:15,25 9:2 9:18,19 27:22 28:22 122:13
**criminal** 12:24 13:5 14:24 15:6 17:21 44:10 77:25 81:11 83:10 85:10 87:14 96:22 97:2,4 98:5 109:12,25 125:7,17 131:22 142:9 147:13,17,24 148:3,10,16,19 149:3,12,18 150:4,23 151:3 151:9,15,18 154:25 186:22 195:24 196:1,1
**criticism** 185:17
**culminating** 201:24
**cummings** 16:6
**current** 4:11 10:1 130:11
**currently** 31:14 33:11 145:24 197:19
**custodial** 95:3,15
**customary** 61:25
**customs** 11:21 34:7 133:13 134:7
**cut** 193:3
**cuyahoga** 35:23 209:5
**cycle** 40:23

**D**

**d** 3:1 13:3 55:19 90:3 109:23 157:4 209:17 209:19
**daily** 55:14,20 56:1,10 56:20 57:3,9 58:8 59:23,25 115:16,19,22 139:17 165:25 168:18
**dash** 96:9
**date** 38:4 71:25 86:19 112:13 115:11 116:21 130:12 134:23 155:6 197:13 201:19 202:6 205:9 209:13
**dated** 69:7 70:17 95:2 96:20 102:17 116:8 117:25 119:2 120:1,16 147:11 149:4 150:24 151:8 151:16 152:19 153:24 177:6 206:8
**dates** 152:3 158:13
**dating** 114:2 202:2
**david** 2:11
**day** 16:23 29:21,22 47:19 48:6,13 49:2 55:16 56:16 60:2 177:12 209:19
**days** 73:23 74:1 121:18,21 148:23 194:24
**daytoday**

25:23 26:5
**deal**
104:7
**dealing**
189:20
**dealings**
62:25
**deals**
122:12
**debriefing**
165:25
**december**
29:19
**decentralized**
118:17
**decide**
27:9 52:2,22 91:14
**decided**
86:8 102:13 166:21
**decides**
166:2,12
**decision**
7:22 27:4,5 28:3 86:11,21 91:15
**decisions**
28:5 66:9 104:5
**defendant**
2:24 11:7 21:8 61:8 62:8 99:1 99:7,11 132:11 133:10 134:9 136:24 147:3 155:11,18 173:24
**defendants**
1:7,12 2:19 13:5 15:6 17:22 85:10 87:14 109:25 125:18 133:10,20 142:9
**defense**
13:5 15:6 77:2 78:3 85:11 96:21 97:1 98:2,23 100:1 101:9,13 110:1 125:18 131:16 131:22 142:9
**define**
105:25
**defined**
96:25 209:17
**definite**
139:21
**definitely**
34:22
**degree**
10:8
**department**
2:21 4:12 5:7 10:10 13:19 15:20 16:20 17:2 21:18,21 22:2 23:18 24:11 26:20 30:24 31:6 33:2,3 37:8,15 43:4 44:17,22 45:23 53:21 54:11 60:10 65:25 67:10 68:12 70:22 72:10 74:7 77:12 78:21 86:10,24 89:14 94:12,14 96:24 96:24 98:1,10 98:16 100:15 100:18 103:10 117:7 120:6,21 121:9 139:16 140:4 141:19 142:6 143:14 143:21 144:16 144:20,22 163:13 171:4 171:13,15,21 172:5,9,19 177:9 178:3 181:1 182:7 183:5 185:1,19 186:6,16 187:4 187:8,9,24 188:1,8,17 189:1,6 190:3 191:4 192:2,25 193:21,24 194:4,8,23 195:4 196:7 197:19 198:16 199:15 200:17 203:5,6,11 205:13,15 206:16,24
**departmental**
30:6,8,10,14 35:6,8,17 87:7 95:24 120:18 120:22 152:18 197:15 204:19
**departments**
16:18 99:17 139:15 140:3 173:9 201:18 202:5
**depending**
165:19
**depends**
121:25 166:10 169:20
**deponent**
208:1
**deposed**
4:5 5:12 20:7
**deposition**
1:14 3:7,8,8,9,9 3:10 5:17,19 10:23 11:1,5,6 18:17 19:5,21 21:22 34:4 36:12,24 61:3 61:9 63:10,14 63:20 64:2,4,8 64:13 67:14,16 67:19,21,24 68:9 69:2,6 70:5 71:1,5 80:14,25 81:9 81:16 82:6,24 83:3,8 85:7 87:17 90:20 91:3 92:23 93:1,10 99:6 107:5,7,19,25 108:16 109:9 109:10,22 110:11,25 111:8,12,17 122:4,6 123:8 124:13,23 125:1,6,11,15 125:20 126:7 126:12,17,19 127:19 132:7,8 132:21 133:5 136:6 140:15 143:23 144:4 144:11 146:21 155:14,24 168:14 170:6 172:13 173:1 173:21 174:12 176:20 180:10 182:13 187:21 188:22 189:11 190:6 192:10 192:23 202:14 203:22 204:15 205:2 208:4 209:9,10,13
**depositions**
209:8
**deputy**
4:13 10:1 67:23 127:6 158:14 184:20
**derogatory**
188:15 189:16
**describe**
25:23 173:6
**described**
27:13 71:20 133:14
**description**
78:14
**descriptions**
25:18
**designated**
5:20 11:13,16 12:6,20 13:24 14:16,22 15:3 16:1,9,25 17:6 18:6 200:4,9
**desk**
121:24
**despite**
204:21
**destroyed**
134:21,24 135:1 135:4
**destroying**
13:12 15:13 81:25 91:4 92:12 110:13 126:8
**detailed**
106:17
**detailing**
80:2
**details**
50:7,15 77:21
**detective**
6:24,25 8:23 13:13 15:14 26:24 31:21 45:3 51:4 52:11,21 55:20 75:24 82:1 91:5 92:13 106:6,7,10,11 106:15,17 110:14 126:9 154:7,9,11,14 155:5 165:9 166:2,11,19,20 167:15 177:1 177:12 182:5,8 183:16
**detectives**
8:25 9:8,9 13:19 13:22 15:21,24 31:14 47:23 48:1,5,7,14,22 49:10,16,17,20 49:22,24 51:13 53:17,22,24 56:2,4,9,22 75:3,22 79:1 82:9,23 89:3 93:3,6,7 98:18 103:10 107:1 111:2 116:4

126:19 141:19 142:6,17,20 143:5,13 144:16,24 155:11,18 165:2,12 166:25 183:1
**determination** 52:10 91:13,14 91:20 134:7
**determine** 171:22 172:20
**determined** 86:5
**develop** 193:21
**developing** 194:17
**developments** 11:24 14:5 34:9 35:10 44:1 80:17 107:9 108:2 122:7 127:21 141:21
**dialog** 169:15
**dictate** 74:16 75:8,15
**dictated** 76:14
**didnt** 21:7 31:11 39:23 42:12 56:11 62:3,12 69:12 75:24 87:10 88:11 106:8 109:8 117:4 162:6 164:9 187:24 190:16 191:10
**difference** 25:14 64:1
**differences** 63:22
**different** 16:19 23:4,5 25:18 27:16 32:2 38:4 43:11 77:8
96:17 104:25 116:10,24 118:15 127:8 130:19 131:3 162:12 168:21 180:16 181:18 189:17
**differently** 168:24
**diligent** 137:3
**diligently** 111:23
**direct** 9:5 41:7 54:18
**directed** 120:6 163:11
**direction** 145:22 209:12
**directly** 8:9 83:15
**director** 23:23 24:1,3,9 65:2,8,8 66:3 66:14,16 94:13 206:7,23
**disagree** 204:24
**discarded** 134:21,23
**disciplinary** 42:24
**discipline** 13:21 15:23 17:10 37:6 82:8 93:2,4,5 111:1 121:20 126:18 156:4 157:18,18 162:5 182:4,6 182:8,15,17 183:1 202:4 206:15
**disciplined** 157:19 183:9,16 184:1
**disclose** 26:9,22 27:14 29:4 87:9,13
131:9 143:5
**disclosure** 12:24 13:3 14:24 15:4 81:12 83:11 85:8 109:13,23 125:8,16 131:15,21
**discovered** 38:23
**discovery** 38:22 96:21 99:14 100:21 102:9 134:20 145:6 147:5
**discretion** 199:14
**discriminatory** 190:1
**discussed** 40:2 92:7 110:2 115:20 131:17 135:22,23 137:15 142:3 155:13 173:16
**discussing** 120:13 136:17
**discussion** 58:11 78:20 116:10
**discussions** 197:7
**disobey** 84:12
**dispose** 60:6,10
**disposition** 59:22
**dispute** 194:18 199:20 202:7 203:9 205:22 206:3
**distributed** 39:13,15 70:19 70:21 98:15 144:15
**district** 1:1,2 6:18,25 7:17 8:12,13
8:16,23 9:1 188:25
**districts** 97:7 188:16
**diversity** 104:6,15 187:22 188:5
**division** 1:2 4:18,24 6:17 7:8 22:13 23:8 23:11 24:4,5,5 25:19,21 27:17 27:23 28:16 30:1 37:7 40:19 41:7,8 42:1 43:8 44:14 45:16 60:14 65:11 66:25 67:6 68:15 70:11 82:13 83:15 94:14 106:11 118:9,13 147:23 156:21 174:4 189:18 189:21 190:13 190:14 195:18 199:4,7,7
**divisional** 22:8 29:10,12,14 29:18 30:3,9 30:12,16,20 40:14,16 65:15 87:1,2,8 89:21 90:5,9 95:24 116:18,19,25 117:18
**divisions** 97:7
**document** 11:9 16:12 17:3 17:24 19:14 25:17 26:19 32:6,11,14,15 33:1,4 35:3,10 35:22 36:22 44:1,5 55:25 56:17 70:18 72:24,25 73:1
78:11 80:9,14 80:17,24 81:5 81:9,16,22 82:4,5,6,10 89:22 93:9 99:9 107:15 109:1 111:15 115:22 117:15 123:8 124:14 129:21 132:14 134:19,22 136:11 141:20 142:1 143:14 144:6,7,8,18 144:24 145:3,5 146:12 153:12 153:16 154:14 154:20 160:15 162:10 167:4 179:8 185:14 186:20 187:6 187:13 191:25 193:12 195:20 196:15 198:1 204:1,12 205:11
**documentary** 156:23
**documentation** 12:2 14:9 17:16 54:23 72:4 80:20 82:12,14 102:11 156:9 162:6,15
**documented** 26:16 32:22 49:1 55:12,13 55:14 57:22 71:19 72:2 73:12 74:23 78:10 88:24 122:25 141:16 153:14 162:1 172:8
**documenting** 11:23 12:19 13:8 14:4,14 15:9 34:9 81:2 81:19 83:2,5

90:22 107:8 108:1,18 122:6 124:24 125:24 127:20 142:18

**documents**
16:16,22 18:19 19:4,6,9,13,17 20:12 21:5 22:4,9 30:4,14 31:9,10 35:18 36:23 42:10 56:13 61:2 67:24 72:19 80:21 81:15 92:4 99:16 107:13 109:18 111:16,18,24 112:11 113:14 113:15,19 114:1,9,11,17 114:20 117:2 122:18 123:3 123:13 125:4 127:10 134:25 135:3 137:8,9 137:22 138:5 138:17,19 139:8,19 141:9 141:17 144:10 148:2 149:11 149:15 155:13 155:15,17 157:24 161:22 162:2 164:7 173:16 174:21 175:2,4,16 178:13,14 181:24 191:2,2 191:17,18 192:1,15

**doesnt**
46:9 49:5 66:24 74:1 85:1 187:18,19

**dog**
24:6

**doing**
59:4 106:4 162:23 191:16

**domestic**
9:19 57:21

**donated**
39:1 112:9

**dont**
5:25 21:17 25:1 27:4 28:5 29:7 33:13,13 34:24 37:22 38:12,12 38:15 41:2 44:4 46:7,11 46:13 52:1 53:11 56:11,12 56:25 57:6 60:12,25 64:1 64:14 66:15 70:25 72:16 73:7,10,16 74:5 77:8,14 77:18 78:9,9,9 78:19,23 79:17 79:23 80:23 81:21 88:25 89:19,19,20 90:5 91:23 93:22 104:16 104:17 105:4 108:22 114:10 114:13 115:7 116:13 118:6 121:3 128:2,7 129:19,21 137:20 138:1 138:19,23 140:5,8 144:14 144:14,17 145:3 146:10 148:1,5,5,20 149:16 150:18 150:21 151:13 152:17 154:8 155:15 157:14 157:18 158:2 169:3 171:3,6 171:9 172:16 174:16,16 175:5,20 176:11 179:17 183:6,13 187:20 189:24 190:24,24 194:6,20 196:10,13 198:20 200:24 203:1 205:21 207:4

**downtown**
8:13,15 47:15

**draft**
68:10,14,20 69:3

**drafted**
197:14

**dramatically**
180:12

**driving**
121:24

**duly**
4:4 209:9

**duties**
4:15,17 9:14 26:21 68:10,16 69:4 70:7,12 70:14 76:25 82:12

**duty**
8:25 27:8,13 34:20 46:16,18 46:21,23 51:17 51:20,21 55:14 55:20 56:1,10 56:20 57:3,9 58:8,22 59:5 59:24 104:11 115:16,20,23

**E**

**e**
2:11 3:1 13:8 135:17 137:14 140:20 209:3,3

**earlier**
71:20 92:4 115:20 120:13 142:14 166:1 187:21

**early**
57:24

**east**
6:18

**eastern**
1:2

**edits**
25:11

**education**
103:20

**edward**
1:14 3:2,4,5 4:1 4:6,10 184:11 192:20 208:2 208:24

**effect**
11:21 14:3 34:7 37:17,20,21 38:10,11 40:17 47:4 64:19,22 84:4 101:23 102:1,2,4,6,7 123:15 129:14 129:17,20 130:6,11 202:22

**effectively**
172:6

**effort**
157:14 180:20 191:15 197:21

**efforts**
16:11,15,15 17:8 137:21,22 138:14 156:1 156:10,15,18 156:19 157:1,9 157:10 158:3 158:19 159:2 159:10 160:4 160:12,20 161:21,23 162:3,7,14,17 163:15 164:11 164:18 167:2 167:10,22 172:3 185:9 191:4,19 192:2

**either**
42:12 54:17 65:14 71:18,20 79:20 168:17

**elementary**
88:21

**elizabeth**
2:2

**employee**
133:10 209:14 209:15

**employees**
37:7 42:1 45:1 84:9

**employment**
118:11

**ems**
24:6

**encompass**
26:5

**encompassed**
109:3

**encompasses**
26:3

**enforce**
42:8

**enforceable**
117:22

**enforced**
41:9

**enforcement**
14:2 34:20 39:10 47:18 59:1 86:22 91:13 103:15 104:9 146:2,4 146:14

**enforcing**
41:18

**engaged**
169:14 193:21

**engaging**
183:17

**englehart**
16:7 62:11 153:5 154:8,9 154:14,25 155:5

**ensure**
42:18 43:4

**entire**
58:10

**entirety**
181:14

**entitled** 98:24
**entries** 76:23
**esq** 2:2,6,7,11,15,20
**essentially** 68:18,19 113:2
**established** 22:2,12,18
**establishes** 102:21
**establishing** 22:24
**estate** 2:19
**et** 1:6,8,11
**eugene** 16:4 150:24 177:2
**event** 82:21
**events** 133:14
**everybody** 88:6
**evidence** 13:3,14 15:4,15 17:18 26:9,22 27:14,25 29:5 34:25 35:24,25 50:8,16,20 78:2 82:2 85:9 86:3,6 87:9,13 90:3 91:6,25 92:14 99:1,6 99:11 101:9 109:24 110:14 122:12 125:16 126:10 131:9 131:16,21 143:6 156:23 159:12,15 160:7 164:14 164:20 171:24 179:10,19 183:9,24
**evidenced** 199:15
**evolved** 104:18
**exact** 80:22 149:17
**exactly** 7:23 8:4 19:13 19:15 33:13 52:22 53:10 58:17 61:14 62:18 67:4 75:9 82:14,22 102:12 105:3 108:10 113:21 123:3 137:25 147:15 153:13 178:24 195:13 196:12
**examination** 1:15 3:2,3 4:2,6 184:11
**example** 39:21 47:23 52:24 66:15
**exceeds** 170:5
**excepted** 100:2
**exception** 99:13
**exculpatory** 13:3,14 15:4,15 17:20 26:9,22 27:5 82:2 85:8 87:9,13 91:5 91:15 92:14 109:24 110:14 125:16 126:10 143:6 159:14 160:6 164:14 164:20 171:24 183:9
**excuse** 56:21
**executive** 41:6
**exhaustive** 139:18
**exhibit** 3:7,8,8,9,9,10,10 3:11,11,12,12 3:13,13,14 11:1,5 36:10 36:12 63:9,10 63:14 64:3,4,9 64:13 67:14,16 67:19,21 68:9 69:2,6 70:5 71:2,5 80:14 80:25 81:9,16 81:22 82:6,24 83:3,8 85:7 90:20 91:3 92:17,23 93:1 93:10 99:6 107:5,19,19,25 108:17 109:9 109:22 110:11 110:25 111:7,8 111:12 122:4 125:1,11,20 126:12,20 132:3,7,8,16 132:18,21 133:6 136:1,3 136:6,18 140:16 143:23 144:1,4 146:17 146:21 155:14 173:1,21 176:14,17,20 192:17,23 203:18,22
**exhibited** 44:19 46:4
**exist** 28:10 33:11 46:8 68:21 114:11 137:24 138:25 146:5 150:21 200:11 206:18
**existed** 30:7 33:15 93:23 94:1 113:9 114:12 124:6,10 138:20 140:23 141:5 175:20 187:23 200:5 202:9
**existence** 24:19,24 69:9 137:12 138:8 139:10 175:18 183:4 187:25 202:22
**exists** 45:13 53:11
**expand** 164:17 167:9 168:3
**expanded** 100:20
**expect** 20:6 67:7 117:9 117:14 155:21 182:19
**expectation** 73:6
**expected** 25:20 26:18 42:5 45:20 47:17 49:23 53:20 54:2,9 54:11 73:2,7 73:22 75:15 78:6 95:6 98:19 99:25 100:13 143:1 155:23
**expecting** 73:5
**expenditures** 199:3
**experience** 33:17 74:6,8 75:5,23 76:5 196:11
**experienced** 106:2
**expiration** 29:24
**expires** 209:23
**explain** 43:15
**explained** 73:11 99:10
**explains** 26:21 33:3
**explanation** 73:4 91:12 99:4
**express** 181:4
**expressly** 120:6
**extent** 107:13 122:18 123:12 133:25 164:16 167:8 168:2 175:10 176:9 179:7 181:13 188:12 189:12 190:22 191:23 200:1 202:14 203:14 205:3,18 207:2
**extra** 10:25
**eyewitness** 17:13 156:6 157:12,23 158:5,21 162:18 163:17 164:3

**F**

**f** 13:12 206:6 209:3
**facetoface** 32:3 58:11
**fact** 11:12 20:7 32:6 69:15 80:8 105:3 139:22 161:6 172:5 202:8 205:23
**facts** 27:2 50:7,15 51:8,12,18,22 52:2,4,6,7,13 53:7 145:15
**failure** 17:18,24 159:12 160:14,15

167:4
**fair**
6:2,7,11 48:9,19 64:2,7,10,17 68:24 96:5 100:6 102:20 130:2,3 149:13 150:4 153:17 166:14 175:21 175:22 177:2 205:15
**familiar**
85:16 86:2 150:13 196:4
**familiarize**
42:2 46:20 50:6 50:20 54:4
**familiarized**
50:14
**far**
25:20 34:16 35:4 90:3 91:10 122:15 134:15 142:13 157:17 162:3 162:15 164:20 181:17,20 190:15
**farmer**
16:5 151:16,23 151:24 152:7
**fashion**
115:6
**favorable**
99:1,6,11 101:9
**fbi**
179:15
**february**
1:19
**federal**
88:2 190:1
**feel**
170:22
**felony**
82:21
**felt**
66:5 146:13 169:2
**field**
26:6 102:18,22 103:5,6,11,18 105:19
**file**
11:25 12:5 14:7 14:12 17:19 31:16,22 34:11 35:12 44:3 45:8,9 79:3,7 79:16,22 80:19 80:23 107:11 108:4 122:9 127:22 141:22 142:8 159:13 180:13 182:20
**filed**
44:12 176:25
**files**
13:18 15:19 16:12 45:19 57:4 118:18,19 118:20,21,23 147:3 155:22
**filing**
130:19
**fill**
55:16 116:22
**final**
18:8 23:18 24:13 65:11,19 65:24 66:2,4,9 66:12 67:9 68:21 76:7 171:12,20 172:18 182:25 183:7
**financial**
9:19 84:1
**financially**
209:15
**find**
111:24 183:15 208:4
**findings**
76:25
**fine**
12:11
**finish**
6:5 20:17
**finished**
155:5
**fire**
24:5
**firearms**
104:5
**firm**
209:16
**first**
4:4 5:6 25:25 39:8,8 49:21 68:14 71:24 75:7 78:16 93:12 98:1 108:11 121:8 132:9,10 136:8 147:8 152:25 171:4,8 193:5 204:17 209:9
**firstline**
163:5
**fitness**
104:5
**five**
196:2
**flip**
60:17 112:25
**folded**
59:17
**follow**
22:14 23:14 26:1,14 29:1 34:21 42:5,12 43:5,16 54:12 57:2 70:13 72:25 78:6 87:23 88:7,22 89:9,9 90:3 91:18 95:6 98:19 100:13 143:2
**followed**
29:16 78:4 88:8 105:8 134:16 161:6 163:23 185:18
**following**
11:18 14:20 17:10 26:17 34:23 42:18 49:8,18 98:24 116:22 143:10 154:4 156:3,15 157:20 162:4 208:6
**follows**
4:5 94:15 97:9 100:19
**followup**
54:24 55:7,21 85:13 159:19 160:1 186:15
**followups**
192:12
**footnote**
202:1
**force**
8:12 9:2 39:24 130:10,25 188:20
**foregoing**
99:13,14 100:9 208:3
**forensic**
9:20
**foreword**
195:19
**form**
32:17,22 33:1,5 53:23 54:20,21 54:22,22,23,24 55:5,7,8 71:13 71:20 75:25,25 104:23 116:22 132:25 149:23 150:3,6 151:12 152:18,20 153:9,10,11,12 153:23 161:24 165:24,24 166:3,3 178:25 202:13 205:1
**formal**
60:13 77:10 88:24 89:6 121:19 140:18 203:4,10
**formalized**
59:13 103:18 105:10 107:1
**formally**
197:11
**format**
68:21
**forms**
90:14
**forth**
80:4 146:12 209:10
**forward**
52:3
**forwarded**
97:7
**found**
70:24 71:2 78:23 138:25
**foundation**
10:14,16 184:25 194:24 195:4,6 195:11,16,21 196:6 201:7
**four**
6:15 7:11,25 10:21 154:17
**fra**
150:12
**frame**
35:2 69:14 128:10 134:8
**francis**
150:9,11
**frank**
16:5 149:2,23
**franks**
16:17 133:11
**free**
66:20
**freely**
170:23
**fresh**
53:4
**friday**
18:23 20:4
**friedman**
1:17 2:7
**front**
158:9

**full**
120:7 181:10 199:13
**fully**
200:22
**function**
9:16 26:25 106:11
**functions**
4:23 204:22
**funded**
184:24 195:12 195:14
**funding**
195:9,13
**funds**
195:25 199:14
**funk**
2:15 20:1,13,20 20:21 21:5 48:18 52:16 63:2 84:22 85:21 86:12 89:15 97:21 101:15 107:17 107:22 108:20 108:24 109:2 109:15 110:16 111:3 113:5 117:11 119:5 119:15,18 124:18 133:23 134:14 137:18 161:10 167:19 170:1,13 172:11 174:22 177:21,23 181:11 182:11 182:21 184:5 191:7,21 193:7 196:23 202:12
**furstenberg**
186:7
**further**
73:11 192:7 207:12
**future**
71:11 72:5

**G**

**g**
13:21
**g1**
69:19,23 70:1 131:1
**g79**
69:23,24 70:2
**gain**
84:2
**gambling**
7:4
**garrity**
177:6
**gary**
68:17
**gather**
27:3 51:22 52:4
**gathered**
28:1
**gatherer**
27:1 52:1
**gathers**
23:3
**general**
8:24 19:8 20:6 22:7,20,25 24:11 25:16,22 26:4,7,12,16 29:15,16 30:19 31:7 35:6 36:2 54:5 69:1,6,8 71:1,8 72:14 72:23 73:17,20 87:7 89:23 90:12 93:13,14 95:11,16,25 98:10 99:4 100:16 102:20 102:21 103:6 105:8 107:6,20 107:24 108:7 110:21 113:21 114:1,18,23,24 115:4,11 116:7 116:11 117:25 118:1,5,7,8,9 118:14,18 119:1,11,15,25 120:15,18,22 121:6,10,15,22 122:25 123:15 124:6,9,10,12 124:22 125:5 125:14,23 126:2,6,16 127:9 129:7,11 129:13,15,16 129:24,25 130:11,20,23 131:7,18,20,23 134:11,16 137:5 138:23 142:15 143:1 143:10 145:23 156:16 157:16 157:22 159:18 159:22 160:1,7 161:4 168:8,16 170:10 174:3 189:1 190:12 190:12
**generally**
4:15 21:25 37:14 153:17 168:12,16 190:9 198:24
**generated**
75:12,13 76:1 179:1
**generic**
55:23 71:25
**gentleman**
200:16
**george**
179:20 181:9
**gerald**
206:7
**getting**
187:25
**gift**
84:2
**gifts**
12:25 14:25 81:13 83:12 84:6,17 109:13 125:9
**gilbert**
1:17 2:6,7 3:4 176:3 184:12 186:3,10 187:14 189:9 192:7 200:19
**give**
12:12 27:7 39:21 45:20 47:12 49:3 52:24 55:5 83:16 98:2 99:25 120:7 146:20 163:18 177:14
**given**
22:13 35:25 39:16 40:10 44:19 46:3 72:13,17,22,23 73:4 80:7 86:9 95:15,24 96:5 96:7 101:5,11 101:12 121:18 130:10 133:1 134:25 144:24 145:11 148:16 151:5 182:15 182:17 193:23 209:12
**gives**
33:22 59:19 77:4 94:16 98:25
**giving**
43:1 68:22 83:17 95:7 123:25 139:22 201:8 209:9
**glean**
179:7
**global**
12:13
**go**
5:10,16 7:5 8:11 8:22 9:25 10:3 11:11 34:18 42:21,22 49:7 51:3 52:3 53:10 56:21 58:10 65:18 66:7 73:9 80:1 81:4,5,6 85:23 88:10 90:18 91:9 100:22 101:16 102:24 106:7 107:14 108:10,14 109:4 112:13 123:11 127:12 135:14 143:24 156:15 158:23 161:11 168:14 174:24 175:11 176:10 179:8 189:12 190:7 192:13 198:7 201:4,14 204:6
**goes**
52:8 57:9 65:6 65:13 69:23 89:8 112:19
**going**
10:22 11:11 12:9,15 39:21 43:21 47:13,15 51:2 57:19,19 70:5 82:24 130:24 142:14 166:5,6 169:15 169:22 171:23 172:20 189:5 195:19 196:15 201:13 203:4 203:10
**good**
39:3 53:2 63:2 170:11,20,21 181:6 184:17 184:18 200:21
**govern**
67:9
**governed**
37:14
**governing**
71:9 142:19
**government**
71:12 88:2
**gpo**
102:18

**gpos** 68:1,11 70:8,18 107:17 176:7
**grades** 105:1
**graduate** 10:5
**grand** 62:14,20,25
**granted** 183:25
**great** 195:17
**greene** 2:7
**group** 7:8 19:12 145:20 147:21 193:20 194:1,5
**guess** 53:8 62:19 84:1
**guidance** 7:20 35:5 70:11 145:22 157:16 163:21 168:16 187:16 197:16
**guide** 23:7 29:3 82:15 82:22
**guided** 142:15
**guidelines** 105:9 108:8 122:24
**guys** 10:25 49:6

**H**

**h** 2:6 112:3
**half** 7:11 8:1
**hall** 2:22
**hand** 209:18
**handed** 11:4 63:13 67:20 111:11 132:6 192:22 203:21
**handled** 9:21 122:25
**handling** 153:25 154:5,15
**handwritten** 38:13,17 39:1 112:2
**happened** 52:25 59:9 204:4
**happens** 56:17 163:12
**hard** 39:16
**harold** 133:11
**hasnt** 108:25
**havent** 20:7 78:15 89:22 114:17 138:25
**head** 41:7
**headsup** 47:11,12
**heard** 78:24 189:5,14 189:16
**hearsay** 177:23
**hearsays** 177:24
**held** 87:22 152:25
**hello** 62:21
**help** 195:25
**herculian** 137:22
**hereinafter** 4:4
**hereunto** 209:18
**hey** 169:14
**high** 10:12
**highlighted** 92:5 204:18
**highlighting** 41:12,14
**hired** 10:13 61:17,24 190:16
**hiring** 190:1,13
**historically** 49:9,13 50:25
**hocking** 152:2,10
**hold** 101:3
**home** 49:5
**homeland** 4:13,19
**homicidal** 13:17 15:19
**homicide** 9:18 12:3 14:10 16:17 17:25 27:21 28:21 47:24 53:15,16 55:17 118:23 118:24,25 133:11,20 151:22,25 160:16 167:5
**honest** 26:15
**hopkins** 5:1
**hours** 19:3 57:16,18 120:21 148:15 152:3,8 154:7 154:18
**houses** 45:15

**I**

**id** 123:2,2 129:9 162:13 175:1
**idea** 170:11,20,21
**identification** 11:2 17:13 36:13 63:11 67:15,17 111:9 132:4,19 136:4 144:2 146:18 156:6 157:12 157:23 158:5 158:21 162:19 163:17 164:3 176:18 192:18 203:19
**identified** 107:20 140:20 173:11
**identify** 17:9 82:17 134:21 156:2 156:11 157:2 157:11,14 159:3,11 160:5 160:13,14,21 162:3 163:16 164:12 167:3 167:23 173:6 175:23
**identifying** 164:2
**ill** 5:16,24 6:1 135:12 146:20 176:22 177:8 184:19 193:4
**illegal** 7:4
**im** 10:22 11:11 12:11,15 14:19 20:23 39:21 57:16,17 62:11 62:18 72:7 80:12 81:8 86:2 90:17 94:24 97:21 100:21 103:24 107:18 113:20 114:14,15 116:24 119:16 121:24 124:7 128:14,18,22 129:1,5 135:14 138:11 139:17 139:21,21 150:1,11,12 155:8 156:22 156:25 158:17 159:8 160:19 161:9 173:20 176:2 178:6 186:1,19,23 187:13,20 192:6 196:20 201:13
**imagine** 32:2 67:2 123:2 145:8
**immediate** 52:25 71:10,18 72:5 206:13
**immediately** 40:17 165:23
**impartial** 180:21
**impeachment** 13:4,14 15:5,15 85:10 109:25 125:17
**implemented** 199:4
**implementing** 201:25 202:9
**importance** 201:22 203:7
**important** 46:17,22 65:16
**imposed** 17:11 156:4 162:5
**impression** 161:21
**improper** 17:13 18:2 156:6 157:12 158:5 160:22 162:18 163:17 164:2 167:24
**improve** 196:1

**incident** 71:14,18,21 74:22 169:4
**include** 81:20 83:20 108:9
**included** 110:23 115:15
**includes** 16:13 56:2,4 67:8
**including** 12:1,4,24 13:4,9 13:14,16 14:8 14:11,24 15:4 15:10,15,17 16:21 17:14 81:12 82:2 83:11 85:9 90:23 98:18 109:12,24 125:8,16 126:1 143:16 156:7 195:11
**inconsistency** 134:5
**inconsistently** 133:12,21
**index** 68:11 70:8 107:16 122:15
**indicates** 155:4 194:15
**indication** 186:14
**indirectly** 83:15
**individual** 2:19 133:9,19
**informal** 89:8 140:19
**informants** 12:23 14:23 81:11 83:9 109:11 125:7
**information** 12:2 14:9 17:19 17:21,24 23:3 27:1 28:1 29:25 31:15,20 32:1,7,9 33:5 49:23 55:4 58:21 71:14 100:22 101:1 136:23 137:9 137:24 138:5 139:7,11,13 145:10 152:18 159:13 160:15 165:15 167:5 167:14 168:7 174:13,17 175:11,15 176:11 183:13 194:18 198:10 199:20 202:7 202:18,20 203:1,9 204:24 205:22
**informational** 54:25
**informed** 28:2 86:17 90:15
**initial** 59:8,11
**ink** 76:23
**innuendo** 52:8
**inperson** 12:19 14:14 17:15 81:2 83:5 108:18 124:24 142:19 142:20 156:8 159:4
**input** 25:9 67:3
**inserted** 77:3
**inserts** 40:9 130:15
**inservice** 183:3 193:22 194:8,13,14,16 199:16,21
**inside** 37:4 196:15
**inspected** 121:16
**inspection** 56:23 99:15 118:16 121:11
**inspections** 115:14,15
**inspector** 68:16
**instance** 39:20 48:17 171:11,19 172:17 183:15
**instill** 197:17
**instruction** 72:13,16,18 80:7 88:16
**instructions** 73:24
**instructor** 147:13,17 148:22
**insure** 161:5 164:23 166:18 167:12 172:5 183:8
**insuring** 183:23
**integral** 97:4
**integrity** 26:15 163:7
**intelligence** 4:25
**interact** 168:17 169:17
**interaction** 168:18
**interactions** 18:3 160:23 167:25
**interest** 66:24
**interested** 44:15 209:15
**internal** 7:11,25 8:5,10 99:16 147:22 153:12 161:4 163:4 191:18
**internally** 118:10 162:7
**international** 151:22
**interpersonal** 153:15
**interrogation** 95:4,15 183:17
**interrogations** 13:8 15:9 18:2 81:19 90:22 125:24 143:15 160:23 167:24
**interrogatories** 132:10 133:1,2 136:8 139:3 173:4
**interrogatory** 133:8 134:2,18 135:7 136:15 136:16 137:2 139:6 140:15 140:20 143:23 173:5,11,22,23 175:14
**interrupt** 12:9
**interruption** 37:23
**interview** 53:2 162:24 163:1 165:12 169:13,17
**interviewed** 53:5 179:4,11,14 179:17,20
**interviewing** 52:14
**interviews** 13:9 15:10 18:2 81:19 90:23 104:6 120:4 125:25 143:15 143:17 160:22 167:24 170:25 172:21 180:19
**intricacies** 51:1
**investigate** 7:3 17:9 47:24 48:2,6,8 130:24 156:2 157:2 158:4 159:3,11 160:5 160:13,21 162:4,18 163:16 164:13 167:3,23 171:22 178:23
**investigated** 7:12 8:14,15,25 9:2 54:16 161:25 162:11 178:20,25 189:18
**investigates** 49:11
**investigating** 51:9,19 53:22 101:1 164:2 165:1,8,12 166:2,11,19,20 167:15 180:25 181:20
**investigation** 9:21 11:24 12:1 12:3,5,24 13:15 14:6,8 14:10,12,24 15:16 16:17 17:25 27:7,25 29:2 32:24 34:10,12 35:11 35:15 42:14 44:2 48:16 50:22 53:15 55:12 79:8,9 80:18 81:12 82:3 83:10 91:6 99:19 107:9,11 108:2 108:4 109:12 110:15 122:8 122:10 125:8 126:11 127:21

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 227 of 248. PageID #: 1545




127:23 130:21 133:12,20 141:21 151:25 160:16 165:2,9 166:14 167:6 167:12 169:19 169:20 178:6 178:11,17 179:3,25 180:2 180:5,21,23 181:7,10,14,23
**investigations** 4:20 9:13 17:12 33:15 35:2 44:11 55:8,22 77:22 156:5
**investigative** 4:23 9:16,17 13:18 15:19 17:19 27:22 28:15,17,19,20 28:21,22,23,24 30:21 31:22 32:23 33:7,8 33:12 45:7 48:24 53:17 54:24 72:5 79:3,7,16,21 80:19,23 91:25 106:14,17 118:20 159:13
**investigator** 13:13 15:14 55:6 77:24 82:1 91:5 92:13 110:13 126:9
**investigators** 8:7 45:18 49:10 51:14 106:18 144:21 180:15 180:16
**investigatory** 118:21,23
**investment** 203:6
**involved** 45:22 133:11,20 153:18 179:4
190:15 195:15
**isnt** 21:24 27:9,10 53:8 85:12 102:6
**issue** 23:21 116:17 182:7
**issued** 40:11 54:5,8 60:14 77:12 84:12 94:20,23 113:22 116:15 130:1 152:9 154:24 174:3 206:22
**issues** 205:13
**item** 206:5
**items** 25:14 57:25 97:2 98:25 99:25 101:8
**iteration** 47:4 64:20
**itll** 57:22
**ive** 73:18 90:5 144:6 176:24 177:16 195:15

**J**

**jackson** 1:3 2:5 5:21 63:16 193:11 203:23 204:18 206:5,12
**jacqueline** 2:7
**james** 16:5,7 94:12 151:16 206:6
**january** 33:25 40:22 94:9 96:7
**jerold** 16:7 153:5 154:24
**jerry** 62:11
**job** 25:18 26:15 52:2,7,9 56:14 61:16,17 62:12 62:17 72:3 86:22 87:24 91:17 188:8
**jobs** 23:9
**john** 16:5 38:17 90:1 96:25 97:16 151:7,12 159:20 186:6
**joined** 10:9 74:6
**joins** 130:9
**jones** 49:5,7 55:21
**jot** 59:3,18 60:18
**jt** 151:23,24
**judge** 1:4,10
**july** 5:8 96:20 102:4 120:1
**june** 119:2 152:19,24 205:9 209:23
**jurisdiction** 46:19,24
**jury** 62:14,20,25
**justice** 195:24 196:2
**juvenile** 18:3,4 153:25 154:5,15 160:23 167:25 168:9,23 169:7 169:13,23 170:25 172:21
**juveniles** 13:10 15:11
81:20 90:24 126:1 168:17 169:17 170:22

**K**

**keep** 45:17,18 51:11 60:4 61:4 77:9 121:10,21,25 122:1 184:14
**keeping** 176:4
**kept** 13:18 15:19 45:11 56:20,23 57:3 118:9,18 118:23,24 194:3
**kid** 61:25
**kind** 7:1,3 39:9 47:11 52:20 54:21 59:4 86:25 95:20,23 106:9 117:8 131:17 149:1 155:20 168:9 180:2 190:19 191:2,2 191:17,18,25
**kinds** 25:14 149:20 188:14 189:5
**knew** 55:2 62:14,16 76:8 88:6
**know** 6:1 22:11 23:14 24:23 25:15 26:12,14 32:25 33:13,13,13 34:16,19,23 36:20 37:19 38:8,13,21,25 39:12,13,22 40:22,25 43:9 46:6,10,12 47:13 48:4,12 48:15 51:1,8 51:12,22,24,25
53:20,25 54:9 54:21 56:11,25 58:16,16,23 60:2,25 61:19 61:21,25 62:8 62:12,22 64:1 64:12 66:7,16 70:4,9,24 71:2 72:16,25 73:14 73:19 74:5,12 75:10 76:8,13 77:14,15,18,18 84:15 86:11 87:20,22 88:16 88:22,23,25,25 89:12,12,22 93:20 95:14 97:12 104:7,8 105:1,6 111:15 111:19,22,24 112:21,24 114:10,13,21 114:25 115:7 119:6 121:3 128:2,7,7 129:23 132:12 136:9 137:20 137:20 138:19 138:23 140:3,5 140:10 141:12 144:5,13,15,18 144:23 145:4,5 145:7 146:10 147:6,14,24 148:12,18 150:16,21 152:14,14 153:2 154:8,17 161:24 166:5,9 167:21 168:20 169:2,3,5,15 169:16,19 170:23 171:4,9 172:13,16,25 173:20 174:16 175:5,6,13,21 176:5,21 182:1 182:3,13,15 183:6,24 184:8 187:18,19

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 228 of 248. PageID #: 1546



189:23,24 191:11,14,14 193:7,25 194:3 194:6 195:14 196:10,10,14 197:21 198:20 200:25 203:14 203:16 205:21
**knowing** 139:14,15
**knowledge** 16:14 21:17 105:5 115:4 138:1 139:25 140:1 149:14 149:16,17 153:7,20 155:8 155:15 158:25 160:19 161:2 185:16 188:12 188:13 190:7 190:23,25 198:6 200:1 202:15,17 203:14 205:3,5 205:19 207:3,5
**known** 31:20 52:13
**kuebler** 1:15 209:7,21
**kwame** 1:8 2:14 5:22

L

**lab** 9:20
**labeled** 206:5
**lack** 17:15 156:9 199:13
**lakeside** 2:21
**large** 19:12,12 111:15
**lasted** 154:17
**law** 2:11,21 14:2 21:18 23:5,14 23:15 26:14,17 34:2,20,21,23 39:10 44:17 45:23 47:18 51:20 58:25 80:2,3 83:25 84:3,18 85:5 85:14 86:22,24 88:1,7,7,10,17 88:22,22 89:10 89:12 90:16 91:13,18 100:14 103:15 104:8 142:15 142:25 143:10 144:20,21 146:2,3,14 156:16 167:13 170:21
**lawful** 4:1 84:12
**laws** 41:9,18 43:10 84:9 88:1 104:4 157:21 163:23
**lawsuit** 186:24 189:25 190:10
**lawyers** 88:13 195:22
**lays** 37:5 103:6
**lead** 169:20
**leaders** 195:22
**leadership** 153:15
**learned** 12:3 14:10 17:25 21:14 51:12,13 160:16 167:5 167:14 177:16
**learning** 71:14
**leather** 60:15
**leave** 47:6 74:21
**led** 169:4
**left** 40:6 48:13,16 74:19
**legal** 27:10 86:1 97:1 102:13
**legislation** 117:15,19
**lesson** 105:4
**letter** 35:22 90:2,6 96:24 97:3,10 97:14 98:9 110:6,8,9 131:13 159:19 177:5,19,25 178:22
**letters** 191:3 192:1
**level** 65:13
**liability** 197:18
**library** 63:18
**lieutenant** 8:8,19,20,22 33:25 150:9,14 153:13
**lieutenants** 33:23
**light** 53:7 134:2 197:13 201:19 202:6
**limited** 13:4 15:5 16:14 16:21 85:9 86:2 109:24 125:17 141:11
**line** 25:25 57:19 120:17 208:7
**lines** 75:2
**lineup** 12:20 14:15 17:15 163:2
**lineups** 81:2 83:5 108:18 124:25 142:19,21 156:8 159:4
**list** 43:14 83:23 154:4
**listed** 18:12 104:24 108:13 153:9 154:9 156:12 157:3
**lists** 135:10
**litigation** 72:20
**little** 53:4 59:12 60:13 77:10 89:6,7 116:24 130:19 131:3 140:22 162:12 168:20 181:18 193:2,14,17 196:16,19 203:4,5,10 204:17
**live** 17:14 156:7
**liz** 12:8
**llc** 2:11
**lloyd** 68:16
**local** 196:1,1
**locate** 16:11,16 113:24 137:21 138:3 138:17 156:18
**located** 69:10,13 71:3 89:23 113:16 123:17 137:5 175:5 200:16
**location** 13:17 15:18 16:21 72:1
**lockers** 122:1
**lodged** 162:11
**loevy** 2:2,2
**long** 5:2,14 6:13,20 9:10,23 19:2 20:8,24 56:24 57:16 58:1 74:13 129:18 184:14
**longer** 117:21 129:16
**look** 10:24 11:8 34:4 36:20 38:1 58:12 60:16 66:19 67:12 68:7 69:22 93:11 94:6,25 96:1 115:8,9 117:24 119:20 132:12 133:5 136:9 143:22 144:4 147:5 152:19 171:10 176:13,20 178:18 191:17 193:4
**looked** 22:5 157:24
**looking** 53:9 65:10,17 161:22
**lookout** 47:20
**looks** 38:2 39:5 77:10 119:7 148:14 150:3
**lost** 77:1 134:21,23

**lot** 20:9 23:3,11 32:2 48:25 57:5 67:3 105:23 111:25 135:15 190:17
**luck** 200:21
**lynching** 188:14

M

**m** 1:18
**mac** 202:2
**maddox** 186:6
**main** 2:16 59:20
**maintain** 80:21 129:19
**maintained** 80:18 118:15
**maintaining** 140:12
**maintenance** 129:7
**major** 9:17 203:6
**maker** 23:18 24:14 65:24 66:2 171:12,20 172:18 182:25 183:7
**making** 25:10 35:24 84:6
**mallamad** 2:20 10:24 12:8 12:17 18:18,21 19:2,21 20:20 20:21 48:20 68:3 84:23 85:22 86:13 87:15 89:16 91:7 92:16,19 97:11 98:6 100:4,7 101:3 101:16 105:17 105:20 107:12 107:18 108:5 110:4 113:10 122:17 123:10 123:12,20 124:1,16,19 125:3,12,21 126:4,14,22 133:24 134:13 137:16 138:9 141:3,7,23 142:11,22 143:7,18 145:1 145:13 154:19 156:13 157:5 157:25 158:6 158:11,23 159:6,16 160:9 160:17,25 161:7 164:15 165:3,21 166:7 166:13,15,23 167:7,18,20 168:1,13,25 169:9,12 170:4 170:9,12,14 171:1,16,25 172:10,12,23 173:17 174:10 174:23 175:9 176:1,8 178:4 178:12 179:6 179:12,22 180:9 181:2,12 181:25 182:10 182:12,22 183:10,19 184:3,6 185:21 186:1,17 187:11 188:10 188:18,21 189:3,7,10 190:5,11,21 191:6,8,20,22 192:4,9,13 194:10,19,21 194:25 195:5 196:8,20 198:5 198:13,18,22 199:1,23,25 200:12,14,21 201:1,12 202:11,13,24 203:12 204:2 205:1,17 206:1 207:1,9,14
**management** 10:8 24:4
**mandated** 27:11
**manner** 83:17
**mans** 203:13
**manual** 19:10 22:7 24:16,17,21,23 25:3,10,15,17 26:2 27:20,21 28:13,15 29:6 30:19 31:7 34:19 36:8,17 37:5,10,13,19 37:21,22,24,25 38:9,21 39:13 39:20,25 40:2 40:9,18,19,23 40:25 41:1,16 43:24 63:15,23 64:12,22,24,25 65:3 67:4 68:10,13 69:4 70:5,7,10 72:11,14 77:7 83:1,4,9 84:5 84:20 85:6 87:6 90:18,20 90:25 91:2,22 91:24 92:17,25 94:10,13,20,23 95:21 109:19 112:5,7 119:3 120:10,12 127:7 134:6,11 134:16 138:24 142:3 163:19 197:10,12,12 197:14,20,22 198:1,2 201:9 201:17,22 202:3,21 203:2 206:25 207:7
**manuals** 27:17 28:8 30:20 31:12 33:6,10,11,15 34:1 35:5 106:22 137:6 137:11 139:9 201:18 202:5
**march** 34:1 152:3 153:24 154:1,6 205:7
**mark** 63:8 67:13 111:6 135:25 176:14 186:7
**marked** 11:1,5 36:9,12 63:11,14 67:15 67:17 80:24 81:22 85:7 111:9,12 131:25 132:3,6 132:15,18 136:3 144:1 146:17 176:17 192:17,23 203:18,22
**markings** 38:13
**maryland** 85:17 86:8,18 87:3
**material** 17:20 85:10 125:17 159:14
**materials** 13:5,15 15:5,16 109:25 117:3 138:7 174:2,8 174:19 175:18 185:10
**matter** 102:13 153:18 178:1,3
**matters** 54:15
**mayor** 24:2 65:1,9,11 65:20,22 66:4 66:11,14,17,23 189:22 205:12 205:24 206:6 206:21
**mayors** 65:18 66:12 67:5 186:21 205:7
**mean** 28:20 38:16 39:5,6 61:22 62:16 76:9 181:19 196:10 199:5
**means** 209:11
**meet** 18:21 19:2
**member** 83:14 181:1 200:16
**members** 22:13 25:21 37:7 41:25 44:14 46:15,17 50:4 51:25 54:4,11,15 58:19 82:13 84:8 94:11 96:23 97:5 115:16 120:5,6 120:20 147:23 154:4 156:21 174:3 183:4 189:18 206:15
**memo** 59:1 74:10 77:6 79:20 206:6,11 206:22
**memoranda** 99:15
**memorandum** 58:20,23 59:7,10 59:13 60:10,12

60:24 61:5,7 61:11 62:5,7 120:23
**memorandums** 120:19
**memorialize** 35:10 44:1 141:20 143:14
**memorialized** 103:17
**memorializing** 11:23 14:5 34:9 107:8 108:1 122:7 127:20 142:18
**memory** 77:23
**memos** 13:13 15:14 82:1 91:5 92:13 110:14 126:9 191:3 192:1
**men** 7:16 23:7 61:16 61:23 70:11 138:2
**mengle** 153:13
**mentioned** 24:16 30:18 53:13 77:7 140:24 141:1 158:12 187:21 192:14
**message** 74:11,19,21 75:22 76:2
**met** 18:18,22,24
**michael** 16:6
**middle** 40:15 97:25
**midnight** 49:7
**mills** 2:11,11
**mind** 177:13,17
**minds** 53:5
**mine** 121:24
**minorities** 188:7
**minute** 97:13
**minutes** 20:25
**miranda** 95:7 170:21
**misconduct** 7:13 17:10,14 156:4,7 157:3 157:11,15,17 158:4,20 159:3 159:11 160:6 160:14,22 162:5 171:23 172:20 180:14 181:1
**misconducts** 156:12
**missing** 66:6 140:6
**mistaken** 100:21
**modern** 197:14
**moment** 115:8 123:5 135:11 136:8 152:20
**monday** 1:19
**money** 83:19
**months** 6:15 7:2 53:5 104:8 199:7
**morning** 58:12
**motion** 183:25
**movement** 13:17 15:18
**multiple** 177:24
**municipal** 29:19
**museum** 38:24 39:2 71:3 111:22 112:1,9 185:13

**N**

**n** 3:1
**name** 4:8 39:8,8 65:17 150:13 186:2,3
**named** 150:14 177:1
**names** 38:25
**narcotics** 7:4 8:17 28:23
**narrative** 154:3
**national** 201:24 202:8
**nature** 178:11
**nearly** 204:20
**necessary** 58:21
**necessitate** 71:11
**need** 10:25 32:25 49:4 73:9 74:22,23 88:15 151:13 170:22 200:19
**needed** 7:20 206:24
**needs** 66:7 71:19
**negative** 188:15
**nelsonville** 152:2
**never** 62:17 78:24 164:21 188:24 189:19,20
**new** 23:4,5 34:2,2,2 38:10 40:11,11 117:15,19 130:9,14 197:13 201:19 202:6
**newly** 77:3
**night** 48:8 121:14
**ninth** 2:12
**nonsalaried** 199:14
**northern** 1:2
**notary** 1:15 209:7,21
**note** 68:13
**notebook** 60:17 76:21,22 76:23 77:5,9 77:12,17,25 78:8,13,18,21 79:1
**notebooks** 79:15
**notes** 12:4 13:13 14:11 15:14 82:1 91:5 92:13 110:14 126:9 143:17
**notice** 1:19 10:23 11:6 29:18,18 30:9 34:4 35:8,17 40:14,16 43:22 65:15 86:9,25 87:1,8 90:5,10 95:24 107:8 109:11 116:19 116:25 117:18 120:22 122:5 123:7 124:13 124:23 125:6 125:15 126:7 126:17 127:13 155:25 158:9 209:14
**noticeable** 63:22,25
**notices** 22:8,11 29:10,13 29:14,14,23 30:3,6,8,10,12 30:14,16,20 35:7 87:2 89:21 116:18 117:7 120:18
**notified** 86:20 90:7,9 180:22
**november** 177:6
**number** 26:13 36:4 38:17 39:3,5,6 39:7 43:6 46:2 51:20 54:7 56:15 80:1 82:20 84:8 94:8 95:2 96:1 96:2,20 97:22 98:25,25 102:14,24 103:2 115:11 116:8 119:2,16 120:1,16 131:2 173:25 195:21 196:21
**numbered** 114:24 115:5
**numbering** 96:8 131:5,6
**numbers** 69:15,17,18,23 96:14 99:24 115:1 146:20 153:25 173:11 193:2,8 196:19
**numeral** 193:15 196:16 196:21
**numerals** 193:17 196:22

196:24 197:1,2 199:9
**numerous** 82:18 156:20 195:6,15

**O**

**oath** 87:25 133:3 136:12 138:4 139:3
**oaths** 209:8
**obedience** 41:23
**obey** 42:3 85:4
**object** 91:7 92:19 98:4 157:5 201:13
**objection** 48:18 52:16 84:22,23 85:21 85:22 86:12,13 87:15 89:15,16 97:11 100:3,4 100:7 101:15 101:16 105:17 105:20 107:12 108:5,20 109:15 110:4 110:16 111:3 113:10 117:11 119:5 122:17 123:10,21,23 123:25 124:17 124:18 125:3 125:12,21 126:4,14,22 133:23,24 134:2,13,14 137:16,18 138:9 141:7,23 142:11,22 143:7,18 145:1 145:13 154:19 156:13 157:25 158:7,23 159:6 159:16 160:9 160:17,25 161:7 164:15 165:3,21 166:7 166:13,15,23 167:7,18,19 168:1,13,25 169:9,12 170:1 170:4,9,12,13 171:1,16,25 172:10,11,23 173:17 174:10 174:22,23 175:9 176:1 177:21,22 178:4,12 179:6 179:12,22 180:9 181:2,11 181:12,25 182:10,11,21 182:22 183:10 183:19 184:3,5 185:21 186:17 187:11 188:10 188:21 189:3 189:10 190:5 190:11,21 191:6,7,20,21 192:4 194:10 194:19,25 195:5 196:8 198:5,13,18,22 199:1,23 200:12 201:1 202:11,12,24 203:12 205:1 205:17 206:1 207:1,9
**objections** 123:24
**obligates** 85:20
**obligation** 26:8 27:13 31:15,23 35:9 87:9 131:9
**obligations** 43:14 86:17
**observation** 71:24
**observing** 126:8
**obtain** 45:3,6 92:1
**obtained** 35:25 38:22 63:17 111:19 111:21 114:6 144:18,19,21 180:17
**obtains** 101:5
**obviously** 12:9 66:3 107:16 178:16 199:2
**occurred** 52:14
**occurrences** 76:25
**oclock** 47:14,14 49:6 121:14
**october** 68:12 70:17 72:11 206:8
**offense** 71:21
**offenses** 122:24 149:20
**offer** 83:16
**offering** 83:17
**office** 2:11 24:13 27:8 28:2 29:20 32:10,20 36:1 45:9 50:17 65:18 91:16,19 92:2 100:23 120:25 121:22 164:22,25 209:18
**officer** 23:21 25:24,25 26:14 27:12 32:9 34:20 39:16,17,22,23 40:4 42:13 43:15 44:8 47:6,6 54:18 54:25 57:10,20 59:16 71:13 73:19 77:24 83:20,21 84:13 84:15 90:15 101:1 103:16 103:18 105:6 106:2,13 120:23 130:9 139:14 140:25 147:10,16 148:8,10,17 149:3,7 150:8 150:19 151:4 152:7 178:21 180:15 182:16 182:18 183:15
**officers** 7:9,21 14:2 21:9 26:8,21 29:4 32:6 33:4 35:1 35:9 37:7,14 39:1,10,14,19 40:3,10 41:25 42:5,18 43:1,4 43:17,25 44:14 44:16 45:1,20 45:21 46:15,16 47:2,10 50:4 50:11,19 51:24 53:25 54:4,15 58:19 59:1 60:4,6,9,21,23 61:4,8 62:8 68:23 70:19,22 71:24 72:7,9 72:10,13 73:5 73:14 76:21 77:13,16 78:16 79:15,19 80:8 80:17 84:8 85:20 86:2,10 86:17 87:8,11 87:25 88:12,15 88:19,19 89:1 89:4,11 90:9 91:14 95:6 98:16,18 99:25 100:13 103:17 103:21,23,25 104:20 105:1 105:12,14,25 111:23 115:23 116:4 121:4,21 121:23 134:9,9 138:14 140:18 140:25 141:6 141:11,15 142:2 143:16 144:15,24 145:11,16,17 145:19,21,24 145:25 146:2,7 146:9,11 147:4 147:19,20,22 150:17,20 155:11 156:20 161:6 163:7 164:13,19 179:4 180:6 183:8,23 188:7 191:11,12 197:8,16,18 199:17,22
**offices** 1:17
**official** 11:25 12:5 14:7 14:12 17:19 34:11 35:12 44:3 77:23 79:3,7,16,21 80:19 107:10 108:3 122:9 127:22 141:22 142:8 159:13
**officials** 197:8
**oh** 10:20 25:7 28:18 42:7 56:5 61:20 69:21 76:16 154:12 173:3 192:11 196:25 204:4,11
**ohio**

1:2,16,18 2:3,8 2:12,17,22 19:9 84:10 142:1 145:19 145:22,24 147:10 148:7,9 148:17 149:3 152:2 209:4,7 209:18,21,22
**okay** 5:9,12,16 6:3,9 6:12 7:24 8:3 9:6,10 10:20 11:11,15 12:17 13:24 18:21 19:20 20:23 21:20 22:23 23:17 24:16 28:7 29:4,12 30:2 31:2,4,13 32:9 34:4 36:6 36:7,23 37:1 37:19 38:25 39:12,19 40:8 42:8 43:1,23 44:5 45:17 46:12 48:11 49:16 50:2,3 50:19 55:9 58:1,4,18 60:20 64:12,15 64:21 65:23 67:8,23 69:6 69:22 70:6 71:4,6 75:21 76:20 77:20 79:12,25 80:7 82:6,24 84:5 84:15,20 85:6 85:19 86:16 87:2 89:11 92:6 93:9,11 93:23 94:7,19 95:1,13 96:1 96:18,19 97:15 99:9 101:18,25 102:2,17,24 103:25 104:19 105:12,22 107:22 109:9 110:11,25 111:6,11,19 112:14,25 113:6,18 114:23 115:4 115:19 117:1 119:22 120:12 122:4,14 124:1 126:24 127:16 128:11 129:6 129:10 130:18 132:25 133:5,7 134:9 135:7,14 136:12,15 139:2 140:5,15 141:5,13,18 143:22 144:7 144:23 145:5 145:17 146:7 147:8 148:6,21 149:11,22 150:2 153:10 154:12 155:8 155:24 156:24 157:8,14 158:3 158:19 161:17 161:23 163:15 163:18 164:10 166:10 167:10 176:25 179:3 184:9,16 185:16 186:24 187:14,21 188:5 189:1,25 193:14,18 194:7 195:3,19 196:15 197:2 197:25 198:10 198:15 199:12 201:6,11 202:18 204:14 204:17 205:6 205:22 206:4 207:6
**old** 129:15 130:14
**older** 78:16 129:19 130:6
**once** 5:13 53:25 142:24 143:9
**ones** 33:10 114:5 129:19 130:14 130:14 138:20 163:6 196:16 197:1
**oneweek** 152:8
**oneword** 162:13
**ongoing** 114:10 190:2 199:16,21
**onthejob** 106:1,20,21 107:3 141:1
**open** 29:20
**operate** 65:4 139:15
**operates** 139:16
**operating** 27:24 53:9
**operation** 30:24 31:5 185:1
**operational** 25:23 29:23 33:24 43:12 103:4
**operations** 4:14,18
**opinion** 170:16 181:3,5 181:16
**opota** 145:24 146:1 147:20
**opportunities** 103:19 116:17 117:8
**opportunity** 62:18 76:3 116:20
**opposed** 75:19
**order** 26:8,12,17 29:15 29:15,16 33:22 36:2 50:14 66:18 72:23 73:22,25 74:2 84:12 87:7 89:24 90:12 95:11,16,25 96:5 97:3 98:10,13,15,19 100:16 102:21 103:6 110:21 112:12 114:18 115:11 116:8 116:11 117:25 119:2,16 120:1 120:2,15,22 121:6,11,15 122:11 124:6,9 124:12,22 125:5,14,23 126:6,16 129:13,15,16 130:23 131:7 131:18,23 159:22 160:2,8 190:19,25
**orderly** 10:17
**orders** 19:8 22:8,11,16 22:21,25,25 24:11 25:12,16 25:22 26:5,7 30:19 31:8 35:6 41:17 54:5,8 69:1,7,8 69:11 71:1 72:15 73:18,20 73:21 93:13,14 93:17,21,23 94:1,4,20 96:8 99:5 107:6,20 107:25 108:7 112:7,22 113:1 113:9,21,23 114:2,23,24 115:5 119:11 120:18 123:1 123:15 126:2 127:9 129:8,11 129:24,25 130:2,6,11,20 131:20 134:12 134:17 137:5 138:24 142:15 143:1,10 156:16 157:16 157:20,21,22 159:19 161:5 168:8,12 170:10 174:3
**ordinance** 117:20
**ordinances** 41:9,18 84:10
**organization** 196:12
**organizations** 23:6
**organized** 4:24
**original** 41:13 79:20
**originally** 39:22
**outlined** 26:25 142:1
**outside** 23:11 87:16
**overloaded** 74:20
**oversaw** 9:16
**oversee** 4:17 167:12
**oversight** 24:4 43:16 162:23 163:21 164:19 168:5
**overview** 20:6 25:20 55:18 178:18 199:6
**overwhelming** 204:21

**P**

**page**
37:1 41:3,23 46:14 50:2 54:3,14 58:2,3 58:18 69:17,18 69:19,22,23 71:4 74:9,10 74:10 76:18 79:24 82:11,17 82:19,20 94:6 94:8,25 96:18 97:25 102:15 102:25 108:11 110:22 112:13 116:7 120:15 122:11,22 134:19 136:15 147:9 148:6 149:1,22 150:22 151:6 151:12,14,21 152:18 153:23 154:24 158:10 173:5,21 177:4 193:14,17 196:16 199:9 199:10,11 201:4,5,7,10 201:16 203:3 206:4,11 208:7

**pages**
70:1 77:1,2 80:1 82:18

**pair**
48:5,7,12,14 53:14

**paper**
59:16 98:3

**parade**
47:15

**paragraph**
199:13

**paragraphs**
12:11

**paramilitary**
65:5

**paraphrase**
177:8

**pardon**
56:3 73:13

**parent**
169:21 170:2

**parked**
59:20

**parking**
57:21

**part**
11:25 14:7 34:11,22 35:12 44:2 45:7,9 51:16 67:8 97:3,4 107:10 108:3 122:9 127:22 141:22 144:25 145:11 154:3 163:3,3 165:6,24 169:19 178:16 191:15

**participated**
151:4

**particular**
29:2 44:16 51:14,18 52:14 52:21 55:3,9 57:6 73:10 88:4,5 93:20 145:3

**particularly**
26:24 73:20

**parties**
209:15

**partner**
48:5 58:8 195:7

**parts**
204:16

**patricks**
29:21

**patrol**
6:17 7:15 47:9 106:13

**patrolman**
75:3

**patrolmen**
75:5

**pattern**
8:15 9:2

**pay**
190:17

**payments**
12:25 14:25 81:13 83:12 84:6,17 109:13 125:9

**peace**
105:6 140:25 145:17,19,25 146:7 147:10 148:7,10,17 149:3

**pending**
6:10

**people**
23:12 25:9 52:1 53:2,5 150:16 153:3 189:19 191:15

**perform**
70:12 191:10

**performance**
58:21 70:13 163:7

**period**
18:9 22:15 34:14 123:16 128:1,2,4,7,11 128:15,19,23 129:2 137:4,7 157:6,9 158:22 159:9 172:15 185:19 188:18 189:7 190:2 191:5 197:22

**perk**
206:6,22

**permits**
115:10

**person**
11:16 44:19 45:4 46:4 65:6 80:3 179:20 200:9

**personal**
76:24 200:1 202:15 203:13 205:3,18 207:2 207:4

**personnel**
118:19 147:3 155:22 182:20

**persons**
16:14 44:9 50:5 51:25 112:4,22

**persuade**
83:21

**peter**
16:6 147:10,12 148:7,9 178:9

**phone**
19:25 20:22,24

**photo**
12:19 14:14 81:2 83:5 108:18 124:24 142:18,20

**photographic**
17:15 156:8

**photographs**
180:18

**physical**
104:5

**pictures**
188:15

**place**
17:18 26:6 32:21 34:3,14 47:7,19 53:6 54:10 71:25 75:9 77:11 79:1,2,15,19 79:20 95:13 108:13 121:2,3 122:3 127:25 135:8 140:17 142:7 143:4,12 159:12 162:21 163:24 171:7 179:16 181:6 183:23 199:6 204:23 205:14 209:13

**placing**
12:4 14:11

**plain**
106:13

**plaintiff**
1:4 2:5 137:8

**plaintiffs**
1:9,21 2:14 3:10 3:11,11,12,12 3:13,13,14 4:2 16:12 132:3,9 132:18 133:15 133:16 134:20 136:3,7 144:1 146:17 176:17 192:17 203:18

**plans**
105:4

**plays**
196:6

**please**
4:8 6:4 34:1 107:23 133:9 134:21 173:6

**plus**
56:14 86:1

**pocket**
59:17

**point**
21:5 51:5 82:18 83:14 85:13 123:4

**police**
4:12,19,24 5:7 5:10 6:13,14 7:13 8:9 10:10 13:12,18 15:13 15:20 16:18,20 17:2 19:8 21:21 22:1,8 22:12,13,18,19 22:20,25,25 23:1,3,8,17,21 23:24 24:5,13 25:6,7,12,16 25:21,22 26:4 26:7,12,13,16 26:20 27:12,17 27:23 29:15,16 29:25 30:19 31:8 33:20 35:6 36:2 37:8 38:23 40:5,6

40:19 41:5,6,7 41:17 42:1 44:14,20 45:25 46:5,17,19,22 46:23 54:6 56:15 59:19 60:14 64:24 65:15,23,24 66:18,20,25 68:12,15,15,22 69:1,6,8 70:12 71:1,3,10,11 71:19 72:15,23 73:17,19,21 81:25 82:13 83:15 87:7,24 88:12,21 89:23 90:12 91:4 92:12 93:13,14 93:17,18,20,23 94:1,4,15,20 95:11,16,25 96:8 98:1,10 98:10,13,15 99:5,17,25 100:15,16,18 103:10,14 104:3 105:15 106:12 107:6 107:20,24 108:7 110:13 110:19 111:22 111:23,25 112:7,22 113:1 113:9,21 114:2 114:18,23,24 115:5,11 116:8 118:10,16 119:2,11,25 120:2,15,18,22 121:11,15,22 123:1,15 124:6 124:9,10,12,22 125:5,14,23 126:2,6,8,16 127:9 129:7,9 129:11,13,15 129:16,24,25 130:6,11,20,23 131:7,18,20,23 134:12,17 137:5 138:23 139:14,14,15 140:3,4,11,18 140:24,25 141:6,19 142:1 142:5,15 143:1 143:10,13,16 144:9 145:20 146:9,11 150:8 150:17,19 153:1 154:1,5 156:16,20,21 157:16,22 159:18,22 160:1,7 161:5 163:13 170:10 171:13 173:8 174:3,4 177:5 177:7,9,10,18 178:2 180:6,7 180:15 182:7 183:2,4 185:1 185:13,18 186:5,16,22 187:4,8,9 188:16 189:6 189:19,21 190:13,15 191:4 192:2,25 194:4,23 195:4 195:11,18 196:7 197:7,10 197:12,12,14 197:19 198:16 199:4,8 200:17 201:9,17,21,22 201:25 202:3,9 202:21 204:22 205:13,14,15 206:8,16,22,24 206:25 207:7

**policeman**
50:24 61:15 62:16

**policemen**
137:23

**policies**
11:21 16:18 17:3 18:10 19:8 22:1 23:5 29:3 30:23 31:5 34:6,13 34:17 53:21 61:1 78:25 80:15 87:5 92:11 106:22 127:14,25 128:5,12,16,20 128:24 129:3 129:11 133:13 133:21 134:10 135:5,16,19,19 136:20,25 137:10,13 138:6 139:9 140:6,13 141:25 171:15 172:4 173:9,10 173:14 174:1,8 174:19 175:7 175:17,24 181:6

**policy**
19:8 23:10,16,18 24:14 26:19 27:16,20,21 28:7,13,15 29:6 30:20 31:11 32:5 33:3,6,10,11 34:2 60:10,22 60:23 65:24 66:2 72:24 73:10 79:14,18 80:25 81:1,10 81:17,23 82:7 95:10 123:6 134:6 135:2,9 163:4 171:5,12 171:20 172:18 176:6 182:25 183:7,22 201:22,25 202:9

**policymaking**
18:8

**position**
4:11,16 5:2 6:20 6:23 8:5 9:10 9:11,23 10:2 133:18

**possession**
58:20

**possibility**
39:3 77:1 114:11 137:23 137:25 139:20

**possible**
114:12 134:22

**posted**
189:17

**postings**
188:15

**posttest**
153:6

**potential**
52:15

**power**
65:20

**practice**
52:12 53:2,13 146:13 183:23

**practices**
11:21 18:11 34:7 127:25 128:5,13,16,21 128:25 129:4 133:13,22 134:7 173:9,14 190:1,13,14,20

**preferred**
76:23

**preliminary**
5:16 205:6

**preparation**
19:4,21 21:22 36:24 44:15 50:21 61:3,9 63:19 67:24 97:5 111:17

**prepare**
18:16

**preparing**
204:15

**prescribed**
152:1

**present**
16:23 17:4,9 20:15,19 27:3 51:23 52:4,7,9 156:3 162:4 169:8 170:2,3 170:24 171:5 177:11

**presentation**
50:17

**presented**
50:8,16

**presently**
203:3

**preservation**
12:2 13:17 14:9 15:18 129:7

**preserve**
17:24 160:15 167:4

**preserved**
44:12

**preserving**
13:12 15:13 81:24 91:4 92:12 110:12 140:12

**pretrial**
96:21

**pretty**
27:23 174:11

**prevent**
78:1 156:11 157:2 158:20 159:3,11 160:5 160:13,21 162:18 163:17 164:13 167:4 167:24 172:6

**preventing**
164:2

**previous**
193:12

**previously**
92:7,21

**primarily**
49:11

**primary**
48:22,24 49:9,16

49:24 53:17,22
**prior**
5:4 42:17,20 50:21 65:2 93:24 109:2 130:1 173:23 187:25
**private**
186:4 192:24 195:25
**probably**
5:15 19:3 65:18 116:17
**problems**
171:14 188:6
**procedure**
4:3 27:24 34:3 53:10 79:18 81:10,17,23 82:7 95:3,5 135:10 178:19
**procedures**
16:19 17:14 18:11 30:24 31:5 34:13 43:12 53:21 68:10,16 69:4 70:8,13 78:25 80:16 82:13 95:14 97:5 102:8,19,22 103:5 127:14 128:5,13,17,20 128:24 129:3 135:5,16,20 136:20,25 137:7,11,13 138:7 139:9 140:6,13 156:7 157:13,23 158:5,21 162:19 171:15 172:4 173:10 174:1,8,19 175:7,17,24 180:24 204:19
**proceed**
52:23
**proceeding**
86:6
**process**
21:19 27:10 74:12 91:25 106:24 114:15 198:3
**produce**
16:11,16 38:22 139:17
**produced**
16:22 19:17 36:17 41:14 69:10 70:10 114:5 129:24 137:8,10 138:6 138:21 139:8 145:6,7,8 147:4 148:2 149:12 164:8 174:4,21 175:3 175:16 186:8 193:1,10 203:24
**producing**
37:23 114:15
**profession**
88:23 106:1
**program**
102:18 103:5,7 103:11,18 105:19 147:13 147:25 148:4 148:10,19,22 148:23 149:4 149:13,15 150:23 151:10 151:15,19 155:1,6 183:3 193:22 194:16
**programs**
155:20 194:9 199:3
**progress**
55:11
**prohibited**
120:3
**project**
197:4,10 201:8
**projects**
195:9 197:6
**promises**
12:25 14:25 81:13 83:12 84:7,17 85:2 109:14 125:9
**promoted**
7:6 8:19 10:1 190:16
**promotion**
83:22
**promotional**
83:23 190:14
**promulgated**
64:24 86:23 93:17 95:11 96:3 103:2 201:17 202:4 202:21
**promulgating**
22:24 24:10 41:17 65:3
**proof**
149:10
**proper**
98:21
**properly**
44:12 50:8,16 167:13
**prosectors**
17:21 125:18
**prosecute**
52:1,5
**prosecuting**
50:5 51:25 97:18 98:22 99:16
**prosecution**
52:3 86:4 99:19
**prosecutor**
27:4,14 28:5 29:20 31:16,23 32:24 35:4,23 44:17 45:23 51:23 52:4 78:1 79:6 90:1 96:25 101:5,12 102:9 131:10 166:20
**prosecutors**
13:6 15:7 27:8 28:2 29:5,19 32:7,10,19 36:1 45:8 50:17 52:2 85:11 87:14 91:16,19 92:2 100:23 110:1,9 131:12,16,22 142:10 164:22 164:25
**prospective**
99:20
**prostitution**
7:4
**protect**
197:18
**prove**
34:25
**provide**
11:17 13:25 16:1,10 17:1,7 18:7 27:6 35:3 70:10 86:3 102:10 146:1 168:5 175:11 197:16
**provided**
4:3 16:4 18:19 20:12 72:24 81:15 103:9,23 125:4 135:24 141:9,17 142:6 142:17 145:4 145:15 149:9 157:17 164:24 168:7 178:22 195:10 200:24
**provides**
25:17,19 76:24
**providing**
161:20
**provision**
97:6
**public**
1:16,17 2:8 10:8 23:24 24:1,3,9 37:8 63:18 65:2 66:3,14 66:16,16 94:13 94:14 104:7 187:3 197:17 206:23 209:7 209:21,22
**publications**
38:4
**published**
37:11 39:23 64:5,13,17 144:13
**publishing**
198:1
**purpose**
4:2 29:12 46:6 70:4,7 77:4,20 77:21 83:22
**purposes**
11:2 36:13 63:11 67:15,17 72:6 111:9 132:4,19 136:4 144:2 146:18 176:18 192:18 203:19
**pursuant**
1:19 197:14 209:13
**push**
33:22 40:24
**put**
23:15 40:10,16 55:19 57:25 59:10 73:17 77:16 89:23 90:4 117:7 130:16 198:16
**putting**
80:22


## Q


**quarter**
204:20
**question**
6:5,10 19:11 20:17 58:14 68:4 91:11 92:24 93:12 98:7 101:14,23

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 236 of 248. PageID #: 1554



106:16 109:4 113:5 122:23 123:2 124:5 129:18 141:4 152:21 156:17 169:7 174:11 176:6 193:5,5 201:13
**questioning** 168:18
**questions** 5:24,25 20:11 49:8 73:15 135:13 175:4 176:4 184:13 192:8 207:13
**quick** 126:25
**quite** 20:8 105:10 165:7
**quote** 177:13

**R**

**r** 209:3
**racially** 188:15
**rademaker** 206:7
**radio** 59:19
**ralph** 206:6,21
**randomly** 121:12
**rank** 106:12
**ranking** 83:20
**ranks** 25:19
**rc1** 71:22
**read** 12:10,15 43:5,7 43:9 50:23 53:23 68:19 73:2,5,7,23,25 87:12 110:22 133:16 135:11 184:20 185:24 192:10 201:20 207:15 208:3
**reading** 84:16 117:14 187:6 198:8
**ready** 152:22
**reagan** 150:9,13,14
**really** 20:9 21:17 40:12 50:12 53:8 87:16 149:16 163:6 164:21 190:16 195:14 196:10 196:13
**reason** 168:23 203:5 205:19,21 208:7
**reasons** 77:4
**recall** 25:1 56:12 63:25 110:21 141:10 148:5 184:23
**receipt** 120:17,21,24
**receive** 25:9 83:16 88:19,20 106:9 120:24 165:15
**received** 35:23 55:4 72:15,20 103:14 121:5 148:21,23 155:19 178:20
**receiving** 71:13 83:18
**recess** 63:6 127:3 161:14
**recognized** 201:23
**recollection** 5:18
**recommend** 66:6 195:24
**recommendati...** 42:13 66:17
**recommendati...** 23:13 66:21 185:17 197:4 201:8 205:8
**recommended** 197:6 201:24
**record** 4:9 6:4,6 12:15 20:18 36:16 38:16 41:12,15 58:21 76:24 77:21 98:3 118:2,5,7,8,18 123:21 124:5 135:2 146:20 161:12 176:22 186:2 203:24 204:8 209:12
**recording** 75:22 76:2,16
**records** 118:9,14 137:3 139:16 150:19 157:15,19 194:3,6 200:15
**recounts** 177:15
**recovered** 111:25
**reduced** 209:11
**reduces** 77:1
**reexamination** 3:5 192:20
**refer** 113:20 122:2 191:18 192:1
**reference** 30:6,13 70:15 92:3 115:19 118:1 120:9,10 184:23 185:4,7 185:11 187:22
**referenced** 137:2
**references** 187:15 191:3
**referred** 54:16
**referring** 92:6,16 113:19 158:7,16 159:21
**refers** 96:2
**reflect** 123:13 178:15
**reflected** 72:19,21 124:14 134:11 141:14 149:15 155:12 155:17 173:15 174:20 181:24 182:19
**reflects** 181:14
**reform** 191:3,19 192:2
**refresh** 5:17 77:23
**regarding** 17:16 82:12 108:8 117:3 137:1 142:18 148:16 156:9 161:20 169:23 184:25 189:25 190:19 191:3
**registration** 149:23 150:6 151:12
**regular** 76:22 78:21 199:10,11
**regulation** 81:18,23 82:8
**regulations** 31:11 40:18 61:2 83:25 92:11 104:4,10 142:4 163:22 164:1 168:9
**reiterate** 89:3
**reiterated** 20:9
**reject** 66:20
**relate** 187:15
**related** 17:14 19:10 148:3 156:7 164:24 168:9 176:5
**relates** 34:5 83:1 86:22 90:21 91:3 93:1 107:7 108:1,17 109:10,23 110:12 111:1 122:5 136:17 157:1
**relating** 11:22 14:4 16:17 18:11 34:8,14 80:16 81:1,10,18,24 82:8 83:4,9 85:8 87:3,8 95:14 123:7 124:12,22 125:5,14,23 126:6,16 127:14 128:1,6 128:13,17,21 128:25 129:4 131:8,21 135:4 135:17,21 137:14 140:19 143:12 148:7 149:12 157:12 157:22 158:4 158:20 159:4 159:12 160:6 160:14,22 164:1 173:10 173:14

**relation** 181:23
**relationship** 23:24
**relative** 20:11 209:14,15
**relevant** 32:24 128:1,4,11 128:19 129:21 137:4,7
**relies** 166:11
**relieving** 46:16 47:10
**remember** 61:22 78:17,20 89:25 188:1
**removed** 77:3
**repealed** 117:17,21
**repeat** 93:4 107:23
**rephrase** 6:1 32:8
**report** 32:18 54:15 55:14,20,25 57:10,22 59:5 59:24 71:21 74:11,16,22,25 75:11,12,13,15 75:16 76:1,2,6 98:4 104:23 115:16,20 176:25 184:24 185:11,18,24 186:2,4,13,21 194:9,15 205:6
**reported** 71:12
**reporter** 11:5 63:13 67:19 124:2 192:22 203:21
**reporters** 60:16
**reporting** 74:11,15 76:10 209:16
**reports** 13:13 15:14 53:23 54:17,19 54:20,24,25 55:11 56:10,20 57:3 71:8,9,23 74:14 75:8 77:23 81:25 86:4 91:4 92:12 97:2 99:15 104:22 108:8,10,13 110:13,19,23 110:24 115:23 126:8 162:22 196:3 198:16 198:20,21,24
**repository** 185:14
**representatives** 195:16
**reproduced** 41:15
**request** 16:12,13 32:19 48:25 49:2,3 144:19 145:8
**requested** 134:19 185:10 197:11
**requests** 19:7 49:1 134:20
**require** 47:1 48:11 50:19 55:8 71:18 169:21 180:17
**required** 39:17 43:7,7 45:3 50:11 55:15,25 60:22 60:23 61:4 71:16 77:9,15 77:16 78:7,11 79:1,4,5,14,19 86:3 87:13,22 89:13 98:2 115:23 116:4 121:10,25 142:6 180:18 180:19
**requirement** 29:4 32:4,5 56:6 56:9 57:9 72:22 80:16 91:17 170:24
**requirements** 28:25 77:19 206:17
**requires** 32:5 43:25 60:4 71:10 72:4 102:10
**requiring** 143:5,13
**rescinded** 130:7,15
**rescinding** 119:3,10
**resign** 83:21
**respect** 31:13 109:1 133:19 134:18 146:8 164:10 171:23 172:21 183:1 196:6 202:19
**respectfully** 97:15
**respond** 7:21 59:20 87:18 134:4
**response** 12:13 87:18 134:5 178:7 183:12 186:15
**responsibilities** 4:16,17 9:14 25:24 26:4,24 28:25 78:12 103:4 104:11 163:20,21
**responsibility** 23:2 24:10 25:18 26:13 27:11 42:16 47:8 51:7 167:1,11 168:5
**responsible** 8:24 22:24 24:3 25:2 33:20 41:17 129:6 140:12 162:21
**responsive** 16:12 19:6,12 20:12 56:12 92:10 111:24 117:2 162:2
**rest** 66:10
**result** 17:11 156:5 182:8,18 193:23
**results** 178:24 180:22
**retain** 143:16
**retained** 56:24 129:14,22
**retention** 17:3 56:25 57:2 129:11 135:2
**retire** 83:21
**retired** 62:13,19 111:23 137:23 156:20 191:11
**retrained** 184:1
**return** 120:24
**reverse** 112:11
**review** 12:12 19:4 21:6 21:12 30:4 60:21 61:2 63:19 65:6 67:23 69:12 76:3,6,15 97:13 107:14 122:21 131:2 162:22,22 171:13,21 172:4,19 178:14 185:9 199:5 204:14
**reviewed** 18:18 19:13,17 28:4 31:9 35:19 36:24 42:11 104:23 111:16,18 114:20 127:7 127:10 144:11 162:2 193:12 204:16
**reviewing** 22:4,9 34:16 42:10 78:23 106:21 129:23 141:9
**reviews** 58:9 161:4
**revise** 206:24
**revised** 29:17 94:15 204:20 207:7
**revising** 25:3
**revision** 102:21 206:14
**revisions** 64:6,8
**rewrite** 197:22
**rewriting** 197:20
**rewritten** 198:3
**ricky** 1:3 2:5 5:21
**rid** 60:2
**right** 6:4,13,22 7:5 10:22 11:4 14:22 19:16 30:18 36:2,3 36:16 37:1

41:3 42:25 43:6 48:2 53:2 54:12 64:16 70:1 71:7 73:2 73:24 74:9 76:11,12,18 79:4,10,12 88:10 90:12 93:15,24 94:17 95:8,9,21,22 96:3,7 97:10 97:18,20 98:11 100:24 101:2,6 101:10,14 102:2,25 103:22 107:16 108:16 114:6 114:17,21,22 115:9 117:13 119:1,20,25 120:10 123:6 127:6,15 132:21 133:8 135:15 138:13 138:17 141:15 144:4 150:3 151:6,14,21 152:22 164:5 165:10,13,16 165:20 173:5 176:13,20 184:9,23 190:24 192:22 193:16 197:3,9 198:8 200:6,8 200:20,23 201:3,4 205:9

**rights** 95:7 96:21 97:1 172:7

**rise** 193:23

**road** 7:7,14,15

**robberies** 8:16

**rocha** 38:18

**roetzel** 2:16

**role** 23:23 29:8 146:8,10 164:21 196:5

**roll** 73:23,25 121:12 121:13

**roman** 193:14,17 196:16,17,20 196:22,23,25

**rookie** 61:15

**room** 2:22 118:2,5,7,8 118:18 162:25

**rule** 11:6 26:19 32:5 33:2 41:23 42:15,17,23 43:24 44:6,8 44:21,23 46:2 46:6,8,12,14 46:25 47:1,3,4 48:11,11 50:2 50:10,19 51:24 54:3,12,14 58:18 60:3,3,5 66:18 71:8,15 71:17 77:7 78:4,5,6 81:17 81:23 82:7 83:14 84:3,4,5 84:8,14,16 85:2,8,14 87:6 87:12 89:9 90:10,11 94:8 95:5,10,14 96:3 98:22 99:24 100:13 100:18,25 101:8 110:2,6 110:8 119:3 120:2,7,7 121:2 171:7 209:17

**rules** 4:3 5:17 19:10 22:7 24:10,17 24:21,23 25:3 25:10,15,15,17 26:2 30:19 31:7,10 34:19 36:8,17 37:6 37:13,22,25 38:9,21 39:13 39:20,25 40:2 40:9,18 41:1 41:24 42:2,6 42:12,19 43:2 43:3,5,9,14,25 53:20 61:1 63:15,23 64:3 64:12,22,25,25 65:3,21,25 67:9 77:7 78:25 83:1,4,9 83:25 84:5,21 85:6 87:6 90:18,20 91:1 91:2,22,24 92:11,17,25 94:10,13,17,20 94:23 95:21 100:21 102:8,9 104:4,10 109:19 119:4 119:10 120:9 120:10 127:7 134:6,11,16 138:24 142:3 143:21 163:19 163:22,25 168:9,12 201:17 202:4 204:20 206:14

**rumor** 52:8

**run** 59:14,15,25 60:4 60:6 61:19,21 62:7 67:7 140:3 194:14

**running** 67:8

**runs** 140:4


## S


**safety** 10:8 23:24 24:1 24:3,9 37:8 65:2,8,8 66:3 66:14,16 94:13 94:14 206:7,23

**sarge** 55:18

**satisfactorily** 151:24

**saw** 30:6 35:14,18 61:14 185:2 186:24 188:24 189:19

**saying** 42:23 43:2 100:25 136:23 139:21 159:21 160:1 163:12

**says** 38:18 41:4,21,25 44:8 46:2 50:4 50:13 51:24 54:7 64:15 68:9,13,18,19 69:19 71:9 73:19,24 76:22 77:17,20 80:20 80:22 85:4 91:23,24 94:9 94:11 95:2 96:2 97:15 98:1,21 99:13 100:11,24 101:8,21,22 108:9 115:13 120:5,20 134:25 136:16 147:12,16 148:8 150:7,11 150:12,12 154:3 158:9 175:15 193:20 195:20 197:4 197:10,11 199:13 201:9 201:16,21 202:3 203:3 206:12

**sayso** 76:7

**scenario** 40:4

**scene** 7:22

**schedule** 57:1,2

**scheduler** 62:20

**school** 10:13 88:10 106:7

**scope** 87:16 168:14 170:5 172:13 180:10 181:3 181:13 182:1 182:13 183:11 187:12,18 188:11,22 189:11 190:6 195:1 196:9 198:6,19 199:25 202:14 203:13 205:2 205:18 207:2

**score** 153:5

**scored** 105:2

**seal** 209:18

**search** 16:15 113:25 114:9,10,14 116:20 117:2 137:3 139:18 191:1,16

**searches** 80:3 191:11

**second** 37:1 49:3,20 69:19 90:19 108:12 115:1 148:6 199:13

**secondly**

162:9
**section**
41:5,21,24 50:4 54:3,14 71:7,8 73:10 76:21 77:20 84:14 131:1 193:19
**sector**
186:5 192:24
**security**
4:13
**see**
22:9 30:4 31:11 38:19 41:10 43:24 44:11 59:7,15 61:1,7 61:13 62:21 63:22 78:9 79:17,23 80:5 80:15,20,23 87:2,5 89:20 90:21 99:2,22 102:14 113:1 115:17 118:3 148:2 150:9 153:11 154:10 155:2 157:18 162:10 163:25 164:4,7 177:19 179:14,17 199:18 204:1 206:9,19
**seeing**
56:12 61:22 141:10
**seen**
11:9 35:8 36:21 36:22 61:11 78:13 90:5 114:18 132:13 132:14 136:9 136:11 144:5,6 147:6,7 176:21 176:24 186:11 186:13,14 193:6 204:12
**seizure**
116:21
**seminar**
151:23 152:25 153:8,25 154:6 154:15,17,22
**senior**
89:2 105:24
**sent**
90:1 130:25
**sentence**
139:12 175:14 199:18 201:20 204:18
**sentences**
12:10
**separate**
44:24 69:18 162:25 193:22
**september**
103:3 117:25 148:11 149:4 150:24 151:8 151:16 155:1 194:17 197:23 198:2 202:23
**sergeant**
7:6 8:7 55:17 112:3,22 153:13 178:7 178:22 179:1,3 179:10,19,25 181:8,19,22
**sergeants**
9:4,6,7,8 153:2,4
**series**
19:6
**serious**
7:19
**serve**
67:1 77:22 195:22
**service**
7:18 57:21 187:3
**services**
4:19,21
**session**
149:8
**set**
24:15 49:10,10 49:16,17,20,21 49:24 53:17,22 69:18 93:20 99:24 105:7 114:23 115:1 123:15 132:10 136:8 145:20 146:3,12 196:12 209:18
**setter**
23:10
**seven**
5:3 73:23,25 104:25 173:3
**sex**
9:18 27:22 28:22 122:12
**shadowed**
106:23
**shawn**
2:20 20:10,14 123:18 176:3
**sheet**
59:15
**sheets**
59:14,25 60:4,7 61:20,21 62:7
**shes**
158:16 176:6
**shift**
7:17 48:6,8 49:3 49:4,4,18,25 54:1 56:18 57:11 58:10 74:23 75:11
**showup**
12:20 14:15 17:15
**showups**
81:3 83:6 108:19 124:25 156:8
**side**
6:18
**sign**
39:7 58:4,8,9 78:7 121:5
**signature**
132:23 150:7 208:1
**signed**
97:16 136:13 139:2 149:23 179:1
**significance**
47:20
**significant**
57:25 59:9 122:12
**signs**
58:7,8
**signup**
150:3
**similar**
38:2
**simply**
54:3
**single**
19:14
**sir**
154:3 185:25
**sit**
195:10
**situation**
169:25
**situations**
197:17
**six**
6:21 19:3 104:8 104:25 157:1 196:16,21,21
**sixth**
6:18,25 7:17 188:25
**skipping**
151:21
**society**
204:22
**sole**
23:10
**solicit**
83:16
**soliciting**
83:17
**somebody**
67:6 89:13,19 106:23 145:9 180:6 200:20
**sorry**
14:19 20:17,23 29:8 62:11 70:15 72:7 82:25 97:21 105:12 107:18 119:16 124:7 124:10 138:11 146:22 150:1 155:9 173:3 186:1 192:12 196:20 202:19
**sort**
88:16 161:3 183:22
**sorts**
118:15
**source**
144:8 146:12 195:13
**sources**
23:4
**south**
2:16
**speak**
19:20,24 20:3 22:3 34:18 40:12 49:5 104:16 107:13 122:18 128:8 169:17 170:23 178:13
**speaking**
21:15 22:16 123:24,25 164:10 179:15 190:10
**special**
4:14,20,21 9:13 33:14 195:23
**specialized**
9:21 106:9
**specific**
7:17 55:24 57:4 66:18 122:3 123:1 143:9,20 154:23 155:20 163:18 169:4 169:19
**specifically**

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 240 of 248. PageID #: 1558



**specifically**
35:9 43:25 57:12 62:22 85:1 93:7 135:3 142:24 154:22 163:9 163:23,25 191:14 195:12 195:14
**specifics**
163:19
**spell**
4:8
**spelled**
84:20
**spent**
135:15
**spoke**
20:10 21:22
**squad**
9:20
**square**
1:17 2:8 209:22
**ss**
209:4
**st**
29:21
**staff**
4:25 196:2
**staimpel**
16:6 151:8,13
**stamp**
44:5
**stamped**
36:18 41:4 63:16 67:20 69:16,17 76:18 93:9 111:13 126:2,20 144:7 203:23 206:5 206:12
**standard**
27:24 53:9 87:21 178:18 197:15
**standards**
145:20 146:3 181:17 197:13 201:19,24 202:2,2,6,8
**stanley**
177:1,5 179:11 179:18,21 181:9
**start**
5:4 21:19 96:8 147:8
**started**
62:3,6 75:7 78:17 121:8 171:8
**starting**
57:14 96:7
**state**
1:16 4:8 10:4 19:9 84:10 85:15 88:1 99:21 133:9 134:23 145:21 146:3,15 147:9 188:3 209:4,7 209:21
**stated**
55:21 79:4 164:19
**statement**
44:25 45:2,4,6 45:12,15 98:4 169:22 174:5 177:14 201:14 204:25
**statements**
12:4 14:11 44:9 44:11,13 45:10 45:10,11,15,17 45:21 97:2 99:20 100:1 101:13 142:7 177:10 180:17
**states**
1:1 41:16 46:14 54:3,14 58:18 84:10 96:23 105:7 133:8 134:19 135:7 136:24 139:7 140:16 151:23 152:23 153:1 154:14,20 173:6,24,25 177:25 204:19
**station**
180:7
**statistics**
199:2
**statute**
117:19
**statutes**
117:16
**stays**
131:3
**stenographer**
74:17
**stenotypy**
209:11
**stephen**
2:15
**steps**
206:13
**steve**
19:25
**stint**
8:10
**stipulations**
1:20 209:14
**stoiker**
16:5 149:2,8,24
**stolen**
47:21 75:1
**stop**
65:14
**stopped**
37:19 38:9
**stops**
65:14
**storage**
13:16 15:18
**street**
2:12,16 8:16 59:20 169:13
**strike**
8:12 9:1 29:9 31:13 70:15 72:8,9 83:2 94:4 105:13 119:14,24 124:7,11 127:11 143:24 155:9 163:10 182:5,6 202:19
**student**
149:23 150:6 151:12
**study**
187:3,7
**subject**
84:1 85:24 94:9 95:3 96:20 102:17 103:3 120:2,17 121:11 137:1 140:19 153:18 153:24
**subjects**
158:12
**submitted**
97:16
**subscription**
83:18
**subsections**
135:12
**subsequently**
183:25
**subset**
112:23
**substance**
148:18 152:14 152:15
**successfully**
149:9
**suggestion**
50:13
**suggestions**
66:21
**suite**
1:18 2:3,8,12,17 209:22
**superior**
42:13 43:17 47:6 84:13
**supervise**
163:8
**supervised**
7:8,16 9:6,7,8
**supervision**
13:21 15:23 82:9 93:2,5 111:2 126:18 152:25 153:18 161:24 162:7 163:5 164:11 176:7 187:16
**supervisor**
7:7,14,15,16 8:14 58:4,6,9 58:11 59:6 60:21 73:9,24 74:3 76:5,9 104:24 105:24 163:2 165:10 165:18 166:4,5 166:10,18,22 167:15,16
**supervisors**
8:8 9:5 42:16 55:15 78:7 89:1 103:16 141:2 162:8,17 163:10,16 164:1,12,23 165:1 167:2,11 167:22 168:4
**supervisory**
7:20 8:5 25:24 78:12 178:20
**supplement**
102:18,22 173:23
**supplemental**
133:2 136:7 139:6 175:15
**supplemented**
136:22
**supposed**
58:4 82:16 84:15
**suppress**
183:25
**suppressed**
183:24
**supreme**
86:21 104:4
**sure**
12:11 35:25 48:14 51:17

57:8 62:19 63:4 76:3 90:2 107:24 150:11 150:12 163:22 168:6 176:2 194:13
**suspect** 47:21 95:7
**suspects** 13:9 15:10 17:21 18:4 81:20 90:23 125:25 143:15 168:22,24
**sworn** 4:4 103:15 209:9
**system** 51:21 74:11,15 75:12,13,22 76:2 130:19 131:5,6 196:2
**systematically** 172:3

**T**

**t** 94:12 96:25 97:16 209:3,3
**tab** 204:17
**tactics** 183:17
**take** 6:9 7:23 11:7 26:5 32:21 36:20 45:4 47:23 67:12 87:25 93:11 94:6,25 97:13 115:8 117:24 119:20 126:25 132:12 133:5 135:11 136:8 143:22 144:4 147:5 152:19 161:10 169:22 176:13,20 193:4 209:8
**taken** 1:14 34:3 42:24 44:9 53:6 72:5 180:18 204:22 209:13
**talk** 7:21 34:5 36:6,8 47:11 49:7 66:23 74:3 127:18 155:24
**talked** 19:25 127:17 131:8 136:20 140:22,23 159:22 165:25
**talking** 22:20 47:25 110:8 113:20 115:14 135:16
**tangible** 98:4
**taped** 180:19
**task** 49:21
**tasks** 49:18
**taught** 56:16 57:24 103:25 104:3 147:24 149:14 152:15 153:4,7 153:14,17,21 154:22
**teach** 89:2
**team** 48:1,4,7,22,24 49:13,14
**technical** 152:2,10
**technically** 66:12
**technology** 74:14 209:12
**telephone** 74:16 75:8
**tell** 19:14 21:8 22:6 33:17,25 40:13 45:12 47:5,11 50:24 57:1 59:9 61:14 65:4 66:22 86:19,20 87:19 87:19 104:2 117:18 122:16 162:6 163:23 166:4,12 171:9 178:15 189:15 195:15
**telling** 206:23
**tells** 118:12
**temporary** 29:14
**ten** 5:15 20:25 33:18,19
**tenure** 189:21
**term** 189:22
**terms** 25:10 53:15 95:6 190:12 196:5
**terpay** 16:5 150:24 151:4 177:2,2 177:12,18 182:5,8,16,18
**terry** 2:6 189:8 192:12
**testified** 21:3 31:6,14
**testify** 11:13 12:21 13:25 62:21 124:3 200:5,10 209:9
**testifying** 123:19
**testimony** 11:18 13:25 16:2,10 17:1,7 18:7 89:17 156:1 174:24 188:3 208:5 209:12
**text** 97:9,14
**thank** 18:14 126:24 186:4 207:15
**thats** 12:11 23:20 27:16 34:3 36:4 41:21 43:21 47:16,17 48:23 64:13 69:2 72:1 73:14,16 89:16 90:6,7 94:18 95:12 96:13 100:24 101:22 116:19 127:20 130:18,22,25 131:6,12 134:3 138:22 139:1 140:2,2 150:2 152:19 154:20 158:8 159:24 162:12 163:3 165:5,24 166:4 169:2 170:11 173:4 174:10 174:24 175:22 178:9,21 186:13,19 193:22 196:16 200:22 205:5
**thefts** 8:16
**thereof** 12:5 14:12
**theres** 49:9 94:8 121:19 123:24 127:18 140:1 144:14 150:7 158:12 173:22 174:18 179:14 187:14 193:14 194:3 201:12 203:5 204:18 205:8
**theyre** 29:23 49:24 55:13 56:21,23 57:3,23 58:3 68:22 73:15,15 82:16 96:5 118:15,24 121:23 123:3,4 130:22 162:23 169:5 175:5 195:7,16 196:23
**theyve** 121:5 195:10
**thing** 22:10 30:8,9,15 68:19 77:6 83:19 95:20,23 107:2 117:17 175:3
**things** 20:10 22:3,6 26:5 30:10 39:11 40:13 48:21 52:6 53:4 57:5 59:3 59:18 60:18 62:1,2 128:8,9 149:20 156:19 165:8 167:12 168:6 175:20 187:16 189:5 189:14,16 195:7
**think** 24:14 29:7 30:13 47:9 53:11 78:9 80:20 84:3,14 87:12 88:3,18 89:7,19,20,25 92:3 95:13 102:12 104:25 105:25 111:21 119:23 124:1 157:14,16 162:1 163:5,9 170:11,20,20

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 242 of 248. PageID #: 1560




170:22 187:17
**thinking**
87:20 92:9
**third**
8:12,23 9:1
**thoroughly**
50:6
**thought**
169:5 181:19
**threats**
13:1 15:1 81:14 83:12 84:7,17 85:2 109:14 125:10
**three**
4:18,22 9:4 10:11 77:4,23 121:18
**tickets**
104:8
**time**
5:9 6:9 18:9 20:8 22:15 34:14 35:2,24 40:1 57:14,15 58:16 63:2 69:13 70:19 72:1 86:16 90:1,17 121:12 123:16 128:1,2 128:4,7,10,11 128:15,19,23 129:2,13 133:14 134:8 135:15 137:4,7 137:12 138:8 139:10 146:14 149:18 150:17 154:11 156:15 157:6,9 158:21 159:9 163:13 165:23 169:16 169:18 172:15 175:18 177:6 178:23 181:21 188:19 189:8 194:9 197:22 202:10 203:11 204:23 205:15 205:25 207:7 209:13
**timecard**
58:17
**times**
18:24 32:18 172:15 180:16 195:8
**tip**
52:8
**tips**
165:15
**title**
37:5
**titled**
144:8 192:24
**today**
11:14 19:22 20:6 21:23 22:4,6,17 24:21 25:2 26:7,10,20 27:18 28:10 29:6,10,13 30:11,16,18,25 31:13,20 32:15 37:21,25 38:3 40:13 43:19,20 45:13 46:8 47:5,16 50:24 54:10 55:13,18 56:6,7,13,19 56:21 57:9,12 57:15,15,24 59:14,16 60:3 61:3,9 64:22 65:4,12 66:22 73:8,17 74:14 79:12 84:4 86:20,21 96:14 96:17 100:19 100:25 101:5 101:24 102:1,6 102:7 103:20 105:10 116:1 116:12,16,19 116:23,25 117:9,17 118:5 118:24 121:4 130:4,18,23 135:16,22 136:21 137:15 147:19,20 157:24 162:20 163:12 168:8 170:7 173:16 178:21 180:3,8 180:25 181:5 193:13 194:14 195:3 196:6 198:21,25 204:15 206:18
**todays**
181:17
**told**
76:15 89:14,20 121:17
**tolliver**
177:1,5,15 179:11,18 181:9
**tollivers**
179:21
**tomba**
1:14 3:2,4,5 4:1 4:6,10,10 127:6 133:25 184:11 192:20 208:2,24
**tomorrow**
29:21 74:24 121:14
**tonight**
47:14
**top**
68:9 102:15 152:23 153:11
**topic**
12:21 14:1,16,22 15:3 16:3,10 17:1,7 18:7 34:5,5,15 43:21 84:6 107:7 109:10 110:12 122:5 123:7 124:13 124:23 125:6 125:15 126:7 126:17 127:19 128:1,6,13,17 128:21,25 131:15,15,17 131:21 135:11 155:24 156:12 156:25,25,25 164:10
**topics**
11:12,14,19 12:16 18:12 23:20 80:8 127:13,15 135:17,21 137:14 153:3
**total**
19:3 152:3
**tour**
46:16,18,21,23
**track**
176:4
**tracking**
58:17
**traditional**
39:9
**traditionally**
39:4
**traffic**
130:22
**train**
89:2 147:20,21 147:21,23
**trained**
40:3 61:23 72:9 78:16 89:5 106:18 149:18 155:12,16
**trainer**
147:21
**trainers**
147:22
**training**
13:21 14:2 15:23 16:4 18:11 43:11,14 72:19 73:4 82:8,15 88:16 88:20 89:6 93:2,5 102:18 102:22 103:5,7 103:9,11,13,14 103:16,18,20 103:22 104:5,6 104:9,15,20,24 105:6,14,19 106:1,10,15,16 106:20,21 107:1,3 111:1 116:9,11,12,14 116:17,20 117:1,3,6,8 126:18 137:6 137:11 138:7 139:9 140:18 140:22,25 141:1,5,10,13 141:14,18,25 142:2,5,13,16 142:24 143:3,9 143:11,20 144:9,25 145:12,17,19 145:21,25 146:7,8,11 147:2,11,13,18 147:25 148:3,8 148:10,17,19 148:23 149:3,8 149:13,15 150:4,8,16,20 150:23 151:4,9 151:15,19 152:24 153:8 155:1,5,19 157:15 173:9 173:11,15 174:2,8,19 175:7,17,24 176:7 183:3 187:16,22 188:5 193:19 193:22 194:8 194:14,16 199:16,21 200:5,10,23 203:3,4,7,8,10
**transacted**
46:18,22

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 243 of 248. PageID #: 1561




**transcribed** 180:20 209:11
**transcription** 208:5
**transferred** 7:10,24
**transpose** 59:23
**treat** 168:20
**treated** 168:24
**trial** 50:21,21 51:3
**tric** 116:21
**true** 24:7 114:3 140:13 174:5 178:21 200:13 205:5 208:4 209:12
**trustees** 152:1
**truth** 209:10,10,10
**try** 6:1 122:22 184:19
**tuesday** 18:23
**turn** 31:15,23 37:1 41:3,23 46:14 60:23 69:19 71:4 79:5,15 79:19,24 91:18 96:18 102:14 136:15 166:21 173:1,21 201:9 204:11,17 206:4
**turned** 28:1 45:8 78:1 92:1 166:19
**turning** 35:24 44:5 74:9 116:7 119:1 151:21,22 201:4
**twice** 18:22
**two** 20:16 54:7 76:25 77:22 111:22 127:8 144:21,24 156:20
**type** 32:25 35:5 45:5 55:5 74:17 76:22 77:9 84:1 95:10 118:19 178:19
**typed** 45:11
**types** 17:10 35:2 156:3,12,18 157:3 162:5
**typewriter** 45:6

**U**

**uhhuh** 18:15 37:3 67:25 196:18
**ultimate** 23:2
**unable** 113:23
**unauthorized** 120:3
**unaware** 167:16 201:3
**underage** 169:5
**underneath** 9:4
**undersigned** 208:2
**understand** 5:25 43:6 57:8 73:7,11,16,22 74:1 84:19 139:2 156:17 163:11 200:22
**understandable** 6:2
**understanding** 19:16 21:25 37:10 44:21 46:25 47:3 50:10,12 70:18 71:15,17 72:3 74:2 85:19 101:20,21,22 104:20,22 112:4 113:8 116:3,14,16 117:5 121:1 129:10 149:5,7 151:1,3,17 152:5,7 154:13 154:21 155:4 155:10 194:7 197:25
**understood** 72:24
**undertaken** 16:16 206:13
**undertook** 171:13,21 172:19
**unfinished** 46:19,23
**unfortunately** 193:2
**uniform** 7:7,21 29:22 66:8
**uniformed** 25:25 57:20
**uniformity** 197:15
**unique** 87:25
**uniqueness** 29:1
**unit** 4:25 8:12 9:3,18 9:19,19,20,22 27:21,22 28:17 28:18,19,20,21 28:23,23 29:2 30:21 43:13 44:10,24,25 45:2,5,12,15 55:17 56:23 118:16,16,23 118:24,25
**united** 1:1 84:9
**units** 9:5 33:7,8,12 43:11 71:12 97:8 118:16
**university** 10:4,12
**unlawful** 183:17
**unusual** 47:7 147:18
**unwritten** 11:20 34:6 127:14,18,24 127:25 128:5 128:12,16,20 128:24 129:3
**update** 33:16 40:23 73:21
**updated** 33:18 34:1 38:5 38:6 40:19 64:3 68:14 121:10
**updates** 25:11
**updating** 33:20
**uphold** 88:1
**use** 12:23 13:16 14:23 15:17 49:12 75:4,24 81:11 83:9 109:11 125:6 130:24 180:13 180:24
**usually** 29:24 48:22 58:1 59:17 60:15 87:1 121:18

**V**

**value** 83:19 86:5,6
**various** 141:20 188:16
**vary** 57:23
**vehicle** 59:21 75:1
**vehicles** 80:3
**verbal** 54:17 55:11
**verbally** 32:10 75:16
**verification** 132:22 136:13 173:2
**verified** 132:25 136:12
**version** 36:17 38:8 39:16 63:15,18 63:23 64:4 68:14 193:1
**versions** 127:7,9 138:24
**versus** 5:21,22 25:16 85:17 86:8,18 87:3
**veto** 65:20
**vice** 6:24,24 7:3 9:3
**view** 162:25,25
**violate** 84:9 85:14
**violated** 42:23
**violation** 42:15,17 57:21 172:6
**violence** 9:19 57:22
**visits** 185:13
**volume** 139:16

**vs**
1:5,10

W

**w**
2:15
**wait**
98:6 113:5 141:3
**walking**
59:2
**wang**
2:2 3:3,6 4:7 10:22 11:3 12:14,18 36:9 36:15 49:15 53:12 63:4,8 63:12 67:13,18 68:6 84:25 86:7 88:9 90:8 91:21 92:18,22 97:23,24 98:8 100:5,12 101:4 101:19 106:5 108:15,25 109:6,21 110:7 110:20 111:6 111:10 113:7 113:17 117:23 119:9,17,19 123:18,23 124:4 126:25 127:5 131:25 132:15 135:25 157:7 158:8 161:11,16 176:14 177:22 184:9 186:8 192:11,14,21 193:9 196:22 196:25 204:4 204:10 207:12
**want**
12:14 22:15 47:12 57:8 127:12,17 159:25 170:16
**wanted**
52:23 158:13,14
**wants**
29:25
**warden**
24:6
**wasnt**
99:8 159:1 178:16 190:15
**way**
5:12 6:6 11:24 14:6 25:10,25 34:10 35:11 39:4,9 43:20 47:16,17 48:21 48:23 50:23,23 55:13 61:25 62:1 73:8 88:4 89:11 94:22 104:10 107:10 108:3 112:10 122:8 127:21 130:7,22 140:5 141:21 146:13 162:17,20 169:2 172:12 184:2 194:13 198:15 202:18
**ways**
32:2 195:25
**wednesday**
154:6
**week**
18:22 29:24 152:24
**went**
8:12 67:4
**west**
2:12
**weve**
53:5 66:8,8 87:21 127:6 135:15,22,23 137:15 195:8
**whats**
4:11 25:14 44:21 85:19 97:21 107:19 111:11 119:15 134:1 135:23 149:5 151:1 153:9 155:12 155:16 160:7 169:14 173:15 177:22 181:24 186:2 192:23
**whatsoever**
87:5
**whereof**
209:18
**white**
16:7 188:7 189:22
**widely**
201:23
**wiley**
2:14 5:22
**willfully**
84:11
**williams**
25:4,5 66:22 86:23
**willing**
177:14
**wish**
6:10 122:15,22 178:14
**withheld**
140:2 183:8
**withholding**
17:20 159:14 160:6 164:13 171:23
**witness**
12:4 14:11 52:18 68:1,5 91:10 100:1,9 101:13,18 105:22 108:22 109:5,17 110:18 111:5 113:6,12 117:13 119:7 123:11 142:7 158:17 169:7 174:15 209:9 209:13,18
**witnessed**
169:24,24
**witnesses**
12:23,25 13:1,9 14:23,25 15:1 15:10 18:3 52:15,15 53:1 72:1 81:11,13 81:14,20 83:10 83:11,13 84:7 84:17 85:2 90:23 99:20,21 109:11,13,14 125:7,9,10,25 143:16 160:24 165:13 167:25 168:10,21,23 172:22
**women**
7:16 23:8 61:17 61:23 70:11
**wonderful**
195:7
**wont**
57:18 68:18 184:14
**worded**
88:4
**work**
10:9 23:6 33:24 35:3 49:2,6 56:16 62:18
**worked**
7:6 10:14 44:22 44:23 47:1 62:13 74:12 138:2
**working**
48:12,14 49:6 55:3 59:3,16 106:13 111:23
**works**
130:18
**wouldnt**
76:9 166:9 167:21
**write**
39:6,11 59:21,21 75:11 104:8 139:11 166:3
**writing**
13:12 15:13 71:7 75:19 81:24 91:3 92:11 110:12 110:18 126:8 162:11 209:11
**written**
11:20 22:1 26:19 27:15 28:7 29:6,7 30:23 31:4 32:4,18,18 34:6,13,17 39:4 43:24 44:20,24 45:4 45:24 46:5 54:17,19,20,23 60:22,22 61:1 71:9,12,22 75:12,13 76:1 76:4 79:14,18 87:5 90:14 99:9 123:6 127:17 135:9 135:19 136:25 137:6,6,10,13 138:6 139:9 159:19 174:1,7 175:17 177:14 186:14 206:15

X

**x**
3:1

Y

**yeah**
5:11 35:18 39:3 57:12 61:22 65:22 66:1 81:8 86:15 88:14 90:6 97:14 109:17 119:7 164:18 170:17 172:15 174:15 175:1 181:5 188:13 188:24 194:12 206:3
**year**
7:8,9 8:18,20 33:16,19 34:3

Case: 1:15-cv-01320-CAB Doc #: 66 Filed: 01/27/17 245 of 248. PageID #: 1563



38:5,6 40:15 73:21 96:2,8,9 96:9,11,12 115:1,2
**yearly** 139:17
**years** 5:3,15 6:21 7:12 8:1 10:21 19:11 33:18,19 50:25 53:6 56:14 73:18 87:21 104:18 139:14 201:23
**yep** 6:3
**yesterday** 58:13
**youd** 71:4 79:24 94:25 96:1,18 102:14 116:21
**youll** 121:17
**youre** 12:9 22:16,20 42:23 50:25 53:9 55:17 56:16,16 58:6 72:22,23 73:2 73:6,19 85:16 92:6,9,16 99:10 100:25 104:11 106:13 114:8 121:18 123:18,24 135:21 138:12 138:12 156:17 158:7,15 163:12 173:13 176:3 182:4
**youve** 21:2 31:6 36:21 114:5,20 132:13 136:9 144:5 147:6 176:21 200:4

**Z**

**zone** 47:8,15 55:3

**0**

**00** 121:14
**000** 71:4
**011** 130:23
**05** 1:18

**1**

**1** 1:5,10 3:7 11:1 11:5 18:12 38:18 41:23,24 50:4 54:4,14 55:5,7 82:24 82:25 84:14 96:9 99:24 101:8 104:23 114:25 153:9 153:10,11,23 165:24 166:3 178:25 184:15 201:21
**10** 3:12 32:17,22 33:1,5 55:8 57:16 71:20 121:14 134:18 144:1,4 165:24 166:3 173:5
**101** 56:15 88:21
**1022** 2:8
**1026** 193:10
**104** 83:14 84:3
**1055** 1:18
**106** 2:22
**1070** 116:8
**10s** 53:23 54:20,22 54:23 75:25
**10th** 103:3
**11** 3:7,12 146:17,21 155:14 199:9 199:10,11
**1105** 203:25
**111** 3:10
**12** 3:13 57:16,18 135:7 136:16 136:16 137:2 139:6 148:22 173:11 176:15 176:17,20 199:6 209:23
**123** 59:20
**1230** 154:7
**1252** 203:25
**12a** 135:17 137:14 140:20
**12month** 40:22
**13** 3:13 140:15,15 147:11 173:12 192:17,23
**1300** 2:12
**132** 3:10,11
**1332** 209:22
**136** 3:11
**14** 3:14 44:6,8 46:2 143:23 203:18 203:22
**144** 3:12
**146** 3:12
**14th** 116:8
**15** 57:20 173:5,22 175:14
**15cv00989** 1:5
**15cv01320** 1:10
**160** 111:13 124:14 125:1,19 126:2 126:12,20
**1630** 154:7
**16th** 117:25 205:7
**170** 122:11
**172** 120:15,15
**176** 3:13
**18** 7:2 152:3
**184** 3:4
**18th** 96:20 102:4 120:1
**19** 124:7 158:9
**192** 3:6,13
**1950** 37:9,11 38:1,9 39:23 64:4,5 64:15,17,25 135:9 136:25 140:17 142:17 143:4,12 171:11,19 172:17 173:7 174:2,9,20 175:8,24 191:5 192:3 201:18 202:5,22 206:15,25
**1950s** 40:12 67:2
**1959** 112:16,17,19 113:2,9
**1960s** 104:21 105:15 105:23 106:25 114:2,19 115:6 117:6 140:23 141:6 146:9
**1961** 112:13
**1962** 39:24 40:5
**1963** 86:8,15,16 115:12,24
**1966** 187:3
**1969** 68:11,17 69:2,7 69:9 93:15,21 93:24 107:6,21 107:25
**1970** 11:22 14:3 18:10 30:7 34:8 72:17 74:4 103:3 116:8 118:1 128:11,15,19 128:23 129:2 157:7 158:15 158:22 159:9 187:10 200:11
**1970s** 21:21 22:2,10,16 22:17,23 23:17 23:23 24:7,12 24:19,23,25 29:8 30:2,15 31:4 39:12,15 40:25 42:9 43:18,19 44:22 44:23 47:1,18 47:25 50:11 53:13,16 56:10 58:24,25 60:9

61:4 67:2 79:8 80:10,11,12 87:3,11 88:25 89:12 95:18 99:10 103:11 103:23 104:2 104:15 105:23 116:4 117:3 118:22 129:8 129:12 144:25 145:12,16 146:5 150:20 158:7 159:5 161:5 163:10 163:15,24 164:6,12 170:25 182:25 183:8,18,22 184:8 198:17 200:6,17

**1971** 102:17 119:2,12 124:7

**1972** 206:8,18,23 207:8

**1973** 36:4 95:2 96:20 96:20 102:4 110:2 131:8 202:2

**1974** 68:11,12 69:2,7 69:9 70:17 72:11 93:15,21 94:2,9 107:6 107:21,25 148:11 149:4 150:25 151:8 151:16 155:1 186:20,22 205:7,9

**1975** 16:22 17:3 37:17 64:19 65:23 86:16 102:2 120:1 171:12,20 172:18 173:7 177:6 183:4 185:2,19 194:9 194:17 195:21 197:23 198:2 202:23 207:8

**1976** 45:14 112:19 113:2,9 120:16 121:2,3

**1977** 153:24 154:2,6 154:15 190:2

**1979** 152:4,12

**1980** 10:18 11:22 14:4 18:10 34:8 128:12,15 128:19,23 129:2 135:9 137:1 140:17 142:17 143:4 143:12 152:19 152:24 157:7 158:15,22 159:9 174:2,9 174:20 175:8 175:25 187:10 191:5 192:3 200:11

**1980s** 34:17 128:9 188:9

**1981** 10:13,18,19

**1984** 104:3

**1985** 5:8 61:16 75:7 104:13 171:8

**1993** 7:6

**19th** 11:22,22 14:3,4 18:10,10 34:7 34:8 171:12,20 172:18 173:7

**1a** 34:5,5 43:21 107:7 122:5 123:7 124:13 127:19

**1b** 124:23 128:6

**1c** 109:10 125:6 128:13

**1d** 109:23 125:15 128:17

**1e** 128:21

**1f** 110:12 126:7 128:25

**1g** 126:17 129:4

**1s** 54:22,24 75:25

**1st** 33:25 34:1 119:2 148:11 149:4 150:24 151:8,16 155:1

### 2

**2** 3:8 14:1 36:10 36:12 44:8 46:2 64:3,9 82:25 83:3,8 85:7 90:20 91:3 92:17 93:1 177:4 193:19

**20** 209:19

**2000** 8:21

**2002** 9:11

**2005** 9:24

**2006** 9:24,24,25

**2007** 10:6

**2016** 1:19

**2017** 209:23

**203** 3:14

**2060** 2:3

**216** 2:9,13,23

**2171** 102:14

**21st** 29:19

**22** 1:19

**222** 2:16

**2273** 95:2 96:2

**23** 152:3,24

**23rd** 29:19

**24** 201:5,7,21

**2411430** 2:9

**24th** 120:16

**25** 201:4,10,16,21

**2553** 115:11

**2589** 144:8

**25th** 94:9 177:6

**26** 115:12

**2675** 120:1

**27** 152:24 203:3

**274** 94:8

**28** 209:17

**2871** 119:2,17,18

**2886** 144:8

**2983** 67:20

**29th** 5:8

**2b** 14:16

**2c** 14:23

**2d** 15:3

**2e** 15:9

**2f** 15:13

**2g** 15:23

### 3

**3** 3:8 16:3 38:18 47:14 63:9,10 63:14 64:4,13 71:4 136:15

**30** 11:6 56:13 85:24 184:15

**3010** 74:9,9

**3020** 76:19

**3060** 82:19,20

**3064** 79:24

**3069** 80:2

**3092** 67:21

**3093** 67:22,22

**30th** 152:19 154:1,6

**31** 50:25 73:18 87:21 139:14

**3103** 108:11 110:23

**3108** 94:6,8

**3110**
94:25
**3112**
96:18 97:23,23
**3149**
102:14
**3159**
102:25
**31st**
95:2 153:24
**3219**
36:19
**3220**
37:4
**3229**
41:4
**323**
119:25
**3231**
41:23
**3242**
44:6
**3264**
46:14
**3273**
50:2
**3274**
54:3
**3277**
54:14
**3281**
58:18
**3285642**
2:4
**330**
2:18
**3305**
36:19
**3337**
146:21
**3342**
146:22 149:25 150:1
**3343**
149:22
**3370**
102:18,24 103:2
**3416**
146:24
**3417**
146:24
**3429**
146:24 151:22
**3470**
117:25
**3516**
151:14
**3545**
146:24 151:6
**3546**
146:24 151:12
**3576**
120:16
**36**
3:8 146:23
**3640**
146:21 147:9
**3641**
146:21
**3762700**
2:18
**3912**
176:22
**3913**
177:4
**3919**
176:23
**3945**
146:22
**3949**
146:22
**3957**
146:24 152:18
**3960**
146:24 153:23
**3965**
146:24 154:24
**3967**
146:25
**3rd**
102:17

**4**

**4**
3:3,9 16:10 49:6 67:14,19 68:9 70:5 71:5 80:14,25 81:9 81:17,22 82:7 130:23 173:21
**40**
152:3,8
**400**
2:17
**40yearold**
179:8
**4147**
120:7
**4172**
67:22
**42**
46:14 48:11
**434**
119:20
**435**
119:21
**44113**
2:8,12 209:22
**44114**
2:22
**44308**
2:17
**460**
2:3
**4682**
63:16
**4755**
63:16
**4756**
203:23
**4762**
204:18
**48**
120:21
**4843**
206:5
**4848**
206:12
**4904**
203:23
**4905**
193:11
**4949**
150:22
**4957**
193:11

**5**

**5**
3:9 17:1 47:14 67:16,21 69:2 69:6 71:2 92:23 93:10 99:6 107:5,19 107:25 108:17 109:10,22 110:11,25
**50s**
61:24 64:9
**53**
116:9
**55**
1:17 2:8 209:22
**57**
38:18
**5th**
206:8

**6**

**6**
3:10 11:6 17:7 18:12 49:6 99:1,24 101:8 101:8 111:8,12 122:4 125:1,11 125:20 126:12 126:20 155:24 206:11
**601**
2:21 119:1
**609**
38:17 39:4
**60s**
61:18,24 89:7
**63**
3:8
**636**
2:12
**66**
50:2
**6642569**
2:23
**67**
3:9,9
**685**
117:24
**6a**
156:1,6,12
**6b**
17:18 164:10
**6c**
17:24
**6d**
18:2
**6th**
205:9

**7**

**7**
3:10 18:8 132:1 132:3,7,8 133:6 134:19 140:16 143:23 193:17
**70s**
34:17 48:23 54:20 61:24 89:7 105:11,15 106:25 114:2 114:19 115:6 117:6 131:4 140:23 141:6 146:9
**71**
54:3
**711**
153:12
**720**
2:4
**73**
82:20 96:2
**732**
116:7
**74**
147:11
**77**
54:14

**8**

**8**
3:11 41:5 57:16 132:16,18,21 133:6,8 173:1
**80302**
2:3
**80s**
159:5 161:5 188:20
**82**