UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

---

|  |  |  |
|---|---|---|
| ISAIAH ANDREWS'S ESTATE ADMINISTRATOR | : | CASE NO. 1:22-cv-00250 |
|  | : |  |
|  | : | OPINION & ORDER |
| Plaintiff, | : | [Resolving Docs. 20, 23, 52, |
|  | : | 57, 59, 60, 63, 85, 89, 122, |
| v. | : | 123, 124, 151, 154, 155] |
|  | : |  |
| CITY OF CLEVELAND, et al., | : |  |
|  | : |  |
| Defendants. | : |  |

---

JAMES S. GWIN, UNITED STATES DISTRICT COURT JUDGE:

In 1975, Ohio convicted Isaiah Andrews of murdering his wife, Regina Andrews. Andrews spent nearly 45 years in prison.  In 2019, Andrews petitioned the state trial court for a new trial and argued that before his original 1975 trial, Ohio had failed to disclose exculpatory evidence pointing to a different murder suspect.  The Ohio trial court granted the motion; Andrews received a new trial; and at an October 2021 retrial, a jury found Andrews not guilty.

In seeking the new trial, Andrews showed that Cleveland police had initially arrested a different person, Willie Watts, for the murder.  Murder scene physical evidence, including a bloody pillowcase from a motel where Watts had been staying, implicated Watts in Regina Andrews's murder.  But police then released Watts after he provided an alibi that covers most of the coroner's preliminary estimate of Regina Andrews's time-of-death—an estimate that the coroner changed before Andrews's trial.

Case No. 1:22-cv-00250
GWIN, J.

On February 14, 2022, Andrews sued the City of Cleveland and ten Defendant Officers[1] in their individual capacities under 42 U.S.C. § 1983.  With his lawsuit, Andrews alleged that Defendant Officers violated his constitutional rights by withholding exculpatory evidence, fabricating false evidence, maliciously prosecuting him, and failing to intervene. Andrews also brought state-law malicious-prosecution and negligence claims.

Plaintiff primarily contends that Defendant Officers did not disclose several key pieces of exculpatory information to the prosecution, including: Willie Watts's arrest, physical evidence implicating Watts in Regina Andrews's murder, inconclusive palm-print evidence, and inconsistencies in the testimonies of two vital witnesses.

Defendant Officers have filed motions to dismiss the case and motions for summary judgment.  The motions to dismiss deal with Plaintiff's arguable failure to timely make claim against the estates of deceased defendants.  The motions for summary judgment deal with whether sufficient evidence supports *Brady* and other claims.

Additionally, all defendants, including the City of Cleveland, seek summary judgment, arguing that there is insufficient evidence supporting the claims against them. They maintain that, during Isaiah Andrews's 1975 trial, Cleveland and its detectives adhered to standard practices by compiling all investigation reports and providing the entire investigatory file to the Cuyahoga County Prosecutor's Office.  According to Defendants,[2] this included the Willie Watts evidence and arrest information.  Defendants argue that they fulfilled their *Brady* obligation when they gave the exculpatory evidence to the prosecutors.

---

[1] Defendant Officers consist of Detectives Allen, Hicks, Hubbard, McCaffrey, Rowell, and Stanic and Sergeants Comodeca, Dugan, Kaminski, and Walsh.

[2] Throughout this opinion, the Court uses "Defendants" to refer to the individual officer defendants unless otherwise specified. References to the City of Cleveland as a Defendant will be noted separately.

Case No. 1:22-cv-00250
GWIN, J.

Defendants say the prosecutors, not individual police officers, were required to give the exculpatory evidence to Andrews's defense attorney.  Defendants do not significantly dispute that neither the prosecutors nor the police provided Andrews with the Watts, witness statements and handprint evidence.  For policy reasons, the prosecutors are likely immune from *Brady* claims. Nevertheless, Defendants say the prosecutors' *Brady* violations do not shift liability to the investigating police officers.

Defendants William Hubbard and Ernest Rowell were the lead detectives in the Regina Andrews murder investigation.  The other defendants either supervised the investigation, participated in the arrest of Isaiah Andrews, or had more distant roles in the investigation.[3]

Two months after bringing this case, Plaintiff Andrews died.  Andrews's estate administrator replaced Andrews as Plaintiff in this case.

After the Cuyahoga County Probate Court appointed an estate administrator to represent the estates of certain deceased defendants, this Court approved Plaintiff's motions to substitute these deceased defendants with their shared estate administrator.  These deceased defendants include Detective William Hubbard, Detective Ernest Rowell, Detective Nick Stanic, Sergeant Peter Comodeca, and Sergeant Kevin Walsh, collectively referred to as the "Estate Defendants."

The "Living Defendants," namely Detective Leo Allen, Detective David Lee Hicks, Detective J. Francis McCaffrey, Debra Dugan (guardian ad litem for Sergeant Walter Dugan),

---

[3] Detectives Allen and Hicks performed further investigation and arrested Watts.  Detectives Stanick and McCaffrey assisted with the arrest of Watts.  Sergeants Comodeca, Dugan, Kaminski, and Walsh supervised the investigation and signed detectives' reports.

Case No. 1:22-cv-00250
GWIN, J.

and Sergeant John Kaminski, are still alive and are individually named as defendants in the lawsuit.

In this opinion and order, the Court considers individual Defendant Officers' motions to dismiss and motions for summary judgment.  The Court also considers Defendant City of Cleveland's motion for summary judgment.[4]

The Court begins by examining whether a plaintiff can bring a claim against a deceased defendant who has not had a claim presented within the six-month deadline set out in Ohio Probate Law.  Then, the Court will evaluate whether the Ohio public official indemnity statute applies to extend the estate six-month rule.  Finally, the Court will assess whether Plaintiff can make a *Brady* claim, given that all the evidence points to police officers having supplied the relevant exculpatory evidence to the prosecutors handling the case.  The Court will also examine Plaintiff's remaining claims.

For the reasons stated below, the Court **GRANTS** Estate Defendants and Debra Dugan's motions to dismiss. The Court further **GRANTS** the remaining Living Defendants and Defendant City of Cleveland's summary judgment motions.

## I.    Estate Defendants and Debra Dugan's Motions to Dismiss

The Court considers the timeliness of Plaintiff's claims against Estate Defendants and the effect of Defendant Dugan's 2022 death.

## A.  Ohio Revised Code § 2117.06's Six-Month-Presentment Requirement Bars Plaintiff's Claims against Estate Defendants

Estate Defendants ask to have Plaintiff's claims against them dismissed, arguing that

---

[4] Defendant City of Cleveland did not file a motion to dismiss.

Case No. 1:22-cv-00250
GWIN, J.

under Ohio's estate-presentment rule, they cannot be sued.[5]  This estate-presentment rule requires that creditors present their claims against a deceased individual to the person's estate within six months after the defendant's death.[6]

The Court agrees with Estate Defendants and finds that regardless of whether the presentment rule pertains to capacity or limitations, it stops Plaintiff's claims against each Estate Defendant.  Additionally, the Court finds that the indemnity exception to the presentment rule does not apply in this case.  As a result, the Court approves each Estate Defendant's motion for dismissal.

Under Ohio Rev. Code § 2117.06,, claimants must generally present claims against estates "within six months after the death of the decedent."[7]  Late claims are "forever barred as to all parties, … .  No payment shall be made on the claim and no action shall be maintained on the claim … ."[8]

Hubbard, Rowell,[9] Comodeca, and Walsh[10] each died long before the October 2021 accrual of Plaintiff's § 1983 claims.  So, Plaintiff could not present any accrued claims to their estates' administrator within six months of their deaths.  Nor did Plaintiff timely present the claims accrued against Stanic to Stanic's estate administrator, even though Stanic died on August 12, 2021.  Plaintiff also did not move to substitute in Stanic's estate administrator until October 7, 2022,[11] outside the R.C. § 2117.06-time requirement.

Plaintiff argues that the six-month-presentment requirement does not apply here.  The

---

[5] Docs. 59, 60, 89.
[6] Ohio Rev. Code § 2117.06.
[7] Ohio Rev. Code Ann. § 2117.06(B).  The Court notes that a new version of § 2117.06 went into effect on April 3, 2023. However, the relevant parts of the statute remain unchanged.
[8] Ohio Rev. Code Ann. § 2117.06(C).  The statute provides for a limited exception in the case of contingent claims that do not accrue until after the decedent's death.
[9] Detectives Hubbard and Rowell were the lead detectives on the Regina Andrews investigation.
[10] Sergeants Comodeca and Walsh were supervisory officers in the homicide investigation.
[11] Doc. 75.

- 5 -

Case No. 1:22-cv-00250
GWIN, J.

parties disagree whether the presentment provision is a substantive capacity-to-be-sued statute or a procedural-limitations statute.  But under either characterization, the presentment provision bars Plaintiff's claims against Estate Defendants.

Capacity statutes define "which entities have the capacity to be sued." [12]  In the estate-administrator context, capacity statutes limit the circumstances under which an estate administrator can be sued in a representative capacity.  Federal courts use the capacity statutes "of the state where the court is located." [13]

The Sixth Circuit has not yet determined if Ohio's estate-presentment provision qualifies as a capacity or limitations statute. [14]  However, at least one Ohio district court has found that the presentment provision is a capacity statute that makes estate administrators unable to be sued for § 1983 claims after the end of the presentment period. [15]

The Third Circuit decided that a similar Delaware probate statute was not a "statute of limitations," but instead "terminates an estate's *capacity* to be sued" unless a claimant presents a claim within the statutory time limit. [16]  This Court finds the Third Circuit's decision instructive.  This Court similarly finds that Ohio's presentment provision is a capacity statute and the Estate Defendants no longer have capacity to be sued.

But even if the presentment provision were instead a statute of limitations, [17] the

---

[12] *Jackson*, 925 F.3d at 793.

[13] Fed. R. Civ. P. 17(b)(3).

[14] *See Jackson v. City of Cleveland*, 925 F.3d 793, 812-13 (6th Cir. 2019) (stating that the application of § 2117.06 to § 1983 claims raises "thorny issues of first impression in this circuit" and "declin[ing] to address these issues").

[15] *See Ridenour v. Ohio Dep't of Rehab. & Correction*, 2013 WL 1363635 at *1 (S.D. Ohio Apr. 3, 2013) (holding that the plaintiffs' failure to present their claims to the tortfeasor's estate administrator within the six-month limit meant that the estate "representative no longer has the capacity to be sued in federal court.").

[16] *Witco Corp. v. Beekhuis*, 38 F.3d 682, 690 (3d Cir. 1994) (emphasis added).

[17] *See In re Est. of Liggons*, 2010-Ohio-1624, ¶ 27, 187 Ohio App. 3d 750, 756 (suggesting that the presentment provision is a "period of limitations").  *But see Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019) (emphasizing that "[t]he judgments of Ohio appellate courts [are] not binding on the Ohio Supreme Court" and therefore not dispositive when federal courts confront Ohio law questions).  Plaintiff also argues that the presentment provision is a nonclaim statute.  Nonclaim statutes are analogous to statutes of limitations, except that they generally cannot be tolled or waived.  *See Nonclaim statute*, BLACK'S LAW DICTIONARY (11th ed. 2019).

- 6 -

Case No. 1:22-cv-00250
GWIN, J.

provision's six-month window would apply to stop these § 1983 claims.

Federal courts apply state personal-injury statutes of limitations to § 1983 claims. In Ohio, plaintiffs have two years to file personal-injury claims.[18] But when a plaintiff files a personal-injury claim against a deceased tortfeasor's estate, the presentment provision narrows the two-year window to six months.[19] So, even if R.C. § 2117.06 were a limitations statute, the provision likewise narrows the window to bring § 1983 claims against a deceased tortfeasor's estate from two years to six months.

Plaintiff argues that a six-month limit clashes with § 1983's purpose. Plaintiff cites to the Supreme Court's decisions in *Felder v. Casey*[20] and *Burnett v. Grattan*.[21] The Court finds each case distinguishable and disagrees.

Both *Felder* and *Burnett* involved state laws that shortened the time federal civil-rights litigants could bring federal civil rights or employment discrimination claims in state courts. *Felder* rejected applying a state's limitations statute because the state statute imposed a shorter limitations period for federal civil-rights claims than it imposed for standard personal-injury claims.[22] *Burnett* similarly rejected applying the limitations period that a state employment agency used for administrative grievance procedures to § 1983 employment-discrimination actions. The *Burnett* Court explained that the "minimal burden [the] state law place[d] on the administrative complainant ... d[id] not correspond ... to the substantial

---

[18] *Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989) (holding that "the appropriate statute of limitations for 42 U.S.C. § 1983 civil rights actions arising in Ohio is contained in Ohio Rev. Code Ann. § 2305.10, which requires that actions for bodily injury be filed within two years of their accrual.").

[19] *Heuser v. Crum*, 31 Ohio St. 2d 90, 94 (1972) (explaining that Ohio amended § 2117.07 to permit recovery against a deceased personal-injury tortfeasor for insurance liability payouts because the state wanted "to alleviate the inequity that R.C. 2117.06 [...] worked upon parties who suffered bodily injury in some instances where the defendant died before the lawsuit was filed.")

[20] 487 U.S. 131 (1988).

[21] 468 U.S. 42 (1984).

[22] *Felder*, 487 U.S. at 145-46. Felder involved a Wisconsin notice-of-claim statute that specifically required litigants to present § 1983 claims to the government within a 120-day window. No such targeting or narrowing only of federal rights is at issue here.

- 7 -

Case No. 1:22-cv-00250
GWIN, J.

burden federal law places on a civil rights litigant."[23]

Under Ohio's estate-presentment provision, no disparity exists.  Civil-rights and personal-injury claimants find themselves on equal footing.  Both must present any claims against an estate within six months.[24]

Finally, Plaintiff argues that Ohio's estate-presentment time limit does not here apply because Plaintiff represents that it will not seek any recovery from Estate Defendants' assets. Plaintiff says that Ohio gives an exception to the six-month-presentment rule when recovery would not come from an estate's assets.[25]

To stay within this recovery-from-non-estate-asset exception, Plaintiff says that under Ohio's indemnity law,[26] Cleveland's municipal treasury—rather than Estate Defendants' assets—would satisfy any judgment.  However, since Plaintiff has not demonstrated that Estate Defendants will benefit from Ohio's indemnification provision, it remains unproven that Andrews's claims fall within the non-estate-asset exception to Ohio's six-month presentment mandate.

To avoid the six-month estate-presentment requirement, Plaintiff must "prove that there is something other than an asset of the estate, such as liability insurance, against which any judgment rendered in [Plaintiff's] favor may be enforced."[27]  This requires some "evidence … that proves the supposed non-estate asset exists."[28]

---

[23] *Burnett*, 468 U.S. at 52.

[24] The Court also notes that, harsh though it may seem, Plaintiff is not entitled to equitable tolling of the six-month limitations period. "[T]he statutory time period found in R.C. 2117.06 may not be excepted on general equitable principles … ." *Dibert v. Watson*, 2009-Ohio-2098, ¶ 15, 2009 WL 1200862 at *5 (quotation marks omitted).

[25] *See Cline v. Dart Transit Co.*, 804 Fed. Appx. 307, 310-11 (6th Cir. 2020) (discussing Ohio Rev. Code § 2117.06(G)).

[26] Ohio Rev. Code § 2744.07.

[27] *Cline*, 804 F. App'x at 311 (quoting Meinberg v. Glaser, 237 N.E.2d 605 (Ohio 1968)).

[28] *Id.* at 311-12.

- 8 -

Case No. 1:22-cv-00250
GWIN, J.

Plaintiff points to Ohio's statute that requires political subdivisions indemnify their employees "in the amount of any judgment ... that is obtained against the employee" arising out of the employee's government service.[29]  Here, according to Plaintiff's argument, the Ohio public employees' indemnity provision serves the same function that liability insurance would.  Because Cleveland would indemnify any judgment against Estate Defendants, Plaintiff says, the indemnity provision satisfies the non-estate-asset requirement and excludes Plaintiff's claims from the six-month presentment requirement.

Plaintiff's argument assumes that Estate Defendants could qualify to receive the statutory indemnity benefit.  But Plaintiff cites no authority supporting that assumption. Instead, recent Ohio case law developments suggest that Estate Defendants would not be indemnified: the Ohio Supreme Court recently found that employees, but not employees' estates, must be indemnified.

As the Ohio Supreme Court explained in *Ayers*, Ohio's indemnity provision creates a "personal" right only for qualifying employees.[30]  Rather than requiring a political subdivision to indemnify a *judgment* against an employee, the provision requires subdivisions to indemnify "*employees* ... in the amount of any judgment ... ."[31]  So, if a party other than the employee—for example, an estate—incurs liability for a judgment arising out of the employee's government service, the political subdivision need not indemnify the non-employee party.[32]

Here, Plaintiff does not show that Cleveland shoulders any obligation to indemnify

---

[29] Ohio Rev. Code § 2744.07(B)(1).
[30] *Ayers v. Cleveland*, 156 N.E.3d 848, 853 (Ohio 2020).
[31] Ohio Rev. Code § 2744.07(B)(1).
[32] *Id.* (emphasis added).

Case No. 1:22-cv-00250
GWIN, J.

Estate Defendants for post-death judgments against them.[33]  So, Plaintiff cannot rely on the indemnity provision to circumvent the six-month-presentment requirement.

But even if the six-month-presentment rule did not apply, for other reasons, Plaintiff's claims against Estate Defendants would not survive summary judgment.  The Court discusses these issues below in the summary-judgment section.

## B.  Debra Dugan

On June 1, 2022, the Court appointed Defendant Dugan's daughter, Debra Dugan, as Dugan's *guardian ad litem* and substituted her as a named defendant in place of Dugan.[34]  On September 23, 2022, a notice of suggestion of death for Sergeant Dugan was filed with the Court.[35]

Under Federal Rule 25(a)(1), an "action …  against the decedent must be dismissed" if a party does not file a motion for substitution "within 90 days after service of a statement noting the death."[36]  Following the 1963 amendment of Rule 25(a)(1), courts have discretion to extend the 90-day period upon a showing of excusable neglect.[37]

Here, Plaintiff did not file a timely motion to substitute Defendant Debra Dugan with the Estate of Sergeant Dugan.  Nor did Plaintiff make any showing of excusable neglect.  So, the Court dismisses Plaintiff's action against Defendant Debra Dugan.

## II.    Defendants' Motions for Summary Judgment

---

[33] This does not mean, however, that a political subdivision owes nothing to estates of its employees for judgments against the employee that *precede* the employee's death.  As Ohio's courts of appeal have explained, "the political subdivision's duty to indemnify and hold harmless attaches immediately upon the issuance of the judgment against the employee." *Ayers v. City of Cleveland,* 99 N.E.3d 1269, 1276 (Ohio App. 8th Dist. 2017), *aff'd sub nom. Ayers v. Cleveland,* 156 N.E.3d 848 (Ohio 2020) (citing *Paolisso v. Edison Local Bd. of Educ.,* 7th Dist. Jefferson No. 90-J-36, 1992 WL 19829).  Here, though, the decedent officers died before incurring any liability.

[34] Doc. 18.

[35] Doc. 67.

[36] Fed. R. Civ. P. 25(a)(1).

[37] Fed. R. Civ. P. 6(b)(1)(B).

- 10 -

Case No. 1:22-cv-00250
GWIN, J.

## A. Background

With this case, Plaintiff principally claims that the defendants failed to provide exculpatory evidence that would have otherwise led to Isaiah Andrews's acquittal at his original trial.  In the complaint, Plaintiff alleges: "Had the Defendant officers disclosed their fabrication and suppression of evidence and other misconduct to prosecutors, or to Andrews or his counsel, the prosecution would not have been initiated or pursued and Andrews would not have been convicted."[38]

Isaiah and Regina Andrews, who had recently married, lived temporarily at the Colonial House Motel as they prepared to move into a new home.  However, on September 18, 1974, tragedy struck when Regina Andrews was found dead in a park, having sustained fatal stab wounds.  The police found her wrapped in blood-soaked bed linens.  According to Plaintiff, the Cuyahoga County Coroner's Office initially estimated that Regina Andrews died on September 18, 1974, between 7:00 am and 11:00 am.[39]

At the crime scene and near Regina Andrews's body, police found a bloody pillowcase with "Howard Johnson's Motor Lodge, University Circle, Cleveland, Ohio" markings.[40]  After finding the pillowcase, lead detectives Hubbard and Rowell went to Howard Johnson's Motor Lodge, spoke with a clerk, and were told that a man named Willie Watts had stayed at the motel and that bed linens were missing from Watts's room.  The clerk also said Watts did not have any luggage with him when he checked in.

---

[38] Doc. 1 at 14 (PageID 14).
[39] Plaintiff's complaint alleges that this was the Coroner's Office's original time-of-death estimate, but the Court has not been able to find that original estimate in the record.  *See* Doc. 1 at 4 (PageID 4).
[40] Doc. 109-1 at 33 (PageID 7071).

Case No. 1:22-cv-00250
GWIN, J.

Hubbard and Rowell went to Watts's mother's home, where other officers were already investigating an unrelated burglary.[41] Watts's mother told police that she believed her son had broken into her home and had stolen her property. Watts was also AWOL from the army, and police had recently arrested Watts for cashing bad checks. Watts's mother said that she had posted a bond on Watts's bad-check charge and that Watts had been released on September 16, two days before Regina Andrews's murder.

The next morning, officers arrested Watts for Regina Andrews's murder.[42] After arresting Watts, Allen and Hicks questioned him. Watts gave them an alibi for the morning of September 18, 1974 through 10:30 a.m. After the police confirmed the alibi, they released Watts.[43]

Plaintiff says that the coroner's office originally estimated Regina Andrews's time of death to be between 7:00 am and 11:00 am.[44] But later, the coroner's office gave the opinion that Regina Andrews died between 9:00 am and 12:00 pm.[45] Plaintiff also says the Bill of Particulars against Andrews indicated Regina Andrews died between 11:00 am and 2:00 pm, outside the time covered by Willie Watts's alibi.[46]

Police arrested Andrews within days of releasing Watts. Andrews was first indicted in September 1974, but was released for speedy trial purposes.[47] Police re-arrested Andrews on December 29, 1974, and re-indicted him on January 21, 1975.[48]

---

[41] *See id.* at 24 (PageID 7062).
[42] *See id.* at 11 (PageID 7049).
[43] *See id.* at 65 (PageID 7103).
[44] Again, the Court has not found evidence in the record of this preliminary time-of-death estimate. The Court includes this alleged fact only because it adds context to Plaintiff's argument that police should have disclosed Watts's arrest. Regardless of whether the preliminary estimate exists, it is not dispositive to Defendants' summary judgment motions.
[45] *See* Doc. 109-1 at 48 (PageID 7086).
[46] *See* Doc. 1 at 6 (PageID 6).
[47] *See* Doc. 105 at 32 (PageID 3627).
[48] Andrews's case was dismissed on speedy trial grounds in early December 1974, but he was *Id.* (PageID 7124).

- 12 -

Case No. 1:22-cv-00250
GWIN, J.

Although there was no physical evidence connecting Andrews to the murder, officers had support for their belief that he murdered his wife.  He had only recently been released from prison after serving over 15 years for another murder conviction.[49]  Andrews also took a polygraph test that indicated that Andrews lied on every question, including when he denied killing the victim.[50]

Andrews acknowledged to the police that he had had an argument with his wife shortly before she was killed.[51]   He also told the officers that he was not in the Andrews's apartment at noon on the day of the murder, even though shortly after the murder he inconsistently told Mary Ostendorf that he had returned home at noon and taken a shower before leaving.[52]  The officers conducted a timed driving test and found that Andrews would have had enough time to commit the murder, dispose of his wife's body, and still be observed by others later that day. [53]

### 1.  Witnesses Betty Worthy and Linda Cloud

Two witnesses from the Colonial House Motel, Betty Worthy and Linda Cloud, gave statements about what they heard and saw on the day of the murder.  They spoke to officers more than once.  Worthy and Cloud's early statements differed from the written statements they later gave and from their trial testimonies.  The earlier statements were not discussed at trial.

---

[49] *See* Doc. 109-1 at 3-7, 14 (PageID 7041-45, 7052).  The probable-cause inquiry may properly "take into account predilections revealed by past crimes or convictions as part of the inquiry into probable cause."  *United States v. Wagers,* 452 F.3d 534, 541 (6th Cir. 2006).

[50] *See id* at 13 (PageID 7051).

[51] *See id.* at 66 (PageID 7104).

[52] *See id.* at 88 (PageID 7126).

[53] *See id.* at 92 (PageID 7130).

Case No. 1:22-cv-00250
GWIN, J.

In a police report, Detective Rowell summarized his and Detective Hubbard's first interview with Betty Worthy.[54]  The first Worthy interview took place on Thursday, September 19, 1974, one day after the murder.  During that first interview, Worthy said that on September 18, 1974, at about 11:00 am, she "saw the victim talking to [her husband Andrews]."[55]  Then Andrews "left and did not return until about 4:00 PM."[56]  When Rowell questioned Worthy again the next day, she said she saw "Andrews standing in his doorway talking to someone or something[.]"[57]  In that second interview, Worthy could not confirm that the other person was Andrews's wife, but said "[whoever] he was talking to seemed to be wearing a headdress and attire of a Muslim lady."[58]

Worthy then gave a written statement on Saturday, September 21, 1974, the day after her second interview with Rowell.[59]  In the third statement, Witness Worthy included additional incriminating details, including how Andrews slammed the door before reentering the room at around 11:00 AM.  In the third statement, Worthy said she heard the television get loud after Andrews entered the room and said she later saw Andrews carrying a sack over his shoulder and placing it in the trunk of his car.  She said he looked at her then went back to the doorway where he appeared to be talking to someone in the room.

Detective Rowell's September 19, 1974, report also summarized his and Detective Hubbard's initial interview with Linda Cloud.  Cloud lived next door to Andrews's apartment and, in the initial interview, Cloud said she saw the victim get into Andrews's car at about

---

[54] *See* Doc. 105-1 at 27-28 (PageIDs 3805-3806).
[55] *Id.*
[56] *Id.*
[57] Doc. 109–1 at 50 (PageID 7088).
[58] *Id.*
[59] *See* Doc. 144-3.

Case No. 1:22-cv-00250
GWIN, J.

2:30 am on Wednesday, September 18, 1974.[60]  Cloud said she did not hear any noise from the Andrews' apartment.[61]

On Friday, September 27, 1974, Cloud similarly gave a written statement that added more details, such as how she heard noise from the television in Andrews's Colonial House Motel room on September 18, 1974, at around 11:00 AM.[62]  At Andrews's March 1975 trial, Cloud testified for the first time that she heard Andrews tell his wife, "Bitch, you know I am going to kill you, don't you?" as they left together by car at around 1:30 AM on the morning of the murder.[63]

Andrews and his defense counsel arguably did not know about Worthy and Cloud's initial statements to Detectives Rowell and Hubbard, as summarized in the September 19-20, 1974, police reports.

### 2.  Scientific Investigation Unit's Palm Print Results

Officers found a palm print on a bloody newspaper near Regina Andrews's body.[64] Andrews's trial defense attorney knew about the palm print.  At trial, Prosecutor Laurie told Andrews's defense counsel that he "ordered the police department to re-examine [and see] if there is anything [regarding the print]" and that he will tell him "[i]f there isn't anything."[65] Hubbard later testified at trial that all of the Scientific Investigation Unit ("SIU")'s tests for prints were negative.[66]

---

[60] *See* Doc. 105-1 at 28 (PageID 3806).
[61] *See id.*
[62] *See* Doc. 144-4.
[63] Doc. 116-1 at 206 (PageIDs 7919-20).
[64] *See* Doc. 105-1 at 23 (PageID 3801).
[65] Doc. 116-1 at 22 (PageID 7735).
[66] *See id.* at 643 (PageID 8356).

Case No. 1:22-cv-00250
GWIN, J.

At trial, neither party discussed a police report that had handwritten notes summarizing SIU's print results or what they meant.  That police report contains a crossed-out handwritten note saying "per SIU partial print completely not defendant's print."[67]  On the same page, another handwritten note that is not crossed out says "print not clear enough to compare."[68]

The SIU lab report is not in the police's homicide file or the prosecutor's file.  Andrews's defense counsel never received the SIU report and allegedly did not know about the police report that discussed SIU's print results.

In sum, police found a newspaper with a bloody palm print.  The police lab and prosecutors never attributed the print to Andrews.  Some inference suggests the lab could not read the smudged print to attribute it to anyone.  Some inference suggests that the lab specifically found that the palm print could not be attributed to Andrews.

### 3.  Andrews's ignorance of Willie Watts and related evidence

Andrews and his defense counsel were never told that police had investigated or arrested Willie Watts.  The prosecution did not mention Watts at trial.  Hubbard testified about the pillowcase with the Howard Johnson's Motor Lodge markings and said that he went to the Howard Johnson's Motor Lodge.[69]  But Hubbard did not testify regarding what he learned at the Howard Johnson motel about Watts's missing bed linens.

In an apparent effort to explain the Howard Johnson pillowcase, the prosecution also presented evidence that the Colonial House Motel used a common linen service and would

---

[67] Doc. 105-1 at 23 (PageID 3801).
[68] *Id.*
[69] *See* Doc. 116-1 at 452 (PageIDs 8165-66).

Case No. 1:22-cv-00250
GWIN, J.

receive bed linens with markings of different motels, including Howard Johnson's Motor Lodge.[70]

## B. Legal Standard

"Summary judgment is appropriate when the court is satisfied 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"[71]  But although the moving party bears"[t]he burden of showing the absence of any such genuine issue,"[72]  the court must enter "summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[73]  Summary judgment is proper "if, after reviewing all facts and drawing all reasonable inferences in favor of the nonmoving party, a reasonable jury could not return a verdict for the nonmoving party."[74]

To establish a § 1983 claim against a public official in his individual capacity, a plaintiff must show that the official either actively participated in the alleged unconstitutional conduct or "implicitly authorized, approved or knowingly acquiesced in the alleged unconstitutional conduct of an offending subordinate."[75]

## C. *Brady* Obligations

Under *Brady v. Maryland*, the government must disclose evidence to the defense if (1) the evidence is "favorable" to the defense and (2) the "evidence is material either to guilt

---

[70] *See id.* at 60 (PageID 7773).
[71] *Lincoln Elec. Co. v. Nat'l Standard, LLC, Corp.,* 2012 WL 2130954, at *3 (N.D. Ohio June 12, 2012) (citing Fed. R. Civ. P. 56(c)).
[72] *Id.* (quotation marks omitted).
[73] Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
[74] *Richko v. Wayne County, Mich.,* 819 F.3d 907, 914 (6th Cir. 2016) (cleaned up).
[75] *Leary v. Daeschner,* 349 F.3d 888, 903 (6th Cir. 2003).

Case No. 1:22-cv-00250
GWIN, J.

or punishment."[76]  "Favorable evidence includes all evidence that creates a reasonable doubt, whether it is exculpatory or impeachment evidence."[77]  And favorable evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[78]

Although both prosecutors and police officers can violate a criminal defendant's constitutional right to due process by withholding *Brady* evidence, their disclosure obligations differ.[79]  While prosecutors are responsible for disclosing *Brady* evidence to the defense, police officers are only responsible for disclosing *Brady* evidence to prosecutors.  In other words, police officers satisfy their *Brady* obligations when they turn over *Brady* evidence to prosecutors, even if the prosecutors later fail to disclose that evidence to the defense.[80]

Here, Plaintiff alleges that Defendant Officers did not provide the relevant *Brady* materials to the Cuyahoga County Prosecutor's Office.  Plaintiff alleges three discrete *Brady* violations.  Plaintiff first says police failed to give prosecutors the police reports that summarized the early Worthy and Cloud interviews.  Instead, the police allegedly disclosed only Worthy and Cloud's written statements, which differed and were more incriminating than their earlier statements as summarized in the September 19 and 20, 1974, police reports.  Second, Plaintiff says police never gave prosecutors any Willie Watts information, including that Watts's Howard Johnson room was missing bed linens.  Third, Plaintiff says

---

[76] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).
[77] *McNeill v. Bagley*, 10 F.4th 588, 598 (6th Cir. 2021).
[78] *Id.* at 601 (quoting *Strickler v. Greene*, 527 U.S. 263, 290 (1999)).
[79] *See Moldowan v. City of Warren*, 578 F.3d 351, 378-381 (6th Cir. 2009) (discussing the police's Brady-derived responsibility and how it differs from prosecutors' responsibility).
[80] *See D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014) (explaining that police officers are not required to disclose *Brady* evidence directly to the defense).

- 18 -

Case No. 1:22-cv-00250
GWIN, J.

police failed to turn over the palm-print results, which were at minimum indeterminate and at best exculpatory.

To support these allegations, Plaintiff attached to the complaint an affidavit by Judge Ronald Adrine. Andrews used the same Adrine affidavit to obtain a new trial.

Adrine served as second-chair on the Andrews prosecution team at Andrews's original trial. In the affidavit attached to the complaint, Adrine says that at the time of trial, he did not know "that police arrested or suspected Watts' involvement in the Regina Andrews murder[.]"[81] Plaintiff claims this testimony shows that Defendant Officers withheld the *Brady* materials from prosecutors.

But unbeknownst to Andrews when he initiated this action, the Cuyahoga County Prosecutor's Office had already scanned and uploaded all its old prosecution files to a database before 2018. The database includes scans of the Andrews case prosecution file, complete with the *Brady* materials that Plaintiff alleges were never disclosed to the prosecutors. The only question, then, is not whether the materials were ever added to the prosecutor's file, but whether the materials were added before Andrews's original trial.

The Court finds that Plaintiff shows no evidence that the *Brady* materials were not given to the prosecutors before Andrews's original trial.

At the time of Andrews's trial, the Cuyahoga County Prosecutor's Office assigned three assistant prosecutors to cover all criminal matters before two common pleas judges for a three-to-six-month period.[82] Three assistant prosecutors would cover all criminal matters,

---

[81] Doc. 1-1 at 1-2 (PageIDs 50, 51).
[82] *See* Doc. 105 at 11 (PageID 3606).

Case No. 1:22-cv-00250
GWIN, J.

including trials, in the two assigned courtrooms.  The assigned prosecutors almost never had contact with cases until the assigned judge set the case for a pretrial and then a trial.[83]

When a criminal case was slated for pretrial, the prosecutor assigned to that courtroom would request the prosecutor's file from the records-room custodian.[84]  The assigned prosecutor would then review the file and, during the pretrial, give an unwritten and unrecorded summary of any potentially exculpatory information to the defense attorney.[85]  Although the prosecutor would summarize the police reports on file, the prosecutor would not give the defense copies of the police reports.[86]  The assigned prosecutor also shared witness statements, but only after the witnesses testified.[87]

The Prosecutor's Office's procedure has obvious shortcomings.  The assistant prosecutors had responsibility for heavy caseloads, as they handled all the criminal cases for the two judges they were assigned to cover.  And the prosecutors who tried any given case were almost never involved with the pre-indictment investigation or the grand-jury presentation.[88]

Given that prosecutors typically had many cases assigned to a single pretrial date,[89] they faced a difficult, if not impossible task of discerning on short notice what evidence in each police file might be *Brady* material.  And while the Prosecutor's Office's procedures suggest that the prosecutors assigned to Andrews's case would have orally described any *Brady* materials to defense counsel, there is no documentation or record of whether and to

---

[83] *See id.* at 10-11 (PageIDs 3606-07).
[84] *See* Doc. 118 at 5 (PageID 8475).
[85] *See* Doc. 105 at 115 (PageID 3710).
[86] *See id.* at 147-48 (PageIDs 3742-43).
[87] See *id.* at 146 (PageID 3741).
[88] *See id.* at 10-11 (PageIDs 3605-06).
[89] *See id.* at 158 (PageID 3753).

- 20 -

Case No. 1:22-cv-00250
GWIN, J.

what extent that occurred.

The Prosecutor's Office's case management system thus left obvious gaps where prosecutors, scrambling to familiarize themselves with cases on short notice, might potentially fail to identify and disclose *Brady* material.

This inference that the prosecutors, and not police, failed in their *Brady* obligations is supported by what actually happened at Andrews's trial.

Andrews drew Judge Sweeney for trial.  At the time, Assistant Prosecutors Charles Laurie and Carmen Marino covered Judge Sweeney's courtroom.  Charles Laurie took first-chair responsibility; Carmen Marino took second-chair responsibility.  About two weeks before Andrews's trial, Marino requested and received the prosecutor's file to begin trial preparation.

At deposition for this lawsuit, Assistant Prosecutor Carmen Marino testified that the *Brady* materials were in the prosecutor's file when he began his trial preparation, and that he personally left handwritten notes on the file, including the handwritten notes about the SIU print results.

To give more detail: Assistant Prosecutor Marino testified that his handwriting appears next to a police report summary of Worthy and Cloud's initial statements, and that that handwriting was added before trial.  Together, Marino's testimony and the handwritten notes on the report defeat Plaintiff's claim that the Cuyahoga County Prosecutor's Office never received Worthy and Cloud's original statements.[90]

Marino likewise testified that he was the one who first wrote and then crossed out the note "per SIU partial print completely not defendant's print" on the police report discussing

---

[90] *See* Docs. 105 at 61-62, 68-69 (PageIDs 3656-57, 3663-64); 105-1 at 27-28, 30 (PageIDs 3805-06, 3808).

Case No. 1:22-cv-00250
GWIN, J.

the bloody palm print.[91]  Marino then wrote "print not clear enough to compare."

In yet another police report, Marino added brackets to a paragraph written early in the investigation, in which police officers theorized that Watts murdered the victim before stealing valuables to fund an escape.  Next to a paragraph about Watts, Marino wrote "No valuable taken from body or def room."[92]

Plaintiff responds that the file handwriting might not be Assistant Prosecutor Marino's.  To make this argument that the handwriting might not be Marino's, Plaintiff relies on then-Assistant Prosecutor Adrine's deposition in this lawsuit.  In his deposition, Adrine guessed that the handwriting looked like Assistant Prosecutor Laurie's handwriting.[93]

Adrine's surmise that the handwriting might be Laurie's is not particularly credible, given that Adrine started working on Andrews's case only a week before the trial and did not even know that Marino had previously worked on the Andrews case.  Moreover, because Laurie and Marino were both prosecutors on the case, it is irrelevant which of them wrote the notes.  Either way, the notes show that prosecutors had the Worthy and Cloud statements and the palm-print results.

Plaintiff has not presented sufficient evidence to establish either that any Defendant Officer made the notations and marks, or, more importantly, that the information was not timely turned over to prosecutors.[94]

Next, Plaintiff claims that one page of a police report was missing from the prosecutor's file.[95]  That page describes the Howard Johnson's pillowcase found at the

---

[91] Docs. 105 at 38 (PageID 3633); 105-1 at 23 (PageID 3801).
[92] Doc. 105 at 54-55 (PageIDs 3649-3650); Doc. 105-1 at 22 (PageID 3800).
[93] *See* Doc. 98 at 49, 53, 58 (PageIDs 1635, 1639, 1644).
[94] The Court explains below why there is no reason to doubt the prosecutor's file's contents.
[95] *See* Doc. 105-1 at 20-22 (PageIDs 3798-3800).

Case No. 1:22-cv-00250
GWIN, J.

murder scene. The page also described the officers' interview with the Howard Johnson's Motor Lodge clerk, who revealed that bed linens were missing from Watts's room the day the victim was murdered.

But Defendant Officers showed that a full copy of the same police report existed elsewhere in the prosecutor's file.[96] Responding, Plaintiff argues that the document's poor reproduction and illegibility create a genuine factual issue about whether the prosecutor's file included the Howard Johnson report. However, Defendant's side-by-side comparison of that full copy in the prosecutor's file and another full copy in the police's homicide file shows that they are the same report.[97] Police gave the Howard Johnson report to the prosecutors.

Finally, Plaintiff says police failed to disclose SIU's palm-print results to prosecutors. True, SIU's palm-print report is unaccounted for—neither the prosecutor's file nor the police's homicide file contains a copy. But the prosecutor's file does contain Marino's handwritten notes summarizing the SIU results. So, any failure to disclose the palm-print results to Andrews was the prosecutor's fault—not any Defendant Officer's.

When Andrews filed a motion for DNA testing in 2018, Assistant Prosecutor Anthony Miranda retrieved an archived copy of the prosecutor's file. Miranda testified that the file was "produced in its entirety in the manner in which the original file was scanned and electronically stored by the Cuyahoga County Prosecutor's Office prior to 2018."[98]

Some evidence shows that (1) at trial, prosecutors had access to some documents that are not in the prosecutor's file now[99] and that (2) post-conviction documents were added to

---

[96] *See* Doc. 97-1 at 26 (PageID 979).
[97] *Compare id. with* Doc. 109-1 at 75 (PageID 7113).
[98] Doc. 97-1 at 1-2 (PageIDs 954-955).
[99] For instance, prosecutors must have known about Betty Worthy and Linda Cloud's written statements as they were exhibits in the trial. Yet, they are not in the prosecutor's file.

- 23 -

Case No. 1:22-cv-00250
GWIN, J.

the file after trial.[100]

But the record shows that the *Brady* materials that Plaintiff says Defendant Officers suppressed were in the prosecutor's file at the time of the original trial.  And the police and the prosecutor's office file-handling procedures also support the only reasonable finding that prosecutors received these *Brady* materials before the trial.

Under the procedure used at the time, once police gave a case file to the prosecutor's office, prosecutors would retain the file and store it in the prosecutor's records room.[101]  Any prosecutor who worked on the case would take the file out of the records room as needed and would write their names and notes on the file jacket when doing so.[102]  If they had questions, prosecutors could contact investigating police officers about the file or ask officers to do additional follow-up work.[103]  Once a trial ended, the prosecutor's file would generally be "sent back to the record room and recorded."[104]

Plaintiff presents no evidence that these standard file-handling procedures were not followed here.  Without any genuine factual dispute about whether or when police gave the relevant *Brady* materials to prosecutors, Defendant Officers are entitled to summary judgment on the *Brady* claims.

Finally, although case evidence supports the inference that prosecutors failed to disclose *Brady* materials to Andrews, individual prosecutors and Cuyahoga County are immune from any lawsuit when the prosecutors function as state agents.[105]

---

[100] The prosecutor's file contains appellate documents and postconviction filings that could not have been in the file during Andrews's trial.
[101] *See* Doc. 118 at 59 (PageID 8529).
[102] *See id.* at 7, 59 (PageIDs 8477, 8529).
[103] *See* Doc. 105 at 15, 23-24 (PageID 3610, 3618-19).
[104] *See* Doc. 118 at 174 (PageID 8644).
[105] Doc. 146 at 11-13 (PageID 13255-57).

- 24 -

Case No. 1:22-cv-00250
GWIN, J.

## D.  Evidence Fabrication

Plaintiff separately alleges that Defendant Officers fabricated the palm-print result and witness statements.  But Plaintiff has not sufficiently presented evidence to support these claims.

To succeed on an evidence-fabrication claim, Plaintiff must show that a Defendant Officer "knowingly" fabricated evidence and that "a reasonable likelihood exists that the false evidence would have affected the decision of the jury."[106]

Plaintiff says Sergeant Walsh and/or other officers fabricated the conclusion that the palm print was not sufficiently legible to compare.  Plaintiff says that by labeling the print as illegible, the officers turned SIU's analysis of the palm print into indeterminate—and therefore non-exculpatory—evidence that the officers did not have to disclose.  To show that Defendant Officers meddled with the print analysis, Plaintiff points to the fact that Defendant Walsh signed the police report that contained the handwritten notations about the SIU print results.  In essence, Plaintiff suggests either that Walsh wrote the notation calling the print analysis indeterminate and then signed off on the report, or that another police officer wrote the notation and Walsh signed off on it.

Again, the police report contains a crossed-out handwritten notation that says "per SIU partial print completely not defendant's print."  And the conclusion in that crossed-out note differs from the other note on the same page, which says "print not clear enough to compare."

But Assistant Prosecutor Marino testified that it was he who left both notes on the

---

[106] *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006) (citing *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)).

Case No. 1:22-cv-00250
GWIN, J.

palm-print police report after speaking with the SIU lab.

Moreover, a different copy of the same police report also shows Sergeant Walsh's signature but does not contain the handwritten notations and marks.[107] In other words, Walsh signed the report before the notations were added. To overcome Marino's testimony that he was the one who later added the notations, Plaintiff would have to show evidence that Walsh himself or other officers went back and added the notes. There is no such evidence before the Court. Without additional evidence, Plaintiff cannot show that officers fabricated the SIU print results.[108]

Plaintiff also says Defendant Officers fabricated Cloud and Worthy's written and trial statements because those later statements differ from Cloud and Worthy's original statements. According to Plaintiff, Cloud and Worthy's statements evolved "to fit the [police's] evolving theory of the case."[109] But Plaintiff gives no evidence permitting a reasonable inference that any Defendant Officer knowingly caused any witness to lie. The fact that certain officers took Cloud and Worthy's written statements or approved police reports about Cloud and Worthy is insufficient to prove that they engaged in fabrication.

Plaintiff also suggests that Detective Hubbard "instructed Cloud to testify at grand jury to statements not included in written statement or any police interview."[110] But context matters. After Cloud gave a statement to police, Hubbard accompanied Cloud out of the police station.[111] Cloud told Hubbard information not included in Cloud's police statement

---

[107] *See* Doc. 109-1 at 77 (PageID 7115).
[108] Hubbard testified at trial that all of the Scientific Investigation Unit ("SIU")'s tests for prints were negative. But he has absolute immunity for his trial testimony.
[109] Doc. 144 at 25-26 (PageIDs 12713-12714).
[110] *Id.* at 28 (PageID 12716).
[111] *See* Doc. 116-1 at 490 (PageID 8203).

Case No. 1:22-cv-00250
GWIN, J.

but declined to give another statement on record.[112]  Hubbard instructed Cloud that even if she were unwilling to give another witness statement, she should give the additional information to the grand jury.[113]  Encouraging candor and full disclosure to the grand jury is not fabricating evidence.[114]

In sum, Plaintiff failed to provide any evidence permitting a reasonable juror to infer that any Defendant Officer fabricated evidence.  So, Defendant Officers are entitled to summary judgment on the fabrication claims.

### E.  Malicious Prosecution

Defendant Officers say Plaintiff's federal and state malicious-prosecution claims fail because sufficient probable cause existed to prosecute Andrews.  The Court agrees.[115]

A malicious-prosecution claim requires four showings.  Plaintiff must show that (1) the defendant was involved in deciding to prosecute the plaintiff and the plaintiff was actually prosecuted;  (2) no probable cause supported the prosecution; (3) the prosecution deprived the plaintiff of a Fourth Amendment liberty aside from the initial seizure; and (4) plaintiff prevailed in the criminal proceeding.[116]

Here, Plaintiff's malicious-prosecution claims fail because sufficient probable cause existed.  Plaintiff fails to rebut the presumption of probable cause from Andrews's

---

[112] *See id.*

[113] *See id.* at 491 (PageID 8204).

[114] And in any event, Plaintiff's claims against Hubbard and other Estate Defendants are time-barred by Ohio's estate-presentment laws.

[115] Plaintiff does not contest Defendant Officers' motion for summary judgment on the false-arrest claim.  But even if Plaintiff had contested judgment, that claim also requires Plaintiff to show that no probable cause existed.  So, Defendant Officers are also entitled to summary judgment on the false-arrest claims.

[116] Sykes v. Anderson, 625 F.3d 294, 308-09 (6th Cir. 2010).  Ohio's malicious-prosecution tort similarly requires a plaintiff to show "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused."  Froehlich v. Ohio Dept. of Mental Health, 871 N.E.2d 1159 (Ohio 2007).

Case No. 1:22-cv-00250
GWIN, J.

indictments. But even without the indictment presumption, sufficient circumstances supported probable cause to prosecute Andrews.

A grand jury indictment creates the rebuttable presumption that probable cause existed.[117] To rebut that presumption, a § 1983 plaintiff needs to show that a defendant officer knowingly or recklessly made false statements or fabricated evidence. The statements or evidence, along with any "misleading omissions," must also have been material to the plaintiff's prosecution. And the false statements, evidence, and omissions cannot "consist solely of grand-jury testimony or preparation for that testimony."[118]

Here, a grand jury twice indicted Andrews for his wife's murder,[119] creating a probable-cause presumption. Probable cause existed unless Plaintiff shows that a Defendant Officer made misleading statements or fabricated evidence.

Plaintiff falls well short of rebutting the probable-cause presumption. As discussed above, Plaintiff does not provide sufficient evidence to support the fabrication claims.

Moreover, even without the indictment presumption, probable cause to prosecute Andrews existed. "[T]he Supreme Court has 'often' reminded courts that probable cause is not a 'high bar.'"[120] Probable cause exists when there is "a probability or substantial chance of criminal activity" based on the totality of the circumstances.[121]

Here, the totality of circumstances gave the prosecutors probable cause. Detectives knew that Andrews had only recently been released from prison after serving over 15 years

---

[117] See King v. Harwood, 852 F.3d 568, 586-88 (6th Cir. 2017).
[118] Id. at 587-88.
[119] See State v. Andrews, No. CR-74-016694-ZA (Dec. 16, 1974) (docket entries noting that the 1974 indictment was nolled); State v. Andrews, No. CR-75-017902-ZA (Mar. 12, 1975) (docket entries noting conviction of the 1975 indictment).
[120] Lester v. Roberts, 986 F.3d 599, 608 (6th Cir. 2021) (quoting Kaley v. United States, 571 U.S. 320 (2014)).
[121] Id. (quoting District of Columbia v. Wesby, 138 S.Ct. 577, 586 (2018)).

Case No. 1:22-cv-00250
GWIN, J.

for murdering a superior Marine Corps officer.[122]  Andrews failed a polygraph test when asked

whether he killed the victim.[123]  And police found the victim's body wrapped in a bedspread

from the Colonial House Motel, where Andrews was staying.[124]

Further, witnesses last saw Andrews at the hotel near the victim's estimated time of

death.  And Andrews's alibi did not account for a timespan during which Andrews could

have committed the murder.[125]  Andrews also told police that he and the victim had recently

been arguing about Andrews's decisions to quit his job and "join[] the Muslim faith."  The

two specifically argued over whether the victim would "hav[e] to wear long skirts and

headdress … ."[126]  So police had evidence that Andrews had been angry with his wife.

Even accounting for the evidence suggesting Watts's involvement, Andrews seemed

a probable defendant.  True, Watts was AWOL from the US Army and had just been released

from county jail.  And bedding had been removed from Watts' hotel room.  But apart from

one assault and battery, Watts had a mostly nonviolent criminal history and no apparent

motive for murdering the victim.

In sum, Defendant Officers had two available theories.  Either Willie Watts committed

a violent murder despite having a relatively minor criminal record and no discernible

motive—or a recently released convicted murderer had killed his wife after fundamental

disagreements.  Against this backdrop, there existed a substantial chance that Andrews

---

[122] *See* Doc. 109-1 at 3-7, 14 (PageID 7041-45, 7052).  The probable-cause inquiry may properly "take into account predilections revealed by past crimes or convictions as part of the inquiry into probable cause."  *United States v. Wagers*, 452 F.3d 534, 541 (6th Cir. 2006).
[123] *See* Doc. 105-1 at 30 (PageID 3808).  "Negative polygraph results, while not sufficient by themselves, can support a finding of probable cause." *Tomasik v. Martin*, No. 22-1081, 2023 WL 2137354, at *5 (6th Cir. Feb. 21, 2023).
[124] *See* Doc. 109-1 at 23 (PageID 7061).
[125] *See* Doc. 105-1 at 28 (PageID 3806).
[126] *See id.* at 29 (PageID 3807).

Case No. 1:22-cv-00250
GWIN, J.

murdered the victim.  So, probable cause existed and Plaintiff's malicious-prosecution claims fail.

### F.  False Arrest and Right to Compulsory Process

Plaintiff does not oppose Defendant Officers' summary-judgment motion on the false-arrest and compulsory-process claims. And the record does not contain sufficient evidence from which a reasonable jury could find that Defendant Officers committed false-arrest or compulsory-process violations.  So, the Court grants Defendant Officers summary judgment on these claims.

### G.  *Monell* Claims Against Defendant City of Cleveland

Plaintiff says that even if the Court grants summary judgment to Defendant Officers, the Defendant City of Cleveland is not entitled to summary judgment.  But because Plaintiff has not explained how any City policy drove prosecutors' failure to disclose *Brady* evidence or caused any other non-*Brady* constitutional violation, the Court grants the City's motion for summary judgment.

Under *Monell v. Department of Social Services*, [127] plaintiffs may sue municipalities for constitutional violations.  But because a municipality is not vicariously liable for its employees' conduct, a § 1983 plaintiff must show that the municipality's "official policy" provided the "moving force of the constitutional violation."[128]

A plaintiff can show a *Monell* claim in four ways: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority

---

[127] 436 U.S. 658 (1978)
[128] *See id.* at 690-95.

- 30 -

Case No. 1:22-cv-00250
GWIN, J.

ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or

(4) the existence of a custom of tolerance or acquiescence of federal rights violations."[129]

Plaintiff argues that all four theories apply here.  Specifically, Plaintiff says that (1)

written police policy contradicted *Brady*'s disclosure requirements[130]; (2) Cleveland's Police

Chief, as final decision maker, ratified constitutional violations[131]; (3) Cleveland failed to

adequately train or supervise police officers[132]; and (4) Cleveland maintained a custom of

covering up and perpetrating police officers' constitutional violations.[133]

All four of Plaintiff's arguments that Cleveland supplied the driving force behind any

*Brady* violation rest on a single premise: that any *Brady* violation arose out of officers' failure

to turn over exculpatory evidence to prosecutors.  Indeed, Plaintiff's brief tacitly concedes

that Andrews's *Monell* claims fails if Cuyahoga County prosecutors, rather than Cleveland

police, committed the *Brady* violation.[134]

As the Court has already explained, the evidence shows that the police turned their

complete investigatory file, including *Brady* materials, over to the Cuyahoga County

Prosecutors Office.  No reasonable juror could find that a *Brady* violation resulted from any

Defendant Officer's failure to deliver exculpatory evidence to prosecutors.  Instead, a

reasonable juror could infer only that police gave the exculpatory evidence over to

prosecutors before the trial and that any failure to provide *Brady* materials was a prosecutor

failure.  So, without a Cleveland or Cleveland police officer *Brady* violation, the Court need

---

[129] Jackson v. City of Cleveland, 925 F.3d 793, 828 (6th Cir. 2019) (quoting Burgess v. Fischer, 735 F.3d 462 (6th Cir. 2013)).
[130] Doc. 145 at 13-17 (PageID 12984-88).
[131] *Id.* at 17-18 (PageIDs 12988-89).
[132] *Id.* at 18-19 (PageIDs 12989-90).
[133] *Id.* at 20-22 (PageIDs 12991-93).
[134] *See* Doc. 145 at 17 (PageID 12988) ("The question that remains is who is responsible for that [*Brady*] violation. … Plaintiff is entitled to have a jury determine if the Defendant police detectives are liable for withholding the evidence.").

Case No. 1:22-cv-00250
GWIN, J.

not reach the question of whether any Cleveland police policy drove a county prosecutor's

*Brady* violations.

Andrews's remaining *Monell* claims against Cleveland likewise fail.[135]  A plaintiff

cannot recover from a municipality in a constitutional tort if no constitutional violation

occurred.[136]  And as the Court has explained, no reasonable juror could find that Andrews

suffered any evidence fabrication, false arrest, or malicious prosecution.  Nor could a

reasonable juror find that Andrews was denied the right to compulsory process.  So, the

Court need not reach the question whether Cleveland's policy or custom created the driving

force behind any constitutional violation Andrews failed to support.

## H.  Failure to Intervene and Supervisory Liability

For largely the same reasons that Plaintiff's *Monell* claims fail, Plaintiff's failure-to-

intervene and supervisory-liability claims also fail.

To prevail on a failure-to-intervene claim, a plaintiff must first show that an officer

knew or should have known that another officer was violating the plaintiff's constitutional

rights.  Then, the plaintiff must show that the officer "had a realistic opportunity to intervene

to prevent the harm … ."[137]

---

[135] Andrews also alleges constitutional evidence-fabrication, false-arrest, malicious-prosecution, and compulsory-process *Monell* claims against Cleveland.

[136] *See* City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).  *Heller* resulted in some debate whether a municipality may be held liable for constitutional violations if none of its employees is liable.  *Compare* Watkins v. City of Battle Creek, 273 F.3d 682, 687 (6th Cir. 2001) ( "If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983."), *with* Winkler v. Madison Cnty., 893 F.3d 877, 899 (6th Cir. 2018) (questioning *Watkins*' conclusion but deciding the case based on the absence of any constitutional violation). Like the *Winkler* court, this Court need not wade into the fray.  Andrews failed to offer any proof that any non-*Brady* constitutional violations occurred.

[137] Bunkley v. City of Detroit, 902 F.3d 552, 565-66 (6th Cir. 2018) (quoting *Kaylor v. Rankin*, 356 F. Supp. 2d 839 (N.D. Ohio 2005)).

Case No. 1:22-cv-00250
GWIN, J.

Supervisory liability similarly requires "that a supervisory official at least implicitly authorized, approved[,] or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."[138]

Both claims require Plaintiff to show the existence of an underlying constitutional violation that Defendant Officers somehow permitted. Plaintiff has failed to give sufficient proof to create a genuine, material, factual question whether any Defendant Officer violated Andrews's constitutional rights. So, the failure-to-intervene and supervisory-liability claims both fail.[139]

## I. Qualified Immunity

So far, the Court has explained that each of Plaintiff's constitutional claims fails because Plaintiff gives insufficient evidence to create a material, factual question whether any Defendant Officer violated Andrews's *Brady* guarantee or whether any non-*Brady* constitutional violation existed. The Court now briefly addresses why, for the same reasons, Defendant Officers are also entitled to qualified immunity.

Police officers generally enjoy immunity from § 1983 claims unless a plaintiff shows both that the officer violated a plaintiff's constitutional right and that the right was clearly established at the time of the violation.[140] The Court "can address these requirements in either order."[141] If the plaintiff fails to make one showing, the Court "need not address the other."[142]

---

[138] Troutman v. Louisville Metro Dept. of Corrections, 979 F.3d 472, 487-88 (6th Cir. 2020).

[139] Plaintiff does not argue that Defendant Officers could be liable for failing to intervene in any county prosecutor's *Brady* violation. In any event, no clearly established federal law requires police to monitor prosecutors' compliance with any *Brady* requirements. So, Defendant Officers would be entitled to qualified immunity for not intervening.

[140] *See* Crawford v. Tilley, 15 F.4th 752, 760 (6th Cir. 2021).

[141] *Id.* (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)).

[142] *Id.*

- 33 -

Case No. 1:22-cv-00250
GWIN, J.

Here, Plaintiff has failed to give sufficient proof to permit a reasonable inference that any Defendant Officer violated Andrews's constitutional rights.  So, not only do each of Plaintiff's constitutional claims fail, but each Defendant Officer also qualifies for immunity from suit.

## J.  State Negligence Claims

Finally, the Court turns to Plaintiff's Ohio negligence claims.  Plaintiff broadly alleges that Defendant Officers' negligence caused constitutional violations, as well as various personal injuries.[143]  Defendant Officers respond that Ohio law provides police officers statutory immunity from any on-the-job negligence claims.  Plaintiff responds that Defendant Officers' conduct does not qualify for any immunity because Defendant Officers acted maliciously, in bad faith, or recklessly.

To the extent that the negligence claims rests on any constitutional violations' existence, these claims fails for the same reasons that Plaintiff's other constitutional claims fail.  Plaintiff failed to give sufficient evidence to establish any constitutional claim.

Similarly, Plaintiff does not point to any evidence suggesting any Defendant Officer negligence that falls outside the statutory immunity's scope.  Ohio law immunizes police officers for negligent acts unless an officer acts maliciously, in bad faith, or recklessly.[144]  A more-culpable-than-negligence mental state is therefore an essential element Plaintiff must establish to overcome statutory immunity.  So, Plaintiff's failure to make any showing that establishes the officers' mental states entitles Defendant Officers to judgment on the negligence claims.

---

[143] Doc. 1 at 48 (PageID 48).
[144] Ohio Rev. Code § 2744.03

- 34 -

Case No. 1:22-cv-00250
GWIN, J.

### III.  Conclusion

For the foregoing reasons, this Court **GRANTS** Estate Defendants and Debra Dugan's

motions to dismiss and the rest of Defendants' summary judgment motions.[145]

IT IS SO ORDERED.


Dated: April 20, 2023                                          s/      *James S. Gwin*
                                                                         JAMES S. GWIN
                                                                         UNITED STATES DISTRICT JUDGE

---

[145] The Court also dismisses Docs. 63, 85, 151, 154, and 155 as mooted.